## <u>EXHIBIT A</u>

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN SIGNATURE, INC., *et al.*,[1] | ) | Case No. 25-12105 (JKS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### INTERIM ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, 364, 503, 506, 507, AND 552, AND BANKRUPTCY RULES 2002, 4001, 6003, 6004, AND 9014 (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING (A) LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS AND (B) ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS, (III) MODIFYING AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "***Motion***")[2] of American Signature, Inc. and certain of its affiliates, each of which is a debtor and debtor in possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and rules 2002-1(b), 4001-2, and 9013-1(m) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), seeking entry of this interim order (this "***Interim Order***"), among other things:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  American Signature, Inc. (6162); American Signature Home Inc. (8573); American Signature USA Inc. (6162); ASI Pure Promise Insurance LLC (6162); ASI Elston LLC (7520); ASI – Laporte LLC (6162); ASI Polaris LLC (6162); ASI Thomasville LLC (6162); and American Signature Woodbridge LLC (6162).  The Debtors' business address is 4300 E. 5th Avenue, Columbus, OH 43235.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion, or if not defined therein, the DIP Loan Documents (as defined herein).

a.  authorizing the Debtors to obtain postpetition financing consisting of the obligations under a superpriority senior secured asset-based credit facility in the aggregate principal amount of $50 million (the "***DIP Facility***" and such funding commitment thereunder, the "***DIP Commitments***"), pursuant to the terms and conditions of that certain *Debtor-in-Possession Credit Agreement*, attached hereto as **Exhibit 2** (as the same may be amended, restated, amended and restated, supplemented, waived, or otherwise modified in accordance with the terms thereof from time to time the "***DIP  Credit Agreement***") by and among (A) American Signature, Inc. (the "***Borrower***"), (B) the subsidiaries of the Borrower from time to time party thereto as guarantors, (C) Second Avenue Capital Partners, LLC ("***SACP***"), as Administrative Agent (in such capacity, the "***DIP Agent***"), and (D) the lenders from time to time party thereto (collectively, the "***DIP Lenders***"; the DIP Agent and the DIP Lenders are collectively referred to herein as the "***DIP Credit Parties***") and allocated and made available to the Borrower as follows:

    i.  upon entry of this Interim Order, subject to the terms and conditions set forth in the DIP Credit Agreement, the other DIP Loan Documents, and this Interim Order, the DIP Commitments shall be available to the Borrower to draw upon pursuant to a "creeping roll-up" whereby all Cash Collateral (as defined herein) is used to pay down the Prepetition ABL Obligations and gives rise to a corresponding amount of DIP Availability (the "***Interim Financing***"); and

    ii. upon entry of the Final Order (as defined herein), subject to the terms and conditions set forth in the DIP Credit Agreement and the other DIP Loan Documents, the repayment and refinancing of any outstanding and remaining Prepetition ABL Loans (as defined herein) (all amounts so repaid and refinanced, the "***DIP Roll-Up Loan***" and together with the Interim Financing, the "***DIP Loans***") pursuant to a "creeping roll-up" whereby all cash is used to pay down the Prepetition ABL Obligations and gives rise to a corresponding amount of DIP Availability, and any remaining outstanding Prepetition ABL Obligations (as defined herein), together with all accrued and unpaid interest, fees, and expenses shall be fully "rolled" into the DIP Facility and shall constitute DIP Obligations (as defined herein) upon the entry of the Final Order granting such relief.

b.  authorizing the Debtors to execute and deliver the DIP Credit Agreement and all other related documents, instruments, letters, notes, and agreements, including, without limitation, security agreements, deposit account control agreements, pledge agreements, guaranties, and promissory notes (collectively, the "***DIP Loan Documents***") and to perform such other acts as may be necessary, convenient, advisable, or appropriate in connection with the DIP Loan Documents;

13085205v9

c. authorizing the Debtors to incur, guarantee, and pay, as applicable, loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, any unused line fees, closing fees, commitment fees, administrative agency fees, the reasonable and documented fees and disbursements of the DIP Credit Parties' attorneys (which firms shall be (x) Choate, Hall & Stewart, LLP and (y) Richards, Layton & Finger, P.A.) advisers, accountants, and other consultants, and all related expenses of the DIP Credit Parties, in each case, subject to the terms and provisions of the DIP Loan Documents, and other fees payable pursuant to the DIP Loan Documents), costs, expenses, and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other Obligations (as defined in the DIP Credit Agreement) due or payable under the DIP Facility to the DIP Lenders (the "**DIP Obligations**"), which, for the avoidance of doubt, shall include the DIP Roll-Up Loan, and to perform such other and further acts as may be necessary, convenient, advisable, desirable, or appropriate in connection therewith;

d. authorizing each subsidiary of the Borrower to jointly and severally guarantee (such entities, the "**Guarantors**" and the Guarantors collectively with the Borrower, the "**DIP Loan Parties**") the DIP Facility and DIP Obligations as set forth herein and in the DIP Loan Documents;

e. subject and subordinate only to the Carve Out (as defined herein) and the relative priorities as agreed upon by the parties-in-interest set forth on **Exhibit 1** hereto (the "**Lien Priority Annex**"), granting allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Chapter 11 Cases and any Successor Cases (as defined herein) to the DIP Obligations;

f. authorizing the Debtors to use the "cash collateral" (as defined in section 363(a) of the Bankruptcy Code and excluding the Segregated Cash Collateral, the "**Cash Collateral**") of the Prepetition ABL Lenders (as defined herein) in accordance with the terms of this Interim Order, that the Debtors are holding or may obtain, pursuant to sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 6004 and in accordance with the Approved Budget (as defined herein);

g. granting to the DIP Agent, for the benefit of the DIP Credit Parties, automatically perfected security interests in and liens on all DIP Collateral (as defined herein), including, without limitation, all property constituting Cash Collateral, which liens shall be subject to the Carve Out and the relative priorities set forth on the Lien Priority Annex;

h. authorizing the Debtors to provide adequate protection to the Prepetition Secured Creditors (as defined herein) solely to the extent of any Diminution in Value (as defined herein) on the terms set forth herein;

i.      approving certain stipulations by the Debtors with respect to the Prepetition Credit Documents and the Prepetition Collateral (each as defined herein) as set forth herein;

j.      waiving any applicable stay and provisions for immediate effectiveness of this Interim Order;

k.      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

l.      granting related relief; and

m.      scheduling a final hearing (the "***Final Hearing***") to consider entry of a final order (the "***Final Order***") authorizing and approving, among other things, the relief requested in the Motion on a final basis, which order shall be in form substantially similar to this Interim Order and otherwise reasonably acceptable to the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition ABL Agent, and approving the form of notice with respect to the Final Hearing.

This Court having considered the interim relief requested in the Motion, the exhibits attached thereto, the *Declaration of Rudolph Morando in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***") and the *Declaration of Craig D. Warznak in Support of the Debtors' Motion Under Bankruptcy Code Sections 105, 361, 362, 363, 364, 503, 506, 507, and 552, and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 (I) Authorizing Debtors To (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection To Prepetition Secured Creditors, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "***DIP Declaration***"), each filed concurrently with the Motion, the DIP Loan Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on November [__], 2025 (the "***Interim Hearing***"); and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by this Court; and it appearing to this Court that,

4

pursuant to Bankruptcy Rule 4001(c)(2), granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Loan Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, INCLUDING THE SUBMISSIONS OF DECLARATIONS AND THE REPRESENTATIONS OF COUNSEL, THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.      _Petition Date_.  On November 22, 2025 (the "**_Petition Date_**"), each of the Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code (the "**_Petitions_**") in the United States Bankruptcy Court for the District of Delaware (the "**_Court_**") commencing the Chapter 11 Cases.   On November [___], 2025, this Court entered an order directing joint administration of the Chapter 11 Cases.

B.      _Debtors in Possession_.  The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

C.      _Jurisdiction and Venue_.  This Court has jurisdiction, pursuant to 28 U.S.C. § 1334, over these proceedings and over the persons and property affected hereby.  Consideration of the

---

[3]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

13085205v9

Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2), and this Court may enter a final order consistent with Article III of the United States Constitution. Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief sought in the Motion and granted in this Interim Order are sections 105, 361, 362, 363, 364, 503, 506, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1(b), 4001-2, and 9013-1(m).

        D.      *Committee Formation*. As of the date hereof, the United States Trustee for the District of Delaware (the "***U.S. Trustee***") has not appointed any committee, including an official committee of unsecured creditors, in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (to the extent appointed in the Chapter 11 Cases, the "***Committee***").

        E.      *Notice*. The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Notice was provided by or on behalf of the Debtors to (a) the U.S. Trustee, (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis), (c) the Securities and Exchange Commission, (d) the Internal Revenue Service, (e) the United States Attorney's Office for the District of Delaware, (f) the state attorneys general for states in which the Debtors conduct business, (g) counsel to the DIP Agent and the Prepetition ABL Agent, (h) counsel to the Prepetition Term Loan Agent, and (i) any party that has requested notice pursuant to Bankruptcy Rule 2022, and therefore complied with Local Rule 9013.

        F.      *Debtors' Stipulations, Releases, and Acknowledgements*. In requesting the use of Cash Collateral, and in exchange for and as a material inducement to the Prepetition Secured Creditors consenting to the Debtors' access to and use of the Cash Collateral, and without prejudice to the rights of the parties-in-interest as set forth in paragraph 44 herein, the Debtors

admit, stipulate, acknowledge, and agree, as follows (collectively, the admissions, stipulations, acknowledgements, and agreements set forth in this paragraph F, the "***Debtors' Stipulations***"):

(i)     *Prepetition ABL Obligations*.   The Borrower, certain of the other Debtors (together with the guarantors of the Prepetition ABL Facility (as defined herein), collectively, the "***Prepetition ABL Obligors***") and SACP, as administrative agent (in such capacity, the "***Prepetition ABL Agent***"), for its own benefit and the benefit of the lenders and letter of credit issuers from time to time party under the Prepetition ABL Facility (the "***Prepetition ABL Lenders***" and collectively with the Prepetition ABL Agent and the other Secured Parties (as defined in the Prepetition ABL Credit Agreement), collectively, the "***Prepetition ABL Secured Parties***"), are party to that certain *Credit Agreement* dated as of December 3, 2024 (as amended, restated, amended and restated, supplemented, replaced, or otherwise modified from time to time, the "***Prepetition ABL Credit Agreement***," and together with the Loan Documents (as defined therein), collectively, the "***Prepetition ABL Documents***," and the revolving facility thereunder, the "***Prepetition ABL Facility***").   Pursuant to the Prepetition ABL Documents, the Prepetition ABL Lenders provided revolving credit, certain banking products, and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Obligors (the "***Prepetition ABL Loans***").   Under the Prepetition ABL Documents, the Prepetition ABL Lenders provided the Prepetition ABL Obligors with, among other things, up to $50,000,000 in Aggregate Revolving Commitments (as defined in the Prepetition ABL Credit Agreement).   As of the Petition Date, there were approximately: (a) $39,247,739.43 in outstanding Committed Revolving Loans (as defined in the Prepetition ABL Credit Agreement); and (b) other outstanding obligations under the Prepetition ABL Documents, including, without limitation, the Termination Fee (as defined in the Prepetition ABL

7

Credit Agreement), reimbursement obligations (contingent or otherwise) in respect of letters of credit, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees, and financial advisors' fees, and related expenses and disbursements, in each case, solely to the extent chargeable or reimbursable under the Prepetition ABL Credit Agreement), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, arising, due, owing, or chargeable in respect of any of the Prepetition ABL Obligors' obligations pursuant to, or secured by, the Prepetition ABL Documents, in each case payable pursuant to the terms and conditions of the Prepetition ABL Credit Agreement (collectively, the "*Prepetition ABL Obligations*").  The accelerated Maturity Date of the Prepetition ABL Obligations occurred prior to the Petition Date.  The Prepetition ABL Obligations are secured by first priority security interests in and liens on the Collateral (as defined in the Prepetition ABL Credit Agreement, the "*Prepetition ABL Collateral*") (the Prepetition ABL Collateral, the Prepetition Term Collateral (as defined herein), and the Prepetition LOC Collateral (as defined herein), together, the "*Prepetition Collateral*" and the immediately forgoing liens and security interests, the "*Prepetition ABL Liens*").  The Prepetition ABL Collateral does not include the Prepetition Term Collateral or the Prepetition LOC Collateral.

(ii) <u>*Prepetition Letter of Credit Obligations*</u>.  The Borrower (the "*Prepetition LOC Obligor*") and PNC Bank, National Association ("*PNC*") are party to that certain *Amended and Restated Letter Agreement, Letter of Credit Facility* dated as of December 26, 2014, among PNC, the Borrower, and Schottenstein Stores Corporation (as amended, modified, supplemented, replaced or refinanced from time to time prior to the filing of the

8

Petitions, the "***Prepetition LOC Agreement***" and, together with the Facility Documents (as defined in the Prepetition LOC Agreement) the "***Prepetition LOC Documents***") and the letter of credit facility thereunder, the "***Prepetition LOC Facility***").  As of the Petition Date, PNC had issued certain letters of credit on behalf of American Signature, Inc. in the aggregate amount of approximately $24,025,000, which letters of credit are cash collateralized by funds deposited at PNC in the amount of $24,347,995 (the "***Segregated Cash Collateral***"), the letters of credit, together with all indebtedness or obligations under the Prepetition LOC Documents as of the Petition Date, including, without limitation, all "Obligations" (as defined in the that certain Pledge Agreement (Bank Deposits) dated as of December 19, 2024, by American Signature, Inc. in favor of PNC, as amended, modified and supplemented from time to time (the "***Prepetition LOC Pledge Agreement***")), and all fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition LOC Documents, <u>plus</u> (b) all allowable 506(b) Amounts (the "***Prepetition LOC Obligations***"). The Prepetition LOC Obligations are secured by all of the "Collateral" (as that term is defined in the Prepetition LOC Pledge Agreement) existing as of the Petition Date, and all proceeds, rents, issues, profits and products thereof (the "***Prepetition LOC Collateral***") (the immediately forgoing liens and security interests the "***Prepetition LOC Liens***").

(iii)     <u>*Prepetition Term Loan Obligations*</u>.  The Borrower, certain of the other Debtors (together with the guarantors of the Prepetition Term Loan Facility, collectively, the "***Prepetition Term Loan Obligors***"), PNC, as administrative agent (in such capacity, the "***Prepetition Term Loan Agent***", and together with the Prepetition ABL Agent, the "***Prepetition Agents***") for its own benefit and the benefit of the lenders from time to time party thereto (the "***Prepetition Term Loan Lenders***", collectively with the Prepetition Term Loan Agent and PNC, as letter of credit issuer,  the "***Prepetition Term Loan Secured Parties***" and,

together with the Prepetition ABL Secured Parties, the "***Prepetition Secured Creditors***") are party to that certain *Credit Agreement*, dated as of July 14, 2022, among PNC, ASI - LAPORTE LLC, an Ohio limited liability company, and ASI THOMASVILLE LLC, a Delaware limited liability company (as amended, restated, amended and restated, supplemented, replaced, or otherwise modified from time to time prior to the filing of the Petitions, the "***Prepetition Term Loan Credit Agreement***", and together with the Loan Documents (as defined therein), the "***Prepetition Term Loan Documents***" (together with the Prepetition LOC Documents the "***Prepetition PNC Documents***", and, the Prepetition PNC Documents together with the Prepetition ABL Documents, the "***Prepetition Credit Documents***"), and the term loan facility thereunder, the "***Prepetition Term Loan Facility***" and, together with the Prepetition LOC Facility the "***Prepetition PNC Facilities***" and the Prepetition PNC Facilities together with the Prepetition ABL Facility, the "***Prepetition Loan Facilities***").  As of the Petition Date, the Prepetition Term Loan Obligors were obligated under the Prepetition Term Loan Credit Agreement to the Prepetition Term Loan Lenders in the aggregate outstanding principal amount of not less than approximately $54,078,921.69, including, without limitation, all "Obligations" (as defined in the Prepetition Term Loan Credit Agreement), and all fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Term Loan Documents, plus (b) all allowable 506(b) amounts (the "***Prepetition Term Loan Obligations***" and, together with the Prepetition LOC Obligations, the "***Prepetition PNC Obligations***", and the Prepetition PNC Obligations together with the Prepetition ABL Obligations, the "***Prepetition Secured Obligations***"). The Prepetition Term Loan Obligations are secured by first priority security interests in and liens on all of the "Collateral" (as that term is defined in the Prepetition Term Loan Credit Agreement existing as of the Petition Date, and all proceeds, rents, issues, profits and products thereof, the "***Prepetition***

*Term Collateral*" and, together with the Prepetition LOC Collateral, the "***Prepetition PNC Collateral***") (the immediately forgoing liens and security interests the "***Prepetition Term Loan Liens***" and, together with the Prepetition LOC Liens, the "***Prepetition PNC Liens***", and the Prepetition PNC Liens, together with the Prepetition ABL Liens, the "***Prepetition Liens***"). The Prepetition Term Collateral does not include the Prepetition ABL Collateral.

(iv)    *Prepetition Obligations*.    Each of the Debtors acknowledges that the Prepetition Secured Obligations owing to the Prepetition Secured Creditors, (a) constitute legal, valid, binding and non-avoidable obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their terms, and (b) no portion of the Prepetition Secured Obligations owing to the Prepetition Secured Creditors, is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, disgorgement, impairment, recovery, subordination (equitable or otherwise), or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any Successor Cases.

(v)    *Prepetition Liens*.    The Debtors acknowledge that, as of the Petition Date, the Prepetition Liens granted to the Prepetition Secured Creditors (a) constitute legal, valid, binding, enforceable, non-avoidable, and properly perfected security interests in and liens on the Prepetition Collateral, and were granted to, or for the benefit of, the Prepetition Secured Creditors for fair consideration and reasonably equivalent value, (b) are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, and (c) are senior in priority over any and all other liens on the Prepetition Collateral *provided* that the Prepetition Term Loan Liens are subject to certain liens senior (solely to the extent such liens

11

were valid, non-avoidable, and senior in priority to the Prepetition Term Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Term Loan Documents (the "***Prepetition Term Permitted Liens***") _provided_ further that the Prepetition ABL Liens are subject to certain liens senior (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition ABL Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition ABL Documents (the "***Prepetition ABL Permitted Liens***" and, together with the Prepetition Term Permitted Liens, the "***Prepetition Permitted Liens***").

(vi)    _No Challenges / Claims_.  The Debtors and their estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against the Prepetition Secured Creditors or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, disgorgement, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents. The Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code, and the aggregate value of the Prepetition Collateral exceeds the amount of the Prepetition Secured Obligations.  The Debtors have waived, discharged, and released any right to challenge any of the Prepetition Secured Obligations, the

13085205v9

priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens.

(vii)    *Cash Collateral*.  Except as otherwise provided in the Prepetition Credit Documents, all of the Debtors' cash, including, without limitation, the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral within the meaning of section 363(a) of the Bankruptcy Code and, excluding the Segregated Cash Collateral, is Prepetition Collateral of the Prepetition ABL Secured Parties.

(viii)    *No Control*.  None of the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, the Prepetition Term Loan Agent or the other Prepetition Secured Creditors controls the Debtors or their operations, has authority to determine the manner in which any of the Debtors' operations are conducted or is a control person or "insider" (as defined in section 101(31) of the Bankruptcy Code) of the Debtors or any of their affiliates by virtue of any of the actions taken through the date of this Interim Order with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Loan Documents, the Prepetition Secured Obligations, and/or the Prepetition Credit Documents.

(ix)    *Release*.  Effective as of the date of entry of this Interim Order and subject to the rights of all parties-in-interest hereunder (including with respect to the Challenge Period), other than the Debtors, as set forth in paragraph 44 herein, each of the Debtors, on their own behalf and on behalf of each of their past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, and solely to the extent permitted under applicable law, hereby forever, unconditionally, permanently, and irrevocably releases, discharges, and acquits each of the DIP Agent, the DIP Credit Parties, the Prepetition ABL Agent, the other Prepetition ABL Secured

Parties, the Lender Service Parties (as defined in the DIP Credit Agreement), the Prepetition Term Loan Agent, the other Prepetition Term Loan Secured Parties, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, advisors, sub-fund advisors, and collateral managers, and each of their respective heirs, predecessors, successors, and assigns, in each case solely in their capacity as such (collectively, the "***Released Parties***") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), actions, suits, controversies, proceedings, losses, damages, injuries, debts, liens, actions, judgments, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, pending, or threatened, arising under, in connection with, or relating to the DIP Obligations or DIP Loan Documents, the Prepetition Secured Obligations or the Prepetition Credit Documents, including, without limitation: (a) any so-called "lender liability" or equitable subordination claims or defenses; (b) Claims and causes of action arising under the Bankruptcy Code; and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and

14

perfection of any of the DIP Obligations, the DIP Loan Documents, the DIP Liens, the Prepetition

Secured Obligations, the Prepetition Credit Documents, or the Prepetition Liens, and further

waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment

of the DIP Obligations and the Prepetition Secured Obligations that the Debtors now have or may

claim to have against the Released Parties, arising under, in connection with, based upon, or

released to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of

this Interim Order. For the avoidance of doubt, nothing in this paragraph F(viii) shall relieve the

DIP Agent, the other DIP Lenders, or the Debtors of their obligations hereunder or under the DIP

Obligations.

      G.     *Findings Regarding the Postpetition Financing*.

      (i)     *Request for Postpetition Financing*. The Debtors seek authority on an

interim basis to: (a) enter into, and access and use the liquidity provided under, the DIP Facility

on the terms described herein and in the DIP Loan Documents; and (b) use Cash Collateral on the

terms described herein to administer the Chapter 11 Cases and fund operations.  For the avoidance

of doubt, the Debtors shall apply the proceeds of the DIP Collateral and the Prepetition Collateral

in accordance with the DIP Loan Documents and paragraph 17 of this Interim Order, including,

without limitation, and upon entry of the Final Order, the repayment and refinancing of the

remaining Prepetition ABL Obligations with proceeds of the DIP Roll-Up Loan.

      (ii)     *Priming of Certain Prepetition Liens; Consent to Use of Cash Collateral*.

For the avoidance of doubt, with respect to the Prepetition PNC Collateral, the DIP Liens shall

not prime, and shall instead be subject and subordinate to the Prepetition PNC Liens on the

Prepetition PNC Collateral.  The Prepetition ABL Secured Parties have consented to the use of

the Cash Collateral and to the subordination of the Prepetition ABL Liens to the DIP Liens and the Carve Out on the terms and conditions set forth in this Interim Order.

(iii)    *Immediate Need for Postpetition Financing and Use of Cash Collateral*. The Debtors' immediate need to use Cash Collateral and to obtain credit pursuant to the DIP Facility as provided for herein is necessary and critical in order to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, to protect the value of their assets, and to otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  Without the ability to access the DIP Facility or use Cash Collateral, the Debtors, their estates, their creditors, their equity holders, and the possibility for a successful reorganization or sale of all or substantially all of the Debtors' assets, would suffer immediate and irreparable harm.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iv)    *DIP Roll-Up Loan.*  Upon (i) entry of this Interim Order, without any further action by the Debtors or any other party, but subject to paragraph 44 herein, all cash, collections and proceeds of DIP Collateral shall be used, on a dollar-for-dollar basis, to reduce the Committed Revolving Loans (as defined in the Prepetition ABL Credit Agreement) and result in a corresponding increase to the Availability (as defined in the DIP Credit Agreement) (the "***Creeping Roll-Up***"), and (ii) entry of the Final Order granting such relief, but subject to paragraph 44 herein, all remaining outstanding Prepetition ABL Obligations shall automatically be deemed exchanged and converted on a cashless basis into and constitute DIP Obligations (the

16

"*Full Roll-Up*" and, together with the Creeping Roll-Up, the "***DIP Roll-Up Obligations***").  The Prepetition ABL Secured Parties would not otherwise consent to the use of their Cash Collateral, and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder, without the inclusion of (a) the Creeping Roll-Up, upon entry of this Interim Order, and (b) the Full Roll-Up, upon entry of the Final Order granting such relief. The DIP Roll-Up Obligations shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition ABL Lenders to fund amounts under the DIP Facility and not as adequate protection for, or otherwise on account of, any Prepetition ABL Obligations.

(v)      *No Credit Available on More Favorable Terms*.  Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Credit Parties on terms more favorable than the DIP Facility.  The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are unable to obtain adequate credit: (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without granting the DIP Agent, for the benefit of the DIP Credit Parties: (x) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets (other than Excluded Property (as defined in the DIP Loan Documents) with the priorities and to the extent set forth herein; (y) superpriority claims and

17

priming liens to the extent set forth herein; and (z) the other protections set forth in this Interim Order, and without incurring the Adequate Protection Superpriority Claims and Adequate Protection Liens (each as defined herein) described herein.

(vi) *Adequacy of the Approved Budget*.  As set forth in the DIP Loan Documents, the Debtors have prepared and delivered to the DIP Credit Parties, a budget, a summary copy of which is attached as **Exhibit 3** hereto (as the same may be modified from time to time consistent with the terms of the DIP Loan Documents and this Interim Order, and once approved by DIP Agent, the "***Approved Budget***").  As a condition to entry into the DIP Credit Agreement, the extensions of credit under the DIP Facility, and the authorization to use Cash Collateral, the DIP Credit Parties require, and the Debtors have agreed, that proceeds of the DIP Facility and the Cash Collateral shall be used in a manner consistent with the terms and conditions of the DIP Loan Documents and this Interim Order and in accordance with the Approved Budget (subject to Permitted Variances (as defined herein)).

(vii) *Certain Conditions to DIP Facility*.  The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things:  (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of the respective obligations thereunder, and to confer upon the DIP Credit Parties and the Prepetition ABL Secured Parties all applicable rights, powers, and remedies thereunder in each case as modified by this Interim Order; (b) the provision and scope of adequate protection, as set forth herein, of the Prepetition ABL Secured Parties' interests in the Prepetition ABL Collateral pursuant to sections 361, 363, and 364 of the Bankruptcy Code; and (c) the DIP Credit Parties being granted, as security for the prompt payment of the DIP Facility and all other obligations of the Debtors under the DIP Loan Documents, subject to the Carve Out and the relative priorities set forth on the Lien Priority

13085205v9

Annex, senior, first priority perfected security interests in and liens upon the DIP Collateral to the extent set forth herein.

H.    *Prepetition ABL Lenders' Adequate Protection*.  Until such time as the Prepetition ABL Obligations are Paid in Full,[4] the Prepetition ABL Secured Parties are entitled to receive adequate protection pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code and as set forth in paragraph 12 of this Interim Order resulting from, among other things: (i) provisions of this Interim Order granting the DIP Liens; (ii) the use of the Cash Collateral; (iii)  the use, sale, lease, or depreciation or other Diminution in Value of the Prepetition ABL Collateral; and/or (iv) the imposition of the automatic stay under the Bankruptcy Code.  The terms of the adequate protection being provided reflect the Debtors' prudent exercise of business judgment and constitute a reasonable compromise for the use of the Prepetition ABL Collateral, including the Prepetition ABL Cash Collateral.

---

[4]    "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, accrued and unpaid interest and fees, reimbursable expenses and indemnities, other than contingent indemnification obligations for which no claim has been asserted and threatened, and all other amounts due and owing by the Debtors) under the applicable credit facility and this Interim Order, the cash collateralization or repayment in full in cash of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable facility and that each of the Prepetition ABL Agent, Prepetition ABL Lenders, Prepetition Term Loan Agent, Prepetition Term Loan Lenders, DIP Agent and DIP Lenders, as the case may be, shall have received a release from each Debtor and any Committee of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities (including, without limitation any obligations or liabilities of any kind related to the Carve-Out upon payment in full of the Prepetition ABL Obligations, the Prepetition PNC Obligations or DIP Obligations) in form and substance acceptable to the Prepetition ABL Agent, the Prepetition Term Loan Agent or the DIP Agent, as applicable or in the case of the Committee, instead of such release, (A) if the Challenge Deadline (as defined in this Final Order) has not elapsed, a written notice or other confirmation that no Challenge or any other claims of any kind (including with respect to the Carve-Out upon payment in full of the Prepetition ABL Obligations, Prepetition PNC Obligations or DIP Obligations) will be asserted or (B) if the Challenge Deadline has elapsed, then no Challenge or any other claim has been asserted or any Challenge or other claim asserted has been dismissed pursuant to a final, non-appealable order of a court of competent jurisdiction and a written notice or other confirmation that no claim of any kind with respect to the Carve Out will be asserted against the Prepetition ABL Agent, any Prepetition ABL Lender, the Prepetition Term Loan Agent, any Prepetition Term Loan Lender, the DIP Agent or any DIP Lender.

I.    _Prepetition Term Loan Secured Parties' Adequate Protection_.  Until such time as the Prepetition PNC Obligations are Paid in Full, the Prepetition Term Loan Secured Parties are entitled to receive adequate protection pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code and as set forth in paragraph 12 of this Interim Order resulting from, among other things:  the (i) provisions of this Interim Order granting the DIP Liens; (ii) use, sale, lease, or depreciation or other Diminution in Value of the Prepetition PNC Collateral; and/or (iii) the imposition of the automatic stay under the Bankruptcy Code.  The terms of the adequate protection being provided reflect the Debtors' prudent exercise of business judgment and constitute a reasonable compromise for the use of the Prepetition PNC Collateral.

J.    _Sections 506(c) and 552(b)_.  The Debtors have agreed as a condition to obtaining financing under the DIP Facility and the use of Cash Collateral that as a material inducement to the DIP Credit Parties' agreement to provide the DIP Facility and the Prepetition Secured Creditors' consent to the use of Cash Collateral, and in exchange for:  (a) the DIP Credit Parties' willingness to provide the DIP Facility to the extent set forth herein; (b) the DIP Credit Parties' and the Prepetition ABL Secured Parties' agreement to subordinate the DIP Liens and the Prepetition Liens, respectively, to the Carve Out; and (c) the consensual use of Cash Collateral consistent with the Approved Budget (subject to Permitted Variances), the terms of the DIP Loan Documents, and the terms of this Interim Order, subject to and upon entry of the Final Order, each of the DIP Credit Parties and Prepetition Secured Creditors shall receive:  (x) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below; and (y) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

K.     _Good Faith of the DIP Credit Parties_.

(i)     _Willingness to Provide Financing_.  Each of the DIP Lenders has indicated a willingness to provide financing to the Debtors subject to:  (a) on an interim basis, the entry by this Court of this Interim Order, and on a final basis, the entry by this Court of a Final Order; (b) approval by this Court of the terms and conditions of the DIP Facility and the DIP Loan Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that each of the DIP Credit Parties is extending credit to the Debtors pursuant to the DIP Loan Documents in good faith, and that each of the DIP Credit Parties' claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided in section 364(e) of the Bankruptcy Code.

(ii)     _Business Judgment and Good Faith Pursuant to Section 364(e)_.  The terms and conditions of this Interim Order, the DIP Loan Documents, the extension of credit and the fees paid and to be paid thereunder: (a) are fair, reasonable, and the best available to the Debtors under the circumstances; (b) reflect the Debtors' exercise of prudent and sound business judgment consistent with their fiduciary duties; and (c) are supported by reasonably equivalent value and consideration.  The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtors and the DIP Credit Parties and the Prepetition Secured Creditors.  The use of Cash Collateral and credit to be extended under the DIP Loan Documents shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and each of the DIP Credit Parties is therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order in the event that this Interim Order

or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.  The DIP Credit Parties and Prepetition ABL Secured Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.

L.    *Prepetition Permitted Liens*.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Credit Parties, the Prepetition Secured Creditors or the Committee (if any), to challenge the validity, priority, enforceability, seniority, perfection, or extent of any alleged Prepetition Permitted Lien and/or security interests.  Subject to entry of the Final Order, the right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Prepetition Permitted Lien and is expressly subject to the Prepetition Liens and the DIP Liens.

M.    *Good Cause*.  Good cause has been shown for the entry of this Interim Order.  The relief requested in the Motion is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors, their creditors, and their estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to:  (a) minimize disruption to the Debtors' businesses and on-going operations; (b) preserve and maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors; and (c) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.  The terms of the DIP Facility are fair and reasonable, reflect each Debtor's exercise of its business judgment, and are supported by reasonably equivalent value and fair consideration.  The DIP Facility is the product of reasonable, arm's-length, good faith negotiations between the Debtors and the DIP Credit Parties.

13085205v9

N.      *Immediate Entry*.  Good and sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion and the record before this Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.      Motion Granted; Interim Financing Approved.  The Motion is granted on an interim basis, the Interim Financing is authorized on an interim basis, and the use of Cash Collateral on an interim basis is authorized, solely to the extent of the terms and conditions set forth in this Interim Order.

2.      Objections Overruled.  All objections, reservations of rights, or other statements with respect to the Interim Financing and/or entry of this Interim Order to the extent not withdrawn or resolved are hereby overruled on the merits.

**DIP Facility Authorization**

3.      Authorization of the DIP Financing and DIP Loan Documents.  The Debtors are expressly and immediately authorized and empowered to:  (a) execute and deliver the DIP Loan Documents; (b) incur and to perform the DIP Obligations (including the Creeping Roll-Up)[5] in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents (including the Approved Budget); and (c) deliver all instruments, agreements, certificates, letters, and documents that may be necessary, desirable, or required for performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Loan Documents.  The Debtors are hereby authorized to pay the principal, interest, fees, expenses and other amounts described in the DIP Loan Documents as

---

[5]      The Full Roll-Up remains subject to entry of the Final Order.

such become due on the terms set forth in the DIP Loan Documents and without need to obtain

further Court approval, including, without limitation, commitment fees, closing fees,

administrative fees, unused line fees, any additional fees and other amounts set forth in the DIP

Loan Documents, and the reasonable and documented fees and disbursements of the DIP Credit

Parties' attorneys, advisers, accountants, and other consultants, all to the extent required by the

DIP Loan Documents, with invoices to be provided in accordance with paragraph 25 below.

Upon execution and delivery, the DIP Loan Documents shall represent valid and binding, and

joint and several, obligations of the Debtors, enforceable against each of the Debtors and their

estates in accordance with the terms of the DIP Loan Documents.  The Debtors are also hereby

authorized, by this Interim Order, to make the Adequate Protection Payments.  Without any

further action by the Debtors or any other party, but subject to any Challenge (as defined herein)

and an appropriate remedy fashioned by this Court in the event of a successful Challenge, the

Debtors shall be authorized and deemed to have repaid and refinanced (i) the Prepetition ABL

Obligations with proceeds of the Creeping Roll-Up, as applicable and (ii) upon entry of the Final

Order, all additional outstanding Prepetition ABL Obligations with the proceeds of the Full Roll-

Up.

4.    _Authorization to Borrow_.    Until a Termination Declaration Date (as defined

herein), and subject to the terms and conditions set forth in the DIP Loan Documents, the DIP

Facility, and this Interim Order, and in order to prevent immediate and irreparable harm to the

Debtors' estates, the Debtors are hereby authorized, prior to the entry of the Final Order, to request

extensions of credit under the DIP Facility up to an aggregate principal amount of $50,000,000 at

any one time outstanding. No other corporate action is required for the Debtors to execute and

13085205v9

deliver the DIP Loan Documents, perform their obligations thereunder, or request any extension of credit under the DIP Facility as set forth herein.

5.    <u>DIP Obligations</u>.  The DIP Loan Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases (collectively, "***Successor Cases***").  Upon entry of this Interim Order, the DIP Obligations shall include all loans, (for the avoidance of doubt, the Roll-Up Loan shall be included upon entry of the Final Order), and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to any of the DIP Credit Parties under the DIP Loan Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses, and other amounts owed pursuant to the DIP Loan Documents, and shall be joint and several obligations of the Debtors in all respects; *provided* that the DIP Roll-Up Loan shall be subject to paragraph 44 hereof, and the challenge rights granted thereunder.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment, or counterclaim.

6.    <u>Postpetition Liens and Collateral</u>.

(a)    Effective immediately upon the entry of this Interim Order, pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of itself

and the other DIP Lenders under and as described in the DIP Loan Documents) is hereby granted, continuing valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens, (collectively, the "***DIP  Liens***") on all tangible and intangible prepetition and postpetition assets and real property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof including, without limitation, the following (the "***DIP Collateral***"):

> (i)      all Accounts;[6]

> (ii)     all Goods, including Equipment, Inventory and Fixtures;

> (iii)    all Documents, Instruments and Chattel Paper;

> (iv)     all Letters of Credit and Letter-of-Credit Rights;

> (v)      all Securities Collateral;

> (vi)     all Investment Property;

> (vii)    all Intellectual Property Assets;

> (viii)   all Commercial Tort Claims;

> (ix)     all General Intangibles (including, without limitation, all Payment Intangibles);

> (x)      all Deposit Accounts, money, cash, and cash equivalents;

> (xi)     all Supporting Obligations;

> (xii)    all money, cash or cash equivalents;

> (xiii)   all credit balances, deposits and other property now or hereafter held or received by or in transit to the DIP Agent or at any other depository or other institution from or

---

[6]    All defined terms in the description of DIP Collateral shall have the meaning ascribed thereto in the DIP Loan Documents. All terms not specifically defined in the DIP Loan Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

13085205v9

for the account of the DIP Loan Parties, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiv)    all real property, and all right, title, and interests therein (including both fee and leasehold interests) and proceeds thereof;

(xv)    the Prepetition Collateral;

(xvi)    all claims and causes of action and the proceeds thereof to avoid a transfer of property (or an interest in property) pursuant to Section 549 of the Bankruptcy Code;

(xvii)    effective upon the entry of the Final Order, all other claims and causes of action, and any proceeds thereof, to avoid a transfer of property (or an interest in property) or an obligation incurred by the DIP Loan Parties pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and section 724(a) of the Bankruptcy Code (collectively, the "*Avoidance Actions*" and any proceeds therefrom "*Avoidance Proceeds*");

(xviii)    effective upon the entry of the Final Order the DIP Loan Parties' rights under Sections 506(c) and 552 of the Bankruptcy Code;

(xix)    to the extent not otherwise described above, all receivables and all present and future claims, rights, interests, assets and properties recovered by or on behalf of the DIP Loan Parties;

(xx)    all books, records, and information relating to any of the foregoing and/or to the operation of the DIP Loan Parties' business, and all rights of access to such books, records, and information, and all property in which such books, records and information are stored, recorded and maintained; and

(xxi)    to the extent not otherwise included or specifically excluded, all other personal property of the DIP Loan Parties, whether tangible or intangible and all Proceeds and

27

products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the DIP Loan Parties from time to time with respect to any of the foregoing.

(b)    Notwithstanding anything in this Interim Order or the DIP Documents to the contrary, in no event shall DIP Collateral include: (a) any leasehold interest in non-residential real property that prohibits or restricts the granting of liens thereon (except as permitted pursuant to applicable non-bankruptcy law), but shall include the proceeds of the sale or other disposition of such leases; (b) any security deposits held by a landlord under any non-residential real property lease or the Debtors' interest in any pre-paid rent under any such lease (but shall include the Debtors' revisionary interests therein), in each case, unless such lien is expressly permitted under such lease and (c) any other Excluded Property (as defined in the DIP Documents).

7.    <u>DIP Lien Priority in DIP Collateral</u>.

(a)    *DIP Liens*.  Pursuant to Section 364(d), the DIP Liens on the DIP Collateral securing the DIP Obligations shall be first and senior in priority to all other interest and liens of every kind, nature, and description, whether created consensually, by an order of this Court or otherwise, including, without limitation, liens or security interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or applicable law; <u>*provided*</u>, *however*, that the DIP Liens on the DIP Collateral shall be subordinate to the Prepetition Permitted Liens and subject to the Carve Out and the relative priorities set forth on the Lien Priority Annex.

13085205v9

(b)      Other than as set forth herein, the DIP Liens, the DIP Superpriority Claims, the Carve Out, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims (each of which shall be subject to the relative priorities set forth on the Lien Priority Annex): (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases or any claim for reclamation or return (whether asserted pursuant to section 546(c) of the Bankruptcy Code or otherwise), and shall be valid and enforceable against the Debtors, their estates, any trustee, or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to challenge under sections 510, 549, 550, or 551 of the Bankruptcy Code; *provided* that the DIP Roll-Up Loan shall be subject to paragraph 44 hereof, and the challenge rights granted thereunder.

8.      <u>DIP Superpriority Claims</u>.

(a)      *DIP Superpriority Claim*.  Subject to the Carve Out on account of all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents, or otherwise, the DIP Agent (for the benefit of itself and the other DIP Lenders) is hereby granted to the maximum extent permitted pursuant to sections 364(c)(1), 503, and 507 of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (collectively, the "***DIP Superpriority Claim***") for all DIP Obligations; *provided* that the DIP Roll-Up Loan shall be subject to paragraph 44 hereof, and the challenge rights granted thereunder.  Subject to paragraph 8(b) of this Interim Order, the Carve

Out, and Prepetition Permitted Liens, the DIP Superpriority Claim shall have priority over any and all other obligations, liabilities, and indebtedness of each Debtor, whether now in existence or hereafter incurred by such Debtor including without limitation administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, and 1114 of the Bankruptcy Code.

(b)     *Priority of DIP Superpriority Claim.*  The DIP Superpriority Claim, subject to the Carve Out and the relative priorities set forth on the Lien Priority Annex, shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including subject to entry of the Final Order, Avoidance Proceeds.

9.     No Obligation to Extend Credit. Except as may be required to fund the Professional Fee Escrow Account (as defined below) or as otherwise required under this Interim Order, no DIP Credit Party shall have any obligation to make any loan or advance under the DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit under the applicable DIP Loan Documents and this Interim Order have been satisfied in full or waived in accordance with the DIP Loan Documents.

10.     Use of Proceeds of the DIP Facility.  The DIP Loans shall be made available to the Debtors: (a) on the Closing Date (as defined in the DIP Credit Agreement) to pay the fees, costs and expenses incurred in connection with the transactions contemplated hereby; and (b) on and/or after the Closing Date (i) to repay the Prepetition ABL Obligations, (ii) for the Debtors' working capital requirements in accordance with the provisions governing the Approved Budget (including the Permitted Variances) set forth herein and in the DIP Credit Agreement, (iii) to fund the costs, fees, and expenses in connection with administration of the Chapter 11 Cases in

accordance with the provisions governing the Approved Budget (including the Permitted Variances) set forth herein and in the DIP Credit Agreement, (iv) payment of all reasonable and documented out of pocket costs, fees, and expenses required by the DIP Loan Documents, (v) payment of Court approved prepetition liabilities of the DIP Loan Parties in accordance with the provisions governing the Approved Budget (including the Permitted Variances) set forth herein and in the DIP Credit Agreement, and (vi) to fund the Professional Fee Escrow Account and obligations benefitting from the Carve Out, in each case of (a) and (b) above, in accordance with the terms of the DIP Loan Documents.  For the avoidance of doubt, until such time as the DIP Obligations and the Prepetition ABL Obligations have been Paid in Full, except as may be otherwise agreed by the DIP Agent, any fees or disbursements of any Case Professional (which shall not include, for the avoidance of doubt, those payments authorized or required pursuant to paragraphs 12(b), 25 and 26 of this Interim Order) shall be paid solely from the Professional Fee Escrow Account (including, to the extent applicable, the Case Professional Carve Out Limit funded into the Professional Fee Escrow Account following delivery of a Carve Out Trigger Notice (as each term is defined herein)) and any retainer held by a Case Professional, as applicable.

### Authorization to Use Cash Collateral

11.     _Authorization to Use Cash Collateral_.  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and in compliance with the Approved Budget (subject to Permitted Variances), the Debtors are authorized to use Cash Collateral only in accordance with the Approved Budget (subject to Permitted Variances) until such time that the DIP Credit Parties or the Prepetition ABL Secured Parties terminate the Debtors' use of Cash Collateral as provided herein; _provided_ that the Prepetition Secured Creditors are granted the Adequate Protection Superpriority Claims, Adequate Protection Liens, Adequate Protection

31

Payments, as applicable, and other forms of adequate protection set forth herein; *provided further* that nothing herein shall impede the Debtors' ability and entitlement to fund the Carve Out as provided in paragraph 31 hereof; *provided further* that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve Out and pay payroll (other than severance) and other day-to-day operational expenses that are necessary and critical to the administration of the Debtors' estates during the Remedies Notice Period.

## Adequate Protection Provisions

12.     As adequate protection for the interest of the Prepetition Secured Creditors in the Prepetition Collateral (including Cash Collateral) on account of the granting of, among other things, the DIP Liens, the incurrence of the DIP Obligations, the subordination, as applicable, of the Prepetition Liens to the Carve Out, the Debtors' use of Cash Collateral, and any other diminution in value arising out of the imposition of the automatic stay or the Debtors' use, sale, lease, depreciation, or disposition of the Prepetition Collateral and Cash Collateral during the pendency of the Chapter 11 Cases (collectively, "***Diminution in Value***"), the Prepetition Secured Creditors shall receive adequate protection as follows:

(a)     *Adequate Protection Liens*. To the extent of any Diminution in Value, each of the Prepetition Agents (for the benefit of itself and the other Prepetition Secured Creditors, as applicable) are hereby granted, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, valid, binding, enforceable, non-avoidable and perfected replacement and additional postpetition security interests in, and liens on the DIP Collateral (the "***Adequate Protection Liens***"), which shall be (x) subject to the Carve Out and the relative priorities set forth on the Lien Priority Annex and (y) subordinate to the Prepetition Permitted Liens.  The Adequate Protection Liens granted to the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders)

32

shall secure the Prepetition ABL Obligations and the Adequate Protection Liens granted to the Prepetition Term Loan Agent shall secure the Prepetition PNC Obligations.

(i)        The Adequate Protection Liens shall be: (A) deemed to be valid, binding, non-avoidable, enforceable, and fully perfected as of the Petition Date; and (B) in all instances, subject to the Carve Out and the relative priorities set forth on the Lien Priority Annex. Other than as set forth herein, until the Prepetition Secured Obligations are Paid in Full, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases. The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to Bankruptcy Code sections 506(c) (upon entry of the Final Order), 510, 549, or 550.  No lien or interest avoided and preserved for the benefit of any Debtor's estate pursuant to Bankruptcy Code section 551 shall be made *pari passu* with or senior to the Adequate Protection Liens.

(ii)        *Priority of Adequate Protection Liens*.  The Adequate Protection Liens shall be payable from and have recourse to all Prepetition Collateral, subject to the Carve Out and the relative priorities set forth on the Lien Priority Annex.

(b)        *Adequate Protection Payments.*

(i)        Until the Prepetition ABL Obligations have been Paid in Full, all claims (including principal, interest at the Default Rate (as defined in the prepetition ABL Documents) and letter of credit fees) arising from or related to the Prepetition ABL Obligations shall continue

33

to accrue and be paid in cash at the Default Rate (as defined in the Prepetition ABL Documents) and at the times specified in the Prepetition ABL Documents through the Chapter 11 Cases (the "***ABL Lender Payments***").

(ii)    Until the Prepetition PNC Obligations have been Paid in Full, all claims (including principal, interest at the default rate and letter of credit fees, costs and other charges) arising from or related to the Prepetition PNC Obligations  shall continue to accrue and be paid in cash at the Default Rate (as defined in the Prepetition PNC Documents) and at the times specified in the Prepetition PNC Documents through the Chapter 11 Cases (the "***Term Loan Lender Payments***", and, together with the ABL Lender Payments, the "***Secured Lender Payments***").

(iii)    The Prepetition ABL Agent (including any successor thereto) and PNC shall further be entitled to the payment of all reasonable and documented fees, costs, expenses and charges of the Prepetition ABL Agent and PNC, to the extent payable under the Prepetition ABL Credit Agreement (the "***ABL Fees and Expenses***") and/or the Prepetition PNC Documents (the "***Term Fees and Expenses***"), in all respects in accordance with the Approved Budget (and together with the ABL Fees and Expenses and Secured Lender Payments, the "***Adequate Protection Payments***"); *provided, however*, that notwithstanding the foregoing, the out-of-pocket expenses incurred by the Prepetition ABL Agent prior to and unpaid as of the Closing Date shall be paid indefeasibly upon the occurrence of the Closing Date without the Prepetition ABL Agent (or their counsel or other professionals) being required to deliver an invoice in summary form as set forth herein.  For all ABL Fees and Expenses and Term Fees and Expenses incurred after the Closing Date, counsel and/or professionals to the Prepetition ABL Agent and PNC, as applicable, shall each deliver an invoice in summary form (which shall not be required to include time entry

34

detail, but shall include a general description of the nature of the matters for which services were performed, and may be redacted for privileged information; *provided, however*, that the Debtors, the U.S. Trustee and any Committee reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals) to counsel to the Debtors, the U.S. Trustee, and any Committee.  If no written objection is received on the date that is ten (10) days after delivery of such invoice to counsel to the Debtors, the U.S. Trustee, and any Committee, the Debtors shall promptly pay such fees and expenses in full.  If an objection to the Prepetition ABL Agent's invoice or PNC's invoice, as applicable, is timely received, the Debtors shall promptly pay the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. None of the Adequate Protection Payments shall be subject to further approval by this Court or the U.S. Trustee guidelines, and counsel and/or professionals to the Prepetition ABL Agent or PNC, as applicable, shall not be required to file applications or motions with this Court for the payment of any of its fees or out-of-pocket expenses (other than with respect to disputed amounts).  Payments of any amounts set forth in this paragraph are not subject to avoidance, subordination, or disgorgement. For the avoidance of doubt, the Adequate Protection Payments shall be subject to paragraph 44 hereof, and the challenge rights granted thereunder.

(c)      *Adequate Protection Superpriority Claims.*

(i)      *Superpriority Claims of the Prepetition Agents*.    As further adequate protection of the interests of the Prepetition Agents and the other Prepetition Secured Creditors with respect to the Prepetition Secured Obligations, each of the Prepetition Agents (for the benefit of itself and the other Prepetition Secured Creditors, as applicable) is hereby granted an allowed administrative claim against the Debtors' estates to the maximum extent permitted

35

under section 503 of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims against the Debtors and their estates of any kind or nature whatsoever, subject to the Carve Out, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113, and 1114 of the Bankruptcy Code, as provided for by section 507(b) of the Bankruptcy Code (the "***Adequate Protection Superpriority Claims***"), to the extent that the Adequate Protection Liens do not adequately protect against any Diminution in Value of the Prepetition Agents' respective interests in the Prepetition Collateral.

(ii) *Priority of Adequate Protection Superpriority Claims*.  The Adequate Protection Superpriority Claims, subject to the Carve Out and the relative priorities set forth on the Lien Priority Annex, shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including subject to entry of the Final Order, Avoidance Proceeds.

(d) *Reservations of Rights*.  Subject only to the Carve Out, the relative priorities set forth on the Lien Priority Annex, and the Prepetition Permitted Liens, nothing contained herein shall impair or modify the Prepetition Secured Creditors' rights under section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Creditors in this Interim Order is insufficient to compensate for the Diminution in Value of the interest of the Prepetition Secured Creditors in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  Nothing contained in this Interim Order shall be construed as an admission as to the extent of any Diminution in Value, if any, in the interest of any Prepetition Secured Creditors in the Prepetition Collateral and nothing shall

36

impair or modify the rights of any party to contest any assertion of Diminution in Value or contest any request for additional adequate protection.

### Provisions Common to DIP Financing and Use of Cash Collateral Authorizations

13.    <u>Amendments</u>.  The DIP Loan Documents may from time to time be amended, restated, amended and restated, supplemented, or otherwise modified, in each case in accordance with the provisions of the DIP Loan Documents governing amendments thereto, by the parties thereto, each without further application to or order of this Court; *<u>provided</u>*, that any amendment to the DIP Credit Agreement: that (a) shortens or lengthens the maturity of the extensions of credit thereunder; (b) increases or decreases the aggregate commitments thereunder; or (c) increases the rate of interest payable with respect thereto (each, a "***Material DIP Amendment***"), shall be (a) provided (which may be by electronic mail) to the U.S. Trustee, the Prepetition Agents and any Committee, which shall have five (5) days from the date of receipt of such notice within which to object, in writing to the Material DIP Amendment and (b) filed with the court, it being understood that waivers for the benefit of the Debtors and extensions of Milestones and similar deadlines shall not be considered "material" for purposes hereof, and may become immediately effective.  If the U.S. Trustee, Prepetition Agent(s) or any Committee timely objects to the Material DIP Amendment, the Material DIP Amendment shall only be permitted pursuant to an order of this Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from this Court of a Material DIP Amendment on an expedited basis.

14.    <u>Approved Budget, Testing, and Permitted Variances</u>.

(a)    *Approved Budget*.  The Approved Budget and any modification to, or amendment or update of, the Approved Budget shall be in form and substance reasonably satisfactory to the DIP Agent and modified or amended in accordance with the DIP Loan Documents.  The Approved Budget shall be updated, modified or supplemented by the Debtors

in accordance with the DIP Credit Agreement and this Interim Order, but in any event the budget shall be updated by the Debtors by no later than 5:00 p.m. on the Thursday of every week (commencing with the first full calendar week after the Petition Date) or, to the extent such Thursday is not a Business Day (as defined in the DIP Credit Agreement and as used herein, "**Business Day**"), the next Business Day thereafter.  Each such updated, modified or supplemented budget shall be in form and substance acceptable to the DIP Agent, and no such updated, modified or supplemented budget shall be effective until so approved and once approved shall be deemed the Approved Budget; *provided, however*, that, in the event that the DIP Agent and the Debtors cannot agree as to a new Approved Budget, the prior Approved Budget shall remain in full force and effect unless and until a new Approved Budget has been approved by the DIP Agent.

(b)      *Permitted Variances*.  The Debtors shall comply with the Approved Budget subject to the permitted variances set out in the DIP Credit Agreement (as amended from time to time as provided herein, the "**Permitted Variances**").

(c)      *Approved Budget Testing*.  Permitted Variances shall be reported by the Debtors on the Thursday following the last Saturday of each completed week.  For the avoidance of doubt, the testing of covenant compliance shall begin on the first full calendar week following the Petition Date.  The Debtors shall prepare a variance report, and deliver such variance report to the DIP Agent, the Prepetition ABL Agent and their advisors in accordance with the requirements set out in the DIP Credit Agreement.

15.      Modification of Automatic Stay.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to permit: (a) the Debtors to grant

38

the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claims, and the Adequate

Protection Superpriority Claims; (b) the Debtors to incur all liabilities and obligations to the DIP

Agent as contemplated under the DIP Loan Documents; and (c) the Debtors to pay, and the DIP

Credit Parties and Prepetition Secured Creditors to retain and apply, all amounts referred to,

required under, and in accordance with the terms of this Interim Order and the DIP Loan

Documents.

      16.     <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

      (a)     This Interim Order shall be sufficient and conclusive evidence of the

priority, perfection, and validity of the DIP Liens, the Adequate Protection Liens, and the other

security interests granted herein, effective as of the Petition Date, without any further act and

without regard to any other federal, state, or local requirements or law requiring notice, execution,

filing, registration, recording, or possession of the DIP Collateral, or other act to validate or

perfect such security interest or lien, including, without limitation:  (i) entering into any control

agreements with any financial institution(s) party to a control agreement or other depository

account consisting of DIP Collateral ; (ii) any requirement to register liens on any certificates of

title; (iii) the filing of any financing statements; (iv) the filing of any intellectual property filings;

(v) entering into any mortgages; (vi) noticing any liens; and/or (vii) the taking of any similar

actions (each of the foregoing (i-(vii) a "***Perfection Act***").  Notwithstanding the foregoing, if the

DIP Agent or any Prepetition Agent, as applicable, shall, in its sole discretion, elect for any reason

to file, record, or otherwise effectuate any Perfection Act, then such DIP Agent or Prepetition

Agent, as applicable, is authorized to perform such act, and the Debtors are authorized to perform

such act to the extent necessary or required by the DIP Loan Documents, which act or acts shall

be deemed to have been accomplished as of the date and time of entry of this Interim Order

notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law.  The DIP Agent or either Prepetition Agent, as applicable, may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law.  Should the DIP Agent or either Prepetition Agent, as applicable, so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

(b)     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by this Interim Order (including the DIP Liens and the Adequate Protection Liens) or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of this Court; *provided, however,* that nothing herein shall excuse the Debtors from payment of any local fees, if any, required in connection with such liens.  By virtue of the terms of this Interim Order, to the extent that the DIP Agent or either Prepetition Agent, as applicable, has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors, such filings shall be deemed to

13085205v9

properly perfect its liens and security interests granted and confirmed by this Interim Order without further action by the DIP Agent or applicable Prepetition Agent.

17.    (a) <u>Application of Proceeds of DIP Collateral</u>.  Subject to the Carve Out, the relative priorities set forth on the Lien Priority Annex, and the Prepetition Permitted Liens, as applicable, the proceeds of DIP Collateral shall be applied in accordance with the terms of the DIP Loan Documents, the Prepetition Credit Documents and this Interim Order.  The Debtors shall not, directly or indirectly, voluntarily purchase, redeem, defease, or prepay any principal of, premium, if any, interest or other amount payable in respect of any indebtedness prior to its scheduled maturity, other than the DIP Obligations, the Adequate Protection Payments required under this Interim Order, and obligations authorized by an order of this Court (which may include, without limitation, obligations secured by Prepetition Permitted Liens). The Debtors shall apply the proceeds of the DIP Collateral, the proceeds of the Prepetition ABL Collateral, and any other cash and collections and receipts of case from any source, including accounts, sale of property, loan advances, or refunds (but excluding amounts reserved for the Carve Out, the Segregated Cash Collateral, the Prepetition Term Loan Collateral) to the repayment and refinancing of the Prepetition ABL Obligations as set forth in this Interim Order, the Prepetition Credit Documents and the DIP Credit Agreement. The extension of the DIP Facility and the repayment and refinancing of the Prepetition ABL Obligations with the proceeds of the DIP Loans are part of an integrated transaction.

(b)    <u>Application of Proceeds of Prepetition PNC Collateral</u>.  Subject to the Carve Out, the relative priorities set forth on the Lien Priority Annex, and the Prepetition Permitted Liens, as applicable, the proceeds of Prepetition PNC Collateral shall be applied in accordance with the terms of the Prepetition PNC Documents, the Prepetition Credit Documents and this Interim

Order.  The Debtors shall apply the proceeds of the Prepetition PNC Collateral to the repayment and refinancing of the Prepetition PNC Obligations.

18.    <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in the Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the repayment in full in cash of all DIP Obligations, and the termination of the DIP Credit Parties' obligations to extend credit under the DIP Facility, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied as set forth in paragraph 17 herein.

19.    <u>Maintenance of DIP Collateral and Prepetition Collateral</u>.  Until the Prepetition Secured Obligations and DIP Obligations are Paid in Full and the DIP Credit Parties' obligations to extend credit under the DIP Loan Documents are terminated, as provided therein, the Debtors shall insure the Prepetition Collateral and the DIP Collateral as required under the DIP Loan Documents and the Prepetition Credit Documents including, without limitation: (i) the payment of all past due tax obligations, solely in accordance with the Approved Budget; (ii) the payment of taxes that come due following the Petition Date as they come due, solely in accordance with the Approved Budget; and (iii) the maintenance of insurance consistent with the Debtors' practices prior to the Petition Date and any insurance related relief granted by the Court.

20.    <u>Termination Declaration Date</u>.  On a Termination Declaration Date (as defined herein), consistent with Article VIII of the DIP  Credit Agreement: (a) all DIP Obligations shall be immediately due and payable; and (b) all commitments to extend credit under the DIP Facility will terminate (subject, in each case, to funding of the Carve Out as provided herein).

21.     Events of Default.  The occurrence of an "Event of Default" under the DIP Credit Agreement, including failure to comply with any Required Milestones (as defined in the DIP Credit Agreement and attached hereto as **Exhibit 4**) as and when required as set forth on **Exhibit 4** (unless otherwise extended by the DIP Agent in its sole discretion), in each case, on terms and conditions and subject to documentation (including, in all cases, forms of all applicable motions and orders) in form and substance satisfactory to the DIP Agent in all respects, shall constitute an event of default under this Interim Order (each, an "***Event of Default***").

22.     Rights and Remedies Upon Event of Default.

(a)     Subject to the terms of the DIP Loan Documents, immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from this Court, but subject to the terms of this Interim Order, including, without limitation, the funding of the Carve Out, the Remedies Notice Period (as defined herein) and the notice and grace period provisions of the DIP Credit Agreement set forth in Article VIII of the DIP  Credit Agreement: (1) (i) the DIP Agent may declare in writing (the "***DIP Termination Declaration***") (A) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (B) the termination, reduction, or restriction of any further commitment to extend applicable credit to the Debtors to the extent any such commitment remains under the DIP Facility, (C) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and/or (D) that any obligations to fund the Carve Out Reserve shall be triggered, through the delivery of the Carve Out Trigger Notice (as defined herein) to the Debtors; and (ii) the DIP Agent may declare a termination, reduction, or restriction on the ability of the

43

Debtors to use Cash Collateral except solely to fund the Carve Out Reserves and to seek a Remedies Determination (as defined herein) (the date on which a DIP Termination Declaration is delivered by the DIP Agent, the "***Termination Declaration Date***").

(b)     Any DIP Termination Declaration shall not be effective until notice has been provided by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Conflicts Committee, counsel to any Committee, the U.S. Trustee and counsel to the Prepetition Agents. The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors is hereby modified so that five (5) Business Days after the Termination Declaration Date (as such period may be extended pursuant to the terms hereof, the "***Remedies Notice Period***") and the funding of the Carve Out in accordance with paragraph 31(b) of this Interim Order, as applicable, and subject to the relative priorities set forth on the Lien Priority Annex and the Prepetition Permitted Liens: (x) the DIP Agent shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and this Interim Order; (y) the applicable Prepetition Agent shall be entitled to exercise its respective rights and remedies to the extent available in accordance with the applicable Prepetition Credit Documents and this Interim Order.

(c)     During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing with this Court (the "***Remedies Determination***"); <u>*provided*</u> that if the Debtors seek an emergency hearing during the Remedies Notice Period, but such hearing is scheduled for a later date by this Court (without any request by the Debtors to this Court with respect to such later scheduling), the Remedies Notice Period shall be tolled and the automatic stay shall not be modified until this Court enters an order determining that an Event of Default has occurred and is continuing. The Court may fashion an appropriate remedy at a hearing on a

44

Remedies Determination; *provided* that the rights of the Debtors, the DIP Credit Parties, and the Prepetition Secured Creditors to contest such relief are expressly preserved.  In addition, upon the delivery of a DIP Termination Declaration, subject to the Remedies Notice Period and in all instances subject to the terms of the Prepetition ABL Documents, and unless otherwise ordered by the Court, the DIP Agent or the Prepetition ABL Agent may, by written email notice (the "***Designation Notice***") to the Debtors' counsel designate some or all of the Debtors' Stores (as defined in the DIP Credit Agreement) to be liquidated (such designated Stores, the "***Designated Stores***"), at which time, after the later of two (2) Business Days after the later of (A) the expiration of the Remedies Notice Period and (B) the date of delivery of the Designation Notice, the Debtors' Specified Liquidation Consultant (as defined in the DIP Credit Agreement and as used herein, the "***Specified Liquidation Consultant***") shall have initiated "going out of business" sales at such Designated Stores.  Except as set forth in this paragraph 22(c) or otherwise ordered by this Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, or the Prepetition Secured Creditors under this Interim Order.  Furthermore, during the Remedies Notice Period, the Debtors may use Cash Collateral solely to fund the Carve Out and pay payroll (other than severance) and other day-to-day operational expenses that are necessary and critical to the administration of the Debtors' estates during the Remedies Notice Period.  Unless this Court orders otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors shall automatically be terminated at the end of the Remedies Notice Period (as it may be extended in accordance with

45

this paragraph) without further notice or order.  Upon expiration of the Remedies Notice Period (as it may be extended in accordance with this paragraph) and the funding of the Carve Out in accordance with paragraph 31(b) of this Interim Order, as applicable, and subject to the relative priorities set forth on the Lien Priority Annex and the Prepetition Permitted Liens, the applicable DIP Agent and the applicable Prepetition Secured Creditors shall be permitted to exercise all remedies set forth herein, and in the DIP Loan Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim Order and the applicable loan documents.  The DIP Credit Parties and the Prepetition Secured Creditors may, subject to the Prepetition Credit Documents, the funding of the Carve Out, as applicable, the relative priorities set forth on the Lien Priority Annex, and the Prepetition Permitted Liens, after the Remedies Notice Period, enter onto the premises of any Debtor in accordance with paragraph 23(b) herein.

23.    Leased Premises.

(a)    Notwithstanding anything to the contrary in this Interim Order, for purposes of this Interim Order, DIP Liens and Adequate Protection Liens shall not encumber and DIP Collateral shall not include (i) leasehold interests of non-residential real property that prohibit or restrict the granting of such liens in the applicable lease except as permitted pursuant to applicable non-bankruptcy law (but shall include the proceeds of the sale or disposition of such leases) and (ii) any security deposits (in possession of the Debtors or the landlord) or the Debtors' interests, if any, in pre-paid rent, unless liens on such security deposits or pre-paid rent are expressly permitted pursuant to the underlying lease documents; *provided* that, the DIP Liens and Adequate Protection Liens shall extend to any such security deposits or pre-paid rent upon reversion thereof to the Debtors, if at all, as well as any proceeds or value of such leasehold

46

interests whether by sale, financing, or other disposition or form of transfer, termination or transaction; *provided, further,* that any liens granted herein relating to the Debtors' insurance policies shall not interfere with any rights held by a landlord under such policies to any such insurance proceeds for damage to landlord's property.

(b)    The DIP Agent's or the Prepetition Agents' exercise of their remedies pursuant to paragraph 22 under the DIP Loan Documents and the Prepetition Credit Documents shall be subject to, as may be applicable: (a) any agreement in writing between the DIP Agent or Prepetition Agents and any applicable landlord; (b) pre-existing rights of the DIP Agent or Prepetition Agents, and any applicable landlord under applicable non-bankruptcy law; (c) written consent of the applicable landlord; or (d) further order of this Court following notice and a hearing.

24.    Good Faith Under Section 364 of the Bankruptcy Code; No Modification or Stay of this Interim Order.  In accordance with sections 364(e) and 363(m) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, amended, or vacated by a subsequent order of this Court, or any other court, the DIP Credit Parties and Prepetition Secured Creditors are entitled, upon entry of this Interim Order, to the protections provided in section 364(e) of the Bankruptcy Code.  Any such reversal, modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby. Any liens or claims granted to the DIP Credit Parties and Prepetition Secured Creditors hereunder arising prior to the effective date of any such reversal, modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including, without limitation, entitlement to all rights, remedies, privileges, and benefits granted herein.

47

25.    <u>DIP and Other Expenses</u>.  The Debtors are authorized to pay, without duplication of fees paid for the benefit of the DIP Credit Parties, all reasonable and documented out-of-pocket costs and expenses (and the DIP Agent is authorized to make advances or charges against the loan account to pay such agreed costs and expenses of the DIP Credit Parties in accordance with the DIP Loan Documents) of the DIP Credit Parties in connection with the DIP Facility (including, without limitation, costs and expenses incurred prior to the Petition Date), to the extent set forth in the DIP Loan Documents. The professionals for the DIP Agent, shall deliver an invoice in summary form (which shall not be required to include time entry detail and may be redacted for privileged information, but shall include (i) a general description of the nature of the matters for which services were performed and (ii) contain sufficiently detailed information to permit the Review Parties (as defined herein) to determine whether the fees and expenses sought to be paid are reasonable) *provided, however*, that the Debtors, the U.S. Trustee and any Committee reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals) to counsel to the Debtors, the U.S. Trustee, and any Committee (together, the "***Review Parties***"); *provided, however*, that notwithstanding the foregoing, the out-of-pocket expenses (including, without limitation, all attorneys' and other professionals' fees and expenses) incurred by the DIP Agent prior to and unpaid as of the Closing Date shall be paid indefeasibly upon the occurrence of the Closing Date without the DIP Agent being required to deliver an invoice in summary form as set forth herein.  If no written objection is received by ten (10) calendar days after receipt of such invoice by the Review Parties, the Debtors shall promptly pay such fees and expenses in full.  If an objection to a professional's invoice is timely received, the Debtors shall promptly pay the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve

13085205v9

the dispute consensually. The DIP Agent's professionals shall not be required to comply with the U.S. Trustee guidelines or to file applications or motions with, or obtain approval of, this Court for the payment of any of their fees or out-of-pocket expenses (other than with respect to disputed amounts).

26.     _Indemnification_. The Debtors shall indemnify and hold harmless the DIP Agent, each other Credit Party, and each Indemnitee (as respectively defined in each DIP Credit Agreement), subject to and in accordance with each DIP Credit Agreement, including, without limitation, Section 10.04(b) of the DIP Credit Agreement.

27.     _Prepetition ABL Indemnity Account_. Upon the closing of the Sale (as defined in Exhibit 4 hereof), the Debtors shall pay to the Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, the sum of $250,000 into a non-interest bearing account maintained with the Prepetition ABL Agent (the "***Prepetition ABL Indemnity Account***") to secure contingent indemnification, reimbursement or similar continuing obligations arising under or related to the Prepetition ABL Documents (the "***Prepetition ABL Indemnity Obligations***"). The Prepetition ABL Indemnity Account shall secure all costs, expenses, and other amounts (including, without limitation, reasonable and documented fees and expenses of the Prepetition ABL Secured Parties' attorneys and advisers) incurred by the Prepetition ABL Agent and the other Prepetition ABL Secured Parties in connection with or related to the Prepetition ABL Indemnity Obligations incurred responding to any (i) formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim, defense, or other challenge whether as contemplated in paragraph 44 hereof or otherwise, (ii) challenge or claim threatened, asserted or filed against the Prepetition ABL Agent or the other Prepetition ABL Secured Parties related to the Prepetition ABL Documents, the Prepetition ABL

49

Obligations, or the liens granted to the Prepetition ABL Agent, as applicable, whether in these Chapter 11 Cases or independently in another forum, court, or venue, or (iii) formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim, defense, or other challenge in connection with or related in any way to any obligations arising under the Prepetition ABL Documents, these Chapter 11 Cases, or any Successor Cases.  The Prepetition ABL Indemnity Obligations shall be secured by a first lien on the Prepetition ABL Indemnity Account and the funds therein and by a lien on the Prepetition ABL Collateral (subject in all respects to the priorities and terms of this Interim Order, and the Lien Priority Annex). Subject to the terms of this Interim Order, the Prepetition ABL Agent, on behalf of itself and the other Prepetition ABL Secured Parties, may apply amounts in the Prepetition ABL Indemnity Account against the Prepetition ABL Indemnity Obligations as and when they arise, without further notice to or consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court.  Until the Prepetition ABL Obligations have been Paid in Full, the Prepetition ABL Agent (for itself and on behalf of the other Prepetition ABL Secured Parties) shall retain and maintain the liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the Prepetition ABL Indemnity Account; provided, that the retention of the liens granted to the Prepetition ABL Agent shall in all respects remain subject to the priorities and terms of this Interim Order, and the Lien Priority Annex; provided, however, that upon the Payment in Full of the Prepetition ABL Obligations, the balance of the Prepetition ABL Indemnity Account, if any, shall be returned to the Debtors on or prior to the effective date of any chapter 11 plan.

28.    <u>DIP Indemnity Account</u>.  Upon the closing of the Sale, the Debtors shall pay to the DIP Agent a sum in the amount of $250,000 from proceeds of the DIP Collateral into a non-interest bearing indemnity account maintained with the DIP Agent (the "***DIP Indemnity Account***") subject to the liens of the DIP Agent, for the benefit of itself and the other DIP Lenders, to secure contingent indemnification, reimbursement or similar continuing obligations arising under or related to the DIP Loan Documents (the "***DIP Indemnity Obligations***"); provided that the liens securing the DIP Indemnity Obligations shall be subject to the priorities and terms of this Interim Order, and the Lien Priority Annex.  Subject to the terms of this Interim Order, the DIP Agent, on behalf of itself and the other DIP Secured Parties, may apply amounts in the DIP Indemnity Account against the DIP Indemnity Obligations as and when they arise, without further notice to or consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court.  The DIP Indemnity Account shall be released and the funds applied in accordance with this Final Order upon the indefeasible payment in full, in cash of the DIP Obligations and the receipt by the DIP Agent and each of the other DIP Lenders of releases from the Debtors and their estates, with respect to any claims arising out of or related to the DIP Credit Agreement and the other DIP Loan Documents, which release shall be acceptable to the DIP Agent.

29.    <u>Proofs of Claim</u>.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of these Chapter 11 Cases or any Successor Cases, neither the DIP Credit Parties, the Prepetition Agents, nor any of the Prepetition Secured Creditors shall be required to file proofs of claim in these cases or any Successor Cases in order to assert claims for payment of any of the DIP Obligations or the Prepetition Secured Obligations, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts due and

51

payable under the Prepetition Credit Documents or this Interim Order. None of the DIP Credit Parties or the Prepetition Secured Creditors will be required to file proofs of claim or requests for approval of administrative expenses in any of the Chapter 11 Cases or Successor Cases, and the provisions of this Interim Order relating to the DIP Obligations, the DIP Superpriority Claims, the relevant Adequate Protection Superpriority Claims, the Prepetition ABL Obligations and the Debtors' Stipulations shall constitute timely filed proofs of claim and/or administrative expense requests (as applicable) in each of the Chapter 11 Cases.

30.     Rights of Access and Information. The Debtors shall use commercially reasonable efforts to afford the DIP Credit Parties, all of the rights of access and information provided for under the DIP Loan Documents.

31.     Carve Out.

(a)     *Priority of Carve Out.* Each of the DIP Liens, the Prepetition Liens (excluding the Segregated Cash Collateral and the Prepetition Term Loan Liens), the Adequate Protection Liens, the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, the DIP Obligations, and the Prepetition Secured Obligations shall be subject and subordinate to payment of the Carve Out (as defined herein). The Carve Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in the Lien Priority Annex.

(b)     *Definition of Carve Out.* As used in this Interim Order, the Carve Out means the sum of (i) all unpaid professional fees and disbursements incurred by the Debtors and the Committee, if any, pursuant to Sections 327 and 1103 of the Bankruptcy Code (the "***Case Professionals***") prior to the delivery of the Carve Out Trigger Notice to the extent allowed by the Bankruptcy Court at any time, but solely to the extent the same are incurred by each Case

Professional in accordance with the Approved Budget; plus (ii) any "Transaction Fee" owed to SSG Advisors, LLC under its engagement letter with the Debtors for investment banking services as in effect on the Petition Date that is allowed by the Bankruptcy Court; plus (iii) following the delivery of a Carve Out Trigger Notice, the unpaid professional fees and disbursements incurred by the Case Professionals in an amount collectively up to $500,000 (the "*Case Professional Carve Out Limit*"), plus (iv) the payment of fees pursuant to 28 U.S.C. § 1930(a), including fees owed to the U.S. Trustee, and any fees required to be paid to the Clerk of the Bankruptcy Court, which fees shall not be limited to amounts that may be set forth in the Approved Budget; plus (v) all reasonable fees and expenses up to $50,000 incurred by a chapter 7 trustee under Section 726(b) of the Bankruptcy Code (the "*Chapter 7 Trustee Carve Out Limit*", and together with the Case Professional Carve Out Limit, the "*Carve Out Limit*") (items (i) through (v), collectively, the "*Carve Out*").  Within three (3) Business Days of delivery of a Carve Out Trigger Notice, the outstanding amount of the Carve Out shall be funded by the Debtors into the Professional Fee Escrow Account; *provided*, that (i) the Debtors shall first utilize cash on hand to fund the Carve Out, and (ii) solely to the extent that the Debtors are unable to fully fund the Carve Out with cash on hand in the manner and in the amount set forth in this paragraph 31(b), then proceeds from the DIP Facility shall be used to fund any shortfall, which funding may be in the form of additional DIP Loans.  For purposes of the foregoing, "*Carve Out Trigger Notice*" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel (Pachulski, Stang, Ziehl & Jones LLP), counsel to the Conflicts Committee (Goodwin Procter), the U.S. Trustee, and lead counsel to any Committee, which notice may be delivered only following the occurrence and during the continuation of an Event of Default.

(c)      *Professional Fee Escrow Account*. Notwithstanding anything to the contrary contained in this Interim Order, until an Event of Default or the Termination Declaration Date has occurred, the Debtors shall be permitted to borrow under the DIP Facility on a weekly basis to fund a non-interest bearing account (which may be the trust account of the Debtors' restructuring counsel) for the benefit of the Case Professionals (the "***Professional Fee Escrow Account***") in the amounts contemplated under clause (i) of the immediately preceding paragraph. The Debtors shall be permitted to pay, or cause to be paid from the Professional Fee Escrow Account, as and when the same may become due and payable, the allowed professional fees of Case Professionals regardless of whether an Event of Default or the Termination Declaration Date has occurred.  None of the provisions of this Interim Order or any DIP Loan Document shall prohibit or restrict the payment of the fees and expenses of any Case Professionals from any retainers held by such Case Professional.  Any amounts remaining in the Professional Fee Escrow Account after the payment in full of all allowed professional fees of Case Professionals pursuant to final fee applications and orders shall be returned to the Debtors, which amounts shall be applied in accordance with paragraph 17 hereof.  The DIP Liens and Adequate Protection Liens shall attach, in accordance with the relative priorities set forth in the Lien Priority Annex, to any cash held in the Professional Fee Escrow Account following the payment of Case Professionals from the Carve Out.

(d)      *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any allowed professional fees shall not reduce or be deemed to reduce the Carve Out; *provided*, *however*, that the obligation of the DIP Credit Parties to fund the Professional Fee Escrow Account shall be deemed satisfied so long as the DIP Credit

54

Parties have complied with their obligations with respect to the Professional Fee Escrow Account as set forth in this paragraph 31.

(e)        *Payment of Carve Out On or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any allowed professional fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding or payment of the Carve Out shall be added to, and made a part of the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law; *provided* that any funding or payment that constituted DIP Obligations, shall not be further added to the DIP Obligations.

(f)        *No Direct Obligation To Pay Allowed Professional Fees*.  None of the DIP Credit Parties or the Prepetition Secured Creditors shall be responsible for the payment or reimbursement of any fees or disbursements of any Case Professional or any fees or expenses of the U.S. Trustee or Clerk of this Court incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Credit Parties or the Prepetition Secured Creditors, in any way, to pay compensation to, or to reimburse expenses of, any Case Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Until the DIP Obligations and Prepetition Secured Obligations have been Paid in Full, Allowed Professional Fees shall be paid solely from the Professional Fee Escrow Account or any retainers held by Case Professionals.

(g)        *Subordination to Carve Out*. Notwithstanding anything to the contrary in this Interim Order, the Debtors' obligations to the DIP Credit Parties and the Prepetition Secured

Creditors and the liens, security interests, and superpriority claims granted herein, under the DIP

Loan Documents, and/or under the Prepetition Credit Documents, including, without limitation,

the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, Adequate Protection

Superpriority Claims, and the Prepetition Secured Obligations, shall be subject in all respects and

subordinate to the Carve Out.  For the avoidance of doubt, upon the funding of the Carve Out as

set forth in this paragraph 31, the DIP Credit Parties and the Prepetition Secured Creditors shall

have no further obligation to fund the Carve Out (including the Professional Fee Escrow

Account), and their liens and claims shall not be subordinate to any obligations or amounts other

than that which is held in the Carve Out.

(h)     In accordance with the DIP Credit Agreement, the DIP Agent shall be

entitled to at all times maintain a reserve (the "*ABL Carve Out Reserve*") against the Borrowing

Base (as defined in the DIP Credit Agreement) in an amount not to exceed, at any time of

determination, the sum of the Carve Out Limit.

(i)     *Reservation of Rights*.  Nothing in this Interim Order shall be construed as

consent to the allowance of any professional fees or expenses of any Case Professional or shall

be construed as a waiver of any right of the DIP Credit Parties and the Prepetition Secured

Creditors with respect to any fee statement, interim application or monthly application issued or

filed by the Case Professionals.  Notwithstanding anything to the contrary herein or in the DIP

Loan Documents, (x) in no event shall any DIP Lender be required to fund any amounts in excess

of its DIP Commitment and (y) the payment of any allowed professional fees pursuant to the

Carve Out shall not (i) reduce any Debtor's obligations owed to the DIP Agent, any DIP Lender,

the DIP Credit Parties, the Prepetition Agents, and the Prepetition Secured Creditors (whether

under this Interim Order or otherwise) or (ii) modify, alter or otherwise affect any of the liens and

security interests of such parties (whether granted under this Interim Order or otherwise) in the Prepetition Collateral or the DIP Collateral (or their claims against the Debtors).

32.    <u>Limitation on Use of DIP Loans and DIP Collateral (Including Cash Collateral)</u>. For the avoidance of doubt and notwithstanding any other provision of this Interim Order or any other order entered by this Court to the contrary, no portion of the Carve Out, DIP Collateral, or Prepetition Collateral (including Cash Collateral) may be used directly or indirectly in connection with: (i) the investigation, initiation, or prosecution of any claims, causes of action, motions, adversary proceedings, or other litigation, (A) against any of the DIP Lenders, the DIP Agent, the Prepetition Secured Creditors (whether in such capacity or otherwise), or (B) challenging the amount, validity, perfection, priority, or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Loan Documents or in connection with the Prepetition Loan Facilities, including, in each case without limitation, for lender liability or pursuant to Sections 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (ii) attempts to modify any of the rights granted to the DIP Lenders or the DIP Agent with respect to the DIP Facility or the Prepetition Agents or the other Prepetition Secured Creditors with respect to the Prepetition Loan Facilities; (iii) any objection to, motion to reconsider or appeal of any order with respect to the DIP Facility; (iv) attempts to prevent, hinder, or otherwise delay any of the DIP Lenders' or the DIP Agent's assertion, enforcement, or realization upon any DIP Collateral in accordance with the DIP Loan Documents and the Final Order once an Event of Default has occurred and any applicable Remedies Notice Period expired; *provided*, *however*, that the proceeds of the DIP Loans and DIP Collateral (including Cash Collateral) may be used by the Committee (if any) to investigate prior to the Challenge Deadline (as defined below), but not to prosecute, (A) the claims

and liens of the Prepetition Secured Creditors, and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Creditors, up to an aggregate cap of no more than $50,000.

33.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

34.    <u>Release</u>.    Subject to paragraph 44 hereof, and the challenge rights granted thereunder, effective upon entry of this Interim Order, each of the Released Parties is released by the Debtors as provided in paragraph F(viii) hereof.

35.    <u>Section 506(c) Claims</u>. Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or Successor Cases at any time shall be charged against the DIP Credit Parties or the DIP Collateral or the Prepetition Secured Creditors or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise and all rights to surcharge the DIP Credit Parties or the DIP Collateral or the Prepetition Secured Creditors or the Prepetition Collateral under sections 105 or 506(c) of the Bankruptcy Code or any other applicable principle of equity or law shall be and are hereby finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties-in-interest in this or any Successor Cases.

36.    <u>No Marshaling / Applications of Proceeds</u>.  Upon entry of the Final Order, none of the DIP Credit Parties or the Prepetition Secured Creditors shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

13085205v9

37.  <u>Section 552(b)</u>.  The DIP Agents and the other DIP Credit Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  Upon entry of the Final Order, and subject to approval by this Court therein, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Credit Parties or the Prepetition Secured Creditors with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral or DIP Collateral.

38.  <u>Limits on Lender Liability</u>.  Nothing in this Interim Order, any of the DIP Loan Documents, the Prepetition Credit Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Creditors of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of the Chapter 11 Cases.  The DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Creditors shall not, solely by reason of having made loans under the DIP Facility or permitting the use of Cash Collateral, as applicable, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Nothing in this Interim Order or the DIP Loan Documents, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Creditors of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

39.    <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Loan Documents.

40.    <u>No Superior Rights of Reclamation</u>.  The extension of the DIP Facility and the repayment and refinancing of the Prepetition ABL Obligations with the proceeds of the DIP Loans are part of an integrated transaction.  Based on the findings and rulings herein concerning the integrated nature of the DIP Facility and the Prepetition ABL Documents and the relation back of the DIP Liens, in no event shall any alleged right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) be deemed to have any additional or greater rights and priority with respect to the Prepetition ABL Liens as such claim had on the Petition Date.

41.    <u>Debtors' Waivers/Covenants</u>. At all times during the Chapter 11 Cases prior to the DIP Obligations and Prepetition Secured Obligations being Paid in Full, and whether or not an Event of Default has occurred, the Debtors waive and covenant not to seek authority to take any of the following actions prior to the DIP Obligations and Prepetition Secured Obligations being Paid in Full, other than as expressly provided for in this Interim Order or the DIP Loan Documents, or unless the DIP Agent or applicable Prepetition Agent otherwise consents in writing: (i) use Cash Collateral under Section 363 of the Bankruptcy Code, (ii) obtain postpetition loans or other financial accommodations pursuant to Section 364(c) or 364(d) of the Bankruptcy Code, (iii) challenge the application of any payments authorized hereunder pursuant to Section 506(b) of the Bankruptcy Code, or assert that the value of the Prepetition ABL Collateral is less than the Prepetition ABL Obligations, or assert that the value of the applicable Prepetition Term

60

Loan Collateral is less than the Prepetition Term Loan Obligations secured thereby (iv) propose, support or have a plan of reorganization or liquidation that does not provide for all DIP Obligations and Prepetition Secured Obligations to be Paid in Full on the effective date of such plan; (v) seek relief under the Bankruptcy Code, including without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of any DIP Credit Parties as provided in this Interim Order and the DIP Loan Documents or any DIP Credit Parties' exercise of such rights or remedies, (vi) challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of the DIP Agent's postpetition liens and claims, or (vii) take any other action prohibited pursuant to Section 6.11 of the DIP Credit Agreement. No consent to any of the foregoing shall be implied from any other action, inaction, or acquiescence by any of the DIP Credit Parties, and the written consent of the DIP Agent shall be required to relieve the Debtors of their obligations under this paragraph 41 and the consent of PNC required to relieve the Debtor of their obligations under this paragraph 41 pertaining to any of the Prepetition PNC Collateral, Prepetition PNC Liens or Prepetition PNC Obligations.

42.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Credit Parties' or the Prepetition Secured Creditors' right to seek any other or supplemental relief in respect of the Debtors (including, the right to seek additional or different adequate protection); (b) the rights of any of the Prepetition Secured Creditors to seek the payment by the Debtors of postpetition interest or fees pursuant to section 506(b) of the Bankruptcy Code; or (c) any of the rights of the DIP Credit Parties or the Prepetition Secured Creditors under the Bankruptcy Code or under non-bankruptcy law, including, without limitation,

61

the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, (iii) seek an injunction, (iv) oppose any request for use of Cash Collateral, (v) object to any sale of assets, or (vi) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; *provided*, that the rights of the DIP Credit Parties and the Prepetition Secured Creditors with respect to sections (i)–(iii) of this paragraph 42 shall be subject to the Carve Out and the relative priorities set forth on the Lien Priority Annex.  Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Credit Parties and the Prepetition Secured Creditors are preserved.

43.     No Waiver by Failure to Seek Relief.  The failure of the DIP Credit Parties to seek relief or otherwise exercise rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Credit Parties.

44.     Binding Effect of Interim Order.  Immediately upon entry by this Court of this Interim Order, the stipulations (including the Debtors' Stipulations), terms and provisions of this Interim Order (including, without limitation, the Adequate Protection Liens, Adequate Protection Payments, and the Adequate Protection Superpriority Claims) shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Credit Parties, the Prepetition Secured Creditors, all other creditors of any of the Debtors, the Committee, if any, and all other parties-in-interest and their respective successors and assigns, including, without limitation, any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or

62

upon dismissal of any Chapter 11 Case or Successor Case, unless, and solely to the extent that:

any person or any party-in-interest (including the Committee, if any) that has sought and obtained

standing and the requisite authority to commence a Challenge[7] (other than the Debtors, as to

which any Challenge is hereby irrevocably waived and relinquished) and has timely commenced

a Challenge until the date that is the earlier of (i) subject to entry of the Final Order, concurrent

with the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan

of reorganization and (ii) seventy five (75) calendar days after the entry of this Interim Order

(the "***Challenge Deadline***"), as such applicable date may be extended in writing from time to

time by the applicable Prepetition Agent in its sole discretion, or by this Court for good cause

shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge

Deadline; *provided* that if the Chapter 11 Cases are converted to chapter 7 or a chapter 7 or chapter

11 trustee is appointed or elected prior to the expiration of the Challenge Deadline, any such estate

representative or trustee shall receive the full benefit of any remaining time before expiration of

the Challenge Deadline, which, solely if not yet expired, shall be extended for a period of sixty

(60) days; and (B) this Court enters judgment in favor of the plaintiff or movant in any such timely

commenced Challenge proceeding and any such judgment has become a final judgment that is

not subject to any further review or appeal. The Challenge Deadline set forth herein shall be tolled

if a party-in-interest (including the Committee, if any) files a motion seeking standing to bring a

---

[7]    "Challenge" as used herein shall mean an adversary proceeding or contested matter (subject to the limitations contained herein) (a) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations or the Prepetition Liens, or (b) asserting or prosecuting any Avoidance Action or any other claims, counterclaims or causes of action, objections, contests or defenses against any Prepetition Secured Creditors or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof in connection with or related to the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Collateral.

13085205v9

Challenge ("***Standing Motion***"), which attaches one or more draft complaints that detail the alleged challenge(s) that the applicable party in interest seeks to file, until such time as the Court decides the Standing Motion and solely with respect to (i) the party-in-interest that files the Standing Motion and (ii) the contents of the complaint attached to the Standing Motion. Notwithstanding any other provision in the interim order, the Court retains the right to enter any appropriate remedy.

45.    <u>Credit Bidding</u>. Subject to paragraph 44 of this Interim Order and the rights of parties-in-interest under section 363(k) of the Bankruptcy Code, in connection with any sale process authorized by the Court, upon entry of the Interim order, the Prepetition Agents may seek to credit bid some or all of their claims for their respective collateral (each a "***Credit Bid***"). A Credit Bid may be applied only to reduce the cash consideration with respect to those assets in which the party submitting such Credit Bid holds a senior, perfected security interest.  For the avoidance of doubt, absent the Payment in Full of the Prepetition PNC Obligations the Prepetition ABL Secured Parties may not credit bid for Prepetition PNC Collateral and absent the Payment in Full of the Prepetition ABL Obligations the PNC Secured Parties may not credit bid for Prepetition ABL Collateral.

46.    Any order dismissing one or more of the Chapter 11 Cases or Successor Cases under section 1112 of the Bankruptcy Code or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that: (i) the DIP Liens, Prepetition Liens, and Adequate Protection Liens shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations, the Prepetition Secured Obligations, and/or Adequate Protection Superpriority Claims, as applicable, are Paid in Full; and (ii) this Court shall retain jurisdiction, to the extent permissible under applicable law, notwithstanding such dismissal, for

the purposes of enforcing the DIP Superpriority Claims, DIP Liens, Carve Out, Adequate Protection Superpriority Claims, Adequate Protection Liens, and the Prepetition Liens. Notwithstanding anything contained herein with respect to the obligations or limitations when a Final Order is entered, the terms of the Final Order shall be what is binding on all parties.

47.    <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations have been Paid in Full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Agent (i) any reversal, modification, stay, vacatur, or amendment to this Interim Order or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims or the Adequate Protection Superpriority Claims, other than the Carve Out; (b) any order, other than this Interim Order or the Final Order, allowing use of Cash Collateral resulting from DIP Collateral; and (c) except as set forth in this Interim Order or the Final Order, any lien on any of the DIP Collateral or Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the Prepetition Liens.

48.    <u>Segregated Cash Collateral</u>. Notwithstanding anything to the contrary herein, PNC letter of credit issuer shall be authorized and entitled to (a) pursuant to the terms of the Prepetition LOC Documents (i) without notice or demand, and at any time or from time to time, charge, set off and otherwise apply all or any part of the, Prepetition LOC Obligations against the Segregated

Cash Collateral or any part thereof and (ii) exercise all other rights and remedies available to it thereunder in respect of the Prepetition LOC Documents and (b) give written notice of non-extension of the PNC letters of credit to the beneficiaries thereof pursuant to the terms of the PNC letters of credit and, in each case, the automatic stay is hereby deemed lifted as necessary to permit such action without the need for any additional notice. The Segregated Cash Collateral secures all Prepetition LOC Obligations, including interest, fees, costs and other charges accrued or accruing under the Prepetition LOC Documents. The Segregated Cash Collateral is not subject to turnover under section 543 of the Bankruptcy Code. For all purposes under this Order and notwithstanding anything to the contrary contained herein, the Segregated Cash Collateral may only be used for purposes of satisfying the Prepetition LOC Obligations for no other purpose, until such Prepetition LOC Obligations and all Prepetition PNC Obligations have been Paid in Full.  For the avoidance of doubt, the Segregated Cash Collateral is subject to the exclusive control and dominion of PNC, and the DIP Lien on the Segregated Cash Collateral is in all respects junior to PNC's interest in the Segregated Cash Collateral.

49.    <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents or this Interim Order, the provisions of this Interim Order shall govern and control.

50.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  Upon entry of the Final Order, the terms and provisions of this Interim

66

Order, including, without limitation, the claims, liens, security interests, and other protections granted to the DIP Credit Parties and Prepetition Secured Creditors pursuant to this Interim Order and/or the DIP Loan Documents, notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (x) all DIP Obligations have been Paid in Full and all commitments to extend credit under the DIP Facility are terminated and (y) all Prepetition Secured Obligations have been Paid in Full.

51.    Final Hearing.  A final hearing to consider the relief requested in the Motion shall be held on [_____], 2025, at [ ] [a.m./p.m.], prevailing Eastern Time before this Court.

52.    Notice of Entry of Interim Order.  The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing and to any party that has filed a request for notices with this Court.

53.    Objections.  Any party in interest objecting to the relief sought at the Final Hearing shall file a written objection no later than [_____], 2025, at [ ] [a.m./p.m.], prevailing Eastern Time and serve such objection or response on the following parties: (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19899, Attn: Laura Davis Jones, Esq. (ljones@pszjlaw.com) and David M. Bertenthal, Esq. (dbertenthal@pszjlaw.com); (b) proposed counsel to the Conflicts Committee, (i) Goodwin Procter LLP, 620 Eighth Ave., New York, NY 10018, Attn: Kizzy L. Jarashow, Esq. (kjarashow@goodwinlaw.com) and Stacy Dasaro, Esq. (sdasaro@goodwinlaw.com) and (ii) Potter Anderson & Corroon LLP 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801, Attn: L. Katherine Good, Esq. (kgood@potteranderson.com); (c) counsel to the DIP Agent

67

and Prepetition ABL Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola, Esq. (jventola@choate.com), Jonathan D. Marshall, Esq. (jmarshall@choate.com), and Lucas B. Barrett, Esq. (lbarrett@choate.com), and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Daniel J. DeFranceschi, Esq. (defranceschi@RLF.com), John H. Knight, Esq. (Knight@RLF.com), Matthew P. Milana, Esq. (Milana@RLF.com); (d) counsel to the Prepetition Term Loan Agent, (i) Goldberg Kohn, 55 East Monroe Street, Chicago, IL 60603-5792, Attn: Randall L. Klein, Esq. (randall.klein@goldbergkohn.com) and Zachary J. Garrett, Esq. (zachary.garrett@goldbergkohn.com) and (ii) Blank Rome LLP, 1201 N. Market Street, Suite 800, Wilmington, DE 19801, Attn: Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com); (e) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Malcolm M. Bates, Esq. (malcolm.m.bates@usdoj.gov); and (f) counsel to the Committee (if any). In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

54.    _Effectiveness_.  This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable _nunc pro tunc_ to the Petition Date immediately upon entry hereof.  Notwithstanding anything to the contrary proscribed by applicable law, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

55.    _Retention of Jurisdiction_.  This Court has and will retain jurisdiction to enforce this Interim Order.

**Exhibit 1**

**Lien Priority Annex**

| Prepetition ABL Collateral | Prepetition PNC Collateral | Other DIP Collateral |
|---|---|---|
| Carve Out | Prepetition Term Permitted Liens | Carve Out |
| Prepetition ABL Permitted Liens | Adequate Protection Liens (for Prepetition Term Loan Secured Parties)<br>Adequate Protection Superpriority Claims (for Prepetition Term Loan Secured Parties) | Prepetition Permitted Liens |
| DIP Liens<br>DIP Superpriority Claim | Prepetition Term Loan Liens<br>Prepetition Term Loan Obligations | DIP Liens<br>DIP Superpriority Claim |
| Adequate Protection Liens (for Prepetition ABL Secured Parties)<br>Adequate Protection Superpriority Claims (for Prepetition ABL Secured Parties) | Carve Out | Adequate Protection Liens<br>Adequate Protection Superpriority Claims |
| Prepetition ABL Liens<br>Prepetition ABL Obligations | DIP Liens<br>DIP Superpriority Claim | NA |
| Adequate Protection Liens (for Prepetition Term Loan Secured Parties)<br><br>Adequate Protection Superpriority Claims (for Prepetition Term Loan Secured Parties) | Adequate Protection Liens (for Prepetition ABL Secured Parties)<br>Adequate Protection Superpriority Claims (for Prepetition ABL Secured Parties) | NA |

**<u>Exhibit 2</u>**

**DIP Credit Agreement**

**FILING VERSION**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of November [●], 2025

among

AMERICAN SIGNATURE, INC.,
as the Borrower,

The Guarantors Party Hereto,

SECOND AVENUE CAPITAL PARTNERS LLC,
as Administrative Agent and Collateral Agent

and

The Lenders From Time to Time Party Hereto

13086027v16

Table of Contents

**Page**

Article I DEFINITIONS AND ACCOUNTING TERMS ................................................................ 2
    1.01 ......... Defined Terms ................................................................................................ 2
    1.02 ......... Other Interpretive Provisions ....................................................................... 42
    1.03 ......... Accounting Terms Generally ........................................................................ 43
    1.04 ......... Rounding ........................................................................................................ 43
    1.05 ......... Times of Day ................................................................................................. 43
    1.06 ......... Divisions ........................................................................................................ 43
    1.07 ......... Rates .............................................................................................................. 43

Article II THE COMMITMENTS AND BORROWINGS ........................................................... 44
    2.01 ......... Committed Revolving Loans; Reserves ........................................................ 44
    2.02 ......... Borrowings of Committed Revolving Loans ................................................ 44
    2.03 ......... [Reserved] ...................................................................................................... 46
    2.04 ......... [Reserved] ...................................................................................................... 46
    2.05 ......... Prepayments .................................................................................................. 46
    2.06 ......... Termination or Permanent Reduction of Aggregate Revolving Commitments ........... 47
    2.07 ......... Repayment of Committed Revolving Loans ................................................. 47
    2.08 ......... Interest ........................................................................................................... 47
    2.09 ......... Fees ................................................................................................................ 47
    2.10 ......... Computation of Interest and Fees; Application of Payments ....................... 48
    2.11 ......... Evidence of Debt ........................................................................................... 48
    2.12 ......... Payments Generally; Agent's Clawback ...................................................... 48
    2.13 ......... Sharing of Payments by Lenders .................................................................. 50
    2.14 ......... Settlement Amongst Lenders ........................................................................ 50
    2.15 ......... [Reserved] ...................................................................................................... 51
    2.16 ......... Defaulting Lenders ........................................................................................ 51

Article III TAXES, YIELD PROTECTION AND ILLEGALITY ............................................. 52
    3.01 ......... Taxes .............................................................................................................. 52
    3.02 ......... Conforming Changes ..................................................................................... 56
    3.03 ......... Inability to Determine Rates; Benchmark Replacement ............................... 56
    3.04 ......... Increased Costs; Reserves on Committed Revolving Loans ........................ 58
    3.05 ......... Reserved ........................................................................................................ 59
    3.06 ......... Mitigation Obligations; Replacement of Lenders ........................................ 59
    3.07 ......... Survival ......................................................................................................... 59

Article IV CONDITIONS PRECEDENT TO REVOLVING CREDIT BORROWINGS ......... 59
    4.01 ......... Conditions of Effectiveness and Initial Revolving Credit Borrowing .......... 59
    4.02 ......... Conditions to all Revolving Credit Borrowings ........................................... 62

Article V REPRESENTATIONS AND WARRANTIES ............................................................ 63
    5.01 ......... Existence, Qualification and Power .............................................................. 63
    5.02 ......... Authorization; No Contravention .................................................................. 64
    5.03 ......... Governmental Authorization; Other Consents ............................................. 64
    5.04 ......... Binding Effect ............................................................................................... 64
    5.05 ......... Financial Information; No Material Adverse Effect ...................................... 64
    5.06 ......... Litigation ....................................................................................................... 65
    5.07 ......... No Default ...................................................................................................... 65
    5.08 ......... Ownership of Property; Liens ....................................................................... 65

Table of Contents

5.09 ........ Environmental Compliance ............................................................ 66
5.10 ........ Insurance .................................................................................... 67
5.11 ........ Taxes ........................................................................................... 67
5.12 ........ ERISA Compliance ...................................................................... 67
5.13 ........ Subsidiaries; Equity Interests ...................................................... 68
5.14 ........ Margin Regulations; Investment Company Act ............................ 68
5.15 ........ Disclosure ................................................................................... 68
5.16 ........ Compliance with Laws ................................................................ 69
5.17 ........ Intellectual Property; Licenses, Etc ............................................ 69
5.18 ........ Labor Matters .............................................................................. 69
5.19 ........ Security Documents ..................................................................... 69
5.20 ........ [Reserved] ................................................................................... 70
5.21 ........ Deposit Accounts; Credit Card Arrangements .............................. 70
5.22 ........ Brokers ........................................................................................ 70
5.23 ........ Customer and Trade Relations ..................................................... 71
5.24 ........ Material Contracts ....................................................................... 71
5.25 ........ Casualty ....................................................................................... 71
5.26 ........ Bankruptcy Matters ..................................................................... 71
5.27 ........ Personally Identifiable Information .............................................. 72
5.28 ........ Cybersecurity ............................................................................... 72

Article VI AFFIRMATIVE COVENANTS .......................................................... 72
6.01 ........ Approved Budget .......................................................................... 72
6.02 ........ Certificates; Other Information .................................................... 73
6.03 ........ Notices ......................................................................................... 74
6.04 ........ Payment of Obligations ................................................................ 75
6.05 ........ Preservation of Existence, Etc ..................................................... 76
6.06 ........ Maintenance of Properties ............................................................ 76
6.07 ........ Maintenance of Insurance ............................................................ 76
6.08 ........ Compliance with Laws ................................................................ 78
6.09 ........ Books and Records; Accountants .................................................. 78
6.10 ........ Inspection Rights ......................................................................... 78
6.11 ........ Use of Proceeds ........................................................................... 79
6.12 ........ Additional Loan Parties ............................................................... 79
6.13 ........ Cash Management ........................................................................ 80
6.14 ........ Information Regarding the Collateral ........................................... 81
6.15 ........ Physical Inventories; Cybersecurity Audits .................................. 82
6.16 ........ Environmental Laws ..................................................................... 82
6.17 ........ Further Assurances ....................................................................... 83
6.18 ........ Compliance with Terms of Leaseholds; Assumption and Rejection of Leases ............ 83
6.19 ........ Material Contracts ....................................................................... 83
6.20 ........ [Reserved] ................................................................................... 84
6.21 ........ [Reserved] ................................................................................... 84
6.22 ........ Employee Benefit Plans ............................................................... 84
6.23 ........ [Reserved] ................................................................................... 84
6.24 ........ Personally Identifiable Information .............................................. 84
6.25 ........ Cybersecurity and Data Protection ............................................... 84
6.26 ........ Performance within Approved Budget .......................................... 84
6.27 ........ Retention Consultants; Communication with Accountants and Other Financial
             Advisors ...................................................................................... 85
6.28 ........ Bankruptcy Related Affirmative Covenants ................................. 87

Table of Contents

6.29 ......... Financing Orders ................................................................................. 87
6.30 ......... Post-Closing Obligations .................................................................. 87
Article VII NEGATIVE COVENANTS ............................................................. 87
7.01 ......... Liens ....................................................................................................... 87
7.02 ......... Investments .......................................................................................... 88
7.03 ......... Indebtedness; Disqualified Stock .................................................. 88
7.04 ......... Fundamental Changes ....................................................................... 88
7.05 ......... Dispositions ......................................................................................... 88
7.06 ......... Restricted Payments .......................................................................... 88
7.07 ......... Prepayments of Indebtedness ........................................................ 88
7.08 ......... Change in Nature of Business ........................................................ 88
7.09 ......... Transactions with Affiliates ............................................................ 88
7.10 ......... Burdensome Agreements ................................................................. 89
7.11 ......... Use of Proceeds .................................................................................. 89
7.12 ......... Amendment of Material Documents ............................................. 89
7.13 ......... Fiscal Year ............................................................................................ 89
7.14 ......... Deposit Accounts; Credit Card Processors ................................. 89
7.15 ......... [Reserved] ............................................................................................ 89
7.16 ......... Designation of Senior Debt ............................................................ 89
7.17 ......... Store Locations; Inventory and Asset Dispositions Outside the Ordinary
                 Course ..................................................................................................... 90
7.18 ......... Reclamation Claims ........................................................................... 90
7.19 ......... Bankruptcy Related Negative Covenants .................................... 90
7.20 ......... Subsidiaries .......................................................................................... 90
7.21 ......... Consignment ....................................................................................... 90
Article VIII EVENTS OF DEFAULT AND REMEDIES ............................... 91
8.01 ......... Events of Default ............................................................................... 91
8.02 ......... Remedies Upon Event of Default ................................................. 95
8.03 ......... Application of Funds ......................................................................... 96
Article IX THE AGENT ........................................................................................ 97
9.01 ......... Appointment and Authority ........................................................... 97
9.02 ......... Rights as a Lender .............................................................................. 97
9.03 ......... Exculpatory Provisions ..................................................................... 97
9.04 ......... Reliance by Agent ............................................................................... 98
9.05 ......... Delegation of Duties .......................................................................... 98
9.06 ......... [Reserved] ............................................................................................ 99
9.07 ......... Non-Reliance on Agent and Other Lenders ............................... 99
9.08 ......... No Other Duties, Etc ........................................................................ 99
9.09 ......... Agent May File Proofs of Claim .................................................... 99
9.10 ......... Collateral and Guaranty Matters ................................................. 100
9.11 ......... Notice of Transfer ........................................................................... 100
9.12 ......... Reports and Financial Statements .............................................. 100
9.13 ......... Agency for Perfection ..................................................................... 101
9.14 ......... Indemnification of Agent .............................................................. 101
9.15 ......... Relation among Lenders ................................................................ 101
9.16 ......... Recovery of Erroneous Payments .............................................. 101
Article X MISCELLANEOUS ............................................................................ 102
10.01 ....... Amendments, Etc ............................................................................ 102
10.02 ....... Notices; Effectiveness; Electronic Communications ............. 103

Table of Contents

10.03 ....... No Waiver; Cumulative Remedies ................................................................... 104
10.04 ....... Expenses; Indemnity; Damage Waiver ................................................... 105
10.05 ....... Payments Set Aside ................................................................................. 106
10.06 ....... Successors and Assigns ........................................................................... 106
10.07 ....... Treatment of Certain Information; Confidentiality ............................... 110
10.08 ....... Right of Setoff ......................................................................................... 111
10.09 ....... Interest Rate Limitation ........................................................................... 111
10.10 ....... Counterparts; Integration; Effectiveness ............................................... 112
10.11 ....... Survival .................................................................................................... 112
10.12 ....... Severability .............................................................................................. 112
10.13 ....... Replacement of Lenders .......................................................................... 112
10.14 ....... Governing Law; Jurisdiction; Etc. .......................................................... 113
10.15 ....... Waiver of Jury Trial ................................................................................ 114
10.16 ....... No Advisory or Fiduciary Responsibility; Disclosure Regarding Affiliates ............. 114
10.17 ....... USA PATRIOT Act Notice ..................................................................... 115
10.18 ....... Foreign Assets Control Regulations ....................................................... 116
10.19 ....... Time of the Essence ................................................................................ 116
10.20 ....... Reserved .................................................................................................. 116
10.21 ....... Press Releases; Non-Disclosure .............................................................. 116
10.22 ....... Additional Waivers .................................................................................. 117
10.23 ....... No Strict Construction ............................................................................. 118
10.24 ....... Attachments ............................................................................................. 118

Table of Contents

**SCHEDULES**

| | |
|---|---|
| 1.01(a) | Eligible Real Estate |
| 1.01(b) | Specified Store Closing Sales Stores |
| 2.01 | Revolving Commitments and Applicable Percentages |
| 2.02 | Mortgage Support Documents |
| 2.03 | Specified Mortgaged Properties |
| 5.01 | Loan Parties Organizational Information |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.09 | Environmental Matters |
| 5.10 | Insurance |
| 5.11 | Taxes |
| 5.13 | Subsidiaries; Equity Interests in the Borrower |
| 5.17 | Intellectual Property Matters |
| 5.18 | Collective Bargaining Agreements |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 5.24 | Material Contracts |
| 6.02(f) | Financial and Collateral Reporting |
| 6.30 | Post-Closing Obligations |
| 7.01 | Existing Liens |
| 7.03 | Existing Indebtedness |
| 7.09 | Affiliate Transactions |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Revolving Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | Borrowing Base Certificate |
| F | Credit Card Notification |
| G-1 to G-4 | U.S. Tax Compliance Certificates |
| H | Customs Broker/Carrier Agreement |
| I | Joinder |
| J | Interim Financing Order |
| L | Initial Approved Budget |

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") is entered into as of November [●], 2025, among (a) American Signature, Inc., an Ohio corporation, as a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), (b) the Guarantors (as defined below) from time to time party hereto, each as a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code, (c) each Lender (as defined below) from time to time party hereto (collectively, the "Lenders" and each individually, a "Lender"; each as hereafter further defined) and (d) Second Avenue Capital Partners LLC, as Administrative Agent (as defined below) and Collateral Agent (as defined below).

## PRELIMINARY STATEMENTS

A.    On November 22, 2025 (the "Petition Date"), the Borrower and the Guarantors (collectively, the "Debtors" and each individually, a "Debtor"), commenced Chapter 11 Case Nos. 25-12100 through 25-12108, as administratively consolidated at Chapter 11 Case No. [●] (collectively, the "Chapter 11 Cases" and each individually, a "Chapter 11 Case") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.    The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code (as defined below).

C.    Prior to the Petition Date, the Borrower and the Guarantors have been provided with financing pursuant to that certain Credit Agreement, dated as December 3, 2024 (as amended, amended and restated, restated, supplemented or otherwise modified through the Petition Date, the "Pre-Petition Credit Agreement"), among the Borrower, the Guarantors, the lenders party thereto (the "Pre-Petition Lenders") and Second Avenue Capital Partners LLC, as agent thereunder (in such capacity, the "Pre-Petition Agent").

D.    On the Petition Date, the Pre-Petition Lenders under the Pre-Petition Credit Agreement were owed $39,247,739.43 in outstanding principal of Revolving Credit Borrowings (as such term is defined in the Pre-Petition Credit Agreement), plus interest, fees, costs and expenses and all other Pre-Petition Obligations under the Pre-Petition Credit Agreement.

E.    The Borrower has requested, and Lenders have agreed, upon the terms and conditions set forth in this Agreement, to make available to the Borrower a senior secured revolving credit facility in an aggregate principal amount not to exceed $50,000,000.

F.    The Borrower and the Guarantors desire to secure the Obligations under the Loan Documents by granting to the Agent, for the benefit of the Credit Parties, a security interest in and Liens upon substantially all of their assets, whether now existing or hereafter acquired, in each instance as more fully set forth in the Loan Documents and the Interim Financing Order (or the Final Financing Order when applicable).

G.    All Obligations of the Borrower and the Guarantors to the Agent, the Lenders and the other Credit Parties hereunder and under the other Loan Documents shall be full recourse to each of the Loan Parties, secured by the Agent's security interest in and Liens on all or substantially all of the assets of the Loan Parties and entitled to super-priority administrative claim status under the Bankruptcy Code as provided herein and in the Financing Orders.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

13086027v16

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01     Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Document of Title" means, with respect to any Inventory, a tangible, negotiable bill of lading or other Document (as defined in the UCC) that (a) is issued by a common carrier or freight forwarder which is not an Affiliate of the Approved Foreign Vendor or any Loan Party which is in actual possession of such Inventory, (b) is issued to the order of a Loan Party or, if so requested by the Agent, to the order of the Agent (c) names the Agent as a notify party and bears a conspicuous notation on its face of the Agent's security interest therein, (d) is not subject to any Lien (other than in favor of the Agent), and (e) is on terms otherwise acceptable to the Agent in its Permitted Discretion; provided that, notwithstanding the foregoing, the Agent may determine in its sole discretion that a tangible, non-negotiable bill of lading on terms acceptable to the Agent in its Permitted Discretion may constitute an Acceptable Document of Title hereunder.

"Accommodation Payment" has the meaning set forth in Section 10.22(d).

"Account" means "accounts" as defined in the UCC and also means a right to payment of a monetary obligation, whether or not earned by performance, that (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.

"ACH" means automated clearing house transfers.

"Acquisition" means, with respect to any Person (a) an investment in, or a purchase of, a Controlling interest in the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a Controlling interest in the Equity Interests, of any Person, or (d) any acquisition of any Store locations of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"Act" has the meaning set forth in Section 10.17.

"Adjusted Term SOFR" means, for purposes of any calculation, the rate *per annum* equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" means Second Avenue in its capacity as administrative agent under any of the Loan Documents, or any successor thereto in such capacities.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

- 2 -

"Affiliate" means, with respect to any specified Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with such specified Person, (ii) any director, officer, managing member, partner, trustee, or beneficiary of such specified Person, (iii) any other Person directly or indirectly holding ten percent (10%) or more of any class of the Equity Interests of such specified Person, or (iv) any other Person holding ten percent (10%) or more of any class of whose Equity Interests is held directly or indirectly by such specified Person.  Without limiting the foregoing, each of the Lender Service Parties shall be deemed to be an Affiliate of Second Avenue for all purposes hereunder and under any other Loan Document, and Second Avenue shall be deemed to not be an Affiliate of the Borrower and its Subsidiaries.  Further, for all purposes hereunder and under any other Loan Documents, American Eagle Outfitters and Designer Brands Inc. shall be deemed to not be an Affiliate of the Borrower and its Subsidiaries.

"Agent" means Second Avenue in its capacity as Administrative Agent and Collateral Agent under any of the Loan Documents, or any successor thereto in such capacities.

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Borrower and the Lenders.

"Aggregate Revolving Commitments" means the lesser of (i) the Revolving Commitments of all of the Lenders and (ii) the amount provided therefor in the Financing Orders.  As of the Closing Date, the Aggregate Revolving Commitments are $50,000,000.

"Agreement" has the meaning set forth in the introductory paragraph hereto.

"Allocable Amount" has the meaning set forth in Section 10.22(d).

"Altamonte Springs Property" means the Real Estate located at 150 South State Road 434, Altamonte Springs, Florida 32714.

"Altamonte Springs Property Lease" means the Ground Lease, dated April 3, 1989, as amended, by and between West Town Corners, LLC, as landlord, and American Signature, Inc., as tenant, with respect to the Altamonte Springs Property.

"Alternative Base Rate" means, for any day, a fluctuating rate per annum equal to the greatest of (a) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the greatest per annum interest rate published by the FRB in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as reasonably determined by Agent) or any similar release by the FRB (as reasonably determined by Agent), (b) the sum of the Federal Funds Effective Rate on such day plus 0.50%, and (c) 3.00%.  Any change in the Alternative Base Rate due to a change in any of the rates referred to in the foregoing clauses (a) through (c) shall be effective from and including the effective date of such change.  The Alternative Base Rate is a reference rate and not necessarily the lowest interest rate at which any Lender may make loans or other extensions of credit to other customers.

"Alternative Base Rate Loan" means a Committed Revolving Loan that bears interest at a rate based on the Alternative Base Rate.

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

13086027v16

"Applicable Margin" means, with respect to SOFR Loans, six and twenty one-hundredths percent (6.20%) per annum and with respect to Alternative Base Rate Loans, five and twenty one-hundredths percent (5.20%).

"Applicable Percentage" means, with respect to any Lender at any time, the percentage of the Aggregate Revolving Commitments represented by such Lender's Revolving Commitment at such time.  If the commitment of each Lender to make Committed Revolving Loans has been terminated pursuant to Section 2.06 or Section 8.02 or if the Aggregate Revolving Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments.  The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraised Value" means, as the context requires, (i) with respect to Eligible Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of Eligible Inventory as set forth in the inventory stock ledger of the Borrower, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent and (ii) with respect to Eligible Real Estate, the fair market value of Eligible Real Estate as set forth in the most recent appraisal of Eligible Real Estate (which shall assume a marketing time of up to twelve (12) months and otherwise based on the appraisal methodology applied in the appraisals in effect on the Closing Date) as determined from time to time by an independent appraiser engaged by the Agent.

"Approved Budget" means the debtor-in-possession thirteen (13) week budget in the form of Exhibit L prepared by the Borrower and furnished to the Agent on or before the Closing Date, as the same may or shall, as applicable, be updated, modified and/or supplemented thereafter from time to time as provided in Section 6.01, which budget shall include a weekly budget, including information on a line item basis as to (a) projected cash receipts (including from asset sales), (b) projected disbursements (including ordinary course operating expenses, capital expenditures, bankruptcy-related expenses (including professional fees and expenses budgeted for the Case Professionals on a weekly basis) and any other fees and expenses relating to the Loan Documents), (c) projected net cash flow, (d) projected Inventory receipts, (e) projected Inventory levels, (f) projected Availability and (g) projected calculations of the Borrowing Base, which budget (as updated, modified or supplemented from time to time in accordance with this Agreement) shall be prepared in consultation with the Loan Party Advisors and shall be in form and substance reasonably acceptable to the Agent.

"Approved Budget Variance Report" means a weekly report (a) provided by the Borrower to the Agent in accordance with Section 6.02(a)(1) showing, in each case, by line item, the actual (i) cash receipts (including asset sales), (ii) disbursements (including ordinary course operating expenses, capital expenditures, bankruptcy-related expenses (including professional fees and expenses budgeted for the Case Professionals on a weekly basis) and any other fees and expenses relating to the Loan Documents), (iii) net cash flow, (iv) Inventory receipts, (v) Inventory levels, (vi) Availability, and (vii) the Borrowing Base, in each case, determined as of the last day of the Prior Week and the Cumulative Four-Week Period, and in each case, noting therein all variances, on a line-item and cumulative basis, from the amounts set forth for such period in the Approved Budget, and shall include explanations for all material variances and (2) an analysis demonstrating the Loan Parties are in compliance with the budget covenants set forth in Section 6.26, and (b) certified by a Responsible Officer of the Borrower.  The Approved Budget Variance Report shall be in a form, and shall contain supporting information, reasonably satisfactory to the Agent.

"Approved Foreign Vendor" means a Foreign Vendor which (a) is located in any country acceptable to the Agent in its discretion, (b) has received timely payment or performance of all obligations

- 4 -

owed to it by the Loan Parties, (c) has not asserted and has no right to assert any reclamation, repossession, diversion, stoppage in transit, Lien or title retention rights in respect of such Inventory, and (d), if so requested by the Agent, has entered into and is in full compliance with the terms of a Foreign Vendor Agreement.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender, or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Approved Liquidator" shall mean a nationally recognized professional liquidator, broker or other advisor acceptable to the Agent.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee, and accepted by the Agent, in substantially the form of Exhibit D or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Availability" means, as of any date of determination thereof by the Agent, the result of:

(a)     the Maximum Revolving Loan Amount,

minus

(b)     the Total Revolver Outstandings,

minus

(c)     the Total Pre-Petition Revolver Outstandings.

In calculating Availability at any time and for any purpose under this Agreement, the Borrower shall certify to the Agent that all Post-Petition accounts payable (including, without limitation, all rents) and Post-Petition Taxes are being paid on a timely basis, in each case subject to and in accordance with this Agreement.

"Availability Block" means an amount equal to the lesser of (a) $5,000,000 (except for the period December 22, 2025 through January 12, 2026, $3,000,000) and (b) ten percent (10%) of the Borrowing Base (calculated, solely for purposes of this clause (b), without giving effect to the Availability Block).

"Availability Period" means the period from and including the Closing Date to the Termination Date.

- 5 -

13086027v16

"Availability Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such other reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral, (b) to reflect claims, liabilities, costs and expenses that the Agent determines will need to be incurred or satisfied in connection with the realization upon the Collateral, (c) to reflect the maximum amount of any other court-ordered charges or other liabilities payable by the Loan Parties, (d) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, (e) to reflect that a Default or an Event of Default then exists or is anticipated to occur, or (f) to protect and preserve the value of the Agent's security interest in the Collateral.  Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's Permitted Discretion, (but are not limited to) reserves based on: (i) rent (including reserves imposed with respect to any or all leased Store locations pursuant to clause (e) above), including due to a failure of the Borrower to obtain an order of the Bankruptcy Court extending the lease assumption/rejection period as contemplated pursuant to the DIP Milestones; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (iv) salaries, wages and benefits due to employees of the Borrower; (v) Customer Credit Liabilities; (vi) Customer Deposits; (vii) reasonably anticipated changes in the Appraised Value of Eligible Inventory or Eligible Real Estate, as applicable, between appraisals; (viii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral; (ix) amounts due to vendors on account of consigned goods (including, for the avoidance of doubt, accrued and unpaid amounts on account of Specified Consigned Inventory); and (x) any reclamation or similar claims as may relate to or arise during the Chapter 11 Cases to the extent that such claims are determined by the Bankruptcy Court to be senior to the Obligations hereunder.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (b) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then removed from any definition providing for "interest periods" (or any similar or analogous definition) pursuant to Section 3.03(e).  For the avoidance of doubt, the only Available Tenor as of the Closing Date is three months.

"Bankruptcy Code" means Title 11, United States Code, as amended and in effect.

"Bankruptcy Court" has the meaning specified in the preliminary statements hereto.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.03(b).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by the Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for

13086027v16

Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Available Tenor, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Agent in consultation with the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to the then-current Benchmark:

        (a)        in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

        (b)        in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

        (a)        a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

        (b)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the FRB, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the

13086027v16

administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if the then-current Benchmark has any Available Tenors, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.03 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.03.

"Bid Procedures" has the meaning set forth in the Financing Orders.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" means any Borrowing Base information, reports, financial statements and other materials delivered by the Borrower hereunder, as well as other Reports and information provided by the Agent to the Lenders.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a)    the face amount of Eligible Credit Card Receivables multiplied by the Credit Card Advance Rate;

plus

(b)    the Cost of Eligible Inventory (other than Eligible Specified Store Closing Inventory), net of Inventory Reserves, multiplied by the Appraised Value of Eligible Inventory, multiplied by the Inventory Advance Rate;

plus

(c)    the Cost of Eligible Specified Store Closing Inventory, net of Inventory Reserves, multiplied by the Appraised Value of Eligible Inventory, multiplied by the Specified Store Closing Inventory Advance Rate;

plus

- 8 -

(d)      solely until December 31, 2025, the Cost of Eligible In-Transit Inventory, net of Inventory Reserves applicable thereto, multiplied by the Appraised Value of Eligible In-Transit Inventory, multiplied by the In-Transit Inventory Advance Rate; provided that, the aggregate amount of availability generated by this clause (d) (after giving effect to the In-Transit Inventory Advance Rate and any Inventory Reserves) shall not exceed $15,000,000; provided further that if the Loan Parties have commenced a full-chain liquidation prior to December 31, 2025, the Agent may exclude Eligible In-Transit Inventory (in whole or in part) from the Borrowing Base;

plus

(e)      the Appraised Value of Eligible Real Estate, multiplied by the Real Estate Advance Rate, minus the then-outstanding amount of PNC Indebtedness;

minus

(f)      the Availability Block;

minus

(g)      the Carve Out Reserve;

minus

(h)      the then-existing amount of all Availability Reserves, if any.

For the avoidance of doubt, from and after the consummation of the Permitted Sale, the Borrowing Base shall be deemed to be zero ($0).

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit E hereto (with such changes therein as may be required by the Agent to reflect the components of and Reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Borrower which shall include appropriate exhibits, schedules, reports, supporting documentation, and additional reports as reasonably requested by the Agent.

"Business" means the retail sale of furniture at the Loan Parties' Stores and through their e-commerce platform.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" has the meaning specified in the Financing Orders.

"Carve Out Reserve" means, at any time of determination, a Reserve in the amount of the "Carve Out Limit" (under and as defined in the Financing Orders).

13086027v16

"Carve Out Trigger Notice" has the meaning specified in the Financing Orders.

"Case Professionals" means Borrower's and any Statutory Committee's professionals, retained by either of them by order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327 or 1103(a) of the Bankruptcy Code.

"Cash Equivalents" means

(a)    readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(b)    commercial paper issued by any Person organized under the laws of any state of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)    fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than one hundred percent (100.0%) of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into; and

(e)    investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (d) above.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent, which, among other matters, authorizes the Loan Parties to use their cash management system, in form and substance reasonably satisfactory to the Agent.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

- 10 -

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, (c) any new, or adjustment to, requirements prescribed by the FRB for "Eurocurrency Liabilities" (as defined in Regulation D of the FRB), requirements imposed by the Federal Deposit Insurance Corporation, or similar requirements imposed by any domestic or foreign governmental authority or resulting from compliance by the Agent or any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority and related in any manner to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or (d) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, however, for the purposes of this Agreement:  (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)      during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body, or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body;

(b)      Schottenstein Stores shall, collectively, cease to own, directly or indirectly, one hundred percent (100%) of the Equity Interests of the Borrower;

(c)      any "change of control" or "sale" or "disposition" or similar event (as defined in any Organization Document of any Loan Party) shall occur; or

(d)      the Borrower fails at any time to own, directly or indirectly, one hundred percent (100%) of the Equity Interests of each other Loan Party that is a Subsidiary of the Borrower free and clear of all Liens (other than the Liens in favor of the Agent), except where such failure is as a result of a transaction permitted by the Loan Documents.

"Chapter 11 Case" and "Chapter 11 Cases" have the meanings specified in the preliminary statements hereto.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "DIP Collateral" as defined in the Financing Orders and all "Collateral" in any applicable Security Document, as applicable, and all other property that is or is intended

under the terms of the Security Documents to be subject to Liens in favor of the Agent for the benefit of the Credit Parties. For the avoidance of doubt and in accordance with the Security Agreement, all Specified Mortgaged Properties and all proceeds thereof constitute Collateral.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral (including, without limitation, a Logistics Servicer), or (b) any landlord of Real Estate leased by any Loan Party, pursuant to which such Person: (i) acknowledges the Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens on the Collateral held by such Person or located on such Real Estate, (iii) provides the Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (v) makes such other agreements with the Agent as the Agent may reasonably require.

"Collateral Agent" means Second Avenue in its capacity as collateral agent under any of the Loan Documents, or any successor thereto in such capacities.

"Committed Loan Notice" means a notice of a Revolving Credit Borrowing, pursuant to Section 2.02, which, if in writing, shall be substantially in the form of Exhibit A. For purposes of Sections 2.02 and 4.02, the term "Committed Loan Notice" as used therein shall be deemed to also include a Borrowing Base Certificate that contains a request for a Revolving Credit Borrowing, as the context may require.

"Committed Revolving Loan" has the meaning set forth in Section 2.01(b).

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Concentration Account" has the meaning set forth in Section 6.13(c).

"Confirmation Agreement" means that certain Confirmation and Ratification of Loan Documents, dated as of the Closing Date, by and among the Agent and the Loan Parties.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day", the definition of "U.S. Government Securities Business Day", any definition providing for "interest periods" (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 3.03 and other technical, administrative or operational matters) that the Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consent" means actual consent given by a Person from whom such consent is sought; or the passage of seven (7) Business Days from receipt of written notice to such Person from the Agent of a

proposed course of action to be followed by the Agent without such Person giving the Agent written notice of that Person's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Account" has the meaning set forth in Section 6.13(a)(ii).

"Controlled Account Agreement" means with respect to a DDA, an agreement, in form and substance satisfactory to the Agent, establishing control (as defined in the UCC) of such DDA by the Agent and whereby the Controlled Account Bank agrees, upon notice from the Agent to such bank, to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Controlled Account Bank" means each bank with whom DDAs are maintained and with whom a Controlled Account Agreement has been, or is required to be, executed in accordance with the terms hereof; provided, that a bank shall not qualify as a Controlled Account Bank if the only DDAs of the Loan Parties held by such bank are Excluded Accounts.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrower's accounting practices, known to the Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrower, the Borrower's purchase journals or the Borrower's stock ledger.  "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrower's calculation of cost of goods sold.

"Credit Card Advance Rate" means ninety-five percent (95.0%).

"Credit Card Issuer" shall mean any person (other than the Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Notifications" has the meaning set forth in Section 6.13(a)(i).

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to the Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

- 13 -

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (iv) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (v) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, (a) all reasonable expenses incurred by the Agent and its Affiliates in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent, (B) outside consultants, advisors and other service providers to or for the Agent (including without limitation Tower Hill and its affiliates, the Lender Group Consultants and any other professionals, consultants, appraisers, analysts, accountants and lawyers hired by the Agent), (C) appraisers, (D) commercial finance examiners, (E) insurance analysts or consultants, and (F) all such expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, and (ii) in connection with (A) the syndication or financing of the credit facility provided for herein, including any fees or expenses incurred in connection with obtaining a rating for such credit facility, (B) the preparation, negotiation, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the administration of this Agreement and the other Loan Documents, and (D) the enforcement or protection of the rights of the Credit Parties in connection with this Agreement and the other Loan Documents or efforts to monitor, preserve, protect, collect, or enforce rights with respect to the Collateral; (b) all customary fees and charges (as adjusted from time to time) of the Agent with respect to access to online Committed Revolving Loan information, the disbursement of funds (or the receipt of funds) to or for the account of the Loan Parties (whether by wire transfer or otherwise), together with any actual and documented costs and expenses incurred in connection therewith; (c) all costs related to the hedging of any exposure to foreign currency fluctuations or the conversion of foreign currency to Dollars; and (d) upon the occurrence and during the continuance of an Event of Default or upon any increase in the amount of Aggregate Revolving Commitments after the Closing Date, all reasonable expenses incurred by the Credit Parties who are not the Agent or any Affiliate, provided that such Credit Parties shall be entitled to reimbursement for no more than one primary counsel (and one local or special counsel or regulatory counsel for each relevant subject matter, in each case, in each appropriate jurisdiction to the extent reasonably necessary) for each group of affected Credit Parties similarly situated taken as a whole and, solely in the case of an actual or potential conflict of interest, one additional counsel (and one additional local or special counsel or regulatory counsel for each relevant subject matter, in each case, in each appropriate jurisdiction to the extent reasonably necessary) for each group of affected Credit Parties similarly situated taken as a whole.

"CRO" has the meaning specified in Section 6.27(b).

"Cumulative Four-Week Period" means the four-week period up to and through the Saturday of the most recent week then ended, or if a four-week period has not then elapsed from the Petition Date, such shorter period of not less than six (6) Business Days since the Petition Date through the Saturday of the most recent week then ended.

13086027v16

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrower entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, (b) outstanding merchandise credits of the Borrower, and (c) liabilities in connection with frequent shopping programs of the Borrower.

"Customer Deposits" means at any time, the aggregate amount at such time of (a) deposits made by customers with respect to the purchase of goods or the performance of services, and (b) layaway obligations of the Borrower.

"Customs Broker/Carrier Agreement" means an agreement substantially in the form attached hereto as Exhibit H among the Borrower, a customs broker, freight forwarder, consolidator or carrier, and the Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent, and makes such other acknowledgments and agreements with the Agent as the Agent may reasonably require.

"D&O Insurance" means directors and officers liability insurance obtained by the Loan Parties or their board of directors or managers (or other equivalent governing body) for losses or advancement of defense costs, or any similar form of insurance.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA (other than an Excluded Account described in clause (b) of the definition thereof) shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"Debtor" and "Debtors" have the meanings specified in the preliminary statements hereto.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, arrangement, rearrangement, receivership, insolvency, reorganization, stay of proceedings, or similar debtor relief Laws of the United States, or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such portion of the Obligations plus three percent (3.00%) per annum.

"Defaulting Lender" means, subject to Section 2.16(b), any Lender that (a) has failed to (i) fund all or any portion of its Committed Revolving Loans within two (2) Business Days of the date such Committed Revolving Loans were required to be funded hereunder, or (ii) pay to the Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three (3) Business Days after written request by the Agent or the Borrower, to confirm in writing to the Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator,

- 15 -

trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; <u>provided</u> that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) as of the date established therefor by the Agent in a written notice of such determination, which shall be delivered by the Agent to the Borrower and each other Lender promptly following such determination.

"DIP Facility" has the meaning set forth in the Financing Orders.

"DIP Milestones" has the meaning set forth in the Financing Orders.

"Disbursement Account" means a DDA (other than an Excluded Account) that is used exclusively as an operating or disbursement account, and does not receive collections, deposits or other payments on or with respect to any Collateral.

"Disposition" or "Dispose" means the sale, transfer, gift, license, lease, return of any Collateral to any vendor to offset an account payable or other disposition (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction and any sale, transfer, license or other disposition) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the Maturity Date; <u>provided</u>, however, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock, and (ii) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Loan Parties or their Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Loan Parties or their Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock.  Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party or Subsidiary to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Loan Parties may become obligated to pay upon

13086027v16

maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Eligible Assignee" means (a) a Credit Party or any of its Affiliates or Approved Funds; (b) a bank, insurance company, or other Person engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $100,000,000; (c) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities, and (d) any other Person (other than a natural person) approved by the Agent.

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to the Borrower from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such Borrower, and (ii) in each case is acceptable to the Agent in its Permitted Discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (j) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than the Borrower as payee or remittance party. In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable. Except as otherwise agreed by the Agent, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

(a) any Credit Card Receivable which does not constitute a "payment intangible" (as defined in the UCC);

(b) Credit Card Receivables that have been outstanding for more than three (3) Business Days from the date of sale;

(c) Credit Card Receivables (i) that are not subject to a perfected first priority Lien in favor of the Agent (other than Permitted Prior Liens that as a matter of law have priority over the Lien in favor of the Agent, in respect of which the Agent may establish a Reserve in its Permitted Discretion), or (ii) with respect to which the Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Permitted Encumbrances);

(d) Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(e) Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(f)    Credit Card Receivables due from any Credit Card Issuer or Credit Card Processor which is the subject of any bankruptcy or insolvency proceedings;

(g)    Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

(h)    Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables;

(i)    Credit Card Receivables which are evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of the Agent, and to the extent reasonably requested by the Agent, endorsed to the Agent; or

(j)    Credit Card Receivables which the Agent determines in its Permitted Discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine in its Permitted Discretion.

Notwithstanding the foregoing criteria, accounts that are owed by Synchrony, Progressive and Fortiva shall be deemed to be Eligible Credit Card Receivables, except to the extent such accounts do not meet reasonable eligibility criteria for Credit Card Receivables as the Agent may determine in its Permitted Discretion.

"Eligible In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, In-Transit Inventory:

(a)    which has been shipped from a foreign location and is scheduled for arrival to the United States within less than thirty (30) days of such shipping date (and in any event, scheduled for arrival no later than December 31, 2025); provided that any such foreign In-Transit Inventory that is in-transit by air shall be scheduled for arrival to the United States within less than fourteen (14) days of such shipping date (and in any event, scheduled for arrival no later than December 31, 2025);

(b)    for which the purchase order is in the name of the Borrower and title and risk of loss has passed to the Borrower;

(c)    for which an Acceptable Document of Title has been issued, and in each case as to which the Agent has control (as defined in the UCC) over the documents of title which evidence ownership of the subject Inventory (such as, if requested by the Agent, by the delivery of a Customs Broker/Carrier Agreement);

(d)    which is insured to the reasonable satisfaction of the Agent (including, without limitation, marine cargo insurance);

(e)    the Foreign Vendor with respect to such In-Transit Inventory is an Approved Foreign Vendor;

(f)    for which payment of the purchase price has been made by the Borrower or the purchase price is supported by a commercial letter of credit;

(g)    for which the Borrower has furnished to the Agent a Foreign Vendor Agreement executed by the applicable Loan Party on terms acceptable to the Agent in its Permitted Discretion, and the Borrower is in full compliance with the terms of such Foreign Vendor Agreement; and

- 18 -

(h)     which otherwise would constitute Eligible Inventory;

provided that the Agent may, in its Permitted Discretion, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Agent determines, in its Permitted Discretion, that such Inventory is subject to any Person's right of reclamation, repudiation, stoppage in transit or any event has occurred or is reasonably anticipated by the Agent to arise which may otherwise adversely impact the ability of the Agent to realize upon such Inventory.

"Eligible Inventory" means, as of the date of determination thereof, items of Inventory (other than Inventory that is in transit) of the Borrower that are finished goods, merchantable and readily saleable to the public in the ordinary course of the Borrower's business and deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, (A) complies with each of the representations and warranties respecting Inventory made by the Borrower in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below.  Except as otherwise agreed by the Agent, in its Permitted Discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a)     Inventory that is not solely owned by the Borrower or the Borrower does not have good and valid title thereto or which is subject to a Lien (other than Permitted Encumbrances);

(b)     Inventory that is leased by or is on consignment to the Borrower (other than Specified Consigned Inventory), or was furnished to the Borrower on a contract for service;

(c)     Inventory that is not located in the United States (including territories or possessions of the United States);

(d)     Inventory that is not located at a location that is owned or leased by the Borrower, except to the extent that the Borrower has furnished the Agent with (i) any UCC financing statements or other documents that the Agent may reasonably request to perfect its security interest in such Inventory at such location, and (ii) a Collateral Access Agreement executed by the Person owning any such location on terms acceptable to the Agent in its Permitted Discretion;

(e)     Inventory that is located: (i) in a distribution center or warehouse operated by a Logistics Servicer or leased by the Borrower unless the applicable Logistics Servicer or lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location as it deems necessary in its Permitted Discretion, or (ii) at any leased location of the Borrower in a Landlord Lien State unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location;

(f)     Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, or were rejected by the Borrower, (iii) are obsolete or slow moving (consistent with normal and customary circumstances for the Loan Parties' Business), or custom items, work in process, raw materials, or that constitute samples, spare parts, promotional, advertising, marketing, display items, labels, bags and other packaging and shipping materials or supplies used or consumed in the Borrower's business, (iv) are seasonal in nature and which have been packed away for sale in the subsequent season, (v) not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (vi) are bill and hold goods;

(g)     Inventory that is not subject to a perfected first priority Lien in favor of the Agent (other than Permitted Prior Liens that as a matter of law have priority over the Lien in favor of the Agent, in respect of which the Agent may establish a Reserve in its Permitted Discretion);

(h)     Inventory that is not insured in compliance with the provisions of Section 5.10;

(i)     Inventory that has been sold but not yet delivered or as to which the Borrower has accepted a deposit;

(j)     Inventory that is subject to any licensing, distribution, patent, royalty, trademark, trade name or copyright agreement with any third party from which the Borrower or any of its Subsidiaries has received notice of a dispute in respect of any such agreement;

(k)     Inventory that is located at a Store location or a distribution center that is leased by the Borrower or operated by a Logistics Servicer on behalf of the Borrower with a remaining lease or service term that is less than ninety (90) days; or

(l)     Inventory which is not of the type usually sold in the ordinary course of the Borrower's business, unless and until the Agent has completed or received (A) an appraisal of such Inventory from appraisers satisfactory to the Agent and establishes the Appraised Value and Inventory Reserves (if applicable) therefor, and otherwise agrees that such Inventory shall be deemed Eligible Inventory, and (B) such other due diligence as the Agent may require, all of the results of the foregoing to be satisfactory to the Agent in its Permitted Discretion.

"Eligible Real Estate" means the Real Estate set forth on Schedule 1.01(a); provided, however, no Real Estate will be Eligible Real Estate if:

(a)     such Real Estate is not owned by a Loan Party in fee simple (or, with respect to the Altamonte Springs Property, leased by a Loan Party pursuant to the Altamonte Springs Property Lease);

(b)     such Real Estate is not subject to the first priority, valid and perfected security interest and Lien of the Agent, for and on behalf of itself and the other Credit Parties (subject, with respect to priority, only to (i) other Permitted Prior Liens that have priority over the Lien of the Agent by operation of Law and otherwise in accordance with the Financing Orders and (ii) Liens in favor of PNC permitted under clause (p) of the "Permitted Encumbrance" definition);

(c)     the Agent has not received an appraisal (based upon Appraised Value) of such Real Estate complying with the requirements of FIRREA by an independent appraiser engaged by the Agent; or

(d)     any of the Mortgage Support Documents have not been satisfied, to the extent requested by the Agent.

"Eligible Specified Store Closing Inventory" means Eligible Inventory that is located at Stores subject to the Specified Store Closing Sales.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the

- 20 -

release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) the violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan or a Multiemployer Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; or (g) the determination that any Pension Plan is considered to be an "at-risk" plan or that any Multiemployer Plan is considered to be in "endangered" or "critical" status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA.

"Event of Default" has the meaning set forth in <u>Section 8.01</u>.  An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in <u>Section 10.01</u>.

- 21 -

"Events and Circumstances" has the meaning assigned to such term in the definition of "Material Adverse Effect".

"Excluded Account" means (a) any DDA that is a "zero balance" account and (b) any DDA that is solely used for (and the balance of which consists solely of funds set aside in connection with) payroll, trust, tax withholding or employee benefits, in each case, in the ordinary course of business.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 10.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e), and (d) any withholding Taxes imposed under FATCA.

"Executive Order" has the meaning set forth in Section 10.18.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including, without limitation, (a) tax refunds, (b) pension plan reversions, (c) proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings but specifically including the proceeds of any D&O Insurance), (d) condemnation awards (and payments in lieu thereof), (e) indemnity payments and (f) any purchase price adjustments related to any Acquisition.

"Facility Guaranty" means, Facility Guarantee, dated as of the Closing Date, made by each Guarantor in favor of the Agent, in form and substance reasonably satisfactory to the Agent.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to money center banks on such day on such transactions as determined by the Agent.

13086027v16

"Fee Letter" means the letter agreement, dated as of the Closing Date, among the Borrower and the Agent.

"Final Financing Order" means, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be in form and substance satisfactory to the Agent and which has not been reversed, vacated, or stayed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Agent, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur the Obligations, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the claims of the Agent and Lenders, subject to the Carve Out and Permitted Prior Liens.

"Final Order Entry Date" means the date on which the Bankruptcy Court enters the Final Financing Order.

"Financial Advisor" has the meaning specified in Section 6.27(b).

"Financing Orders" means the Interim Financing Order and Final Financing Order, as applicable.

"Fiscal Year" means any period of twelve (12) consecutive months ending on or near July 31st of any calendar year.

"Floor" means a rate of interest equal to two percent (2.00%).

"Force Majeure Event" means an event or circumstance which is beyond the control and without the fault or negligence of the Person affected and which by the exercise of reasonable diligence the party affected was unable to prevent, including, but not limited to, (a) riot, war, invasion, act of foreign enemies, hostilities (whether war be declared or not), acts of terrorism, civil war, rebellion, revolution, insurrection of military or usurped power, requisition or compulsory acquisition by any Governmental Authority, (b) ionizing radiation or contamination, radio activity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel, radio-active toxic explosive or other hazardous properties of any explosive assembly or nuclear component, (c) pressure waves caused by aircraft or other aerial devices travelling at sonic or supersonic speeds, (d) internet outages, hacking, denial of service attacks, cybersecurity breaches, cyber-attack or other act of sabotage, data failure or failure of any blockchain or any other technological system, (e) earthquakes, flood, fire or other physical natural disaster, (f) strikes or industrial disputes or (g) any other accident or act of god or public enemy.

"Foreign Assets Control Regulations" has the meaning set forth in Section 10.18.

"Foreign Lender" means (a) if any Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if any Borrower is not a U.S. Person, a Lender that is resident or organized under the Laws of a jurisdiction other than that in which such Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Vendor" means a Person that sells In-Transit Inventory to the Borrower.

"Foreign Vendor Agreement" means an agreement between a Foreign Vendor and the Agent in form and substance satisfactory to the Agent and pursuant to which, among other things, the parties shall agree upon their relative rights with respect to In-Transit Inventory of the Borrower purchased from such Foreign Vendor.

- 23 -

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Full Satisfaction" means with respect to the Pre-Petition Committed Revolving Loans and the other Pre-Petition Obligations, that such amounts have been "Paid in Full" as such term is defined in the Financing Orders.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state, or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means each Subsidiary of the Borrower that executes a Joinder to the Facility Guaranty and the other Loan Documents pursuant to Section 6.12.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holdings" has the meaning set forth in Section 10.16(b).

13086027v16

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    any obligations of such person incurred in connection with any consignment arrangement, conditional sale, or similar title retention program;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than sixty (60) days after the date on which such trade account payable was created);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness of such Person;

(g)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock, or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends); and

(h)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning set forth in Section 10.04(b). "Information" has the meaning set forth in Section 10.07.

"Intellectual Property" means all present and future: trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible

and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Interest Payment Date" means the first day after the end of each month and the Maturity Date.

"Interim Financing Order" means, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing, substantially in the form attached hereto as Exhibit J and/or otherwise in form and substance satisfactory to the Agent, together with all extension, modifications, and amendments thereto approved by the Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, any Loan Party's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"In-Transit Inventory" means Inventory of the Borrower which is in the possession of a common carrier and is in transit from a Foreign Vendor of the Borrower from a location outside of the continental United States to a location of the Borrower that is within the continental United States.

"In-Transit Inventory Advance Rate" means one hundred percent (100.0%).

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Advance Rate" means (i) from the Closing Date through January 12, 2026, one hundred percent (100%), and (ii) at all other times, ninety percent (90.0%).

"Inventory Reserves" means such reserves as may be established from time to time by the Agent in its Permitted Discretion with respect to the determination of the saleability, at retail, of the Eligible Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Agent determines, in its Permitted Discretion, will need to be satisfied in connection with the realization upon the Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Agent's Permitted Discretion, include (but are not limited to) reserves based on:

        (a)      obsolescence;

        (b)      seasonality;

        (c)      Shrink;

- 26 -

(d)       imbalance;

(e)       change in Inventory character;

(f)       change in Inventory composition;

(g)       change in Inventory mix;

(h)       markdowns (both permanent and point of sale);

(i)       retail markups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

(j)       out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition, or (d) any other investment of money or capital in order to obtain a profitable return.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Investment Banker" has the meaning specified in Section 6.27(b).

"IRS" means the United States Internal Revenue Service.

"IT Systems" has the meaning set forth in Section 5.28.

"Joinder" means an agreement, in the form of Exhibit I or otherwise in form and substance satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either the Borrower or a Guarantor, as the Agent may determine.

"Landlord Lien State" means any state, territory or province of the United States in which (a) a landlord's claim for rent may have priority over the Lien of the Agent in any of the Collateral or (b) a landlord is permitted to exercise lock out rights with respect to any Loan Party, as tenant.

"Laws" means each international, foreign, federal, state, and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lender" means, individually, each Person having a Revolving Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Assumption by which such Person becomes a Lender and

- 27 -

collectively, all such persons, or, after the making of the Committed Revolving Loans on the Closing Date, each Person holding any portion of the Committed Revolving Loans and "Lenders" means, collectively, all such Persons.

"Lender Group Consultant" has the meaning set forth in <u>Section 6.27(f)</u>.

"Lender Service Parties" has the meaning set forth in <u>Section 10.16(b)</u>.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Agent.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien or adverse right or claim or deemed trust (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, consignment, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing), and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Account" has the meaning set forth in <u>Section 2.11(a)</u>.

"Loan Documents" means this Agreement, each Note, the Fee Letter, all Borrowing Base Certificates, all Compliance Certificates, the Controlled Account Agreements, the Credit Card Notifications, the Security Documents, the Collateral Access Agreements, the Customs Broker/Carrier Agreements, each Facility Guaranty, each Subordination Agreement, the Perfection Certificate, the PNC Mortgagee's Waiver, the Tri-Party License Agreement and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Loan Party Advisor" and "Loan Party Advisors" have the meaning specified in <u>Section 6.27(b)</u>.

"Logistics Servicer" means any unaffiliated provider of warehousing, storage, order fulfillment, shipping or other logistics services, who is, in all cases, acting on behalf of, or is engaged by, any of the Loan Parties.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or financial condition of the Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of the Loan Parties, taken as a whole, to perform their obligations under the Loan Documents; (c) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party or (d) the occurrence of a Force Majeure Event.  In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then-existing events would result in a Material Adverse Effect.  Notwithstanding the foregoing, the filing of the Chapter 11 Cases and the events specifically described in the Declaration of Rudolph Morando in Support of the Debtors' Chapter 11 Petitions and First Day Relief, filed with the

- 28 -

Bankruptcy Court on or about the Petition Date (collectively, the "Events and Circumstances") will, individually and collectively, not be deemed to have a Material Adverse Effect.

"Material Contract" means, with respect to any Loan Party, (i) each lease agreement or services agreement for any distribution center leased by such Loan Party or operated by a Logistics Servicer on such Loan Party's behalf (ii) each contract to which such Loan Party is a party that the loss of which could reasonably be expected to result in a Material Adverse Effect and (iii) an agreement for the purchase or sale of goods or products or performance of services by, to or with any vendor or customer where the annual payments therefor exceed $10,000,000.

"Material Indebtedness" means, collectively, (i) Subordinated Indebtedness, (ii) the PNC Indebtedness, (iii) the Schottenstein Indebtedness, (iv) Indebtedness of any Loan Party to any Affiliate that is not a Loan Party and (v) any other Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $5,000,000. For purposes of determining the amount of Material Indebtedness at any time, (a) undrawn committed or available amounts shall be included, and (b) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means the earliest of: (a) one hundred eighty (180) days after the Closing Date; (b) fourteen (14) days after an order confirming a plan of reorganization for the Loan Parties is entered by the Bankruptcy Court; (c) the closing of a sale of all or substantially all of the assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code and (d) the date that the Agent provides written notice to the Borrower of its election to accelerate all Obligations following the occurrence and during the continuance of an Event of Default.

"Maximum Rate" has the meaning set forth in Section 10.09.

"Maximum Revolving Loan Amount" means, at any time of determination, the lesser of (a) the Aggregate Revolving Commitments or (b) the Borrowing Base.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage Support Documents" means, with respect to any real estate subject to a Lien in favor of the Agent pursuant to the Security Agreement (including all Specified Mortgaged Properties), (i) a Mortgage, or another Security Document and (ii) the deliverables and documents described on Schedule 2.02, in all cases, to the extent such Mortgages and/or deliverables and documents set forth on Schedule 2.02 are requested by the Agent.

"Mortgages" means each fee and leasehold mortgage or deed of trust, security agreement and assignment, in each case, in form and substance reasonably satisfactory to the Agent, by and between the Loan Party owning or holding the fee or leasehold interest in the Real Estate encumbered thereby in favor of the Agent.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five (5) plan years, has made or been obligated to make contributions.

"Net Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), over (ii) the sum of (A)

- 29 -

the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), and (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates); and (b) with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction, over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Note" means a promissory note made by the Borrower in favor of a Lender evidencing the Committed Revolving Loans made by such Lender, substantially in the form of Exhibit B, as each may be amended, restated, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts including principal, interest, fees, costs, and expenses, liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Committed Revolving Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Committed Revolving Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such

- 30 -

13086027v16

Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 10.13).

"Overadvance" means a Committed Revolving Loan to the extent that, immediately after its having been made, Availability is less than or equal to zero.

"Participant" has the meaning set forth in Section 10.06(d).

"Participant Register" has the meaning set forth in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five (5) plan years.

"Perfection Certificate" means (a) that certain perfection certificate dated as of the Closing Date, executed and delivered by the Loan Parties in favor of the Agent, for the benefit of the Credit Parties, and (b) each other perfection certificate (which shall be in form and substance acceptable to the Agent in its reasonable discretion) executed and delivered by the applicable Borrower or Guarantor in favor of the Agent for the benefit of the Credit Parties contemporaneously with the execution and delivery of a Joinder pursuant to Section 6.12.

"Periodic Term SOFR Determination Day" has the meaning assigned to such term in the definition of "Term SOFR".

"Permitted Discretion" means a determination made in the exercise of reasonable business judgment from the perspective of a secured, asset-based commercial lender.

"Permitted Disposition" means any of the following:

     (a)     Dispositions of Inventory in the ordinary course of business (it being understood and agreed that the foregoing shall not include any bulk or "going out of business" sale of Inventory);

     (b)     a non-exclusive license or sublicense of Intellectual Property of a Loan Party or any of its Subsidiaries in the ordinary course of business, which does not interfere, individually or in the aggregate, in any material respect with the conduct of the business of the Loan Parties and their Subsidiaries;

     (c)     licenses existing Pre-Petition for the conduct of licensed departments within the Loan Parties' Stores in the ordinary course of business; provided that, if requested by the Agent, the Agent shall have entered into an intercreditor agreement with the Person operating such licensed department on terms and conditions reasonably satisfactory to the Agent;

     (d)     Dispositions by any Loan Party to any other Loan Party; and

- 31 -

(e)    Dispositions (i) pursuant to the Permitted Sale or (ii) in accordance with the Specified Store Closing Sales.

"Permitted Encumbrances" means:

(a)    Liens in favor of (i) the Agent securing the Obligations and (ii) the Pre-Petition Agent securing the Pre-Petition Obligations;

(b)    Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(c)    carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue or are being contested in compliance with Section 6.04;

(d)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(e)    deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(f)    Liens in respect of judgments that would not constitute an Event of Default hereunder;

(g)    easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(h)    Liens existing on the Closing Date and listed on Schedule 7.01;

(i)    [reserved];

(j)    statutory Liens of landlords and lessors in respect of rent not in default;

(k)    [reserved];

(l)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)    Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

- 32 -

(n)    a non-exclusive license or sublicense of Intellectual Property of a Loan Party or any of its Subsidiaries in the ordinary course of business, which does not interfere, individually or in the aggregate, in any material respect with the conduct of the business of the Loan Parties and their Subsidiaries;

(o)    Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations so long as (i) such obligations are being actively contested in good faith by appropriate proceedings diligently conducted, (ii) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, and (iii) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

(p)    Liens securing Indebtedness permitted under clause (j) of the "Permitted Indebtedness" definition so long as such Liens are only on Real Estate owned by any Loan Party and certain personal property and fixtures related to such Real Estate subject to the terms of the PNC Mortgagee's Waiver, in each case, as of the Closing Date;

(q)    Liens securing Indebtedness to the extent permitted under clause (k) of the "Permitted Indebtedness" definition so long as such Liens are only on letters of credit issued and/or cash or other liquid collateral under the PNC LC Agreement; and

(r)    adequate protection Liens granted under the Financing Orders.

"Permitted Indebtedness" means each of the following as long as no Default or Event of Default exists or would arise from the incurrence thereof:

(a)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.03;

(b)    Indebtedness of any Loan Party to any other Loan Party;

(c)    [reserved];

(d)    (i) the Schottenstein Indebtedness so long as such Indebtedness remains unsecured and (ii) any Subordinated Indebtedness so long as such Subordinated Indebtedness remains subject to a Subordination Agreement;

(e)    contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business in connection with the construction or improvement of Stores;

(f)    [reserved];

(g)    [reserved];

(h)    the Obligations;

(i)    the Pre-Petition Obligations;

(j)    the PNC Indebtedness in an aggregate amount not to exceed $54,078,921.69 in principal amount at any time outstanding; and

- 33 -

(k)    Indebtedness under the PNC LC Agreement in an aggregate amount not to exceed $24,025,000 in principal amount at any time outstanding.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists or would arise from the making of such Investment:

(a)    Investments in cash or Cash Equivalents;

(b)    Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date;

(c)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(d)    Guarantees constituting Permitted Indebtedness;

(e)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(f)    capital contributions made by any Loan Party to another Loan Party;

(g)    Investments by any Loan Party in or to another Loan Party; and

(h)    [reserved].

"Permitted Overadvance" means an Overadvance made by the Agent, in its Permitted Discretion, which:

(a)    is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties;

(b)    is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation; or

(c)    is made to pay any other amount chargeable to any Loan Party hereunder;

provided however, that the foregoing shall not result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder; provided further that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Committed Revolving Loans would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Revolving Commitments pursuant to Section 2.06 hereof).

"Permitted Prior Liens" means the "Prepetition Permitted Liens" (as defined in the Financing Orders).

"Permitted Sale" means (a) the sale of all or substantially all of the Loan Parties' business assets (other than those subject to the Specified Store Closing Sales) pursuant the Purchase Agreement or another similar sale as approved by the Bankruptcy Court and the Agent; provided that any sale pursuant to the

- 34 -

Purchase Agreement or as otherwise approved by the Bankruptcy Court and the Agent shall either (x) be for cash consideration to be paid at the closing of such sale in an amount in excess of all outstanding Obligations under the DIP Facility and all outstanding Pre-Petition Obligations and shall not be subject to any financing contingencies, or (y) be consented to in writing by the Agent, or (b) a transaction or transactions on terms and conditions acceptable to the Agent combining the sale of all or substantially all of the Loan Parties' Inventory and Equipment and the permanent closing of all or a portion of the Loan Parties' Stores and the sale of all Collateral of the Loan Parties located therein through the retention by the Loan Parties of one or more Approved Liquidators, as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code, which transaction shall be (x) in the form of an "equity bid" including a payment at closing in an amount in excess of all outstanding Obligations under the DIP Facility and all outstanding Pre-Petition Obligations or (y) consented to in writing by the Agent.  In the case of clauses (a) and (b) above, all of the proceeds thereof (in an amount up to the outstanding balance of the Obligations and the Pre-Petition Obligations) shall be paid to the Agent for application in accordance with the terms and conditions of this Agreement and the Financing Orders.

"Permitted Variance" has the meaning specified in Section 6.26.

"Person" means any natural person, corporation, limited or unlimited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the preliminary statements hereto.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"PNC" means PNC Bank, National Association.

"PNC Credit Agreement" means that certain Loan Agreement, dated as of July 14, 2022, by and between PNC, the Borrower, ASI - Laporte LLC, an Ohio limited liability company, and ASI Thomasville LLC, a Delaware limited liability company, together with any amendments, restatements, modifications or supplements of or to the same that are not otherwise prohibited by Section 7.12 hereof.

"PNC Indebtedness" means Indebtedness outstanding under the PNC Credit Agreement.

"PNC LC Agreement" means that certain Amended and Restated Letter Agreement Letter of Credit Facility, dated as of December 26, 2014, between PNC, the Borrower and Schottenstein Stores, together with any amendments, restatements, modifications or supplements of or to the same that are not otherwise prohibited by Section 7.12 hereof.

"PNC Mortgagee's Waiver" means that certain Reciprocal Waiver and Collateral Access Agreement, dated as of the Closing Date, by and between PNC and the Agent and the Borrower and the other Loan Parties party thereto.

"Post-Petition" means the time period commencing immediately upon the filing of the Chapter 11 Cases.

"PR Advisor" has the meaning specified in Section 6.27(b).

"Prepayment Event" means:

- 35 -

(a)      any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Loan Party;

(b)      any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset (including, without limitation, any Specified Mortgaged Property) of any Loan Party;

(c)      the issuance by any Loan Party of any Equity Interests, other than any issuance of Equity Interests (i) to any other Loan Party, or (ii) as a compensatory issuance to any Loan Party's employee, director, or consultant (including under any option plan);

(d)      the incurrence by any Loan Party of any Indebtedness for borrowed money (other than Permitted Indebtedness); or

(e)      the receipt by any Loan Party of any Extraordinary Receipts.

"Pre-Petition" means the time period prior to the commencement of the Chapter 11 Cases.

"Pre-Petition Agent" has the meaning specified in the preliminary statements hereto.

"Pre-Petition Committed Revolving Loans" means the "Committed Revolving Loans" under and as defined in the Pre-Petition Credit Agreement,

"Pre-Petition Credit Agreement" has the meaning specified in the preliminary statements hereto.

"Pre-Petition Credit Facility" means the credit facility advanced by the Pre-Petition Agent pursuant to the Pre-Petition Credit Agreement and the "Loan Documents" thereunder.

"Pre-Petition Lenders" has the meaning specified in the preliminary statements hereto.

"Pre-Petition Obligations" means all "Obligations" under and as defined in the Pre-Petition Credit Agreement.

"Prior Week" means, as of any date of determination, the immediately preceding week ended on a Saturday and commencing on the prior Sunday.

"Purchase Agreement" shall mean (i) the Stalking Horse Purchase Agreement or (ii) such other purchase agreement with respect to the Permitted Sale to be entered into by and among the Loan Parties and such other bidder selected in accordance with the Bid Procedures, as applicable, on terms and conditions acceptable to the Agent.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Real Estate Advance Rate" means seventy-five percent (75.0%).

"Real Estate and Lease Disposition Advisor" has the meaning specified in Section 6.27(b).

"Receipts and Collections" has the meaning set forth in Section 6.13(c).

"Recipient" means the Agent or any Lender, as applicable.

"Register" has the meaning set forth in Section 10.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Relevant Governmental Body" means the FRB or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the FRB or the Federal Reserve Bank of New York or any successor thereto.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Reports" has the meaning set forth in Section 9.12(b).

"Required Lenders" means, as of any date of determination, (a) the Agent and (b) the Lenders holding more than fifty percent (50.00%) of the Aggregate Revolving Commitments or, if the commitment of each Lender to make Committed Revolving Loans has been terminated pursuant to Section 2.06 or Section 8.02, Lenders holding in the aggregate more than fifty percent (50.00%) of the Total Revolver Outstandings; provided that the Revolving Commitment of, and the portion of the Total Revolver Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Required Milestones" has the meaning set forth in Section 6.28.

"Rescindable Amount" has the meaning set forth in Section 2.12(b)(ii).

"Reserves" means all Inventory Reserves, Availability Reserves and the Carve Out Reserve.

"Responsible Officer" means the chief executive officer, chief restructuring officer, president, chief financial officer, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder; provided, that, in each case the Agent shall have received satisfactory background checks with respect to each such person in accordance with Section 6.10(d). Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retraction, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"Revolving Commitment" means, as to each Lender, its obligation to make Committed Revolving Loans to the Borrower pursuant to Section 2.01 in an aggregate principal amount at any one time

- 37 -

outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Credit Borrowing" means a borrowing consisting of simultaneous Committed Revolving Loans made by each of the Lenders pursuant to Section 2.01.

"S&P" means S&P Global Ratings, a division of S&P Global Inc., or any successor thereto.

"SACP Entities" means, collectively, the Pre-Petition Agent, the Pre-Petition Lenders, the Agent and the Lenders.

"Sale Order" has the meaning set forth in the Financing Orders.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SB360" means SB360 Capital Partners, LLC and its affiliates.

"Schottenstein Indebtedness" means unsecured Indebtedness of the Borrower and its Subsidiaries owing to Schottenstein Stores in the principal amount of $25,269,054.24 outstanding as of the Closing Date.

"Schottenstein Stores" means Schottenstein Stores Corporation, a Delaware corporation.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Second Avenue" means Second Avenue Capital Partners LLC.

"Second Avenue Entity" has the meaning set forth in Section 10.06(i).

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Agent.

"Security Documents" means the Security Agreement, the Controlled Account Agreements, the Credit Card Notifications, the Financing Orders, the Mortgages, the Mortgage Support Documents, the Confirmation Agreement and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting or perfecting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning set forth in Section 2.14(a).

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

- 38 -

"SOFR Loan" means a Committed Revolving Loan that bears interest at a rate based on Adjusted Term SOFR.

"Specified Consigned Inventory" means those items of Inventory of the Borrower which have been purchased by SB360 from the Borrower prior to the Closing Date, and from time to time thereafter, and, promptly following any such purchase, transferred by SB360 back to the Borrower on a consignment basis.

"Specified Liquidation Agreement" means that certain Consulting Agreement, dated as of September 19, 2025, by and among the Borrower and the Specified Liquidation Consultant, which, among other things provides for the Specified Store Closing Sales on terms satisfactory to the Agent, and which agreement, together with (x) all material documents relating thereto and (y) all exhibits, annex and schedules thereto, shall have been approved by the Agent, as further amended, supplemented and modified with the consent of the consent of the Agent.

"Specified Liquidation Consultant" means SB360, together with any of its Affiliates acting with respect to the Specified Store Closing Sales.

"Specified Mortgaged Properties" means the owned and leased properties of the Loan Parties listed on Schedule 2.03, as amended, modified or otherwise supplemented from time to time, which are subject to a Mortgage in favor of the Agent to the extent such Mortgages are requested by the Agent.

"Specified Store Closing Inventory Advance Rate" means (i) from the Closing Date through December 20, 2025, one hundred percent (100%), and (ii) at all other times, the product of one hundred percent (100%) multiplied by the inverse of the projected prevailing discount for the following week applied to the Eligible Specified Store Closing Inventory, as determined by the Agent.

"Specified Store Closing Sales" means the closure of, and liquidation of Inventory and Equipment located at (a) the Stores designated on Schedule 1.01(b) and (b) any additional Stores (i) designated by the Borrower on or prior to the date that is three (3) weeks after the Petition Date and (ii) approved in writing by the Agent (subject to the performance of a desktop appraisal in form and substance acceptable to the Agent), by the Specified Liquidation Consultant pursuant to the Specified Liquidation Agreement; it being understood that (a) once a Store has been designated as being closed and liquidated pursuant to a "Specified Store Closing Sale" hereunder, no Loan Party may change such Store designation without the prior written consent of the Agent and (b) any Stores that will not be acquired under the Purchase Agreement shall automatically be deemed to constitute Stores subject to Specified Store Closing Sales, the closings of which Stores shall be consummated pursuant to the Specified Liquidation Agreement.

"Stalking Horse Bidder" means ASI Purchaser LLC, a Delaware limited liability company.

"Stalking Horse Purchase Agreement" means that certain Asset Purchase Agreement, dated as of [●], by and among the Stalking Horse Bidder, the Borrower and each of the sellers party thereto.

"Statutory Committee" means any official committee of unsecured creditors in any of the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Store Closing and Sale Milestones" has the meaning set forth in the Financing Orders.

- 39 -

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated with respect to collateral rights and/or in right of payment to the prior payment in full of the Obligations and which is in form and on terms (including the amount thereof) approved in writing by the Agent in its sole discretion.

"Subordination Agreements" means any subordination agreement entered into in connection with Subordinated Indebtedness.

"Subordination Provisions" has the meaning set forth in Section 8.01(r).

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited or unlimited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to taxes or penalties applicable thereto.

"Term SOFR" means for any day in any calendar month, the Term SOFR Reference Rate for a tenor of three months on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such calendar month, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for such tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day; provided, further, that if Term SOFR determined as provided above (including pursuant to the proviso above) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"Term SOFR Adjustment" means a percentage equal to 0.26161% per annum.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Agent in its reasonable discretion).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Revolving Commitments are

13086027v16

irrevocably terminated (or deemed terminated) in accordance with <u>Article VIII</u>, or (iii) the termination of the Aggregate Revolving Commitments in accordance with the provisions of <u>Section 2.06(a)</u> hereof.

"Total Pre-Petition Revolver Outstandings" means, on any date, the aggregate outstanding principal amount of Pre-Petition Committed Revolving Loans after giving effect to any prepayments or repayments of Pre-Petition Committed Revolving Loans occurring on such date.

"Total Revolver Outstandings" means, on any date, the aggregate outstanding principal amount of Committed Revolving Loans after giving effect to any borrowings and prepayments or repayments of Committed Revolving Loans occurring on such date.

"Tower Hill" means Tower Hill Advisory Services, LLC.

"Trading with the Enemy Act" has the meaning set forth in <u>Section 10.18</u>.

"Tri-Party License Agreement" means that certain Tri-Party License Agreement, dated as of the Closing Date, by and between Schottenstein Stores and the Agent, and acknowledged by the Loan Parties.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 of the Uniform Commercial Code; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"UFCA" has the meaning set forth in <u>Section 10.22(d)</u>.

"UFTA" has the meaning set forth in <u>Section 10.22(d)</u>.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed

13086027v16

income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 3.01(f).

"Wage Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent in its discretion, which, among other matters, authorizes and directs the Loan Parties to pay certain Pre-Petition wages, benefits and other amounts owing to employees.

**1.02    Other Interpretive Provisions.**  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (i) the repayment in Dollars in full in cash in immediately available funds (or, in the case of any contingent Obligations, providing cash collateralization or other collateral as may be requested by the Agent) of all of the Obligations (other than contingent indemnification obligations for which a claim has not been asserted and any

13086027v16

other obligations which, by their terms, survive termination of this Agreement) and (ii) the termination of the Aggregate Revolving Commitments.

**1.03**     **Accounting Terms Generally**.

(a)     <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP, applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein; provided, however, that all obligations of any Person that are or would have been categorized as operating leases as determined in accordance with GAAP prior to giving effect to the Financial Accounting Standards Board Accounting Standard Updated 2016-2, Lease (Topic 842), issued on February 25, 2016, will not be considered Indebtedness or Capital Lease Obligations for all purposes under this Agreement, notwithstanding the fact that such obligations are required in accordance with ASC 842 (on a prospective or retroactive basis or otherwise) to be treated as Capital Lease Obligations.

(b)     <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein, and (ii) the Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04**     **Rounding**.  Any financial ratios required to be maintained by the Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05**     **Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06**     **Divisions.**  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

**1.07**     **Rates**.  The Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its

- 43 -

discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any other Loan Party, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE II
## THE COMMITMENTS AND BORROWINGS

**2.01    Committed Revolving Loans; Reserves**.

(a)    [Reserved.]

(b)    Subject to the terms and conditions set forth herein, each Lender severally agrees to make loans (each such loan, a "Committed Revolving Loan") to the Borrower from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Revolving Commitment, or (y) such Lender's Applicable Percentage of the Borrowing Base; subject in each case to the following limitations:

(i)    after giving effect to any Revolving Credit Borrowing, the sum of (x) the Total Revolver Outstandings and (y) the Total Pre-Petition Revolver Outstandings, shall not exceed the Maximum Revolving Loan Amount; and

(ii)    after giving effect to any Revolving Credit Borrowing, the aggregate outstanding amount of the sum of (x) the Committed Revolving Loans of any Lender and (y) the Pre-Petition Committed Revolving Loans of such Lender shall not exceed the lesser of (A) such Lender's Revolving Commitment, and (B) such Lender's Applicable Percentage of the Borrowing Base.

Within the limits of each Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01, prepay under Section 2.05, and reborrow Committed Revolving Loans under this Section 2.01.

(c)    The Inventory Reserves, Availability Reserves and the Carve Out Reserve as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to Section 4.01(c) hereof.

(d)    The Agent shall have the right, at any time and from time to time after the Closing Date in its Permitted Discretion to establish, modify or eliminate Reserves.

**2.02    Borrowings of Committed Revolving Loans**.

(a)    Each Revolving Credit Borrowing shall be made upon the Borrower's irrevocable written notice to the Agent.  Each such notice must be received by the Agent not later than 11:00

- 44 -

a.m. one (1) Business Day prior to the requested date of any Revolving Credit Borrowing (or such shorter prior notice period approved by the Agent from time to time). Each notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Agent of a written Committed Loan Notice (or, by electronic submission by the Borrower), appropriately completed and signed by a Responsible Officer of the Borrower. Unless otherwise agreed to by the Agent, each Revolving Credit Borrowing shall be in a minimum principal amount of $500,000. Each Committed Loan Notice shall specify (i) the requested date of the Revolving Credit Borrowing (which shall be a Business Day), and (ii) the principal amount of the Committed Revolving Loans to be borrowed.

(b)     Following receipt of a Committed Loan Notice, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Committed Revolving Loans. Each Lender shall make the amount of its Committed Revolving Loan available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice (or, if agreed by the Agent in writing, not later than 1:00 p.m. on the Business Day following the date of such Committed Loan Notice). Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Revolving Credit Borrowing is the initial Revolving Credit Borrowing, Section 4.01), the Agent shall use reasonable efforts to make all funds so received available to the Borrower in like funds by no later than 4:00 p.m. on the day of receipt by the Agent by wire transfer of such funds in accordance with instructions provided to (and acceptable to the Agent in its Permitted Discretion) the Agent by the Borrower.

(c)     The Agent, without the request of the Borrower, may advance as a Committed Revolving Loan any interest, fee, service charge (including direct wire fees), Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby. The Agent shall advise the Borrower of any such advance or charge promptly after the making thereof. Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrower's obligations under Section 2.05(c). Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(c) shall bear interest at the interest rate then and thereafter applicable to Committed Revolving Loans.

(d)     Each Revolving Credit Borrowing of Committed Revolving Loans shall be made by the Lenders pro rata in accordance with their respective Applicable Percentage. The failure of any Lender to make any Committed Revolving Loan shall neither relieve any other Lender of its obligation to fund its portion of the Committed Revolving Loans in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

(e)     At any time that Committed Revolving Loans are outstanding, the Agent shall notify the Borrower and the Lenders of any change in the applicable prime rate or Adjusted Term SOFR used in determining the applicable interest rate.

(f)     The Agent and the Lenders shall have no obligation to make any Committed Revolving Loan if an Overadvance would result. The Agent may, in its Permitted Discretion, make Permitted Overadvances without the consent of the Borrower and the Lenders, and the Borrower and each Lender shall be bound thereby. A Permitted Overadvance is for the account of the Borrower and shall constitute a Committed Revolving Loan and an Obligation and shall be repaid by the Borrower in accordance with the provisions of Section 2.05(c). The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances

- 45 -

to remain outstanding. The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

2.03    **[Reserved]**.

2.04    **[Reserved]**.

2.05    **Prepayments**.

(a)    Following (and subject to) the repayment and Full Satisfaction of the Pre-Petition Obligations subject to the terms of the Financing Orders, the Borrower shall have the right at any time or from time to time to voluntarily prepay Committed Revolving Loans, in whole or in part. Each such prepayment shall be applied ratably to the outstanding Committed Revolving Loans and Revolving Commitments of the Lenders in accordance with their respective Applicable Percentages.

(b)    [Reserved].

(c)    If for any reason (x) the Total Revolver Outstandings plus (y) the Total Pre-Petition Revolver Outstandings at any time exceed the Maximum Revolving Loan Amount as then in effect, the Borrower shall immediately prepay the outstanding Pre-Petition Committed Revolving Loans and Committed Revolving Loans in an aggregate amount equal to such excess; provided however that the Borrower shall first apply any such repayment to the outstanding Pre-Petition Committed Revolving Loans until paid in full subject to the terms of the Financing Orders.

(d)    The Borrower shall (i) first, prepay the outstanding Pre-Petition Committed Revolving Loans and other outstanding Pre-Petition Obligations subject to the terms of the Financing Orders and (ii) second, prepay the outstanding Committed Revolving Loans and other Obligations, in each case, with proceeds and collections received by the Loan Parties to the extent so required under the provisions of Section 6.13 hereof.

(e)    The Borrower shall immediately (i) first, prepay the outstanding Pre-Petition Committed Revolving Loans and other outstanding Pre-Petition Obligations (until the Full Satisfaction thereof) subject to the terms of the Financing Orders and (ii) second, prepay the outstanding Committed Revolving Loans and other Obligations, in each case, in an amount equal to the Net Proceeds received by a Loan Party on account of a Prepayment Event.

(f)    [Reserved].

(g)    Subject to the terms of the Financing Orders, prepayments made pursuant to clauses (d) and (e) above, *first*, shall be applied ratably to the outstanding Pre-Petition Committed Revolving Loans; *second*, shall be applied ratably to any other Pre-Petition Obligations that are then due and owing; *third*, shall be applied ratably to the outstanding Committed Revolving Loans; *fourth*, shall be applied ratably to any other Obligations that are then due and owing; and *fifth*, the amount remaining, if any, after the prepayment in full of all Committed Revolving Loans outstanding at such time may be retained by the Borrower for use in the ordinary course of its business.

- 46 -

**2.06    Termination or Permanent Reduction of Aggregate Revolving Commitments**.

(a)    The Borrower may, upon irrevocable notice from the Borrower to the Agent, terminate the Aggregate Revolving Commitments or from time to time permanently reduce the Aggregate Revolving Commitments; provided that (i) any such notice shall be received by the Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $5,000,000 or any whole multiple of $1,000,000 in excess thereof and (iii) the Borrower shall not terminate or reduce the Aggregate Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, (x) the Total Revolver Outstandings plus (y) the Total Pre-Petition Revolver Outstandings would exceed the Maximum Revolving Loan Amount.

(b)    The Agent will promptly notify the Lenders of any termination or reduction of the Aggregate Revolving Commitments under this Section 2.06.  Upon any reduction of the Aggregate Revolving Commitments, the Revolving Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount.  All fees (including, without limitation, commitment fees) and interest in respect of the Aggregate Revolving Commitments accrued until the effective date of any termination of the Aggregate Revolving Commitments shall be paid on the effective date of such termination.

**2.07    Repayment of Committed Revolving Loans.**  The Borrower shall repay to the Agent, for the account of the Lenders on the Termination Date the aggregate principal amount of Committed Revolving Loans outstanding on such date, together with accrued but unpaid interest and all other Obligations outstanding with respect to the Committed Revolving Loans.

**2.08    Interest**.

(a)    Subject to the provisions of Sections 2.08(b), 3.02 and 3.03, each Committed Revolving Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to Adjusted Term SOFR plus the Applicable Margin.

(b)    (i)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    If any other Event of Default exists, then the Agent may, and upon the request of the Required Lenders shall, notify the Borrower that all outstanding Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Except as provided in Section 2.08(b)(iii), interest on each Committed Revolving Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

**2.09    Fees**.  In addition to any other fees described herein or in any other Loan Document, the Borrower shall pay the fees in the amounts, at the times and to the Persons specified in the Fee Letter.  Such

- 47 -

fees shall be fully earned at the times specified in the Fee Letter and shall not be refundable for any reason whatsoever.

**2.10    Computation of Interest and Fees; Application of Payments**.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Committed Revolving Loan for the day on which the Committed Revolving Loan is made.  For purposes of the calculation of the outstanding amount and interest on the Committed Revolving Loans, all payments made by or on account of the Borrower shall be deemed to have been applied to the Committed Revolving Loans three (3) Business Days after receipt of such payments by the Agent (as such receipt is determined pursuant to Section 2.12).  Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11    Evidence of Debt**.

(a)    The Committed Revolving Loan made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business.  In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Committed Revolving Loan from such Lender, each payment and prepayment of principal of any such Committed Revolving Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.  The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Committed Revolving Loan made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Agent, the Borrower shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Committed Revolving Loans, in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Committed Revolving Loans and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrower will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)    The Agent shall render monthly statements regarding the Loan Account to the Borrower including principal, interest, fees, and including an itemization of all charges and expenses constituting Credit Party Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between the Borrower and the Credit Parties unless, within thirty (30) days after receipt thereof by the Borrower, the Borrower shall deliver to the Agent a written objection thereto describing the error or errors contained in any such statements.

**2.12    Payments Generally; Agent's Clawback**.

(a)    General.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.

- 48 -

The Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Agent (i) prior to or at 2:00 p.m., shall be deemed received on the same Business Day, and (ii) after 2:00 p.m., shall be deemed received on the next succeeding Business Day; any applicable interest or fee shall continue to accrue and shall be calculated pursuant to Section 2.10.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)      Funding by Lenders and Payments by Borrower; Presumptions by Agent.

(i)      Unless the Agent shall have received notice from a Lender prior to 12:00 noon on the date of such Revolving Credit Borrowing that such Lender will not make available to the Agent such Lender's share of such Revolving Credit Borrowing, the Agent may assume that such Lender has made or will make such share available on such date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Revolving Credit Borrowing available to the Agent, then the applicable Lender and the Borrower severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Committed Revolving Loans.  If the Borrower and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Revolving Credit Borrowing to the Agent, then the amount so paid shall constitute such Lender's Committed Revolving Loan included in such Revolving Credit Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Agent.

(ii)      Unless the Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Agent for the account of the Credit Parties hereunder that the Borrower will not make such payment, the Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Credit Parties, as the case may be, the amount due. With respect to any payment that the Agent makes for the account of the Credit Parties hereunder as to which the Agent determines (which determination shall be conclusive and binding absent manifest error) that any of the following applies (such payment referred to as the "Rescindable Amount"): (1) the Borrower has not in fact made such payment; (2) the Agent has made a payment in excess of the amount so paid by the Borrower (whether or not then owed); or (3) the Agent has for any reason otherwise erroneously made such payment; then each of the Credit Parties severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Credit Party, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds

- 49 -

Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice from the Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Agent funds for any Committed Revolving Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Agent because the conditions to the applicable Revolving Credit Borrowing set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 4.02 hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Committed Revolving Loans and to make payments hereunder are several and not joint.  The failure of any Lender to make any Committed Revolving Loan or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its portion of its Committed Revolving Loan or to make its payment hereunder.

**2.13    Sharing of Payments by Lenders**.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in any Lender's receiving payment of a proportion of the aggregate amount of Obligations in respect of Committed Revolving Loans greater than its pro rata share thereof as provided herein (including in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Lenders or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

(a)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)    the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Committed Revolving Loans to any assignee or participant, other than to the Borrower or any Subsidiary (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.14    Settlement Amongst Lenders**.

(a)    The amount of each Lender's Applicable Percentage of outstanding Committed Revolving Loans shall be computed weekly (or more frequently in the Agent's Permitted

- 50 -

Discretion) and shall be adjusted upward or downward based on all Committed Revolving Loans and repayments of Committed Revolving Loans received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

(b)    The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Committed Revolving Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Agent shall transfer to each Lender its Applicable Percentage of repayments, and (ii) each Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Committed Revolving Loans made by each Lender shall be equal to such Lender's Applicable Percentage of all Committed Revolving Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Agent by the Lenders and is received prior to 12:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 12:00 p.m., then no later than 12:00 p.m. on the next Business Day.  The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent.  If and to the extent any Lender shall not have so made its transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand, such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

**2.15**    **[Reserved]**.

**2.16**    **Defaulting Lenders**.

(a)    Adjustments.    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 10.01.

(ii)    Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Agent from a Defaulting Lender pursuant to Section 10.08 shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Committed Revolving Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; third, if so determined by the Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Committed Revolving Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such

- 51 -

Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Committed Revolving Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Committed Revolving Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Committed Revolving Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Committed Revolving Loans of such Defaulting Lender until such time as all Committed Revolving Loans are held by the Lenders pro rata in accordance with the Revolving Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.  No Defaulting Lender shall be entitled to receive any fee payable under Section 2.09 or the Fee Letter for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    Defaulting Lender Cure.  If the Borrower and the Agent agree in writing that a Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Committed Revolving Loans of the other Lenders or take such other actions as the Agent may determine to be necessary to cause the Committed Revolving Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lenders, having been a Defaulting Lender.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

**3.01    Taxes**.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law.  If any applicable Law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and

- 52 -

withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Borrower.  The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Indemnification by the Loan Parties.  The Loan Parties shall indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Loan Parties have not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.06(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this paragraph (d).

(e)    Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section, the Loan Party shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(f)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower or the Agent, at the time or times prescribed by applicable Law or reasonably requested by the Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding

- 53 -

anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (f)(ii)(A), (ii)(B) and (ii)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that any Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax,

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(2)    executed copies of IRS Form W-8ECI,

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such

- 54 -

Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner, and

(C)        any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), executed copies of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or the Agent to determine the withholding or deduction required to be made; and

(D)        if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Agent in writing of its legal inability to do so.

(g)        Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other

- 55 -

information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Survival.  Each party's obligations under this Section shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)    Defined Terms.  For purposes of this Section, the term "applicable Law" includes FATCA.

3.02    **Conforming Changes**.  In connection with the use or administration of Term SOFR, the Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

3.03    **Inability to Determine Rates; Benchmark Replacement**.

(a)    Subject to this Section 3.03, if:

(i)    the Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, or

(ii)    the Required Lenders determine that for any reason in connection with any SOFR Loan or a conversion thereto or a continuation thereof that Adjusted Term SOFR does not adequately and fairly reflect the cost to such Lenders of making and maintaining such SOFR Loan, and the Required Lenders have provided notice of such determination to the Agent,

the Agent will promptly so notify the Borrower and each Lender.

Upon notice thereof by the Agent to the Borrower, (x) any obligation of the Lenders to make or maintain SOFR Loans shall be suspended until the Agent (with respect to clause (ii), at the instruction of the Required Lenders) revokes such notice, and (y) the Borrower may revoke any pending request for a borrowing of SOFR Loans or, failing that, will be deemed to have converted such request into a request for a borrowing of Alternative Base Rate Loans in the amount specified therein, and any outstanding SOFR Loans will be converted automatically to Alternative Base Rate Loans and shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Alternative Base Rate plus the Applicable Margin.

(b)    Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Agent (without, except as specifically provided in the two following sentences, any action or consent by any other party to this Agreement) may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Agent has posted such proposed amendment to all affected Lenders and the

Borrower so long as the Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders or the Borrower. No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 3.03(b) will occur prior to the applicable Benchmark Replacement Date.

(c)    Benchmark Replacement Conforming Changes.    In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(d)    Notices; Standards for Decisions and Determinations.    The Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 3.03(e) and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.03, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.03.

(e)    Unavailability of Tenor of Benchmark.    Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Agent may modify any definition providing for "interest periods" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Agent may modify any definition providing for "interest periods" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)    Benchmark Unavailability Period.    Upon Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (a) the Borrower may revoke any pending request for a borrowing during the Benchmark Unavailability Period of SOFR Loans or, failing that, will be deemed to have converted such request into a request for a borrowing of Alternative Base Rate Loans in the amount specified therein, and (b) any outstanding SOFR Loans will be converted automatically to Alternative Base Rate Loans.

- 57 -

(g)    Conflict.  In the event the provisions of this Section 3.03 conflict with another Section of this Agreement, this Section 3.03 shall govern.

**3.04    Increased Costs; Reserves on Committed Revolving Loans**.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in Adjusted Term SOFR);

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or any Committed Revolving Loans accruing interest at Adjusted Term SOFR made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Committed Revolving Loan at Adjusted Term SOFR (or of maintaining its obligation to make any such Committed Revolving Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Revolving Commitments of such Lender or the Committed Revolving Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such

- 58 -

Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    <u>Reserves on Committed Revolving Loans</u>.  The Borrower shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each Committed Revolving Loan accruing interest at Adjusted Term SOFR equal to the actual costs of such reserves allocated to such Committed Revolving Loan by such Lender (as determined by such Lender in its Permitted Discretion, which determination shall be conclusive and binding absent manifest error), which shall be due and payable on each date on which interest is payable on such Committed Revolving Loan; <u>provided</u> that the Borrower shall have received at least ten (10) days' prior notice (with a copy to the Agent) of such additional interest from such Lender.  If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) days from receipt of such notice.

**3.05    Reserved**.

**3.06    Mitigation Obligations; Replacement of Lenders**.

(a)    <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender gives a notice pursuant to <u>Section 3.02</u>, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Committed Revolving Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>3.04</u>, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02</u>, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, the Borrower may replace such Lender in accordance with <u>Section 10.13</u>.

**3.07    Survival**.  All of the Borrower's obligations under this <u>Article III</u> shall survive the termination of the Aggregate Revolving Commitments and the repayment of the Committed Revolving Loans and all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO REVOLVING CREDIT BORROWINGS

**4.01    Conditions of Effectiveness and Initial Revolving Credit Borrowing**.  The obligation of each Lender to make its initial credit extension hereunder is subject to satisfaction of the following conditions precedent (except to the extent any of the following conditions precedent are permitted to be satisfied after the Closing Date in accordance with <u>Section 6.30</u>):

- 59 -

(a)    (i) the Bankruptcy Court shall have entered the Interim Financing Order, (ii) the Interim Financing Order shall not have been stayed, vacated or reversed (in whole or in part) and (iii) the Interim Financing Order shall not have been amended or modified other than with the written consent of the Agent;

(b)    The Agent shall have received each of the following duly executed Loan Documents, each dated as of the Closing Date, as applicable, and each in form and substance satisfactory to the Agent:

(i)    executed counterparts of this Agreement sufficient in number for distribution to the Agent, each Lender and the Borrower;

(ii)    the Security Documents and certificates evidencing any certificated Equity Interests being pledged thereunder, together with undated transfer powers executed in blank, each duly executed by the applicable Loan Parties;

(iii)    all other Loan Documents, each duly executed by the applicable Loan Parties; and

(iv)    the Perfection Certificate, duly executed by the Loan Parties;

(c)    The Agent shall have received a Borrowing Base Certificate relating to the most recent calendar week ended prior to the Closing Date (calculated as of the close of business of the Saturday of such week), in form and substance satisfactory to the Agent, and the Agent shall be satisfied that, after giving effect to the first funding of the Committed Revolving Loans on the Closing Date, Availability as of the Closing Date shall not be less than ninety percent (90.00%) of Availability as projected in the initial Approved Budget;

(d)    The Agent shall have received documents, instruments, filings, and any other evidence required by, or satisfactory to, the Agent evidencing that it shall hold effective, first-priority perfected liens in the Collateral (subject only to the Permitted Prior Liens and as otherwise set forth in the Financing Orders), including all documents and instruments, including UCC financing statements, required by Law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents;

(e)    The Agent shall have received (i) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of such party to enter into and perform under this Agreement and the other Loan Documents to which such Person is a party or is to become a party, and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Person is a party or is to become a party; and (ii) copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each such Person is duly organized or formed, and that each such Person is validly existing, in good standing, in each case of the foregoing <u>clauses (i)</u> and <u>(ii)</u>, in form and substance satisfactory to the Agent;

(f)    All fees and expenses required to be paid to the Agent pursuant to the Pre-Petition Credit Facility and the DIP Facility on or before the Closing Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders the Pre-Petition Credit Facility and the DIP

Facility on or before the Closing Date shall have been paid in full; <u>provided</u> that the foregoing fees and expenses may be deducted from advances made hereunder on the Closing Date;

(g)     The Borrower shall have paid all fees, charges and disbursements of counsel to the Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute the Agent's reasonable estimate of such fees, charges and disbursements incurred or to be incurred by the Agent through the Closing Date (<u>provided</u> that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Agent); <u>provided</u> further that the foregoing fees, charges and disbursements may be deducted from advances made hereunder on the Closing Date;

(h)     There shall not have been: (i) since the Petition Date, other than those customarily resulting from the commencement of the Chapter 11 Cases, any Material Adverse Effect as to the Loan Parties, or any Loan Party, or the Collateral, (ii) any non-stayed litigation commenced which could reasonably be expected to have a Material Adverse Effect on any Loan Party, or its business, or its ability to perform any material obligation or repay the loans, or which challenges the DIP Facility, (iii) since the Petition Date, any material increase in the liabilities, liquidated or contingent, of any Loan Party, or any material decrease in the assets of the Loan Parties, and (iv) since the Petition Date, other than those resulting from the commencement of the Chapter 11 Cases, any adverse change in the ability of the Agent and the Lenders to enforce the Loan Documents and the obligations of the Loan Parties thereunder;

(i)     The Agent shall have received satisfactory results of customary Lien and other searches (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made;

(j)     The Agent shall have received and be satisfied with (i) the initial Approved Budget, (ii) form of Approved Budget Variance Report and (iii) such other information (financial or otherwise) reasonably requested by the Agent;

(k)     (i) The Agent shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance satisfactory to the Agent not later than a reasonable time in advance of the Petition Date for the Agent's counsel to review and analyze the same; and (ii) all motions, orders (including the "first day" orders) and other documents to be filed with and submitted to the Bankruptcy Court on the Petition Date shall be in form and substance satisfactory to the Agent, and the Bankruptcy Court shall have approved and entered the "first day" orders;

(l)     (i) The Bankruptcy Court shall have entered the Cash Management Order and the Wage Order, (ii) neither the Cash Management Order nor the Wage Order shall have been stayed, vacated or reversed (in whole or in part) and (iii) neither the Cash Management Order nor the Wage Order shall have been amended or modified other than with the written consent of the Agent;

(m)     The Agent shall have received such additional certificates, documents, instruments and information as are customary for transactions of this type as the Agent may request in its sole discretion to effect the transactions contemplated hereby, including each of the following duly executed documents, each dated as of the Closing Date, and each in form and substance satisfactory to the Agent:

- 61 -

13086027v16

(i)       a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.01(h), 4.02(a) and 4.02(b) have been satisfied (or substantially concurrently with the Revolving Credit Borrowing will be satisfied, as applicable), (B) that, except with respect to the filing of the Chapter 11 Cases and those matters resulting from the Events and Circumstances, there has been no event or circumstance since the Petition Date that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect and (C) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by each Loan Party and the validity against each Loan Party of the Loan Documents to which it is a party, or (2) subject to the entry by the Bankruptcy Court of the Interim Financing Order, that all such consents, licenses and approvals have been obtained and are in full force and effect;

(ii)      evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(iii)     (1) appraisals (based on net liquidation value) by a third party appraiser acceptable to the Agent of all Inventory of the Borrower, the results of which are satisfactory to the Agent and (2) appraisals (based on fair market value) by a third party appraiser acceptable to the Agent of all Real Estate, the results of which are satisfactory to the Agent; and

(iv)      such other assurances, certificates, documents, consents or opinions as the Agent or its counsel reasonably may request;

(n)       The Agent shall have received the duly executed Stalking Horse Purchase Agreement, duly executed by the Stalking Horse Bidder, the Borrower and each other applicable party thereto;

(o)       The Loan Parties shall have completed all of the actions and milestones set forth in Section 6.28 and the Financing Orders that are required to have been completed on or before one (1) business day after the Petition Date; and

(p)       The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required hereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02    Conditions to all Revolving Credit Borrowings**.  The obligation of each Lender to honor any Revolving Credit Borrowings is subject to the following conditions precedent:

(a)       The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect"

- 62 -

13086027v16

shall be true and correct in all respects as so qualified)  on and as of the date of such Revolving Credit Borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects as so qualified) as of such earlier date;

(b)    No Default or Event of Default shall exist, or would result from such proposed Revolving Credit Borrowing, or from the application of the proceeds thereof;

(c)    The Agent shall have received a Committed Loan Notice in accordance with the requirements hereof;

(d)    Since the Closing Date, no event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred or would result from such proposed Revolving Credit Borrowing, except for matters arising from the Events and Circumstances;

(e)    No Overadvance shall result from such Revolving Credit Borrowing;

(f)    (i) If the Interim Financing Order has expired, the Final Financing Order shall have been entered following the expiration of the Interim Financing Order; (ii) the Interim Financing Order (or, when applicable, the Final Financing Order) shall not have been vacated, stayed, reversed, modified, or amended without the Agent's consent and shall otherwise be in full force and effect; and (iii) no motion for reconsideration or notice of appeal of the Interim Financing Order (or, when applicable, the Final Financing Order) shall have been timely filed by any Loan Party or any of its Affiliates; and

(g)    Each Revolving Credit Borrowing shall be for purposes and in amounts consistent with the Approved Budget (subject to the Permitted Variance).

No extension of credit may be requested following the payment in full of all Pre-Petition Obligations and the Obligations.  Each Committed Loan Notice submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Revolving Credit Borrowing.  The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties, but until the Required Lenders otherwise direct the Agent to cease making Committed Revolving Loans, the Lenders will fund their Applicable Percentage of all Committed Revolving Loans whenever made, which are requested by the Borrower and, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, agreed to by the Agent; provided, however, the making of any such Committed Revolving Loans shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Committed Revolving Loans hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power**.  Each Loan Party and each Subsidiary (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its

incorporation, organization, or formation, (b) subject to any entry of any required orders of the Bankruptcy Court, including, without limitation, the entry of the Interim Financing Order and the Final Financing Order, as applicable, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business, and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02    Authorization; No Contravention**.  Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

**5.03    Governmental Authorization; Other Consents**.  Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof), or (b) such as have been obtained or made and are in full force and effect.

**5.04    Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Financial Information; No Material Adverse Effect**.

(a)    All financial statements delivered to the Agent, including with respect to periods ended prior to the Closing Date, (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all Material Indebtedness and other liabilities, direct or contingent, of the Borrower and its

- 64 -

Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness, subject, in each case, to the absence of footnotes and to normal year-end audit adjustments.

(b)     The initial Approved Budget as attached hereto as <u>Exhibit L</u>, which was furnished to the Agent on or prior to the Closing Date, and each subsequent Approved Budget delivered in accordance with <u>Section 6.01</u>, has been prepared in good faith, with due care and based upon assumptions the Borrower believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget.  To the knowledge of the Borrower, as of the Closing Date, no facts exist that (individually or in the aggregate) would result in any material change in the Approved Budget.

(c)     Since the Petition Date, other than the Events and Circumstances, there has been no other event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

(d)     To the knowledge of the Borrower, no Internal Control Event exists or has occurred since the Petition Date that has resulted in or could reasonably be expected to result in a misstatement in any material respect, (i) of any financial information delivered or to be delivered to the Agent or the Lenders, (ii) of the Approved Budget, (iii) of the Borrowing Base, (iv) of covenant compliance calculations provided hereunder (including pursuant to any Approved Budget Variance Report), or (v) of the assets, liabilities, financial condition or results of operations of the Borrower and its Subsidiaries on a Consolidated basis.

(e)     [Reserved].

(f)     [Reserved].

(g)     The Loan Parties and their Subsidiaries have no Indebtedness other than Indebtedness permitted pursuant to <u>Section 7.03</u>.

**5.06    Litigation**.    Other than the Events and Circumstances, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect.

**5.07    No Default**.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08    Ownership of Property; Liens**.

(a)     Each of the Loan Parties and each Subsidiary has good record and marketable title in fee simple to or valid leasehold interests in, all Real Estate necessary for the ordinary conduct of its business free and clear of all Liens, other than Permitted Encumbrances.  Each of the Loan Parties and each Subsidiary has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business free and clear of all Liens, other than Permitted Encumbrances.

- 65 -

(b)    Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate that is owned by the Loan Parties and each of their Subsidiaries, together with a list of the holders of any mortgage or other Lien thereon as of the Closing Date.  Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to each such Lease as of the Closing Date.  Each of such Leases is in full force and effect and the Loan Parties are not in material default of the terms thereof.

(c)    Schedule 7.01 sets forth a complete and accurate list of all Liens (other than any Liens that otherwise qualify as Permitted Encumbrances pursuant to the definition thereof) on the property or assets of each Loan Party and each of its Subsidiaries, showing as of the Closing Date the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto.  The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d)    [Reserved].

(e)    Schedule 7.03 sets forth a complete and accurate list of all Indebtedness (other than any Indebtedness that otherwise qualifies as Permitted Indebtedness pursuant to the definition thereof) of each Loan Party or any Subsidiary of a Loan Party on the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity thereof.

**5.09    Environmental Compliance**.

(a)    Except as specifically disclosed in Schedule 5.09, no Loan Party or any Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability, or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as otherwise set forth in Schedule 5.09, to the best of the knowledge of the Loan Parties, none of the properties currently owned or operated by any Loan Party or any Subsidiary is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; to the best of the knowledge of the Loan Parties, there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed of on any property currently owned or operated by any Loan Party or any Subsidiary; to the best of the knowledge of the Loan Parties, there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary; and Hazardous Materials have not been released, discharged or disposed of on any property currently owned or operated by any Loan Party or any Subsidiary.

(c)    Except as otherwise set forth on Schedule 5.09, to the best of the knowledge of the Loan Parties, no Loan Party or any Subsidiary is undertaking, and no Loan Party or any Subsidiary has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or

13086027v16

transported to or from, any property currently owned or operated by any Loan Party or any Subsidiary have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary.

**5.10    Insurance**.  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption, and property damage and marine cargo insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties and their Subsidiaries operate.  Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date.  Each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11    Taxes**.  Except as otherwise set forth on Schedule 5.11, or to the extent payment of such Taxes has been stayed by the Bankruptcy Court, the Loan Parties and their Subsidiaries have filed all federal, state, and other material Tax returns and reports required to be filed, and have paid all federal, state, and other Taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being actively contested in good faith by appropriate proceedings diligently conducted, for which adequate reserves have been provided in accordance with GAAP, and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation.  There is no proposed Tax assessment against any Loan Party or any Subsidiary except those which are being actively contested in good faith by appropriate proceedings diligently conducted, for which adequate reserves have been provided in accordance with GAAP, and which contest effectively suspends the collection of the contested obligation and the enforcement of any such Tax assessment against such Loan Party or Subsidiary.  No Loan Party or any Subsidiary is a party to any Tax sharing agreement.

**5.12    ERISA Compliance**.

(a)    Each Loan Party, each of its ERISA Affiliates and each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of the Loan Parties, nothing has occurred which would prevent, or cause the loss of, such qualification.  The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Sections 412 or 430 of the Code and to each Multiemployer Plan, and no application for a funding waiver or an extension of any amortization period pursuant to Sections 412 or 430 of the Code has been made with respect to any Plan.  No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan or Multiemployer Plan.

(b)    There are no pending or, to the knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with

- 67 -

respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

5.13    **Subsidiaries; Equity Interests**.  The Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary.  All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable (if applicable) and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents. Except as set forth in Schedule 5.13, there are no outstanding rights to purchase any Equity Interests in any Subsidiary.  The Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part (a) of Schedule 5.13.  All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable (if applicable) and are owned in the amounts specified on Part (b) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents.  The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

5.14    **Margin Regulations; Investment Company Act**.

(a)    No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the Revolving Credit Borrowings shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Revolving Credit Borrowings to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

5.15    **Disclosure**.  Each Loan Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation and delivery (it being understood that (a) no forecasts are to be viewed as facts, (b) all forecasts are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and

- 68 -

their respective Subsidiaries, (c) no assurance can be given that any particular projections will be realized, and (d) actual results may vary from such forecasts and that variations may be material).

**5.16    Compliance with Laws**.  Each of the Loan Parties and each Subsidiary is in compliance (a) in all material respects with the requirements of all Laws (including without limitation, the provisions of the Bankruptcy Code and any other Debtor Relief Laws) and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being actively contested in good faith by appropriate proceedings diligently conducted, or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (b) with Sections 10.17 and 10.18 hereof.

**5.17    Intellectual Property; Licenses, Etc.**  The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person.  To the knowledge of the Loan Parties, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person.  Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Loan Parties, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.18    Labor Matters**.  There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened.  The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters.  Subject to the approval of the Bankruptcy Court, all payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party.  Except as set forth on Schedule 5.18, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement.  There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition.  There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices, charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries.  The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**5.19    Security Documents**.

(a)    The Security Agreement creates in favor of the Agent, for the benefit of the Credit Parties (or the "Secured Parties" as referred to therein), a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  All applicable financing statements, releases and

- 69 -

other similar filings are in appropriate form and have been or will be filed in the offices specified in <u>Schedule II</u> of the Security Agreement.  Upon such filings and/or the obtaining of "<u>control</u>" (as defined in the UCC), the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made) in each case prior and superior in right to any other Person, subject to Permitted Prior Liens that as a matter of law have priority over the Lien in favor of the Agent.

(b)    When the Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office and when all applicable financing statements, releases and other similar filings in appropriate form are filed in the offices specified in <u>Schedule II</u> of the Security Agreement, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in such offices, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered Intellectual Property acquired by the Loan Parties after the Closing Date).

(c)    The Financing Orders and, to the extent requested by the Agent, the Mortgages create in favor of the Agent, for the benefit of the Credit Parties (or the "Secured Parties" or other similar term referred to therein), a legal, valid, continuing and enforceable Lien in the Specified Mortgaged Properties, the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  Upon the entry of the Interim Financing Order (regardless of whether any Mortgages are filed or recorded), the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Specified Mortgaged Properties that may be perfected by such filing (including without limitation the proceeds of such Specified Mortgaged Properties), in each case prior and superior in right to any other Person, subject to Permitted Encumbrances.

**5.20    [Reserved]**.

**5.21    Deposit Accounts; Credit Card Arrangements**.

(a)    Annexed hereto as <u>Schedule 5.21(a)</u> is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository; and (iv) the identification of each Controlled Account Bank.

(b)    Annexed hereto as <u>Schedule 5.21(b)</u> is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22    Brokers**.  No broker or finder brought about the obtaining, making or closing of the Committed Revolving Loans or transactions contemplated by the Loan Documents, and no Loan Party or

13086027v16

Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith. Notwithstanding the foregoing, the Loan Parties shall be solely responsible for payment of any other finder's or brokerage fees.

      **5.23    Customer and Trade Relations**. There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations.

      **5.24    Material Contracts**. Schedule 5.24 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date. The Loan Parties have delivered true, correct and complete copies of all Material Contracts to the Agent.

      **5.25    Casualty**. Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

      **5.26    Bankruptcy Matters**.

      (a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable Law and notice of (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order has been or will be given. The Loan Parties shall give, on a timely basis as specified in the Interim Financing Order or the Final Financing Order, as applicable, all notices required to be given to all parties specified in the Interim Financing Order or Final Financing Order, as applicable.

      (b)    After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims (other than (x) the Carve Out up to, at any date of determination, the amount of the Carve Out Reserve, and (y) Permitted Prior Liens) and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (after entry of the Final Financing Order), 507(a), 507(b), 546(c), 546(d), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the priorities set forth in the Interim Financing Order or the Final Financing Order, as applicable.

      (c)    After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Final Financing Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority only, to (x) the Carve Out up to, at any date of determination, the amount of the Carve Out Reserve and (y) the Permitted Prior Liens.

      (d)    The Interim Financing Order (with respect to the period on and after entry of the Interim Financing Order and prior to the Final Order Entry Date) or the Final Financing Order (with respect to the period on and after the Final Order Entry Date), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended.

- 71 -

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Financing Order or Final Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Credit Parties shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, under the other Loan Documents or under applicable Law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

**5.27    Personally Identifiable Information**.  The Loan Parties maintain a policy for the treatment, handling and storage of consumer information and personally identifiable information in accordance with applicable Laws.

**5.28    Cybersecurity**.  Except as could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, the information technology assets, equipment, systems, networks, software, hardware, and the computers, websites, applications and databases used by or on behalf of the Borrower and its Subsidiaries (collectively, "IT Systems") (i) are adequate for the operation of the Borrower's and each such Subsidiaries' business as currently conducted, and (ii) to the knowledge of the Loan Parties are free and clear of all bugs, errors, defects, Trojan horses, time bombs, malware and other corruptants.  Except as could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (i) the Loan Parties have implemented and maintained commercially reasonable (taking into account the nature, scope and sensitivity of the information) policies, procedures, and safeguards designed to maintain and protect all data and confidential information (including trade secrets) included in the Collateral and the integrity, continuous operation, redundancy and security of all IT Systems and data and (ii) to the knowledge of the Loan Parties, there have been no breaches, cyberattacks (including ransomware attacks) or unauthorized uses of or accesses to the IT Systems or any data, trade secrets or confidential information stored therein or processed thereby, except for those that have been fully remedied.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Revolving Commitment hereunder, or any Committed Revolving Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), each Loan Party shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Subsidiary to:

**6.01    Approved Budget**.  The Approved Budget may be updated, modified or supplemented by the Borrower with the written consent of the Agent and shall be updated upon the Agent's request from time to time.  Notwithstanding the foregoing, by 5:00 p.m. EST on Thursday of each week (or, if such day is not a Business Day, on the next succeeding Business Day), commencing on December 4, 2025, an updated budget for the next successive thirteen (13) week period, which weekly budget shall include each of the projections set forth in clauses (a) through (g) of the definition of "Approved Budget" (as in effect on the Closing Date).  Each such updated, modified or supplemented budget shall be approved by, and be in form and substance satisfactory to, the Agent in its sole discretion, and, for the avoidance of doubt, no such updated, modified or supplemented budget shall be effective as an Approved Budget hereunder until so approved in writing by the Agent, and only once the Agent has provided such written approval shall any such updated budget be deemed an Approved Budget; provided that (i) in the event the Agent, on the one hand, and the Borrower on the other hand, cannot (while acting in good faith) agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default once the period covered by the most recent Approved Budget has terminated and (ii) the budget covenants set forth in Section 6.26 with respect to any period shall be tested based on the initial Approved Budget for such period (without giving effect to any updates or other modifications thereto unless expressly approved by the Agent

- 72 -

for the purpose of testing such covenants in <u>Section 6.26</u>).  Each Approved Budget delivered to the Agent and the Lenders shall be accompanied by such supporting documentation as requested by the Agent or any Lender.

     **6.02**    **Certificates; Other Information**.  Deliver to the Agent, in form and detail satisfactory to the Agent:

     (a)    by 5:00 p.m. EST on Thursday of each week (or, if such day is not a Business Day, on the next succeeding Business Day), commencing on December 4, 2025, a Compliance Certificate, duly executed by a Responsible Officer of the Borrower, which Compliance Certificate shall, among other things, (i) contain a certification that the Loan Parties are in compliance with the covenants contained in <u>Section 6.26</u> and (ii) attach an Approved Budget Variance Report.  Further, the Borrower shall exercise commercially reasonable efforts to deliver evidence to the Agent, on a weekly basis, that the Loan Parties have paid all Post-Petition taxes (including sales taxes), if any, that have become due and payable since the date of the immediately preceding Approved Budget Variance Report;

     (b)    [reserved];

     (c)    by 5:00 p.m. EST on Wednesday of each week (or, if such day is not a Business Day, on the next succeeding Business Day) a Borrowing Base Certificate showing the Borrowing Base (including Availability) as of the close of business as of the last day of the Prior Week, each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Borrower and accompanied by all applicable system generated documentation supporting the information contained within the Borrowing Base Certificate, including but not limited to each of the following:

     (i)    inventory reporting inclusive of inventory mix by category and/or department, including itemizing separately inventory located at Stores to be closed pursuant to the Specified Store Closing Sales and inventory located at non-closing Stores and, where applicable, accounts receivable detail documentation;

     (ii)    screen shots of the Loan Parties' (a) bank accounts reflecting cash balances as of the date of such Borrowing Base Certificate, (b) Credit Card Processors reflecting processed credit card transactions as of the date of such Borrowing Base Certificate and (c) undeposited funds as of the date of such Borrowing Base Certificate, if requested by the Agent;

     (iii)    accounts payable agings, accounts receivables agings (including with respect to wholesale accounts receivables), flash sales report (including sales comparison by Store), inventory receipts by vendor and any additional documentation reasonably requested by the Agent;

     (iv)    all accrued and unpaid amounts owed by any Loan Party to its landlords, warehousemen, Logistics Servicers, customs brokers, freight forwarders, consolidators, carriers and suppliers and any other similar Persons; and

     (v)    [reserved]; and

     (vi)    any other supporting documentation reasonably requested by the Agent related thereto.

13086027v16

(d)    [reserved];

(e)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Loan Parties, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange, and in any case not otherwise required to be delivered to the Agent pursuant hereto;

(f)    the financial and collateral reports described on <u>Schedule 6.02(f)</u>, at the times set forth in such Schedule;

(g)    promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or any Subsidiary pursuant to the terms of any indenture, loan or credit or similar agreement (including under and pursuant to the PNC Credit Agreement and any related loan documents) and not otherwise required to be furnished to the Lenders pursuant to <u>Section 6.01</u> or any other clause of this <u>Section 6.02</u>;

(h)    if requested by the Agent, as soon as available, but in any event within thirty (30) days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Agent, or any Lender through the Agent, may reasonably specify;

(i)    to the extent not previously delivered to the Agent, copies of all Material Contracts and documents evidencing Material Indebtedness;

(j)    promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary or any other matter which, if adversely determined, could reasonably expected to have a Material Adverse Effect;

(k)    promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

**6.03    Notices**.  Promptly notify the Agent:

(a)    of the occurrence of any Default or Event of Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)    of any breach or non-performance of, or any default under, or any termination of, a Material Contract or with respect to Material Indebtedness;

(d)    of any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary and any Governmental Authority or the commencement of, or any

- 74 -

material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary (or in respect of any Specified Mortgaged Property), including pursuant to any applicable Environmental Laws;

       (e)     of the occurrence of any ERISA Event;

       (f)     of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary;

       (g)     of any change in any Loan Party's senior executive officers;

       (h)     [reserved];

       (i)     of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

       (j)     of the filing of any Lien for unpaid Taxes against any Loan Party;

       (k)     of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

       (l)     of any claim made in respect of D&O Insurance;

       (m)     of any environmental claim made in respect of any Specified Mortgaged Property;

       (n)     of (i) any failure by any Loan Party to pay Post-Petition rent or any other amounts due at (A) any distribution centers or warehouses, or (B) any of such Loan Party's locations when such rent or such other amounts first came due following the Petition Date, unless such non-payment was permitted under the Bankruptcy Code or pursuant to an order of the Bankruptcy Court, and (ii) notice of termination of any Lease;

       (o)     the termination, discharge, or resignation of any Loan Party Advisor; and

       (p)     the receipt or delivery of any material notice (including, without limitation, any notice of any breach or alleged breach) under the Purchase Agreement, Specified Liquidation Agreement or any agency agreement, asset purchase agreement or other contract relating to a Permitted Sale by any party thereto.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to <u>Section 6.03(a)</u> shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

       **6.04**     **Payment of Obligations**.  Subject to the provisions of the Bankruptcy Code and, in all cases, the Approved Budget, pay, discharge or otherwise satisfy as the same shall become due and payable, all of its Post-Petition obligations and liabilities, including (a) all Post-Petition Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all Post-Petition lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders,

consolidators, carriers and suppliers) which, if unpaid, would by Law or contract become a Lien upon its property; and (c) all Post-Petition Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (i) the validity or amount thereof is being actively contested in good faith by appropriate proceedings, (ii) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and (iv) no Lien has been filed with respect thereto.  Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement.

6.05    **Preservation of Existence, Etc**.  Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

6.06    **Maintenance of Properties**.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.07    **Maintenance of Insurance**.

(a)    Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent in its reasonable discretion, and not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons, including marine cargo insurance and D&O Insurance.

(b)    Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c)    Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent in its reasonable discretion, and not Affiliates of the Loan Parties, insurance with respect to its IT Systems and the data maintained therein against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons, in each case to be endorsed to name the Agent as an additional insured.

(d)    Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

- 76 -

(e)     Cause business interruption policies (including policies insuring against any disruption on the Loan Parties' business operations resulting from any unauthorized access, use, control, disclosure, destruction or modification of such Loan Parties' IT Systems and/or the data maintained therein) to name the Agent as a lender's loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer, and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(f)     Cause marine cargo policies to be endorsed to the name of the Agent as a lender's loss payable.

(g)     Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(h)     Deliver to the Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent, including an insurance binder) together with evidence satisfactory to the Agent of payment of the premium therefor.

(i)     If at any time the area in which any Real Estate, including, without limitation, any Specified Mortgaged Property, is located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as is reasonable and customary for companies engaged in the same or similar business of the Loan Parties, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as is reasonable and customary for companies engaged in the Business.

(j)     Maintain for themselves and their Subsidiaries, a D&O Insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent furnish the Agent certificates evidencing renewal of each such policy.

(k)     Permit any representatives that are designated by the Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

(l)     None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by Law, to waive their right of recovery, if

- 77 -

any, against the Credit Parties and their agents and employees.  The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08    Compliance with Laws**.  Except to the extent non-performance thereof is permitted by the Bankruptcy Code, comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being actively contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP; (b) such contest effectively suspends enforcement of the contested Laws, and (c) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**6.09    Books and Records; Accountants**.

(a)    (i)  Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties and their Subsidiaries; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties and their Subsidiaries.

(b)    [Reserved].

**6.10    Inspection Rights**.

(a)    Permit representatives and independent contractors of and advisors to the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors and officers, and permit the Agent or professionals (including investment bankers, consultants, accountants, lawyers, Lender Group Consultants and other Lender Service Parties) retained by the Agent to conduct evaluations of the Approved Budget, projections, forecasts and cash flows, and the Borrower's Inventory and key performance indicators affecting the net orderly liquidation value of such Inventory all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that when a Default or Event of Default exists, the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

(b)    [Reserved].

(c)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Collateral, including, without limitation, the assets included in the Borrowing Base. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such appraisals. Without limiting the foregoing, the Loan Parties acknowledge that the Agent may, in its Permitted Discretion, undertake as many inventory appraisals, intellectual property appraisals, and appraisals of the Specified Mortgaged Properties each Fiscal Year at the Loan Parties' expense, as it deems necessary or appropriate.  Notwithstanding any foregoing provision of this clause (c) to the

- 78 -

contrary, so long as the Agent has received a real estate appraisal from PNC that covers any Specified Mortgaged Property, the Agent and the Lenders shall rely on such real estate appraisal conducted by PNC or its retained professionals pursuant to the PNC Credit Agreement or related loan documentation in lieu of conducting independent real estate appraisals for such applicable Specified Mortgaged Property pursuant to the terms of this <u>clause (c)</u>.

(d)　　　With respect to any Specified Mortgaged Property, permit the Agent to engage a geohydrologist, an independent engineer or other qualified consultant or expert, acceptable to the Agent in its Permitted Discretion, at the expense of the Loan Parties, to undertake Phase I environmental site assessments during the term of this Agreement of such Specified Mortgaged Property, <u>provided</u> that such assessments may only be undertaken (i) during the continuance of a Default or an Event of Default, and (ii) if a Loan Party receives any notice or obtains knowledge of (A) any potential or known release of any Hazardous Materials at or from any such Specified Mortgaged Property, notification of which must be given to any Governmental Authority under any Environmental Law, or notification of which has, in fact, been given to any Governmental Authority, or (B) any complaint, order, citation or notice with regard to air emissions, water discharges, or any other environmental health or safety matter affecting any Loan Party or any such Specified Mortgaged Property from any Person (including, without limitation, the Environmental Protection Agency).　Environmental assessments may include detailed visual inspections of the Specified Mortgaged Property, including, without limitation, any and all storage areas, storage tanks, drains, dry wells and leaching areas, and the taking of soil samples, surface water samples and ground water samples, as well as such other investigations or analyses as are reasonably necessary for a determination of the compliance of the Specified Mortgaged Property and the use and operation thereof with all applicable Environmental Laws.　The Borrower will, and will cause each of its Subsidiaries to, cooperate in all respects with the Agent and such third parties to enable such assessment and evaluation to be timely completed in a manner reasonably satisfactory to the Agent.

**6.11　　Use of Proceeds**.　Use the proceeds of the Revolving Credit Borrowings and proceeds of Collateral, in each case of the following <u>clauses (a)</u> through <u>(e)</u>, to the extent permitted under applicable Law, the Approved Budget (subject to the Permitted Variance), and the Loan Documents solely for: (a) the repayment of the Pre-Petition Obligations to the extent provided herein and in the Financing Orders, (b) working capital purposes, (c) payment of fees and costs of administering the Chapter 11 Cases, including professional fees, (d) payment of Bankruptcy Court-approved Pre-Petition liabilities of the Loan Parties, and (e) other lawful purposes of the Borrower permitted by the terms of the DIP Facility.

**6.12　　Additional Loan Parties**.　Without limiting <u>Section 6.17</u>, notify the Agent at the time that any Person becomes a Subsidiary, and concurrently therewith, cause any such Person (a) to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement and the other applicable Loan Documents and such other documents as the Agent shall deem appropriate for such purpose, (ii) grant to the Agent a Lien on such Person's assets of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in <u>clauses (iv)</u> and <u>(v)</u> of <u>Section 4.01(a)</u> and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in <u>clause (a)</u>), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness, in each case in form, content and scope reasonably satisfactory to the Agent.　In no event shall compliance with this <u>Section 6.12</u> waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this <u>Section 6.12</u> if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Loan Party or permit the inclusion of any acquired assets in the computation of the Borrowing Base.

13086027v16

6.13    **Cash Management**.

(a)    Each Loan Party shall, if requested by the Agent:

(i)    deliver to the Agent copies of notifications (each, a "Credit Card Notification") substantially in the form attached hereto as Exhibit F which have been executed on behalf of the applicable Loan Party and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 5.21(b); and

(ii)    enter into a Controlled Account Agreement with each Controlled Account Bank (the DDAs subject to such Controlled Account Agreements, collectively, together with the Concentration Account, the "Controlled Accounts"); provided that such Controlled Account Agreement may be delivered after the Closing Date in accordance with Section 6.30.

(b)    After the Closing Date and subject to the terms of the Cash Management Order, the Loan Parties shall cause to be deposited or sent via ACH or wire transfer, in each case no less frequently than each Business Day (and whether or not there are then any outstanding Pre-Petition Obligations or Obligations) to a Controlled Account (other than a Disbursement Account) all of the following (collectively, "Receipts and Collections"):

(i)    all amounts on deposit in each DDA (net of any minimum balance, not to exceed $20,000, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained);

(ii)    all payments due from Credit Card Processors and Credit Card Issuers and proceeds of all credit card charges;

(iii)    all cash receipts from the Disposition of Inventory and other assets (whether or not constituting Collateral);

(iv)    all proceeds of Accounts; and

(v)    all Net Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event.

(c)    The Loan Parties shall cause the ACH or wire transfer no less frequently than each Business Day (and whether or not there are then any outstanding Pre-Petition Obligations or Obligations) to the concentration account controlled by the Agent (the "Concentration Account"), of all Receipts and Collections, including, without limitation, the then entire ledger balance of each Controlled Account (net of any minimum balance, not to exceed $20,000, as may be required to be kept in the subject Controlled Account by the applicable Controlled Account Bank), but excluding amounts on deposit in each Disbursement Account.

(d)    The Concentration Account shall at all times be under the sole dominion and control of the Agent, all funds therein (net of any minimum balance, not to exceed $20,000, as may be required to be kept therein by the applicable Controlled Account Bank) shall be wired to an account specified by Agent no less frequently than each Business Day, and subject to the terms of the Financing Orders, the Agent shall cause all such funds on deposit in the Concentration Account received by it to be applied to the Pre-Petition Obligations or the Obligations, on the same Business

- 80 -

Day on which such funds are received by it (if such funds are received prior to 11:00 a.m. EST on the day received) or on the next Business Day following the date on which such funds are received by it (if such funds are received on or after 11:00 a.m. EST on the day received), which amounts shall be applied to the Pre-Petition Obligations or the Obligations in the order prescribed in either <u>Section 2.05(g)</u> or <u>Section 8.03</u> of this Agreement, as applicable.  The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, and (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Pre-Petition Obligations and the Obligations.  In the event that, notwithstanding the provisions of this <u>Section 6.13</u>, any Loan Party receives or otherwise has dominion and control of any such Receipts and Collections, such Receipts and Collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(e)     Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Controlled Account to ensure the proper transfer of funds as set forth above and provide the Agent with "view-only" access to each of the Loan Parties' bank accounts identified by the Agent.

**6.14    Information Regarding the Collateral**.

(a)     Furnish to the Agent prior written notice of any change in:  (i) any Loan Party's legal name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office, Store or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's federal taxpayer identification number or organizational identification number assigned to it by its state of organization.  The Loan Parties agree not to effect, permit or suffer any change referred to in the preceding sentence to be effected unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all of the Collateral (subject to the Permitted Prior Liens and the Carve Out) for its own benefit and the benefit of the other Credit Parties.

(b)     Should any of the information on any of the Schedules hereto or to the other Loan Documents become inaccurate or misleading in any material respect as a result of changes after the Closing Date, the Borrower shall advise the Agent in writing of such revisions or updates as may be necessary or appropriate to update or correct the same.  From time to time as may be reasonably requested by the Agent, the Borrower shall supplement each Schedule hereto and to the other Loan Documents, or any representation herein or in any other Loan Document, with respect to any matter arising after the Closing Date that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).  Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or under any other Loan

13086027v16

Document or fail to undertake any action required hereunder or under any other Loan Document or otherwise depart from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default or Event of Default resulting from the matters disclosed therein.

**6.15    Physical Inventories; Cybersecurity Audits**.

(a)     Cause not less than one (1) physical inventory to be undertaken, at the expense of the Loan Parties, in each twelve (12) month period and periodic cycle counts, in each case consistent with past practices, conducted by such third party inventory takers as are satisfactory to the Agent and following such methodology as is consistent with the methodology used in the immediately preceding inventory or as otherwise may be satisfactory to the Agent.  The Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party.  The Borrower, within ten (10) Business Days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b)     Permit the Agent, in its Permitted Discretion, if any Default or Event of Default exists, to cause additional such inventories to be taken as the Agent determines (each, at the expense of the Loan Parties).

(c)     Cause to be conducted by an outside firm acceptable to the Agent not less than one (1) in each twelve (12) month period an examination, audit and other evaluations of the Loan Parties' practices in respect of cybersecurity, with a scope and utilizing procedures as are reasonably satisfactory to the Agent, including, without limitation, such commercially reasonable (taking into account the nature, scope and sensitivity of the information) policies, procedures, and safeguards that have been implemented designed to maintain and protect all data and confidential information (including trade secrets) included in the Collateral and the integrity, continuous operation, redundancy and security of all IT Systems and data.  The Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled cybersecurity audit which is undertaken on behalf of any Loan Party.  The Agent may cause additional cybersecurity examinations to be undertaken (i) as it deems necessary or appropriate, at its own expense or, (ii) if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties; provided that, no more than two (2) such cybersecurity examinations shall be undertaken in any twelve (12) month period.

**6.16    Environmental Laws**.  (a) Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are necessary to comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being actively contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.17    Further Assurances**.

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties.  The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    In no event shall compliance with this Section 6.17 waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this Section 6.17 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)    [Reserved].

(d)    Upon the request of the Agent, use commercially reasonable efforts to cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require.

(e)    Upon the request of the Agent, use commercially reasonable efforts to cause any of its landlords, Logistics Servicers or other bailees to deliver a Collateral Access Agreement to the Agent in such form as the Agent may reasonably require.

**6.18    Compliance with Terms of Leaseholds; Assumption and Rejection of Leases**.

(a)    Except as otherwise expressly permitted hereunder or to the extent non-performance thereof is permitted by the Bankruptcy Code and other than the filing of the Chapter 11 Cases and the effect thereof, (i) make all payments and otherwise perform all obligations arising Post-Petition in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party and keep such Leases in full force and effect, (ii) not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, (iii) notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and (iv) cause each of its Subsidiaries to do the foregoing, except, in each case, with respect to Leases relating to Store locations subject to Specified Store Closing Sales after the date of the effectiveness of the rejection of the applicable Leases.

(b)    Other than with respect to Leases relating to any Specified Store Closing Sale, (i) obtain the Agent's prior written consent prior to rejecting any Leases and (ii) and consult with the Agent regarding any plans to assume or reject Leases.

**6.19    Material Contracts**.  Except as otherwise expressly permitted hereunder or to the extent non-performance thereof is permitted by the Bankruptcy Code and other than the filing of the Chapter 11 Cases and the effect thereof, (a) perform and observe all the terms and provisions of each Material Contract to be performed or observed by it on a Post-Petition basis, (b) maintain each such Material Contract in full force and effect, (c) enforce each such Material Contract in accordance with its terms, (d) take all such action to such end as may be from time to time requested by the Agent, (e) upon request of the Agent, make,

- 83 -

to each other party to each such Material Contract, such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (f) cause each of its Subsidiaries to do the foregoing.

**6.20**    **[Reserved]**.

**6.21**    **[Reserved]**.

**6.22**    **Employee Benefit Plans**.  Except to the extent that failure to do so could not reasonably be expected to result in a Material Adverse Effect:

(a)    Maintain, and cause each ERISA Affiliate to maintain, each Pension Plan in substantial compliance with all applicable Laws.

(b)    Make, and cause each ERISA Affiliate to make, on a timely basis, all required contributions to any Multiemployer Plan.

(c)    Not, and not permit any ERISA Affiliate to (i) seek a waiver of the minimum funding standards of ERISA, (ii) terminate or withdraw from any Pension Plan or Multiemployer Plan, or (iii) take any other action with respect to any Pension Plan that would, or could reasonably be expected to, entitle the PBGC to terminate, impose liability in respect of, or cause a trustee to be appointed to administer, any Pension Plan.

**6.23**    **[Reserved]**.

**6.24**    **Personally Identifiable Information**.  Maintain and comply with a policy for the treatment, handling, and storage of consumer information and personally identifiable information in accordance with applicable Laws.

**6.25**    **Cybersecurity and Data Protection**.

(a)    Maintain the information technology systems used in the business of Borrower and its Subsidiaries so as to operate and perform in all material respects as required to permit Borrower and its Subsidiaries to conduct their business as presently conducted.

(b)    Except as would not cause or could not be reasonably expected to result in, individually or in the aggregate, a Material Adverse Effect, (i) Borrower and its Subsidiaries shall implement and maintain a reasonable enterprise-wide privacy and information security program with plans, policies and procedures for privacy, physical and cybersecurity, disaster recovery, business continuity and incident response, including reasonable and appropriate administrative, technical and physical safeguards to protect information subject to any applicable data protection laws and the information technology systems of Borrower and each of its Subsidiaries from any unauthorized access, use, control, disclosure, destruction or modification, (ii) Borrower and each of its Subsidiaries shall be in compliance with all applicable Law and Material Contracts regarding the privacy and security of customer, consumer, patient, employee and other personal data and is compliant with their respective published privacy policies.

**6.26**    **Performance within Approved Budget**.

(a)    At all times following the entry of the Interim Financing Order, perform in accordance with the Approved Budget, including having made all scheduled payments to the

- 84 -

Lenders, as applicable, as and when required, subject to the following (the "Permitted Variance"): (i) the Loan Parties' actual cash receipts, determined on a cumulative basis with respect to all line items appearing under the heading "Total Receipts" in the Approved Budget, shall not be less than 90% of the projected cumulative cash receipts as set forth in the Approved Budget for the Cumulative Four-Week Period (or, with respect to the initial two-week cumulative period from the Petition Date, 80%, and with respect to the initial three-week cumulative period from the Petition Date, 85%), (ii) the Loan Parties' actual disbursements, determined on a cumulative basis with respect to all line items appearing under the heading "Total Disbursements" in the Approved Budget, shall not be greater than 110% of the projected disbursements as set forth in the Approved Budget for the Cumulative Four-Week Period (or, with respect to the initial two-week cumulative period from the Petition Date, 115%, and with respect to the initial three-week cumulative period from the Petition Date, 115%), excluding professional fees of the Agent and the Lenders, and (iii) actual Availability, as of any date of determination, shall not be less than 90% of the projected Availability as set forth in the Approved Budget for such date of determination. The covenants set forth in this Section may not be waived or modified with the prior written consent of the Agent.

(b)     Each of the covenants set forth above in Section 6.26(a) shall be tested as of Saturday of each week, commencing with Saturday, December 6, 2025, in the case of each of clauses (i) and (ii) above, for the Cumulative Four-Week Period then ended, and in the case of clause (iii) above, as of the last day of the week then ended, in each case, pursuant to the Approved Budget Variance Report delivered by the Borrower to the Agent in accordance with Section 6.02(a).

(c)     The Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of bankruptcy expenses, including professional fees and expenses to the Agent and the Lenders, are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the Financing Orders regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget (including any estimates of a loan balance in excess of Borrowing Base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the Borrowing Base restrictions or other lending limits set forth therein.

**6.27    Retention Consultants; Communication with Accountants and Other Financial Advisors.**

(a)     Continue to exclusively engage Luxury Delivery Services, Inc. (or an approved Affiliate thereof) for all delivery and other related services, in all cases, in the same manner of such engagement prior to the Petition Date and on terms and conditions acceptable to the Agent in its sole discretion, but only so long as such services continue to be required by the Loan Parties in their sole discretion.

(b)     Continue to retain (i) SB360 as the Specified Liquidation Consultant, (ii) Berkeley Research Group, LLC as the Loan Parties' financial advisor (in such capacity, the "Financial Advisor") and as the Loan Parties' chief restructuring officer (in such capacity, the "CRO"), (iii) SSG Advisors, LLC as the Loan Parties' investment banker (in such capacity, the "Investment Banker"), (iv) C Street Advisory Group, LLC as the Loan Parties public relations advisor (the "PR Advisor") and (v) A&G Real Estate Partners as the Loan Parties' real estate and lease disposition advisor (in such capacity, the "Real Estate and Lease Disposition Advisor" and, together with the Specified Liquidation Consultant, the Financial Advisor, the CRO, the Investment Banker, the PR

Advisor and any other independent appraisers, financial advisors, investment bankers and consultants, if any, which are consented to by the Agent and have been engaged from time to time by the Loan Parties on terms acceptable to the Agent, each a "Loan Party Advisor" and collectively, the "Loan Party Advisors"). The retention of each Loan Party Advisor shall be on terms and conditions (including as to scope of engagement) satisfactory to the Agent. Each Loan Party Advisor shall be retained by and at the sole cost and expense of the Loan Parties and solely on behalf of Loan Parties at all times.

(c)     Fully cooperate with the Loan Party Advisors, including, without limitation, in connection with the preparation of the Approved Budget, Approved Budget Variance Reports and other reporting or information required to be delivered pursuant to this Agreement and the other Loan Documents and achievement of the Required Milestones. Except as to confidential sale or marketing information to the extent that the Agent, the Lenders, or any Affiliates thereof are potential bidders on the Loan Parties' assets, each Loan Party hereby (i) authorizes the Agent (or the Agent's agents or advisors, including any Lender Group Consultant or any Lender Service Party) to communicate directly with the Loan Party Advisors regarding any and all matters related to the Loan Parties and their Affiliates or the Chapter 11 Cases, including all Approved Budgets, Approved Budget Variance Reports, financial reports and projections developed, reviewed or verified by any Loan Party Advisor, Store closing information, including pursuant to the Specified Store Closing Sales, and all additional information and reports reasonably requested by the Agent, and (ii) authorizes and directs each Loan Party Advisor to (A) communicate directly with the Agent (or the Agent's agents or advisors, including any Lender Group Consultant or any Lender Service Party) regarding any and all matters related to the Loan Parties and their Affiliates or the Chapter 11 Cases, including all Approved Budgets, Approved Budget Variance Reports, financial reports and projections developed, reviewed or verified by any Loan Party Advisor, Store closing information, including pursuant to the Specified Store Closing Sales, and all additional information and reports reasonably requested by the Agent and (B) promptly provide the Agent and the Lenders (or their respective agents or advisors, including any Lender Group Consultant or any Lender Service Party) with copies of reports, Collateral valuation updates and other information or materials prepared or reviewed by such Loan Party Advisor as the Agent or any Lender may reasonably request.

(d)     (i) Permit the Loan Party Advisors to attend (or, at the option of such representative, monitor by telephone) all meetings (both regular and special) of the board of directors (or equivalent governing body) of each Loan Party and each committee thereof, and (ii) cause the Loan Party Advisors to (A) receive prior written notice of all such meetings, and (B) all notices, information and reports which are furnished or made available to the members of such body and/or committee at the same time and in the same manner as the same is furnished or made available to such members. If any action is proposed to be taken by such board of directors (or equivalent governing body) and/or committee by written consent in lieu of a meeting, the Borrower will provide the Loan Party Advisors with prior written notice thereof (such notice to be given in the same manner and at the same time as notice is given to the members of such body and/or committee). For the avoidance of doubt, no Loan Party Advisor shall constitute a member of such body and/or committee and shall not be entitled to vote on any matters presented at meetings of such body and/or committee or to consent to any matter as to which the consent of any such body and/or committee shall have been requested.

(e)     Conduct and participate in (and cause the Loan Party Advisors to participate in) weekly conference calls with the Agent and Lenders (and/or their advisors and counsel, including the Lender Group Consultants and any Lender Service Parties, if applicable) to discuss, except as to confidential sale or marketing information to the extent that the Agent, the Lenders, or any

- 86 -

Affiliates thereof are potential bidders on the Loan Parties' assets, any and all matters related to the Loan Parties and their Affiliates or the Chapter 11 Cases, including all Approved Budgets, Approved Budget Variance Reports, financial reports and projections developed, reviewed or verified by any Loan Party Advisor, Store closing information, including pursuant to the Specified Store Closing Sales, and all additional information and reports reasonably requested by the Agent or any Lender.

(f)     Each Loan Party acknowledges that the Agent shall be permitted to engage (directly or through counsel), for the benefit of the Lenders, such outside consultants and advisors (each, a "Lender Group Consultant"), for the sole benefit of the Agent and the Lenders, as the Agent may determine to be necessary or appropriate, in its sole discretion. Except as to confidential sale or marketing information to the extent that the Agent, the Lenders, or any Affiliates thereof are potential bidders on the Loan Parties' assets, each Loan Party covenants and agrees that (i) such Loan Party shall provide its complete cooperation during normal business hours with any Lender Group Consultant (including, without limitation, providing reasonable access to such Loan Party's business, books and records and senior management); (ii) all reasonable costs and expenses of any such Lender Group Consultant shall be expenses required to be paid by the Loan Parties under Section 10.04(a); and (iii) all reports, determinations and other written and verbal information provided by any Lender Group Consultant shall be confidential and no Loan Party shall be entitled to have access to same.

**6.28     Bankruptcy Related Affirmative Covenants.**  Complete, or shall cause to be completed, each of the DIP Milestones and Store Closing and Sale Milestones (collectively, the "Required Milestones") as and when required pursuant to the Financing Orders (unless otherwise extended by the Agent in its sole discretion pursuant to and in accordance with the Financing Orders), in each case, on terms and conditions, and subject to documentation (including, in all cases, forms of all applicable motions and orders) in form and substance acceptable to the Agent in all respects.

**6.29     Financing Orders.**  Comply with (a) the terms and conditions of the Financing Orders, as then in effect, in all respects, and shall not seek any reversal, vacatur, stay, amendment or modification thereto without the prior written consent of the Agent; and (b) all terms and conditions of all other orders entered by the Bankruptcy Court, unless otherwise agreed to in writing by the Agent.

**6.30     Post-Closing Obligations.**  Execute and deliver the documents or complete the tasks, as applicable, set forth on Schedule 6.30, in each case, within the time limits specified on such Schedule (or such later times as determined by the Agent in writing in its sole discretion), each of which shall be completed or provided in form and substance reasonably satisfactory to the Agent.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Revolving Commitment hereunder or any Committed Revolving Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01     Liens.**  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file any such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent

13086027v16

or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

**7.02    Investments**.  Make any Investments, except for Permitted Investments.

**7.03    Indebtedness; Disqualified Stock**.  (a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, other than Permitted Indebtedness; (b) issue Disqualified Stock, or (c) issue and sell any other Equity Interests.

**7.04    Fundamental Changes**.  Merge, dissolve, liquidate, wind up, consolidate with or into another Person (or agree to do any of the foregoing), whether in one transaction or in a series of transactions (including, in each case, pursuant to a division described in Section 1.06).

**7.05    Dispositions**.  Make any Disposition or enter into any agreement to make any Disposition, except for Permitted Dispositions.

**7.06    Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contribution, except that so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom, (i) each Subsidiary may make Restricted Payments to the Borrower or to any other Subsidiary that is a Loan Party; and (ii) each Loan Party and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests (other than Disqualified Stock) of such Person.

**7.07    Prepayments of Indebtedness**.  Pay, prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness (other than (a) the Pre-Petition Obligations and the Obligations, (b) any adequate protection payments expressly provided for in the Financing Orders, and (c) as set forth in the Approved Budget or expressly permitted under this Agreement), or make any payment in violation of any subordination or intercreditor terms of any Subordinated Indebtedness.

**7.08    Change in Nature of Business**.  In the case of each of the Loan Parties, engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates**.  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party or any Subsidiary, not in the ordinary course of business, provided that the foregoing restriction shall not apply to (a) a transaction in the ordinary course of business between Loan Parties and its Affiliates, (b) a transaction on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, (c) a transaction between or among the Loan Parties, (d) subject to the Approved Budget, transactions described on Schedule 7.09 hereto, (e) subject to the Approved Budget, advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (f) subject to the Approved Budget, the issuance of Equity Interests in the Borrower to any officer, director, employee or consultant of the Borrower or any of its Subsidiaries, (g) subject to the Approved Budget, the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or any

13086027v16

of its Subsidiaries, and (h) any issuances of securities of the Borrower (other than Disqualified Stock and other Equity Interests not permitted hereunder).

**7.10    Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation (other than the Pre-Petition Credit Agreements, the "Loan Documents" (under and as defined in the Pre-Petition Credit Agreement), this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clause (c) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.11    Use of Proceeds**.  Use the proceeds of any Revolving Credit Borrowing, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; or (b) for purposes other than those permitted under this Agreement.

**7.12    Amendment of Material Documents**.  Amend, modify or waive any rights of a Loan Party or a Subsidiary under, or otherwise terminate or cancel, (a) its Organization Documents, (b) any Material Contract (other than the PNC Credit Agreement and PNC LC Agreement), (c) any Material Indebtedness, the PNC Credit Agreement or the PNC LC Agreement, in each case to the extent that such amendment, modification, waiver, termination or cancellation (i) would result in a Default or Event of Default under any of the Loan Documents, (ii) would adversely affect the rights of any Loan Party or any Subsidiary, as applicable, or any Credit Party, or (iii) could reasonably be expected to have a Material Adverse Effect, (d) the PNC Credit Agreement to the extent that such amendment, modification, waiver, termination or cancellation would increase the Commitment (as defined in the PNC Credit Agreement) thereunder or (e) the PNC LC Agreement to the extent such amendment, modification, waiver, termination or cancellation would increase the amount of the "Facility" (as defined in the PNC LC Agreement) thereunder.

**7.13    Fiscal Year**.  Change, or suffer any change to, the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

**7.14    Deposit Accounts; Credit Card Processors**.  Open new DDAs or Controlled Accounts unless the Loan Parties shall have delivered to the Agent appropriate Controlled Account Agreements consistent with the provisions of Section 6.13 and otherwise satisfactory to the Agent.  No Loan Party shall maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein unless the Loan Parties shall have delivered to the Agent appropriate Credit Card Notifications consistent with the provisions of Section 6.13(a)(i) hereof.

**7.15    [Reserved]**.

**7.16    Designation of Senior Debt**.  Designate any Indebtedness (other than the Indebtedness under the Loan Documents) of any Loan Party or any of its Subsidiaries as "Designated Senior Debt" (or any similar term).

**7.17    Store Locations; Inventory and Asset Dispositions Outside the Ordinary Course**.
Open or close any Store location after the Closing Date, in all cases, other than pursuant to the Specified
Store Closing Sales or as otherwise approved by the Agent.

**7.18    Reclamation Claims**.  Enter into any agreement to return any of its Inventory to any of its
creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-
Petition claims under Section 546(c) of the Bankruptcy Code or agree to allow any creditor to take any
setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-
Petition claims based upon any such return pursuant to Section 553(b)(l) of the Bankruptcy Code or.

**7.19    Bankruptcy Related Negative Covenants**.  Seek, consent to, or permit to exist any of the
following:

(a)    any modification, stay, vacation or amendment to the Financing Orders to which
the Agent has not consented in writing;

(b)    a priority claim or administrative expense or unsecured claim against the Borrower
(now existing or hereafter arising or any kind or nature whatsoever, including, without limitation,
any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 503(a),
503(b), 506(c) (after entry of the Final Financing Order), 507(a), 507(b), 546(c), 546(d), 726, 1114
of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Lenders in
respect of the Obligations, subject to (x) the Carve Out up to, at any date of determination, the
amount of the Carve Out Reserve, and (y) Permitted Prior Liens, and except as otherwise set forth
in the Financing Orders;

(c)    any Lien on any Collateral having a priority equal or superior to the Lien securing
the Obligations, including any adequate protection Liens, subject to (x) the Carve Out up to, at any
date of determination, the amount of the Carve Out Reserve, and (y) Permitted Prior Liens, and
except as otherwise set forth in the Financing Orders;

(d)    any order which authorizes the return of any Loan Parties' property pursuant to
Section 546(h) of the Bankruptcy Code;

(e)    any order which authorizes the payment of any Indebtedness (other than Pre-
Petition Indebtedness reflected in the Approved Budget (subject to the Permitted Variance))
incurred prior to the Petition Date, except as set forth in the orders entered into in connection with
the first day motions and the Financing Orders and the grant of "adequate protection" (whether
payment in cash or transfer of property) with respect to any such Indebtedness which is secured by
a Lien; or

(f)    any order seeking authority to take any action that is prohibited by the terms of this
Agreement or the other Loan Documents or refrain from taking any action that is required to be
taken by the terms of this Agreement or any of the other Loan Documents.

**7.20    Subsidiaries**.  Form or otherwise create any Subsidiary without the prior written consent
of the Agent in its sole discretion.

**7.21    Consignment**.  With respect to any Inventory (other than Specified Consigned Inventory),
enter into a consignment, conditional sale or similar title retention program or arrangement.

**ARTICLE VIII**
**EVENTS OF DEFAULT AND REMEDIES**

**8.01**     **Events of Default**.  Any of the following shall constitute an Event of Default:

(a)     Non-Payment.  The Borrower or any other Loan Party fails to pay, as and when required to be paid in the applicable Loan Document, (i) any amount of principal of any Committed Revolving Loan, or (ii) any interest on any Committed Revolving Loan, or any fee due hereunder or under any other Loan Document, or (iii) any other amount payable hereunder or under any other Loan Document; or

(b)     Specific Covenants.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01 (Approved Budget), 6.02 (Certificates; Other Information), 6.03 (Notices), 6.05 (Preservation of Existence), 6.07 (Maintenance of Insurance), 6.10 (Inspection Rights), 6.11 (Use of Proceeds), 6.12 (Additional Loan Parties), 6.13 (Cash Management), 6.14 (Information Regarding the Collateral), 6.15 (Physical Inventories; Commercial Finance Examinations; Cybersecurity Audits), 6.18 (Compliance with Terms of Leaseholds; Assumption and Rejection of Leases), 6.19 (Material Contracts), 6.22 (Employee Benefit Plans), 6.26 (Performance within Approved Budget), 6.27 (Retention of Consultants, Etc.; Communication with Accountants and other Financial Advisors), 6.28 (Bankruptcy Related Affirmative Covenants), 6.29 (Financing Orders), 6.30 (Post-Closing Covenants) or Article VII; or (ii) any Guarantor fails to perform or observe any term, covenant or agreement contained in the Facility Guaranty; or (iii) any of the Loan Parties fails to perform or observe any term, covenant or agreement contained in the Security Documents to which it is a party; or

(c)     Other Defaults.  Any Loan Party fails to perform or observe any other term, covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document to which it is a party and such failure continues for ten (10) days; or

(d)     Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party in this Agreement, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate or Approved Budget Variance Report) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     Cross-Default.  Any Loan Party or any Subsidiary (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Post-Petition or unstayed Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), or (B) fails to observe or perform any other agreement or condition relating to any such Post-Petition or unstayed Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Post-Petition or unstayed Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (C) there exists any unstayed default or an event of default under any Material Contract.

- 91 -

(f)    [Reserved].

(g)    [Reserved].

(h)    Judgments.  There is entered against any Loan Party or any Subsidiary on a Post-Petition basis (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $250,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(i)    ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or any ERISA Affiliate under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $1,000,000 or which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $250,000 or which would reasonably likely result in a Material Adverse Effect; or

(j)    Invalidity of Loan Documents.  (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all of the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Security Document; or

(k)    Change of Control.  There occurs any Change of Control; or

(l)    [Reserved].

(m)    Loss of Collateral.  There occurs any uninsured loss to any material portion of the Collateral; or

(n)    [Reserved].

(o)    Indictment.  The indictment or institution of any legal process or proceeding against any Loan Party or any Subsidiary, under any federal, state, municipal, and other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony; or

(p)    [Reserved].

(q)    Guaranty.  The termination or attempted termination of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document; or

(r)    Subordination.  (i) The subordination and/or intercreditor provisions of the documents evidencing or governing any Subordinated Indebtedness (any such provisions, the "Subordination Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) any Loan Party or any holder of the applicable Indebtedness shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions; or

(s)    [Reserved].

(t)    Permitted Sale and Specified Store Closing Sales.  Any Loan Party shall (i) fail to comply with the terms of (a) the Purchase Agreement for the Permitted Sale or (b) the Specified Liquidation Agreement for the Specified Store Closing Sales or any of the documents or agreements executed in connection therewith in any material respect, (ii) fail to consummate (a) the Permitted Sale in accordance with the terms of the Purchase Agreement or (b) the Specified Store Closing Sales in accordance with the terms of such Specified Liquidation Agreement (in each case of clauses (i) and (ii) without any waiver or amendment to the Purchase Agreement or the Specified Liquidation Agreement, as applicable, unless such waiver or amendment is made with the written consent of the Agent), or (iii) take any action to terminate (a) the Purchase Agreement with respect to the Permitted Sale or (b) the Specified Liquidation Agreement with respect to all or any of the Store locations subject thereto, without the written consent of the Agent; or

(u)    Chapter 11 Cases.  The occurrence of any of the following in the Chapter 11 Cases:

(i)    any Loan Party, without the Agent's prior written consent, files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of such Loan Party's assets or capital stock unless the transactions that are the subject of the motion will result, as reasonably determined by the Agent, in payment in full in cash of the all Pre-Petition Obligations and Obligations pursuant to the DIP Facility on the closing of such sale;

(ii)    other than in connection with the payment in full or refinancing of the Pre-Petition Obligations and Obligations pursuant to the DIP Facility, the bringing or supporting of a motion, taking of any action or the filing of any plan or disclosure statement attendant thereto by or on behalf of any Loan Party in any of the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Financing Order or Final Financing Order, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code, without the prior written consent of the Agent; (D) that seeks to prohibit Agent or Lenders from credit bidding on any or all of the Loan Parties' assets during the pendency of the Chapter 11 Cases; or (E) any other action or actions materially adverse to the interest of the Agent or the Lenders in their capacities as such or their rights and remedies hereunder or its interest in the Collateral;

(iii)    (A) other than in connection with the indefeasible repayment in full or refinancing of the Pre-Petition Obligations and Obligations pursuant to the DIP Facility on the effective date of such plan, the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party or any other Person to which the Agent does not consent or otherwise agree to treatment of the respective claims of the Agent and the Lenders, (B) the entry of any order terminating the Loan Parties' exclusive right to file a plan of reorganization without the consent of the Agent, or (C) the expiration of the Loan Parties' exclusive right to file a plan of reorganization, without the written consent of the Agent;

(iv)    the entry of an order in any of the Chapter 11 Cases confirming a plan that (A) is not acceptable to the Agent in its Permitted Discretion or (B) does not contain a provision for termination of the Aggregate Revolving Commitments and indefeasible repayment in full in cash of all Pre-Petition Obligations and Obligations pursuant to the DIP Facility on or before the effective date of such plan or plans;

(v)    (A) the entry of an order reversing, amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Financing Order, the Final Financing Order, or the Cash Management Order, in each case, without the written consent of the Agent, (B) the filing of a motion for reconsideration by any Loan Party with respect to the Interim Financing Order or the Final Financing Order, in each case, without the written consent of the Agent, or (C) the Interim Financing Order, the Final Financing Order, or the Cash Management Order are otherwise not in full force and effect, in each case, without the written consent of the Agent;

(vi)    the Final Financing Order is not entered prior to the expiration of the Interim Financing Order;

(vii)    except as set forth in any motions which have been delivered to and are acceptable to the Agent and as contemplated by the Approved Budget (subject to the Permitted Variance), the payment of, or application for authority to pay, any Pre-Petition Indebtedness or Pre-Petition claim without the Agent's prior written consent;

(viii)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agent, any other Credit Party or any of the Collateral;

(ix)    the filing of a motion by a Loan Party for, or the entry of an order directing, the appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, liquidation or reorganization of the Loan Parties; or the sale, without the Agent's written consent, of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, liquidation, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for indefeasible payment in full in cash of the Obligations and termination of the Revolving Commitments on the effective date of such plan or the closing of such sale;

(x)    the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from Chapter 11 to Chapter 7 of the Bankruptcy Code, or any Loan Party files a

motion or other pleading seeking the dismissal of such Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(xi)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value of $100,000 (or $250,000 in the aggregate) or more, or (B) with respect to any Lien or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority other than Permitted Prior Liens;

(xii)    the commencement of a suit or action against the Agent, any Lender or any other Credit Party by or on behalf of any Loan Party;

(xiii)    the entry of an order in any Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under this Agreement or the other Loan Documents;

(xiv)    the failure of any Loan Party to perform any of its obligations under the Interim Financing Order, the Final Financing Order or the Cash Management Order or any of its material obligations under any other order of the Bankruptcy Court;

(xv)    [reserved]; or

(xvi)    the entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal or superior to that granted to the Agent and the Lenders, except as set forth in the Financing Orders.

**8.02    Remedies Upon Event of Default**.  Subject to the applicable Financing Order, including, any Remedies Notice Period (as defined in the Financing Orders), in addition to all other actions permitted by the Financing Orders (including, without limitation, directing the commencement of "going out of business" sales at the Designated Stores (as defined in the Financing Orders) pursuant to the Financing Orders), if any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(a)    declare the Revolving Commitments of each Lender to make Committed Revolving Loans to be terminated, whereupon such Revolving Commitments shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Committed Revolving Loans, all interest accrued and unpaid thereon and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)    declare that the application of the Carve Out has occurred through the delivery of a Carve Out Trigger Notice to the Loan Parties;

(d)    capitalize any accrued and unpaid interest by adding such amount to the outstanding principal balance of the Committed Revolving Loans, at which time such capitalized amount shall bear interest at the Default Rate;

(e)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under

- 95 -

this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties; and/or

(f)    the Agent may purchase, in any public or private sale conducted under the provisions of the UCC (including pursuant section 9-610 and 9-620 of the UCC), the provisions of the Bankruptcy Code (including pursuant to section 363 of the Bankruptcy Code) or any other Debtor Relief Laws or at any sale or foreclosure conducted by the Agent (whether by judicial action or otherwise) in accordance with applicable Law, all or any portion of the Collateral.  The Lenders hereby irrevocably authorize the Agent, upon written consent of the Required Lenders, to credit bid (in an amount and on such terms as may be directed by the Required Lenders) and purchase at any such sale (either directly or through one or more acquisition vehicles) all or any portion of the Collateral on behalf of and for the benefit of the Lenders.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03    Application of Funds**.  After the exercise of remedies provided for in Section 8.02 (or after the Committed Revolving Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Agent in the following order:

First, subject to the terms of the Financing Orders, to payment of all outstanding Pre-Petition Obligations;

Second, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent;

Third, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Third payable to them;

Fourth, to the extent not previously reimbursed by the Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

Fifth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Committed Revolving Loans and other Obligations, and fees, ratably among the Lenders in proportion to the respective amounts described in this clause Fifth payable to them;

Sixth, to payment of that portion of the Obligations constituting unpaid principal of the Committed Revolving Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Sixth held by them;

Seventh, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations), ratably among the Credit Parties in proportion to the respective amounts described in this clause Seventh held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

## ARTICLE IX
## THE AGENT

**9.01    Appointment and Authority**.  Each of the Lenders hereby irrevocably appoints Second Avenue to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Loan Party or any Subsidiary shall have rights as a third party beneficiary of any of such provisions.  It is understood and agreed that the use of the terms "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**9.02    Rights as a Lender**.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions**.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except for discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law;

(c)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of their Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity;

(d)     shall not be liable for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 8.02 and 10.01) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction;

(e)     shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties or a Lender.  Upon the occurrence of a Default or Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders.  Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties.  In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful; and

(f)     shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**9.04    Reliance by Agent**.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Committed Revolving Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Committed Revolving Loan.  The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05    Delegation of Duties**.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Agent.  The Agent and any such sub agent may perform any and all of its duties and

- 98 -

exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facility provided for herein as well as activities as the Agent. The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

9.06    **[Reserved].**

9.07    **Non-Reliance on Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  Except as provided in Section 9.12, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

9.08    **No Other Duties, Etc**.  Anything herein to the contrary notwithstanding, no person who is or becomes a bookrunner, arranger, syndication agent or documentation agent hereunder shall have any powers, rights, liabilities, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity as the Agent or a Lender hereunder.

9.09    **Agent May File Proofs of Claim**.  The Agent (irrespective of whether the principal of any Committed Revolving Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

        (a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Committed Revolving Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agent, the other Credit Parties and their respective agents and counsel and all other amounts due to the Lenders, the Agent and the other Credit Parties hereunder, including, without limitation under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

        (b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.09 and 10.04.

13086027v16

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding.

**9.10    Collateral and Guaranty Matters**.  The Credit Parties irrevocably authorize the Agent, at its option and in its reasonable discretion,

(a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Revolving Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01;

(b)    to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

(c)    to release any Guarantor from its obligations under the Facility Guaranty and any other Loan Document to which such Guarantor is a party if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.10.  In each case as specified in this Section 9.10, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

**9.11    Notice of Transfer**.  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.06.

**9.12    Reports and Financial Statements**.  By signing this Agreement, each Lender:

(a)    [reserved];

(b)    is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all Borrowing Base Certificates, financial statements and other Borrower Materials required to be delivered by the Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

(c)    expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials, and shall not be liable for any information contained in any Borrower Materials (including any Report);

(d)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect

only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)      agrees to keep all Reports and other Borrower Materials confidential in accordance with the provisions of <u>Section 10.07</u> hereof; and

(f)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report and any other Borrower Materials in connection with any Revolving Credit Borrowing that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Committed Revolving Loan or Committed Revolving Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.13    Agency for Perfection**.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States, can be perfected only by possession. Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.14    Indemnification of Agent**.  Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agent and any of its Related Parties, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent and its Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent and any of its Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's or its Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.15    Relation among Lenders**.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in the case of the Agent) authorized to act for, any other Lender.

**9.16    Recovery of Erroneous Payments**.  Without limitation of any other provision in this Agreement, if at any time the Agent makes a payment hereunder in error to any Credit Party, whether or not in respect of an Obligation due and owing by the Borrower at such time, where such payment is a Rescindable Amount, then in any such event, each Credit Party receiving a Rescindable Amount severally agrees to repay to the Agent forthwith on demand the Rescindable Amount received by such Credit Party in immediately available funds in the currency so received, with interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.  Each Credit Party irrevocably waives any and all

- 101 -

defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another) or similar defense to its obligation to return any Rescindable Amount.  The Agent shall inform each Credit Party promptly upon determining that any payment made to such Credit Party comprised, in whole or in part, a Rescindable Amount.

# ARTICLE X
## MISCELLANEOUS

**10.01    Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the Consent of the Required Lenders, and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or Consent shall:

(a)    increase the Revolving Commitment of any Lender (or reinstate any Revolving Commitment terminated pursuant to Section 8.02) without the written Consent of such Lender;

(b)    as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Revolving Commitments hereunder or under any other Loan Document without the written Consent of such Lender;

(c)    as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Committed Revolving Loan held by such Lender, or (subject to clause (ii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written Consent of each Lender entitled to such amount; provided, however, that only the Consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)    as to any Lender, change Section 2.05, Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of such Lender;

(e)    change any provision of this Section or the definition of "Applicable Lenders" or "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(f)    except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(g)    except for Permitted Dispositions, release all or substantially all of the Collateral from the Liens of the Security Documents without the written Consent of each Lender;

(h)    increase the Aggregate Revolving Commitments without the written Consent of each Lender;

(i)    modify the definition of Permitted Overadvance so as to increase the amount thereof, except as provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written Consent of each Lender; and

(j)    except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender;

and, provided further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document; and (ii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Revolving Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender, and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, this Agreement or any other Loan Document (1) may be amended and waived with the written consent of the Agent at the request of the Borrower without the need to obtain the consent of any Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities or defects, or (iii) to cause any Loan Document to be consistent with this Agreement and the other Loan Documents and (2) may be amended to replace Adjusted Term SOFR with a Benchmark Replacement or to implement Conforming Changes, in either case in accordance with Section 3.03.

**10.02   Notices; Effectiveness; Electronic Communications**.

(a)    <u>Notices Generally</u>.  Except as provided in subsection (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Loan Parties or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)    if to any Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    Electronic Communications.  Notices and other communications to the Loan Parties and the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent may, in its reasonable discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    The Internet.  In no event shall the Agent or any of its Related Parties have any liability to any Loan Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the Internet.

(d)    Change of Address, Etc.  Each of the Loan Parties and the Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Agent.  In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent, and (ii) accurate wire instructions for such Lender.

(e)    Reliance by Agent and Lenders.  The Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03    No Waiver; Cumulative Remedies**.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.  Without limiting the generality of the foregoing,

13086027v16

the making of a Committed Revolving Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04    Expenses; Indemnity; Damage Waiver**.

(a)    <u>Costs and Expenses</u>.  The Borrower shall pay all Credit Party Expenses.  The Borrower acknowledges that some or all of the Lender Service Parties, including, without limitation, Tower Hill, are Affiliates of the Agent.

(b)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, each Lender Group Consultant and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless (on an after Tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Committed Revolving Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Controlled Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  Paragraph (b) of this Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc.  arising from any non-Tax claim.

(c)    <u>Reimbursement by Lenders</u>.  Without limiting their obligations under <u>Section 9.14</u> hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by them, each Lender severally agrees to pay to the Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) in its capacity as such, or against any Related

- 105 -

Party of any of the foregoing acting for the Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)    Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Committed Revolving Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    Payments. All amounts due under this Section shall be payable on demand therefor.

(f)    Survival. The agreements in this Section shall survive the resignation of any Agent, the assignment of any Revolving Commitment or Committed Revolving Loan by any Lender, the replacement of any Lender, the termination of the Revolving Commitments and the repayment, satisfaction or discharge of all of the other Obligations.

**10.05    Payments Set Aside**. To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its reasonable discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06    Successors and Assigns**.

(a)    Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section (b), (ii) by way of participation in accordance with the provisions of Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null

- 106 -

and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders. Any Lender may at any time assign to one or more Eligible Assignees (or, if an Event of Default exists, any Person approved by the Agent) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment or any portion of the Committed Revolving Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Revolving Commitment and the Committed Revolving Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Revolving Commitment (which for this purpose includes Committed Revolving Loans outstanding thereunder) or, if the Revolving Commitment is not then in effect, the principal outstanding balance of the Committed Revolving Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 unless the Agent otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all of the assigning Lender's rights and obligations under this Agreement with respect to the Committed Revolving Loans or the Revolving Commitment assigned;

(iii)    Required Consents. No consent shall be required for any assignment except (A) to the extent required by subsection (b)(i)(B) of this Section and (B) the consent of the Agent and the Consent of the Borrower shall be required for assignments in respect of any Committed Revolving Loans or Revolving Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)    Assignment and Assumption. The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its reasonable

discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

(v)     Certain Additional Payments.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Agent, the applicable pro rata share of Committed Revolving Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent or any Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Committed Revolving Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the Lender's having been a Defaulting Lender.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)     Register.  The Agent, acting solely for this purpose as an agent of the Borrower (and such agency being solely for tax purposes), shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Revolving Commitments of, and principal amounts (and state interest) of the Committed Revolving Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, with the consent of the Borrower and notice to the Agent, sell participations to any Person (other than a natural person, any direct or indirect owner of the Equity Interests of any Loan Party, any Loan Party or any Loan Party's Affiliates or Subsidiaries, in each case, unless consented to by the Agent in writing) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Revolving Commitments and/or the Committed Revolving Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement.  Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Section 3.01 (subject to the requirements and limitations therein, including the requirements under Section 3.01(f) (it being understood that the documentation required under Section 3.01(f) shall be delivered to the participating Lender)) and 3.04 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b).  To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts (and stated interest) and other Obligations from time to time (each a "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in each Participant Register shall be conclusive absent manifest error and the Loan Parties, the Agent and the Lenders shall treat each Person whose name is recorded in a Participant Register as the owner of such participation for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under Section 3.01, Section 3.04 and Section 10.08) notwithstanding any notice to the contrary.  For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(e)     Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(f)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)  Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)  Reserved.

(i)  Transactions with Second Avenue Entity.  Notwithstanding anything in this Agreement or any other Loan Document to the contrary, (A) neither the Agent nor any Affiliate (each, a "Second Avenue Entity") shall be required to comply with this Section 10.06 in connection with any transaction involving any other Second Avenue Entity or any of its or their lenders or funding or financing sources, and no Second Avenue Entity shall have any obligation to disclose any such transaction to any Person, and (B) there shall be no limitation or restriction on (i) the ability of any Second Avenue Entity to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Revolving Commitment, any Committed Revolving Loan, or any other Obligation to any other Second Avenue Entity or any lender or financing or funding source of a Second Avenue Entity, or (ii) any such lender's or funding or financing source's ability to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Revolving Commitment, any Committed Revolving Loan, or any other Obligation.  Notwithstanding any other term or condition of this Agreement, the Agent may at any time appoint a Second Avenue Entity as a replacement or successor agent hereunder, and such Second Avenue Entity shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.

**10.07  Treatment of Certain Information; Confidentiality**.  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, any Lender Group Consultants and any Lender Service Party and to the respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives of its Affiliates, any Lender Group Consultants and any Lender Service Party, in each case, on a need-to-know basis, in connection with the transactions described herein (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section on a need-to-know basis, in connection with the transactions described herein, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Borrower, or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

- 110 -

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary relating to the Loan Parties, any Subsidiary or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary, provided that, in the case of information received from any Loan Party or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or any Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information, and (c) it will handle such material non-public information in accordance with applicable Law, including federal and state securities Laws.

**10.08    Right of Setoff**.  If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of Section 2.16 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have. Each Lender agrees to notify the Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09    Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Committed Revolving Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

13086027v16

**10.10    Counterparts; Integration; Effectiveness**.    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf., or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11    Survival**.    All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Revolving Credit Borrowing, and shall continue in full force and effect as long as any Committed Revolving Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.  Further, the provisions of <u>Sections 3.01</u>, <u>3.04</u> and <u>10.04</u> and <u>Article IX</u> shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Revolving Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any Obligations that may thereafter arise under <u>Section 10.04</u>.

**10.12    Severability**.    If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby, and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this <u>Section 10.12</u>, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13    Replacement of Lenders**.    If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 10.06</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(a)    the Borrower shall have paid to the Agent the assignment fee specified in <u>Section 10.06(b)</u>;

(b)        such Lender shall have received payment of an amount equal to the outstanding principal of its Committed Revolving Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)        in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)        such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**10.14    Governing Law; Jurisdiction; Etc**.

(a)        <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)        <u>SUBMISSION TO JURISDICTION</u>.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, TO THE EXTENT THAT THE BANKRUPTCY COURT DOES NOT EXERCISE JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH BANKRUPTCY COURT OR, IF APPLICABLE, NEW YORK COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH COURTS.  EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)        <u>WAIVER OF VENUE</u>.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR

- 113 -

RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES.    EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN THE BANKRUPTCY COURT OR, IF APPLICABLE, A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR ANY FEDERAL COURT SITTING THEREIN AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15    Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16    No Advisory or Fiduciary Responsibility; Disclosure Regarding Affiliates**.

(a)    In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit

- 114 -

Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates (including, without limitation, the Lender Service Parties) may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

(b)      Each of the Loan Parties acknowledges and agrees that the SACP Entities, the Specified Liquidation Consultant and any applicable Lender Service Parties (as such term is defined in the Pre-Petition Credit Agreement, which include, without limitation, Tower Hill Advisory Services, LLC and SB360) each have a common parent, SB360 Holdings, LLC, a Delaware limited liability company ("Holdings"). While the Loan Parties and Holdings are both part of the Schottenstein family of companies, Holdings has separate owners in addition to the Schottenstein family.

(c)      Each of the Loan Parties hereby further acknowledges and agrees that certain Affiliates of and/or direct and indirect equity holders in or advisors to the Agent or one or more of the Lenders (including, without limitation, Tower Hill, SB360 and Agent's parent entity, Holdings) (collectively, "Lender Service Parties") may from time to time be retained to provide services to the Agent and Lenders concerning the Loan Parties or other business entities (including, without limitation, consulting or analytic services, appraisals, reviews of purchases, sales and other dispositions of inventory, real property, financial instruments and other assets of public and private companies), and such Lender Service Parties may provide such services to the Credit Parties or their borrowers on ordinary and customary market terms, and regardless of any such retention, Agent may consult with the Lender Service Parties regarding the Loan Parties, the Collateral, and related matters. Nothing herein shall preclude the Lender Service Parties from engaging in the above-referenced ordinary course business transactions conducted without use of or reference to the confidential information provided to the Credit Parties hereunder. The fees and expenses of the Lender Service Parties shall be Credit Party Expenses. Nothing contained herein shall limit or preclude the Lender Service Parties or any of their respective Affiliates from providing services to or doing business with the Loan Parties or any other party, including, without limitation, any competitor, supplier or customer of the Loan Parties. None of the Lender Service Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document and none of the Lender Service Parties has any obligation or duty to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Lender Service Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17    USA PATRIOT Act Notice**. Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to

13086027v16

the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Act. No part of the proceeds of the Committed Revolving Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended. The Loan Parties shall, promptly following a request by the Agent or any Lender, provide all documentation and other information that the Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**10.18    Foreign Assets Control Regulations**.  Neither of the advance of the Committed Revolving Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order"), and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).  Furthermore, none of the Borrower or its Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations, or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19    Time of the Essence**.  Time is of the essence of the Loan Documents.

**10.20    Reserved**.

**10.21    Press Releases; Non-Disclosure**.

(a)       Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and without the prior written consent of the Agent and the Borrower unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

(b)       The Borrower's consent shall be required for any publication by the Agent or any Lender of advertising material, including any "tombstone" or comparable advertising, on its website or in other marketing materials of Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia.  The Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Borrower for review and comment prior to the publication thereof. The Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

**10.22    Additional Waivers**.

(a)    The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

(b)    The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Revolving Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Revolving Commitments).

(c)    To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Revolving Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Revolving Commitments have been terminated. Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)    Each Loan Party is obligated to repay the Obligations as joint and several obligors under this Agreement. Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Revolving Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise

- 117 -

attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.  Subject to the foregoing, to the extent that any Loan Party shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Committed Revolving Loans made to another Loan Party hereunder or other Obligations incurred directly and primarily by any other Loan Party (an "Accommodation Payment"), then the Loan Party making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Loan Parties in an amount, for each of such other Loan Parties, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Loan Party's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Loan Parties.  As of any date of determination, the "Allocable Amount" of each Loan Party shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Loan Party hereunder without (a) rendering such Loan Party "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Loan Party with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Loan Party unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

(e)    Without limiting the generality of the foregoing, or of any other waiver or other provision set forth in this Agreement, each Loan Party hereby absolutely, knowingly, unconditionally, and expressly waives any and all claim, defense or benefit arising directly or indirectly under any one or more of Sections 2787 to 2855 inclusive of the California Civil Code or any similar law of California.

**10.23    No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.24    Attachments**.  The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

[Signature Pages Follow]

13086027v16

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**AMERICAN SIGNATURE, INC.,**
as the Borrower


By:_____
Name:
Title:

[Signature Page to Debtor-in-Possession Credit Agreement]

13086027v8

4916-1924-0571.5 03721.00001

**SECOND AVENUE CAPITAL PARTNERS LLC,**
as the Agent and a Lender


By:_____
Name: Mark Gallivan
Title:   Authorized Signer

[Signature Page to Debtor-in-Possession Credit Agreement]

13086027v8

4916-1924-0571.5 03721.00001

**<u>Exhibit 3</u>**

**Approved Budget**

**American Signature, Inc.**
**DIP Budget**
**$ in Millions**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | (a) | (b) | (a + b) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Number | | | | | | | | *Post-Petition* | | | | | | | Total | Total | Grand |
| Week Ending | | 29-Nov | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 3-Jan | 10-Jan | 17-Jan | 24-Jan | 31-Jan | 7-Feb | 14-Feb | 21-Feb | 13-Wks | 10-Wks | Total |
| Act / Fcst | | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Thru 2/21 | Thru 5/02 | 23-Wks |
| **I. Receipts** | | | | | | | | | | | | | | | | | |
| 1.) | **Total Receipts** | 15 | 17 | 12 | 10 | 9 | 8 | 72 | 0 | 1 | 0 | 0 | 0 | 0 | 146 | 16 | 162 |
| **II. Operating Disbursements** | | | | | | | | | | | | | | | | | |
| 2.) | Merchandise, Freight, Customs & Duty | (5) | (5) | (3) | (1) | (3) | (1) | (1) | - | (1) | - | - | - | - | (20) | - | (20) |
| 3.) | Payroll, Taxes & Benefits | (4) | (6) | (4) | (4) | (5) | (3) | (6) | (3) | (6) | (3) | (5) | (2) | (4) | (55) | (14) | (69) |
| 4.) | Occupancy | (0) | (7) | (0) | (0) | (0) | (1) | (4) | (0) | (0) | (0) | (4) | (0) | (0) | (19) | (5) | (23) |
| 5.) | All Other | (2) | (6) | (2) | (2) | (2) | (2) | (2) | (2) | (3) | (2) | (2) | (2) | (1) | (29) | (3) | (31) |
| 6.) | **Subtotal: Operating Disbursements** | (12) | (24) | (10) | (8) | (10) | (6) | (12) | (5) | (10) | (5) | (11) | (4) | (6) | (123) | (21) | (144) |
| 7.) | **Operating Cash Flow** | 3 | (8) | 2 | 2 | (1) | 2 | 60 | (5) | (10) | (5) | (10) | (4) | (5) | 23 | (5) | 18 |
| **III. Restructuring Costs** | | | | | | | | | | | | | | | | | |
| 8.) | Professional Fees | (0) | (1) | (1) | (1) | (1) | (1) | (2) | (1) | (1) | (1) | (1) | (0) | (0) | (12) | (1) | (14) |
| 9.) | Liquidation (Expense) / Reimbursement | (0) | (0) | (0) | (0) | (0) | - | 6 | 3 | 4 | 4 | 7 | 4 | 4 | 30 | 14 | 45 |
| 10.) | Other One-Time / Restructuring | (1) | (1) | - | (0) | (0) | - | (1) | - | (0) | 5 | - | - | (0) | 3 | 6 | 8 |
| 11.) | **Subtotal: Restructuring Costs** | (1) | (2) | (2) | (2) | (2) | (1) | 4 | 3 | 3 | 7 | 7 | 3 | 3 | 21 | 19 | 40 |
| 12.) | **Net Cash Flow** | 3 | (10) | 1 | 1 | (2) | 1 | 64 | (2) | (7) | 2 | (4) | (1) | (2) | 44 | 14 | 58 |
| **IV. Total Liquidity** | | | | | | | | | | | | | | | | | |
| | **Cash Balance** | | | | | | | | | | | | | | | | | |
| 13.) | Beginning Book Cash | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 18 | 15 | 9 | 11 | 7 | 6 | 0 | 5 | 0 |
| 14.) | Net Cash Flow | 3 | (10) | 1 | 1 | (2) | 1 | 64 | (2) | (7) | 2 | (4) | (1) | (2) | 44 | 14 | 58 |
| 15.) | Prepetition ABL Borrowings / (Paydown) | (15) | (17) | (7) | - | - | - | - | - | - | - | - | - | - | (39) | - | (39) |
| 16.) | DIP Borrowings / (Paydown) | 13 | 27 | 7 | (1) | 2 | (1) | (47) | - | - | - | - | - | - | - | - | - |
| 17.) | **Ending Book Cash** | 0 | 0 | 0 | 0 | 0 | 0 | 18 | 15 | 9 | 11 | 7 | 6 | 5 | 5 | 18 | 18 |
| | **Total Liquidity** | | | | | | | | | | | | | | | | | |
| 18.) | Ending Book Cash | 0 | 0 | 0 | 0 | 0 | 0 | 18 | 15 | 9 | 11 | 7 | 6 | 5 | 5 | 18 | 18 |
| 19.) | Availability | 13 | 3 | 4 | 5 | 3 | 3 | - | - | - | - | - | - | - | - | - | - |
| 20.) | **Total Liquidity** | 13 | 3 | 4 | 5 | 3 | 3 | 18 | 15 | 9 | 11 | 7 | 6 | 5 | 5 | 18 | 18 |

**Exhibit 4**

**Required Milestones**

**Each of the following are collectively referred to as the "DIP Milestones":**

- On or before one (1) Business Day after the Petition Date, the Debtors shall file a motion with the Court seeking approval of the DIP Facility.

- On or before one (1) Business Day after the Petition Date, the Debtors shall file a motion with the Court seeking to assume that certain Consulting Agreement, dated as of September 19, 2025, by and among certain of the Debtors and the Specified Liquidation Consultant (the "***Specified Liquidation Agreement***") pursuant to which the Loan Parties shall conduct Specified Store Closing Sales.

- On or before one (1) Business Day after the Petition Date, the Debtors shall file a motion with the Court seeking authority to honor certain customer programs on the Petition Date.

- On or before three (3) Business Days after Petition Date, the Court shall have entered this Interim Order authorizing the DIP Facility on an interim basis.

- On or before three (3) Business Days after Petition Date, the Court shall have entered an order authorizing the Debtors to assume the Specified Liquidation Agreement.

- On or before three (3) Business Days after Petition Date, the Debtors shall have filed a motion requesting, and on or before December 12, 2025, shall have obtained, an order of the Court extending the lease assumption/rejection period such that the lease assumption/rejection period shall be 210 days.

- On or before December 5, 2025, the Debtors shall file a motion with the Court seeking to retain Berkeley Research Group, LLC ("***BRG***") as their chief restructuring officer pursuant to that certain Letter Regarding Interim Management Services, dated as of November 7, 2025, from BRG to certain of the Debtors.

- On or before December 30, 2025, the Court shall have entered the Final Order authorizing the DIP Facility on a final basis.

**Each of the following are collectively referred to as the "Store Closing and Sale**

**Milestones":**

- On or before two (2) Business Days after the Petition Date, the Debtors shall file a motion in form and substance acceptable to the DIP Agent (the "***Sale Procedures Motion***"), requesting an order of the Court approving the procedures for the Permitted Sale (under and as defined in the DIP Credit Agreement, and as used herein, the "***Sale***"), which order shall, among other things, (w) seek approval of the bidding procedures for the Sale (the "***Bid Procedures***"), (x) seek approval of the Stalking Horse Purchase Agreement (as

defined in the DIP Credit Agreement), (y) establish the date of the Auction (to be defined in the Sale Procedures Motion), which shall occur no later than January 5, 2026, and (z) establish a date for a hearing to approve the Sale.

- On or before December 12, 2025, the Bankruptcy Court shall have approved the Sale Procedures Motion; it being understood that if the Court does not approve the Sale Procedures Motion on or before December 12, 2025, after the Remedies Notice Period expires, the Debtors shall immediately commence a full chain liquidation on terms and conditions satisfactory to the DIP Agent in its sole discretion.

- The Court shall establish no later than December 30, 2025, as the deadline for submission of bids to purchase any portion of, or all or substantially all of, the Debtors' assets in connection with the Sale.

- On or before December 31, 2025, the Debtors shall distribute to the DIP Agent all bids received for the Sale.

- On or before January 5, 2026, the Auction (as defined in the Sales Procedure Motion) shall have completed; *provided* that this Required Milestone will not apply if the Borrower does not receive two or more qualified bids for the Sale by the applicable bid deadline.

- On or before January 7, 2026, the Court shall have entered an order approving the Sale (the "***Sale Order***").

- On or before January 9, 2026, the initial installment of the guaranteed amount under the Purchase Agreement (as defined in the DIP Credit Agreement and as used herein, the "***Purchase Agreement***") shall have been made in accordance with the Purchase Agreement (the "***Initial Guaranteed Amount Payment Deadline***").

- On or before January 9, 2026, the Sale shall have been consummated.

- On or before January 9, 2026, the Debtors shall have paid in full all Prepetition ABL Obligations, and DIP Obligations, and Prepetition PNC Obligations (unless such Prepetition PNC Obligations are assumed by a purchaser on terms satisfactory to PNC in its sole discretion).