**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AMERICAN SIGNATURE, INC., *et al.*,[1] | ) | Case No. 25-12105 (JKS) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS AUTHORIZING THE DEBTORS TO (A) ASSUME THE CONSULTING
AGREEMENT, (B) CONDUCT STORE CLOSING  SALES, WITH SUCH SALES TO BE
FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, AND
(C) GRANTING RELATED RELIEF**

American Signature, Inc. and its affiliated debtors and debtors in possession (each, a

"Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases, by and

through their undersigned proposed counsel, submit this motion (this "Motion") for entry of

interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**

(respectively, the "Interim Order" and "Final Order") pursuant to sections 105, 363, 365, and 544

of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"),

Rules 2002, 6003 6004, 6006, and 6007 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rules 2002-1, 6004-1, and 9013-1 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules"), (a) authorizing the Debtors to assume and perform under that certain *Consulting*

*Agreement* dated as of September 19, 2025, attached as Exhibit 1 to the Interim Order (the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  American Signature, Inc. (6162); American Signature Home Inc. (8573); American Signature USA Inc. (6162); ASI Pure Promise Insurance LLC (6162); ASI Elston LLC (7520); ASI – Laporte LLC (6162); ASI Polaris LLC (6162); ASI Thomasville LLC (6162); and American Signature Woodbridge LLC (6162). The Debtors' business address is 4300 E. 5th Avenue, Columbus, OH 43235.

"Original Agreement"), made by and between American Signature, Inc. and SB360 Capital Partners, LLC (the "Consultant") and that certain *Amendment No. 1 to Consulting Agreement* dated as of November 5, 2025 by and between American Signature, Inc. and the Consultant, attached as Exhibit 2 to the Interim Order (the "First Amendment" and, together with the Original Agreement, the "Consulting Agreement"),  (b) authorizing and approving the continuation of certain store closing sales or similar themed sales and store closures at the stores listed on Exhibit A to the Original Agreement and Exhibit A to First Amendment (collectively, the "Initial Closing Stores") or initiation of store closing sales and store closures at additional stores (beyond the stores identified in the Original Agreement and the First Amendment) at a later date or dates pursuant to the Consulting Agreement and Proposed Orders (the "Additional Closing Stores," if any, and together with the Initial Closing Stores, the "Closing Stores"), with such sales to be free and clear of all liens, claims, and encumbrances (the "Sales" or "Store Closing Sales"), in accordance with the terms of the store closing sale guidelines (the "Sale Guidelines"), attached as Exhibit 3 to the Interim Order, (c) authorizing and approving the payment of fees and reimbursement of expenses and the remittance of the proceeds from the sale of the Additional Merchandise (as defined in the Consulting Agreement), to the Consultant in accordance with the provisions of the Consulting Agreement and the Interim Order, and (d) granting related relief. In addition, the Debtors request that the Court (as defined herein) schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

### Jurisdiction and Venue

1.     The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy

Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105, 363, 365, and 554 of Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, and 6007, and Local Rules 2002-1, 6004-1, and 9013-1.

### Background[2]

4.      On November 22, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

---

[2] A detailed description of the Debtors and their business, including the facts and circumstances supporting the motion, is set forth in the *Declaration of Rudolph Morando in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* filed contemporaneously herewith (the "First Day Declaration"). Capitalized terms used but not defined in this motion shall have the meanings ascribed to them in the First Day Declaration.

**The Store Closing Sales**

5.      As further described in the First Day Declaration, the Debtors have faced a challenging sales environment over the past years brought on by macroeconomic and industry-specific market pressures, including reduced foot traffic in stores, a rise in interest rates, inflation, tariffs, heightened competition from comparable furniture retailers, and a disparity between inventory and customer demand.

6.      Prior to the Petition Date, the Debtors undertook a review of their lease portfolio and determined that they should liquidate and close the Closing Stores (each such closure a "Store Closure"). In furtherance of their business decision, the Debtors executed the Consulting Agreement with the Consultant to assist in liquidating and closing the Closing Stores, which commenced with the identification of five stores in September 2025 under the Original Agreement. In November 2025, the Debtors identified an additional twenty-eight stores in connection with the First Amendment. The Debtors and Consultant have already begun advertising and conducting liquidation sales at the Initial Closing Stores, which are currently expected to end in December 2025 and January 2026.  The relief sought in this motion will permit the Debtors to continue the liquidation of the Closing Stores to generate proceeds for the benefit of the Debtors' stakeholders.

7.      The Store Closing Sales and Store Closures are critical to the Debtors' chapter 11 objectives as they will allow the Debtors to monetize existing inventory in a controlled manner that will maximize value for the Debtors' estates. The Consulting Agreement will facilitate the Store Closing Sales in a timely manner and will establish fair and uniform store closing procedures that will maximize value for all stakeholders.

### The Consultant

8.      Prior to the commencement of these chapter 11 cases, the Debtors retained the Consultant pursuant to the Consulting Agreement to serve as the consultant to the Debtors with respect to the Store Closing Sales.  The Consultant has significant expertise and experience in serving as a consultant for store closing sales for businesses, merchandise, and store operations that are substantially similar to those of the Debtors.  Annexed hereto as **Exhibit C** is a summary of Consultant's extensive experience in furniture liquidation sales and other transactions.  The Consultant is affiliated with the Debtors. The Debtors are, indirectly, wholly-owned by the Schottenstein family, including through various trusts.  The Consultant is wholly-owned by SB360 Holdings, LLC ("Holdings"), sixty-percent of which is owned by the Schottenstein family.  The balance of Holdings is owned by non-Schottenstein family interests.[3]

---

[3] Consultant is not being retained pursuant to section 327 of the Bankruptcy Code, and applicable case law in Delaware and other jurisdictions provides that the disinterestedness standard does not apply  Nonetheless, by means of full disclosure, the Debtors note the following connections, as set forth in the First Day Declaration: (i) the Debtors anticipate that they will shortly enter into agreements, subject to higher and better bids, with ASI Purchaser LLC, an affiliate of the Debtors (the "Stalking Horse Bidder"), to (a) grant the Stalking Horse Bidder designation rights on substantially all of the Debtors' leases and sell to the Stalking Horse Bidder, *inter alia*, certain of the Debtors' assets, and (b) to grant the Stalking Horse Bidder the right to act as the Debtors' agent for purposes of liquidating their inventory, furniture, fixtures and equipment at certain locations, with respect to which the Consultant is expected to be delegated responsibility; and (ii) in addition to common ownership between the Debtors and Consultant set forth above, the Debtors and Consultant are also affiliated with other transaction counterparties parties in these Chapter 11 Cases.  Specifically, Second Avenue Capital Partners LLC ("SACP"), the Debtors' proposed debtor-in-possession lender and as administrative agent, collateral agent and lender to the Company in connection with its Prepetition ABL Facility, is owned by Holdings.  SACP SPV, LLC ("SACP SPV") an entity members of which include officers and employees of the Consultant and SACP, among others, participates in loans made by SACP. Eric Jackson (CFO of the Debtors) and Jeff Swanson (a member of the Board of Directors of the Debtors) are members of SACP SPV. The aforementioned loan participations are no more than 7.5% per loan and no one person holds an interest in SACP SPV greater than 10%. Lender Service Parties (as defined in the Debtor-in-Possession Credit Agreement, the "DIP Credit Agreement") include, without limitation, Tower Hill Advisory Services, LLC, which is owned by Holdings.  Tower Hill Advisory Services, LLC was retained in 2024 by SACP to appraise the inventory of the Debtors and provided collateral monitoring services to SACP.  In June of 2025, Consultant and the Company entered into a consignment agreement pursuant to which Consultant purchased certain inventory to be sold in the Debtors' stores on a consignment basis which expired in accordance with its terms in August of 2025.  Consultant has also purchased and sold other inventory to the Debtors in 2025. In addition, Consultant has guaranteed certain payment obligations of Merchant under a consignment agreement.

9.     The Debtors concluded in their business judgment, in consultation with the Conflicts Committee of the Debtors' Board of Directors, that (a) the services of the Consultant are necessary (i) for the seamless and efficient large-scale Store Closures process, as is contemplated by this motion, and (ii) to maximize the value of the saleable inventory located in the Closing Stores (the "Merchandise"), and the associated furniture, fixtures, and equipment ("FF&E" and, together with the Merchandise, the "Store Closure Assets"), and (b) the Consultant is qualified and capable of performing the required tasks in a value-maximizing manner.

### The Consulting Agreement

10.     Pursuant to the Consulting Agreement, the Consultant will serve as the Debtors' consultant in connection with the Store Closing Sales and Store Closures. A summary of the key terms of the Consulting Agreement is set forth below.[4]

| Term | Applicable Provision |
|---|---|
| **Services to be Provided by Consultant:** | The Consultant shall continue to provide the Company with the following Services with respect to the conduct of the Sale: (i) provision of qualified Supervisors to supervise and assist Company in its conduct of the Sale; (ii) provide the Company with such oversight, supervision and guidance with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and Owned FF&E from the Stores as may be required to maximize Gross Proceeds and proceeds from Owned FF&E; (iii) recommend and implement appropriate point of purchase, point of sale and external advertising to effectively sell the Merchandise during the Sale Term; (iv) advise the Company as to appropriate discounting of Merchandise, appropriate staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees; (v) recommend an acceptable sign package to be used throughout the Sale Term subject to the Company's final approval;  (vi) oversee the display of Merchandise in the Stores; (vii) assist Company in the formulation and implementation of a loss prevention program designed to protect the Merchandise from theft or other shortages; (viii) assist Company with accounting functions for the Stores; (ix) to the extent requested by the Company, recommend and implement the transfer and balancing of Merchandise between and among the Stores to maximize results during the Sale; (x) participate in weekly calls with representatives of the Company; (xii) coordinate with Company regarding an |

---

[4] The following summary chart is for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects. Capitalized terms used but not defined in the summary have the meaning ascribed to them in the Consulting Agreement.

|  | advertising and signage program to direct customers to Company's on-going stores; (xiii) with the permission of the Company, provide Additional Merchandise to be procured by the Consultant; (xiv) leave the Stores in broom swept condition with unsold FF&E abandoned neatly in place;[5] and (xiv) provide such other related services deemed necessary or prudent by the Company and the Consultant, or as reasonably requested by the Company under the circumstances giving rise to the Sale. |
|---|---|
| **Term of Sale:** | The period of time beginning with such Store's Sale Commencement Date and ending on such Store's Sale Termination Date, as follows:  (i) for the initial five stores on Exhibit A to the Original Agreement, a Sale Commencement Date of October 16, 2025 and estimated outside Sale Termination Date of January 31, 2026; and (ii) for the Stores on Exhibit A to the First Amendment, a Sale Commencement Date of November 13, 2025and estimated outside Sale Termination Date of December 31, 2025.[6] |
| **Sale Expenses:** | In connection with the Sale and subject to the limitations set forth in the Budget, the Company shall be responsible for the payment of all expenses incurred in connection with the Sale, including without limitation all Sale Expenses (and Consultant shall not be responsible for any such expenses or Sale Expenses except as expressly provided). Consultant Incurred Expenses shall not exceed the aggregate amount for each category of Consultant Incurred Expenses set forth on the Budget without the prior written consent of the Company; all such Consultant Incurred Expenses in excess of the preapproved Consultant Incurred Expenses shall be the sole responsibility of Consultant. The Company shall reimburse Consultant for any reasonable and documented Consultant Incurred Expense on a weekly basis in connection with the weekly settlement provided for in the Consulting Agreement upon presentation of invoices and statements for such expenses, which reimbursement or payment shall be in addition to any Base Fee, and/or FF&E Fee.<br><br>As of the Petition Date, the Company has funded a retainer of $125,000 to the Consultant (the "Prepayment") which shall be held by Consultant until the Final Settlement. The Company shall not apply the Prepayment to, or otherwise offset any portion of the Prepayment against, any weekly reimbursement, payment of Consultant Expenses or other amount owing to Consultant under this Agreement prior to the final reconciliation. Without limiting any of Consultant's other rights, Consultant may apply the Prepayment to any unpaid obligation owing by the Company to Consultant under the Consulting Agreement. Any portion of the Prepayment not used to pay amounts explicitly contemplated by the Consulting Agreement shall be returned to the Company within three (3) days following the Final Settlement. In anticipation of the possibility of future store closings, the Company would like to order sign packages to be prepared to close additional stores. In addition, as contemplated by the Original Agreement, the Company has funded a payment of $800,000 for the purchase of additional signage to be earmarked for the purchase of signage for additional stores. The Company |

---

[5] Although the Original Agreement contemplated that the Closing Stores would be left in white box condition, given the intervening bankruptcy and the associated costs to the Debtors for Consultant to leave the Closings Stores in such condition, as set forth herein, the Consultants and the Debtors reserve the right to abandon the unsold FF&E neatly in place, as is customary in the Chapter 11 cases.

[6]  Initially, the Original Agreement and underlying proformas for the Sale contemplated a six (6) month Sale Term, which period, given the Chapter 11 filing and associated financial limitations, has been compressed to a shorter period.

| | |
|---|---|
| | owns the signs purchased to be utilized in connection with the closing of future stores.[7]<br><br>All expenses incurred in connection with fulfilling Pre-Sale Orders, including but not limited to, Sales Taxes, credit card fees, labor and delivery and all sales commissions attributable to the Fulfillment Merchandise shall be borne and paid by Company and Company shall pay or reimburse Agent for (i) any billed freight of the Fulfillment Merchandise required to fulfill said Pre-Sale Orders, (ii) any and all out-of-pocket expenses incurred by Agent to complete said Pre-Sale Orders, including, without limitation, any transfer expenses between locations, sales tax, credit card fee or finance fees, sales personnel commission, preparation work, refinishing, administrative matters and salaries and wages relating to the completion and delivery of the Fulfillment Merchandise for such Pre-Sale Orders, and (iii) a commission to Agent of two percent (2.0%) percent of the gross sales amount (excluding sales tax and delivery charges) for handling said Pre-Sale Orders (the "Pre-Sale Orders Handling Fee"). |
| **FF&E Disposition:** | In addition to the consulting Services provided with respect to the sale of Merchandise, with respect to furniture, fixtures and equipment owned by Company and located at the Stores, Consultant shall sell the Owned FF&E for the Company's benefit. Within ten (10) days of the Sale Commencement Date, the Company may inform the Company of any furniture, fixtures and equipment it elects not to be sold in order to use for its own purposes or because it does not own such items. Consultant shall advertise in the context of advertising for the Sale that items of Owned FF&E at Stores are available for sale and shall contact and solicit known purchasers and dealers of furniture and trade fixtures. In consideration of providing such services, Consultant shall retain 15% of the gross receipts (net only of applicable sales taxes and budgeted sale expenses, if any and without duplication, established by mutual agreement of the Company, and the Consultant) from all sales or other dispositions of Owned FF&E. |
| **Compensation for Consultant:** | Base Fee. In consideration of Consultant's provision of the Services provided, Company shall pay a fee to Consultant, equal to two percent (2.0%) of Gross Proceeds from the sale of Merchandise, plus the Pre-Sale Orders Handling Fee. In addition, Consultant shall retain (or be paid) ten percent (10%) of the Companies fee from the sales of Rugs.<br><br>Consultant shall pay to Merchant an amount equal to seven percent (7.0%) percent of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Merchandise (the "Additional Merchandise Fee") and Consultant shall retain all remaining amounts from the sale of the Additional Merchandise. Consultant shall pay Merchant its Additional Merchandise Fee in connection with each Weekly Sale Reconciliation with respect to sales of Additional Merchandise sold by Consultant during each then prior week.[8] |

---

[7] In the event that the transaction with Stalking Horse Bidder is approved, then the Debtors shall be reimbursed for the signage attributable to any store locations that is closed pursuant to the Agency Agreement.

[8] The Original Agreement provided for a 50/50 sharing of the net proceeds from the sale of the Additional Merchandise (after recoupment of the costs of goods and associated expenses of selling such goods). However, in order to accommodate a shorter sale term at the Initial Closing Stores, which would require steeper discounts at a more accelerated pace, the parties agreed in the First Amendment, to modify the structure of the Additional Merchandise Fee to the more traditional 7% of the gross proceeds from the sale of the Additional Merchandise, to ensure that, regardless of whether or not there would be net proceeds from the aggregate sales of the Additional Merchandise, the Company will a percentage of the overall sales of the Additional Merchandise.

| | |
|---|---|
| **Insurance Obligations:** | Company shall maintain throughout the Sale Term, (i) insurance with respect to the Merchandise at the Stores and any storage facility in amounts and on such terms and conditions as are consistent with Company's ordinary course operations and (ii) casualty and liability insurance policies (including, but not limited to, product liability, comprehensive public liability insurance, auto liability insurance on an occurrence basis in an amount of at least $1,000,000 per occurrence and $2,000,000 in the aggregate and umbrella coverage of at least $5,000,000 covering injuries to persons and property in or in connection with the operation of the Stores, and shall cause Consultant to be listed as an additional insured with respect to all such policies. Company shall be responsible for the payment of all deductibles, self-insurance and other amounts payable in connection with any claim asserted under such policies, except for any claims arising directly from the negligence, willful misconduct or unlawful acts of Consultant or Supervisors, or their employees, representatives, or agents. Additionally, throughout the Sale Term, the Company shall maintain, in such amounts as it currently has in effect, workers' compensation insurance in compliance with all applicable statutory requirements.<br><br>Consultant shall maintain, throughout the Sale Term, casualty and liability insurance policies (including, but not limited to, comprehensive public liability insurance, auto liability insurance and workers' compensation, statutory disability and employer's liability insurance) covering injuries to persons and property in or in connection with the operation of the Stores on an occurrence basis in an amount of at least $1,000,000 per occurrence and $2,000,000 in the aggregate and umbrella coverage of at least $5,000,000, and shall cause Company to be named an additional insured with respect to such policies. |
| **Indemnification by Consultant:** | The Consultant shall indemnify and hold Company and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors, harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; (ii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Company (including, without limitation, any Store Employees) by Consultant or any of Consultant's representatives (including, without limitation, any Supervisor); (iii) any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Company or Company Indemnified Parties or from a breach of the terms hereof by Company; (iv) any consumer warranty or products liability claims relating to any Additional Merchandise; and (v) the negligence, willful misconduct or unlawful acts of Consultant or any Supervisor or any of their respective officers, directors, employees, agents or representatives; provided that Consultant shall not be obligated to indemnify any Company Indemnified Party from or against any claims, demands, penalties, losses, liability or damages arising primarily from any Company Indemnified Party's gross negligence, willful misconduct or unlawful act. |
| **Indemnification by Merchant:** | Company shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "<u>Consultant Indemnified Parties</u>"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without |

<table>
<tr><td></td><td>limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Company's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered in connection herewith; (ii) any failure of Company to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iii) any consumer warranty or products liability claims relating to any Merchandise; (iv) any liability or other claims asserted by customers, any of Company's employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); except where due to the negligence, willful misconduct or unlawful acts of Consultant or from a breach of the terms hereof by Consultant; (v) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by Company or any of Company's employees, agents, or representatives (including, without limitation, any Company employees); and (vi) the negligence, willful misconduct or unlawful acts of Company or any of its officers, directors, employees, agents or representatives; provided that Company shall not be obligated to indemnify any Consultant Indemnified Party from or against any claims, demands, penalties, losses, liability or damages arising primarily from any Consultant Indemnified Party's gross negligence, willful misconduct or unlawful act.</td></tr>
</table>

## **The Sale Guidelines**

11.    The Debtors seek approval of streamlined procedures to sell the Store Closure Assets, in each case free and clear of liens, claims, and encumbrances. The Debtors also seek approval of the Sale Guidelines, attached as <u>Exhibit 3</u> to the Interim Order, to provide newspapers and other advertising media in which the Sales may be advertised with comfort that the Debtors are conducting the Sales in compliance with applicable law and with the Court's approval. The Debtors seek interim approval of the Sale Guidelines to allow the commencement of the Sales at the Closing Stores.

12.    The Debtors have determined, in the exercise of their reasonable business judgment and in consultation with their the Conflicts Committee and their respective advisors, that the Sale Guidelines will provide the best and most efficient means of selling the Store Closure Assets to maximize their value to the estates. As set forth below, the Sale Guidelines are substantially similar to sale guidelines approved in retail bankruptcies around the United States.

## Liquidation Sale Laws and Dispute Resolution Procedures

13.     Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances (collectively, the "Liquidation Sale Laws"). The Liquidation Sale Laws may establish licensing, permitting or bonding requirements, waiting periods, time limits, bulk sale restrictions, and augmentation limitations that would otherwise apply to the Store Closing Sales. Such requirements may hamper the Debtors' ability to maximize value in selling their inventory. Subject to the Court's approval, the Debtors intend to conduct the Store Closing Sales in accordance with the Sale Guidelines, and to the extent such guidelines conflict with the Liquidation Sale Laws, the Sale Guidelines shall control.

14.     For the purpose of orderly resolving any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Sale Guidelines and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Court authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"):

(a)     Provided that the Sales are conducted in accordance with the Interim Order, any Final Order, and the Sale Guidelines, the Debtors, the Consultant, and the Debtors' landlords shall be deemed to be in compliance with any requirements of all county, parish, or municipal or other local government and Liquidation Sale Laws establishing licensing or permitting requirements, waiting periods or time limits, or bulk sale restrictions that would otherwise apply to the Sales and sales of the Store Closure Assets of any state or local Governmental Unit (as defined in section 101(27) of the Bankruptcy Code); *provided* that the term "Liquidation Sale Laws" shall be deemed not to include any public health or safety laws of any state (collectively, "Safety Laws"), and the Debtors and the Consultant shall continue to be required to comply, as applicable, with such Safety Laws and General Laws (as defined in the proposed Interim Order), subject to any applicable provision of the Bankruptcy Code and federal law, and nothing in this Order shall be deemed to bar Governmental Units (as defined in section 101(27) of the Bankruptcy Code) or public officials from enforcing Safety Laws or General Laws.

(b)　　Within five business days after entry of the Interim Order, the Debtors will serve by first class mail, copies of the Interim Order, the proposed Final Order, and the Sale Guidelines on the following: (a) the Attorney General's office for each state where the Sales are being held; (b) the county consumer protection agency or similar agency for each county where the Sales are being held; (c) the division of consumer protection for each state where the Sales are being held; (d) the landlord for the Closing Stores; and (e) the National Association of Attorneys General (collectively, the "Dispute Notice Parties").

(c)　　With respect to any Additional Closing Stores, within five business days after filing any Additional Closing Store List (as defined below) with the Court, the Debtors will serve by first-class mail, copies of the Interim Order, or the Final Order, as applicable, the Consulting Agreement, and the Sale Guidelines on the Dispute Notice Parties.

(d)　　To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, any Final Order or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within 10 days following entry of the Interim Order, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice explaining the nature of the dispute to: (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19899, Attn: Laura Davis Jones, Esq. (ljones@pszjlaw.com) and David M. Bertenthal, Esq. (dbertenthal@pszjlaw.com); (b) proposed counsel to the Conflicts Committee, (i) Goodwin Procter LLP, 620 Eighth Ave., New York, NY 10018, Attn: Kizzy L. Jarashow, Esq. (kjarashow@goodwinlaw.com) and Stacy Dasaro, Esq. (sdasaro@goodwinlaw.com) and (ii) Potter Anderson & Corroon LLP 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801, Attn: L. Katherine Good, Esq. (kgood@potteranderson.com); (c) counsel to the DIP Agent and Prepetition ABL Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola, Esq. (jventola@choate.com), Jonathan D. Marshall, Esq. (jmarshall@choate.com), and Lucas B. Barrett, Esq. (lbarrett@choate.com), and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Daniel J. DeFranceschi, Esq. (defranceschi@RLF.com), John H. Knight, Esq. (Knight@RLF.com), Matthew P. Milana, Esq. (Milana@RLF.com); (d) counsel to the Prepetition Term Agent, (i) Goldberg Kohn, 55 East Monroe Street, Chicago, IL 60603-5792, Attn: Randall L. Klein, Esq. (randall.klein@goldbergkohn.com) and Zachary J. Garrett, Esq. (zachary.garrett@goldbergkohn.com) and (ii) Blank Rome LLP, 1201 N. Market Street, Suite 800, Wilmington, DE 19801, Attn: Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com); (e) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Malcolm M. Bates, Esq.; (f) counsel to the Consultant, Leichtman Law, PLLC, 185 Madison Avenue, 15th Floor, New York, NY 10016. Attn.: Maura I. Russell, Esq. (mrussell@leichtmanlaw.com) and Morris Nickols Arsht & Tunnel LLP, 1201 North Market Street, 16th Floor, Wilmington, DE 19899-1347, Attn.: Derek C. Abbott, Esq. (dabbott@morrisnichols.com) and (g) counsel to the Committee any statutory committee appointed in these chapter 11 cases. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

(e)     In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to the Interim Order or the Final Order, as applicable, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, the Debtors and the Consultant shall be authorized to conduct the Sales pursuant to the terms of the Interim Order or the Final Order, the Consulting Agreement, and the Sale Guidelines and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(f)     If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (d) and (e) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

## **Fast Pay Laws**

15.     Many U.S. states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "<u>Fast Pay Laws</u>" and, together with the Liquidation Sale Laws, the "<u>Applicable State Laws</u>"). These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

16.     The nature of the Store Closing Sales contemplated by this motion will result in all associate and store manager employees being terminated during the Store Closing Sales. To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures. The Debtors' payroll systems, however, will simply be unable to

process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws. Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by applicable law. This process requires the Debtors' payroll department to calculate individual payments upon termination, prepare each termination payment check, obtain authorization for each check, and then prepare each such check for mailing. Given the number of employees who will be terminated during the course of the Store Closing Sales, this process could easily take several days, making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible.

### Lease Restrictions

17.     The Debtors also request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closing Sales. In certain cases, the contemplated Store Closing Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions. Such restrictions would also hamper the Debtors' ability to maximize value in selling their inventory.

18.     The Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the Store Closing Sales or the sale of Store Closure Assets or institute any action against the Debtors in any court (other than in this Court) or before any administrative body that in any way directly or indirectly interferes with,

obstructs, or otherwise impedes the conduct of the Store Closing Sales or the sale of Store Closure Assets or the advertising and promotion (including through the posting of signs) of the Store Closing Sales or the sale of Store Closure Assets.

19.    Given that the Debtors are seeking this relief on an interim basis, the Debtors seek to resolve the concerns of landlords as expeditiously as possible in the early stages of these chapter 11 cases. To do so, the Debtors request relief to enter into side letters between the Debtors, the Consultant, and the effected landlord that will affect a binding modification of the Sale Guidelines. In similar cases, courts have approved store closing procedures with materially similar lease restrictions and which included a provision allowing for "side letters" between a debtor and landlord to resolve landlord concerns. *See, e.g.*, *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 18, 2025) (approving store closing procedures which provide for side letters between the debtors and landlord); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (same); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. May 31, 2023) (same).[9]

## **Abandonment**

20.    The Debtors respectfully request that the Court authorize the abandonment of certain owned FF&E remaining in the Closing Stores. The Debtors intend to sell any marketable owned FF&E present in the Closing Stores. However, the Debtors may determine that the cost associated with holding or selling that property exceeds the proceeds that will be realized from its sale, or such property may not be saleable at all. In such cases, retaining the property would be

---

[9] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

burdensome to the estates and the property would be of inconsequential value. For the avoidance of doubt, the Debtors will not sell any personally identifiable information (which means information that alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) as part of the Store Closing Sales, and all personally identifiable information will be removed from any FF&E prior to abandonment of same. Accordingly, the Debtors respectfully submit that abandonment of such property is in the best interests of their estates and request that the Court authorize them to do so where they determine in their business judgment that abandonment is the appropriate course of action.

## Relief Requested

21.     The Debtors seek entry of the Interim Order and Final Order pursuant to Bankruptcy Code sections 105, 363, 365, and 544, Bankruptcy Rules 2002, 6003 6004, 6006, and 6007, and Local 2002-1, 6004-1, and 9013-1, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) authorizing, but not directing, the Debtors to assume and perform under that certain Consulting Agreement, (b) authorizing and approving the continuation or commencement of Closing Sales, with such Sales to be in accordance with the terms of the Sales Guidelines, and (c) granting related relief.

## Basis for Relief

### A.      The Court Should Authorize the Assumption of the Consulting Agreement

22.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgement standard and it can only be overturned if the decision was a product of bad faith, whim or caprice); *see also In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule." (citation omitted)). "A debtor's decision to reject [or assume] an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'" *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001).

23.    Assumption of the Consulting Agreement is an exercise of the Debtors' sound business judgment. The Debtors believe that continuing to engage the Consultant will capitalize on the Consultant's knowledge of store liquidation and closing sales to deliver the best results for the Debtors. Further, the Debtors believe that the terms set forth in the Consulting Agreement are fair and reasonable and present the best path for the Sales. Courts hearing chapter 11 cases filed by retailers have approved the assumption of similar agreements. *See, e.g.*, *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 18, 2025) (authorizing assumption of consulting agreement); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (same); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same)*; In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. May 31, 2023) (same); *In re Indep. Pet Partners Holdings, LLC*, No. 23-10153 (LSS) (Bankr. D. Del. Mar. 1, 2023) (same).

24.    The Debtors submit that they have exercised reasonable business judgment in engaging the Consultant to conduct the Store Closing Sales. Given the number of stores and the

Consultant's in-depth knowledge and expertise as discussed above, it is unlikely the Debtors could retain a liquidator able to conduct the process as efficiently and effectively as the Consultant. If the Consulting Agreement is not assumed on a final basis, the Sales would lose the benefit of the Consultant's oversight and might be delayed or suspended entirely, leading to loss of additional liquidity and increased administrative expense. Accordingly, the Debtors respectfully request that the Court authorize their assumption of the Consulting Agreement.

**B.      The Debtors Have a Valid Business Justification for the Sales**

25.      Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also In re Culp*, 545 B.R. 827 (D. Del. 2016), *aff'd*, 681 F. App'x 140 (3d Cir. 2017) ("[t]ransactions under Section 363 must be based upon the sound business judgment of the trustee."); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b)).

26.      Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors. *See, e.g.*, *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 18, 2025) (authorizing the debtors to conduct store closings in accordance with court-approved sale guidelines); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (same); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same);

*In re Express, Inc.* No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. May 31, 2023) (same).

27. Sufficient business justification exists to approve the proposed Sales under section 363(b)(1). Prior to the Petition Date, the Debtors, with the assistance of their advisors, engaged in an extensive review of each of their stores to: (a) identify underperforming stores; (b) consider whether the store's performance can be improved by various initiatives; (c) determine which stores were candidates for downsizing; and (d) determine what stores should be closed promptly to eliminate their ongoing negative impact on the Debtors' financial performance and to improve the Debtors' liquidity. This process resulted in the Debtors' identification of the Closing Stores. The Debtors, with the assistance of their advisors, have determined that the Sales represent the best path to maximize the value of the Store Closure Assets. Meaningful amounts of Merchandise will be monetized most efficiently and quickly through an orderly process. Further, delay in commencing the Sales would diminish the recovery tied to monetization of the Store Closure Assets. Many of the Closing Stores fail to generate positive cash flow and therefore are a significant drain on liquidity. As such, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets and the termination of operations at the Closing Stores.

28. Uninterrupted and orderly Sales will also allow the Debtors to timely reject leases associated with the Closing Stores and therefore avoid the accrual of unnecessary administrative expenses for rent and related costs. Suspension of the Sales until entry of the Final Order may cause the Debtors to incur claims for rent at many of these stores for another month, potentially costing the estate millions of dollars of administrative expenses. Moreover, the Debtors have

already advertised the Store Closing Sales.  Any interruption or change to the Store Closing Sales

could confuse the Debtors' customers and negatively impact the Store Closing Sales.

**C.**     **The Court Should Approve the Sale Guidelines**

29.     The Court may authorize the Debtors to consummate the Store Closing Sales

pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. Section 363(b)(1) of the

Bankruptcy Code provides, in relevant part, that, "[t]he [debtor], after notice and a hearing, may

use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C.

§ 363(b)(1). Further, section 105(a) of the Bankruptcy Code provides, in relevant part, that, "[t]he

court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a).

30.     As discussed herein, pursuant to section 363(b) of the Bankruptcy Code, for the

purpose of conducting the Store Closing Sales, the Debtors need only show a legitimate business

justification for the proposed action. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996)

(citation omitted).

31.     In addition, the Court may authorize the Store Closing Sales based on section

105(a) of the Bankruptcy Code. Section 105(a) codifies a bankruptcy court's inherent equitable

powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may authorize any action

that is essential to the continued operation of a debtor's businesses. *See In re NVR L.P.*, 147 B.R.

126, 127 (Bankr. E.D. Va. 1992) (holding that a court may permit pre-plan payments of prepetition

obligations when essential to the continued operation of the debtor); *see also In re Fin. News

Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) ("[the] 'doctrine of necessity' stands

for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's organization").

32.     The relief requested by this motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates and is justified under sections 105(a) and 363(b) of the Bankruptcy Code. The Debtors and their advisors believe that the Sale Guidelines represent the most efficient and appropriate means of maximizing the value of the Store Closure Assets, while balancing the potentially competing concerns of landlords and other parties in interest.

33.     Courts in this district have routinely approved store closing sale guidelines in chapter 11 cases, and numerous courts have granted retail debtors authority to implement such procedures. *See, e.g.*, *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 18, 2025) (authorizing the debtors to conduct store closings in accordance with court-approved sale guidelines); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (same); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re Express, Inc*., No. 24-0831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. May 31, 2023) (same). The sale guidelines approved in the foregoing cases are substantially similar to the Sale Guidelines attached hereto. As such, the Court should authorize the Store Closing Sales and approve the Sale Guidelines as a reasonable exercise of the Debtors' business judgment.

**D.     The Court Should Approve the Sale of the Store Closure Assets Free and Clear of All Liens, Encumbrances, and Other Interests Under Section 363(f) of the Bankruptcy Code.**

34.     The Debtors request approval to sell the Store Closure Assets on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code. A debtor in possession may sell property under sections 363(b)

and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. *See* 11 U.S.C. § 363(f); *see also In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001)*, aff'd*, 322 F.3d 283, 290 (3d Cir. 2003) ("[U]nder § 363(f), . . . a sale free and clear of any [interest in property] can occur if any one of five conditions has been satisfied."). Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets free and clear of liens. *Id.*, 322 F.3d at 289.

35.     The Debtors anticipate that, to the extent there are liens on the Store Closure Assets, all holders of such liens will consent to the Sales because they provide the most effective, efficient, and time-sensitive approach to realizing proceeds for, among other things, the repayment of amounts due to such parties. Any and all liens on the Store Closure Assets sold under the Sales would attach to the remaining net proceeds of such sales with the same force, effect, and priority as such liens currently have on these assets, subject to the rights and defenses, if any, of the Debtors and of any party-in-interest with respect thereto. Moreover, all identified lienholders have received sufficient notice and have been given sufficient opportunity to object to the relief requested.

36.     Accordingly, the Debtors submit that the sale of the Store Closure Assets satisfies the statutory requirements of section 363(f) of the Bankruptcy Code and should, therefore, be free and clear of any liens, claims, encumbrances, and other interests.

E.   **Sales of Store Closure Assets Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

37.   Because the customers in respect of the Store Closing Sales act in good faith, they are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sales of Store Closure Assets. Section 363(m) of the Bankruptcy Code provides in pertinent part: "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code protects a purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. Purchasers are provided this protection so long as they leased or purchased the assets in "good faith." *Id.* Although the Bankruptcy Code does not define "good faith purchaser," one circuit court has stated that a good faith purchaser is "one who purchases in 'good faith' and for 'value.'" *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) (internal citations omitted); *In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986); *see* 3 Collier on Bankruptcy ¶ 363.11 (Richard Levin & Henry J. Sommer eds., 16th ed.). Courts generally conclude that a purchaser has acted in good faith as long as the consideration is adequate and reasonable and the terms of the transaction are fully disclosed. *In re Abbott Dairies* at 149–50. To constitute a lack of good faith, a party's conduct in connection with the sale usually must amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *In re Vetter Corp.*, 724 F.2d 52, 56 (7th Cir. 1983) (emphasis omitted) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805,

the precursor to section 363(m))); *see* 3 Collier on Bankruptcy ¶ 363.11 (Richard Levin & Henry J. Sommer eds., 16th ed.).

38.     Here, the customers of the Store Closing Sales are unaffiliated third parties acting for bona fide personal purposes. Each sale of a Store Closure Asset will be mutually beneficial to both parties and the terms thereof will be fully disclosed to each customer. A fair and transparent process ensures the sales are at arm's-length, without collusion or fraud, and entered into in good faith. Accordingly, the Debtors request that the Court determine that the customers act at all times in good faith and, as a result, are entitled to the full protections of good faith purchasers under section 363(m) of the Bankruptcy Code.

**F.      The Court Should Waive Compliance with Applicable State Laws and Approve the Dispute Resolution Procedures.**

39.     The Debtors' ability to conduct the Store Closing Sales in accordance with the Sale Guidelines and without complying with Applicable State Laws is critical to the Store Closing Sales' success. Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Store Closing Sales, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales. Additionally, compliance with Fast Pay Laws would require the Debtors to pay terminated employees within a time frame that would be detrimental to the conduct of these chapter 11 cases, if not impossible.

40.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Applicable State Laws, the Debtors propose the Sale Guidelines as a way to streamline the administrative burdens on their estates while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closing Sales. As

such, the Debtors believe the Sale Guidelines mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closing Sales, and therefore, the requested relief seeking the waiver of certain state and local laws and lease provisions is appropriate.

41.     There is strong support for granting the Debtors authority to not comply with the Liquidation Sale Laws, subject to the Sale Guidelines. *First*, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws. *See, e.g.*, Fla. Stat. Ann. 559.25(2) (exempting from the provisions of the chapter sales pursuant to any court order); Ga. Code Ann. § 10-1-393(b)(24)(C)(iv) (same); 815 ILCS 350/3 (same); N.Y. Gen. Bus. Law § 584(a) (same). *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Applicable State Laws as it is essential to the continued operation of the Debtors' business and maximizing value from Sales. *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). *Third*, this Court will be able to supervise the Store Closing Sales because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. Moreover, 28 U.S.C. § 959, which requires debtors to comply with state and other laws in performance of their duties, does not apply to the Store Closing Sales. *See, e.g.*, *In re Borne Chemical Co.*, 54 B.R. 126, 135 (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is only applicable when property is being managed or operated for the purpose of continuing operations). As such, creditors and the public interest are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of the Court.

42.    Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. *See In re Shenango Grp., Inc.*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . . [A] state statute . . . cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

43.    Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety. *See In re Baker & Drake, Inc.*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure). However, preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety. *See In re Baker & Drake*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

44.    Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors. Accordingly, authorizing the Store Closing Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, sales, and similar items is necessary and appropriate. The requested waiver is narrowly tailored to facilitate the successful consummation of Store Closing Sales. The Debtors do not seek

a general waiver of all state and local requirements, but only those that apply specifically to retail liquidation sales. With the exception of the limited waivers and accommodations requested herein, the Debtors will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising. Finally, the Dispute Resolution Procedures provide an orderly means for resolving any disputes arising between the Debtors and any Governmental Units with respect to the applicability of any Liquidation Sale Laws and should therefore be approved.

45. Courts in this district have recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein. *See, e.g.*, *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 18, 2025) (authorizing debtors to conduct store closing sales under the terms of the order and finding that "no further approval, license, or permit of any Governmental Unit shall be required"); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (same); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. May 31, 2023) (same).

46. Courts have also granted similar relief from Fast Pay Laws in other bankruptcy cases under similar circumstances. *See, e.g.*, *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 18, 2025) (granting relief from federal, state, or local laws including "fast pay laws" in connection with store closing sales); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (same); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. May 31,

2023) (same); *In re Indep. Pet Partners Holdings, LLC*, No. 23-10153 (LSS) (Bankr. D. Del. Mar. 1, 2023) (same).

**G.    The Court Should Waive Compliance with Restrictions in the Debtors' Leases.**

47.    Certain of the Debtors' leases governing the premises of the Closing Stores may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales. Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code. *In re Ames Dep't Stores Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that if a conflict existed between a restrictive covenant prohibiting a liquidation sale and "a debtor-in-possession's duty to maximize assets for the estate, the latter would certainly take precedent upon the filing of a bankruptcy petition"); *In re R. H. Macy and Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (allowing a retail company's liquidation sale despite a restrictive covenant to the contrary where the sale did not conflict the purpose of the covenant).

48.    Courts in this district have authorized waivers of compliance with restrictive lease provisions affecting store liquidation sales in chapter 11 cases. *See, e.g.*, *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 18, 2025) (ordering that store closing sales be conducted without further need for compliance with, among other things, lease provisions); *In re Liberated*

*Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (same); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same)*; In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. May 31, 2023) (same).

49.    Thus, to the extent that such provisions or restrictions exist in any of the leases for the Closing Stores, the Debtors request that the Court authorize the Debtors and the Consultant to conduct any sales without reference to any such restrictive provisions or interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

**H.    The Court Should Approve the Abandonment of Certain Property in Connection with any Store Closings.**

50.    After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim"). Courts generally give a debtor in possession great deference to its decision to abandon property. *See In re Syntax-Brillian Corp.*, No. 08-11407 (KJC), 2018 WL 3491758, at *15 (Bankr. D. Del. July 18, 2018) ("The Trustee's power to abandon property is discretionary and the Court will generally defer to the Trustee's judgment in determining whether to abandon a property." (internal quotation omitted) (citation omitted)); *see also In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003), *aff'd*, 112 F. App'x 868 (3d Cir. 2004) ("The trustee's power to abandon property is discretionary."). Unless certain property is harmful to the public, once a debtor has shown that it is burdensome or of inconsequential value to the estate, a court should approve the abandonment. *See In re Unidigital, Inc.*, 262 B.R. 283, 286

(Bankr. D. Del. 2001) (recognizing an exception to abandonment where there is a threat to the public health).

51.    The Debtors are seeking to sell all owned FF&E remaining in the Closing Stores. However, the Debtors may determine that the costs associated with holding or selling certain property or FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all. In such event, the property is of inconsequential value and benefit to the estates and may be burdensome to retain. To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any of their remaining owned FF&E or other property located at any of the Closing Stores without incurring liability to any person or entity. The Debtors further request that the landlord of each Closing Store with any abandoned FF&E or other property be authorized to dispose of such property without liability to any third parties. Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personally identifiable information (which means information that alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

**I.    The  Court Should Approve the Procedures Relating to Additional Closing Stores.**

52.    The Debtors request that the Sale Guidelines and the Interim and Final Order, as applicable, apply to any Additional Closing Stores. In order to provide landlords and other parties in interest with information regarding the ultimate disposition of the Closing Stores, to the extent that the Debtors seek to conduct Store Closings (and related Store Closing Sales) at any Additional Closing Store, the Debtors will file a list of such Additional Closing Stores with the Court (the

"<u>Additional Closing Store List</u>"), and serve a notice of their intent to conduct the applicable Store Closing Sales at the Additional Closing Stores on the Dispute Notice Parties, including the applicable landlords (the "<u>Additional Closing Store Landlords</u>") and any other interested parties by email (to the extent available to the Debtors) or first class mail within five business days of filing the Additional Closing Store List or as soon as reasonably practicable thereafter. With respect to the Dispute Notice Parties, including the Additional Closing Store Landlords, that do not have an email address on file in the Debtors' books and records, the Debtors will mail such notice to the notice address set forth in the lease for such Additional Closing Store (or, if none, at the last known address available to the Debtors).

53.    The Debtors propose that the Additional Closing Store Landlords (each of whom will have already been served with this Motion, the Interim Order, and the Final Order) and any interested parties have seven days after service of the applicable Additional Closing Store List to object to the application of the Interim Order or Final Order, as applicable, to their Additional Closing Stores. If no timely objections are filed with respect to the application of the Interim Order or the Final Order to an Additional Closing Store, then the Debtors should be authorized, pursuant to sections 105(a), and 363(b) and (f) of the Bankruptcy Code, to proceed with conducting the Store Closing and Store Closing Sales at the Additional Closing Store in accordance with the Interim Order or Final Order, the Sale Guidelines, and the Consulting Agreement.

54.    If any objections are filed with respect to the application of the Interim Order or the Final Order, as applicable, to an Additional Closing Store, and such objections are not resolved, the objections and the application of the Interim Order or the Final Order, as applicable, to the Additional Closing Store will be considered by the Court at the next regularly scheduled omnibus hearing, subject to the rights of any party to seek relief on an emergency basis on shortened notice,

to the extent necessary so that the Debtors can move promptly to maximize value and minimize expenses for the benefit of their creditors and stakeholders. Similar relief has been granted in recent retail bankruptcy cases. *See, e.g.*, *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 18, 2025) (approving similar procedures for additional stores); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. May 31, 2023) (same); *In re Indep. Pet Partners Holdings, LLC*, No. 23-10153 (LSS) (Bankr. D. Del. Mar. 1, 2023) (same).

## J.    Processing of Checks and Electronic Fund Transfers Should Be Authorized

55.    The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored. Therefore, the Debtors request authority to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

56.    Bankruptcy Rule 6003 empowers a court to grant certain relief within the first 21 days after the petition date only to the extent that relief is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a). For the reasons set forth above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to receive the requested relief during the first 21 days of these chapter 11 cases

would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm. The requested relief is necessary for the Debtors to operate their business in a value-maximizing manner for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and request that the Court grant the requested relief.

### Reservation of Rights

57.    Notwithstanding anything to the contrary herein, nothing contained in this motion or any actions taken pursuant to any order granting the relief requested in this motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an implication or admission as to the amount, validity, or priority of, or basis for, any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume (other than with respect to the Consulting Agreement), adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; (h) an approval, assumption (other than with respect to the Consulting Agreement), adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a

concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

### **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

58.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### **Notice**

59.    The Debtors will provide notice of this motion to the following parties or their respective counsel, as applicable:  (a) the Office of the United States Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) counsel to the DIP Agent and the Prepetition ABL Agent; (h) counsel to the Prepetition Term Agent; (i) the Consultant; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013 1(m). In light of the nature of the relief requested, no other or further notice need be given.

**K.**    <u>**No Prior Request**</u>

60.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated: November 24, 2025          **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszjlaw.com
       dbertenthal@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*