**<u>Exhibit A</u>**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN SIGNATURE, INC., *et al.*,[1] | Case No. 25-12105 (JKS) |
| Debtors. | (Joint Administration Requested) |
| | **Re: Docket No. __** |

## INTERIM ORDER AUTHORIZING THE DEBTORS TO (A) ASSUME THE CONSULTING AGREEMENT, (B) CONDUCT STORE CLOSING SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, (C) SCHEDULING A HEARING, AND (D) GRANTING RELATED RELIEF

Upon consideration of the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), seeking entry of an interim order (this "<u>Interim Order</u>"), pursuant to Bankruptcy Code sections 105, 363, 365, and 544, Bankruptcy Rules 2002, 6003 6004, 6006, and 6007, and Local 2002-1, 6004-1, and 9013-1, (a) authorizing, but not directing, the Debtors to assume and perform under that certain Consulting Agreement, (b) authorizing and approving the Closing Sales, with such Sales to be in accordance with the terms of the Sales Guidelines, and (c) granting related relief, all as more fully set forth in the Motion; and upon consideration of the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: American Signature, Inc. (6162); American Signature Home Inc. (8573); American Signature USA Inc. (6162); ASI Pure Promise Insurance LLC (6162); ASI Elston LLC (7520); ASI – Laporte LLC (6162); ASI Polaris LLC (6162); ASI Thomasville LLC (6162); and American Signature Woodbridge LLC (6162). The Debtors' business address is 4300 E. 5th Avenue, Columbus, OH 43235.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at an interim hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:

1.      The Debtors have advanced sound business reasons for assuming the Consulting Agreement and adopting the Sale Guidelines, on an interim basis subject to the Final Hearing, as set forth in the Motion and at the Hearing, and assuming the Consulting Agreement is a reasonable exercise of the Debtors' business judgement and in the best interest of the Debtors and their estates.

2.      The Consulting Agreement, a copy of which is attached to this Interim Order as **Exhibit 1** and **Exhibit 2**, collectively, was negotiated, proposed, and entered into by the Consultant and the Debtors without collusion, in good faith and from arm's length bargaining positions.

3.      The assumption of the Consulting Agreement on an interim basis is a sound exercise of the Debtors' business judgment.

4.      The Sale Guidelines, which are attached hereto as **Exhibit 3**, are reasonable and appropriate, and the conduct of the Sales in accordance with the Sale Guidelines will provide an efficient means for the Debtors to dispose of the Store Closure Assets and are in the best interest of the Debtors' estates.

5.     The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

6.     The Store Closings and Sales are in the best interest of the Debtors' estates.

7.     The Dispute Resolution Procedures are fair and reasonable and comply with applicable law.

8.     The Debtors have represented that they intend to neither sell, lease, nor abandon personally identifiable information pursuant to the relief requested in the Motion, although the Consultant will be authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information. The Debtors have represented that they will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information from any Store Closing Asset prior to its Sale or abandonment.

The entry of this Interim Order is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby ORDERED THAT:

1.     The Motion is GRANTED on an interim basis as set forth herein.

2.     Any objections to the entry of this Interim Order, to the extent not withdrawn or settled, are overruled.

3.     The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2025, at __:__ _.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2025 and shall be served on: (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP,

919 North Market Street, 17th Floor, Wilmington, DE 19899, Attn: Laura Davis Jones, Esq. (ljones@pszjlaw.com) and David M. Bertenthal, Esq. (dbertenthal@pszjlaw.com); (b) proposed counsel to the Conflicts Committee, (i) Goodwin Procter LLP, 620 Eighth Ave., New York, NY 10018, Attn: Kizzy L. Jarashow, Esq. (kjarashow@goodwinlaw.com) and Stacy Dasaro, Esq. (sdasaro@goodwinlaw.com) and (ii) Potter Anderson & Corroon LLP 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801, Attn: L. Katherine Good, Esq. (kgood@potteranderson.com); (c) counsel to the DIP Agent and Prepetition ABL Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola, Esq. (jventola@choate.com), Jonathan D. Marshall, Esq. (jmarshall@choate.com), and Lucas B. Barrett, Esq. (lbarrett@choate.com), and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Daniel J. DeFranceschi, Esq. (defranceschi@RLF.com), John H. Knight, Esq. (Knight@RLF.com), Matthew P. Milana, Esq. (Milana@RLF.com); (d) counsel to the Prepetition Term Agent, (i) Goldberg Kohn, 55 East Monroe Street, Chicago, IL 60603-5792, Attn: Randall L. Klein, Esq. (randall.klein@goldbergkohn.com) and Zachary J. Garrett, Esq. (zachary.garrett@goldbergkohn.com) and (ii) Blank Rome LLP, 1201 N. Market Street, Suite 800, Wilmington, DE 19801, Attn: Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com); (e) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Malcolm M. Bates, Esq.; (f) counsel to the Consultant, Leichtman Law, PLLC, 185 Madison Avenue, 15th Floor, New York, NY 10016. Attn.: Maura I. Russell, Esq. (mrussell@leichtmanlaw.com) and Morris Nickols Arsht & Tunnel LLP, 1201 North Market Street, 16th Floor, Wilmington, DE 19899-1347, Attn.: Derek C. Abbott, Esq. (dabbott@morrisnichols.com) and (g) counsel to the Committee any statutory committee appointed in these chapter 11 cases.

4.      To the extent any conflict between this Interim Order, the Sale Guidelines, and the Consulting Agreement, the terms of this Interim Order shall control over all other documents and the Sale Guidelines shall control over the Consulting Agreement.

**I.      Authority to Assume the Consulting Agreement.**

5.      The Debtors are authorized to assume and perform under the Consulting Agreement on an interim basis pursuant to sections 363 and 365 of the Bankruptcy Code, including (a) making payments required by the Consulting Agreement to the Consulting without the need for any application of the Consultant or a further order of the Court, (b) allowing the sale of Additional Merchandise, all as permitted under the Consulting Agreement.

6.      The Debtors' assumption of and performance under the Consulting Agreement is approved in all respects on an interim basis. The Debtors are authorized to assume and perform under the Consulting Agreement pursuant to sections 363 and 365 of the Bankruptcy Code, including by, subject to compliance with the Budget (as defined in the Consulting Agreement), making the payments required by the Consulting Agreement to the Consultant without the need for any application of the Consultant, or a further order of the Court. The (a) payment of all obligations to the Consultant under the Consulting Agreement, including but not limited to all past due, current or future fees, expenses, the proceeds from the sale of the Additional Merchandise (net of the Additional Merchandise Fee) (collectively, the "Consultant Payment Obligations") is approved without further order of the Court and (b) all such payments of the Consultant Payment Obligations shall be made in accordance with the Consulting Agreement, the Budget, and the provisions of this Interim Order.

7.      The Debtors shall timely fund and remit payment of the Consultant Payment Obligations (without offset) from the gross proceeds from the sale of the Debtor's inventory and

owned FF&E (the "Closing Location Assets"), in each case in accordance with the terms of the Consulting Agreement and any Budget approved in connection therewith, without the need for any application of the Consultant, or a further order of the Court, and without adherence to any weekly, monthly, or aggregate limitation in any interim or final order approving the DIP Credit Agreement (the "DIP Orders"), other order, or any budget approved in connection with a DIP Order (each a "DIP Budget"), cash collateral or other budget entered in connection with the Debtors chapter 11 case (collectively, as the case may be an "Approved Budget"); provided however, payment of the Consultant Payment Obligations shall be (a) deemed to be in compliance with any Approved Budget and the applicable provisions of the DIP Orders; and (b) included in each such Approved Budget. To the extent there is any conflict or inconsistency between this Interim Order and the DIP Orders, the Consultant's rights under this Interim Order regarding the payment of Consultant Payment Obligations shall be governed by this Order.

8.      The Debtors' are authorized to accept delivery of Additional Merchandise at the Closing Stores, offer the Additional Merchandise for sale at the Closing Stores on a consignment basis, and to remit the proceeds from sales of Additional Merchandise, in each case, as provided in the Consulting Agreement.  The Consultant Payment Obligations shall be paid in accordance with the provisions of the Consulting Agreement.

9.      Subject to the restrictions set forth in this Interim Order, the Sale Guidelines, and any Side Letters (as defined below), the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement and the Sales, and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and/or the Sales prior to the date of this Interim Order, are hereby approved and ratified.

10.     If Consultant Payment Obligations are not timely paid as contemplated by the Consulting Agreement and this Interim Order (for any reason), including court order (the "Unpaid Consultant Payment Obligations"), the Consultant can, at their election, suspend the provision of services until the Debtors have paid all outstanding Unpaid Consultant Payment Obligations (and replenished any portion of the Prepayment (described above) that has been exhausted by the Consultant, or terminate the Consulting Agreement and in either case have no further obligation to perform services under the Consulting Agreement during such suspension period or after such termination, as applicable, and the Consultant shall have no liability for any claims arising from such suspension or termination of services are hereby released and the Consultant shall be indemnified for any damages caused by the suspension or termination of services; provided that the Consultant may not recover the amount of any such claim (other than Unpaid Consultant Payment Obligations) from any advances or any other amounts on deposit in the advance funding account, whether by setoff, lien, attachment or otherwise without the prior written consent of the DIP Agent.  In addition, the Consultant will have the right to file a motion on expedited one day notice) with an expedited hearing (subject to court availability) to compel payment of any Unpaid Consultant Payment Obligations.

11.     The Debtors and the Consultant may modify the Consulting Agreement in accordance with the terms thereof without further order of the Court; *provided* that (a) the Debtors shall provide five (5) calendar days' advance notice of any contemplated material modification(s) of the Consulting Agreement (including any modification of the Consulting Agreement's economic terms) to the U.S. Trustee, counsel to the DIP Agent, counsel to the Official Committee of Unsecured Creditors (the "Committee"), any landlord directly affected by such modification (and, if known, such landlord's counsel), and counsel to any party that has requested such notice

(collectively, the "Amendment Notice Parties"); (b) the Debtors' modification of the Consulting Agreement shall be subject to the applicable provisions of the DIP Orders and related documentation; and (c) notwithstanding anything contained herein or in the Consulting Agreement, the Budget and any amendments, modifications, or supplements thereto shall be subject to the consent of the DIP Agent.  If an Amendment Notice Party timely objects to a proposed material modification to the Consulting Agreement and the Debtors, the Consultant, and such objecting Amendment Notice Party cannot consensually resolve such objection, the Debtors and the Consultant shall not proceed with such modification absent a further order of the Court approving such modification.

12.     Notwithstanding anything to the contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising out of the Consultant's fraud, willful misconduct, or gross negligence.

13.     The failure to include any provisions of the Consulting Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that such provisions of the Consulting Agreement be, and hereby are, authorized and approved.

**II.     Authority to Engage in Sales and Conduct Store Closings.**

14.     The Debtors are authorized, on an interim basis pending the Final Hearing, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately conduct the Sales at the Closing Stores in accordance with this Interim Order, the Sale Guidelines, and the Consulting Agreement, as may be modified by any Side Letters (as defined below) between the Debtors or the Consultant and the landlords at the Closing Stores. Notwithstanding anything in this Interim

Order to the contrary, the Debtors may elect to discontinue the Sales at any Closing Stores and revert to normal operations without further notice or authorization from the Court.

15.     The Sale Guidelines are approved in their entirety on an interim basis.

16.     The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Interim Order and the Sale Guidelines.

17.     All entities that are presently in possession of some or all of the Store Closure Assets in which the Debtors hold an interest that are or may be subject to the Consulting Agreement or this Interim Order hereby are directed to surrender possession of such Store Closure Assets to the Debtors or the Consultant.

18.     Neither the Debtors nor the Consultant nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined under section 101(27) of the Bankruptcy Code) or landlord, to conduct the Sales and Store Closings and to take the related actions authorized herein.

**III.    Conduct of Sales.**

19.     All newspapers and other advertising media in which the Sales and Store Closings may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Sales and Store Closings pursuant to the Consulting Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise and FF&E in the manner contemplated by and in accordance with this Interim Order, the Sale Guidelines, and the Consulting Agreement.

20.     The Debtors and the Consultant are hereby authorized, without necessity of further order of this Court, to take such actions as may be necessary and appropriate to implement the Consulting Agreement and to conduct the Sales and Store Closings as provided in the Consulting

Agreement and the Sale Guidelines (subject to any Side Letters, as defined below), including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales as contemplated in the Sale Guidelines through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of sign-walkers, A-frames, and other street signage, as contemplated in the Sale Guidelines.

21.     Except as expressly provided in the Consulting Agreement and the Sale Guidelines, the sale of the Merchandise and FF&E shall be conducted by the Debtors and the Consultant notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store. Closings or the Sales (including the sale of the Merchandise and FF&E), the rejection of leases, abandonment of assets, or "going dark" provisions shall not be enforceable in conjunction with the Store Closings or the Sales. Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Sales are conducted in accordance with the terms of this Interim Order, any Side Letter (as defined below), and the Sale Guidelines. The Debtors, the Consultant, and the landlords of the Closing Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Debtors, the Consultant, and any such landlords; *provided* that nothing in such Side Letters affects the provisions of this Interim Order. In the event of any conflict between the Sale Guidelines, the

Consulting Agreement, any Side Letter, and this Interim Order, the terms of such Side Letter shall control.

22.     Except as expressly provided for herein or in the Sale Guidelines, no person or entity, including, but not limited to, any landlord, subtenant, licensor, service providers, utilities, or creditors, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Store Closings, the Sales, or the sale of the Store Closure Assets, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such sales, as applicable, and all such parties and persons and entities of every nature and description, including, but not limited to, any landlord, subtenant, licensor, service providers, utilities, and creditors and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Store Closings and the Sales, and/or (b) instituting any action or proceeding in any court (other than in this Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Consultant, or the landlords at the closing locations that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale of the Store Closure Assets or other liquidation sales at the closing locations or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

23.     In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as modified by any Side Letters) and this Interim Order.

24.     All in-store sales of Store Closure Assets and Additional Merchandise shall be "as is" and final as of the Sale Commencement Date. Conspicuous signs stating that "all sales are final" and "as is" will be posted at the point-of-sale areas at all Closing Stores. As to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

25.     The Consultant shall not be liable for sales taxes except as expressly provided in the Consulting Agreement and the payment of any and all sales taxes is the responsibility of the Debtors. The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due; *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of such dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit. For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected. The Consultant shall collect, remit to the Debtors, and account for sales taxes as and to the extent provided in the Consulting Agreement. This Interim Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state, provincial, or federal law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state, provincial or federal law.

26.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell the Store Closure Assets and all sales of Store Closure Assets, whether by the Consultant or the Debtors, shall be free and clear of any and all liens, claims, encumbrances, and other interests (as may be modified by any Side Letter), with such liens, claims, encumbrances, and other interests attaching to the proceeds thereof.

27.    The Debtors or the Consultant (as the case may be) are authorized and empowered to transfer Store Closure Assets among, and into, the Closing Stores in accordance with the Sale Guidelines, as applicable. The Consultant is authorized to sell the Debtors' FF&E and, notwithstanding any provision in the underlying leases for the Closing Stores, the Original Agreement or the First Amendment, abandon the same, in each case, as provided for and in accordance with the Sale Guidelines.

28.    The Consultant is authorized to supplement the Merchandise in the Sales with Additional Merchandise as provided for in the Consulting Agreement. The Consultant and Debtors shall cooperate to ensure that the Additional Merchandise is marked in such a way that a reasonable consumer could identify the Additional Merchandise as being non-Merchant goods. The Consultant shall provide signage in the Stores notifying customers that the Additional Merchandise has been included in the Sale. Absent the Debtors' written consent, and the Consultant's agreement to reimburse the Debtors for any associated expenses, the Consultant shall not use the Debtors' distribution centers for any Additional Merchandise.

29.    The Consultant shall pay the Debtors an amount equal to 7.0% of the gross proceeds (excluding Sale Taxes) from the Sale of the Additional Merchandise (the "Additional Merchandise Fee"). The Consultant shall retain all remaining amounts from the sale of the Additional Merchandise.

30.    All transactions relating to the Additional Merchandise are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from the Consultant to the Debtors under Article 9 of the Uniform Commercial Code (the "UCC") and not a consignment for security purposes. Subject solely to Consultant's obligations to pay to the Debtors the Additional Merchandise Fee, at all times and for all purposes the Additional Merchandise and their proceeds

shall be the exclusive property of the Consultant, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Merchandise or the proceeds thereof. The Additional Merchandise shall at all times remain subject to the exclusive control of the Consultant.

31.    The Debtors shall, at the Consultant's sole cost and expense, insure the Additional Merchandise and, if required, promptly file any proofs of loss with regard thereto. The Consultant shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Merchandise.

32.    The Consultant is hereby granted a first-priority security interest in and lien upon (a) the Additional Merchandise and (b) the Additional Merchandise proceeds, and the Consultant is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof.

33.    Notwithstanding anything to the contrary in this Interim Order, the Debtors shall not sell or abandon any property that the Debtors know is not owned by the Debtors; *provided* that the Debtors will either (a) provide for the return of such property to the Debtors' headquarters or (b) return such property to the applicable lessor, or other owner of the property.

34.    For purposes of this Order only, neither the Sale Guidelines, Consulting Agreement, nor this Interim Order authorize the Debtors to transfer or sell to Consultant or Consultant to sell to any other party the personally identifiable information (which means information that alone or in conjunction with other information identifies an individual, including but not limited to an individual's first name (or initial) and last name, physical address, electronic address, telephone number, social security number, date of birth, government-issued identification

number, account number, and credit or debit card number) of any customers. The foregoing shall not limit the Consultant's use of the Debtors' customer lists and mailing lists in accordance with the Consulting Agreement solely for purposes of advertising and promoting the Sales.

35.     The Debtors shall remove or cause to be removed any confidential and/or personally identifiable information in any of the Debtors hardware, software, computers, or cash registers or similar equipment which are to be sold or abandoned so as to render the personally identifiable information unreadable or undecipherable. At the conclusion of the Sales, the Consultant shall provide the Debtors with written verification that the Consultant has not removed, copied, or transferred any customer personally identifiable information and that any records containing personally identifiable information were shredded, erased, or otherwise modified to render the personally identifiable information unreadable or undecipherable.

36.     Nothing herein is intended to affect any rights of any applicable Government Unit (as such term is defined in section 101(47) of the Bankruptcy Code) to enforce any law affecting the Debtors' conduct of any store closing sale that occurred before the Petition Date.

**IV.     Procedures Relating to Additional Closing Stores.**

37.     To the extent that the Debtors seek to conduct Sales at any Additional Closing Store, the Sale Guidelines and this Interim Order shall apply to the Additional Closing Stores.  At the time of designation of Additional Closings Stores, the Debtors and the Consultant shall mutually agree upon an increase to the Prepayment attributable to each group of designated Additional Closing Stores to being held by the Consultant in accordance with the Consulting Agreement.

38.     Prior to conducting the Sales at any Additional Closing Store, the Debtors will file a list including such Additional Closing Store with this Court (each, an "Additional Closing Store

List"), and serve a notice of their intent to conduct the applicable Store Closing Sales at the Additional Closing Stores on the Dispute Notice Parties, including the applicable landlords (the "Additional Closing Store Landlords") and any other interested parties by email (to the extent available to the Debtors) or first class mail within two business days of filing the Additional Closing Store List or as soon as reasonably practicable thereafter. With respect to the Dispute Notice Parties, including the Additional Closing Store Landlords, that do not have an email address on file in the Debtors' books and records, the Debtors will mail such notice to the notice address set forth in the lease for such Additional Closing Store (or, if none, at the last known address available to the Debtors).

39.     The Additional Closing Store Landlords and any interested parties shall have five days after service of the applicable Additional Closing Store List to object to the application of this Interim Order. If no timely objections are filed with respect to the application of this Interim Order to an Additional Closing Store, the Debtors are authorized, pursuant to sections 105(a), and 363(b) and (f) of the Bankruptcy Code, to continue with conducting the Sales at the Additional Closing Stores in accordance with this Interim Order, the Sale Guidelines, the Consulting Agreement, and any Side Letter, if applicable. If any objections are filed with respect to the application of this Interim Order or the Final Order to an Additional Closing Store, and such objections are not resolved, the objections and the application of this Interim order or the Final Order to the Additional Closing Store will be considered by the Court at the next regularly scheduled omnibus hearing, subject to the rights of any party to seek relief on an emergency basis on shortened notice, to the extent necessary. Any objections as to particular Additional Closing Stores will not affect the Debtors' and Consultant's rights to begin Sales at non-objected-to Additional Closing Stores.

## VI.    Dispute Resolution Procedures with Governmental Units.

40.    Nothing in this Interim Order, the Consulting Agreement, the Sale Guidelines, or any Side Letter releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.

41.    Nothing in this Interim Order, the Consulting Agreement, the Sale Guidelines, or any Side Letter shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. The Sales shall not be exempt from laws of general applicability, including, without limitation, public health and safety, criminal, tax, (including, but not limited to, the collection of sales taxes), labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising, consumer protection, the sale of gift certificates, layaway programs, return of goods, express or implied warranties of goods, and "weights and measures" regulation and monitoring (collectively, "General Laws"). Nothing in this Interim Order, the Consulting Agreement, the Sale Guidelines, or any Side Letter shall alter or affect obligations to comply with all applicable federal safety laws and regulations. Nothing in this Interim Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(27) of the Bankruptcy Code) from enforcing General Laws in the applicable non bankruptcy forum, subject to the Debtors' rights to assert in that forum or before this Court, that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Interim Order. Notwithstanding any other

provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

42.    To the extent that the sale of Store Closure Assets is subject to any Liquidation Sale Laws, the following provisions of this paragraph 42 shall apply and control over any Side Letters:

(a) Provided that the Sales are conducted in accordance with the Interim Order, any Final Order, and the Sale Guidelines, the Debtors, the Consultant, and the Debtors' landlords shall be deemed to be in compliance with any requirements of all county, parish, or municipal or other local government and Liquidation Sale Laws establishing licensing or permitting requirements, waiting periods or time limits, or bulk sale restrictions that would otherwise apply to the Sales and sales of the Store Closure Assets of any state or local Governmental Unit (as defined in Bankruptcy Code section 101(27)); *provided* that the term "Liquidation Sale Laws" shall be deemed not to include any public health or safety laws of any state (collectively, "Safety Laws"), and the Debtors and the Consultant shall continue to be required to comply, as applicable, with such Safety Laws and General Laws, subject to any applicable provision of the Bankruptcy Code and federal law, and nothing in this Order shall be deemed to bar Governmental Units (as defined in section 101(27) of the Bankruptcy Code) or public officials from enforcing Safety Laws or General Laws.

(b) Within five business days after entry of the Interim Order, the Debtors will serve by first class mail, copies of the Interim Order, the proposed Final Order, and the Sale Guidelines on the following: (a) the Attorney General's office for each state where the Sales are being held; (b) the county consumer protection agency or similar agency for each county where the Sales are being held; (c) the division of consumer protection for each state where the Sales are being held; (d) the landlords for the Closing Stores; and (e) the National Association of Attorneys General (collectively, the "Dispute Notice Parties").

(c) With respect to any Additional Closing Stores, within five business days after filing any Additional Closing Store List (as defined below) with the Court, the Debtors will serve by first-class mail, copies of the Interim Order, or the Final Order, as applicable, the Consulting Agreement, and the Sale Guidelines on the Dispute Notice Parties.

(d) To the extent that there is a dispute arising from or relating to the Sales, the Orders, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within 10 days following entry of the Interim Order, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice explaining the nature of the dispute to: (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19899, Attn: Laura Davis Jones, Esq. (ljones@pszjlaw.com) and David M. Bertenthal, Esq. (dbertenthal@pszjlaw.com); (b)

proposed counsel to the Conflicts Committee, (i) Goodwin Procter LLP, 620 Eighth Ave., New York, NY 10018, Attn: Kizzy L. Jarashow, Esq. (kjarashow@goodwinlaw.com) and Stacy Dasaro, Esq. (sdasaro@goodwinlaw.com) and (ii) Potter Anderson & Corroon LLP 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801, Attn: L. Katherine Good, Esq. (kgood@potteranderson.com); (c) counsel to the DIP Agent and Prepetition ABL Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola, Esq. (jventola@choate.com), Jonathan D. Marshall, Esq. (jmarshall@choate.com), and Lucas B. Barrett, Esq. (lbarrett@choate.com), and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Daniel J. DeFranceschi, Esq. (defranceschi@RLF.com), John H. Knight, Esq. (Knight@RLF.com), Matthew P. Milana, Esq. (Milana@RLF.com); (d) counsel to the Prepetition Term Agent, (i) Goldberg Kohn, 55 East Monroe Street, Chicago, IL 60603-5792, Attn: Randall L. Klein, Esq. (randall.klein@goldbergkohn.com) and Zachary J. Garrett, Esq. (zachary.garrett@goldbergkohn.com) and (ii) Blank Rome LLP, 1201 N. Market Street, Suite 800, Wilmington, DE 19801, Attn: Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com); (e) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Malcolm M. Bates, Esq.; (f) counsel to the Consultant, Leichtman Law, PLLC, 185 Madison Avenue, 15th Floor, New York, NY 10016. Attn.: Maura I. Russell, Esq. (mrussell@leichtmanlaw.com) and Morris Nickols Arsht & Tunnel LLP, 1201 North Market Street, 16th Floor, Wilmington, DE 19899-1347, Attn.: Derek C. Abbott, Esq. (dabbott@morrisnichols.com) and (g) counsel to the Committee any statutory committee appointed in these chapter 11 cases. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

(e) In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to the Interim Order or the Final Order, as applicable, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, the Debtors and the Consultant shall be authorized to conduct the Sales pursuant to the terms of the Interim Order or the Final Order, the Consulting Agreement, and the Sale Guidelines and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(f) If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject

to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (d) and (e) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

43.    Subject to paragraphs 40 and 41 above, each and every federal, state, or local agency, department, or Governmental Unit with regulatory authority over the Store Closings or the Sales and all newspapers and other advertising media in which the Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors or the Consultant be required to post any bond, to conduct the Sales.

44.    Provided that the Sales are conducted in accordance with the terms of this Interim Order, the Consulting Agreement, and the Sale Guidelines (as may be modified by Side Letters) and in light of the provisions in the laws that exempt court-ordered sales from their provisions, the Debtors and the Consultant shall be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Store Closings and the Sales in accordance with the terms of this Interim Order and the Sale Guidelines (as may be modified by Side Letters) without the necessity of further showing compliance with any such Liquidation Sale Laws.

45.    Notwithstanding anything to the contrary herein, in view of the importance of the use of sign-walkers, banners, and other advertising to the Sales and the Store Closings, to the extent that disputes arise during the course of the Sales regarding laws regulating the use of sign-walkers, banners, or other advertising and the Debtors and the Consultant are unable to resolve the matter consensually, any party may request an immediate telephonic hearing with this Court. Such hearing will, to the extent practicable and subject to the Court's availability, be scheduled initially no later than the earlier of (a) the Final Hearing or (b) within three business days of such request.

This scheduling procedure shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

### VII.    Other Provisions.

46.     Neither the Consultant nor any of its respective affiliates (whether individually, as part of a joint venture, or otherwise), shall be precluded from providing additional services to the Debtors or bidding on the Debtors' assets in connection with any other future process that may or may not be undertaken by the Debtors to close stores.

47.     Not later than seven days prior to the objection deadline related to entry of an order approving the Motion on a final basis, the Consultant shall file a declaration disclosing connections to the Debtors, their creditors, and other parties in interest in these chapter 11 cases, and all parties who have filed requests for service under Bankruptcy Rule 2002, by email, or if the email address is not available to the Debtors, then by first class mail.

48.     The Consultant shall act solely as a consultant to the Debtors and shall not be liable for any claims against the Debtors other than as expressly provided in the Consulting Agreement (including the Consultant's indemnity obligations thereunder) or the Sale Guidelines, with the exception of acts of gross negligence or willful misconduct and, for greater certainty, the Consultant shall not be deemed to be an employer, or a joint or successor employer or a related or common employer or payor within the meaning of any legislation governing employment or labor standards or pension benefits or health and Safety or other statute, regulation or rule of law or equity for any purpose whatsoever, and shall not incur any successor liability whatsoever.

49.     The Debtors are authorized and permitted to transfer to the Consultant personal information in the Debtors' custody and control solely for the purposes of assisting with and conducting the Sales and only to the extent necessary for such purposes; *provided* that the

Consultant removes such personal information from the FF&E prior to the abandonment of the same.

50.     To the extent the Debtors are subject to any Fast Pay Laws in connection with the Store Closings, the Debtors shall be presumed to be in compliance with such laws to the extent, in applicable states, such payroll payments are made by the later of: (a) the Debtors' next regularly scheduled payroll; and (b) seven calendar days following the termination date of the relevant employee, and in all such cases consistent with, and subject to, any previous orders of this Court regarding payment of same.

51.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

52.     Nothing contained in the Motion or this Interim Order, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with this Interim Order), is intended as or shall be construed or deemed to be: (a) an implication or admission as to the amount, validity, or priority of, or basis for, any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in the Motion or this Interim Order; (e) a request or authorization to assume (other than with respect

to the Consulting Agreement), adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; (h) an approval, assumption (other than with respect to the Consulting Agreement), adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

53.　　The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

54.　　The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003.

55.　　Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

56.　　Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

57. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

58. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order or the Consulting Agreement, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords and/or the Consultant for protection from interference with the Store Closings or Sales, (c) any other disputes related to the Store Closings or Sales, and (d) protect the Debtors and/or the Consultant against any assertions of any liens, claims, encumbrances, and other interests. No such parties or person shall take any action against the Debtors, the Consultant, the landlords, the Store Closings, or the Sales until this Court has resolved such dispute.

## **Exhibit 1**

**Original Agreement**

## CONSULTING AGREEMENT

This Consulting Agreement, dated as of September 19, 2025 (this "Agreement") is made by and between American Signature, Inc. (the "Company") and SB360 Capital Partners, LLC (the "Consultant").

## R E C I T A L S:

WHEREAS, the Company desires to retain Consultant to provide consulting services to Company with respect to the disposition of the Merchandise and Owned FF&E (each as defined below) in the context of a "Store Closing Sale", "Total Inventory Blowout'", "Everything On Sale" or similar themed sales at Company's retail store locations identified on Exhibit A attached hereto, each individually, a "Store", and collectively, the "Stores") (referred herein individually or collectively, as the context so requires, as the "Sale").

WHEREAS, Company may, at its sole discretion, from time to time, add or delete stores on seven (7) days written notice to Consultant by providing to Consultant the form set forth on Exhibit B (a store added to the Sale pursuant to Exhibit B shall be a "Store").

WHEREAS, Consultant is willing to serve as the Company's exclusive consultant for the purpose of providing such consulting services, upon the terms and conditions and in the manner set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**1.** **Definitions**

For the purposes of this Agreement, the terms listed below shall have the respective meanings indicated:

"Additional Merchandise Expenses" shall mean the cost of obtaining the Additional Merchandise (including freight, shipping-related labor, cost of capital, and insurance) the cost of ticketing the Additional Merchandise, cost of insurance for Additional Merchandise and other expenses incurred by Consultant which are attributable to the purchase and sale of the Additional Merchandise. The Consultant shall make all records and reports pertaining to Additional Merchandise Expenses available to Company during regular business hours upon reasonable notice.

"Additional Merchandise Proceeds" shall mean the aggregate of (i) the total amount (in dollars) of all sales of Additional Merchandise during the Sale Term, exclusive of sales taxes; (ii) all proceeds of insurance for loss or damage to Additional Merchandise arising from events occurring during the Sale Term relating to the Additional Merchandise; and (iii) the amount of honored customer deposits, honored discount coupons, store credits, gift certificates, loyalty program benefits and frequent shopper certificates, exclusive of all applicable sales taxes, utilized during the Sale Term relating to Additional Merchandise. The Consultant shall make all

records and reports pertaining to Additional Merchandise Proceeds available to Company during regular business hours upon reasonable notice.

"Additional Merchandise Net Proceeds" shall mean the Additional Merchandise Proceeds minus the Additional Merchandise Expenses.

"Advertising Expenses" means the costs and expenses incurred in connection with advertising the Sale, including, without limitation, direct media costs, marketing, agency fees and production costs and Signage Costs.

"Central Services" shall mean those central administrative services provided by Company that are necessary or appropriate for the conduct and support of the Sale, including, use of Company's: (i) inventory control system, (ii) payroll system, (iii) accounting system, (iv) office facilities (including use of reasonably sized offices located at Company's central office facility to effect the Sale), (v) central administrative services and personnel to process and perform sales audit, banking, accounting, sale and expense reconciliation, and other normal course administrative services customarily provided to or for the benefit of operating the Stores, (vi) weekly email messages targeted to the customers of the Stores which email messages will be designed by Consultant (and approved by Company) and sent by Company or Company's existing service provider and (vii) such other central office services reasonably necessary or appropriate for the Sale.

"Consultant Incurred Expenses" shall mean, as proscribed herein or set forth in the Budget (as defined below), the aggregate amount of (i) Supervisor Costs, (ii) Advertising Expenses, (iii) corporate travel, and (iii) Consultant's reasonable and documented legal fees incurred in connection with the Sale.

"Gross Proceeds" shall mean, in aggregate, all proceeds received by Company and derived from the sale of Merchandise made in each Store during such Store's respective Sale Term (excluding amounts paid for sales, excise, or gross receipts taxes); plus (i) all proceeds of fire, flood or other insurance covering the Merchandise, and (ii) the amount of any gift cards or merchandise credits redeemed at each Store during such Store's respective Sale Term.

"Gross  Rings" shall have the meaning set forth in Section 3.2(b).

"Merchandise" shall mean all inventory that is owned by Company and is located at, or in transit from the Company's warehouse to, a Store as of the Sale Commencement Date with respect to each such Store; provided, however, the Company and the Consultant agree that "Merchandise" shall expressly exclude: (1) goods which belong to sublessees, licensees or concessionaires of Company; (2) goods held by the Company on memo or consignment, unless otherwise agreed to by Company and Consultant; (3) Additional Merchandise; (4) customer warranties, and (5) Owned FF&E.

"Sale Commencement Date" shall mean, October __ 2025  and with respect to any stores which may be added to the Sale by the Company the date on Exhibit B.

"Sale Expenses" shall mean, in aggregate, all expenses incurred in connection with and attributable to the Sale  and the operation of each Store during such Store's Sale Term (including, without limitation, all Consultant Incurred Expenses and all other store-level and corporate expenses associated with the Sale, including, but not limited to (i) payroll (including any store-level commissions) and related employee benefits and payroll taxes (ii) security costs associated with the Sale; (iii) credit card processing fees for Merchandise; (iv) Store-level employee bonuses mutually approved by Company and Consultant which shall not exceed ten percent (10%) of base payroll and shall take into consideration any employee compensation plan; (v) insurance amounts; (vi) telephone charges; and (vii) costs of transferring Merchandise between Stores and other expenses necessary to operate the Sale. All Sale Expenses, whether listed or not, are the responsibility of the Company.

"Sale Guidelines" shall mean the Sale Guidelines annexed hereto as Exhibit C which shall serve as the guidelines under which the Sale shall be conducted.

"Sale Term" shall mean, with respect to each Store, the period of time beginning with such Store's Sale Commencement Date and ending on such Store's Sale Termination Date.

"Sale Termination Date" shall mean, -----------, 2026, or as early terminated as provided herein,  with respect to each Store on Exhibit A and (a) as set forth on Exhibit B (for any Store that is subsequently added), (b) or as extended upon mutual agreement by the Company and Consultant.

"Services" shall mean the services to be performed by Consultant pursuant to Section 2.2 of this Agreement.

"Signage Costs" shall mean all the interior and exterior signage, banners and sign walkers used in connection with the Sale, in each case to the extent approved by the Company.

"Store Employees" shall mean those employees of the Company retained by Company to conduct the Sale following consultation with Consultant.

"Supervisor(s)" shall mean the individual(s) whom Consultant may engage to provide Services in the Stores to Company in connection with the Sale in accordance with Section 2.3 below.

"Supervisor Costs" shall mean the following customary costs and expenses incurred by Consultant with respect to Supervisors as preapproved by the Company in accordance with the Budget: (i) the weekly compensation paid during the Sale Term per Supervisor (which in each case represents Consultant's actual costs); (ii) reasonable and documented travel expenses of the Supervisors between Stores during the term of the Sale, and to and from the Sale locations at the commencement and conclusion of the Sale (and reasonable travel to and from the Supervisors' homes during the Sale Term as is typical and customary in the liquidation industry given the nature of the Merchandise, the length of the Sale, and the actual results of the Sale); and (iii) reasonable Supervisor deferred compensation as agreed pursuant to Section 2.3(b) below.

## 2.    Consulting Services

2.1     Company hereby retains Consultant and Consultant hereby agrees to serve as the exclusive consultant to the Company in connection with the conduct of the Sale as set forth herein. With respect to the Sale and during the Sale Term, Consultant shall serve as the sole and exclusive consultant to the Company relative to the conduct of the Sale at the Stores or future stores which may be included within this Agreement in the Company's sole discretion.

2.2     On the terms and conditions set forth herein, commencing as of the Sale Commencement Date, the Consultant shall provide the Company with the following Services with respect to the conduct of the Sale:

(i)     provision of qualified Supervisors to supervise and assist Company in its conduct of the Sale as further described in Section 2.3 below, including such lead, regional, financial, and field Supervisors as needed (after consultation with Company) to assist Company in conducting the Sale and oversee the Sale process;

(ii)     provide the Company with such oversight, supervision and guidance with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and Owned FF&E from the Stores as may be required to maximize Gross Proceeds and proceeds from Owned FF&E;

(iii)     recommend and implement appropriate point of purchase, point of sale and external advertising to effectively sell the Merchandise during the Sale Term, consistent with the theme of the Sale and the Sale Guidelines, it being understood that the Sale will be advertised as specified by the Company on a per store basis as a "Total Inventory Blowout", "Store Closing", "Everything on Sale" or similar handles throughout the term of the Sale;

(iv)     advise the Company as to appropriate discounting of Merchandise, appropriate staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees;

(v)     recommend an acceptable sign package to be used throughout the Sale Term subject to the Company's final approval

(vi)     oversee the display of Merchandise in the Stores;

(vii)     assist Company in the formulation and implementation of a loss prevention program designed to protect the Merchandise from theft or other shortages;

(viii)     assist Company with accounting functions for the Stores, including evaluation of sales of Merchandise by category, sales reporting and monitoring of expenses, in each case using Company's infrastructure and IT systems;

(ix)     to the extent requested by the Company, recommend and implement the transfer and balancing of Merchandise between and among the Stores to maximize results during the Sale;

(x)     participate in weekly calls with representatives of the Company;

(xii)    coordinate with Company regarding an advertising and signage program to direct customers to Company's on-going stores;

(xiii) with the permission of the Company, provide Additional Merchandise to be procured by the Consultant:

(xiv) leave the Stores in white box condition after the Sale Termination Date; and

(xiv)    provide such other related services deemed necessary or prudent by the Company and the Consultant, or as reasonably requested by the Company under the circumstances giving rise to the Sale.


2.3    (a)    In connection with the Sale, Consultant may directly or indirectly retain and engage the Supervisors upon the prior written approval of the Company.  The Supervisors are engaged by Consultant and are not and shall not be deemed to be employees or agents of Company in any manner whatsoever; nor do the Supervisors have any relationship with Company by virtue of this Agreement or otherwise which creates any liability or responsibility on behalf of Company for the Supervisors.  During the Sale Term, the Supervisors shall perform Services during normal Store operating hours and for the period of time prior to the Stores' opening and subsequent to the Stores' closing, as required in connection with the Sale, in Consultant's discretion.

(b)    In consideration of Consultant's engagement of the Supervisors, Company agrees to reimburse Consultant, as Consultant Incurred Expense in accordance with the Budget, for the actual Supervisor Costs paid by Consultant for services rendered by the Supervisors in connection with the Sale during the Sale Term which shall include deferred compensation plan for the Supervisors of 50% of total compensation to the extent reflected in the Budget.  Company shall reimburse Consultant for all Supervisor Costs weekly, based upon invoices or other documentation reasonably satisfactory to Company.  Company shall not be obligated to pay Supervisor Costs and/or Supervisor deferred compensation that have not been included in, or provided for, in the Budget.

2.4    Title to all Merchandise shall remain with Company at all times during the Sale Term until such Merchandise is sold.  Although Consultant shall undertake its obligations under this Agreement in a manner designed to achieve the desired results of the Sale and to maximize the benefits to Company, Company expressly acknowledges that Consultant is not guaranteeing the results of the Sale or insuring the Merchandise.  All sales of Merchandise in the Stores shall be made on behalf of Company. Company further agrees that responsibility for the handling of any goods, inventory or other merchandise held by Company and located in the Stores under any consignment, sale or return, or other similar agreement shall lie exclusively with Company, and Consultant shall have no responsibility with respect thereto.

2.5    All warranty claims shall be handled by the Company in accordance with the Company policy as may be modified by the Company

**3.**    **Expenses; Consultant's Fees**

3.1    Sale Expenses.    (a) The Consultant and the Company have agreed on a pro forma budget of the Consultant Incurred Expenses relating to the Sale for the Stores (the "Budget") in the form and content annexed hereto and made a part hereof as Exhibit D (which Budget shall be modified by mutual agreement of the Company and the Consultant to include Stores added to Exhibit B, if any). In connection with the Sale and subject to the limitations set forth in the Budget, the Company shall be responsible for the payment of all expenses incurred in connection with the Sale, including without limitation all Sale Expenses (and Consultant shall not be responsible for any such expenses or Sale Expenses except as expressly provided for in Section 10.1 below). Consultant Incurred Expenses shall not exceed the aggregate amount for each category of Consultant Incurred Expenses set forth on the Budget without the prior written consent of the Company; all such Consultant Incurred Expenses in excess of the preapproved Consultant Incurred Expenses shall be the sole responsibility of Consultant. The Company shall reimburse Consultant for any reasonable and documented Consultant Incurred Expense on a weekly basis in connection with the weekly settlement provided for in Section 4.1 hereof upon presentation of invoices and statements for such expenses, which reimbursement or payment shall be in addition to any Base Fee, and/or FF&E Fee (each as defined below) earned and payable hereunder.

3.2    Consultant's Compensation.

(a)    Base Fee. In consideration of Consultant's provision of the Services provided for hereunder, Company shall pay a fee to Consultant, equal to two percent (2.0%) of Gross Proceeds from the sale of Merchandise (the "Base Fee"). In addition, Consultant shall retain (or be paid) fifty percent (50%) of the Additional Merchandise Net Proceeds and ten percent (10%) of the Companies fee from the sales of Rugs (the "Consultant License Fee").

(b)    For purposes of calculating Gross Proceeds, the Company shall keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store. Register receipts shall show for each item sold the retail price (as reflected on Company's books and records) for such item, and the markdown or other discount granted by Consultant in connection with such sale ("Gross Rings"). The Company, after consultation with the Consultant, shall have the right to decide the amount and duration of markdowns and discounts. The Company shall make all such records and reports available to Consultant during regular business hours upon reasonable notice.

3.3    Fixtures Disposition.    (a) In addition to the consulting Services provided for herein with respect to the sale of Merchandise, with respect to furniture, fixtures and equipment owned by Company and located at the Stores (collectively, the "Owned FF&E"), Consultant shall sell the Owned FF&E for the Company's benefit. Within ten (10) days of the Sale Commencement Date, the Company may inform the Company of any furniture, fixtures and equipment it elects not to be sold in order to use for its own purposes or because it does not own such items. Consultant shall advertise in the context of advertising for the Sale that items of Owned FF&E at Stores are available for sale, and shall contact and solicit known purchasers and dealers of furniture and trade fixtures. In consideration of providing such services, Consultant shall retain 15% of the gross receipts (net only of applicable sales taxes and budgeted sale expenses, if any and without duplication, established by mutual agreement of the Company, and the Consultant) from all sales

6

or other dispositions of Owned FF&E (the "FF&E Fee"). In addition, Company shall reimburse Consultant for Consultant's reasonable and documented out–of–pocket expenses incurred in connection with the sale or other disposition of the Owned FF&E pursuant to a budget established by mutual agreement of the Company and the Consultant (the "FF&E Budget").

(b)    Consultant shall have no liability to Company or any third party for its failure to sell any or all of the Owned FF&E, and shall leave the Stores in white box condition.

**4.    Sale Proceeds; Weekly Settlement**

4.1    The Company shall collect all proceeds from the sale of Merchandise and Owned FF&E (including all Gross Proceeds) and deposit the same in deposit accounts established by Company for the deposit thereof consistent with Company's existing cash management system (which may be Company's existing Store-level deposit accounts) (the "Sale Accounts"). The Company shall, upon request, deliver to Consultant account statements and such other information relating to the sale of Merchandise and Owned FF&E (including the Gross Proceeds and the Sale Accounts) reasonably requested by Consultant. On Wednesday of each week, commencing on the first Wednesday following the first Sale Commencement Date, the Company and the Consultant shall reconcile the results of the Sale for the prior week, including, without limitation, Gross Proceeds, sales of Owned FF&E, Sale Expenses, Owned FF&E sale-related expenses, and all fees payable hereunder including the Base Fee, Consultant License Fee and the FF&E Fee. Company shall promptly pay all amounts due to Consultant for the previous week (subject to the limitations set forth in the Budget and the FF&E Budget). In the event that amounts due to Consultant are not paid when due such amount shall bear interest at the rate of 10% per annum effective as of the date such amounts are due. The Company waives the right to contest the application of usury laws or take any action to challenge the amount of interest due on amounts outstanding.

4.2    No later than ten (10) business days following the end of the final Sale Term, the Company and the Consultant shall complete a settlement of all amounts contemplated by this Agreement (the "Final Settlement"), including, without limitation, the settlement of the Consultant's Additional Merchandise Fee, the determination and payment of any further fees, including any Base Fee, Consultant License Fee due to the Consultant and all reimbursements and payments contemplated hereby (subject to the limitations set forth in the Budget and the FF&E Budget).

**5.    Store Employees**

5.1    The Company and the Consultant shall cooperate to retain employees of the Company, as mutually agreed from time-to-time, to be utilized to conduct the Sale at the Stores during the Sale Term. Such employees shall remain employees of the Company, and, except as set forth in Section 8.2, Consultant shall have no liability to such employees (including, without limitation, all the Store Employees and any of Company's former employees) of any kind or nature whatsoever, including, without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, WARN Act payments, or any other costs, expenses, obligations, or liabilities arising from Company's or Company's employment of such Store Employees prior to, during, and subsequent to the Sale Term. Other than advising Company that Consultant no longer desires to utilize the services of any employee in connection with the

7

Sale, Consultant shall not have the right to change the terms of employment of any Store Employees.

5.2     At the request of the Company, in the event that any Store Employees discontinue their services during the Sale Term, the Consultant agrees to supplement or replace such Store Employees as deemed necessary upon approval by the Company.  Any such incremental expenses arising therefrom shall be deemed to be Sale Expenses.

**6.     [Intentionally Omitted]**

**7.     <u>Representation And Warranties</u>**

7.1     <u>Representation And Warranties of Consultant</u>:   Consultant hereby represents, warrants and covenants in favor of Company as follows:

(a)     Consultant is a company duly organized, validly existing, and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and Consultant has taken all necessary action required to authorize the execution, performance and delivery of this agreement, and to consummate the transactions contemplated hereby.

(b)     Upon execution by the parties hereto, this Agreement is a valid and binding obligation of Consultant enforceable in accordance with its terms.

(c)     No action or proceeding has been instituted or, to Consultant's knowledge, threatened, affecting the consummation of this Agreement or the transactions contemplated herein.

(d)     Except as provided in the Sale Guidelines, Consultant will comply with and act in accordance with any and all applicable state and local laws, rules and regulations and other legal obligations of all governmental authorities and the terms/restrictions of the underlying Store leases.

7.2     <u>Representations And Warranties Of Company</u>: The Company hereby represents, warrants and covenants in favor of Consultant as follows:

(a)     Company is a company duly organized, validly existing, and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and Company has taken all necessary action required to authorize its execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby.

(b)     Upon execution by the parties hereto, this Agreement is a valid and binding obligation of the Company enforceable in accordance with its terms, subject only to any applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally, including the approval or assumption of the agreement by the bankruptcy court in the event of any bankruptcy filing by the Company, and the availability of equitable remedies.

(c)     No action or proceeding has been instituted or, to Company's knowledge, threatened, affecting the consummation of this Agreement or the transactions contemplated herein.

(d)     Company has maintained its pricing files pertaining to the Sale in the ordinary course of business, and prices charged to the public for goods pertaining to the Sale are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files, records, and information received by Consultant are true and accurate in all material respects.

## 8.     **Affirmative Duties Of Consultant**

8.1     To the extent necessary, Consultant shall assist Company in obtaining all required permits and governmental consents required in order to conduct the Sale, and shall ensure that the Sale is conducted in accordance with all applicable laws, regulations and ordinances.

8.2     The Consultant shall indemnify and hold Company and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors (collectively, "Company Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(i)     Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(ii)     any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Company (including, without limitation, any Store Employees) by Consultant or any of Consultant's representatives (including, without limitation, any Supervisor);

(iii)     any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Company or Company Indemnified Parties or from a breach of the terms hereof by Company;

(iv)     any consumer warranty or products liability claims relating to any Additional Merchandise; and

(v)     the negligence, willful misconduct or unlawful acts of Consultant or any Supervisor or any of their respective officers, directors, employees, agents or representatives; provided that Consultant shall not be obligated to indemnify any Company Indemnified Party from or against any claims, demands, penalties, losses, liability or damages arising primarily from any Company Indemnified Party's gross negligence, willful misconduct or unlawful act.

8.3     Consultant shall comply with applicable federal, state and local laws, rules and regulations and any other rules and regulations contained in any documents of record. To the extent that the Company receives a notice of a violation, the Company and Consultant shall respond to such notice

9

in order to address the issues but if it the issue can not be satisfactory resolved the parties shall  use their reasonable efforts  to rectify the violation  within 10 days.

8.4    Consultant shall conduct the Sale in accordance with the terms of this Agreement and the Sale Guidelines.

8.5    Consultant will not take any disciplinary action against any employee of the Company.

9.    **Additional Merchandise**.

(a)    Upon prior written approval by the Company, Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale at the Stores with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise in the Sale at the Stores ("Additional Merchandise").  The Additional Merchandise shall be purchased by Consultant as part of the Sale and delivered to the Stores at Consultant's sole expense (including as to labor, freight and insurance relative to shipping such Additional Merchandise to the Stores).  Sales of Additional Merchandise shall be run through Company's cash register systems; provided, however, that Consultant shall mark the Additional Merchandise using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Merchandise from the sale of Merchandise.

(b)    Consultant may obtain Additional Merchandise on consignment from rug vendor or other consignees (the "Additional Merchandise Consignment").

(c)    Consultant and Company intend that the transactions relating to the Additional Merchandise are, and shall be construed as, a true consignment from Consultant to Company in all respects and not a consignment for security purposes.  At all times and for all purposes the Additional Merchandise and their proceeds shall be the exclusive property of Consultant, and no other person or entity shall have any claim against any of the Additional  Merchandise or their proceeds. The Additional Merchandise shall at all times remain subject to the exclusive control of Consultant.

(d)    Company shall, at Consultant's sole cost and expense, insure the Additional Merchandise and, if required, promptly file any proofs of loss with regard to same with Company's insurers. Consultant shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Merchandise.

(e)    Company acknowledges that the Additional Merchandise shall be consigned to Company as a true consignment under Article 9 of the Code.  Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Merchandise and (ii) the Additional Merchandise proceeds, which security interest shall be deemed perfected pursuant to the Approval Order, if any and Consultant shall file UCC financing statements or providing notifications to any prior secured parties (provided that Consultant is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC

10

identifying Consultant's interest in the Additional Merchandise as consigned goods thereunder and the Company as the consignee therefor, and Consultant's security interest in and lien upon such Additional Merchandise and Additional Merchandise proceeds).

(e)   At all times and for all purposes the Additional Merchandise and their proceeds shall be the exclusive property of Consultant, and no other person or entity shall have any claim against any of the Additional Merchandise or their proceeds. Consultant shall pay the Company (or the Company shall retain) 50% of Additional Merchandise Net Proceeds and 50% of Additional Merchandise Net Proceeds, shall be retained by the Consultant (or the Company shall pay Consultant). For the avoidance of doubt, Additional Merchandise Net Proceeds shall not include Consultant License Fee.

## 10.   **Affirmative Duties Of Company**

10.1   Company shall be solely liable for, and shall pay when due (except as provided in this Section 10.1) the following: (i) all Store-level operating expenses, Central Service expenses, and related expenses (including, without limitation, Sale Expenses and Owned FF&E sale-related expenses (subject to the FF&E Budget), but excluding (x) Consultant Incurred Expenses in excess of the amounts set forth in the Budget (unless otherwise agreed to by Company in writing) and (y) FF&E expenses in excess of the amounts set forth on the FF&E Budget (unless otherwise agreed to by Company in writing), which are necessary to conduct, or incurred in the conduct of, the Sale or Company's businesses, including, without limitation, all taxes, costs, expenses, accounts payable and other liabilities relating to the Sale, the Stores, Store Employees, any other agents and representatives of Company, and/or Company's businesses; and (ii) Consultant's Base Fee and FF&E Fee.

10.2   Company shall prepare and process all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes to the appropriate taxing authorities; and Company shall pay the same when due. Consultant shall provide all assistance reasonably required or requested by Company in connection with the preparation and processing of any such reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes to the appropriate taxing authorities.

10.3   Without limiting any other term or provision of this Agreement, during the Sale Term, Company shall provide Consultant, with (i) Central Services; (ii) employees at the Stores necessary or appropriate to implement and conduct the Sale, subject to Section 5.2 above, and (iii) peaceful use and occupancy of, and reasonable access (including reasonable before and after hours access and normal utilities/phone service) to, the Stores and Company's corporate offices for the purpose of preparing for, conducting, and completing the Sale as contemplated hereby.

10.4   Unless modified by the Company, the Company and the Consultant shall honor gift cards and merchandise credits at the Stores in accordance with store-level operation procedures to be mutually agreed upon between Company and the Consultant. No gift cards shall be sold from the Stores during the Sale Term.

10.5    Company shall collect all sales, excise, or gross receipts taxes and shall be solely responsible for reporting and paying the same to the appropriate taxing authorities in accordance with applicable law; provided that Consultant shall provide all assistance reasonably required or requested by Company in connection with the preparation and processing of any such reports, forms, certificates, and other documentation required in connection with the payment of all applicable taxes to the appropriate taxing authorities.

10.6    Unless modified by the Company, the Company and the Consultant shall accept returns of inventory ("Returned Merchandise") sold and delivered to customers prior to the Sale Commencement Date in a manner consistent with Company's customary practices and policies in effect on the Sale Commencement Date.  All customer requests for cash refunds or merchandise credits with regard to sales completed prior to the Sale Commencement Date shall be processed exclusively through Company's point of sale system.  All Returned Merchandise, to the extent it is not defective, shall be included as Merchandise.

10.7    Company shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Consultant Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

        (i)    Company's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered in connection herewith;

        (ii)    any failure of Company to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term;

        (iii)    any consumer warranty or products liability claims relating to any Merchandise;

        (iv)    any liability or other claims asserted by customers, any of Company's employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); except where due to the negligence, willful misconduct or unlawful acts of Consultant or from a breach of the terms hereof by Consultant;

        (v)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by Company or any of Company's employees, agents, or representatives (including, without limitation, any Company employees); and

        (vi)    the negligence, willful misconduct or unlawful acts of Company or any of its officers, directors, employees, agents or representatives; provided that Company shall not be obligated to indemnify any Consultant Indemnified Party from or against any claims, demands, penalties, losses, liability or damages arising primarily from any Consultant Indemnified Party's gross negligence, willful misconduct or unlawful act.

10.8    In the event of a filing of petition for reorganization is filed by or against the Company, the Company shall file a motion pursuant to Section 363 (or 365 in the case the agreement is in effect prior to the filing) of the Bankruptcy Code (the "Store Closing Sale Motion") seeking entry of an order (the "Approval Order") which shall be in form and substance reasonably acceptable to the Company and Consultant: (a) approving of assuming this Agreement, (b) approving the Company's retention and employment of Consultant to perform the Services contemplated by this Agreement, (c) the payment of the Base Fee, the Consultant's Additional Merchandise Fee and reimbursement of Consultant Expenses (the "Consultant Payments") to Consultant are approved without further order of the Bankruptcy Court and shall be free and clear of all liens, claims and encumbrances; (d) all payments of the the Consultant Payments shall be made without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (e) approval of the inclusion of the Additional Merchandise, (f) the payment of the Consultant Payments shall be made out of proceeds and need not be in adherence with or superseded by, any approved debtor-in-possession, cash collateral, or other post-petition financing budget which agreements shall provide for the payment of fees and expenses owed to the Consultant without regard to any budget restrictions and expressly provide the Consultant with the ability to terminate or suspend this obligations under this Consulting Agreement without any liability in the event the Consultant payments are not timely paid; (g) authorizing Company's conduct of the Sale, without necessity to comply with state and local laws, rules and regulations, including, but not limited to, licensing requirements, purporting to restrict the conduct of the Sale, (h) authorizing Company's conduct of the Sale notwithstanding any restrictive provisions in any Store lease or occupancy agreement that purport to preclude or restrict the conduct of the Sale at the Stores or the necessity of obtaining any third party consents, and (f) such other terms and provisions as may be necessary or appropriate to facilitate the conduct of the Sale. The approval of the payment of the Consultant Payments provided in the Approval Order shall govern over any dip or cash collateral order.

11.    **Insurance; Risk of Loss**

11.1    Company shall maintain throughout the Sale Term, (i) insurance with respect to the Merchandise at the Stores and any storage facility in amounts and on such terms and conditions as are consistent with Company's ordinary course operations and (ii) casualty and liability insurance policies (including, but not limited to, product liability, comprehensive public liability insurance, auto liability insurance on an occurrence basis in an amount of at least $1,000,000 per occurrence and $2,000,000 in the aggregate and umbrella coverage of at least $5,000,000 covering injuries to persons and property in or in connection with the operation of the Stores, and shall cause Consultant to be listed as an additional insured with respect to all such policies. Company shall be responsible for the payment of all deductibles, self-insurance and other amounts payable in connection with any claim asserted under such policies, except for any claims arising directly from the negligence, willful misconduct or unlawful acts of Consultant or Supervisors, or their employees, representatives, or agents. Additionally, throughout the Sale Term, the Company shall maintain, in such amounts as it currently has in effect, workers' compensation insurance in compliance with all applicable statutory requirements.

11.2    Consultant shall maintain, throughout the Sale Term, casualty and liability insurance policies (including, but not limited to, comprehensive public liability insurance, auto liability insurance and workers' compensation, statutory disability and employer's liability insurance) covering injuries to persons and property in or in connection with the operation of the Stores on an occurrence basis in an amount of at least $1,000,000 per occurrence and $2,000,000 in the aggregate and umbrella coverage of at least $5,000,000, and shall cause Company to be named an additional insured with respect to such policies.

11.3    Except as set forth in Section 8.2, the Company and the Consultant agree that Company shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Stores before, during and after the Sale Term, except to the extent any such claim arises from the negligence, willful misconduct, or unlawful acts of the Consultant or any Supervisor engaged by Consultant under the terms of this Agreement.

12.    **Miscellaneous**

12.1    Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by facsimile or by prepaid registered or certified mail, addressed as follows:

| | |
|---|---|
| If to the Company: | American Signature, Inc.<br>4300 E Fifth Ave.<br>Columbus, Ohio 43219Att. CFO |
| | Chief Legal Officer<br>Attn: Eric Jackson<br>      Tod Friedman<br>Email: Eric.Jackson@americansignature.com<br>Tod.friedman@spgroup.com |
| If to the Consultant: | SB360 CAPITAL PARTNERS, LLC<br>Attn: Aaron Miller<br>      Siegfried Schaffer<br>Email: Amiller@SB360.com<br>      Zschaffer@SB360.com |

12.2    Governing Law.    This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of Ohio, without reference to any conflict of law provisions.

12.3    Severability.    In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

14

12.4    Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect of the subject matter hereof and supersedes all prior negotiations and understandings and can only be modified by a writing signed by the Company and the Consultant.

12.5    Assignment. Neither Company nor Consultant shall assign this Agreement without the express written consent of the other. This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns. Notwithstanding the foregoing, the Consultant is authorized to utilize subcontractors in performing the Services; provided, however, the Consultant shall remain responsible for the performance of all Services. Moreover, Consultant shall have the right, in its sole discretion, to syndicate such transaction with (and to add as part of Consultant hereunder) one or more additional national inventory liquidation firms.

12.6    Counterparts. This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument. Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

12.7    Independent Contractor. Nothing contained herein shall be deemed to create any relationship between the Company and the Consultant other than that of an independent contractor. It is stipulated that the parties are not partners or joint ventures.

12.8    Termination. This Agreement shall terminate upon the completion and approval of the Final Settlement (as provided in Section 4.2 above); provided, however, that either party may terminate this Agreement in the event that the other commits a material breach or material failure of its obligations hereunder. If either party seeks to terminate this Agreement by reason of a claim of a material breach or material failure, such party shall provide the other party with not less than five (5) days' prior written notice stating with specificity the nature of the claimed material breach or material failure, and the party receiving such notice shall have five (5) business days in which to cure such material breach or material failure, failing which this Agreement shall be deemed terminated. In the event this Agreement is terminated by Consultant on account of a material breach or material failure by Company, Consultant shall be entitled to be paid any Base Fee, and the FF&E Fee earned and accrued through the date of termination, together with reimbursement of any Sale Expenses or FF&E sale-related expenses incurred in conformity with the Budget and FF&E Budget, respectively, through the date of such termination.

12.9    Confidentiality. All information of a business nature relating to the pricing, sales, promotions, marketing, assets, liabilities or other business affairs of Company, its customers, parent, subsidiary or other affiliated entities (for purposes of this provision, all such entities are included within each reference to "Company") is Company's confidential, trade secret information ("Company Confidential Information"), which is and shall remain the exclusive intellectual property of Company. Consultant shall not divulge, furnish, make available or in any other manner disclose such information to any third party other than Consultant's officers, employees, representatives and agents. Consultant shall take and shall cause its officers, employees, representatives and agents to take such action as shall be reasonably necessary or advisable to preserve and protect the confidentiality of Company Confidential Information. Consultant agrees to maintain strict confidentiality and agrees that it may use Company Confidential Information

15

only as reasonably necessary to the performance of its obligations related to the Sale. Notwithstanding the foregoing, Company hereby agrees that Consultant may identify Company as a Consultant customer for which Consultant has provided services for purposes of promoting its business.

12.10   Force Majeure. If any casualty or act of God, war, or terrorism or acts of violence substantially inhibits the conduct of business in the ordinary course at any Store(s), then the subject location(s) and the remaining Merchandise located thereat shall be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Consultant shall have no further rights or obligations hereunder with respect thereto; provided, however, that the proceeds of any insurance attributable to Merchandise or proceeds from business interruption insurance shall constitute proceeds of the Sale hereunder for purposes of calculating Gross Proceeds and any Base Fee.

12.11   Disclosures. Consultant and the Company are both part of the Schottenstein family of companies. Second Avenue Capital Partners LLC ("SACP"), an affiliate of Consultant is Administrative Agent, Collateral Agent and Lender to the Company in connection with its Credit Agreement. Tower Hill Advisory Services, LLC, also an affiliate of Consultant has been retained by SACP to appraise the inventory. Consultant and the Company are parties to a Consignment Agreement with respect to certain inventory.

[SIGNATURES APPEAR ON NEXT PAGE]

16

IN WITNESS WHEREOF, the Company and the Consultant have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**American Signature, Inc.**

By: _____
Name: Eric Jackson
Its: CFO

**SB360 Capital Partners, LLC**

By: _____
Name: Aaron Miller
Its: President

**Exhibit A Store Closing Stores**

| Store | Sale Termination Date |
|---|---|

**American Signature**
**First 5 GOB Stores Detail**

| | Store # | Store Name | Lease End Date | Address | City | State | ZIP | Sale Start Date | Sale End Date | Sale Duration |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.) | 81 | Charlotte #1 | 4/30/2026 | 2320 Sardis Road North | Charlotte | NC | 28227 | 10/16/2025 | 1/28/2026 | 105 Days |
| 2.) | 400 | Nashville | 4/30/2028 | 1777 Galleria Blvd | Franklin | TN | 37067 | 10/16/2025 | 1/28/2026 | 105 Days |
| 3.) | 401 | Madison | 4/30/2028 | 2130 Gallatin Pike North | Madison | TN | 37115 | 10/16/2025 | 1/28/2026 | 105 Days |
| 4.) | 445 | Governors Square | 1/31/2030 | 2821 Wilma Rudolph Blvd | Clarksville | TN | 37040 | 10/16/2025 | 1/28/2026 | 105 Days |
| 5.) | 446 | Murfreesboro | 4/30/2029 | 2075 Old Fort Parkway | Murfreesboro | TN | 37129 | 10/16/2025 | 1/28/2026 | 105 Days |

## Exhibit 2

**First Amendment**

1

## AMENDMENT NO. 1 TO CONSULTING AGREEMENT

This Amendment No. 1 to  Consulting Agreement made as of November 5, 2025 (this "Agreement") is made by and between American Signature, Inc. (the "Company") and SB360 Capital Partners, LLC (the "Consultant").

## R E C I T A L S:

WHEREAS, the Company and Consultant  are parties to  the Consulting Agreement dated as of September 19, 2025 (the "Consulting Agreemeent") in connection with the liquidation of Stores to be designated and the Company and the Company and Consultant  desire to amend the Consulitng Agreement reflecting the terms herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Incorporation of Terms. All capitalized terms shall have the same meanings as ascribed thereto in the Consulting Agreement unless the same shall be expressly amended and modified by the terms of this Amendment.

2.    Definitions For the purposes of this Amendment, the following  terms shall be deleted:

~~"Additional Merchandise Expenses" shall mean the cost of obtaining the Additional Merchandise (including freight, shipping related labor, cost of capital, and insurance) the cost of ticketing the Additional Merchandise, cost of insurance for Additional Merchandise and other expenses incurred by Consultant which are attributable to the purchase and sale of the Additional Merchandise. The Consultant shall make all records and reports pertaining to Additional Merchandise Expenses available to Company during regular business hours upon reasonable notice.~~

~~"Additional Merchandise Proceeds" shall mean the aggregate of (i) the total amount (in dollars) of all sales of Additional Merchandise during the Sale Term, exclusive of sales taxes; (ii) all proceeds of  insurance for loss or damage to Additional Merchandise arising from events occurring during the Sale Term relating to the Additional Merchandise; and (iii) the amount of honored customer deposits, honored discount coupons, store credits, gift certificates, loyalty program benefits and frequent shopper certificates, exclusive of all applicable sales taxes, utilized during the Sale Term relating to Additional Merchandise. The Consultant shall make all records and reports pertaining to Additional Merchandise Proceeds available to Company during regular business hours upon reasonable notice.~~

~~"Additional Merchandise Net Proceeds" shall mean the Additional Merchandise Proceeds minus the Additional Merchandise Expenses.~~

3.    Sale Expenses.

Add a Section 3.2 as follows:

"Prepayment.  Concurrently with the execution of this Amendment, the Company shall fund to Consultant a retainer of $125,000 (the "Prepayment") which shall be held by Consultant until the Final Settlement. The Company shall not apply the Prepayment to, or otherwise offset any portion of the Prepayment against, any weekly reimbursement, payment of Consultant Expenses or other amount owing to Consultant under this Agreement prior to the final reconciliation. Without limiting any of Consultant's other rights, Consultant may apply the Prepayment to any unpaid obligation owing by the Company to Consultant under the Consulting Agreement. Any portion of the Prepayment not used to pay amounts explicitly contemplated by the Consulting Agreement shall be returned to the Company within three (3) days following the Final Settlement.

In anticipation of the possibility of future store closings, the Company would like to order sign packages to be prepared to close additional stores.  The Company will notify the Consultant when to order signs and at that time  the Company shall fund to Consultant a payment of $800,000 to be earmarked for the purchase of signage for additional stores. The Company shall own the signs purchased to be utilized in connection with the closing of future stores."

4.      Additional Merchandise.

(e)      delete Section 9(e):  ~~Consultant shall pay the Company (or the Company shall retain) 50% of Additional Merchandise Net Proceeds and 50% of Additional Merchandise Net Proceeds, shall be retained by the Consultant (or the Company shall pay Consultant).~~  and replace with:  Consultant shall pay to Merchant an amount equal to seven percent (7.0%) percent of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Merchandise (the "Additional Merchandise Fee") and Consultant shall retain all remaining amounts from the sale of the Additional Merchandise. Consultant shall pay Merchant its Additional Merchandise Fee in connection with each Weekly Sale Reconciliation with respect to sales of Additional Merchandise sold by Consultant during each then prior week.

5.      Insert Section 10.9. Pre-Sale Orders and Expenses.

(a)      The Company shall retail all responsibility for satisfying all customer orders for which a deposit was made prior to the start of the Sale (the "Pre-Sale Orders") or otherwise resolving those deposits.

(b)      Subject to the provisions of this Section 8.10, during the first eighteen (18) days of the Sale Term ("On Hand Fulfillment Order Deadline") Agent shall assist Company in connection with its efforts to fulfill certain orders placed with Company prior to the Sale Commencement Date for which the Company has received deposits from the affected customer(s) and with respect to which all of the goods related to such orders are on hand and fully reserved at the Closing Locations as of the Sale Commencement Date or which are received by Company into inventory on or before the On Hand Fulfillment Order Deadline. The Fulfillment Merchandise related to On Hand Fulfillment Orders shall be electronically earmarked to fill the respective On Hand Fulfillment Orders in a manner to be agreed upon by Company and Agent. Agent shall use reasonable efforts to fulfill and deliver the On Hand Fulfillments Orders.. Any additional funds received from customers on account of the On Hand Fulfillment Orders, net of the Pre-Sale Order

Expenses (provided for in Section 8.10(c) below) and  Fulfillment Processing Expenses, shall be remitted to Company on a weekly basis and included in the weekly reconciliation prepared pursuant to Section 8.7(a) hereunder.

(c)     All expenses incurred in connection with fulfilling such Pre-Sale Order, including but not limited to,  Sales Taxes, credit card fees, labor and delivery and all sales commissions attributable to the Fulfillment Merchandise shall be borne and paid by Company and Company shall pay or reimburse Agent for  (i) the any billed freight of the Fulfillment Merchandise required to fulfill said Pre-Sale Orders, (ii) any and all out-of-pocket expenses incurred by Agent to complete said Pre-Sale Orders, including, without limitation, any transfer expenses between locations, sales tax, credit card fee or finance fees, sales personnel commission, preparation work, refinishing, administrative matters and salaries and wages relating to the completion and delivery of the Fulfillment Merchandise for such Pre-Sale Orders, and (iii) a commission to Agent of  two percent (2.0%) percent of the gross sales amount (excluding sales tax and delivery charges) for handling said Pre-Sale Orders (the and commissions (collectively, the "<u>Fulfillment Processing Expenses</u>").

**[SIGNATURES APPEAR ON NEXT PAGE]**

IN WITNESS WHEREOF, the Company and the Consultant have executed this Amendment or caused this Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

**American Signature, Inc.**


By:_____
Name:
Its:


**SB360 Capital Partners, LLC**

By:_____
Name: Aaron Miller
Its: President

**Exhibit A**
**Store List**

| STORE # | STORE | LOCATION | ADDRESS | CITY | STATE | ZIP | SQ FT | Commencement Date | Termination Date |
|---|---|---|---|---|---|---|---|---|---|
| 412 | American Signature Furniture | Tropicaire | 7775 SW 40th Street | Miami | FL | 33155 | 50,000 | 11/13/2025 | 1/7/2026 |
| 443 | American Signature Furniture | Alpharetta | 7461 North Point Parkway | Alpharetta | GA | 30022 | 41,750 | 11/13/2025 | 1/7/2026 |
| 420 | American Signature Furniture | Camp Creek | 3755 Carmia Drive SW Suite 1000 | Atlanta | GA | 30331 | 50,134 | 11/13/2025 | 1/7/2026 |
| 418 | American Signature Furniture | Duluth | 3900 Venture Drive | Duluth | GA | 30096 | 55,727 | 11/13/2025 | 1/7/2026 |
| 413 | American Signature Furniture | Kennesaw | 840 Ernest W Barrett Parkway NW Suite 250 | Kennesaw | GA | 30144 | 50,000 | 11/13/2025 | 1/7/2026 |
| 448 | American Signature Furniture | Lithonia | 2918 Turner Hill Road | Lithonia | GA | 30038 | 49,319 | 11/13/2025 | 1/7/2026 |
| 431 | American Signature Furniture | Southlake | 1972 Mt Zion Road | Morrow | GA | 30260 | 40,500 | 11/13/2025 | 1/7/2026 |
| 433 | American Signature Furniture | Smyrna | 2540 Cumberland Boulevard SE | Smyrna | GA | 30080 | 42,934 | 11/13/2025 | 1/7/2026 |
| 148 | Value City Furniture | Gurnee Mills | 6116 Grand Avenue | Gurnee | IL | 60031 | 80,158 | 11/13/2025 | 1/7/2026 |
| 21 | Value City Furniture | Clarksville | 945 East Lewis and Clarke Parkway | Clarksville | IN | 47129 | 27,277 | 11/13/2025 | 1/7/2026 |
| 56 | Value City Furniture | South Bend | 5865 Grape Road | Mishawaka | IN | 46545 | 58,152 | 11/13/2025 | 1/7/2026 |
| 51 | Value City Furniture | Dixie - Louisville | 9070 Dixie Highway | Louisville | KY | 40258 | 38,848 | 11/13/2025 | 1/7/2026 |
| 163 | Value City Furniture | Rockville | 12055 Rockville Pike | Rockville | MD | 20852 | 48,070 | 11/13/2025 | 1/7/2026 |
| 177 | Value City Furniture | Ann Arbor | 425 East Eisenhower Parkway | Ann Arbor | MI | 48108 | 69,911 | 11/13/2025 | 1/7/2026 |
| 172 | Value City Furniture | Clinton | 33801 Southbound Gratiot Avenue | Clinton Twp | MI | 48035 | 69,260 | 11/13/2025 | 1/7/2026 |
| 101 | Value City Furniture | Dearborn | 5701 Mercury Drive | Dearborn | MI | 48126 | 50,591 | 11/13/2025 | 1/7/2026 |
| 174 | Value City Furniture | Lansing | 8748 West Saginaw Highway | Lansing | MI | 48917 | 109,297 | 11/13/2025 | 1/7/2026 |
| 171 | Value City Furniture | Chesterfield | 50400 Gratiot Avenue | New Baltimore | MI | 48051 | 73,151 | 11/13/2025 | 1/7/2026 |
| 175 | Value City Furniture | Novi - New | 27775 Novi Road | Novi | MI | 48377 | 102,600 | 11/13/2025 | 1/7/2026 |
| 181 | Value City Furniture | Portage | 550 Ring Road | Portage | MI | 49024 | 50,686 | 11/13/2025 | 1/7/2026 |
| 102 | Value City Furniture | Chippewa | 7077 Chippewa Street | St. Louis | MO | 63119 | 70,920 | 11/13/2025 | 1/7/2026 |
| 124 | Value City Furniture | Amherst | 4220 Maple Road | Amherst | NY | 14226 | 50,858 | 11/13/2025 | 1/7/2026 |
| 76 | Value City Furniture | Buffalo Thruway | 800 Thruway Plaza Drive | Cheektowaga | NY | 14225 | 49,872 | 11/13/2025 | 1/7/2026 |
| 71 | Value City Furniture | Centerville - Dayton | 2070 Miamisburg Centerville Road | Centerville | OH | 45459 | 51,282 | 11/13/2025 | 1/7/2026 |
| 80 | Value City Furniture | Eastgate | 650 Eastgate South Drive Suite A | Cincinnati | OH | 45245 | 48,065 | 11/13/2025 | 1/7/2026 |
| 92 | Value City Furniture | Mechanicsburg | 6520 Carlisle Pike Suite 400 | Mechanicsburg | PA | 17050 | 50,377 | 11/13/2025 | 1/7/2026 |
| 109 | Value City Furniture | Newport News | 12149 Jefferson Avenue | Newport News | VA | 23602 | 55,800 | 11/13/2025 | 1/7/2026 |
| 129 | Value City Furniture | Richmond | 9110 West Broad Street | Richmond | VA | 23294 | 62,781 | 11/13/2025 | 1/7/2026 |

28    Store Count

## Exhibit B

### Supplemental Store Form

This is Exhibit B to the agreement of SB360 Capital Partners, LLC ("Consultant") and The Company dated as of September 19, 2025 (the "Agreement").

Unless otherwise modified herein, the terms of the Agreement are in full force and effect.

The Company designates the stores attached hereto as Stores subject to this Agreement.

The term "Sale Term" with respect to each of the Stores shall commence on November 13, 2025 (the "Sale Commencement Date") and shall end with respect to each respective Store no later than the dates set forth on the attached (the "Sale Termination Date"); provided, however, that the Company and Consultant  may decide on an earlier or later "Sale Commencement Date" or "Sale

Attached hereto is an expense budget for the "Consultant Expenses" for the additional Closing Stores.

**Exhibit D**
**Budget**

| Supervision Expense | | |
|---|---|---|
| **Title** | **# of Personnel** | **Total Supervision Expense** |
| Store Supervisors | 12 | $644,143 |
| Startup Supervisors | 2 | 37,700 |
| Operations Lead | 1 | 55,800 |
| F&A | 1 | 55,800 |
| **Total** | **16** | **$793,443** |

| Advertising Expense | |
|---|---|
| **Type of Advertising** | **Total Advertising Expense** |
| Interior Signs and Exterior Banners | $182,980 |
| Sign walker Program | 235,200 |
| Advertising | 604,800 |
| **Total** | **$1,022,980** |

| Other Expense | |
|---|---|
| **Type of Expenses** | **Total Other Expense** |
| Professional Expense | $10,000 |
| **Total** | **$10,000** |
| **Grand Total** | **$1,826,423** |

Notes:

1. Assumes a standard industry rate of 50% for deferred compensation.

2. Assumes an Operations Lead to oversee sale operations remotely and in the field for the duration of the sale term.

3. Assumes 1 F&A to manage financial operations for the duration of the sale term.

4. Assumes 2 Startup Supervisors in the field across the 28-stores on a discretionary basis for a total of 21 days throughout the sale term.

5. The expense budget contemplates a sale term of November 13, 2025 through January 07, 2026. The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.

6. The expense budget is specific to the 28 stores as listed on Exhibit A. To the extent additional stores are added, the budget would be subject to modification.

7. Any legal expenses associated with issues raised by or disputes with landlords, including (without limitation) negotiations in respect of landlord side letters, and / or a insolvency proceeding shall be in addition to and not part of the budgeted expenses.

**Exhibit 3**

**Sale Guidelines**

## Sale Guidelines[1]

1. The Sales shall be conducted so that the Closing Stores in which sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Closing Stores.

2. The Sales shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Debtors had been operating such Closing Store on a Sunday prior to the commencement of the Sales.

3. On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Closing Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Closing Store is located; *provided* that the Consultant may solicit customers in the Closing Stores themselves. On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4. The Debtors and the Consultant shall have the right to use and sell the Store Closure Assets and the Additional Merchandise. The Debtors and the Consultant may advertise the sale of the Store Closure Assets and the Additional Merchandise in a manner consistent with these Sale Guidelines. The purchasers of any of the Store Closure Assets and the Additional Merchandise sold during the Sales shall be permitted to remove the Store Closure Assets and the Additional Merchandise either through the back or alternative shipping areas at any time, or through other areas after store business hours; *provided*, *however*, that the foregoing shall not apply to the sale of de minimis Store Closure Assets and Additional Merchandise, whereby the item(s) can be carried out of the store in a shopping bag.

5. At the conclusion of the Sale, the Consultant shall vacate the Closing Stores; *provided* that Consultant may abandon any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property) ("FF&E") not sold in the Sales at the conclusion of the Sales (the "Termination Date"), without cost or liability of any kind to the Consultant. The Consultant shall notify the Debtors of its intention to abandon any FF&E at least two days prior to the Termination Date. The Debtors will have the option to remove the FF&E at its own cost prior to the Termination Date. Any abandoned FF&E left in a Closing Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors. For the avoidance of doubt, as of the Termination Date, the Consultant and the Debtors may abandon any FF&E in place and without further responsibility or liability of any kind.

6. The Consultant may advertise the Sales as "store closing", "sale on everything", "everything must go", "everything on sale" or similar-themed sales. The Consultant may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale

---

[1] Capitalized terms used in these Sale Guidelines have the meanings given to them in the *[Motion]*

Guidelines. All signs, banners, ads and other advertising material, promotions, and campaigns will be approved by the Debtors, prior to purchase, in accordance with these Sale Guidelines.

7. The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Consultant and the Debtors shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Consultant and the Debtors shall be permitted to utilize exterior banners at (i) non-enclosed mall Closing Stores and (ii) enclosed mall Closing Stores to the extent the entrance to the applicable Closing Store does not require entry into the enclosed mall common area; *provided*, *however*, that such banners shall be located or hung so as to make clear that the Sales are being conducted only at the affected Closing Store, and shall not be wider than the storefront of the Closing Store. In addition, the Consultant and the Debtors shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Consultant and the Debtors any additional restrictions not contained in the applicable lease agreement.

8. Conspicuous signs shall be posted in the cash register areas of each of the affected Closing Stores to effect that "all sales are final."

9. Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Closing Stores, except as authorized by the applicable lease.

10. The Consultant shall not make any alterations to interior or exterior Closing Store lighting, except as authorized by the applicable lease. No property of the landlord of a Closing Store shall be removed or sold during the Sales. The hanging of exterior banners or in-Closing Store signage and banners shall not constitute an alteration to a Closing Store.

11. The Consultant shall keep Closing Store premises and surrounding areas clear and orderly consistent with present practices.

12. The Consultant, at the direction of the Debtors, and the landlord of any Store are authorized to enter into Side Letters without further order of the Court; *provided* that such agreements do not have a material adverse effect on the Debtors or their estates.

13. Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all FF&E owned by the Debtors (the "Owned FF&E"). The Consultant may advertise the sale of the Owned FF&E in a manner consistent with these guidelines and the Consulting Agreement. The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours; *provided*, *however* that the foregoing shall not apply to de minimis FF&E sales made whereby the item can be carried out of the Closing Store in a

shopping bag. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility, any FF&E.

14. At the conclusion of the Sales at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases. The Debtors, the Consultant, and their agents and representatives shall continue to have access to the Closing Stores, pending assumption or rejection of applicable leases, as provided for in the Consulting Agreement.

15. The rights of landlords against Debtors for any damages to a Closing Store shall be reserved in accordance with the provisions of the applicable lease; *provided* that to the extent certain leases of Closing Stores require written confirmation of receipt of a key to effectuate surrender, this requirement is waived.

16. If and to the extent that the landlord of any Closing Store affected hereby contends that the Debtors or the Consultant are in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Debtors and the Consultant as follows:

> If to Consultant:
>
> > Robert Raskin (Raskin@sb360.com)
>
> with copies (which shall not constitute notice) to:
>
> > Leichtman Law, PLLC
> > 185 Madison Avenue, 15th Floor,
> > New York, NY 10016
> > Attn.: Maura I. Russell, Esq. (mrussell@leichtmanlaw.com)
> >
> > and
> >
> > Morris Nickols Arsht & Tunnel LLP,
> > 1201 North Market Street, 16th Floor,
> > Wilmington, DE 19899-1347
> > Attn.: Derek C. Abbott, Esq. (dabbott@morrisnichols.com)
>
> If to Debtors:
>
> > American Signature, Inc.
> > 4300 E 5th Ave
> > Columbus, OH 43219
> > Attn.: Eric Jackson (eric.jackson@americansignature.com)
>
> with copies (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor, Wilmington, DE 19899
Attn: Laura Davis Jones, Esq. (ljones@pszjlaw.com)
David M. Bertenthal, Esq. (dbertenthal@pszjlaw.com)

17. If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than three business days' written notice to the other party, served by email or overnight delivery.