### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN SIGNATURE, INC., *et al.*,[1] | ) | Case No. 25-12105 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**Objection Deadline: December 5, 2025, at 10:00 a.m. (ET)**
**Hearing Date: December 9, 2025, at 11:00 a.m. (ET)**

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING
BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER
INTO (I) STALKING HORSE ASSET PURCHASE AGREEMENT AND
(II) STALKING HORSE AGENCY AGREEMENT AND TO PROVIDE BID
PROTECTIONS THEREUNDER, (C) SCHEDULING AN AUCTION AND APPROVING
THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION
AND ASSIGNMENT PROCEDURES, AND (E) SCHEDULING A SALE HEARING
AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF;
(II)(A) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, INTERESTS, AND ENCUMBRANCES AND (B) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

The above captioned debtors and debtors in possession (the "<u>Debtors</u>" or the

"<u>Company</u>"), hereby file this motion (the "<u>Motion</u>") with the Court for the entry of an order

substantially in the form attached hereto as **<u>Exhibit A</u>**, (the "<u>Bid Procedures Order</u>") approving

bid procedures, substantially in the form attached to the Bid Procedures Order as <u>Exhibit 1</u> (the

"<u>Bid Procedures</u>"), to be used in connection with approval of a stalking horse bid (the "<u>Stalking</u>

<u>Horse Bid</u>"), the terms of which are set forth in that certain *Asset Purchase Agreement*, dated as

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  American Signature, Inc. (6162); American Signature Home Inc. (8573); American Signature USA Inc. (6162); ASI Pure Promise Insurance LLC (6162); ASI Elston LLC (7520); ASI – Laporte LLC (6162); ASI Polaris LLC (6162); ASI Thomasville LLC (6162); and American Signature Woodbridge LLC (6162).  The Debtors' business address is 4300 E. 5th Avenue, Columbus, OH 43235.

of November 25, 2025 (the "Stalking Horse APA") by and between the Debtors and ASI Purchaser LLC (and together with any applicable designee, the "Stalking Horse Buyer") and SEI, Inc. as Guarantor, and the accompanying *Agency Agreement*, dated as of November 25, 2025 (the "Stalking Horse Agency Agreement"), by and between the Debtors and ASI Purchaser LLC (and/or its designee(s)) (the "Stalking Horse Agent") and SEI, Inc. as Guarantor.[2]  The Debtors' assets subject to the transactions contemplated under the Stalking Horse Agency Agreement, pursuant to which the Stalking Horse Bidder will act as the Debtors' agent for the purposes of liquidating their inventory, furniture, fixtures, and equipment at certain stores and distribution centers plus the assets to be sold to the Stalking Horse Bidder under the Stalking Horse APA, which include, *inter alia*, granting the Stalking Horse Bidder designation rights on substantially all of the Debtors' leases and selling to the Stalking Horse Bidder certain of the Debtors' assets, including the Debtors' owned real estate assets, the Debtors' intellectual property, and certain of the Debtors' claims and causes of action and the other assets identified in the Stalking Horse APA, are collectively referred to as the "Aggregate Assets."  The Motion seeks entry of an order (a) approving the Bid Procedures; (b) authorizing the Debtors to provide an expense reimbursement and payment of the Augment Purchase (defined below), as provided in the Stalking Horse APA; (c) scheduling an auction of the Aggregate Assets and scheduling the hearing to approve the sale of the Aggregate Assets; (d) approving the form and manner of notices of the proposed sale hearing, substantially in the form attached to the Bid Procedures Order as Exhibit 2; (e) authorizing procedures governing the potential assumption and assignment of the Debtors' executory contracts and unexpired leases in connection with the sale of the Aggregate Assets,

---

[2]  The Stalking Horse Agent and the Stalking Horse Buyer are collectively referred to as the "Stalking Horse Bidder." The Stalking Horse APA and the Stalking Horse Agency Agreement are collectively referred to as the "Stalking Horse Agreements."

(each a "Potential Assigned Agreement" and together, the "Potential Assigned Agreements"); (f) approving the form and manner of notice to each relevant non-debtor counterparty to a Potential Assigned Agreement of (1) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under an applicable Potential Assigned Agreement and (2) certain other information regarding the potential assumption and assignment of Potential Assigned Agreements in connection with the sale of the Aggregate Assets, substantially in the form attached to the Bid Procedures Order as Exhibit 3; and (g) an order (1) authorizing the sale of the Aggregate Assets free and clear of all liens, claims, interests, and encumbrances provided with such liens, claims, interests and encumbrances to attach to the proceeds of such sale; (2) authorizing the assumption and assignment of Potential Assigned Agreements; and (3) granting related relief.

1.      A copy of the Stalking Horse Agreements are attached hereto as **Exhibit B**, which includes the Stalking Horse APA (without exhibits) and the Stalking Horse Agency Agreement (without exhibits, except for the sale guidelines governing the liquidation of the Debtors' personal property attached as Exhibit 8.1(a) thereto (the "Sale Guidelines")) as Exhibit A to **Exhibit B**, and pursuant to which the Debtors have agreed to sell substantially all the Aggregate Assets, subject to a competitive auction process by which qualified bidders may submit higher and better bids in order to purchase such assets (a "Successful Bidder").

2.      The Debtors believe the proposed Bid Procedures will best facilitate a value maximizing sale of the Aggregate Assets for the benefit of the Debtors' estates.  The Bid Procedures likewise will allow the Debtors additional time to continue to market the Aggregate Assets, receive and evaluate bids, and hold an auction (if necessary) to determine the highest or

otherwise best bid.  In addition, the marketing process and the Bid Procedures proposed herein are aligned with the sale milestones set forth in the proposed Interim DIP Order.[3]

3.      In support of this Motion, the Debtors rely upon the *Declaration of Rudolph Morando in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 5] (the "First Day Declaration").  In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

4.      The United States District Court for the District of Delaware has jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] *Interim Order Under Bankruptcy Code Sections 105, 361, 362, 363, 364, 503, 506, 507 and 552, and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status, and (B) Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and Scheduling Final Hearing, and (V) Granting Related Relief* (the "Interim DIP Order").

7.     The bases for the relief requested herein are sections 105(a), 363(b), 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, 9006-1 and 9013-1(m).

## INTRODUCTION

8.     On November 22, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrent with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

9.     Debtor American Signature, Inc., together with its subsidiaries, is a residential furniture company operating across its Value City Furniture and American Signature Furniture brands and serving as a furniture destination consumers can rely on for style, quality, and value.  Headquartered in Columbus, Ohio, the Company operates more than 120 stores across 17 states, with the largest concentrations in Ohio (20), Michigan (16), and Illinois (11).  The Company employs approximately 3,000 team members.

10.     The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

11.     As described in the First Day Declaration, the Debtors have faced a challenging economic environment exacerbated by high inflation, softer consumer purchases in the furniture environment, and limited liquidity.  In addition, the national housing crisis, rising inflation and higher interest rates, and newly established tariffs have dimmed consumer demand for homeware.  While the Debtors have entered into the Stalking Horse Agreements,[4] the Aggregate Assets remain available for purchase by a Successful Bidder who provides a higher and better offer for all or a portion of all of the Aggregate Assets, including bidders who may wish to continue the Debtors' operations, or who otherwise may which to purchase the Aggregate Assets without the store sales contemplated under the Stalking Horse Agency Agreement.  The Debtors have obtained sufficient postpetition financing to allow them, with the assistance of their professionals, robustly market the sale of the Aggregate Assets through the closing of the sale of the Aggregate Assets to the Stalking Horse Bidder or Successful Bidder.[5]

## RELIEF REQUESTED

12.     Pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Bankruptcy Rules and Local Rules 2002-1,

---

[4] As described in more detail in the First Day Declaration, to, among other things, avoid any potential conflict of interest as a result of the relationship between the Stalking Horse Bidder, on the one hand, and the Debtors, on the other, the board of directors of Debtor American Signature, Inc., constituted a conflicts committee ("Conflicts Committee"), comprised of Adam Zalev (the "Independent Director"), as sole member, and delegated to the Independent Director, among other things, the full power and authority to negotiate, review, approve, and ratify all related party transactions.

[5] On November 24, 2025, the Debtors filed their *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Assume the Consulting Agreement, (B) Conduct Store Closing Cales With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, (C) Modify Customer Programs at the Closing Stores, and (D) Granting Related Relief* (the "Consulting Agreement Assumption Motion") [Docket No. 18].  The Consulting Agreement Assumption Motion relates to store locations in which the Debtors are currently conducting store closing sales and does not relate to Aggregate Assets that are the subject of the Stalking Horse Agency Agreement and this Motion.

6004-1 and 9006-1, the Debtors hereby seek:

(a)    entry of the Bid Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the following relief:

(i)    authorizing and approving the Bid Procedures, substantially in the form attached to the Bid Procedures Order as <u>Exhibit 1</u>, to be used in connection with the sale of Aggregate Assets;

(ii)    establishing the following dates and deadlines in connection with the Bid Procedures:

a.    <u>Bid Deadline</u>: **December 30, 2025, at 4:00 p.m.** (prevailing Eastern time), as the deadline by which all bids to purchase the Aggregate Assets must be actually received by the Debtors pursuant to the Bid Procedures (the "<u>Bid Deadline</u>");

b.    <u>Auction</u>: **January 5, 2026, at 10:00 a.m.** (prevailing Eastern time), as the date by which the Debtors will conduct an auction pursuant to the Bid Procedures (the "<u>Auction</u>"), if necessary;

c.    <u>Sale Objection Deadline</u>: **December 30, 2025, at 4:00 p.m.** (prevailing Eastern time), as the deadline for parties to file objections to proposed sale of the Aggregate Assets to Stalking Horse Bidder or Successful Bidder; and

d.    <u>Sale Hearing</u>: **January 7, 2026**, as the date for the Court to consider approval of the sale of the Aggregate Assets (the "<u>Sale Hearing</u>").

(iii)    authorizing the Debtors to provide the Stalking Horse Bidder, with (A) an expense reimbursement not to exceed $1.5 million on account of expenses incurred by the Stalking Horse Bidder in connection with the sale of the Aggregate Assets (the "<u>Expense Reimbursement</u>"; and (B) to provide for payment of the

Augment Purchase pursuant to the terms of the Stalking Horse APA,[6] together with the Augment Purchase, the "<u>Bid Protections</u>");

(iv)     approving the form and manner of notice of the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bid Procedures Order as <u>Exhibit 2</u> (the "<u>Sale Notice</u>");

(v)     approving procedures for the assumption and assignment of the Potential Assigned Agreements in connection with the sale of the Aggregate Assets) (the "<u>Assumption and Assignment Procedures</u>"); and

(vi)     approving the form and manner of notice to each relevant nondebtor counterparty to a Potential Assigned Agreement (each, a "<u>Counterparty</u>" and, collectively, the "<u>Counterparties</u>") of (A) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under the applicable Potential Assigned Agreements (the "<u>Cure Amounts</u>") and (B) certain other information regarding the potential assumption and assignment of Potential Assigned Agreements in connection with the sale of the Aggregate Assets, substantially in the form attached to the Bid Procedures Order as <u>Exhibit 3</u> (the "<u>Potential Assumption and Assignment Notice</u>").

(b)     following entry of the Bid Procedures Order, approval of an applicable proposed order (each a "<u>Approval Order</u>")[7] at the Sale Hearing for the Aggregate Assets, authorizing and approving the following:

---

[6]  Section 8.2(a)(ii) of the Stalking Horse APA provides that in addition any payments that may be due pursuant to section 8.2(a)(i) of the Stalking Horse APA, if the Stalking Horse APA is terminated pursuant to section 12.1 thereof (other than a termination pursuant to sections 12.1.(c)(i) or 12.1(d)), the Debtors shall purchase from the Stalking Horse Buyer, at cost, the "Additional Agent Goods" (as defined in the Stalking Horse Agency Agreement) acquired by the Stalking Horse Buyer or any designee in connection with the Stalking Horse APA and the Stalking Horse Agency Agreement prior to the date of such termination (the "<u>Augment Purchase</u>").  "Additional Agent Goods" refers to the Stalking Horse Agent's right to purchase additional Merchandise in the Sale (as those terms are defined in the Stalking Horse Agency Agreement) procured by the Stalking Horse Agent which are of like kind, and no lesser quality to the Merchandise in the Sale.  The Additional Agent Goods shall be purchased by the Stalking Horse Agent at the Stalking Horse Agent's sole expense, to the extent provided in section 8.9 of the Stalking Horse Agency Agreement. Section 8.2(a)(ii) of the Stalking Horse APA also provides that the Augment Purchase shall be made on the third Business Day following the consummation of a Subsequent Transaction (as defined in the Stalking Horse APA) solely out of and to the extent of the proceeds of the purchase price received by the Debtors from such Subsequent Transaction, in the manner provided in the Stalking Horse APA.

As set forth in the Bid Procedures, on or prior to December 25, 2025, the Stalking Horse Bidder will notify the Debtors of the amount of the Augment Purchase as of such date, and will also notify the Debtors of any additional Augment Purchases incurred after December 25, 2025, through January 2, 2026.  The Debtors will notify bidders and the DIP Agent of the amounts of Augment Purchases that has been provided them by the Stalking Horse Bidder.

[7]  The Debtors expect to file a form of Sale Order in advance of the Bid Procedures Hearing.

(i)     the sale of the Aggregate Assets pursuant to liquidation sale in accordance with the terms of the Stalking Horse Agency Agreement or to the Stalking Horse Bidder (or its designee) in accordance with the terms of the Stalking Horse APA or, alternatively, to the Successful Bidder (as defined below) free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse Agreements or the asset purchase agreement with the otherwise Successful Bidder, as applicable;

(ii)    authorizing the assumption and assignment of the Potential Assigned Agreements in connection with the sale of the Aggregate Assets); and

(iii)    granting related relief.

**SALE TIMELINE**

13.    The Bid Procedures and the Debtors' proposed timeline for this sale process are a product of good-faith, arm's length negotiations and reflect the best option available for the Debtors to maximize the value of their Aggregate Assets under the circumstances. Specifically, the Debtors have agreed to, among others, the following proposed key dates and deadlines to govern the sale process in the proposed Interim DIP Order (the "Sale Milestones"):[8]

| SALE PROCESS KEY DATES AND DEADLINES | |
|---|---|
| **December 5, 2025, at 4:00 p.m. (prevailing Eastern Time)** | Deadline to object to proposed Bid Procedures (including proposed Bid Protections) and entry of Bid Procedures Order |
| **December 9, 2025** | Hearing to consider approval of Bid Procedures (including proposed Bid Protections) and entry of Bid Procedures Order<br><br>**(**DIP Milestone: Entry of Bid Procedures Order on or before December 9, 2025**)** |
| **On or before three (3) Business Days after entry of Bid Procedures Order** | Deadline for Debtors to file and serve Sale Notice |

---

[8] Capitalized terms used in this Motion but not previously defined herein shall have the respective meanings ascribed to such terms later in this Motion, the Bid Procedures, the Bid Procedures Order, the Stalking Horse APA and the Stalking Horse Agency Agreement, as applicable.

| | |
|---|---|
| **On or before three (3) Business Days after entry of Bid Procedures Order** | Deadline for Debtors to file and serve Potential Assumption and Assignment Notice for Potential Assigned Agreements |
| **As soon as practicable after entry of the Bid Procedures Order, the Debtors may cause the Sale Notice to be published** | Deadline to publish notice of sale of Aggregate Assets |
| **December 23, 2025, at 4:00 p.m.(prevailing Eastern Time)** | Deadline for potential bidders to deliver Preliminary Bid Documents |
| **December 30, 2025, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for parties to file objections to proposed sale of Aggregate Assets to Stalking Horse Bidder or Successful Bidder ("Sale Objection Deadline") |
| **December 30, 2025, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for Counterparties to file objections to Potential Assumption and Assignment Notice for Potential Assigned Agreements |
| **December 30, 2025, at 4:00 p.m. (prevailing Eastern Time)** | Bid Deadline<br><br>(DIP Milestone:  December 30, 2025)<br><br>(DIP Milestone for distribution of Bids to DIP Agent: December 31, 2025) |
| **January 2, 2026** | Deadline to select Qualified Bids |
| **January 2, 2026** | Deadline to notify Bidders if they are selected as Qualified Bidders and provide them with notice of Auction |
| **January 5, 2026, at 10:00 a.m. (prevailing Eastern Time)** | Auction (if necessary)<br><br>(DIP Milestone:  January 6, 2026) |
| **As soon a reasonably practicable following the closing of the Auction but no later than one day following such closing** | Notice of Auction Results |
| **January 7, 2026** | Sale Hearing<br><br>(DIP Milestone:  January 7, 2026) |

| January 8, 2026 | Deadline for entry of Approval Order |
| | (DIP Milestone: January 8, 2026) |
| January 9, 2026 | Deadline to close sale of Aggregate Assets |
| | (DIP Milestone: January 9, 2026) |

14.     As noted above, the Debtors, with the assistance of their advisors, will continue to market the Aggregate Assets to potential purchasers.  As such, the Debtors believe that prospective bidders will have sufficient time and information to conduct the necessary due diligence to submit binding bids in accordance with the timeline proposed herein.

15.     Completion of the sale process in a timely manner will also maximize the value of the Aggregate Assets.  The proposed dates governing the sale of the Aggregate Assets, marketing, and auction process are within the Sale Milestones provided under the Interim DIP Order.  Failure to adhere to the Sale Milestones with respect to the sale of the Aggregate Assets would constitute a default under the Interim DIP Order.  Accordingly, it is in the Debtors' and their stakeholders' best interests to complete a robust sale process as swiftly as possible to consummate the sale of the Aggregate Assets within the parameters set by the Sale Milestones. In view of the foregoing, the Debtors respectfully submit that the Court should grant the relief requested herein and approved proposed timeline for completing the sale, marketing, and auction process for the Aggregate Assets.

## Summary of Terms of the Stalking Horse Agreements[9]

16.     The following chart summarizes the terms and conditions of the Stalking

Horse Agreements and discloses certain information required pursuant to Local Rule 6004-1:

| Provision | Description |
|---|---|
| **Parties to Stalking Horse Agreements** | Stalking Horse Agency Agreement:<br><br>Sellers:  the Debtors<br><br>Agent:  ASI Purchaser LLC (and/or its designee(s))<br><br>Guarantor:  SEI, Inc.<br><br>Stalking Horse APA:<br><br>Sellers:  the Debtors<br><br>Buyer: ASI Purchaser LLC (together with any applicable designee)<br><br>Guarantor:  SEI, Inc. |
| **Sale to Insiders**<br><br>Local Bank. R. 6004-1(b)(iv)(A) | The Stalking Horse Bidder and SEI, Inc. are, directly or indirectly, wholly owned by the Schottenstein family.  In addition, certain of the Debtors' leased stores, distribution centers, and transaction counterparties are owned by entities affiliated with the Schottenstein family.  Each of the Stalking Horse Bidder and SEI, Inc. is therefore an insider of the Debtors. To ensure the fairness of the sale process, the Debtors created the Conflicts Committee comprised of an independent director who, in consultation with its independent professionals and the Debtors' advisors and professionals, determined that the Stalking Horse Bidder proposed a fair bid for the assets to be acquired in the Stalking Horse APA and that entry into the Stalking Horse APA is in the best interests of the estate as it sets a floor price for the Assets and creates a structure around the purchase of the Debtors' assets. At all times, the Stalking Horse Bidder has been represented by separate counsel and negotiations resulting in entry into the Stalking Horse APA have been conducted at arm's-length and in good faith. |
| **Aggregate Assets to Be Sold** | Stalking Horse APA<br><br>Purchase and Sale of the Acquired AssetsUpon the terms and subject to the conditions of this Agreement, on the Closing Date (or (i) with respect to each Acquired Location and related Acquired Assets, on the applicable Lease Assignment Date, (ii) with respect to each Assigned Agreement assumed and assigned pursuant to <u>Section 3.6</u>, the date of such assumption and assignment and (iii) with respect to any Equipment as to which Borrower elects to take ownership pursuant to <u>Section 3.7</u>, as of the date of such election), Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer (or, with respect to any Acquired Lease Premise, the |

---

[9]  The summary of the provisions of the Stalking Horse APA, the Stalking Horse Agency Agreement, the Bid Procedures, and Bid Procedures Order described herein is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between the summary in this Motion and either the Stalking Horse APA, Stalking Horse Agency Agreement, Bid Procedures or Bid Procedures Order, as applicable, those documents shall govern in all respects.

applicable Assignee), and the Buyer (or, with respect to any Acquired Lease Premise, the applicable Assignee) shall purchase, all right, title and interest of Sellers in, to or under all of Sellers' assets (other than the Excluded Assets) (collectively, excluding any Excluded Assets, the "Acquired Assets") to be transferred as of such date (i.e., the Closing Date, or (i) with respect to each Acquired Location and related Acquired Assets, on the applicable Lease Assignment Date, (ii) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment and (iii) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, as of the date of such election) free and clear of any and all Encumbrances of any and every kind, nature and description (including, without limitation, any interests under any IP Licenses), other than Permitted Post-Closing Encumbrances. The Acquired Assets shall include, without limitation, the following assets:

(a) all Intellectual Property, all rights to royalty income associated therewith, all rights to sue and recover damages and profits for past, present and future infringement, misappropriation or other violation thereof, and all rights of priority with respect thereto (with respect to IP Licenses, to the extent transferable) (the "Acquired Intellectual Property");

(b) all Acquired Real Property;

(c) (i) with respect to each Acquired Location, the applicable Acquired Lease, each other Assigned Agreement Primarily Relating to such Acquired Location and all Acquired Lease Rights relating to such Acquired Lease and other Assigned Agreements and (ii) any other Assigned Agreement;

(d) all receivables owed to the Sellers, including, other than any credit card receivables; provided that credit card Proceeds (as defined in the Agency Agreement) shall nevertheless be payable to Agent pursuant to the terms of the Agency Agreement;

(e) all cash in the Stores (as defined in the Agency Agreement) (the "Store-Level Cash");

(f) any Equipment as to which Buyer elects to take ownership pursuant to Section 3.7;

(g) all Acquired Improvements with respect to any Acquired Location or Acquired Real Property;

(h) all signage acquired by the Sellers in connection with any liquidation sale (including, without limitation, pursuant to the Consulting Agreement);

(i) any and all real (including, without limitation, real estate taxes, assessments and related governmental impositions both general and special imposed under the laws of any one or more jurisdictions in which the applicable Lease Premises or Acquired Real Property is located against the land, buildings and other improvements), personal and intangible property Taxes ("Property Taxes") that are prepaid with respect to each Acquired Lease or Acquired Real Property or any other Acquired Assets related to such Acquired Lease or Acquired Real Property;

(j) any interest in or right to any refund, rebate or credit of Taxes (excluding tariffs) and any other choses in action;

(k) the securities accounts maintained with Raymond James under account no. 1893Y370 (the "Specified Account") and all assets held therein;

(m) to the extent permitted by applicable law, all rights (but not obligations) of the Sellers under any non-disclosure or confidentiality, non-compete or non-solicitation agreements, to the extent any such agreement relates to any Acquired Assets;

(n) all assignable Assigned Plans and Permits with respect to any Acquired Location or Acquired Real Property;

(o) all books and records, including, without limitation, files, data, reports, computer codes, sourcing data, advertiser and supplier lists, cost and pricing information, business plans, manuals, blueprints, plans, schematics, reports, research and development files, and other records of any Seller used in, held for use in, or relating to the Acquired Assets or the Assumed Liabilities, other than Retained Books and Records;

(p) any and all keys and security codes relating to any Acquired Location or Acquired Real Property, such Acquired Location's or Acquired Real Property's building systems or any parking or other common areas of any shopping center in which such Acquired Location or Acquired Real Property is located;

(q) any and all rights of the Sellers in and to any security deposits or prepayments, letters of credit, escrow deposits (excluding deposits of other bidders for the Potential Acquired Assets in the Bankruptcy Cases) and cash collateral, including, without limitation, cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit, utility deposits made prior to the Petition Date,  to the performance, payment or surety bonds, credits, allowance, prepaid rent or other assets, charges, setoffs, prepaid expenses, other prepaid items and other security (collectively, "Security Deposits"), together with all contracts, agreements or documents evidencing or related to the same (collectively, "Security Deposit Documents"), in each case to the extent Primarily Related to any Acquired Location;

(r) any and all insurance proceeds, warranty proceeds, condemnation awards or other compensation in respect of loss or damage to any Acquired Location, Acquired Real Property or any other Acquired Asset, to the extent occurring on or after the date hereof, and all right and claim of the Sellers to any such insurance proceeds, warranty proceeds, condemnation awards or other compensation not paid by the applicable Lease Assignment Date with respect to any Acquired Lease Premise, subject to Sections 2.2(a)(v) and 12.3; and

(s) other than the Seller Retained Claims, any and all rights, Claims, Actions, rebates, refunds, causes of action, choses in action, suits or proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable or have been asserted) against any Person, including, without limitation, (i) any and all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise), (ii) any and all Avoidance Actions and (iii) any and all Claims in respect of class actions.

§ 3.1 Stalking Horse APA

Stalking Horse Agency Agreement

Merchandise Subject to This Agreement

(a)  For purposes of this Agreement, "Merchandise" shall mean (A) all finished goods inventory located at the Stores as of the Sale Commencement Date; (B) Distribution Center Merchandise received at a Store during the applicable Sale Term,  (C) On-Order Merchandise received at the Stores on or before the date that is sixty (60) days after the Sale Commencement Date (such date, the "Receipt Deadline"); provided that On-Order Merchandise received in the Stores on or after the date that is forty-five (45) days after the Sale Commencement Date and on or before the Receipt Deadline shall be included in the Sale as Merchandise at the Cost Value and Retail Price of each such good multiplied by the inverse of the then prevailing Sale discount for each such good at the applicable Store as of the date of receipt in such Store; provided further that the aggregate Cost Value of On-Order Merchandise included in the Sale shall not exceed $5,000,000.00 (the "On-Order Cap") (D) Display Merchandise (other than Excluded Defective Merchandise);

(E) Merchandise subject to Gross Rings; and (F) Defective Merchandise (other than Excluded Defective Merchandise).  Notwithstanding the foregoing, "Merchandise" shall not include:  (1) goods which belong to customers, sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, vehicles and other personal property (other than inventory) at the Stores, Distribution Center, and/or corporate offices (collectively, "FF&E") or improvements to real property; provided that, Agent shall be permitted to sell Owned FF&E as set forth in Section 15.9; (4) Excluded Defective Merchandise; (5) Merchant Consignment Goods; (6) Additional Agent Goods; (7) On-Order Merchandise received at any Store after the Receipt Deadline; (8) On-Order Merchandise in excess of the On-Order Cap; (9) non-merchandise and service departments referenced in the Cost File; (10) Fulfillment Merchandise; and (11) Broken Set Inventory.

(b)  As used in this Agreement, the following terms have the respective meanings set forth below:

"Broken Set Inventory" means (i) those items of inventory that are customarily sold as a set where one or more pieces of the set is not included in Merchandise or is not in the same location as the other pieces of the set; or (ii) those items of inventory where multiple pieces make up a single unit (i.e., tabletop and 4 legs) where one or more of the pieces is not included in Merchandise or is not in the same location as the other pieces of the unit. By way of example, Broken Set Inventory shall include any table tops without bases, table bases without tops (other than stand-alone table bases designed for interchangeable tops), leafs to tables without corresponding tables, hutch tops without matching bases, foot boards without matching headboards, bed rails without beds, odd glass shelves and glass panels, glass tops without bases, upholstered furniture missing seat cushions, dining chairs without seat cushions or back panels, chairs missing legs, case furniture missing drawers, tops or sides, lamp shades without lamps, upholstered sectional furniture pieces or sections without matching components, miscellaneous parts bed slats, hooks, nuts, bolts, glass repair parts, shelves, drawer fronts, hardware, cushion cores, fabric panels, foam, dacron wrap, odd legs, wood panels, lamp parts, harps, and finials.

"Defective Merchandise" means any item of inventory which is not new, finished, first-quality, saleable goods sold in the normal or ordinary course.  Examples of Defective Merchandise include goods that are used, damaged, defective, scratched, soiled, dented, shopworn, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mismated, near mates, parts, items typically sold as a set which are incomplete, or gift with purchase items.  Display Merchandise shall not per se be deemed to be Defective Merchandise.

"Display Merchandise" means those items of inventory used in the ordinary course of business as displays or floor models, including inventory that has been removed from its original packaging  for the purpose of putting such item on display, which goods are not otherwise damaged or defective.  For the avoidance of doubt, Merchandise created for display and not saleable in the ordinary course of business shall not constitute Display Merchandise.

"Distribution Center Merchandise" means, those items of inventory identified by SKU on the Cost File, that were located in Merchant's Distribution Centers and, which goods, to the extent not delivered to the Stores prior to the Sale Commencement Date, shall be delivered by Merchant to the Stores in accordance with the Allocation Schedule.

"Excluded Defective Merchandise" means those items of (a) Defective Merchandise that are not saleable in the ordinary course because they are so damaged or defective that such inventory cannot reasonably be used for its  intended purpose, (b) Defective Merchandise or Display Merchandise for which Merchant and Agent cannot mutually agree upon the

| | |
|---|---|
| | Cost Value, (c) inventory of any kind or nature, wherever located, that was, is, becomes during the Sale Term or reasonably could become subject to a claim of trademark (or other intellectual property) infringement by any third party, (d) used furniture, (e) returned bedding, (f) furniture or bedding that does not meet required governmental fire and safety codes for legal sale in given markets, (f) display racks, props and display-prop models (*i.e.*, sales aides such as bedding or furniture with cut-outs for internal display), (g) SKU's that were utilized as FF&E (*i.e.*, desks, chairs, tables, etc., that were taken from inventory and used in daily operations at the Stores and Distribution Centers), (h) fabric swatches and (i) any items identified as belonging to an "unsellable department" (including, without limitation, supplies, leather, RTA, special cost and traffic) in the Cost File.<br><br>"<u>Fulfillment Merchandise</u>" means those items of merchandise located in the Stores or the Distribution Centers that have been fully or partially earmarked or reserved from available merchandise by Merchant as of the Sale Commencement Date for fulfillment of Pre-Sale Orders (as defined below) made after the Petition Date.<br><br>"<u>On-Order Merchandise</u>" means items of inventory that were ordered by Merchant in the ordinary course of business as identified by SKU on <u>Exhibit 5.2(b)</u> which shall be mutually agreed by the parties, acting reasonably, which inventory was not received in the Stores or Distribution Centers as of the Sale Commencement Date, but which may be received in the Stores on or prior to the Receipt Deadline and shall be delivered to the Stores in accordance with Allocation Schedule.<br><br>§ 5.2 Stalking Horse Agency Agreement |
| **Excluded Assets** | <u>Stalking Horse APA</u><br><br><u>Excluded Assets</u>. Notwithstanding anything herein to the contrary, the Acquired Assets shall not include any of the following (collectively, the "<u>Excluded Assets</u>"):<br><br>(a) any Seller's rights, Claims and Actions under this Agreement, the Agency Agreement and the other Transaction Documents;<br><br>(b) except as otherwise expressly included as Acquired Assets, all cash and cash equivalents, including, without limitation, checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, of such Sellers and all deposit accounts of such Sellers, including cash collateral held in Seller's bank accounts used to secure letters of credit;<br><br>(c) all documents prepared in connection with this Agreement or the transactions contemplated hereby or thereby, or Primarily Relating to the Bankruptcy Cases, all minute books, corporate records (such as stock registers), and organizational documents of Sellers and the Retained Subsidiaries, all documents and records which contain information subject to attorney-client or attorney work product privileges, and (ii) copies of all documents relating (but not Primarily Relating) to the Bankruptcy Cases;<br><br>(d) any Contract that is not an Assigned Agreement;<br><br>(e) the Excluded IP/IT;<br><br>(f) all shares of capital stock or other equity interests of any Seller or Retained Subsidiary or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller, Retained Subsidiary or any other Person;<br><br>(g) all Inventory, all Excluded Equipment and all Excluded Improvements;<br><br>(h) all Employee Plans, including, without limitation, any assets, trust agreements or other funding Contracts related thereto (but not, for clarity, any rights to enforce restrictive covenants that is an Acquired Asset pursuant to Section 3.1(m)); and<br><br>(i) the Seller Retained Claims; |

(j) any securities accounts maintained any Seller with any third-party (other than the Specified Account) and all assets held in any such securities account;

(k) the Elston Location, the applicable lease and any Potential Assigned Agreements Primarily Related thereto; provided that the Agent shall nevertheless acquire the right to liquidate the inventory and Equipment at the Elston Location pursuant to the Agency Agreement;

(l) all credit card receivables; provided that credit card Proceeds (as defined in the Agency Agreement) shall nevertheless be payable to Agent pursuant to the terms of the Agency Agreement;

(m) all rights to proceeds of the Sellers' directors and officers insurance policies; provided that, for the avoidance of doubt, nothing in this Section 3.2(m) shall give any Seller any rights in respect of (including, without limitation, any right to assert or prosecute) any rights, Claims, Actions, rebates, refunds, causes of action, choses in action, suits or proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights that constitute Acquired Assets;

(n) all insurance proceeds payable with respect to Excluded Assets or Excluded Liabilities (except as set forth in Article II);

(o) except to the extent constituting an Acquired Asset pursuant to Section 3.1(p), all of the Sellers' deposits, including utility deposits made on or after the Petition Date;

(p) all refunds of any drawn letters of credit issued on behalf of the Sellers (except to the extent (i) such letters of credit constitute Acquired Assets pursuant to Section 3.1(p) or (ii) the amounts refunded were initially paid by Schottenstein Stores Corporation);

(q) all refunds of credit card holdbacks (except to the extent such holdbacks were payable from Proceeds as defined in the Agency Agreement) otherwise payable to Agent pursuant to the terms of the Agency Agreement or otherwise funded by Buyer or Agent);

(r) all claims of the Sellers for rebates, refunds or other returns of tariffs or proceeds from sale of claims of the Sellers for rebates, refunds or other refunds of tariffs;

(s) Sellers' locations listed on Schedule 3.2(s), the applicable lease and any Potential Assigned Agreements Primarily Related thereto; provided that the Agent shall nevertheless acquire the right to liquidate the inventory and Equipment at such locations pursuant to the Agency Agreement;

(t) deposits of other bidders for the Potential Acquired Assets in the Bankruptcy Cases; and

(u) any assets, properties or rights that the Buyer, acting in its sole discretion, identifies to the Seller prior to the date that is ninety (90) days after the Closing Date (it being agreed that, if the Buyer identifies any such asset, property or right after the Closing Date, the Buyer shall be deemed to have never acquired any such asset, property or right); provided, however, that any such exclusion under this Section 3.2(u) shall not reduce the Purchase Price.

§ 3.2 Stalking Horse APA

Stalking Horse Agency Agreement

Excluded Goods.  Subject to the terms of the APA, Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder.  If Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale as "Merchant Consignment Goods" at prices mutually and through sales channels agreed upon by Merchant and Agent.  Agent shall retain

| | |
|---|---|
| | twenty percent (20%) of the sale price for all sales of Merchant Consignment Goods (less applicable Sales Taxes) (the "Consignment Fee"), and Merchant shall receive eighty percent (80%) of the receipts in respect of such sales (less applicable Sales Taxes). Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly sale reconciliation by Merchant and Agent pursuant to Section 8.6. If Merchant does not elect to have Agent sell goods not included as Merchandise, then all such items will be removed by Merchant from the Stores at its expense as soon as practicable after the Sale Commencement Date. Except as expressly provided in this Section 5.4, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise. For the avoidance of doubt, no amounts received by Merchant or the Merchant Secured Creditors in respect of Merchant Consignment Goods hereunder shall be credited towards the Purchase Price.<br><br>§ 5.4 Stalking Horse Agency Agreement |
| **Purchase Price for Aggregate Assets** | Consideration    Buyer shall pay to the Sellers the amount of $147,890,004.37 (the "Purchase Price"), of which $83,153,833.56 (plus scheduled payments of principal and interest under the PNC Mortgage Loan from the date of this Agreement through the Closing) shall be paid in cash and $64,736,170.81 (less scheduled payments of principal and interest under the PNC Mortgage Loan from the date of this Agreement through the Closing) shall be paid through the assumption by Buyer (or an Assignee) of the Assumed Liabilities, in each case in accordance with the terms, at the times, and subject to adjustment in accordance with, this Agreement and the Agency Agreement as consideration for the sale, transfer, assignment, conveyance and delivery of (i) the Designation Rights, (ii) the right to dispose of certain of Sellers' assets in accordance with and pursuant to the terms of the Agency Agreement and (iii) Sellers' right, title and interest in, to and under the Acquired Assets, in each case by Sellers to Buyer under the terms of the Transaction Documents. In addition, Buyer shall pay Sellers the amount of $608,547.00 for all signage included in the Acquired Assets (the "Signage Payment"). Other than payment of the applicable Buyer Cure Costs in accordance with the terms of this Agreement or as otherwise expressly provided in this Agreement and the Agency Agreement, no additional consideration shall be required to be paid by Buyer or any Assignee to Sellers in connection with any exercise by Buyer of the Designation Rights, the sale, transfer, assignment, conveyance and delivery to the applicable Assignee of an Acquired Lease and the other related Acquired Assets or its rights under the Agency Agreement. Buyer shall not be required to deliver any portion of (and may retain for its own benefit) any consideration it may receive from any Person in connection with any such exercise of Designation Rights or sale, transfer, assignment, conveyance and delivery of Acquired Assets.<br><br>§ 4.1 Stalking Horse APA |
| **Compensation to Stalking Horse Agent** | Compensation to Agent. Subject to entry of the Sale Order:<br><br>(a)     Subject to the terms of this Agreement, Agent shall receive, as compensation for its services rendered to Merchant, all Proceeds and any other amounts payable to it pursuant to the terms hereof. Provided that no Event of Default has occurred and continues to exist on the part of Agent, all Merchandise remaining at the conclusion of the Sale ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims, interests and encumbrances of any kind or nature. Agent and its affiliates shall be authorized to sell or otherwise dispose (at its sole cost and expense) of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo. Agent shall also be permitted, at no cost |

| | |
|---|---|
| | to Agent, to abandon all Remaining Merchandise at the Stores and/or the Distribution Centers.<br><br>§ 3.2 Stalking Horse Agency Agreement |
| **Sale Free and Clear of Leases and Lease Designation Rights**<br><br>**Local Bankr. R. 6004-1(b)(iv)(M)** | <u>Acquisition of Designation Rights</u>  Upon the terms and subject to the conditions of this Agreement and the Approval Order, on the Closing Date, Sellers shall sell, transfer, assign and convey, or cause to be sold, transferred, assigned and conveyed, to Buyer, and Buyer shall purchase from Sellers, the Designation Rights.  For the avoidance of doubt, the sale, transfer, assignment and conveyance of the Designation Rights provided for herein on the Closing Date shall not effectuate a sale, transfer, assignment or conveyance of any Lease or any related assets of Sellers to Buyer or any other Assignee, which shall only be effectuated on a Lease Assignment Date (as defined below).  Subject to the terms and conditions of this Agreement, the Approval Order and the requirements of section 365(b) of the Bankruptcy Code, Buyer shall have the right to designate itself or any other Person as the Assignee to which a Lease is to be assumed and assigned.  The Designation Rights with respect to any Leased Premise shall terminate upon the expiration of the Designation Rights Period.<br><br>§§ 2.1 Stalking Horse APA<br><br>The Approval Order contains provisions providing for sale of the Aggregate Assets free and clear sale of interest. |
| **GOB Sale Term** | <u>Term</u>. (a) Subject to satisfaction of the conditions precedent set forth in Section 10, the Sale shall commence at each Store on the first business day following the entry of the Sale Order, but, subject to the entry of the Sale Order, in no event later than January 9, 2026 (the "<u>Sale Commencement Date</u>").  Subject to the prior expiration of the term of any Store or Distribution Center lease (as reflected on <u>Exhibit 6.1</u> annexed hereto), Agent shall complete the Sale at each Store and vacate each Store and Distribution Center in accordance with the terms of <u>Section 6.2</u> by no later than April 30, 2026, unless the Sale is extended by mutual written agreement of Agent and Merchant (such date, the "<u>Sale Termination Date</u>"; the period from the Sale Commencement Date to the Sale Termination Date as to any Store or Distribution Center being the "Sale Term" for such Sale or Distribution Center); <u>provided that</u>, to the extent that the lease with respect to any Store or Distribution Center is assumed and assigned in accordance with the terms of the APA, the Sale Term with respect to such Store or Distribution Center shall terminate no later than the date of such assignment, Merchant shall have no further obligations hereunder with respect to such Store or Distribution Center and the applicable assignee may waive all obligations of Agent arising under this provision without the consent of any other party (including Merchant).  Notwithstanding the above and without impacting Agent's designation rights under the APA, Agent may, in its discretion, accelerate the Sale Termination Date and the end of the Sale Term at any Store or Distribution Center upon not less than five (5) business days' prior written notice (a "<u>Vacate Notice</u>") to Merchant, the end of such notice period being the "<u>Vacate Date</u>" for the applicable Store or Distribution Center.  In the event Agent fails to provide Merchant with such timely notice, Agent shall be liable for and pay the actual amounts payable to landlords for the days by which notice of a Store or Distribution Center closing was less than five (5) business days.<br><br>§ 6.1 Stalking Horse Agency Agreement |
| **Conduct of GOB Sale** | <u>Rights of Agent</u>.  Subject to the provisions of this Agreement, the Sale Guidelines and the Sale Order, Agent shall be permitted to conduct the Sale as a "store closing," "sale on everything," "total liquidation," "total inventory blowout," "everything must go," "going out of business" or similarly themed sale, throughout the Sale Term.  Agent shall conduct |

the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and, except as modified by the Sale Order, all governing laws and applicable agreements to which Merchant is a party. Agent shall conduct the Sale in accordance with the Sale Order and the sale guidelines attached hereto as <u>Exhibit 8.1(a)</u> which shall be mutually agreed by the parties, acting reasonably (the "<u>Sale Guidelines</u>"). In addition to any other rights granted to Agent hereunder in conducting the Sale, but subject to any applicable agreements to which Merchant is a party except as modified by the Sale Order, as applicable, Agent, in the exercise of its reasonable discretion, shall have and is hereby granted the right during the Sale Term:

(a) to establish Sale prices for the sale of all Merchandise, Owned FF&E, Additional Agent Goods, warranties, protection programs and services, including delivery and repairs, and Store and Distribution Center hours which are consistent with the terms of applicable leases or other occupancy agreements and local laws or regulations, including Sunday closing laws.

(b) except to the extent such intellectual property is acquired by Agent pursuant to the APA, to use, make, sell, offer for sale, import, reproduce, prepare derivative works of, distribute, perform, display and otherwise exploit without charge (except as otherwise expressly included as an Expense) during the Sale Term all FF&E, trademarks, intellectual property trade names, logos, customer lists, mailing lists, email lists and websites (in each case, whether owned or licensed by Merchant) relating to and used in connection with the operation of Merchant's business (<u>provided, however</u>, that Agent shall use commercially reasonable efforts to keep any such confidential information therein confidential and shall not rent, sell or otherwise share it with any third party except in the exercise of Agent's rights hereunder and that such access shall be provided solely through Merchant's outside advertisement services, and Agent shall not have direct access to any personally identifiable information contained therein), computer hardware and software, social networking and social media sites and accounts, existing supplies located at the Stores or Distribution Centers, intangible assets (including Merchant's name, logo and tax identification numbers), Store or Distribution Centers keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses (except as modified by the Sale Order); provided further that, subject to the terms and conditions of the APA and the Sale Order with respect to such intellectual property and information, such restrictions shall not apply to Agent from and after the transfer of ownership of such intellectual property and information to Agent in accordance with the terms of the APA and the Sale Order;

(c) subject to Agent's payment (if applicable) of Expenses in accordance with <u>Section 4.1(o)</u>, so long as such access does not unreasonably disrupt the business operations of Merchant, to use Merchant's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant in house, at no additional cost to Agent<u>; provided, however</u>, that, in the event that Agent expressly requests Merchant to provide services other than those normally provided to the Stores and Distribution Centers and relating to the sale of merchandise by Merchant and expressly contemplated by this Agreement, Agent shall be responsible for the actual incremental cost of such services as an Expense;

(d) except as otherwise agreed by Agent, to establish and implement advertising, signage (including exterior banners and signs and **sign** walkers) and promotional programs at the Stores consistent with the a "store closing," "sale on everything," "total liquidation," "total inventory blowout," "everything must go," "going out of business" or similarly themed sale described herein, in accordance with and as otherwise provided and

|  | permitted in the Sale Guidelines and the Sale Order, as and where applicable (including by means of media advertising, A-frame and similar interior and exterior signs and banners, use of sign walkers and similar signage); |
|---|---|
|  | (e) to transfer Merchandise between and among the Stores, and, solely in accordance with the **Allocation** Schedule, between the Distribution Centers and the Stores; |
|  | (f) to supplement (at **Agent's** sole cost and expense) the Merchandise at the Stores with Additional Agent Goods in accordance with <u>Section 8.9</u> hereof; and |
|  | (g) subject to entry of the Sale Order, to conduct the Sale in accordance with the provisions of the Sale Guidelines and Sale Order. |
|  | § 8.1 Stalking Horse Agency Agreement |
| **Approval of Sale Guidelines** | Exhibit 8.1(a) of the Stalking Horse Agency Agreement provides a set of Sale Guidelines to be use in connection with the sale of the inventory and personal property at the Stores |
| **Record Retention**<br><br>Local Bankr R. 6004-1(b)(iv)(J) | <u>Post-Closing Books and Records and Personnel</u>.  For thirty six (36) months after the end of the Designation Rights Period, (a) neither Buyer nor any Seller shall dispose of or destroy any of the business records and files of the Locations or relating to any Acquired Assets or Assumed Liabilities, including, without limitation, any Retained Books and Records, and (b) Buyer and Sellers (including, without limitation, any trust established under a chapter 11 plan of Sellers or any other successors of Sellers) shall allow each other, any applicable Assignee (to the extent requested by Buyer) and the Representatives of any of the foregoing reasonable access during normal business hours, and upon reasonable advance notice and to the extent permitted by applicable law, to all employees, files and any books and records (including, without limitation, any Retained Books and Records) and other materials included in the Potential Acquired Assets for purposes relating to the Bankruptcy Case, the wind-down of the operations of Sellers, the functions of any such trusts or successors, or other reasonable business purposes, including, without limitation, Tax matters, litigation, or potential litigation, each as it relates to the Potential Acquired Assets or the Assumed Liabilities, and Buyer and Sellers (including, without limitation, any such trust or successors) and such Representatives shall have the right to make copies of any such files, books, records and other materials.  In addition, from and after the Closing Date or the applicable Lease Assignment Date for a period of sixty (60) days, Sellers will permit Buyer, any applicable Assignee (to the extent requested by Buyer) and their respective Representatives access to such personnel of Sellers during normal business hours as Buyer or any applicable Assignee may reasonably request to assist with the transfer of the  applicable Acquired Assets (including, without limitation, any related Assigned Plans and Permits).  Following the end of the Designation Rights Period, nothing in this <u>Section 9.4</u> shall be construed to prevent Sellers from winding down their operations and dissolving their business entities as is determined by Sellers (in their sole discretion) to be in their best interests<br><br>§ 9.4 Stalking Horse APA |
| **Representation and Warranties** | Article VI of the Stalking Horse APA sets forth the Debtors representations and warranties under the Stalking Horse APA.  Article VII of the Stalking Horse APA contains the representations and warranties of the Stalking Horse Bidder and the Guarantor to the Stalking Horse APA<br><br>Article VI and VII, Stalking Horse APA |
| **Stalking Horse Agent Indemnification** | <u>Agent Indemnification</u>.   Agent shall indemnify and hold Merchant and its officers, directors, employees, agents (other than Agent) and representatives (each, a "<u>Merchant</u> |

| | |
|---|---|
| | Indemnified Party") harmless from and against all claims, demands, penalties, losses, liability or damage, including reasonable attorneys' fees and expenses, directly or indirectly asserted against Merchant or any Merchant Indemnified Party, resulting from, or related to: (i) Agent's material breach of or material failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment or engagement; (iii) any taxes or penalties arising out of Agent's failure to collect and/or remit Sale Taxes in accordance with Section 8.3 or in amounts required by applicable law; (iv) [intentionally omitted;] (v) any Agent Claims; (vi) the gross negligence (including omissions) or willful misconduct of Agent or its officers, directors, employees, agents or representatives; (vii) any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors, supervisors, or other officers, directors, or representatives of Agent; or (viii) any consumer warranty or product liability claims solely to the extent relating to the Additional Agent Goods; provided, however this Section 13.2 shall not apply to any claims, demands, penalties, losses, liability or damage resulting from, or related to, the gross negligence (including omissions) or willful misconduct of, or breach of this Agreement by any of the Merchant Indemnified Parties.<br><br>§ 13.2 Stalking Horse Agency Agreement |
| **Merchant Indemnification** | Merchant Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless of, from and against all claims, demands, penalties, losses, liability or damage, including reasonable attorneys' fees and expenses, directly or indirectly asserted against Agent or any Agent Indemnified Party, resulting from, or related to: (i) Merchant's material breach of or material failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's satisfaction of its obligations pursuant to Sections 4.1(a) and 4.1(b), any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iii) subject to Agent's compliance with its obligations under Section 8.3, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iv) subject to Section 13.2(vii), any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including claims by employees arising under collective bargaining agreements, workers' compensation or under the WARN Act); (v) the gross negligence (including omissions) or willful misconduct of Merchant or its officers, directors, employees, individuals, agents (other than Agent) or representatives; (vi) claims from any of Merchant's customers for return of customer deposits or any other amounts in connection with any orders placed prior to the Sale Commencement Date, including but not limited to any unfulfilled Pre-Sale Orders; or (vii) any harassment or any other unlawful, tortious, or otherwise actionable treatment of Agent or any of its employees, agents, independent contractors, supervisors, or other officers, directors, or representatives by Merchant or any of its employees, agents, independent contractors, supervisors, or other officers, directors, or representatives; provided, however this Section 13.1 shall not apply to any claims, demands, penalties, losses, liability or damage resulting from, or related to, the gross negligence (including omissions) or willful misconduct of, or breach of this Agreement by any of the Agent Indemnified Parties.<br><br>§ 13.1 Stalking Horse Agency Agreement |

| Agreements With Management

Local Bank. R. 6004-1(b)(iv)(B) | From and after the date of this Agreement, the Buyer shall be permitted to discuss the possibility and terms of future employment with the Sellers' employees; provided that Buyer shall not make offers of employment to such employees until the Closing Date; provided, however, that Buyer shall not be precluded from making offers of employment prior to such date to any such employee (i) whose employment by Sellers ceased prior to the making of such offer by Buyer or (ii) who responds to solicitation not specifically targeted at employees of Sellers (including by a search firm or recruiting agency); provided further that, for the avoidance of doubt, Buyer shall not be restricted from engaging in general solicitations or advertising not specifically targeted at employees of Sellers prior to such date.

§ 9.7 Stalking Horse APA |
|---|---|
| Releases

Local Bank. R. 1(b)(iv)(C) | The Stalking Horse Agreements do not provide for the release of claims. For avoidance of doubt, the Stalking Horse APA does provide that certain Seller Retained Claims shall constitute Excluded Assets. The Seller Retained Claims are defined as:

"Seller Retained Claims" shall mean any (i) Avoidance Actions against Persons other than (A) Buyer, the Guarantor, Schottenstein Stores Corporation, Schottenstein Property Group, Kroehler Corporation, Kroehler Furniture Mfg. Co., Inc., Luxury Delivery Service, Inc., SB360 Capital Partners, LLC, Second Avenue Capital Partners LLC and Tower Hill Advisory Services, LLC, (B) any Affiliate of any of the Persons described in clause (A), (C) any direct or indirect equityholders, beneficiaries, members, partners, directors, managers, officers, employees, counsel, advisors, or other representatives of any of the persons and entities descried in clauses (A) and (B), (D) any company, partnership, trust or other entity or investment vehicle created for the benefit of, or the holdings of which are for the primary benefit of, any of the Persons referred to in clauses (A), (B) and (C) of this definition (or of any family member of any such Person or the estate, legatees and devisees of any such Person) and (E) Magnussen and H317, and (ii) existing class action Claims against Google and Discover, and (iii) any Claim against Buyer or Guarantor under this Agreement or the Agency Agreement.

See §§ 1.1, 3.2(i) Stalking Horse APA |
| Private Sale/No Competitive Bidding

Local Bank. R. 6004-1(b)(iv)( D) | The Debtors propose and open Auction and sale process.  The Bid Procedures Order provides for a potential auction if the Debtors receive at least another Qualified Bid. |
| Closing and Other Deadlines

Local Bank. R. 6004-1(b)(iv)(E) | Closing Date.  Upon the terms and subject to the conditions hereof, the closing of the sale, transfer, assignment, conveyance and delivery of the Designation Rights, the right to dispose of certain of Sellers' assets in accordance with and pursuant to the terms of the Agency Agreement, and Sellers' right, title and interest in, to and under the Acquired Assets by Sellers to Buyer contemplated hereby (the "Closing") shall take place at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019, on the Payment Date (as defined in the Agency Agreement), or at such other place or time as Buyer and the Sellers may mutually agree. The date and time at which the Closing actually occurs is referred to as the "Closing Date."

§ 5.1 Stalking Horse APA |
| Good Faith Deposit
Local Bankr. R. 6004-1(b)(iv)(F) | Deposit.  No later three (3) Business Days following the Petition Date, Buyer shall deliver to an escrow agent reasonably acceptable to each of Buyer and the Sellers (the "Escrow Agent") an amount equal to $5,000,000.00 (the "Deposit") by wire transfer of immediately available funds, to be held subject to the terms of this Agreement and an escrow agreement reasonably acceptable to each of Buyer and the Sellers.  The Deposit |

| | |
|---|---|
| | shall be held by the Escrow Agent and released as follows: (1) at the Closing, the Deposit shall be credited and applied toward payment of the Initial Purchase Price Payment (as defined in the Agency Agreement) and paid to Sellers; (2) if Sellers terminate this Agreement prior to Closing pursuant to Section 12.1(c) (a "Buyer Default Termination"), the Deposit shall become nonrefundable and shall be paid to Sellers for Sellers' own account; and (3) if this Agreement is terminated by Sellers prior to Closing for any reason other than a Buyer Default Termination, or by Buyer in accordance with Section 12.1, then the Deposit shall be returned to Buyer. <br><br> § 4.2(a) Stalking Horse APA |
| **Interim Arrangements with Proposed Purchaser** <br><br> Local Bankr. R. 6004-1(b)(iv)(G) | The Stalking Horse Agreements provide for a Transition Services Agreement to filed pursuant to which the Debtors and Stalking Horse Purchaser will provide mutual services and payment to each other. <br><br> Stalking Horse Agency Agreement <br><br> Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and on the same terms and conditions as such employees were employed prior to the date of this Agreement, and Agent may (in consultation with Merchant) select and schedule the number and type of Merchant's employees required for the Sale, which number and type shall be based on appropriate staffing levels as determined by Agent in consultation with Merchant.  In addition, if applicable, Agent may use the services of the Distribution Center employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and on the same terms and conditions as such individuals were providing services to Merchant prior to this Agreement and Agent may select and schedule the number and type of such individuals required for the Sale, which number and type shall be based on appropriate staffing levels as determined by Agent in consultation with Merchant.  Agent shall identify any of (i) Merchant's employees at the Stores and all regional employees, in each case to be used in connection with the Sale, in each case, to the extent such employees do not terminate their employment with Merchant (each such employee, a "Retained Employee") and (ii) the Distribution Center employees to be used in connection with the Sale prior to the Sale Commencement Date, in each case, to the extent such employees do not terminate their employment with Merchant.  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of Merchant.  Agent's selection and scheduling of Merchant's employees and Distribution Center employees shall at all times comply with all applicable laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement or be deemed a joint or successor employer with respect to such employees.  Agent shall comply in the conduct of the Sale with all of Merchant's employee rules, regulations, guidelines and policies (and such rules as may be applicable to the Distribution Center employees) which have been provided to Agent in writing prior to the execution of this Agreement.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Retained Employees prior to the Sale Termination Date at all Stores and Distribution Centers.  Merchant shall not transfer any Retained Employee during the Sale Term without Agent's prior consent, which consent shall not be unreasonably withheld. During the Sale Term, Merchant shall process the payroll for all Retained Employees and, if applicable, any former employees and temporary labor engaged for the Sale |

| | § 9.1 Stalking Horse Agency Agreement |
|---|---|
| **Use of Proceeds**<br><br>Local Bankr. R. 6004-1(b)(iv)(H) | Cash proceeds derived from the sale of the Aggregate Assets will be used by the Debtors in accordance with the Interim DIP Order and Final DIP Order. |
| **Tax Exemption**<br><br>Local Bank. R. 6004-1(b)(iv)(I) | The Approval Order does not seek to have the sale exempted from taxes under section 1146(a) of the Bankruptcy Code. |
| **Sale of Avoidance Actions**<br><br>Local Bank. R. 6004-1(b)(iv)(K) | The Stalking Horse APA includes the sale of Avoidance Actions to the Stalking Horse Purchaser as part of the Acquired Assets to be sold under that agreement.<br><br>§ 3.1(r) Stalking Horse APA. |
| **Requested Findings as to Successor Liability**<br><br>Local Bankr. R. 6004-1(b)(iv)(L) | The Approval Order contains findings and provisions limiting the Stalking Horse Bidder's successor liability. |
| **Credit Bid**<br><br>Local Bankr. R. 6004-1(b)(iv)(N) | The Bid Procedures Order preserves the credit bid rights of Qualified Bidders with valid, perfected and enforceable lien on any assets of the Debtors' estates in accordance with Bankruptcy Code section 363(k) and preserves the rights of the Debtors, the Creditors' Committee and other parties in interest in the Chapter 11 Cases to object to such credit bid.<br><br>Bid Procedures Order ¶ 19 |
| **Relief From Bankruptcy Rule 6004(h)**<br><br>Local Bankr. R. 6004-1(b)(iv)(O) | The proposed Approval Order may provide, that notwithstanding Bankruptcy Rules 6004 and 6006, the Approval Order shall be effective and enforceable immediately upon entry. |
| **Assumed Liabilities** | Assumed Liabilities   Except for (t) those Liabilities under the PNC Mortgage Loan (provided that Buyer shall not have any obligation with respect to such assumption unless the aggregate amount of liabilities thereunder do not exceed $54,078,921.69), (u) those Liabilities under the Huntington Lease (provided that Buyer shall not have any obligation with respect to such assumption unless the aggregate amount of liabilities thereunder do not exceed $2,715,740.12), (v) those Liabilities owing to Magnussen and H317 (not to exceed $7,941,509.00), (w) accrued paid time-off, vacation and other similar Liabilities solely to the extent relating exclusively to employees of Sellers that are hired by Buyer (or any of its Affiliates) as of the Closing Date, (x) those Liabilities relating to the payment or performance of obligations arising solely after the applicable Lease Assignment Date with respect to the Acquired Leases and the other Assigned Agreements Primarily Related to such Acquired Leases (or, with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, those Liabilities relating to the payment or performance of obligations arising solely after the date of such assumption and assignment), which shall be Liabilities only of Buyer or the applicable Assignee, as |

applicable, (y) Buyer's obligation to pay Occupancy Expenses as provided (and subject to the limitations set forth) in Section 2.2(b), and (z) all Buyer Cure Costs (but not Excess Cure Costs) solely with respect to the Acquired Leases and the other Assigned Agreements, which shall be Liabilities only of Buyer (collectively, the "Assumed Liabilities"), none of Buyer, any Affiliate of Buyer or any Assignee shall assume, be deemed to assume or become obligated hereunder in any way to pay or perform (whether as a successor to any Seller or otherwise) any Liabilities of any of the Sellers or any of their respective Affiliates of any kind or nature, known, unknown, contingent or otherwise, whether direct or indirect, matured or unmatured (the foregoing, including, without limitation, the following but excluding the Assumed Liabilities, the "Excluded Liabilities"), which shall include the following Liabilities (except to the extent constituting Assumed Liabilities):

(a) any Liability arising out of facts or circumstances in existence prior to the Closing Date (or (i) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date and (ii) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment) and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of the Sellers or any of their Affiliates under any Contract, agreement, arrangement or understanding to which any Seller or any of its Affiliates is a party prior to the Closing Date (or (x) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date and (y) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment), including, without limitation, any Acquired Leases;

(b) any Liability arising from or related to any claim, Action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) against any Seller or its Affiliates, or related to any Acquired Assets, pending or threatened or relating to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date (or (i) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date, (ii) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (iii) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election);

(c) any Liability arising from or related to the operation or condition of the Acquired Assets prior to the Closing Date (or (i) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date, (ii) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (iii) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election) or facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date (or (x) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date, (y) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (z) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election);

(d) any Liability arising from or related to, whether before, on or after the Closing Date, the operation by Sellers of the Sellers' business or any of the Sellers' products or services, including, without limitation, any Liability relating to (i) design or manufacturing defects (whenever discovered) and (ii) warranties, product liability, safety or other Liability, in the cases of clauses (i) and (ii), relating to any product sold or manufactured by any Seller or any of its respective Affiliates;

(e) any Liability in respect of any indebtedness of any Seller (except to the extent expressly constituting an Assumed Liability);

(f) except to the extent expressly set forth in clause (w) above, any Liability with respect to Service Providers, including, without limitation, (i) any Liability arising under or with respect to any Employee Plan and (ii) any Liability of any Seller in respect of Service Providers, including, without limitation, collective bargaining agreements, pensions and post-employment medical and health benefits (including, without limitation, coverage mandated by COBRA), wages, other remuneration, holiday or vacation pay, bonus, severance (statutory or otherwise), separation, termination or notice pay or benefits, commissions, insurance premiums, Taxes, Liabilities or Actions for workers' compensation, Liabilities or Actions under the WARN Act, and any other form of accrued or contingent compensation (including, without limitation, vacation, sick days, personal days or other leave entitlements), irrespective of whether and when such Liabilities or Actions are paid or made, as applicable;

(g) any Liability attributable to, relating to or arising under (i) Environmental Laws, (ii) any Contract or other arrangement for disposal or treatment of Hazardous Substances, or the transportation of Hazardous Substances for disposal or treatment, (iii) environmental contamination or remediation, in each case arising from or related to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date (or (x) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date, (y) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (z) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election), or (iv) for toxic torts arising as a result of or in connection with loss of life or injury to Persons (whether or not such loss or injury was made manifest on or after (A) the Closing Date, (B) any applicable Lease Assignment Date, (C) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (D) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election) or other harm caused or allegedly caused by exposure to Hazardous Materials present at, on, in, under, adjacent to or migrating from any Acquired Location, Acquired Real Property or any other Acquired Assets;
(h) any liabilities for or in respect of Excluded Taxes;

(i) any Liability with respect to any brokerage or finders' fees or agents' commissions or other similar payment in connection with the transactions contemplated hereby incurred by any Seller;

(j) any Liability of Sellers under this Agreement or any documents or instruments executed and delivered pursuant to this Agreement;

(k) any Liability relating to or arising, whether before, on or after the Closing Date, out of, or in connection with, any assets, properties and rights of the Sellers or any of their Affiliates other than the Acquired Assets, including, without limitation, the Excluded Assets;

| | |
|---|---|
| | (l) Cure Costs (i) with respect to any Contracts other than the Assigned Agreements or (ii) with respect to any Assigned Agreement, in excess of the applicable Buyer Cure Costs; |
| | (m) any Liability arising under, or relating to, any existing customer loyalty program (*e.g.*, points, rewards, discounts, etc.) of any of the Sellers or community marketing undertaken by any of the Sellers; |
| | (n) any Liability in respect of any gift cards, gift certificates, merchandise credits, return credits, customer membership or customer loyalty discount programs, coupons, groupons or other similar credits or programs issued by, on behalf of or in relation to Sellers; and |
| | (o) any Liability that is not expressly included among the Assumed Liabilities. |
| | § 3.3 Stalking Horse APA |
| **Termination of Stalking Horse APA** | <u>Termination Events</u> Anything contained in this Agreement to the contrary notwithstanding, this Agreement and the Agency Agreement may be terminated at any time prior to the Closing: |
| | (a) by either Sellers or Buyer: |
| | (i) if the Bankruptcy Court shall have stated unconditionally that it will not enter the Approval Order or if a Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any applicable Law (including, without limitation, any Order) which is in effect and has the effect of making the Transactions illegal or otherwise restraining or prohibiting consummation of the Transactions and which is not satisfied, resolved or preempted by the Approval Order; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement and the Agency Agreement pursuant to this <u>Section 12.1(a)(i)</u> shall not be available to any Party whose material breach of any of its representations, warranties, covenants or agreements contained   herein and in the Agency Agreement results in or causes such event; |
| | (b) by Buyer: |
| | (i) in the event of any breach by any Seller of any of its agreements, covenants, representations or warranties  contained herein or in the Agency Agreement that would result in the failure of a condition set forth in <u>Article X</u> to be satisfied, and the failure of Sellers to cure such breach by the earlier of (A) the Outside Date and (B) the date that is ten (10) days after  receipt of the Buyer Termination Notice; <u>provided</u>, <u>however</u>, that (1) Buyer is not in breach of any of its  representations, warranties, covenants or agreements contained herein and in the Agency Agreement in a manner that would result in the failure of a condition set forth in <u>Article XI</u> to be satisfied, (2) Buyer notifies Sellers in writing (the "<u>Buyer Termination  Notice</u>") of its intention to exercise its rights under this <u>Section 12.1(b)(i)</u> as a result of such breach, and (3) Buyer  specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Agency Agreement of  which Sellers are allegedly in breach and the basis for Buyer's assertion of the existence of such breach; |
| | (ii) if Sellers withdraw or seek authority to withdraw the Bid Procedures Motion; |
| | (iii) if any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the applicable Sellers' business is appointed in any of the Bankruptcy Cases; |

(iv) if the Approval Order has not been entered on or before January 7, 2026 (or is stayed as of such date or has been modified or vacated on or prior to such date);

(v) if (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is, without Buyer's prior written consent, (A) amended, modified or supplemented or (B) voided, reversed or vacated or is subject to a stay, or (ii) following entry by the Bankruptcy Court of the Approval Order, the Approval Order is, without Buyer's prior written consent, (A) amended, modified or supplemented or (B) voided, reversed or vacated or is subject to a stay

(vi) if the Closing shall not have occurred by the close of business on January 9, 2026 (the "Outside Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 12.1(b)(vi) shall not be available to any Party whose material breach of any of its representations, warranties, covenants or agreements contained herein results in the failure of the Closing to be consummated by such time;

(vii) in the event of the occurrence of any Major Casualty / Condemnation Event;

(viii) if (x) Sellers enter into a definitive agreement with respect to, or file (or any other party files on behalf of Sellers) a motion or other request to approve, a Competing Bid or (y) the Bankruptcy Court enters an order approving a Competing Bid;

(ix) if Buyer is not the Successful Bidder at the Auction; or

(x) if any of the Bankruptcy Court Milestones are not met;

(c) by Sellers:

(i) in the event of any breach by Buyer of any of its agreements, covenants, representations or warranties contained herein or in the Agency Agreement that would result in the failure of a condition set forth in Article XI to be satisfied, and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is ten (10) days after receipt of the Sellers' Termination Notice; provided, however, that Sellers (1) are not themselves in breach of any of their representations, warranties, covenants or agreements contained herein and in the Agency Agreement, in each case in a manner that results in the failure of a condition set forth in Article X to be satisfied, (2) notify Buyer in writing (the "Sellers' Termination Notice") of their intention to exercise their rights under this Section 12.1(c)(i) as a result of the breach, and (3) specify in the Sellers' Termination Notice the representation, warranty, covenant or agreement contained herein or in the Agency Agreement of which Buyer is allegedly in breach and the basis for Sellers' assertion of the existence of such breach;

(ii) if the Approval Order has not been entered on or before January 9, 2026 (or is stayed as of such date or has been modified or vacated on or prior to such date);

(iii) if the Closing shall not have occurred by the close of business on January 9, 2026; provided, however, that the right to terminate this Agreement pursuant to this Section 12.1(c)(iii) shall not be available to any Party whose material breach of any of its representations, warranties, covenants or agreements contained herein results in the failure of the Closing to be consummated by such time; or

(iv) if Sellers consummate a Competing Bid; or

(d) by mutual written consent of Sellers and Buyer.

§ 12.1 Stalking Horse APA

| Conditions to Parties' Performance Obligations | Stalking Horse APA<br><br>Article X of the Stalking Horse APA sets forth the conditions precedent to the obligations of the Stalking Horse Bidder to close.  Article XI sets forth the conditions precedent to the obligations of the Debtors to close.<br><br>Articles X and XI of Stalking Horse APA<br><br>Stalking Horse Agency Agreement<br><br>Section 10 of the Stalking Horse Agency Agreement contains conditions precedent and subsequent of the Agent and the Debtors to enter into the transactions contemplated under the Stalking Horse Agency Agreement<br><br>§ 10(b) Stalking Horse Agency Agreement |
|---|---|

## THE DEBTORS' MARKETING PROCESS

17.     The Debtors (with the assistance and supervision of the Conflicts Committee) engaged in vigorous, arms-length negotiations with the Stalking Horse Bidder regarding the proposed terms of the Stalking Horse Agreements.  After those good faith and arms' length negotiations, the Debtors, with the approval of the Conflicts Committee, and the Stalking Horse Bidder ultimately agreed on the terms of the Stalking Horse Agreements, and all documents ancillary thereto.  On November 25, 2025, the Debtors entered into the Stalking Horse Agreements with the Stalking Horse Bidder.  The Stalking Horse Agreements seek to sell the Aggregate Assets to the Stalking Horse Bidder, subject to higher and better bids.

18.     The Debtors retained SSG Capital Advisors, LLC ("SSG") in November 2025 to serve as their investment bankers to develop a sale and marketing plan to maximize the value of the Debtors' assets for the benefit of their estates and their creditors.  The Debtors, with the assistance of SSG, intend to broadly market their assets postpetition with the goal of fostering a robust bidding process and a competitive auction for the sale of the Aggregate Assets consistent

with terms of the proposed forms of Bid Procedures. Although SSG was only recently engaged, it has already been able to gain substantial information from the Debtors' management, including the Debtors' chief restructuring officer, to become well-acquainted with the Debtors' operations and the scope of Aggregate Assets to be sold pursuant to this Motion. Simultaneously, SSG has engaged in efforts to foster a competitive bidding process and to assist potential bidders in developing and submitting bids for the Aggregate Assets at Auction. These efforts include, among other things, preparing a teaser and other marketing materials with extensive information regarding the Debtors, the Debtors' operations, and the Debtors' assets. SSC has also prepared a virtual data room to provide potential purchasers with diligence materials. In addition, SSG is working with the Debtors to develop a list of potential purchasers that SSG believes may have an interest in purchasing the Aggregate Assets at Auction to effectuate a sale of the Debtors' assets within the proposed sale timeline.

19.    No later than three (3) Business Days after entry of the Bid Procedures Order, the Debtors will (to the extent not already provided) transmit the Motion and/or serve the Sale Notice to all parties they believe may be potentially interested in acquiring the Aggregate Assets. The Debtors and their professionals will assist interested parties who either have, or will, execute confidentiality agreements acceptable to the Debtors to conduct diligence on the Aggregate Assets, in accordance with the Bid Procedures. The Debtors believe that the marketing of the Aggregate Assets over the period contemplated by the Bid Procedures will result in the highest and best purchase price for the Aggregate Assets and maximize value for all of the Debtors' constituents.

20.     Given the Debtors' liquidity and operational constraints, the timing of the sale proposed herein is reasonable under the circumstances.  The Debtors believe that the Bid Procedures proposed hereby will therefore enable the efficient consummation of the sale of the Aggregate Assets at an auction to the highest or best bidder.

### THE PROPOSED BID PROCEDURES AND THE ASSETS TO BE SOLD PURSUANT TO THE SALE

**A.      Summary of Proposed Bid Procedures**

21.     The Bid Procedures are designed to promote a competitive and expedient sale process.  If approved, the Bid Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or best offer for the sale of the Aggregate Assets on a schedule consistent with the Sale Milestones.

22.     As the Bid Procedures are attached to the Bid Procedures Order, they are not herein restated in their entirety.  Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bid Procedures for the Aggregate Assets are highlighted in the chart below.

| MATERIAL TERMS OF THE BID PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders** Local Rule 6004-1(c)(i)(A) | To receive due diligence information and to receive additional non-public information regarding the Debtors, a potential bidder must (x) not be in breach of any agreement with any Debtors and (y) deliver to each of: (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19899, Attn: Laura Davis Jones, Esq. (ljones@pszjlaw.com) and David M. Bertenthal, Esq. (dbertenthal@pszjlaw.com); (b) Chief Restructuring Officer of American Signature Inc., BRG, 225 Franklin Street, Suite 3200, Boston, MA 02110 Attn: Rudy Morando (rmorando@thinkbrg.com), Chris McAvinn (cmcavinn@thinkbrg.com), and Stephen Coulombe (scoulombe@thinkbrg.com); and (c) proposed investment bankers to Debtors, SSG Capital Advisors, LLC, 300 Barr Harbor Drive, Suite 420, West Conshohocken, PA 19428, Attn: Teresa C. Kohl (tkohl@ssgca.com), Craig D. Warznak (cwarznak@ssgca.com), and J. Scott Victor (jsvictor@ssgca.com) (collectively, the "Debtors' Advisors"), the following documents (collectively, the "Preliminary Bid Documents") on or prior to _____ **at 4:00 p.m. (prevailing Eastern time)**, unless otherwise waived by the Debtors in their discretion: <br><br>     a.    an executed Confidentiality Agreement on terms acceptable to the Debtors, to the extent not already executed, which Confidentiality Agreement shall, among |

|  | other terms, contain customary provisions regarding: (i) the nondisclosure of confidential information, (ii) prohibitions on contacting third parties in connection with a Transaction, (iii) covenant to not solicit employees of the Debtors, (iv) prohibitions on purchasing or otherwise acquiring the Debtors' debt and equity securities, and (v) the survival of certain provisions of the Confidentiality Agreement; |
|--|--|
|  | b.   evidence by the potential bidder of its sufficient financial capacity to close a proposed Transaction, which may include financial statements of, or verified financial commitments obtained by, the potential bidder (or, if the potential bidder is an entity formed for the purpose of acquiring the Aggregate Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors, with the assistance of the Debtors' Advisors; |
|  | c.   written disclosure of any connections or agreements with the Debtors, the Stalking Horse Bidder, any other known potential bidder or Qualified Bidder (defined below), "insiders" of the Debtors (as that term is contemplated by section 101(31) of the Bankruptcy Code), and/or any manager or direct or indirect equity security holder of the Debtors; and |
|  | d.   identification of the potential bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Transaction. |
|  | Only those potential bidders that (a) are not in breach of any contract with any Debtor (unless otherwise waived by the Debtors); and (b) have submitted acceptable Preliminary Bid Documents, as determined by the Debtors (an "<u>Acceptable Bidder</u>"), may submit Bids. |
| **Provisions Governing Qualified Bids** Local Rule 6004-1(c)(i)(B) | Each Bid submitted by an Acceptable Bidder must be submitted in writing and satisfy the following requirements (collectively, the "<u>Bid Requirements</u>," unless otherwise modified by the Debtors, in their discretion: |
|  | a.   <u>Bid Deadline</u>.  A Bid must be received no later than the Bid Deadline, unless otherwise extended by the Debtors in their sole discretion; |
|  | b.   <u>Marked Agreement</u>.   A Bid should include an executed asset purchase agreement, together with all exhibits and schedules (a "<u>Competing APA</u>") and, to the extent applicable to the Bid, a competing agency agreement, together with all exhibits and schedules (the "<u>Competing Agency Agreement</u>" and together with the Competing APA (the "<u>Transaction Documents</u>"), pursuant to which the Acceptable Bidder proposes to effectuate the contemplated transaction, which Competing APA and Competing Agency Agreement (to the extent applicable) should be similar in form and substance to the Stalking Horse APA and Stalking Horse Agency Agreement, respectively, and be marked to reflect the differences between the Stalking Horse Agreements and the respective Transaction Documents, including, without limitation, specification of the proposed purchase price, any assumed liabilities, and any changes to any exhibits or schedules to any of the Stalking Horse Agreements.  A Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned pursuant to the Transaction Documents.   The Transaction Documents must include a commitment to close by no later than the closing date provided in the Stalking Horse Agreements.  A Bid should propose a contemplated transaction involving all or substantially all of the Aggregate Assets; *provided, however*, that (i) the Debtors may consider proposals for less than substantially all the Aggregate Assets, and (ii) the Debtors will evaluate all Bids, in their sole discretion, subject to prior consultation with the Consultation Parties, to determine whether such Bid or |

combination of Bids maximizes the value of the Debtors' estates as a whole in light of any factors regarding such bid which the Debtors determine are appropriate to be considered in evaluating Bids.

c.  Purpose.  Each Acceptable Bidder must state that the Bid includes an offer by the Acceptable Bidder to purchase some or all of the Aggregate Assets and state which Aggregate Assets with reasonable specificity.  Each Acceptable Bid must clearly identify the following: (i) contracts to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof; (ii) the liabilities, if any, to be assumed; (iii) leases of equipment or stores to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof; and (iv) which employees or groups thereof will be offered employment.

d.  Purchase Price.  The consideration proposed by a Bid may include cash and/or other consideration acceptable to the Debtors in an amount of no less than the sum of (i) the Purchase Price (as defined in the Stalking Horse Agreements) plus (ii) the Expense Reimbursement and the Augment Purchase[10] plus (iii) $250,000 *provided that* the Bid must include sufficient cash to pay all DIP Obligations (as defined in the DIP Order) in full upon closing, in addition to the Expense Reimbursement and the Augment Purchase.

e.  Forms of Consideration.  Each Bid must (a) indicate (x) whether it is an all-cash offer (including confirmation that the cash component of the Bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid and/or the assumption of liabilities; and (y) the liabilities to be assumed, if applicable; and (b) provide sufficient cash consideration specifically designated for the payment of the Expense Reimbursement and the Augment Purchase.  The Debtors may request that any Bid include the allocation of the Purchase Price among the Aggregate Assets to be purchased.

f.  Deposit.  Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate value of the cash and non-cash consideration (with the deposit amount for the non-cash consideration determined by the Debtors in their discretion) of the Bid to be held in an escrow account to be identified and established by the Debtors (the "Deposit"); *provided that* that the Debtors reserve the right to increase the amount of the Deposit in their discretion, including, without limitation, the right to request an additional Deposit in the event an Acceptable Bidder increases the amount of its Bid.

g.  Irrevocable.  All Bids must be irrevocable until the Debtors' selection of the Successful Bid and Backup Bid; *provided however*, that the Bids selected as either the Successful Bid or the Backup Bid (defined below) must be irrevocable and remain open for acceptance by the Debtors until the earlier of (i) such time that the Transaction is consummated and (ii) 30 days from entry of the Approval Order, subject to the terms of such Successful Bidder's or Backup Bidder's Transaction Documents; *provided however*, the Stalking Horse Bidder shall not be selected as the Backup Bidder.

h.  Committed Financing.   To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction, that demonstrates that the

---

[10]  On or prior to December 25, 2025, the Stalking Horse Bidder will notify the Debtors of the amount of the Augment Purchase as of such date, and will also notify the Debtors of any additional Augment Purchases incurred after December 25, 2025, through January 2, 2026.  The Debtors will notify bidders and the DIP Agent of the amounts of Augment Purchases that has been provided them by the Stalking Horse Bidder.

|   | | Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's purchase price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors. |
|---|---|---|
|   | i. | <u>Unconditional Offer/Contingencies</u>.  A statement that the Bid is formal, binding, and unconditional and is not subject to any further due diligence or financing contingency and is irrevocable until the Debtors notify the Acceptable Bidder that such Bid is not a Successful Bid or a Backup Bid. |
|   | j. | <u>Non-Reliance</u>.  A Bid must include a written acknowledgement and representation of the Acceptable Bidder that it has had an opportunity to conduct any and all due diligence regarding the Aggregate Assets and Assumed Liabilities (as defined in the Stalking Horse Agreements) prior to making its Bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Aggregate Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Aggregate Assets, the financial performance of the Aggregate Assets or the physical condition of the Aggregate Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction. |
|   | k. | <u>Identity</u>. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Acceptable Bidder, including if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific person(s), counsel and other advisors whom the Debtors' Advisors should contact regarding such Bid.  Nothing herein shall preclude multiple Acceptable Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein. |
|   | l. | <u>Adequate Assurance</u>.  Each Bid must contain evidence acceptable to the Debtors in their discretion that the Acceptable Bidder has the ability to perform thereunder and otherwise complies with the requirements of adequate assurance of future performance under section 365(b)(1) and 365(b)(3) of the Bankruptcy Code.  Such evidence may include audited and unaudited financial statements, tax returns, bank account statements, a description of the proposed business to be conducted at the premises and/or any other documentation that the Debtors further request. |
|   | m. | <u>Authorization</u>.  Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the closing of the Transaction contemplated in such Bid. |
|   | n. | <u>No Fees Payable to Qualified Bidder</u>.  Except with respect to the Expense Reimbursement and the Augment Purchase payable to the Stalking Horse Bidder in accordance with the Stalking Horse Agreements, a Bid may not request or entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue any break-up fee, |

| | |
|---|---|
| | termination fee, expense reimbursement or similar type of payment, or substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bid Procedures.<br><br>By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bid Procedures and to refrain from submitting a Bid or seeking to reopen the Auction after conclusion of the Auction.  The submission of a Bid shall constitute a binding and irrevocable offer to purchase the Aggregate Assets as reflected in such Bid. |
| **Provisions Providing Bid Protections to Stalking Horse Bidder** Local Rule 6004-1(c)(i)(C) | To provide the Stalking Horse Bidder with an incentive to participate in a competitive process and to compensate the Stalking Horse Bidder for (i) performing substantial due diligence and incurring the expenses related thereto and (ii) entering into the Stalking Horse Agreements with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed, and the Court has approved in the Bid Procedures Order, that the Stalking Horse Bidder is entitled from the proceeds of a Subsequent Transaction[11] consummated pursuant to a Successful Bid (defined below) with the Successful Bidder (defined below) subject to the terms of the Stalking Horse Agreements and pursuant to the terms thereof, to: (A) the Expense Reimbursement (the "<u>Expense Reimbursement</u>") subject to a cap of $1.5 million and (B) the Augment Purchase. As set forth below, payment of the Expense Reimbursement and the Augment Purchase (to the extent payable under the Stalking Horse Agreements and Bid Procedures Order) shall be a component of any Qualified Bid submitted by a Qualified Bidder (other than the Stalking Horse Bidder).  The Expense Reimbursement and the Augment Purchase shall be payable as provided for pursuant to the terms of the Bid Procedures Order, the Approval Order (as defined in the Bid Procedures Order), the Stalking Horse Agreements, and the Interim DIP Order. |
| **Modification of Bid Procedures** Local Rule 6004-1(c)(i)(D) | Nothing in the Bid Procedures requires the Debtors to take any action, or to refrain from taking any action, with respect to the Bid Procedures, to the extent that the Debtors determine that taking such action, or refraining from taking such action, is required to comply with applicable law or their fiduciary duties under applicable law. |
| **Closing with Alternative Backup Bidders** Local Rule 6004-1(c)(i)(E) | Notwithstanding anything in the Bid Procedures to the contrary, if the Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the conclusion of the Auction for the Aggregate Assets or any sub-group thereof, as determined by the Debtors in the exercise of their business judgment, shall be required to serve as a backup bidder (the "<u>Backup Bidder</u>") with respect to the Aggregate Assets until the earlier of (i) such time that the Transaction is consummated and (ii) 30 days from entry of the Approval Order, subject to the terms of such Backup Bidder's Transaction Documents.<br><br>The Stalking Horse Bidder shall not serve as the Backup Bidder (whether in respect of the Stalking Horse Bid or any Overbid it may submit at the Auction).  Each Qualified Bidder (other than the Stalking Horse Bidder) shall agree and be deemed to agree to be a Backup Bidder if so designated by the Debtors, subject to the terms of such Backup Bidder's Transaction Documents.<br><br>The identity of a Backup Bidder and the amount and material terms of the Qualified Bid of such Backup Bidder shall be announced by the Debtors, at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder related thereto.  Such Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the earlier of (i) the closing of the Approved Transaction (defined |

---

[11]  As defined in the Stalking Horse APA.

| | |
|---|---|
| | below) and (ii) 30 days from entry of the Approval Order. Each Backup Bidder's Deposit shall be held in escrow (which may be held in escrow by Pachulski Stang Ziehl & Jones LLP) until the earlier of (i) three (3) Business Days after the closing of the Approved Transaction or (ii) 30 days from entry of the Approval Order, subject to the terms of such Backup Bidder's Transaction Documents. |
| | If a Successful Bidder fails to consummate the Approved Transaction contemplated by its Successful Bid, the Debtors may select the Backup Bidder with respect to the Aggregate Assets or sub-group of the Debtors' assets or business as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance. |
| **Provisions Governing the Auction** Local Rule 6004-1(c)(ii) | The Auction shall be conducted pursuant to the following procedures: <br><br> a. <u>The Debtors Shall Conduct the Auction</u> <br><br> The Debtors and the Debtors' Professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid(s). All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders and the Consultation Parties. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids, the Successful Bid(s), and any Backup Bid(s). <br><br> Only (i) Qualified Bidders and each of their respective legal and financial advisors, (ii) the Consultation Parties and each of their respective legal and financial advisors, and (iii) the Committee's counsel and financial advisors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person (live or on video conference) and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to make any subsequent bids at the Auction. <br><br> b. <u>Terms of Overbids</u> <br><br> "<u>Overbid</u>" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions: <br><br> (i) <u>Minimum Overbid Increment</u>. Any Overbid to the initial Baseline Bid at the start of the Auction shall be in increments of no less than a value equal to $100,000 unless otherwise determined by the Debtors in an exercise of their business judgment; *provided, however,* that to the extent that the Baseline Bid constitutes the Stalking Horse Bid, the bidding for such Aggregate Assets at the first round of bidding will start at an amount equal to the sum of: (i) the value of the Baseline Bid, (ii) the amount of the Expense Reimbursement and the Augment Purchase, and (iii) $250,000. <br><br> (ii) <u>Conclusion of Each Overbid Round</u>. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "<u>Overbid Round Deadline</u>") by which time any Overbids must be submitted to the Debtors. |

| | |
|---|---|
| | (iii) <u>Overbid Alterations</u>.    An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of the Bid Procedures. |
| | (iv) <u>No Round-Skipping</u>.  Round-skipping, as described herein, is explicitly prohibited.  To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for the Aggregate Assets. |
| | (v) <u>Announcing Highest Bid.</u>  With respect to the Auction, the Debtors shall, subsequent to each Overbid Round Deadline, announce whether the Debtors in consultation with the Consultation Parties have identified (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Baseline Bid in respect of the Aggregate Assets that are the subject of the Auction or (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria. |

23.    The Debtors have determined that, in light of their financial situation and liquidity needs, a more viable alternative to a sale of the Aggregate Assets does not exist and that the Stalking Horse Agreements are their best option, subject to the process under the Bid Procedures and the potential for higher and better offers for the Aggregate Assets.  The Debtors believe that the sale of the Aggregate Assets pursuant to this Motion optimizes value for their economic stakeholders.

**B.    Sale Noticing and Objection Procedures**

24.    The "Sale Process Key Dates and Deadlines" chart set forth above summarizes the proposed noticing and objection procedures and requirements with respect to service of the Sale Notice, the Sale Objection Deadline, and the deadline to publish the Sale Notice (collectively, the "Sale Noticing and Objection Procedures").  The Debtors submit that the Sale Noticing and Objection Procedures constitute adequate and reasonable notice of the key dates and deadlines and other important information regarding the sale process, including the Sale Objection Deadline and the Sale Hearing.

25.    The Sale Notice also provides parties with information on how to obtain copies of the Motion, sets forth the Bid Deadline, and the time and place of the Auction. No later than three (3) Business Days after entry of the Bid Procedures Order, the Debtors will serve the Sale Notice on the following parties: (i) counsel to any statutory committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee"); (ii) the U.S. Trustee; (iii) counsel to DIP Agent and Prepetition ABL Agent; (iv) counsel to the Stalking Horse Bidder; (v) counsel to the Prepetition Term Agent; (vi) all known creditors of the Debtors (for whom identifying information and addresses are available to the Debtors); (vii) the Internal Revenue Service; (viii) all applicable federal, state, and local taxing authorities; (ix) all persons and entities known by the Debtors to have expressed an interest to the Debtors in the Aggregate Assets; (x) all persons and entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in the Aggregate Assets (for whom identifying information and addresses are available to the Debtors); (xi) Counterparties to Potential Assigned Agreements; (xii) any governmental authority known to

have a claim against the Debtors in the Chapter 11 Cases; (xiii) the United States Securities and Exchange Commission; (xiv) the United States Attorney's Office for the District of Delaware; (xv) United States Attorney General's Office for the District of Delaware; (xvi) the Office of the Attorney General and the Secretary of State in each state in which the Debtors operate; (xvii) counsel to the Conflicts Committee; (xviii) all of the parties entitled to notice pursuant to Bankruptcy Rule 2002; and (xix) all other parties as directed by the Court.

26.     The Debtors also propose that any objections to the sale of the Aggregate Assets must be in writing, state, with specificity, the legal and factual bases thereof, be filed with the Court by the Sale Objection Deadline and be served on the following parties: (1) proposed counsel for the Debtors, (2) counsel to any statutory committee, (3) the United States Trustee, (4) counsel to DIP Agent and Prepetition ABL Agent, (5) counsel to the Stalking Horse Bidder, (6) counsel to the Prepetition Term Agent, (7) counsel to the Conflicts Committee, and (8) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties").

27.     The Sale Notice also provides information on how to obtain copies of the Motion and other sale related information directly from the case website maintained by the Debtors' claims agent, Verita Global (the "Case Management Website").   Accordingly, the Debtors request that the Court approve the form of Sale Notice, substantially in the form attached to the Bid Procedures Order as Exhibit 2 and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

**C.** **Potential Assumption and Assignment Notice**
**and Proposed Assumption and Assignment Procedures for Contracts**

28.     At or after the closing of the sale of the Aggregate Assets, the Debtors may

seek to assume and assign to the Successful Bidder all or certain of the Potential Assigned

Agreements.[12]  The Successful Bidder may decide to (i) assume and assign the Potential Assigned

Agreement or (ii) not to assume and assign the Potential Assigned Agreement.[13]

29.     The Debtors will serve the Potential Assumption and Assignment Notice

substantially in the form attached to the Bid Procedures Order as Exhibit 3 on all Counterparties

to Potential Assigned Agreements.  The Assumption Assignment Notice provides notice of, *inter*

*alia*, the possible assumption and assignment of the Potential Assigned Agreements, the Debtors'

proposed Cure Amounts, the applicable deadlines to object to the assumption, and assignment of

the Potential Assigned Agreements with respect to disputed Cure Amounts and/or on the basis of

adequate assurance of future performance.  The Potential Assumption and Assignment Notice also

provides information on how to access the Bid Procedures and Bid Procedures Order from the

---

[12]  The inclusion of any agreement in the list of Potential Assigned Agreements does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included in the list of Potential Assigned Agreements.

[13]  The Successful Bidder may designate the Leases and Potential Assigned Agreements Primarily Related to such Lease (as those terms are defined in the Stalking Horse APA) that the Stalking Horse may designate for assumption and assignment to its designee. In such event, the Debtors will serve the Lease Assignment Notice substantially in the form attached as Exhibit D to the Approval Order to the affected counterparties, which notice will disclose the Lease and Potential Assigned Agreements Primarily Related to such Lease, together with information concerning the proposed assignee's ability to provide adequate assurances of future performance pursuant to section 365(b)(1)(C) of the Bankruptcy Code.  The Lease Assignment Notice will provide that the counterparty to the Lease will have seven (7) Business Days to file an objection to the proposed assumption and assignment of the Lease and any Potential Related Agreements Relating to such Leases.

Section 3.6 of the Stalking Horse APA permits the Stalking Horse Bidder to add certain Contracts  to the Assigned Agreements for assumption and assignment (including to its delegee) following the Closing until the Designation Deadline. The Debtors will use commercially reasonable efforts to assume and assign such Contracts pursuant to section 3.6 of the Stalking Horse APA and in accordance with the terms and conditions of that agreement.

Case Management Website.  Accordingly, the Debtors request that the Court approve the form of Potential Assumption and Assignment Notice, substantially in the form attached to the Bid Procedures Order as <u>Exhibit 3</u>, and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 6006 and Local Rule 2002-1.

30.    Payment of all Cure Amounts that may be owed to any counterparty to the Potential Assigned Agreements shall be satisfied pursuant to the terms of the Stalking Horse Agreements.  The Successful Bidder shall also be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b)(1) of the Bankruptcy Code in connection with the proposed assignment of any Potential Assigned Agreements.  The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Potential Assigned Agreements pursuant to section 365(b)(1) of the Bankruptcy Code at the Sale Hearing.

31.    The Debtors request that the Court approve the proposed Assumption and Assignment Procedures, including with respect objections by any Counterparty to:  the proposed assumption or assignment of its Potential Assigned Agreement, the Debtors' proposed Cure Amounts with respect to such Potential Assigned Agreement, if any, or the ability of the Stalking Horse Bidder or any other potential bidder to provide adequate assurance of future performance (collectively, an "<u>Assumption and Assignment Objection</u>").[14]    The Debtors propose that all

---

[14]  For avoidance of doubt, to the extent the identity of the assignee designated by the Stalking Horse Bidder to any Potential Assigned Agreement is not provided in any Potential Assumption and Assignment Notice or Supplemental Potential Assumption and Assignment Notice (as defined below), the Counterparty to any Potential Assigned Agreement shall not be required to file an Assumption and Assignment Objection solely on the grounds of (i) the identity of the proposed assignee to the Potential Assigned Agreement, or (ii) the ability of the proposed assignee to provide adequate assurances of future performance under any Potential Assumed Agreement.

Assumption and Assignment Objections must be in writing, comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amount the Counterparty believes is required to cure defaults (as that concept is contemplated by section 365(b)(1) of the Bankruptcy Code) under the relevant Potential Assigned Agreement, and be filed no later than ten (10) calendar days after the date of service of the Assumption and Assignment Notice.

32.     If a Counterparty files a timely Assumption and Assignment Objection, the Debtors propose that the Court hear and determine such objection either at the Sale Hearing or such other date that the Debtors and the Successful Bidder shall determine (subject to the Court's calendar).  If a Counterparty fails to file with the Court and serve a timely Assumption and Assignment Objection, the Counterparty shall be barred from asserting any such objection with regard to the assumption or assignment of its Potential Assigned Agreement.  In such event, notwithstanding anything to the contrary in the Potential Assigned Agreement, or any other document, the Debtors request that the Cure Amounts set forth in the Potential Assumption and Assignment Notice be controlling and shall be the only amount necessary to cure outstanding defaults under the applicable Potential Assigned Agreement under section 365(b)(1) of the Bankruptcy Code arising out of or related to the Potential Assigned Agreement following the assumption and assignment of the Potential Assigned Agreement.  Moreover, if a Counterparty fails to file with the Court and serve a timely Assumption and Assignment Objection, the Debtors request that the Counterparty be forever barred from asserting any cure or other pre-assignment amounts in excess of the Cure Amount set forth in the applicable Potential Assumption and

Assignment Notice with respect to such Potential Assigned Agreement against the Debtors, the Successful Bidder or the property of any of them.

33.     The Debtors may, subject to the agreement with the Stalking Horse Bidder or other Successful Bidder, add supplemental Potential Assigned Agreements for potential assumption and assignment or modify previously noticed Cure Amounts in accordance with the Stalking Horse Agreements or agreement with such other Successful Bidder.  In such an event, the Debtors will promptly serve a supplemental assumption and assignment notice, by overnight mail, and, if known, e-mail, on the applicable Counterparties (collectively, a "Supplemental Assumption and Assignment Notice").  Each Supplemental Assumption and Assignment Notice will include the same information with respect to the applicable Potential Assigned Agreement as is required to be included in the Potential Assumption and Assignment Notice.

34.     Any Counterparty listed on a Supplemental Assumption and Assignment Notice whose Potential Assigned Agreement is proposed to be assumed and assigned and was not included in the Potential Assumption and Assignment Notice may object to the proposed assumption or assignment of its Potential Assigned Agreement, the Debtors' proposed Cure Amounts with respect to its Potential Assigned Agreement, if any, or the ability of the Successful Bidder to provide adequate assurance of future performance (collectively, a "Supplemental Assumption and Assignment Objection").  The Debtors request that all Supplemental Assumption and Assignment Objections must state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amounts the Counterparty believes is required to cure defaults (as that concept is contemplated by section 365 of the Bankruptcy Code) under the relevant

Potential Assigned Agreement and be filed by no later than ten (10) calendar days after the date of service of such Supplemental Assumption and Assignment Notice.  If a Potential Assigned Agreement was listed in the Potential Assumption and Assignment Notice and the previously stated Cure Amount is modified in the Supplemental Assumption and Assignment Notice, the Counterparties to such Potential Assigned Agreement may file a Supplemental Assumption and Assignment Objection only if such objection is to the modified Cure Amount.

35.     If a Counterparty fails to file with the Court and serve a timely Supplemental Assumption and Assignment Objection, the Counterparty shall be barred from asserting any such objection with regard to the assumption or assignment of its Potential Assigned Agreement.  In such event, notwithstanding anything to the contrary in the Potential Assigned Agreement or any other document, the Debtors request that the Cure Amounts set forth in the Supplemental Assumption and Assignment Notice be controlling and shall be the only amount necessary to cure outstanding defaults under the applicable Potential Assigned Agreement under section 365(b)(1) of the Bankruptcy Code arising out of or related to the Potential Assigned Agreement following the assumption and assignment of the Potential Assigned Agreement.  Moreover, if a Counterparty fails to file with the Court and serve a timely Supplemental Assumption and Assignment Objection, the Debtors request that the Counterparty be forever barred from asserting any cure or other pre-assignment amounts in excess of the Cure Amount set forth in the applicable Supplemental Assumption and Assignment Notice with respect to such Potential Assigned Agreement against the Debtors, the Successful Bidder or the property of any of them.

36.     The Successful Bidder for the Aggregate Assets will be responsible for providing evidence of "adequate assurances of future performance" to the extent required in connection with the assumption and assignment of any Potential Assigned Agreement.

37.     Finally, the Debtors request that, following any Auction, if the Stalking Horse Bidder is not the Successful Bidder, each Counterparty may raise any objections to such Successful Bidder's ability to provide adequate assurances of future performance under section 365(b)(1) at the Sale Hearing, provided that any objections relating to (i) the ability of the Stalking Horse Bidder to provide adequate assurance of future performance with respect to such Potential Assigned Agreements or (ii) the Cure Amounts that must be cured by either the Stalking Horse Bidder or any Successful Bidder that is not the Stalking Horse Bidder with respect to the Potential Assigned Agreements, must be filed by Assumption and Assignment Objection Deadline as provided above.

38.     The Debtors submit that the proposed procedures governing the assumption and assignment of Potential Assigned Agreements are reasonable and should be approved.

## **ARGUMENT**

**D.     The Bid Procedures Are Fair, Appropriate,
        and in the Best Interests of the Debtors and Their Stakeholders**

39.     The Bid Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of a debtor's property—maximizing the value of sale proceeds received by the estate.  *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 573 (3d

Cir. 2003) (debtor has "fiduciary duty to maximize the value of the bankruptcy estate"); *Four B. Corp v. Food Barn Stores (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564- 65 (8th Cir. 1997) ("a primary objective of the Code [in asset sales is] to enhance the value of the estate at hand") (citing *Metro. Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 . . . advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors.")).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy (In re O'Brien Envtl. Energy)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1992) ("[C]ourt-imposed rules for the disposition of assets . . .  [should] provide an adequate basis for comparison of offers, and [should] provide for fair and efficient resolution of bankrupt estates.").

40.    The Bid Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may submit offers in connection with the sale of the Aggregate Assets.  The Debtors, with the assistance of their advisors, have structured the Bid Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Aggregate Assets.  The Bid Procedures will allow the Debtors to conduct any Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely sale or sales.

41.     Courts in this District and other districts routinely approve procedures substantially similar to the proposed Bid Procedures. *See*, *e.g.*, *In re GigaMonster Networks, LLC*, No. 23-10051 (JKS) (Bankr. D. Del. Feb. 8, 2023), ECF No. 113; *In re Medly Health Inc.*, No. 22-11257 (KBO) (Bankr. D. Del. Jan. 18, 2023), ECF No. 402; *In re RTI Holding Co., LLC*, No. 20-12456 (JTD) (Bankr. D. Del. Nov. 20, 2020), ECF No. 585; *In re BL Restaurants Holding, LLC*, No. 20-10156 (MFW) (Bankr. D. Del. Feb. 28, 2020), ECF No. 227; *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Feb. 4, 2020), ECF No. 854; *In re Consolidated Infrastructure Group, Inc.*, No. 19-10165 (BLS) (Bankr. D. Del. Apr. 24, 2019), ECF No. 151 (authorizing designation of stalking horse bidders and provision of bid protections without further hearing with consent of United States Trustee and consultation parties); *In re Hobbico, Inc.*, No. 18-10055 (KG) (Bankr. D. Del. Mar. 14, 2018), ECF No. 243 (same); *In re California Proton Treatment Center, LLC*, No. 17-10477 (LSS) (Bankr. D. Del. Apr. 12, 2017), ECF No. 158 (same); *In re United Road Towing, Inc.*, No. 17-10249 (LSS) (Bankr. D. Del. Mar. 6, 2017), ECF No. 131 (same); *In re Constellation Enterprises LLC*, No. 16-11213 (CSS) (Bankr. D. Del. Jun. 15, 2016), ECF No. 260 (same); s*ee also, e.g., In re Mabvax Therapeutics Holdings, Inc.*, No. 19-10603 (CSS) (Bankr. D. Del. Apr. 8, 2019), ECF No. 78 (approving bidding procedures with a bid deadline eighteen days after entry of bidding procedures order); *In re Things Remembered, Inc.*, No. 19-10248 (CSS) (Bankr. D. Del. Mar. 13, 2019), ECF No. 100 (approving bidding procedures with bid deadline seven days after entry of order and auction scheduled for twenty-six days after entry of order); *In re Charlotte Russe Holding, Inc.*, No. 19-10210 (LSS) (Bankr. D. Del. Feb. 21, 2019), ECF No. 199 (approving bidding procedures with bid deadline ten days after entry of order and auction

scheduled for twenty-nine days after entry of order); *In re Maurice Sporting Goods, Inc.*, No. 17-12481 (CSS) (Bankr. D. Del. Dec. 12, 2017), ECF No. 125 (entering bidding procedures order twenty-two days after petition date, approving bid deadline ten days after entry of order); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) (Bankr. D. Del. Oct. 6, 2016), ECF No. 196 (approving bidding procedures with a bid deadline eleven days after entry of order and auction scheduled for thirteen days after entry of order).

42.    Accordingly, the Bid Procedures should be approved, not just because they are aligned with the circumstances of the Debtors' chapter 11 cases, but also because they are consistent with procedures approved by courts in this District in cases of similarly situated debtors and are otherwise reasonable, appropriate, and in the best interests of the Debtors, their estates and all parties in interest.

**E.    The Proposed Bid Protections Are Necessary, Reasonable, and Appropriate**

43.    As indicated above, the Debtors hereby request that the Court approve the Bid Protections, which include the Augment Purchase and the Expense Reimbursement.  The Augment Purchase requires the Debtors to compensate the Stalking Horse Bidder for the Additional Agent Goods purchased by the Stalking Horse Agent in anticipation of the sales contemplated under the Stalking Horse Agency Agreement.  The Successful Bidder may then have the opportunity to acquire such Additional Agent Goods from the Debtors and sell them pursuant to its own competing agency agreement, or otherwise, to the extent agreed to by the Debtors.

44.    The amount of the Expense Reimbursement is also reasonable, given the benefits to the Debtors' estates of having a stalking horse bidder by virtue of the definitive Stalking

Horse Agreements, and the risk to the Stalking Horse Bidder that a third-party offer may ultimately be accepted.  To date, the Stalking Horse Bidder has expended a considerable amount of time and money in negotiating and entering into the Stalking Horse Agreements with the Debtors and will continue to incur expenses through the date of any auction.  Competing bidders will have benefitted from the diligence and efforts expended by the Stalking Horse Bidder and the transactions contemplated under both the Stalking Horse Agreements.  The Debtors believe that the agreement to pay the Expense Reimbursement and consummate the Augment Purchase on the terms of the Stalking Horse Agreements is necessary to induce the Stalking Horse Bidder to enter into the transactions encompassed by the Stalking Horse Agreements, will enable the Debtors to obtain the highest and best possible price for the Aggregate Assets and are fair and reasonable under the circumstances of these cases.  The Bid Protections will encourage competitive bidding and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

45.     While the Stalking Horse Agreements do not provide for any payment of a break-up fee and only purport to provide the Stalking Horse Bidder with the Expense Reimbursement and the Augment Purchase, case law examining the payment of amounts to a stalking horse bidder in order to encourage competitive bidding and set a floor for the sale of the Aggregate Assets is instructive.  In the Third Circuit, expense reimbursements (along with break-up fees) are considered administrative expenses and must be necessary to preserve the value of a debtor's estate.  *O'Brien Envtl. Energy*, 181 F.3d at 533.  Bidding protections encourage potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price

at which the debtor is sold will reflect its true worth." *Id.* Termination and similar fees are effective mechanisms for protecting bidders in connection with an asset sale and can be "important tools to encourage bidding and to maximize the value of the [d]ebtors' assets." *Official Comm. v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992). Put differently, these bidding protections enable a debtor to assure a sale to a contractually committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity to generate even greater value through an auction process. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "'legitimately necessary to convince a "white knight" to enter the bidding by providing some form of compensation for the risks it is undertaking.'") (quoting *Samjens Ptrs. v. Burlington Ind.*, 663 F. Supp. 614, 624 (S.D.N.Y. 1987)).

46.     As set forth above, the Bid Protections are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to secure an adequate floor for the Aggregate Assets and to therefore insist that competing bids be materially higher or otherwise better than as provided under the Stalking Horse Agreements—a clear benefit to the Debtors' estates. The Debtors submit that the Bid Protections for the Stalking Horse Agreements reflect market terms for a transaction of this size and nature. *See, e.g.*, *In re* The *Rockport Co., LLC*, (No. 18-11145) (LSS) (Bankr. D. Del. June 5, 2018), ECF No. 146 (approving break-up fee and expense reimbursement equal to approximately 4.3% of the purchase price); *In re Orexigen Therapeutics, Inc.*, (No. 18-10518) (KG) (Bankr. D. Del. April 23, 2018), ECF No. 231 (approving break-up fee and expense reimbursement equal to approximately 7.3% of the purchase price); *In re The*

*Weinstein Company Holdings LLC*, (No. 18-10601) (MFW) (Bankr. D. Del. Apr. 6, 2018), ECF No. 190 (approving break-up fee and expense reimbursement equal to approximately 5% of the purchase price); *In re ATopTech, Inc.*, (No. 17-10111) (MFW) (Bankr. D. Del. Apr. 21, 2017), ECF No. 234 (approving break-up fee and expense reimbursement equal to approximately 5% of the purchase price); *In re Phoenix Brands LLC*, (No. 16-11242) (BLS) (Bankr. D. Del. June 8, 2016), ECF No. 136 (approving break-up fee and expense reimbursement greater than 5% of the purchase price).

47.    Most importantly, absent approval of the Bid Protections, the Debtors may lose the opportunity to obtain the highest and otherwise best offers for the Aggregate Assets through the Auction process.  If the Court does not approve the proposed Bid Protections, the success of the sale process could be compromised, the competitive nature of any Auction could be undermined, and the estates could suffer accordingly.  The Bid Protections were negotiated at arm's length and in good faith with the Stalking Horse Bidder.  The Bid Protections are integral parts to the Stalking Horse Agreements.  In the absence of the Bid Protections, the Stalking Horse Buyer would not  have entered into the Stalking Horse Agreements.  Accordingly, the Debtors request that the Court approve the Bid Protections pursuant to and in accordance with the terms of the Bid Procedures Order and the Stalking Horse Agreements, as such bid protections will be in the best interest of the Debtors and their estates.

**F.    Approval of the Proposed Sale Is Warranted**
   **Under Section 363 of the Bankruptcy Code**

48.    Section 363 of the Bankruptcy Code provides, in relevant part, that the debtor may, "after notice and a hearing . . . use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1). While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363, courts routinely authorize a sale if it is based upon the debtor's sound business judgment. *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

      49.    Courts typically consider the following factors in determining whether a sale under section 363 of the Bankruptcy Code passes muster under the business judgment standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was provided to interested parties, (c) whether the sale will produce a fair and reasonable price for the property, and (d) whether the parties have acted in good faith. *See In re Decora Indus.*, No. 00-4459, 2002 U.S. Dist. LEXIS 27031, at *7-8, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting *Lionel* factors) (citing *Guilford Transp. Indus., Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing nonexclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)). As such, it follows that when a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "'on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

**G.      The Debtors Have Demonstrated a Sound Business
        <u>Justification for the Proposed Sale of the Aggregate Assets</u>**

50.     A sound business justification exists where the sale of a debtor's assets is necessary to preserve the value of the debtor's estate for the benefit of creditors and interest holders.  *See, e.g.*, *Cumberland Farm Dairy v. Abbotts Dairies (In re Abbotts Dairies)*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business purpose . . . ."); *In re Lionel Corp.*, 722 F.2d at 1071 (adopting a rule "requiring that a judge determining a § 363(b) application expressly find from the evidence presented before him . . . a good business reason to grant" the sale).

51.     As set forth above, a strong business justification exists for a sale of the Aggregate Assets.  In light of the Debtors' financial condition, an orderly but expeditious sale of the Aggregate Assets is critical to maximizing recoveries for all of the Debtors' stakeholders.  Moreover, a timely closing of the sale of the Aggregate Assets is necessary under the Interim DIP Order, without which Debtors would not have been able to execute an orderly and value-maximizing sale process or fund these chapter 11 cases.

**H.      The Proposed Sale of the Aggregate Assets
        <u>Will Yield a Fair and Reasonable Purchase Price</u>**

52.     As set forth above, the Debtors believe that the sale of the Aggregate Assets governed by the Bid Procedures will yield a fair and reasonable price for the Aggregate Assets.  The Bid Procedures were designed to facilitate a robust and competitive bidding process and provide significant flexibility to do so.  The Debtors also constructed the Bid Procedures to

promote transparency, good faith, and fairness throughout the entire sale process within the

parameters of the Sale Milestones.  The Bid Procedures provide an appropriate framework for the

Debtors to review, analyze, and compare one or more bids for the Aggregate Assets and to engage

with bidders on an arm's length basis to work to improve the quality of their bids for the benefit

of all parties in interest.

53.    A sale governed by the Bid Procedures undoubtedly will serve the important

objectives of obtaining not only a fair and reasonable purchase price for the Aggregate Assets, but

also the highest or best value for the Aggregate Assets.

**I.    The Successful Bidder(s) Should Be Entitled
to the Protections of Section 363(m) of the Bankruptcy Code**

54.    Section 363(m) of the Bankruptcy Code is designed to protect the sale of a

debtor's assets to a good-faith purchaser.  Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale ... were stayed pending
> appeal.

11 U.S.C. § 363(m).  Section 363(m) embodies the "'policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon which third parties rely.'"  *Abbotts Dairies*, 788 F.2d at 147 (quoting *Hoese Corp v. Vetter*

*Corp. (In re Vetter Corp.)*, 724 F. 2d 52, 55 (7th Cir. 1983)); *see also Allstate Ins. Co. v. Hughes*,

174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of

property will not be affected by the reversal or modification on appeal of an unstayed order,

whether or not the transferee knew of the pendency of the appeal").

55.     While the Bankruptcy Code does not define "good faith," the Third Circuit

has held that indicia of bad faith typically include "'fraud, collusion between the purchaser and

other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders . . .'"

*Abbotts Diaries*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572

F.2d 1195, 1198 (7th Cir. 1978)); *see also Kabro Assoc. v. Colony Hill Assocs. (In re Colony Hill

Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

56.     As set forth above, the Bid Procedures were designed with the goal of

producing a fair and transparent sale process that will yield the highest or otherwise best value for

the Aggregate Assets.  As noted above, each of the Stalking Horse Bidder and SEI, Inc. is an

insider of the Debtors.  To ensure the fairness of the sale process, the Debtors created the Conflicts

Committee comprised of an independent director who, in consultation with its independent

professionals and the Debtors' advisors and professionals, determined that the Stalking Horse

Bidder proposed a fair bid for the assets to be acquired pursuant to the Stalking Horse Agreements

and entry into such agreements is in the best interests of the estates.  At all times, the Stalking

Horse Bidder has been represented by separate counsel to represent its interests in the negotiation

of the Stalking Horse Agreements and in the sale process generally for the Aggregate Assets.  The

Debtors submit, and the testimony presented at the Sale Hearing will demonstrate, that the terms

and conditions of the sale of the Aggregate Assets will have been negotiated by the Debtors and

the Stalking Horse Bidder or Successful Bidder for the Aggregate Assets at arm's length and in

good faith and that the parties did not engage in any conduct that would cause or permit the sale

of the Aggregate Assets to be avoided under section 363(n) of the Bankruptcy Code.

57.     The Debtors submit that the Stalking Horse Bidder is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  Further, as set forth above, the Bid Procedures are designed to produce a fair and transparent competitive bidding process.  Each Qualified Bidder participating in the Auction will be required confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Aggregate Assets. Any purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's length and in good faith.  As such, the Debtors request a finding that any Successful Bidder (including the Stalking Horse Bidder if it is the Successful Bidder) is a good-faith purchaser and is entitled to the full protections afforded under section 363(m) of the Bankruptcy Code.

58.     In view of the foregoing, the Debtors have demonstrated that the proposed sale of their Aggregate Assets should be approved as a sound exercise of their business judgment.

**J.      The Sale of the Aggregate Assets Free and Clear of Liens, Claims, Interests, and Encumbrances Is Appropriate Under Section 363(f) of the Bankruptcy Code**

59.     In the interest of attracting the best offers, the Court should authorize the Debtors to sell the Aggregate Assets free and clear of any liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances of an entity other than the estate if any one of the following conditions is met:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)      such interest is in bona fide dispute; or

(e)      such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) - (5); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

60.     Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

61.     The Debtors submit, and to the extent necessary will demonstrate at the Sale Hearing, that the sale of the Aggregate Assets free and clear of all liens, claims, interests, and encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  The proposed sale of the Aggregate Assets satisfies one or more of the requirements under section 363(f) of the Bankruptcy Code to permit a "free and clear" sale of the Aggregate Assets.

For example, the Aggregate Assets are subject to the liens of the Debtors' prepetition and postpetition secured lenders, each of whom either have consented or are expected to consent to the sale of the Aggregate Assets. Additionally, any parties with junior liens on the Aggregate Assets can be compelled to accept a money satisfaction of their interests but also would be adequately protected by such liens attaching to the proceeds of the applicable sale of the Aggregate Assets in the order of their respective priority.

62.     Moreover, the Debtors will send the Sale Notice to any other purported prepetition lienholders. If such lienholders do not object to the proposed sale of the Aggregate Assets, then their consent should be presumed. Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, or encumbrance on any of the Stalking Horse timely objects to this Motion as it relates to the sale of the Aggregate Assets (and not the Bid Procedures), such party shall be deemed to have consented to any sale of the Aggregate Assets approved at the Sale Hearing. *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein). Accordingly, the Debtors request that the Court authorize the sale of the Aggregate Assets free and clear of any liens, claims, interests, and encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances attaching to the proceed thereof in the same order of relative priority, with the same validity, force, and effect as prior to such.

63.     It is also appropriate to sell the Aggregate Assets free and clear of successor liability relating to the Debtors' business. Such limitations on successor liability ensure that the

Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is the successor in interest to one or more of the Debtors. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mineworkers v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Ormet*, 2014 Banker. LEXIS 3071, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an underfunded pension plan); *Amphenol Corp. v. Shandler (In re Insilco Techs.)*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

64.    The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, potential bidders may choose not to participate in the Auction or, if they did, would submit reduced bid amounts. To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses but should hold the Aggregate Assets free and clear.

65.     Accordingly, the Debtors request that the Court authorize the sale of any of the Aggregate Assets free and clear of any liens, claims, interests and encumbrances, to the fullest extent permitted by section 363(f) of the Bankruptcy Code.

**K.      The Debtors' Assumption and Assignment of Executory Contracts and Unexpired Leases Are Appropriate under Section 365 of the Bankruptcy Code**

66.     Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."   11 U.S.C. § 365(a).   Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or an unexpired lease.   *See*, *e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment . . . ."); *In re HQ Global Holdings*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice).   In this context, the business judgment test only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.   *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

67.     The proposed sale of the Aggregate Assets will provide a Successful Bidder with the opportunity to designate the Potential Assigned Agreements for assumption and assignment.   Assumption and assignment of any Potential Assigned Agreements is an exercise of the Debtors' sound business judgment because the transfer of such contracts in connection with

the sale of the Aggregate Assets is an essential element in the Debtors' ability to maximize the value of the Aggregate Assets—particularly so when a Potential Assigned Agreement is integral to the ownership or operation of the Aggregate Assets.  Further, the ability to assume and assign necessary Potential Assigned Agreements will increase the likelihood that the Debtors will be able to sell the Aggregate Assets to the Stalking Horse Bidder or Successful Bidder.

68.    The consummation of any sale of the Aggregate Assets involving the assignment of a Potential Assigned Agreement will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) requires that any outstanding defaults under the Potential Assigned Agreements to be assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured. *See* 11 U.S.C. § 365(b)(1).  The Debtors' assumption and assignment of any Potential Assigned Agreements will be dependent upon payment of Cure Amounts and effective only upon the closing of the sale of the Aggregate Assets, or such later date as set forth in accordance with the Stalking Horse APA.  As set forth above, subject to the Court's approval, the Debtors will file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice setting forth the Debtors' calculation of the Cure Amounts for each Potential Assigned Agreement that could be assumed in connection with the sale of the Aggregate Assets.

69.    Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance . . . whether or not there has been a default in such contract."  11 U.S.C. § 365(f)(2).  While the Bankruptcy Code does not define "adequate assurance," courts have held that what constitutes "adequate assurance" should

be determined by "'a practical, pragmatic construction based upon the facts and circumstances of each case.'"  *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1988) (quoting *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations.").  While no single standard governs every case, adequate assurance "'will fall considerably short of an absolute guarantee of performance.'"  *Carlisle Homes*, 103 B.R. at 538 (quoting *Bonton*, 53 B.R. at 803); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

70.    Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business, and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

71.    The Bid Procedures expressly specify that for a bid to qualify as a Qualified Bid, a prospective bidder must include with its bid adequate assurance information regarding the prospective bidder's ability to perform the applicable obligations under any Potential Assigned Agreements that may be included in the bid.  Accordingly, the proposed Assumption and Assignment Procedures are carefully designed to ensure that Counterparties receive timely and

sufficient notice with respect to the disposition of their Potential Assigned Agreements.  In light of the foregoing, the Debtors' assumption and assignment of any Potential Assigned Agreements in accordance with the proposed Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

72.    Finally, in order to facilitate the assumption and assignment of Potential Assigned Agreements in furtherance of maximizing the value of the Aggregate Assets, the Debtors further request that the Court find that any anti-assignment provision included in any Potential Assigned Agreement, whether such provision expressly prohibits or has the effect of restricting or limiting assignment of a Potential Assigned Agreement, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[15]

## L.    The Designation Rights Set Forth the Stalking Horse APA Are Appropriate

73.    The Stalking Horse APA grants the Stalking Horse Bidder with certain designation rights (the "Designation Rights") pursuant to which the Stalking Horse Bidder may request assumption by the applicable Debtor(s) and assignment to the Stalking Horse Bidder's designee of the Debtors' Leases and Potential Assigned Agreements Primarily Related to such Lease (as these terms are defined in the Stalking Horse APA).  The Stalking Horse APA will enable the Stalking Horse Bidder to effectively designate the Leases and the Potential Assigned

---

[15] Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ." 11 U.S.C. § 365(f)(1).  Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

Agreements Primarily Related to such Leases that it elects to have assumed and assigned to its chosen assignee (which may be the Stalking Horse Bidder) during the Designation Rights Period (defined below). The Designation Rights will allow the Stalking Horse Bidder (or another Successful Bidder) to receive the benefits of the locations that are the subject of the Designation Rights until such time as those leases are assumed and assigned or, alternatively, rejected.

74.     The Designation Rights commence as of the Closing Date and end on the date that is the earliest of (i) five Business Days after the delivery of a Buyer Rejection Notice (as defined in the Stalking Horse APA) to the Debtors; (ii) the date on which the applicable lease is assumed and assigned to an assignee; and (iii) April 30, 2026 (the "Designation Rights Period"). The Stalking Horse Bidder has required this concept as an essential condition of the Stalking Horse Agreements, but the Designation Rights will be potentially available to any Successful Bidder.

75.     The Stalking Horse APA also provides for the filing of a notice providing for the assumption and assignment of the Leases and the Potential Assigned Agreements Primarily Related to such Leases substantially in the form as Exhibit D to the proposed Approval Order (the "Lease Assignment Notice") with the Court and to be served on the applicable lessor(s) and appropriate notice parties in order to effectuate the assumption and assignment of the Leases and Potential Assigned Agreements Primarily Related to such Leases in accordance with the terms of the Stalking Horse Agreements. The Lease Assignment Notice will provide seven (7) Business Days for the counterparties to the Leases and Potential Assigned Agreements Primarily Related to such Leases to file any objection to the proposed assignment. As noted above, section 3.6 of the Stalking Horse APA permits the Stalking Horse Bidder to add certain Contracts to the Assigned

Agreements for assumption and assignment (including to its delegee) following the Closing until the Designation Deadline.  The Debtors will use commercially reasonable efforts to assume and assign such Contracts pursuant to section 3.6 of the Stalking Horse APA and in accordance with the terms and conditions of the Stalking Horse APA.

76.     Bankruptcy courts in this District and other jurisdictions have approved similar designation rights.  *See, e.g., In re FHC Corp.*, No. 20-13076 (BLS) (Bankr. D. Del. Jan. 22, 2021), ECF No. 384 (sale order approving designation rights period extending up to 150 days after closing date); *In re Alpha Entm't LLC*, No. 20-10940 (LSS) (Bankr. D. Del. Aug. 7, 2020), ECF No. 358 (sale order approving designation rights period extending through the earlier of (a) plan confirmation occurring no earlier than 70 days after closing date, or (b) 90 days from and after closing date); *In re Brooks Bros. Grp.*, No. 20-11785 (CSS) (Bankr. D. Del. Aug. 3, 2020), ECF No. 285 (approved bidding procedures order for stalking horse agreement providing for designation rights period extending post-closing until the later of plan confirmation or Dec. 31, 2020); *In re Daily Bread Winndown LLC*, Case No. 20-11266 (JTD) (Bankr. D. Del. June 29, 2020), ECF No. 435 (order approving private sale with postclosing date designation deadline ten days following entry of sale order); *In re SGR Winndown, Inc.*, No. 19-11973 (MFW) (Bankr. D. Del. Oct. 15, 2019), ECF No. 268 (approved bidding procedures order for stalking horse agreement providing for designation rights period extending ninety days from and after closing date); *In re RM Wind-Down Holdco LLC*, No. 18-11795 (MFW) (Bankr. D. Del. Sept. 6, 2018), ECF No. 187 (same).

**ADDITIONAL PROVISIONS RELATING TO**
**THE STORE CLOSING SALES PURSUANT TO THE**
**TERMS OF THE STALKING HORSE AGENCY AGREEMENT**

77.     As explained above, the Debtors propose to conduct the sale and liquidation of their owned inventory, store fixtures, FF&E, and other personal property at the store locations that are the subject of the Stalking Horse Agency Agreement (collectively, the "Store Closing Assets"), subject to higher and better offers at Auction.  To maximize the value of the Store Closing Assets, the Debtors seek approval of streamlined procedures approved in national retail bankruptcies.  The Debtors intend to conduct the sales of the Store Closing Assets (the "Store Closing Sales") in accordance with the Sale Guidelines attached as Exhibit 8.1(a) to the Stalking Horse Agency Agreement.  During the Store Closing Sales, subject to the terms of the Stalking Horse Agency Agreement, all sales of merchandise at the stores that the subject of the Stalking Horse Agency Agreement (the "Stores") will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  The Stalking Horse Agency Agreement provides for the authorization to abandon any remaining inventory and FF&E following the Sale Termination Date (as defined in the Stalking Horse Agency Agreement).

A.     **The Sale Guidelines for the Store Closing Sales**

78.     Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state and local laws, statutes, rules, regulations, and ordinances. Section 2.1(c) of the Stalking Horse Agency Agreement provides that the Stalking Horse Agent will comply with applicable federal, state and local laws, regulations and

ordinances, including all laws and regulations relating to advertising, permitting, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "store closing," "sale on everything," "total liquidation," "total inventory blowout," "everything must go," "going out of business" or similar-themed sales (collectively, the "Liquidation Sale Laws") provided that such sales are conducted in accordance with the terms of the Stalking Horse Agency Agreement, the Sale Guidelines, and the Approval Order.

79.    To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Liquidation Sale Laws, the Debtors propose the Sale Guidelines as a way to streamline the administrative burdens on their estates while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the sale of the Store Closing Assets.  As such, the Debtors believe the Sale Guidelines mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closing Sales.  Therefore, the below requested relief is consistent with any applicable Liquidation Sale Laws.

80.    The Court may authorize the Debtors to consummate the Store Closing Sales pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that, "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C.

§ 363(b)(1).  As discussed herein, pursuant to section 363(b) of the Bankruptcy Code, for the purpose of conducting the Store Closing Sales, the Debtors need only show a "legitimate business justification" for the proposed action.  *See, e.g., Martin,* 91 F.3d at 395.

81.    Section 105(a) codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), courts may authorize any action that is essential to the continued operation of a debtor's businesses.  *See In re Just for Feet, Inc.,* 242 B.R. 821, 825 (D. Del. 1999) (authorizing the use of estate property when "necessary for the debtor's survival during chapter 11").

82.    Approval of the Sale Guidelines represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.  Under the Sale Guidelines, the Store Closing Sales will maximize value to the Debtors' estates by maintaining consistent operational efficiency across the Stores while balancing the potentially competing concerns of landlords and other parties in interest.  Meaningful amounts of merchandise, in the aggregate, will be monetized most efficiently and quickly through an orderly process in accordance with the Sale Guidelines following the closing of the Sale of the Assets.

83.    Courts in this and other districts have routinely approved store closing sale guidelines in chapter 11 cases, and numerous courts have granted retail debtors authority to implement such procedures.  *See, e.g., In re Liberated Brands LLC,* No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025), ECF No. 384 (authorizing the debtors, pursuant to sections 105(a) and

363(b), to conduct store closings in accordance with court-approved sale guidelines); *In re JOANN,*

*Inc.,* No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025), ECF No. 431 (same); *In re EXP OldCo*

*Winddown, Inc.,* No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024), ECF No. 232 (same); *In re*

*Rite Aid Corp.,* No. 23-18993 (Bankr. D.N.J. Nov. 20, 2023), ECF No. 709 (same); *In re Bed Bath*

*& Beyond Inc.,* No. 23-13359 (Bankr. D.N.J. June 7, 2023), ECF No. 641 (same).[16]  As such, the

Court should authorize the Store Closing Sales and approve the Sale Guidelines as a reasonable

exercise of the Debtors' business judgment.

84.    The Debtors request approval to sell the assets under the terms of the

Stalking Horse Agency Agreement (the "Store Closing Assets"), free and clear of any and all liens,

claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  A debtor in

possession may sell property under section 363(b) and 363(f) "free and clear of any interest in such

property of an entity other than the estate" if any one of the following conditions is satisfied:

(a) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold

is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide

dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money

satisfaction of such interest.  11 U.S.C. § 363(f); *see also Trans World Airlines,* 322 F.3d at 290

("[U]nder § 363(f), . . . a sale free and clear of any [interest in property] can occur if any one of

five conditions has been satisfied.").  The Debtors' "authority to sell free and clear is broad."  *In*

---

[16]  Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

*re Trans World Airlines, Inc.,* No. 01-0056 (PJW), 2001 Bankr. LEXIS 723, at *10, 2001 WL

1820325, at *3 (Bankr. D. Del. Mar. 27, 2001), *aff'd*, 322 F.3d 283 (3d Cir. 2003).

        85.    The Debtors anticipate that, to the extent there are liens on the Store Closing

Assets, all holders of such liens will consent to the Store Closing Sales because such sales provide

the most effective, efficient, and time-sensitive approach to realizing proceeds for, among other

things, the repayment of amounts due to such parties. Any and all liens on the Store Closing Assets

sold under the Store Closing Sales would attach to the remaining net proceeds of such sales with

the same force, effect, and priority as such liens currently have on these assets, subject to the rights

and defenses, if any, of the Debtors and of any party in interest with respect thereto.

        86.    Accordingly, the Debtors submit that the sale of the Store Closing Assets

satisfies the statutory requirements of section 363(f) of the Bankruptcy Code and should, therefore,

be free and clear of any liens, claims, encumbrances, and other interests.

**B.**      **Liquidation Sale Laws, and Dispute Resolution Procedures**

        87.    For the purpose of efficiently resolving any disputes between the Debtors

and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due

to the Sale Guidelines and the alleged applicability of any Liquidation Sale Laws, the Debtors

respectfully request that the Bankruptcy Court authorize the Debtors to implement the following

dispute resolution procedures (the "Dispute Resolution Procedures"), as set forth in the Order:

      (i)    Provided that the Store Closing Sales are conducted in accordance with the
              Approval Order, the Stalking Horse Agency Agreement and the Sale
              Guidelines, and in light of the provisions in the laws of many Governmental
              Units that exempt court ordered sales from their provisions, the Debtors.
              and the Debtors' landlords shall be deemed to be in compliance with any
              requirements of any Liquidation Sale Laws and are authorized to conduct
              the Store Closing Sales in accordance with the terms of the Approval Order,

the Stalking Horse Agency Agreement and the Sale Guidelines without the necessity of showing compliance with any such Liquidation Sale Laws (subject to certain limitations to be set forth in the Approval Order).

(ii)     Within five (5) business days after entry of the Approval Order, the Debtors will serve copies of the Approval Order, the Stalking Horse Agency Agreement, and the Sale Guidelines via e-mail, facsimile or regular mail, on: (i) the Attorney General's office for each state where the Store Closing Sales are being held, (ii) the county consumer protection agency or similar agency for each county where the Store Closing Sales will be held, (iii) the division of consumer protection for each state where the Store Closing Sales will be held; and (iv) the chief legal counsel for the local jurisdiction (collectively, the "Dispute Notice Parties").

(iii)    To the extent that there is a dispute arising from or relating to the Store Closing Sales, the Approval Order, the Stalking Horse Agency Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Bankruptcy Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within fifteen (15) days following entry of the Approval Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute so as to ensure delivery thereof within one (1) business day thereafter (the "Dispute Notice") explaining the nature of the dispute to: (i) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19899, Attn: Laura Davis Jones, Esq. (ljones@pszjlaw.com) and David M. Bertenthal, Esq. (dbertenthal@pszjlaw.com); and (ii) counsel to the Stalking Horse Bidder (a) Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019, Attn: Scott Charles, Esq. (SKCharles@wlrk.com), Neil M. Snyder, Esq. (NMSnyder@wlrk.com) and (b) Morris Nichols Arsht & Tunnell, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington DE 19899-1347, Attn: Derek C. Abbott (dabbott@morrisnichols.com). The Dispute Notice will be promptly delivered by the Debtors to the affected landlord, and to the extent known, such landlord's counsel of record. If the Debtors, the Stalking Horse Agent, and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days after service of the notice, the aggrieved party may file a motion with the Bankruptcy Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

(iv)    In the event that a Dispute Resolution Motion is filed, nothing in the Approval Order shall preclude the Debtors, the Stalking Horse Agent, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of the Approval Order nor the conduct of the Debtors or Stalking Horse Agent pursuant to the Approval Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth

herein shall not be deemed to affect the finality of the Approval Order or to limit or interfere with the Debtors' or Stalking Horse Agent's ability to conduct or to continue to conduct the Store Closing Sales pursuant to the Approval Order and Stalking Horse Agency Agreement, as applicable, absent further order of the Bankruptcy Court.  Upon the entry of the Approval Order, the Debtors and Stalking Horse Agent shall be authorized to conduct the Store Closing Sales pursuant to the terms of the Approval Order, the Stalking Horse Agency Agreement and the Sale Guidelines (as may be modified by any side letters) and to take all actions reasonably related thereto or arising in connection therewith.  The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code.  Nothing in the Approval Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(v)     If, at any time, a dispute arises between the Debtors and/or the Stalking Horse Agent and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Approval Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (iv) and (v) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs.  Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

(vi)    Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the Store Closing Sales, to the extent that disputes arise during the course of the Sale regarding laws regulating the use of sign-walkers and banner advertising and the Debtors or the Stalking Horse Agent are unable to resolve the matter consensually with the Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions.  Such hearing will, to the extent practicable, be scheduled initially within two (2) business days of such request.  This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

## C.      **Lease Restrictions**

88.     The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closing Sales.  In certain cases, the contemplated Store Closing Sales may be

inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions. Such restrictions would also hamper the Debtors' ability to maximize value in selling their inventory.

89.     The Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the Store Closing Sales or institute any action against the Debtors in any court (other than in this Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closing Sales or the advertising and promotion (including through the posting of signs) of the Store Closing Sales.

90.     Courts in this district and others have authorized waivers of compliance with restrictive lease provisions affecting store liquidation sales in chapter 11 cases. *See, e.g., Liberated Brands,* ECF No. 384 (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *JOANN, Inc.,* ECF No. 431 (same); *EXP OldCo Winddown,* ECF No. 232 (same); *Rite Aid Corp.,* ECF No. 709 (same); *Bed Bath & Beyond*, ECF No. 641 (same). Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Store Closing Sales, the Debtors request that the Court authorize the Debtors and the Stalking Horse Agent to conduct any liquidation sales without

interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

**D.    Customers Purchasing Merchandise Pursuant to the Store Closing Sales Will Be Good Faith Purchasers Pursuant to Bankruptcy Code Section 363(m)**

91.    Because the customers in respect of the Store Closing Sales act in good faith, they are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sales of Store Closing Assets.  Section 363(m) of the Bankruptcy Code provides in pertinent part: "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."  11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code protects a purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  Purchasers are provided this protection so long as they leased or purchased the assets in "good faith."  *Id.*  Although the Bankruptcy Code does not define "good faith purchaser," one circuit court has stated that a good faith purchaser is "one who purchases in 'good faith' and for 'value.'"  *Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (quoting *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985)); *Abbotts Dairies*, 788 F.2d at 147; *see* 3 *Collier on Bankruptcy* ¶ 363.11 (16th ed. 2025).  Courts generally conclude that a purchaser has acted in good faith as long as the consideration is adequate and reasonable and the terms of the transaction are fully disclosed.  *Abbott Dairies,* 788 F.2d at 149-50.  To constitute a

lack of good faith, a party's conduct in connection with the sale usually must amount to "'fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders.'" *Vetter Corp.*, 724 F.2d at 56 (7th Cir. 1983) (quoting *Rock Indus. Mach. Corp.*, 572 F.2d at 1198) (interpreting Bankruptcy Rule 805, the precursor to section 363(m)); *see* 3 *Collier on Bankruptcy* ¶ 363.11.

92.    Here, the customers of the Store Closing Sales are unaffiliated third parties acting for bona fide personal purposes.  Each sale of a Store Closing Asset will be mutually beneficial to both parties and the terms thereof will be fully disclosed to each customer.  A fair and transparent process ensures the sales are at arm's length, without collusion or fraud, and entered into in good faith.  Accordingly, the Debtors request that the Court determine that the customers act at all times in good faith and, as a result, are entitled to the full protections of good faith purchasers under section 363(m) of the Bankruptcy Code.[17]

E.    **Abandonment**

93.    The Debtors respectfully request that the Court authorize the abandonment of certain inventory and FF&E remaining in the Stores, Distribution Centers, and Locations, as applicable, in accordance with the Stalking Horse Agency Agreement and Stalking Horse APA. The Debtors intend to sell any marketable inventory and FF&E present in the Stores pursuant to

---

[17]  Section 8.2(e)of the Stalking Horse Agency Agreement provides that the Stalking Horse Agent shall not have any obligation to accept or honor any Merchant (as that term is defined therein) or third party gift certificates, gift cards, merchandise credits, customer rewards programs, rights to exchange, other promotional programs or merchandise guarantees or warranties issued by Merchant or any third party.  Notwithstanding anything to the contrary, neither Merchant nor the Stalking Horse Agent shall sell or otherwise issue any Merchant or third party gift certificates, gift cards or merchandise credits, customer rewards programs, rights to exchange, other promotional programs, or except as expressly provided in section 8.11 of the Stalking Horse Agency Agreement, any merchandise guarantees or warranties.

the terms of the Stalking Horse Agency Agreement and Stalking Horse APA.  However, in certain cases, the cost associated with holding or selling that property will likely exceed the proceeds that will be realized from its sale, or such property may not be marketable at all.  In such cases, retaining the property would be burdensome to the estate and the property would be of less value to the estate than the cost to maintain the property.

94.    After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).  Courts generally give a debtor in possession great deference to its decision to abandon property.  *See In re Syntax-Brillian Corp.*, No. 08-11407 (KJC), 2018 Bankr. LEXIS 2116, at *41-42, 2018 WL 3491758, at *15 (Bankr. D. Del. July 18, 2018) ("'The Trustee's power to abandon property is discretionary and the Court will generally defer to the Trustee's judgment in determining whether to abandon a property.'" (quoting *In re Moore*, 2015 Bankr. LEXIS 3260, at *24 (Bankr. D.N.J. Sept. 25, 2015)); *see also In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003) ("The trustee's power to abandon property is discretionary."), *aff'd*, 112 F. App'x 868 (3d Cir. 2004).  Unless certain property is harmful to the public, once a debtor has shown that it is burdensome or of inconsequential value to the estate, a court should approve the abandonment.  *See In re Unidigital, Inc.*, 262 B.R. 283, 286 (Bankr. D. Del. 2001) (recognizing an exception to abandonment where there is a threat to the public health).

F.    **Fast Pay Laws**

95.    Many U.S. states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with the employee's

termination (the "Fast Pay Laws" and, together with the Liquidation Sale Laws, the "Applicable State Laws"). These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

96.    The nature of the Store Closing Sales contemplated under the Stalking Horse Agency Agreement will result in certain employees being terminated during the Store Closing Sales. To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures. The Debtors' payroll systems, however, may simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws. Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by applicable law. This process requires the Debtors' payroll department to calculate individual payments upon termination, prepare each termination payment check, obtain authorization for each check, and then prepare each such check for mailing. Given the number of employees who will be terminated during the course of the Store Closing Sales, this process could easily take several days, making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible.

97.    Accordingly, the Debtors respectively submit that the Fast Pay Laws are at odds with the Bankruptcy Code and as such, the Debtors should be granted relief from their requirements. Courts have also granted similar relief from Fast Pay Laws in other bankruptcy cases under similar circumstances. *Liberated Brands*, ECF No. 384 (same); *In re F21 OpCo.*, No. 25-10469 (MFW) (Bankr. D. Del. Apr. 14, 2025), ECF No. 208 (same); *In re Franchise Group*,

No. 24-12480 (LSS) (Bankr. D. Del. Dec. 6, 2024), ECF No. 351 (same); *EXO OldCo Winddown*, ECF No. 234 (same); *In re New Rue21 Holdco*, No. 24-10939 (BLS) (Bankr. D. Del. May 23, 2024), ECF No. 237 (same); *In re Number Holdings*, No. 24-10719 (JKS) (Bankr. D. Del. May 9, 2024), ECF No. 462 (same); *In re Christmas Tree Shops*, No. 23-10576 (TMH) (Bankr. D. Del. May 31, 2023), ECF No. 201 (same); *In re Ind. Pet Partners Holdings*, No. 23-10153 (LSS) (Bankr. D. Del. Mar. 1, 2023), ECF No. 229 (same).

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

98.    The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### REQUESTS FOR IMMEDIATE RELIEF & WAIVER OF STAY

99.    Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Bid Procedures Order and any Approval Order, as well as any other separate order authorizing the assumption or assumption and assignment of a Potential Assigned Agreement in connection with the sale of the Aggregate Assets.  Bankruptcy

Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

100.    As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' estates for the benefit of their economic stakeholders. Accordingly, the Debtors submit that ample cause to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

## NOTICE

101.    The Debtors have or will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware, (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis), (c) counsel to the DIP Agent and Prepetition ABL Agent; (d) counsel to the Prepetition Term Agent, (e) the United States Attorney's Office for the District of Delaware, (f) the state attorneys general for all states in which the Debtors conduct business, (g) any known party asserting a lien on the Debtors' assets, (h) all persons and entities known by the Debtors to have expressed an interest to the Debtors in the Aggregate Assets, and (i) any party that requests service pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

102.     No prior request for the relief sought herein has been made to this Court or

any other court in connection with the chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court grant the relief

requested in this Motion, enter the Bid Procedures Order, substantially in the form attached hereto

as Exhibit A, and grant such other and further relief to the Debtors as the Court may deem proper.

Dated:   November 26, 2025                    **PACHULSKI STANG ZIEHL & JONES LLP**

                                            _/s/ Laura Davis Jones_
                                            Laura Davis Jones (DE Bar No. 2436)
                                            David M. Bertenthal (CA Bar No. 167624)
                                            919 North Market Street, 17th Floor
                                            P.O. Box 8705
                                            Wilmington, Delaware  19899 (Courier 19801)
                                            Telephone:  (302) 652-4100
                                            Facsimile:   (302) 652-4400
                                            Email: ljones@pszjlaw.com
                                                   dbertenthal@pszjlaw.com


                                            _Proposed Counsel to the Debtors and Debtors in Possession_