## EXHIBIT B TO SALE MOTION

**Stalking Horse APA and Stalking Horse Agency Agreement**

EXECUTION COPY

**ASSET PURCHASE AGREEMENT**

**DATED AS OF NOVEMBER 25, 2025**

**BY AND AMONG**

**ASI PURCHASER LLC,**

**AMERICAN SIGNATURE, INC.,**

**SEI, INC.,**

**AND**

**THE OTHER PARTIES SIGNATORY HERETO**

ARTICLE I DEFINITIONS ................................................................................. 2

    Section 1.1    Definitions ............................................................... 2
    Section 1.2    Other Definitions and Interpretive Matters ............................................ 18

ARTICLE II DESIGNATION RIGHTS ................................................................ 20

    Section 2.1    Acquisition of Designation Rights ........................................ 20
    Section 2.2    Parties' Respective Obligations Before and During Designation Rights Period ............................................................. 20
    Section 2.3    Assumption and Assignment ................................................ 23
    Section 2.4    Rejection ................................................................. 25

ARTICLE III PURCHASE AND SALE ................................................................ 26

    Section 3.1    Purchase and Sale of the Acquired Assets ............................. 26
    Section 3.2    Excluded Assets .......................................................... 28
    Section 3.3    Assumed Liabilities ..................................................... 30
    Section 3.4    Assignments ............................................................. 33
    Section 3.5    Further Assurances ...................................................... 34
    Section 3.6    Additional Assigned Agreements ........................................ 35
    Section 3.7    Equipment ............................................................... 35
    Section 3.8    Withholding ............................................................. 36

ARTICLE IV PURCHASE PRICE ....................................................................... 36

    Section 4.1    Consideration ............................................................ 36
    Section 4.2    Payment ................................................................. 37
    Section 4.3    Discharge of Assumed Liabilities After Closing .................... 38
    Section 4.4    Allocation of Purchase Price ........................................... 38

ARTICLE V CLOSING ...................................................................................... 38

    Section 5.1    Closing Date ............................................................. 38
    Section 5.2    Buyer's Deliveries ...................................................... 38
    Section 5.3    Sellers' Deliveries ...................................................... 39

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF SELLERS ............................ 40

    Section 6.1    Organization and Good Standing ........................................ 40
    Section 6.2    Authority; Validity; Consents ........................................... 40
    Section 6.3    No Conflict .............................................................. 41
    Section 6.4    Environmental Matters .................................................. 41
    Section 6.5    Title to Acquired Assets ................................................ 41
    Section 6.6    Real Property ............................................................ 42
    Section 6.7    Taxes .................................................................... 43
    Section 6.8    [Reserved] ............................................................... 44
    Section 6.9    Brokers or Finders ...................................................... 44
    Section 6.10    Employee and Employee Plan Matters ................................. 44
    Section 6.11    Equipment ............................................................... 45

i

Section 6.12     Assumed Liabilities ................................................................ 45
Section 6.13     No Other Representations or Warranties; No Survival ...................... 45

ARTICLE VII REPRESENTATIONS AND WARRANTIES OF BUYER AND
        GUARANTOR ................................................................................ 46

Section 7.1     Organization and Good Standing ............................................ 46
Section 7.2     Authority; Validity; Consents................................................ 46
Section 7.3     No Conflict ....................................................................... 46
Section 7.4     Availability of Funds .......................................................... 47
Section 7.5     Litigation ......................................................................... 47
Section 7.6     Brokers or Finders ............................................................. 47
Section 7.7     Condition of Acquired Assets; Representations........................ 47
Section 7.8     No Survival ...................................................................... 47

ARTICLE VIII ACTION PRIOR TO THE CLOSING DATE ................................... 48

Section 8.1     Operations........................................................................ 48
Section 8.2     Bankruptcy Court Filings and Approval ................................. 49

ARTICLE IX ADDITIONAL AGREEMENTS ................................................... 53

Section 9.1     Taxes.............................................................................. 53
Section 9.2     Payments Received ............................................................ 54
Section 9.3     Assigned Agreements; Adequate Assurance of Future
                Performance..................................................................... 54
Section 9.4     Post-Closing Books and Records and Personnel ..................... 55
Section 9.5     Confidentiality ................................................................. 55
Section 9.6     License............................................................................ 55
Section 9.7     Employee Contacts ............................................................ 55

ARTICLE X CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO
        CLOSE ........................................................................................ 56

Section 10.1     Accuracy of Representations ................................................ 56
Section 10.2     Sellers' Performance ......................................................... 56
Section 10.3     No Material Adverse Effect.................................................. 56
Section 10.4     No Order......................................................................... 56
Section 10.5     Governmental Authorizations .............................................. 56
Section 10.6     Sellers' Deliveries ............................................................ 56
Section 10.7     Extension of Deadline to Assume or Reject............................ 56
Section 10.8     Personally Identifiable Information........................................ 57
Section 10.9     Approval Order................................................................. 57
Section 10.10    Agency Agreement............................................................ 57
Section 10.11    Lease Termination ............................................................ 57

ARTICLE XI CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO
        CLOSE ........................................................................................ 57

Section 11.1     Accuracy of Representations ................................................ 57

Section 11.2      Buyer's Performance ............................................................ 57
Section 11.3      No Order ................................................................................ 57
Section 11.4      Governmental Authorizations ............................................ 58
Section 11.5      Buyer's Deliveries ............................................................... 58
Section 11.6      Approval Order ..................................................................... 58
Section 11.7      Agency Agreement .............................................................. 58

ARTICLE XII TERMINATION .................................................................................. 58

Section 12.1      Termination Events ............................................................. 58
Section 12.2      Effect of Termination .......................................................... 60
Section 12.3      Casualty/Condemnation Events ........................................ 60

ARTICLE XIII GENERAL PROVISIONS ................................................................. 62

Section 13.1      Public Announcements ....................................................... 62
Section 13.2      Notices .................................................................................. 63
Section 13.3      Amendment; Waiver ........................................................... 64
Section 13.4      Entire Agreement ................................................................ 64
Section 13.5      Assignment .......................................................................... 65
Section 13.6      Severability .......................................................................... 65
Section 13.7      Governing Law; Consent to Jurisdiction and Venue; Jury Trial
                  Waiver .................................................................................. 65
Section 13.8      Counterparts ........................................................................ 66
Section 13.9      Parties in Interest; No Third Party Beneficiaries ........... 66
Section 13.10     Fees and Expenses .............................................................. 66
Section 13.11     Non-Recourse ...................................................................... 66
Section 13.12     Schedules; Materiality ........................................................ 67
Section 13.13     Specific Performance .......................................................... 67
Section 13.14     Set-Off .................................................................................. 67
Section 13.15     Deferred Completion of Certain Exhibits and Schedules ...... 67

ARTICLE XIV GUARANTEE ..................................................................................... 68

Section 14.1      Guarantee ............................................................................. 68

EXHIBIT A Agency Agreement ........................................................................... A-1
EXHIBIT B Form of Bid Procedures Order ........................................................ C-1
EXHIBIT C Approval Order ...................................................................................
EXHIBIT D Form of Lease Assignment Notice] ................................................ D-1
EXHIBIT E Privacy Policy ..................................................................................... E-1
EXHIBIT F Treatment of Personally Identifiable Information ........................ F-1

<u>SCHEDULES</u>

SCHEDULE 1.1(a):    Buyer Cure Costs

SCHEDULE 1.1(b):    Locations

SCHEDULE 1.1(c):    Intellectual Property

SCHEDULE 1.1(d):    Permitted Post-Closing Encumbrances

SCHEDULE 1.1(e):    Permitted Pre-Closing Encumbrances

SCHEDULE 1.1(f):    Excluded IP/IT

SCHEDULE 2.2(b):    Occupancy Expenses

SCHEDULE 3.2(s):    Excluded Stores

SCHEDULE 6.1:        Organization and Good Standing

SCHEDULE 6.4:        Environmental Matters

SCHEDULE 6.6(a):    Acquired Real Property

SCHEDULE 6.6(b):    Lease Premises

SCHEDULE 6.8:        IP Licenses

SCHEDULE 6.9:        Brokers or Finders

SCHEDULE 6.10:      Employment Matters

SCHEDULE 6.11:      Intellectual Property

SCHEDULE 6.12:      Equipment

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of November 25, 2025 (the "Effective Date"), by and between ASI PURCHASER LLC, a Delaware limited liability company (together with any applicable designee, "Buyer"), SEI, INC., a Nevada corporation ("Guarantor"), and AMERICAN SIGNATURE, INC., an Ohio corporation ("ASI"), and each of its Subsidiaries party hereto (collectively, "Sellers" and each individually, a "Seller").

### RECITALS

WHEREAS, Sellers filed voluntary petitions for relief (the "Filings" and each a "Filing") on November 22, 2025 (the "Petition Date") and commenced cases (the "Bankruptcy Cases") under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Sellers expect to file the Bid Procedures Motion (as defined below) with the Bankruptcy Court on or about the Effective Date;

WHEREAS, Sellers and Buyer are simultaneously entering into that certain Agency Agreement pursuant to which Sellers are to retain the Buyer to serve as Sellers' exclusive agent for the limited purpose of selling or otherwise disposing of certain of Sellers' assets, a copy of which is attached hereto as Exhibit A (the "Agency Agreement");

WHEREAS, Sellers and Buyer are entering into this Agreement in accordance with the terms of the Agency Agreement;

WHEREAS, Sellers desire to sell to Buyer (or, in accordance with the terms set forth herein, an applicable Assignee (as defined below)) the Designation Rights (as defined below) and the Acquired Assets (as defined below) and appoint Buyer as the Sellers' exclusive agent to dispose of certain of Sellers' assets and Buyer desires to purchase from Sellers the Designation Rights and the Acquired Assets and accept appointment as such exclusive agent, in each case upon the terms and conditions set forth herein and in the Agency Agreement;

WHEREAS, the execution and delivery of this Agreement and the Agency Agreement and Sellers' ability to consummate the transactions set forth in this Agreement and the Agency Agreement are subject to, among other things, a competitive sale process to be described in the Bid Procedures Motion (as defined below) and the entry of the Bid Procedures Order (as defined below) and the Approval Order (as defined below) under, *inter alia*, sections 363 and 365 of the Bankruptcy Code;

WHEREAS, the Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Approval Order and the satisfaction or waiver of the other conditions precedent set forth herein and in the Agency Agreement; and

WHEREAS, the transaction contemplated by this Agreement shall not be consummated unless and until the Bankruptcy Court enters the Approval Order and the other conditions precedent set forth herein and in the Agency Agreement are satisfied or waived.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"Accounting Firm" shall have the meaning set forth in Section 4.4(a).

"Acquired Assets" shall have the meaning set forth in Section 3.1.

"Acquired Improvements" shall mean, with respect to any Acquired Real Property or any Acquired Lease Premises, all Improvements located on or comprising the applicable Acquired Real Property or Acquired Lease Premises.

"Acquired Intellectual Property" shall have the meaning set forth in Section 3.1(a). Notwithstanding anything to the contrary set forth herein, the Acquired Intellectual Property shall not include any credit card information or social security number information.

"Acquired Lease" shall mean (i) each Lease which is assumed and assigned by any of the Sellers pursuant to the exercise by Buyer of the Designation Rights and (ii) each Lease which Buyer elects, by written notice delivered to Seller on or prior to December 17, 2025, for the Debtors to assume and assign to an Assignee effective as of the Closing (each Lease described in this clause (ii), a "Closing Date Acquired Lease").

"Acquired Lease Premises" shall mean the Lease Premises which are subject to an Acquired Lease.

"Acquired Locations" shall mean any Location which is subject to an Acquired Lease.

"Acquired Lease Rights" shall mean, with respect to an Acquired Lease, all real property rights and all other rights and interests of the tenant thereunder, including, without limitation, all options to renew, purchase, expand or lease (including, without limitation, rights of first refusal, first negotiation and first offer), and all credit for the prepaid rent associated therewith and all Security Deposits made in respect of such Acquired Lease and any Improvements thereon.

"Acquired Real Property" shall have the meaning as provided in Section 6.6(a).

2

"Action" shall mean any Claim, action, complaint, suit, litigation, arbitration, appeal, petition, inquiry, hearing, Order, decree, legal proceeding, investigation or other legal dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority.

"ADA" shall have the meaning set forth in the definition of "Law".

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings; provided that, for purposes of determining the respective rights and obligations of the Buyer and Sellers under this Agreement, (i) none of the Buyer and its Affiliates (other than the Sellers and their Subsidiaries) are Affiliates of any of the Sellers or their Subsidiaries and (ii) none of the Sellers and their Subsidiaries are Affiliates of the Buyer or any of its Affiliates (other than the Sellers and their Subsidiaries).

"Affiliated Lease" shall mean any Lease as to which the counterparty to the applicable Seller is Buyer or any Affiliate of Buyer.

"Agency Agreement" shall have the meaning set forth in the Recitals.

"Agent" shall have the meaning set forth in the Agency Agreement.

"Agreement" shall have the meaning set forth in the Preamble.

"Allocation" shall have the meaning set forth in Section 4.4(a).

"Approval Order" shall mean an order of the Bankruptcy Court approving this Agreement and the Agency Agreement and the transactions contemplated hereby and thereby in substantially the form of Exhibit C attached hereto, or otherwise in form and substance reasonably acceptable to Buyer and Sellers.

"Arbitrator" shall have the meaning set forth in the definition of "Law".

"Artwork" shall have the meaning set forth in the definition of "Intellectual Property".

"ASI" shall have the meaning set forth in the Preamble.

"Assigned Agreements" shall mean (i) the Acquired Leases, and (ii) solely to the extent expressly designated for assignment to, and assumption by, the applicable Assignee by written notice from Buyer to the Sellers in accordance with the terms of this Agreement (but subject to the last sentence of Section 3.6), any other Contracts to which a Seller is a party.

"Assigned Plans and Permits" shall mean, with respect to any Acquired Location or Acquired Real Property, all Plans and Permits, if any, that are assignable by contract pursuant to

the applicable issuing Governmental Authority and are Primarily Related to such Acquired Location or Acquired Real Property.

"Assignee" shall mean, (i) as to any Acquired Lease or an Assigned Agreement Primarily Related to such Acquired Lease, Buyer or any other Person designated by Buyer in the applicable Buyer Assumption Notice and (ii) as to any other Assigned Agreement not described in the foregoing clause (i), Buyer or any other Person designated by Buyer pursuant to Section 3.6.

"Assumed Liabilities" shall have the meaning set forth in Section 3.3.

"Augment Purchase" shall have the meaning set forth in Section 8.2(a)(ii).

"Avoidance Actions" shall mean any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code, or state fraudulent conveyance, fraudulent transfer or other similar state laws.

"Bankruptcy Cases" shall have the meaning set forth in the Recitals.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Bid Procedures" shall mean procedures for the submission of bids for all or any portion of the Acquired Assets, the assets subject to the Agency Agreement and/or any of the Sellers' other assets, which shall be in the form attached as Exhibit 1 to the form of Bid Procedures Order attached hereto as Exhibit B or otherwise in form and substance reasonably acceptable to Buyer and Sellers.

"Bid Procedures Motion" shall have the meaning set for in Section 8.2(c)(i).

"Bid Procedures Order" shall mean an order of the Bankruptcy Court (a) approving the Bid Procedures, (b) in the case of any such bids, approving the initial overbid of and further incremental overbids, (c) approving the Expense Reimbursement and the Augment Purchase, (d) authorizing and scheduling the Auction, (e) scheduling the Sale Hearing, and (f) approving the form and manner of notice of the Auction procedures and Sale Hearing, which Order shall be in the form attached hereto as Exhibit B or otherwise in form and substance reasonably acceptable to Buyer and Sellers.

"Business Day" shall mean any day of the year, other than a Saturday or Sunday, on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized by Law to remain closed.

"Business Names" shall have the meaning set forth in the definition of "Intellectual Property".

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer Assumption Notice" shall have the meaning set forth in Section 2.3(a).

"Buyer Cure Costs" shall mean (A) with respect to any Acquired Lease (other than an Affiliated Lease) or any other Assigned Agreement Primarily Related thereto, the amount of Cure Costs with respect to such Acquired Lease or Assigned Agreement, as determined by the Bankruptcy Court (or agreed by Buyer, the Sellers and the counterparty to such Acquired Lease or other Assigned Agreement) that does not exceed the expected amount of Cure Costs set forth in Schedule 1.1(a) with respect to such Acquired Lease or Assigned Agreement, and (B) with respect to any other Acquired Lease or Assigned Agreement, all Cure Costs with respect to such Acquired Lease or Assigned Agreement, as determined by the Bankruptcy Court (or agreed by Buyer, the Sellers and the counterparty to such Acquired Lease or other Assigned Agreement). For the avoidance of doubt (i) if any Acquired Lease (other than an Affiliated Lease) or Assigned Agreement Primarily Related thereto does not appear on Schedule 1.1(a), such Acquired Lease or Assigned Agreement shall be treated for purposes of determining the Buyer Cure Costs as if it were an Acquired Lease or Assigned Agreement described in clause (B) above and (ii) if the expected amount of Cure Costs set forth in Schedule 1.1(a) with respect to any Acquired Lease or Assigned Agreement described in clause (A) is listed as "$ -", such expected amount shall be deemed to be $0.00.

"Buyer Rejection Notice" shall have the meaning set forth in Section 2.4(a).

"Buyer Termination Notice" shall have the meaning set forth in Section 12.1(b)(i).

"Buyer's Allocation Schedule" shall have the meaning set forth in Section 4.4(a).

"Carve Out" shall mean the carve out, if any. provided for in the order in the Bankruptcy Case approving the Debtors' debtor-in-possession financing facility as sought by a motion on file on the date hereof.

"Casualty / Condemnation Event" shall have the meaning set forth in Section 12.3(a).

"Claims" shall mean all claims, causes of action, rights of recovery (including, without limitation, rights of indemnity, warranty rights, rights of contribution, rights to refunds and rights to reimbursement) and rights of set-off, in each case, of whatever kind or description against any Person (including, without limitation, any claim as defined in the Bankruptcy Code).

"Closing" shall have the meaning set forth in Section 5.1.

"Closing Date" shall have the meaning set forth in Section 5.1.

"Closing Date Acquired Lease" shall have the meaning set forth in the definition of "Acquired Lease".

"Closing Legal Impediment" shall have the meaning set forth in Section 10.4.

"COBRA" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended and as codified in Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Competing Bid" shall have the meaning set forth in Section 8.2(b).

"Consent" shall mean any consent, approval, concession, grant, waiver, exemption, license, entitlement, suitability determination, franchise, development right, certificate, variance, registration, permit, Order or other authorization of or notice of any Person.

"Consideration" shall have the meaning set forth in Section 4.4(a).

"Consulting Agreement" shall have the meaning given to such term in the Agency Agreement.

"Contract" shall mean any contract, agreement, undertaking, lease, sublease, license, sublicense, sales order, purchase order or other instrument or commitment, whether written or oral (including, without limitation, commitments to enter into any of such), that purports to be binding on any Person or any part of its property (or subjects any such assets or property to an Encumbrance).

"Copyrights" shall have the meaning set forth in the definition of "Intellectual Property".

"Cure Costs" shall have the meaning set forth in Section 3.4(a)(i).

"Deposit" shall have the meaning set forth in Section 4.2(a).

"Designation Rights" shall mean the exclusive right to select, identify and designate (on one or more occasions) any Location in respect of which, (i) the applicable Assignee will acquire all of Sellers' right, title and interest in and to the applicable Lease, together with all of Sellers' right, title and interest in and to certain related assets (as set forth in Article III), or (ii) the applicable Lease shall be rejected, all in accordance with the terms and conditions of this Agreement.

"Designation Rights Period" shall mean, with respect to any Location, the period commencing on the Closing Date and ending on the date which is the earliest of (i) five (5) Business Days after the delivery of an applicable Buyer Rejection Notice, (ii) the date on which the applicable Lease is assumed and assigned to an Assignee and (iii) April 30, 2026.

"Designs" shall have the meaning set forth in the definition of "Intellectual Property".

"Domain Names" shall have the meaning set forth in the definition of "Intellectual Property".

"Effective Date" shall have the meaning set forth in the Preamble.

"Elston Location" shall mean the Location at 2536 N. Elston Ave., Chicago, IL 60647.

"Employee Plan" shall mean any plan, program, policy, practice, contract, agreement or other arrangement providing for compensation or benefits, including, without limitation, deferred compensation, severance, retention, change of control payments, termination pay, performance awards, bonuses, stock or stock-related awards, health or welfare benefits, fringe benefits or other

6

employee benefits or remuneration of any kind, whether formal or informal, funded or unfunded, including, without limitation, each "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA), that is sponsored, maintained, contributed to or required to be contributed to, by any Seller or any ERISA Affiliate of any Seller for the benefit of any employee of Seller or any of their respective Subsidiaries, and pursuant to which any Seller or any ERISA Affiliate of any Seller has or would reasonably be expected to have any Liability.

"Employment Laws" shall mean all Laws (including, without limitation, the WARN Act), now or at the applicable time in effect and regulating, respecting, concerning or relating directly or indirectly to employees, independent contractors, labor relations, workers' compensation, unemployment compensation, foreign workers employed in the United States, wages and hours, safety, compensation, worker classification or other workplace or employment standards or practices.

"Encumbrance" shall mean all mortgages, pledges, hypothecations, charges, liens, interests, debentures, trust deeds, claims and encumbrances of any type whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Bankruptcy Cases, and whether imposed by agreement, understanding, Law, equity, or otherwise), including, without limitation, "claims" as defined in section 101(5) of the Bankruptcy Code, assignments by way of security or otherwise, security agreements and interests, conditional sales contracts or other title retention agreements, rights of first refusal, first negotiation or first offer, options to purchase or similar restrictions or obligations, instruments creating a security interest in the Potential Acquired Assets or any part thereof or interest therein, and any agreements, leases, subleases, licenses, occupancy agreements, options, easements, rights of way, covenants, conditions, restrictions, declarations, defects in title, encroachments, exceptions or other encumbrances adversely affecting title to the Potential Acquired Assets or any part thereof or interest therein.

"Environmental Laws" shall mean all applicable Laws relating to pollution or protection of human health or safety (as related to exposure to hazardous materials or other environmental conditions) or the environment (including, without limitation, ambient air, water, surface water, groundwater, land surface, soil or subsurface) or natural resources, including, without limitation, applicable Laws relating to the generation, storage, transfer, transportation, investigation, cleanup, treatment, remediation, or use of, or release or threatened release into the environment of, any Hazardous Substances.

"Environmental Permits" shall mean all licenses, permits, easements, variances, exceptions, consents or certificates issued pursuant to Environmental Laws.

"Equipment" shall mean all machinery, equipment, rolling stock, vehicles, appliances, supplies, furniture, fixtures, janitorial and cleaning equipment, partitions, desks, chairs, tables, telephone lines, cubicles, point-of-sale systems, graphics, branding, signs and signage (including, without limitation, any signs and signage on any buildings, pylons or monuments and any

directional or other ground or off-premises signs and signage).   For the avoidance of doubt, Improvements do not constitute Equipment.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"ERISA Affiliate" shall mean, with respect to any entity, trade or business, any other entity, trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business, or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"Excess Cure Cost" shall mean, with respect to any Acquired Lease (other than an Affiliated Lease) or any other Assigned Agreement Primarily Related thereto, the amount of Cure Costs with respect to such Acquired Lease or Assigned Agreement as determined by the Bankruptcy Court (or agreed by Buyer, the Sellers and the counterparty to such Acquired Lease or other Assigned Agreement) that exceeds the expected amount of Cure Costs set forth in Schedule 1.1(a) with respect to such Acquired Lease or Assigned Agreement. For the avoidance of doubt (i) there shall be no Excess Cure Costs with respect to any Acquired Lease or other Assigned Agreement that is (A) an Affiliated Lease, (B) an Assigned Agreement Primarily Related to an Affiliated Lease or (C) not a Lease or an Assigned Agreement Primarily Related thereto. The Excess Cure Costs with respect to any Acquired Lease or Assigned Agreement Primarily Related thereto that that does not appear on Schedule 1.1(a) shall be $0.00. If the expected amount of Cure Costs set forth in Schedule 1.1(a) with respect to any Acquired Lease or Assigned Agreement described in the first sentence of this definition is listed as "$ -", such expected amount shall be deemed to be $0.00.   Solely for the purposes of determining the Assigned Agreements Primarily Related to an Acquired Lease that are subject to the payment of Excess Cure Costs (i) an Assigned Agreement shall be deemed to be Primarily Related to an Acquired Lease only if such Assigned Agreement is directly related to, required to be entered into pursuant to, or contemplated by such Acquired Lease, and (ii) an Assigned Agreement shall not be deemed to be Primarily Related to an Acquired Lease only because such Assigned Agreement is Primarily Related to the business conducted at the applicable Location with respect to such Acquired Lease.

"Excluded Assets" shall have the meaning set forth in Section 3.2.

"Excluded Equipment" shall mean all Equipment other than Equipment Buyer elects to acquire pursuant to Section 3.7.

"Excluded Improvements" shall mean all Improvements other than the Acquired Improvements.

"Excluded IP/IT" shall mean the Intellectual Property, Equipment and other assets set forth on Schedule 1.1(f).

"Excluded Liabilities" shall have the meaning set forth in Section 3.3.

"Excluded Taxes" shall mean any and all (i) Taxes imposed on or payable by any of the Sellers or their Affiliates for any taxable period; (ii) Taxes imposed on or with respect to any of the Acquired Assets, the Acquired Real Property, the Acquired Locations, the Sellers' business at the Acquired Locations or the Acquired Real Property, or the Assumed Liabilities, in each case, for any Pre-Assignment Tax Period (for the avoidance of doubt, other than amounts payable by Buyer under Section 2.2(b)); (iii) Taxes imposed on or with respect to the Excluded Assets or the Excluded Liabilities for any taxable period; (iv) Taxes imposed on or payable in connection with (I) the sale, transfer, assignment, conveyance or delivery of any of the Designation Rights, the Acquired Assets, the Assumed Liabilities, and any transaction entered into by the Sellers or their Affiliates in anticipation thereof or (II) any other transaction contemplated by this Agreement (other than the portion of the Transfer Taxes to be borne by Buyer under Section 9.1(c) of this Agreement, but including the portion of the Transfer Taxes to be borne by Sellers under Section 9.1(c) of this Agreement); (v) Liabilities of Buyer or any of its Affiliates for Taxes of any Sellers or their Affiliates as a transferee or successor, by contract, operation of law or otherwise; and (vi) Property Taxes for which any of the Sellers are responsible pursuant to Section 9.1(c); in each case, other than U.S. federal (and applicable state and local) income Taxes imposed on Buyer or its shareholders as a result of the treatment, for U.S. federal (and applicable state and local) income tax purposes, of any of the Sellers as a "qualified subchapter S subsidiary" (within the meaning of Section 1361(b)(3)(B) of the Code) with respect to Buyer or otherwise as an entity disregarded as separate from Buyer. For purposes of this Agreement, in the case of any Straddle Period, (x) Taxes (other than Property Taxes) imposed on or with respect to any of the Acquired Assets, the Acquired Real Property, the Acquired Locations, the Sellers' business at the Acquired Locations or the Acquired Real Property, or the Assumed Liabilities, in each case, for any Pre-Assignment Tax Period shall be computed as if such taxable period ended as of the closing of business on the Closing Date, the applicable Lease Assignment Date, or, with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment, pursuant to the terms of this Agreement, and (y) Property Taxes shall be allocated between the Pre-Assignment Tax Period and the Post-Assignment Tax Period in the manner set forth in Section 9.1(c). Notwithstanding and without duplication of the foregoing, Excluded Taxes shall not include any obligation of a Seller to reimburse a landlord for Taxes under a Lease.

"Expense Reimbursement" shall have the meaning set forth in Section 8.2(a)(i).

"Filing" shall have the meaning set forth in the Recitals.

"Governmental Authority" shall mean any United States federal, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, or any court, tribunal or judicial body having jurisdiction, including, without limitation, the Bankruptcy Court.

"Governmental Authorization" shall mean any approval, consent, license, permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Guarantor" shall have the meaning set forth in the Preamble.

"Hazardous Substances" shall mean any material, substance or waste (solid, liquid, gaseous or combination thereof) defined, characterized or regulated as hazardous, toxic, explosive, a pollutant or a contaminant under Environmental Laws, including, without limitation, asbestos or any substance containing asbestos, formaldehyde, polychlorinated biphenyls, lead paint and petroleum or petroleum products (including, without limitation, crude oil and any fraction thereof), and by-products of any or all of the foregoing.

"Huntington Lease" shall mean the Master Lease, dated as of September 8, 2022, between ASI and The Huntington National Bank.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the relevant rules and regulations thereunder.

"Improvements" shall mean, with respect to any Location or Acquired Real Property, all building systems (including, without limitation, HVAC, electrical, plumbing, mechanical, vertical transportation and other similar systems), leasehold alterations, improvements, structures, buildings, fixtures and equipment which are affixed to and constitute a part of or are used in the operation of such Location or Acquired Real Property, as applicable, together with all tenant improvements. For the avoidance of doubt, Inventory and Equipment are not Improvements.

"Information" shall have the meaning set forth in the definition of "Intellectual Property".

"Intellectual Property" shall mean (a) all trademarks and service marks, including, without limitation, to the marks set forth on Schedule 1.1(c) attached hereto, and all registrations and applications therefor, and all worldwide rights, title and interest associated with the foregoing, whether registered or not, together with the goodwill connected with the use of and symbolized by such marks, in any form including, without limitation, abbreviation, derivation and/or otherwise, whether stylized or not stylized (collectively the "Trademarks"); (b) all trade names, fictitious business names, brand names and other names, including, without limitation, those listed on Schedule 1.1(c) attached hereto (collectively the "Business Names"); (c) (i) all domain names and websites, including, without limitation, domain names and websites related to, or used in connection with, any Seller's business, including, without limitation, those listed on Schedule 1.1(c) attached hereto (collectively, such domain names and websites, the "Domain Names") as well as all source code relating to any such websites and all content on any such websites (including, without limitation, codes, wireframes, annotated comps and designs) and all customer information obtained from any such websites, and (ii) any social media accounts, including, without limitation, those listed on Schedule 1.1(c) attached hereto (collectively the "Media Accounts"); (d) all technology, including, without limitation, all designs, methods, techniques, ideas, know-how, research and development, technical data, programs, materials, specifications, processes, inventions (whether patentable or unpatentable), patents, creations, improvements, works of authorship and other similar materials, and all recordings, drawings, reports, analyses (including, without limitation, website analytics), and other writings and other tangible embodiments of the foregoing, and including, without limitation, all related technology, that are used in, incorporated in, embodied in, displayed by, relate to or are used or useful in (i) the design, development, reproduction, maintenance or modification of, any of the products developed, manufactured, marketed or sold by any Seller or any third party licensees, (ii) any of the Domain Names or (iii) any Seller's business, whether work in progress, pending application or in final

form, including, without limitation, as set forth on Schedule 1.1(c) attached hereto (collectively the "Designs"), and all copyrights and registrations and applications therefor and works of authorship, and mask work rights, including, without limitation, those listed on Schedule 1.1(c) attached hereto (collectively the "Copyrights"); (e) all samples, artwork, photography (and any model's rights related thereto), product images and archival material including, without limitation, trade booths, advertising/marketing materials (external and internal), copy, catalogues, images, labels, brand books, style guides, retailer presentations, photos, samples, all designs, prints, archival drawings and similar material for any of the Domain Names or any Seller's business, and any other material showing the heritage of the Trademarks and any Seller's business (collectively the "Artwork"); (f) (i) all vendor and supplier lists, with each subelement of information, including, without limitation, name, address, email, and other detailed contact information, (ii) all customer contact information (including, without limitation, personally identifiable information such as name, email address, phone numbers), together with all customer transaction history, at the customer level, including, without limitation, product and date information for transactions, and customer loyalty program data and participation information, (iii) all customer opt-out or opt-in lists, (iv) all current customer models, segmentation, life time value, share of wallet, probability to shop and next product to buy, and other customer-based analyses or reports, and (v) all loyalty program data, including, without limitation, information described in (ii) of this subsection (f); in all cases set forth in clauses (i) through (v), whether such information is stored by Sellers or by a third party on behalf of Sellers, (collectively (i) through (vi), the "Customer Information"); (g) all historical licensing and approval documents and communications with licensees relating to approvals; and (h) all other proprietary information and trade secrets including, without limitation, such information and trade secrets associated with the conduct of any Seller's business or the Trademarks (including, without limitation, cost and pricing data) (collectively (g) and (h), the "Information"); (i) all claims, rights and causes of action of any Seller for damages, profits or otherwise, including, without limitation, for declaratory relief, known or unknown, for infringement, misappropriation, violation or any similar or related causes of action relating to any of the Trademarks, Business Names, Domain Names, Designs, Copyrights or Artwork or other intellectual property; (j) all books, data, records and files (both hard copy and electronic) regarding the foregoing, whether in the possession or custody of any Seller or any third party and (k) all other intellectual property.  For the avoidance of doubt, Intellectual Property shall include, without limitation, the name "American Signature" and any derivations thereof, and the Sellers' entire customer list and database, and all assets used or useful by any Seller in the conduct of its business over the internet or in any electronic medium, including, without limitation, any websites or domain names owned by any Seller.  Notwithstanding the foregoing, Intellectual Property shall not include any computer hardware or equipment.

"Inventory" shall mean all finished goods and other merchandise held for retail sale or lease, including, without limitation, those held for display or demonstration or out on lease.

"IP License" shall mean any license or sublicense (incoming or outgoing) of any Intellectual Property to which any Seller is a party.

"Knowledge" shall mean, with respect to any matter in question, in the case of Sellers, the actual knowledge after reasonable inquiry of Eric Jackson with respect to such matter.

"Law" shall mean any foreign or domestic law, statute, code, ordinance, rule, regulation, order, decision, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority, including, without limitation, all Environmental Laws and the Americans with Disabilities Act, as amended ("ADA"), together with all final and unappealable awards or decisions by an arbitrator or arbitration panel ("Arbitrator") by which Sellers or any of Locations, Leases, Acquired Real Property or other Acquired Assets is bound.

"Lease" shall mean each of (A) those leases or lease agreements described on Schedule 6.6(b) attached hereto (together with all amendments, modifications, supplements, correspondence or notices concerning term commencement and expiration dates and other material matters affecting the leases, and renewals thereof) and all other leases or lease agreements of real property used in connection with the operation of the Locations, and (B) to the extent applicable to such leases and lease agreements, all non-disturbance agreements with fee owners or senior landlords, subordination, non-disturbance and attornment agreements, estoppels, waivers and consents in favor of any of the Sellers, estoppel certificates from landlords under any of the Leases (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any of the Sellers or any asset-based lenders; provided that, if Buyer elects to remove any Location as set forth in the proviso in the definition of "Location", following such election, the applicable Lease shall not constitute a Lease for any purposes under this Agreement.

"Lease Assignment" shall have the meaning set forth in Section 2.3(d).

"Lease Assignment Agreement" shall have the meaning set forth in Section 2.3(b).

"Lease Assignment Date" shall have the meaning set forth in Section 2.3(d).

"Lease Assignment Notice" shall have the meaning set forth in Section 2.3(b).

"Lease Assignment Order" shall mean an order of the Bankruptcy Court (which may be the Approval Order) in form and substance reasonably acceptable to Buyer and Sellers, that for any Acquired Lease designated as such by Buyer pursuant to Section 2.3, approves the assignment of such Acquired Lease to the applicable Assignee pursuant to section 365 of the Bankruptcy Code.

"Lease Premises" shall have the meaning as provided in Section 6.6(a).

"Lease Rejection Order" shall mean an order of the Bankruptcy Court in form and substance reasonably acceptable to Buyer and Sellers, that for any Rejected Lease designated as such by Buyer pursuant to Section 2.4, approves the rejection of such Rejected Lease pursuant to section 365(a) of the Bankruptcy Code.

"Liability" shall mean any liability, indebtedness, debt, guaranty, claim, demand, loss, damage, deficiency, assessment, responsibility, "claim" (as defined in section 101(5) of the Bankruptcy Code), Action, proceeding or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured) and including, without limitation, all costs, fees and expenses relating thereto.

"Location" shall mean (i) the Sellers' corporate office, as described on Schedule 1.1(b) attached hereto and (ii) each of Sellers' retail stores, distribution centers and other locations described on Schedule 1.1(b) attached hereto; provided that, at any time on or prior to December 22, 2025, Buyer may elect to remove any Location by written notice to the Sellers and, following such election, such Location shall not constitute a Location for any purposes under this Agreement.

"Major Casualty / Condemnation Event" shall have the meaning set forth in Section 12.3(a).

"Material Adverse Effect" shall mean any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments and events has had, or would reasonably be expected to have, a material adverse effect on (a) the assets, liabilities, properties, business or condition (financial or otherwise) of the Designation Rights, Acquired Assets and Assumed Liabilities taken as a whole, or (b) the Sellers' ability to consummate the transactions contemplated by this Agreement pursuant to the terms hereof, in each case excluding any effect, change, condition, circumstance, development or event that results from or arises out of: (i) the execution and delivery of this Agreement or the announcement thereof or the pendency or consummation of the transactions contemplated hereby; (ii) geopolitical conditions or any outbreak or escalation of hostilities or acts of terrorism or war or any effect, change or event that is otherwise generally applicable to the industries and markets in which Sellers operate; (iii) changes in (or proposals to change) Laws or accounting regulations or principles; (iv) the Bankruptcy Cases, including, without limitation, any announced liquidation of the Sellers or any of their respective assets; or (v) any action expressly contemplated by this Agreement or taken at the written request or with the written consent of Buyer.

"Material Casualty / Condemnation Event" shall have the meaning set forth in Section 12.3(a).

"Media Accounts" shall have the meaning set forth in the definition of "Intellectual Property".

"Multiemployer Plan" shall mean a "multiemployer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA.

"Occupancy Expenses" shall mean, with respect to the Locations, base rent, percentage rent, HVAC, utilities, common-area maintenance, storage costs, real estate and use taxes, commercial rent tax, merchants' association dues and expenses, local, leased line, satellite broadband connections, local and long-distance telecom/telephone charges, charges for internet connections and other telecommunications services, security in the Locations (to the extent customarily provided in the Locations), including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance, housekeeping and cleaning expenses, pest control services, snow and trash removal expenses, a pro rata portion of comprehensive public liability insurance attributable to the Locations, personal property leases (including, without limitation, point of sale equipment), cash register maintenance, building maintenance, and rental for furniture, fixtures and equipment and all other categories of expenses at the Locations.

13

"Order" shall mean any award, writ, injunction, judgment, order, decree, attachment, stay, stipulation, certification, determination, decision, verdict, ruling, subpoena, or award issued or entered by or with any Governmental Authority or Arbitrator (whether temporary, preliminary or permanent).

"Ordinary Course of Business" shall mean the operation of the Sellers' business in the ordinary and usual course consistent with past practice taking into consideration the current financial condition of Sellers, as well as (and subject to) the Filings and all Orders entered in connection therewith.

"Outside Date" shall have the meaning set forth in Section 12.1(b)(vi).

"Party" or "Parties" shall mean, individually or collectively, Buyer, the Guarantor and Sellers.

"Permitted Post-Closing Encumbrances" shall mean (a) with respect to real property leased or owned by the Sellers, zoning restrictions, building codes and other land use laws regulating the use or occupancy of real property, and defects of title, easements, rights of way, covenants and restrictions, and any other encumbrance which would be shown on a then-current title commitment or survey, and in the case of real property owned by Sellers, that do not materially impair the value of the assets to which they relate or materially interfere with the use of assets to which they relate as the same are currently used and occupied; provided, however, that following the date that is two (2) Business Days prior to the date of the hearing to consider entry of the Bid Procedures Order, any such matter that would be shown on a then-current title commitment or survey shall be a Permitted Post-Closing Encumbrance without regard to materiality unless Buyer provides Sellers with written notice thereof on or prior to such date, (b) other non-monetary Encumbrances in existence on the date hereof that do not materially impair the value of the assets to which they relate or materially interfere with the use of the assets to which they relate as the same are currently used and occupied, (c) any encumbrances on the interest of any landlord or sublandlord or underlying fee interest of any Acquired Lease, (d) Encumbrances securing Liabilities to be assumed by Buyer pursuant to clauses (u), (v) and (w) of Section 3.3, and (e) as otherwise set forth on Schedule 1.1(d).

"Permitted Pre-Closing Encumbrances" shall mean (a) any Permitted Post-Closing Encumbrances, (b) Encumbrances which will be cleared by the Bankruptcy Court, (c) liens for Taxes that are not delinquent or which are being contested in good faith, (d) mechanics', carriers', workmen's, repairmen's or other similar liens arising or incurred in the Ordinary Course of Business for amounts not due and payable, and (e) as otherwise set forth on Schedule 1.1(e).

"Person" shall mean any individual, corporation (including, without limitation, any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Petition Date" shall have the meaning set forth in the Recitals.

"Plans and Permits" shall mean, with respect to any Location or Acquired Real Property, all related reports (including, without limitation, engineering and environmental), surveys (boundary and topographical), plans, blueprints and other schematics, franchises, grants,

14

authorizations, licenses, permits, easements, variances, exceptions, consents, certificates (including, without limitation, all certificates of occupancy), building permits, fire, health and safety permits, site plan approvals and all other planning approvals, zoning variances, conditional or special use permits (including, without limitation, for firearms or other special occupancies or uses), general assembly or general use permits or other similar documentation, and all Environmental Permits, approvals, clearances and Orders of a Governmental Authority, together with all architect, engineer, contractor, vendor and supplier warranties and guarantees with respect to any of the foregoing and/or the related Improvements.

"PNC Mortgage Loan" shall mean the indebtedness owed by any Seller to PNC Bank, National Association pursuant to that certain Loan Agreement, dated as of July 14, 2022, by and between ASI, ASI - Laporte LLC, an Ohio limited liability company, ASI Thomasville LLC, a Delaware limited liability company, and PNC Bank, National Association, together with any amendments, restatements, modifications or supplements of or to the same prior to the date of this Agreement.

"Post-Assignment Tax Period" shall mean, with respect to any Acquired Asset, Acquired Location, or Assumed Liability, any taxable period (or portion thereof) beginning after the date on which (i) the sale, transfer, assignment, conveyance or delivery of, or relating to, the Acquired Assets or Acquired Locations to Buyer (or an applicable Assignee) or (ii) the assumption of such Assumed Liability by Buyer (or an applicable Assignee), in each case, is consummated, which date shall be the Closing Date, the applicable Lease Assignment Date, or, with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment, pursuant to the terms of the Agreement and, in the case of any Straddle Period, the portion of such Straddle Period beginning after such date.

"Potential Acquired Assets" shall mean all assets of the Sellers of any kind that either (i) constitute Acquired Assets or (ii) will become Acquired Assets if the Location to which such assets relate becomes an Acquired Location.

"Potential Assigned Agreement" shall mean all Leases and other Contracts which Buyer may designate for assignment and assumption to an applicable Assignee pursuant to the terms of this Agreement.

"Pre-Assignment Tax Period" shall mean, with respect to any Acquired Asset, Acquired Location or Assumed Liability, any taxable period (or portion thereof) ending on or before the date on which (i) the sale, transfer, assignment, conveyance or delivery of, or relating to, such Acquired Asset or Acquired Location to Buyer (or an applicable Assignee) or (ii) the assumption of such Assumed Liability by Buyer (or an applicable Assignee), in each case, is consummated, which date shall be the Closing Date, the applicable Lease Assignment Date, the date of such assumption and assignment (with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6) or the date of such election (with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7), pursuant to the terms of this Agreement and, in the case of any Straddle Period, the portion of such Straddle Period ending on such date.

"Primarily Related" to any business, asset or liability, shall mean owned or held primarily by, required primarily for, or used, intended for use, leased or licensed, primarily in connection

with, or (in the case of liabilities) to the extent accrued, reserved or incurred in connection with, such business, asset or liability.

"Proceeding" shall mean any claim, as defined in the Bankruptcy Code, action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Property Taxes" shall have the meaning set forth in Section 3.1(i).

"Purchase Price" shall have the meaning set forth in Section 4.1.

"Rejected Lease" shall have the meaning set forth in Section 2.4(a).

"Representative" shall mean, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including, without limitation, legal counsel, accountants and financial advisors.

"Retained Books and Records" shall mean (a) any documents that the Sellers are required by applicable Law to retain, (b) corporate seals, minute books, charter documents, corporate stock record books, Tax Returns and other books, records and work papers related to income Taxes paid or payable by any of the Sellers or their Affiliates (for the avoidance of doubt, other than Tax Returns and other books, records and work papers related to U.S. federal (and applicable state and local) Income Taxes imposed on Buyer or its shareholders as a result of the treatment, for U.S. federal (and applicable state and local) income tax purposes, of any of the Sellers as a "qualified subchapter S subsidiary" (within the meaning of Section 1361(b)(3)(B) of the Code) with respect to Buyer or otherwise as an entity disregarded as separate from Buyer), and such other books and records, in each case, as pertaining to the organization, or share capitalization of any of the Sellers, (c) any books and records or information related exclusively to any of the Excluded Assets or Excluded Liabilities, and (d) copies of any other books and records or information to the extent primarily related to any Excluded Assets or Excluded Liabilities (it being understood that copies of such books and records or information to the extent related to the Acquired Assets or Assumed Liabilities shall not be Retained Books and Records).

"Retained Subsidiaries" shall mean all direct and indirect Subsidiaries of Seller.

"Sale Hearing" shall mean a hearing before the Bankruptcy Court to approve this Agreement and the Agency Agreement, the transactions contemplated hereby and thereby and the entry of the Approval Order.

"Sale Period" shall have the meaning set forth in Section 2.2(a).

"Security Deposit Documents" shall have the meaning set forth in Section 3.1(q).

"Security Deposits" shall have the meaning set forth in Section 3.1(q).

"Seller Retained Claims" shall mean any (i) Avoidance Actions against Persons other than (A) Buyer, the Guarantor, Schottenstein Stores Corporation, Schottenstein Property Group,

Kroehler Corporation, Kroehler Furniture Mfg. Co., Inc., Luxury Delivery Service, Inc., SB360 Capital Partners, LLC, Second Avenue Capital Partners LLC and Tower Hill Advisory Services, LLC, (B) any Affiliate of any of the Persons described in clause (A), (C) any direct or indirect equityholders, beneficiaries, members, partners, directors, managers, officers, employees, counsel, advisors or other representatives of any of the persons and entities descried in clauses (A) and (B) of this definition, (D) any company, partnership, trust or other entity or investment vehicle created for the benefit of, or the holdings of which are for the primary benefit of, any of the Persons referred to in clauses (A), (B) and (C) of this definition (or of any family member of any such Person or the estate, legatees and devisees of any such Person) and (E) Magnussen and H317, and (ii) existing class action Claims against Google and Discover, and (iii) any Claim against Buyer or Guarantor under this Agreement or the Agency Agreement.

"Sellers" and "Seller" shall have the meaning set forth in the Preamble.

"Sellers' Allocation Notice" shall have the meaning set forth in Section 4.4(a).

"Sellers' Termination Notice" shall have the meaning set forth in Section 12.1(c)(i).

"Service Providers" shall mean the current and former directors, officers, employees, consultants and independent contractors of the Sellers and their Affiliates.

"Signage Payment" shall have the meaning set forth in Section 4.1.

"Straddle Period" shall mean a taxable period that commences prior to and includes (but does not end on) the Closing Date, the applicable Lease Assignment Date, or, with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment, as applicable.

"Subsidiary" shall mean, with respect to any Person, any other Person where a majority of its outstanding voting or equity interests are held, directly, or indirectly through one or more intermediaries, by such Person.

"Tax" or "Taxes" shall mean any federal, state, provincial, local, municipal, foreign or other taxes, duties, levies, fees, charges or assessments or deficiencies thereof, including, without limitation, all income, alternative, minimum, franchise, tariffs, capital stock, net worth, capital gains, profits, intangibles, gross receipts, value added, sales, use, goods and services, excise, customs, transfer, recording, occupancy, employment, unemployment, social security, payroll, withholding, estimated or other taxes, duties, levies, fees or other charges or assessments or deficiencies thereof (including, without limitation, all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Authority.

"Tax Proceeding" shall mean any notice of deficiency, proposed adjustment, adjustment, assessment, audit, contest, litigation, dispute, examination, investigation or other administrative or judicial proceeding with or against any Governmental Authority or otherwise with respect to Taxes.

"Tax Return" shall mean any return, declaration, report, claim for refund, information return or other document (including, without limitation, any related or supporting estimates,

elections, schedules, statements, or information) filed with or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax, including any amendments thereof.

"Third-party" shall mean a Person who or which is neither a Party nor an Affiliate of a Party.

"Trademarks" shall have the meaning set forth in the definition of "Intellectual Property".

"Transaction Documents" shall mean this Agreement, the Agency Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transactions" shall mean the transactions contemplated herein to be consummated hereby and those contemplated by the Agency Agreement and to be contemplated thereby, including, without limitation, the purchase and sale of the Designation Rights, the Acquired Assets and the right to dispose of certain of Sellers' assets in accordance with and pursuant to the terms of the Agency Agreement and the assumption of the Assumed Liabilities provided for in this Agreement.

"Transfer Taxes" shall have the meaning set forth in Section 9.1(a).

"Transition Services Agreement" shall mean the Transition Services Agreement, dated on or about the Closing Date, between Buyer and the Sellers in a form reasonably acceptable to Buyer and Sellers, which shall require (a) Sellers to provide services to be agreed, at a price to be agreed (which shall be no less than cost), for a period to be agreed and (b) Buyer to provide services to be agreed, at cost and for a period to be agreed. The form of the Transition Services Agreement shall be agreed not later than two (2) Business Days prior to the hearing with respect to the Bid Procedures Motion, and shall provide (i) for the payment to Buyer and the Sellers (as applicable) in an amount not less than the aggregate direct and indirect cost to Buyer and the Sellers (as applicable) in providing services thereunder, (ii) that neither party thereto shall have any obligation to continue to provide services thereunder if the other party is not then providing any material services (or is not current on payments for services rendered thereunder) in accordance with the terms thereof, and (iii) procedures for the termination of services in the event of breach or default.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar Law (including, without limitation, any similar local, state or non-U.S. notice requirement relating to the termination of employees), and the rules and regulations thereunder.

Section 1.2    Other Definitions and Interpretive Matters.

(a)    (i)    Each of Buyer, the Guarantor and the Sellers agree that the terms of this Agreement and the Agency Agreement are intended to be mutually consistent and should be interpreted as such. To the extent, however, of any irresolvable inconsistency between the terms and provisions of the Agency Agreement and those of this Agreement as to matters which are addressed in this Agreement, the terms and provisions of the Agency Agreement shall govern and control.

(b)     Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Any reference in this Agreement to "$" means U.S. dollars.

(iii)     Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement.  No reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules.  No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  Any information, item or other disclosure set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent from the facts specified in such disclosure.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)     Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)     The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified.

(vi)     Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)     The word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not merely mean "if."

(viii)     The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(c)     No Strict Construction. Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II

## DESIGNATION RIGHTS

Section 2.1     Acquisition of Designation Rights. Upon the terms and subject to the conditions of this Agreement and the Approval Order, on the Closing Date, Sellers shall sell, transfer, assign and convey, or cause to be sold, transferred, assigned and conveyed, to Buyer, and Buyer shall purchase from Sellers, the Designation Rights. For the avoidance of doubt, the sale, transfer, assignment and conveyance of the Designation Rights provided for herein on the Closing Date shall not effectuate a sale, transfer, assignment or conveyance of any Lease or any related assets of Sellers to Buyer or any other Assignee, which shall only be effectuated on a Lease Assignment Date (as defined below). Subject to the terms and conditions of this Agreement, the Approval Order and the requirements of section 365(b) of the Bankruptcy Code, Buyer shall have the right to designate itself or any other Person as the Assignee to which a Lease is to be assumed and assigned. The Designation Rights with respect to any Leased Premise shall terminate upon the expiration of the Designation Rights Period.

Section 2.2     Parties' Respective Obligations Before and During Designation Rights Period. Notwithstanding anything to the contrary herein, nothing in this Agreement shall in any way limit the obligations of Buyer pursuant to and in accordance with the terms of the Agency Agreement.

(a)     Sellers' Obligations.

(i)     Without limiting the obligations of Buyer under the Agency Agreement, and provided that Agent is then current in its material undisputed payment obligations thereunder, Sellers shall pay when due any and all Occupancy Expenses with respect to each Location and the related Lease solely to the extent arising during the period (the "Sale Period") (A) commencing on the Petition Date through (B) the later of (1) the date immediately preceding the commencement of the Designation Rights Period and (2) (I) with respect to the Sellers' corporate office, the last date as to which Agent pays Central Services Expenses (as defined under the Agency Agreement) pursuant to the Agency Agreement, (II) with respect to Locations constituting Stores (as defined under the Agency Agreement), the last date as to which Agent pays Occupancy Expenses (as defined under the Agency Agreement) with respect thereto pursuant to the Agency Agreement, (III) with respect to Locations constituting Distribution Centers (as defined under the Agency Agreement), the last date as to which Agent pays Distribution Center Expenses (as defined under the Agency Agreement) with respect thereto pursuant to the Agency Agreement and

(IV) with respect to other Locations, the last date on which sales pursuant to the Consulting Agreement occur at such Location, in each case at such times and in such amounts as are required under the terms of the applicable Lease and any other applicable agreement pertaining to such Location. Sellers shall not pay any amount due from Sellers pursuant to any provision of this Agreement using any security deposit associated with any Location, Lease or other Location-related agreement.

(ii)    From the date hereof through the end of the Designation Rights Period, Sellers shall (x) use commercially reasonable efforts to maintain and preserve each Location, each Lease and all related Potential Acquired Assets in their present condition (including, without limitation, using commercially reasonable efforts to comply with written instructions from Buyer as to the renewal (or lack of renewal) of each Lease that comes up for renewal during the Designation Rights Period; provided that, if Buyer instructs the Sellers to renew any Lease that comes up for renewal during the Designation Rights Period, Buyer shall indemnify Sellers for all lease payments and other obligations arising under the Lease as a result of such renewal, and concurrently deliver to the Sellers a Buyer Assumption Notice and a Lease Assignment Agreement with respect to such Lease in accordance with <u>Section 2.3</u>) and, with respect to the Lease Premises, in the condition required under the respective Leases (if the condition of such Lease Premises on the date hereof does not satisfy such standard), other than reasonable wear and tear, casualty and condemnation (which shall be governed by <u>Section 12.3</u>) and sales of Inventory and Equipment in accordance with the terms of the Agency Agreement and (y) use commercially reasonable efforts to cause each landlord under the Leases and any applicable counterparty under any other Potential Assigned Agreements to perform such party's covenants, agreements and obligations (including, without limitation, repair and maintenance obligations with respect to the Location and any shopping center in which any Location is located) under the respective Leases and other Potential Assigned Agreements. Sellers shall not be obligated to so renew absent delivery of a notice described in clause (x) above. During the Designation Rights Period, Sellers shall not without Buyer's consent, and shall not solicit any other Person to, (A) sell, transfer, assign, convey, lease, license, mortgage, pledge or otherwise encumber any Location, related Lease or related Potential Acquired Asset (other than sales of Inventory and Equipment in accordance with the terms of the Agency Agreement, Permitted Post-Closing Encumbrances and any applicable statutory liens (solely to the extent that such Lease or related Potential Acquired Asset will be transferred free and clear of such statutory liens pursuant to the applicable Lease Assignment Order)), (B) amend, supplement or modify in any fashion (or terminate or enter into) any Lease or other Potential Assigned Agreement (<u>provided</u> that Sellers shall use commercially reasonable efforts to comply with instructions from Buyer as to the renewal (or lack of renewal) of each Lease that comes up for renewal during the Designation Rights Period as set forth in clause (x) above), (C) grant or terminate any other interests in any Location, related Lease or related Potential Acquired Asset (other than sales of Inventory and Equipment located at any Location in accordance with the terms of the Agency Agreement), (D) cancel or compromise any claim or waive or release any right, in each case that is related to any Location or any related Potential Acquired Assets (for the avoidance of doubt, other than any Excluded Assets), (E) except as required pursuant to <u>Section 2.4</u>, seek or obtain an order approving rejection of a Lease or other Potential Assigned Agreement, (F) issue any gift cards, gift certificates, merchandise credits, return

credits, customer membership or customer loyalty discount programs, coupons, groupons or other similar credits or programs, (G) take any action with respect to Taxes or Tax matters that could reasonably be expected to result in an Encumbrance on any Location or related Potential Acquired Assets (unless the applicable Lease and all other related Potential Acquired Asset will be transferred free and clear of such Encumbrances pursuant to the applicable Lease Assignment Order) or an increase in the Tax Liability of Buyer or any of its Affiliates or (H) enter into any agreement or commitment to take any action prohibited by this <u>Section 2.2(a)(ii)</u>.

(iii)    From the date hereof through the end of the Designation Rights Period, Sellers shall make available to Buyer a data room containing complete copies of all Leases as in effect on the date hereof or otherwise during the Designation Rights Period (including, without limitation, all material notices delivered by any Person pursuant thereto or in connection therewith to the extent such notices may relate to such Lease during the Designation Rights Period). From the date hereof through the end of the Designation Rights Period, Sellers shall make available to Buyer access to the Locations at such times as Buyer or its agents may reasonably request during normal business hours; <u>provided</u> that Buyer or its agents have given Sellers not less than 24 hours written advance notice of such request for access to a Location and are accompanied by a representative of Sellers for the duration of any such access.

(iv)    Buyer and Sellers acknowledge and agree that, during the Designation Rights Period, subject to the terms of the Agency Agreement, (i) Buyer shall operate the Locations as agent for Sellers in accordance with the terms of the Agency Agreement, the Approval Order and the Sale Guidelines (as defined in the Agency Agreement) and (ii) Agent may conduct liquidation sales at any or all of the Locations, which sales shall be in accordance with the terms of the Agency Agreement, the Approval Order and the Sale Guidelines.

(v)    From the date hereof through the end of the Designation Rights Period, subject to the terms of the Agency Agreement, Sellers shall bear the risk of loss or damage to the Locations and Sellers shall continue all insurance policies with respect to the Locations, including, without limitation, comprehensive public liability, casualty and umbrella liability insurance and all other insurance required to be maintained under any Lease or otherwise, in such amounts as it currently has in effect, and shall use commercially reasonable efforts to cause Buyer to be named as an additional insured with respect to all such policies. Sellers shall pay to Buyer promptly following receipt all insurance recoveries and all warranty and condemnation proceeds received or receivable after the Closing Date with respect to the Acquired Locations or the related Leases for events occurring during the Designation Rights Period (excluding any recoveries in respect of Inventory located at the Acquired Locations to the extent the Agent is entitled to such proceeds under the Agency Agreement). During the Designation Rights Period, Sellers shall provide Buyer with notice of any Casualty / Condemnation Event within three (3) Business Days of the occurrence of such Casualty / Condemnation Event.

(vi)    From the date hereof through the end of the Designation Rights Period, Sellers shall use commercially reasonable efforts to cause the landlords under the Leases

to maintain the insurance policies that are required under the Leases with respect to the Locations and the shopping centers in which the Locations are located.

(vii)    Subject to any obligations of Buyer under the Agency Agreement, from the date hereof through the end of the Designation Rights Period, Sellers shall perform repairs and maintenance and provide security services at the Locations in the manner and to the extent in place as of the date hereof or required under the Leases.

(b)    Buyer's Obligations.  Buyer shall pay (or reimburse Sellers) all actual Occupancy Expenses incurred in connection with the operation of the Locations on a per Location, per category and per diem basis in an amount up to the per Location per category per diem amount set forth on Schedule 2.2(b) attached hereto from (i) the date immediately following the end of the Sale Period at a Location through (ii) the end of the Designation Rights Period at such Location; provided, however, that nothing in this Section 2.2(b) shall impose any obligation on Buyer to pay any rent or other Occupancy Expenses other than as expressly set forth on Schedule 2.2(b). Notwithstanding the foregoing, to the extent that Buyer instructs the Sellers to renew any Lease pursuant to Section 2.2(a), the Sellers successfully renew such Lease in accordance with such instructions and the effect of such renewal is to increase the base rent or percentage rent under such Lease in comparison to the base rent or percentage rent under such Lease on the date hereof, the per diem cap on Buyer's obligation to reimburse the Sellers for rent under such Lease pursuant to this Section 2.2(b) or the Agency Agreement shall be increased by an amount equal to the per diem increase in base rent or percentage rent resulting from such renewal).

Section 2.3    Assumption and Assignment.

(a)    Following Closing, at any time on or prior to the date that is fifteen (15) Business Days prior to the last day of the Designation Rights Period with respect to a Lease, Buyer shall have the right, which right may be exercised at any time and from time to time in Buyer's sole and absolute discretion, to designate such Lease (and any Potential Assigned Agreements Primarily Related to such Lease designated by Buyer in its sole discretion) for assumption and assignment and shall provide notice to Sellers (each such notice, a "Buyer Assumption Notice") of Buyer's election to require Sellers to assume such Lease and Potential Assigned Agreements Primarily Related to such Lease and assign the same to the Assignee identified in such Buyer Assumption Notice; provided that such designation (and any obligation of Buyer or any applicable Assignee to consummate any such assumption and assignment) may be conditioned upon any condition identified by Buyer, acting in its sole discretion, in such Lease Assumption Notice or the accompanying Lease Assignment Agreement (provided that Sellers shall not be required to take any actions not otherwise expressly required by the terms of such Lease or Potential Assigned Agreement to be assumed and assigned to cause such conditions to be satisfied, and no such condition shall require the Sellers to expend any funds (directly or indirectly) not otherwise payable pursuant to the terms hereof); and provided, further that Buyer shall pay all Buyer Cure Costs associated with any assumption and assignment of any such related Potential Assignment Agreements in accordance with the terms of Section 3.4(a)(ii).  The Buyer Assumption Notice shall provide the following information: (1) the Lease and/or other Potential Assigned Agreements Primarily Related to such Lease being assumed and assigned, (2) the identity of the applicable Assignee(s), and (3) sufficient information with respect to the ability of the proposed Assignee to provide adequate assurance of future performance under the Lease and/or Potential Assigned

23

Agreements Primarily Related to such Lease necessary to satisfy the requirements of section 365(b)(1)(C) of the Bankruptcy Code.

(b)    Within three (3) Business Days following the date upon which Buyer delivers a Buyer Assumption Notice to Sellers, together with a related lease assignment agreement in form and substance reasonably acceptable to Buyer and Sellers (the "Lease Assignment Agreement") executed by the applicable Assignee, Sellers shall (1) deliver to Buyer and such Assignee a fully executed Lease Assignment Agreement and (2) file with the Bankruptcy Court and serve on the applicable lessor(s) and other appropriate notice parties (as applicable) a notice substantially in the form attached hereto as Exhibit D (the "Lease Assignment Notice"), and, if not approved pursuant to the Approval Order, shall seek entry by the Bankruptcy Court of a Lease Assignment Order in respect of the Lease and related Potential Assigned Agreements subject to such Buyer Assumption Notice. As of the applicable Lease Assignment Date, except for such obligations and liabilities with respect to such Lease and the related Location arising during the Designation Rights Period, Buyer (other than as the Assignee, if Buyer is the Assignee) shall have no further obligation or liability with respect to such Lease or the related Location (including, without limitation, any obligation to continue to pay Expenses (as defined in the Agency Agreement) with respect thereto) and the Assignee shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with such Lease, Potential Assigned Agreements Primarily Related to such Lease or the related Location. If Buyer is the Assignee, Buyer shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with such Lease and Potential Assigned Agreements Primarily Related to such Lease or the related Location.

(c)    Upon Buyer's request, within three (3) Business Days following the entry of a Lease Assignment Order (or, if earlier, not later than the last day of the Designation Rights Period), Sellers shall deliver to the applicable Assignee, at Assignee's reasonable cost and expense, any instruments reasonably necessary or desirable (in the reasonable judgment of such Assignee) for the due sale, transfer, assignment, conveyance and delivery to such Assignee of the applicable Lease, at Assignee's reasonable cost and expense, together with the related Acquired Assets, in each case free and clear of all Encumbrances of any and every kind, nature and description, other than Permitted Post-Closing Encumbrances (collectively, the "Assignment Instruments"), and shall otherwise promptly take (or cause to be taken) all actions (including, without limitation, payment of all Excess Cure Costs in accordance with the terms of this Agreement) reasonably necessary or desirable (in the reasonable judgment of such Assignee) in order to cause such sale, transfer, assignment, conveyance and delivery to become effective (collectively, the "Assignment Actions").

(d)    The effective date of the sale, transfer, assignment, conveyance and delivery by Sellers to such Assignee of a Lease and related assets pursuant to this Agreement and the applicable Lease Assignment Agreement (a "Lease Assignment") shall be the "Lease Assignment Date" with respect to such Lease and related assets.

(e)    With respect to any Lease or Potential Assigned Agreement Primarily Related to such Lease designated in a Buyer Assumption Notice:

(i)     Sellers and Buyer shall each use (and Buyer shall use commercially reasonable efforts to cause Assignee to use) commercially reasonable efforts to accomplish, and shall fully cooperate with each other in, the resolution of any objections to the proposed assumption and assignment of such Lease and related assets;

(ii)    Buyer shall provide (if it is the Assignee) or use commercially reasonable efforts to cause Assignee to provide (if the Buyer is not Assignee) evidence (A) of adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code, and (B) that Assignee is a good faith purchaser for purposes of section 363(m) of the Bankruptcy Code, including, in both cases, through the provision of such financial information and/or the filing of such affidavits or declarations with the Bankruptcy Court as may reasonably be requested by Sellers; and

(iii)   The Assignee shall assume the Assumed Liabilities with respect to such Lease and, to the extent constituting Assigned Agreements, the Potential Assigned Agreements Primarily Related to such Lease.

(iv)    Except as expressly provided herein or in the Agency Agreement, Buyer shall have no liability or obligations, other than for the payment of Buyer Cure Costs and certain "Expenses" (as provided herein or in the Agency Agreement), with respect to any liabilities, claims, damages or other obligations of any Seller under such Lease or otherwise with respect to the Location subject to such Lease (including, without limitation, with respect to any related assets sold, transferred, assigned and conveyed together with such Lease), whether arising before or after the Petition Date; provided, however, that if Buyer is the Assignee of such Lease or Potential Assigned Agreements Primarily Related to such Lease, Buyer shall assume the Assumed Liabilities in accordance with the terms of this Agreement.

(f)     With respect to each Closing Date Acquired Lease, the Lease Assignment Date shall be the Closing Date and Buyer and the Sellers shall take all reasonable actions contemplated by this Section 2.3 in a manner and at times (including, without limitation, prior to the Closing Date) sufficient to permit the assumption, assignment and transfer of such Closing Date Acquired Lease and the related Acquired Assets to the applicable Assignee concurrently with the Closing.

(g)     Except as otherwise set forth in this Article II, each Person shall bear their own costs and expenses in respect of obtaining entry of a Lease Assignment Order and otherwise implementing the sale, transfer, assignment, conveyance and delivery of the applicable Lease and related assets to the applicable Assignee, including, without limitation, the filing and prosecution of any motions or other papers with respect to the same.

Section 2.4    Rejection.

(a)     At any time on or prior to the date that is five (5) Business Days prior to the last day of the Designation Rights Period with respect to a Lease, Buyer shall have the right, which right may be exercised at any time and from time to time in Buyer's sole and absolute discretion, to designate such Lease for rejection and provide notice to the Sellers (each such notice, a "Buyer

Rejection Notice") of Buyer's election to require Sellers to reject such Lease (such Lease, a "Rejected Lease") and terminate and surrender the related Location to the lessor thereof.

(b)     Within five (5) Business Days following the date upon which Buyer delivers a Buyer Rejection Notice to Sellers, Buyer shall vacate the applicable Location and deliver to Sellers the keys to such Location, if in the possession of Buyer, and possession of such Location in "broom clean" condition, ordinary wear and tear excepted, except for Remaining Merchandise (as defined in the Agency Agreement), Equipment and supplies, to ensure Sellers' ability to surrender within the aforementioned five (5) Business Day period (or such shorter time, if applicable). Within the same period, Sellers shall take all reasonable actions (including, without limitation, actions required under section 365 of the Bankruptcy Code) to seek and obtain a Lease Rejection Order from the Bankruptcy Court in respect of such Rejected Lease. As of the date that is five (5) Business Days after the date of the Buyer Rejection Notice, subject to its compliance with its obligations under this Section 2.4, Buyer shall have no further obligation or liability with respect to the applicable Rejected Lease or the related Location other than as set forth in this Section 2.4(b), except with respect to obligations and liabilities with respect to such Rejected Lease and the related Location arising during the Designation Rights Period, and Sellers shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with respect to such Rejected Lease or the related Location. Notwithstanding anything to the contrary set forth herein, if the Designation Rights Period with respect to any Location ends during a calendar month or if the Buyer Rejection Notice is delivered to Sellers less than five (5) Business Days before the end of a calendar month, and as a result, the Sellers are required to pay Occupancy Expenses to the applicable landlord for the entire calendar month (i.e., "in for a day, in for a month"), Buyer's obligations to pay Occupancy Expenses in accordance with Section 2.2(b) for such Location shall continue until the last day of such calendar month.

(c)     Each Person shall bear their own costs and expenses in respect of obtaining authority for such rejection of a Rejected Lease, including, without limitation, the filing and prosecution of any motions or other papers with respect to the same.

## ARTICLE III

## PURCHASE AND SALE

Section 3.1    Purchase and Sale of the Acquired Assets. Upon the terms and subject to the conditions of this Agreement, on the Closing Date (or (i) with respect to each Acquired Location and related Acquired Assets, on the applicable Lease Assignment Date, (ii) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment and (iii) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, as of the date of such election), Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer (or, with respect to any Acquired Lease Premise, the applicable Assignee), and the Buyer (or, with respect to any Acquired Lease Premise, the applicable Assignee) shall purchase, all right, title and interest of Sellers in, to or under all of Sellers' assets (other than the Excluded Assets) (collectively, excluding any Excluded Assets, the "Acquired Assets") to be transferred as of such date (i.e., the Closing Date, or (i) with respect to each Acquired Location and related Acquired Assets, on the applicable Lease Assignment Date, (ii) with respect to each Assigned Agreement

26

assumed and assigned pursuant to <u>Section 3.6</u>, the date of such assumption and assignment and (iii) with respect to any Equipment as to which Borrower elects to take ownership pursuant to <u>Section 3.7</u>, as of the date of such election) free and clear of any and all Encumbrances of any and every kind, nature and description (including, without limitation, any interests under any IP Licenses), other than Permitted Post-Closing Encumbrances. The Acquired Assets shall include, without limitation, the following assets:

(a)     all Intellectual Property, all rights to royalty income associated therewith, all rights to sue and recover damages and profits for past, present and future infringement, misappropriation or other violation thereof, and all rights of priority with respect thereto (with respect to IP Licenses, to the extent transferable) (the "<u>Acquired Intellectual Property</u>");

(b)     all Acquired Real Property;

(c)     (i) with respect to each Acquired Location, the applicable Acquired Lease, each other Assigned Agreement Primarily Relating to such Acquired Location and all Acquired Lease Rights relating to such Acquired Lease and other Assigned Agreements and (ii) any other Assigned Agreement;

(d)     all receivables owed to the Sellers, including, other than any credit card receivables; provided that credit card Proceeds (as defined in the Agency Agreement) shall nevertheless be payable to Agent pursuant to the terms of the Agency Agreement;

(e)     all cash in the Stores (as defined in the Agency Agreement) (the "<u>Store-Level Cash</u>");

(f)     any Equipment as to which Buyer elects to take ownership pursuant to <u>Section 3.7</u>;

(g)     all Acquired Improvements with respect to any Acquired Location or Acquired Real Property;

(h)     all signage acquired by the Sellers in connection with any liquidation sale (including, without limitation, pursuant to the Consulting Agreement);

(i)     any and all real (including, without limitation, real estate taxes, assessments and related governmental impositions both general and special imposed under the laws of any one or more jurisdictions in which the applicable Lease Premises or Acquired Real Property is located against the land, buildings and other improvements), personal and intangible property Taxes ("<u>Property Taxes</u>") that are prepaid with respect to each Acquired Lease or Acquired Real Property or any other Acquired Assets related to such Acquired Lease or Acquired Real Property;

(j)     any interest in or right to any refund, rebate or credit of Taxes (excluding tariffs) and any other choses in action;

(k)     the securities accounts maintained with Raymond James under account no. 1893Y370 (the "<u>Specified Account</u>") and all assets held therein;

(l)     to the extent permitted by applicable law, all rights (but not obligations) of the Sellers under any non-disclosure or confidentiality, non-compete or non-solicitation agreements, to the extent any such agreement relates to any Acquired Assets;

(m)     all assignable Assigned Plans and Permits with respect to any Acquired Location or Acquired Real Property;

(n)     all books and records, including, without limitation, files, data, reports, computer codes, sourcing data, advertiser and supplier lists, cost and pricing information, business plans, manuals, blueprints, plans, schematics, reports, research and development files, and other records of any Seller used in, held for use in, or relating to the Acquired Assets or the Assumed Liabilities, other than Retained Books and Records;

(o)     any and all keys and security codes relating to any Acquired Location or Acquired Real Property, such Acquired Location's or Acquired Real Property's building systems or any parking or other common areas of any shopping center in which such Acquired Location or Acquired Real Property is located;

(p)     any and all rights of the Sellers in and to any security deposits or prepayments, letters of credit, escrow deposits (excluding deposits of other bidders for the Potential Acquired Assets in the Bankruptcy Cases) and cash collateral, including, without limitation, cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit, utility deposits made prior to the Petition Date, to the performance, payment or surety bonds, credits, allowance, prepaid rent or other assets, charges, setoffs, prepaid expenses, other prepaid items and other security (collectively, "Security Deposits"), together with all contracts, agreements or documents evidencing or related to the same (collectively, "Security Deposit Documents"), in each case to the extent Primarily Related to any Acquired Location;

(q)     any and all insurance proceeds, warranty proceeds, condemnation awards or other compensation in respect of loss or damage to any Acquired Location, Acquired Real Property or any other Acquired Asset, to the extent occurring on or after the date hereof, and all right and claim of the Sellers to any such insurance proceeds, warranty proceeds, condemnation awards or other compensation not paid by the applicable Lease Assignment Date with respect to any Acquired Lease Premise, subject to Sections 2.2(a)(v) and 12.3; and

(r)     other than the Seller Retained Claims, any and all rights, Claims, Actions, rebates, refunds, causes of action, choses in action, suits or proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable or have been asserted) against any Person, including, without limitation, (i) any and all Claims or choses in action warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise), (ii) any and all Avoidance Actions and (iii) any and all Claims in respect of class actions.

Section 3.2     Excluded Assets.  Notwithstanding anything herein to the contrary, the Acquired Assets shall not include any of the following (collectively, the "Excluded Assets"):

(a)     any Seller's rights, Claims and Actions under this Agreement, the Agency Agreement and the other Transaction Documents;

(b)     except as otherwise expressly included as Acquired Assets, all cash and cash equivalents, including, without limitation, checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, of such Sellers and all deposit accounts of such Sellers, including cash collateral held in Seller's bank accounts used to secure letters of credit;

(c)     (i) all documents prepared in connection with this Agreement or the transactions contemplated hereby or thereby, or Primarily Relating to the Bankruptcy Cases, all minute books, corporate records (such as stock registers), and organizational documents of Sellers and the Retained Subsidiaries, all documents and records which contain information subject to attorney-client or attorney work product privileges, and (ii) copies of all documents relating (but not Primarily Relating) to the Bankruptcy Cases;

(d)     any Contract that is not an Assigned Agreement;

(e)     the Excluded IP/IT;

(f)     all shares of capital stock or other equity interests of any Seller or Retained Subsidiary or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller, Retained Subsidiary or any other Person;

(g)     all Inventory, all Excluded Equipment and all Excluded Improvements;

(h)     all Employee Plans, including, without limitation, any assets, trust agreements or other funding Contracts related thereto (but not, for clarity, any rights to enforce restrictive covenants that is an Acquired Asset pursuant to Section 3.1(m)); and

(i)     the Seller Retained Claims;

(j)     any securities accounts maintained any Seller with any third-party (other than the Specified Account) and all assets held in any such securities account;

(k)     the Elston Location, the applicable lease and any Potential Assigned Agreements Primarily Related thereto; provided that the Agent shall nevertheless acquire the right to liquidate the inventory and Equipment at the Elston Location pursuant to the Agency Agreement;

(l)     all credit card receivables; provided that credit card Proceeds (as defined in the Agency Agreement) shall nevertheless be payable to Agent pursuant to the terms of the Agency Agreement;

(m)     all rights to proceeds of the Sellers' directors and officers insurance policies; provided that, for the avoidance of doubt, nothing in this Section 3.2(m) shall give any Seller any rights in respect of (including, without limitation, any right to assert or prosecute) any rights, Claims, Actions, rebates, refunds, causes of action, choses in action, suits or proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights that constitute Acquired Assets;

(n)    all insurance proceeds payable with respect to Excluded Assets or Excluded Liabilities (except as set forth in Article II);

(o)    except to the extent constituting an Acquired Asset pursuant to Section 3.1(p), all of the Sellers' deposits, including utility deposits made on or after the Petition Date;

(p)    all refunds of any drawn letters of credit issued on behalf of the Sellers (except to the extent (i) such letters of credit constitute Acquired Assets pursuant to Section 3.1(p) or (ii) the amounts refunded were initially paid by Schottenstein Stores Corporation);

(q)    all refunds of credit card holdbacks (except to the extent such holdbacks were payable from Proceeds as defined in the Agency Agreement) otherwise payable to Agent pursuant to the terms of the Agency Agreement or otherwise funded by Buyer or Agent);

(r)    all claims of the Sellers for rebates, refunds or other returns of tariffs or proceeds from sale of claims of the Sellers for rebates, refunds or other refunds of tariffs;

(s)    Sellers' locations listed on Schedule 3.2(s), the applicable lease and any Potential Assigned Agreements Primarily Related thereto; provided that the Agent shall nevertheless acquire the right to liquidate the inventory and Equipment at such locations pursuant to the Agency Agreement;

(t)    deposits of other bidders for the Potential Acquired Assets in the Bankruptcy Cases; and

(u)    any assets, properties or rights that the Buyer, acting in its sole discretion, identifies to the Seller prior to the date that is ninety (90) days after the Closing Date (it being agreed that, if the Buyer identifies any such asset, property or right after the Closing Date, the Buyer shall be deemed to have never acquired any such asset, property or right); provided, however, that any such exclusion under this Section 3.2(u) shall not reduce the Purchase Price.

Section 3.3    Assumed Liabilities.  Except for (t) those Liabilities under the PNC Mortgage Loan (provided that Buyer shall not have any obligation with respect to such assumption unless the aggregate amount of liabilities thereunder do not exceed $54,078,921.69), (u) those Liabilities under the Huntington Lease (provided that Buyer shall not have any obligation with respect to such assumption unless the aggregate amount of liabilities thereunder do not exceed $2,715,740.12), (v) those Liabilities owing to Magnussen and H317 (not to exceed $7,941,509.00), (w) accrued paid time-off, vacation and other similar Liabilities solely to the extent relating exclusively to employees of Sellers that are hired by Buyer (or any of its Affiliates) as of the Closing Date, (x) those Liabilities relating to the payment or performance of obligations arising solely after the applicable Lease Assignment Date with respect to the Acquired Leases and the other Assigned Agreements Primarily Related to such Acquired Leases (or, with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, those Liabilities relating to the payment or performance of obligations arising solely after the date of such assumption and assignment), which shall be Liabilities only of Buyer or the applicable Assignee, as applicable, (y) Buyer's obligation to pay Occupancy Expenses as provided (and subject to the limitations set forth) in Section 2.2(b), and (z) all Buyer Cure Costs (but not Excess Cure Costs) solely with respect to the Acquired Leases and the other Assigned Agreements, which shall be Liabilities only

of Buyer (collectively, the "Assumed Liabilities"), none of Buyer, any Affiliate of Buyer or any Assignee shall assume, be deemed to assume or become obligated hereunder in any way to pay or perform (whether as a successor to any Seller or otherwise) any Liabilities of any of the Sellers or any of their respective Affiliates of any kind or nature, known, unknown, contingent or otherwise, whether direct or indirect, matured or unmatured (the foregoing, including, without limitation, the following but excluding the Assumed Liabilities, the "Excluded Liabilities"), which shall include the following Liabilities (except to the extent constituting Assumed Liabilities):

(a)     any Liability arising out of facts or circumstances in existence prior to the Closing Date (or (i) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date and (ii) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment) and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of the Sellers or any of their Affiliates under any Contract, agreement, arrangement or understanding to which any Seller or any of its Affiliates is a party prior to the Closing Date (or (x) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date and (y) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment), including, without limitation, any Acquired Leases;

(b)     any Liability arising from or related to any claim, Action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) against any Seller or its Affiliates, or related to any Acquired Assets, pending or threatened or relating to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date (or (i) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date, (ii) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (iii) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election);

(c)     any Liability arising from or related to the operation or condition of the Acquired Assets prior to the Closing Date (or (i) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date, (ii) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (iii) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election) or facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date (or (x) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date, (y) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (z) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election);

(d)     any Liability arising from or related to, whether before, on or after the Closing Date, the operation by Sellers of the Sellers' business or any of the Sellers' products or services, including, without limitation, any Liability relating to (i) design or manufacturing defects (whenever discovered) and (ii) warranties, product liability, safety or other Liability, in the cases of clauses (i) and (ii), relating to any product sold or manufactured by any Seller or any of its respective Affiliates;

(e)     any Liability in respect of any indebtedness of any Seller (except to the extent expressly constituting an Assumed Liability);

(f)     except to the extent expressly set forth in clause (w) above, any Liability with respect to Service Providers, including, without limitation, (i) any Liability arising under or with respect to any Employee Plan and (ii) any Liability of any Seller in respect of Service Providers, including, without limitation, collective bargaining agreements, pensions and post-employment medical and health benefits (including, without limitation, coverage mandated by COBRA), wages, other remuneration, holiday or vacation pay, bonus, severance (statutory or otherwise), separation, termination or notice pay or benefits, commissions, insurance premiums, Taxes, Liabilities or Actions for workers' compensation, Liabilities or Actions under the WARN Act, and any other form of accrued or contingent compensation (including, without limitation, vacation, sick days, personal days or other leave entitlements), irrespective of whether and when such Liabilities or Actions are paid or made, as applicable;

(g)     any Liability attributable to, relating to or arising under (i) Environmental Laws, (ii) any Contract or other arrangement for disposal or treatment of Hazardous Substances, or the transportation of Hazardous Substances for disposal or treatment, (iii) environmental contamination or remediation, in each case arising from or related to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date (or (x) with respect to any Acquired Lease and the other Assigned Agreements and Acquired Assets Primarily Related to such Acquired Lease, the applicable Lease Assignment Date, (y) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (z) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election), or (iv) for toxic torts arising as a result of or in connection with loss of life or injury to Persons (whether or not such loss or injury was made manifest on or after (A) the Closing Date, (B) any applicable Lease Assignment Date, (C) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (D) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election) or other harm caused or allegedly caused by exposure to Hazardous Materials present at, on, in, under, adjacent to or migrating from any Acquired Location, Acquired Real Property or any other Acquired Assets;

(h)     any liabilities for or in respect of Excluded Taxes;

(i)     any Liability with respect to any brokerage or finders' fees or agents' commissions or other similar payment in connection with the transactions contemplated hereby incurred by any Seller;

(j)    any Liability of Sellers under this Agreement or any documents or instruments executed and delivered pursuant to this Agreement;

(k)    any Liability relating to or arising, whether before, on or after the Closing Date, out of, or in connection with, any assets, properties and rights of the Sellers or any of their Affiliates other than the Acquired Assets, including, without limitation, the Excluded Assets;

(l)    Cure Costs (i) with respect to any Contracts other than the Assigned Agreements or (ii) with respect to any Assigned Agreement, in excess of the applicable Buyer Cure Costs;

(m)    any Liability arising under, or relating to, any existing customer loyalty program (*e.g.*, points, rewards, discounts, etc.) of any of the Sellers or community marketing undertaken by any of the Sellers;

(n)    any Liability in respect of any gift cards, gift certificates, merchandise credits, return credits, customer membership or customer loyalty discount programs, coupons, groupons or other similar credits or programs issued by, on behalf of or in relation to Sellers; and

(o)    any Liability that is not expressly included among the Assumed Liabilities.

Section 3.4    Assignments.

(a)    Assigned Leases and Cure Costs.

(i)    On or prior to the date hereof, the Sellers have delivered Schedule 1.1(a) to Buyer, which Schedule contains with respect to each Lease and other Potential Assigned Agreement, the Sellers' good-faith estimate of the amount required to be paid with respect to such Lease or other Potential Assigned Agreement to cure all monetary defaults under such Lease or other Potential Assigned Agreement to the extent required by section 365(b) of the Bankruptcy Code and otherwise satisfy all requirements imposed by section 365(d) of the Bankruptcy Code (the actual amounts of such costs, the "Cure Costs").

(ii)    On each Lease Assignment Date, pursuant to section 365 of the Bankruptcy Code, the Approval Order and the applicable Lease Assignment Order, the Sellers shall assume and assign to the applicable Assignee the applicable Acquired Lease and the other Assigned Agreements related thereto and shall (i) pay all undisputed Excess Cure Costs with respect to such Acquired Lease and Assigned Agreements to the appropriate counterparty and (ii) pay any Excess Cure Costs that it disputes into a segregated account for later determination by the Bankruptcy Court, each subject to provision of adequate assurance by the applicable Assignee as may be required under section 365 of the Bankruptcy Code and payment by Buyer of the Buyer Cure Costs in respect of such Acquired Lease and Assigned Agreements. The undisputed Buyer Cure Costs in respect of such Acquired Lease and Assigned Agreements shall be paid by Buyer to the appropriate counterparty. Any Buyer Cure Costs that Buyer disputes shall be paid by Buyer into a segregated account for later determination by the Bankruptcy Court. Sellers shall be solely responsible for the payment, performance and discharge when due of all Liabilities under or relating to the Acquired Assets with respect to the applicable Acquired Location, including, without limitation, such Acquired Lease and Assigned Agreements, arising prior

to such Lease Assignment Date (other than such Buyer Cure Costs and, for the avoidance of doubt, Assumed Liabilities).

(b)    If, following the Closing or any Lease Assignment, as applicable, any Seller receives or becomes aware that it holds any asset, property or right which constitutes an Acquired Asset, then Sellers shall transfer such asset, property or right to Buyer or the applicable Assignee (including, without limitation, the execution and delivery of all appropriate transfer documents) as promptly as practicable for no additional consideration.

(c)    If, following the Closing or any Lease Assignment, as applicable, Buyer receives or becomes aware that it or any Assignee holds any asset, property or right which constitutes an Excluded Asset, then Buyer shall transfer (or, if not the applicable Assignee, shall use commercially reasonable efforts to cause the applicable Assignee to transfer) such asset, property or right to the Sellers (including, without limitation, the execution and delivery of all appropriate transfer documents) as promptly as practicable for no additional consideration.

Section 3.5    Further Assurances.    At the Closing, Sellers shall, upon Buyer's request, execute and deliver to Buyer such instruments of transfer as shall be reasonably necessary or desirable to vest in Buyer title to the Acquired Assets, and each of Sellers, on the one hand, and Buyer, on the other hand, shall take (or cause to be taken) all appropriate action, do (or cause to be done) all things necessary under applicable Law, and execute and deliver such instruments and documents, in each case as may be reasonably requested and reasonably necessary or desirable to consummate the transactions contemplated by this Agreement at or after the Closing.  On each Lease Assignment Date, Sellers shall, upon the request of Buyer or the applicable Assignee, execute and deliver to such Assignee such instruments of transfer as shall be reasonably necessary or desirable to vest in such Assignee title to the applicable Acquired Lease and all other Acquired Assets relating to the foregoing required hereunder to be transferred on such Lease Assignment Date (and evidence the assumption by Sellers, and the assignment by Sellers to the applicable Assignee, of such Acquired Lease and all related Assigned Agreements), and each of Sellers, on the one hand, and such Assignee, on the other hand, shall (and Buyer shall use commercially reasonable efforts to cause each Assignee to) take (or cause to be taken) all appropriate action, do (or cause to be done) all things necessary under applicable Law, and execute and deliver such instruments and documents, in each case as may be reasonably requested and reasonably necessary or desirable to consummate the transactions contemplated by this Agreement at or after the Lease Assignment Date.  In furtherance and not in limitation of the foregoing, in the event that any of the Acquired Assets shall not have been conveyed at Closing (or (i) on the applicable Lease Assignment Date, (ii) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (iii) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election), Sellers shall convey such Acquired Assets to Buyer or such Assignee, as applicable, as promptly as practicable after the Closing (or (i) on the applicable Lease Assignment Date, (ii) with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6, the date of such assumption and assignment or (iii) with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7, the date of such election).  As promptly as practicable following the date (as notified by Buyer to Sellers in writing) on which Buyer is permitted to receive Customer Information constituting "personally identifiable information" (as defined in the Bankruptcy Code), Sellers shall deliver to Buyer a copy of the Customer Information constituting

34

Acquired Intellectual Property in its existing format or in such other format as is mutually agreeable to Sellers and Buyer.

For all purposes of this Agreement, any requirement that Buyer or any Seller use its "commercially reasonable efforts" shall not require such Person to incur material obligations or pay or commit to pay material amounts (excluding all professional fees and expenses) or waive material rights.

Section 3.6     Additional Assigned Agreements.    Notwithstanding anything in this Agreement to the contrary, following the Closing (or, with respect to any IP Licenses, subject to applicable law, on or following the date of this Agreement), Buyer may, in its sole and absolute discretion, by written notice delivered to the Sellers, add any Contract of any Seller (other than any lease of non-residential real property and other than Excluded Assets set forth in Section 3.2 (other than Section 3.2(d)) to the Assigned Agreements April 30, 2026 (the "Designation Deadline"). Upon the addition of any such Contract to the Assigned Agreements pursuant to this Section 3.6, the Sellers will use their commercially reasonable efforts to assume and assign to Buyer such Contract; provided, however, that nothing herein shall be deemed or construed to obligate the Sellers to retain, or refrain from rejecting or terminating any Contract after the Designation Deadline that does not constitute an Assigned Agreement. Notwithstanding anything to the contrary herein, the Sellers shall not be obligated to assume and assign any Contract pursuant to this Section 3.6 with respect to which Buyer fails to satisfy the Bankruptcy Court as to adequate assurance of future performance. Notwithstanding the foregoing and the definition of "Assigned Agreements", no IP License shall be or become an Assigned Agreement unless such IP License is assignable to Buyer (after giving effect to any consent of any counterparty thereto and the enforceable terms thereof) in accordance with applicable law. The Sellers shall not reject any Potential Assigned Agreement prior to the Designation Deadline without the prior written consent of Buyer; provided that, if the Sellers deliver written notice to Buyer that they intend to reject any Potential Assigned Agreement (other than (I) any Lease or any Potential Assigned Agreement Primarily Related thereto and (II) prior to the Sale Termination Date for all Stores and Distribution Centers (each as defined in the Agency Agreement), any Potential Assigned Agreement required or desirable in connection with the conduct of the Sale (as defined in the Agency Agreement) pursuant to the terms of the Agency Agreement) and Buyer does not deliver written instructions to the Sellers not to reject such Potential Assigned Agreement on or prior to the date that is the later of (x) the Closing Date and (y) five (5) Business Days after the date on which Buyer received such written notice, this Section 3.7 shall no longer prohibit the Sellers from rejecting such Potential Assigned Agreement (it being understood that other provisions of this Agreement or the Agency Agreement may have such effect); provided further that, if Buyer delivers such written instructions not to reject to the Sellers, Buyer shall be responsible for all costs or liabilities (excluding, for the avoidance of doubt, any rejection damages) accruing under such Potential Assigned Agreement from the later of (A) the date of such instructions and (B) the Closing Date until the Designation Deadline (or, if earlier, five (5) Business Days after the date on which Buyer withdraws such instructions); provided further that the Sellers shall not take any action not otherwise required under this Agreement or the Agency Agreement that would cause costs or liabilities to accrue under such Potential Assigned Agreement.

Section 3.7     Equipment.    Notwithstanding anything in this Agreement to the contrary, at all times (a) with respect to any Acquired Real Property, from and after the Closing and (b) with

respect to any Location, during the Designation Rights Period, in each case, Buyer shall have the right to sell any Equipment owned by Sellers (including, without limitation, as a result of the exercise and satisfaction of an applicable buy-out right with respect to Equipment leased by Sellers) located at such Acquired Real Property or Location. Buyer shall be entitled to retain all proceeds of any such sale. Buyer shall be responsible for the payment of all costs and expenses associated with the disposition of such Equipment (including, without limitation, any price payable to an Equipment lessor in connection with the exercise of a buy-out right). Upon written request from Buyer, and subject to Buyer's payment of all costs and expenses in connection therewith, Sellers shall exercise any such buy-out right at the election of Buyer, in its sole discretion, and shall not otherwise exercise any such buy-out right after the Closing. Notwithstanding anything in this Agreement to the contrary, Agent shall be authorized (i) to transfer, at Buyer's expense, Equipment from any Acquired Real Property or Location to any other Acquired Real Property or Location, (ii) to abandon any and all Equipment, whether owned by Sellers or not, in place, without any cost or liability to Buyer and (iii) to take ownership of any Equipment by delivering notice of its election to take ownership thereof to the Sellers; provided that any Equipment remaining at any Location (other than the Acquired Locations) at the end of the Designation Rights Period at such Location shall be deemed to have been abandoned by Buyer pursuant to clause (ii). Buyer shall provide reasonable access to any lessor of Equipment to take possession of such leased Equipment to the extent Buyer does not cause Seller to exercise its buy-out right. For the avoidance of doubt, except as expressly set forth in this Section 3.7 in connection with the exercise of a buy-out right and without limitation of any responsibility imposed on Agent pursuant to Section 15.9 of the Agency Agreement, Buyer shall have no responsibility whatsoever with respect to Equipment that is not owned by Sellers other than to grant access to the owners of such Equipment to repossess such Equipment.

Section 3.8    Withholding. Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement any amount as may be required to be deducted and withheld with respect to the making of such payment under applicable U.S. federal, state or local or foreign laws; provided, however, that Buyer shall use commercially reasonable efforts to notify Sellers prior to making any payment of any material amount otherwise payable pursuant to this Agreement and provide a reasonable opportunity for Sellers to provide such forms or other evidence that would eliminate or reduce any such deduction or withholding. In the event Sellers dispute Buyer's right to so withhold or deduct any payment, the dispute shall be adjudicated by the Bankruptcy Court on an expedited basis so as not to delay the Closing. To the extent that amounts are so deducted and withheld, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

## ARTICLE IV
## PURCHASE PRICE

Section 4.1    Consideration.    Buyer shall pay to the Sellers the amount of $147,890,004.37 (the "Purchase Price"), of which $83,153,833.56 (plus scheduled payments of principal and interest under the PNC Mortgage Loan from the date of this Agreement through the Closing) shall be paid in cash and $64,736,170.81 (less scheduled payments of principal and interest under the PNC Mortgage Loan from the date of this Agreement through the Closing) shall be paid through the assumption by Buyer (or an Assignee) of the Assumed Liabilities, in each case

36

in accordance with the terms, at the times, and subject to adjustment in accordance with, this Agreement and the Agency Agreement as consideration for the sale, transfer, assignment, conveyance and delivery of (i) the Designation Rights, (ii) the right to dispose of certain of Sellers' assets in accordance with and pursuant to the terms of the Agency Agreement and (iii) Sellers' right, title and interest in, to and under the Acquired Assets, in each case by Sellers to Buyer under the terms of the Transaction Documents.  In addition, Buyer shall pay Sellers the amount of $608,547.00 for all signage included in the Acquired Assets (the "Signage Payment").  Other than payment of the applicable Buyer Cure Costs in accordance with the terms of this Agreement or as otherwise expressly provided in this Agreement and the Agency Agreement, no additional consideration shall be required to be paid by Buyer or any Assignee to Sellers in connection with any exercise by Buyer of the Designation Rights, the sale, transfer, assignment, conveyance and delivery to the applicable Assignee of an Acquired Lease and the other related Acquired Assets or its rights under the Agency Agreement.  Buyer shall not be required to deliver any portion of (and may retain for its own benefit) any consideration it may receive from any Person in connection with any such exercise of Designation Rights or sale, transfer, assignment, conveyance and delivery of Acquired Assets.

Section 4.2    Payment.

(a)    Deposit.  No later three (3) Business Days following the Effective Date, Buyer shall deliver to an escrow agent reasonably acceptable to each of Buyer and the Sellers (the "Escrow Agent") an amount equal to $5,000,000.00 (the "Deposit") by wire transfer of immediately available funds, to be held subject to the terms of this Agreement and an escrow agreement reasonably acceptable to each of Buyer and the Sellers.  The Deposit shall be held by the Escrow Agent and released as follows: (1) at the Closing, the Deposit shall be credited and applied toward payment of the Initial Purchase Price Payment (as defined in the Agency Agreement) and paid to Sellers; (2) if Sellers terminate this Agreement prior to Closing pursuant to Section 12.1(c) (a "Buyer Default Termination"), the Deposit shall become nonrefundable and shall be paid to Sellers for Sellers' own account; and (3) if this Agreement is terminated by Sellers prior to Closing for any reason other than a Buyer Default Termination, or by Buyer in accordance with Section 12.1, then the Deposit shall be returned to Buyer.

(b)    Additional Payments.  At the Closing, Buyer shall (i) pay the Initial Purchase Price Payment (as defined in the Agency Agreement), less the Deposit, to Sellers in accordance with the terms of the Agency Agreement, (ii) pay to Sellers the Signage Payment by wire transfer of immediately available funds to the same account to which the Initial Purchase Price Payment is paid, (iii) authorize the Escrow Agent in writing to deliver the Deposit to Sellers and (iv) assume the Assumed Liabilities.  The Buyer shall pay the remaining cash portion of the Purchase Price to Sellers at the times specified in, and in accordance with the terms of, this Agreement and the Agency Agreement.

(c)    Application of Purchase Price.  Subject to approval of the Bankruptcy Court (which may be in the Approval Order), the Sellers shall apply any cash proceeds of the Purchase Price, promptly following receipt thereof, to the payment of all outstanding obligations under the DIP

Financing (as defined in the Agency Agreement), the ABL Credit Agreement (as defined in the Agency Agreement) and the Huntington Lease subject to the Carve Out.

Section 4.3    Discharge of Assumed Liabilities After Closing.    From and after the Closing, Buyer shall pay, perform, discharge and satisfy (and shall indemnify and hold harmless the Sellers from and against) the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed, discharged or satisfied, in each case in accordance with their respective terms.

Section 4.4    Allocation of Purchase Price.    For U.S. federal (and applicable state and local) income tax purposes, the Purchase Price (as may be adjusted pursuant to the terms of this Agreement and the Agency Agreement), along with any other items that are treated as additional consideration to the Sellers in exchange for the Designation Rights, the Acquired Assets, and the right to dispose of certain of Sellers' assets in accordance with and pursuant to the terms of the Agency Agreement) shall be allocated among the Designation Rights, the Acquired Assets and the right to dispose of certain of Sellers' assets in accordance with and pursuant to the terms of the Agency Agreement for U.S. federal income tax purposes in accordance with the relevant principles of Section 1060 of the Code and the Treasury regulations thereunder (the "Allocation").    Within ninety (90) days following the latest expiration of any Designation Rights Period, Buyer shall deliver the Sellers the Allocation, which shall be final, conclusive and binding on Buyer and the Sellers absent manifest error.    Each of the Sellers and Buyer agree to (and shall cause their respective Affiliates to) prepare and file all Tax Returns (including, without limitation, Internal Revenue Service Form 8594 and any comparable form under state, local, or foreign law) consistent with the Allocation.    Except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any comparable provision of state, local or foreign law), none of the Parties shall (and each shall cause its Affiliates not to) take any position on any Tax Return or in any Tax Proceeding that is inconsistent with the Allocation.    The Allocation shall be determined solely for Tax purposes, and in administering any Proceeding, the Bankruptcy Court shall not be required to apply the Allocation in determining the manner in which the Purchase Price should be allocated as between any of the Sellers and their respective estates.

**ARTICLE V**

**CLOSING**

Section 5.1    Closing Date.    Upon the terms and subject to the conditions hereof, the closing of the sale, transfer, assignment, conveyance and delivery of the Designation Rights, the right to dispose of certain of Sellers' assets in accordance with and pursuant to the terms of the Agency Agreement, and Sellers' right, title and interest in, to and under the Acquired Assets by Sellers to Buyer contemplated hereby (the "Closing") shall take place at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019, on the Payment Date (as defined in the Agency Agreement), or at such other place or time as Buyer and the Sellers may mutually agree.    The date and time at which the Closing actually occurs is referred to as the "Closing Date."

Section 5.2    Buyer's Deliveries.    At the Closing, Buyer shall deliver to Sellers:

38

(a)    the payment of the Initial Purchase Price Payment, less the Deposit, in accordance with Section 4.2;

(b)    the certificates of Buyer to be received by Sellers pursuant to Sections 11.1 and 11.2;

(c)    the Transition Services Agreement, executed by Buyer;

(d)    such documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property, and in the customary form, in the applicable city, county, state or province where each parcel of the Acquired Real Property is located; and

(e)    such assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers, which are reasonably necessary or desirable (in the reasonable judgment of Buyer) to (x) transfer and assign the Acquired Assets to Buyer and (y) properly give effect to Buyer's assumption of the Assumed Liabilities in accordance with this Agreement.

Section 5.3    Sellers' Deliveries.  At the Closing, Sellers shall deliver to Buyer:

(a)    a copy of the Approval Order entered by the Bankruptcy Court;

(b)    the certificates of Sellers to be received by Buyer pursuant to Sections 10.1 and 10.2;

(c)    a completed Internal Revenue Service Form W-9 executed by each Seller (or, if a Seller is a disregarded entity for U.S. federal income Tax purposes, by the Person treated as the owner of such Seller for U.S. federal income Tax purposes), substantially in the form of the sample certification in Treasury Regulations Section 1.1445-2(b)(2)(iv)(B); provided, that no Internal Revenue Service Form W-9 shall be required with respect to any Seller that, for U.S. federal income tax purposes, is a "qualified subchapter S subsidiary" (within the meaning of Section 1361(b)(3)(B) of the Code) with respect to Buyer or otherwise as an entity disregarded as separate from Buyer;

(d)    the Transition Services Agreement, executed by Sellers;

(e)    such documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a seller of real property, and in the customary form, in the applicable city, county and state or province where each parcel of Acquired Real Property is located, none of which shall expand the representations and warranties, or any other Liability of Sellers, or remedies of Buyer against Sellers, hereunder;

(f)    physical access to and possession of each parcel of Acquired Real Property;

(g)    with respect to each Acquired Real Property, (i) a quitclaim deed, in appropriate form for recording in each applicable jurisdiction and in form and substance reasonably acceptable to Buyer, delivering good, marketable and insurable fee simple title to Buyer in such Acquired Real Property, subject only to Permitted Post-Closing Encumbrances, (ii) an assumption and

assignment of each reciprocal operating and easement agreement or other similar agreement ("REA") applicable to such Acquired Real Property, if any, together with all required notices (if any) of such transfer and assumption, to each party under each applicable REA, and (iii) owner's affidavits in customary form and such other customary documents as may be reasonably by Buyer's title company in connection with any Buyer's title insurance;

(h)     such bills of sale, endorsements, assignments, UCC terminations and other filings and other good and sufficient instruments, in form reasonably satisfactory to Buyer, which are reasonably necessary or desirable (in the reasonable judgment of Buyer) to vest in Buyer all the right, title and interest of Sellers in, to or under the Acquired Assets free and clear of Encumbrances other than Permitted Post-Closing Encumbrances.

## ARTICLE VI

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Schedules delivered as of the date hereof by the Sellers to Buyer, Sellers hereby, jointly and severally, represent and warrant to Buyer that the statements contained in this Article VI are true and correct as of (i) the date hereof and (ii) the Closing Date:

Section 6.1     Organization and Good Standing. Each Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization. Subject to the limitations imposed on such Seller as a result of its Filing, each Seller has the requisite corporate, partnership or limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. Except as set forth on Schedule 6.1, each Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where a Location or Acquired Real Property is located where the character of its business or the nature of its properties makes such qualification or licensing necessary, except, solely with respect to qualification, licensing and good standing in a jurisdiction other than its jurisdiction of organization, where the failure to be so qualified or licensed or to be in good standing would not have a Material Adverse Effect.

Section 6.2     Authority; Validity; Consents.    Each Seller has, subject to requisite Bankruptcy Court approval, as applicable, the requisite corporate power and authority necessary to enter into and perform its obligations under this Agreement, the Agency Agreement and the other Transaction Documents to which it is, or will become, a party and to consummate the transactions contemplated hereby and thereby. This Agreement and the Agency Agreement have been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by Sellers at any time will be duly and validly executed and delivered by each Seller. Subject to requisite Bankruptcy Court approval, as applicable, this Agreement and the Agency Agreement and (when duly executed by Sellers) the other Transaction Documents constitute, with respect to each Seller, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to, and after giving effect to, requisite Bankruptcy Court approval (including, without limitation, the Approval Order) and no Seller is required to give any notice to, make any filing

with or obtain any consent from any Person (including, without limitation, any Governmental Authority) in connection with the execution and delivery of this Agreement, the Agency Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a Material Adverse Effect.

Section 6.3    No Conflict. When the Approval Order and the consents and other actions described in Section 6.2 have been obtained and taken, the execution and delivery of this Agreement, the Agency Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the material breach of any of the terms and provisions of, or constitute a material default under, or materially conflict with, or require consent or the giving of a notice under, or cause any acceleration of any material obligation of Sellers under (a) any Order, (b) any Law or (c) the organizational documents of any Seller.

Section 6.4    Environmental Matters. Except as set forth on Schedule 6.4, to Sellers' Knowledge, (i) no Lease Premises or Acquired Real Property has been used by any Person as a landfill or storage, treatment, or disposal site for any type of Hazardous Substance or non-hazardous solid wastes as defined under the Resource Conservation and Recovery Act of 1976, as amended, in a manner which would reasonably be expected to result in any Seller incurring material liabilities under Environmental Laws; (ii) there are no abandoned oil wells on any Lease Premises or Acquired Real Property, there are no abandoned underground storage tanks or above ground storage tanks on or under any Lease Premises or Acquired Real Property (and if any remain in use, the same are in compliance with all Environmental Laws) and there have been no spills or releases of Hazardous Substances on or under any Lease Premises or Acquired Real Property that would have been required to be reported to the appropriate governmental authorities; (iii) the use by each Seller of the Lease Premises and Acquired Real Property is, and since January 1, 2024 has been, in compliance with all Environmental Laws and Environmental Permits, except for such non-compliance that has not been, and would not reasonably be expected to be, individually or in the aggregate, material to Sellers, the Designation Rights, the Potential Acquired Assets, or the Assumed Liabilities; and (iv) no Seller is subject to any material pending Action alleging that any Seller, any Lease Premises or any Acquired Real Property is in violation of any Environmental Law or Environmental Permit. Since January 1, 2024, Sellers have not received any written notice threatening any material Action alleging that any Seller is in violation of any Environmental Law or Environmental Permit in respect of any Acquired Location or Acquired Real Property.

Section 6.5    Title to Acquired Assets.

(a)    Sellers have good (and, in the case of the Acquired Real Property, marketable fee simple) title to, or, in the case of Potential Acquired Assets that are leased by Sellers, a valid leasehold interest in, all of the Potential Acquired Assets, free and clear of all Encumbrances, except for Permitted Pre-Closing Encumbrances. Sellers have not leased or otherwise granted the right to use or occupy any Acquired Real Property or any portion thereof. Sellers will (i) with respect to any Acquired Asset other than an Acquired Lease Premise, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 5.3 and (ii) with respect to any Potential Acquired Assets related to any Acquired Location, upon delivery to the applicable Assignee of the instruments of transfer contemplated by an applicable Lease Assignment

41

Agreement, and in each case subject to the terms of the Approval Order and any applicable Lease Assignment Order, thereby transfer to Buyer or the applicable Assignee, as applicable, good (and, in the case of the Acquired Real Property, marketable fee simple) title to, or, in the case of Potential Acquired Assets that are leased by Sellers, a valid leasehold interest in, all of the Potential Acquired Assets, free and clear of all Encumbrances, except for Permitted Post-Closing Encumbrances.

Section 6.6    Real Property.

(a)    Schedule 6.6(a) sets forth a true, correct and complete list of all real property owned in fee simple by the Sellers (the "Acquired Real Property"). Schedule 6.6(b) sets forth a materially true, correct and complete list of all Leases and material Security Deposit Documents with respect to any real property for the Locations (collectively, such real property, the "Lease Premises"). To the extent information is available to Sellers, the data site to which Buyer will be provided access within 14 days includes documentation evidencing the following with respect to the Locations: the address of the applicable Location; the name and address of the applicable landlord; the date and description of each document comprising the applicable Lease; the date the Location opened; with respect to each Location, the expiration date, number of remaining renewal options, and current option notice deadline; the number of square feet (leasable and payable, to the extent different); the current base rent per square foot and the base rent per square foot for the remaining renewal options; the current common area maintenance costs per square foot (whether under the Lease, an OEA or otherwise); the current taxes per square foot; the current insurance costs per square foot (to the extent not included in common area maintenance costs); and the current balance or available amount of each Security Deposit; and for each Location for the fiscal year 2024: the gross sales for percentage rent purposes under the Leases; sales; cost of sales; payroll and benefits per Locations; total occupancy costs; and EBITDA; and with respect to each Security Deposit, the holder or issuer of each Security Deposit, the bank account or other identifying account with respect thereto; and date and description of each Security Deposit Document. Neither any Seller nor any Subsidiary of any Seller except for the Acquired Real Property and except for and pursuant to the Leases or as otherwise set forth on Schedule 6.6(a) or (b), owns, leases, subleases, licenses, occupies or has or, other than Permitted Pre-Closing Encumbrances, is subject to any other material interest (including, without limitation, any options or rights of first refusal, first offer or first negotiation to lease or purchase) in any real property, with respect to the Acquired Real Property, the Locations or the operation thereof. Within 14 days, Sellers will deliver or make available to Buyer true and complete copies of all Leases and material Security Deposit Documents for all Locations, and, regarding the Locations and Acquired Real Property, all material Plans and Permits in their possession, a monthly schedule of Taxes, insurance charges and common area maintenance charges, if any (including, without limitation, all audits and reconciliations of same), including, without limitation, for the last calendar year and the last calendar quarter preceding the date hereof. Except as set forth on Schedule 6.6(a) or (b), there are no material agreements, understandings or undertakings pertaining to the Acquired Real Property, the Leases, the Security Deposits, the Security Deposit Documents, the real property interest in the Locations or the Lease Premises or Sellers' use or occupation of the Lease Premises or any portion thereof. To Sellers' Knowledge, no Person that is not a Seller has any right to possess, use or occupy the Acquired Real Property or the Lease Premises, except as provided in Schedule 6.6(a) or Schedule 6.6(b). A Seller has (x) good and marketable fee simple and insurable title to each Acquired Real Property, (y) a good and valid leasehold interest in the Leases and (z) good and valid title to, or a valid

42

leasehold interest in, all Equipment, Improvements and other material tangible personal property constituting Potential Acquired Assets, free and clear of all Encumbrances (except Permitted Pre-Closing Encumbrances).

(b)      Sellers have not conveyed any interest in any Acquired Real Property to any other person and have not granted any options to purchase or any rights of first offer, first negotiation or first refusal to purchase any of the same. At the Closing, Sellers shall convey good and marketable fee simple and insurable title to each Acquired Real Property to Buyer pursuant to a special warranty deed subject only to Permitted Post-Closing Encumbrances.

(c)      Each of the Leases is legal, valid, binding and enforceable against the Sellers party thereto and, to the Sellers' Knowledge, against each other party thereto, in accordance with its terms (except for any direct or indirect restriction, limitation or condition on Sellers' assignment of the Leases to Buyer which shall not be of any force or effect pursuant to the Approval Order and any applicable Lease Assignment Order), and is in full force and effect.

(d)      There are no pending or, to the Knowledge of the Sellers, threatened condemnation or eminent domain proceedings or any proceedings in lieu thereof against any of the Lease Premises or Acquired Real Property, and Sellers have not received any notice, oral or written, of the intention of any Governmental Authority or other Person to take or use all or any part thereof. There is no pending or, to the Knowledge of the Sellers, proposed special assessment affecting (or which may affect) any of the Leases or the Lease Premises or any Acquired Real Property. There is no pending or, to the Knowledge of the Sellers, threatened litigation or claims for indemnification arising under or with respect to any of the Leases or in connection with Sellers' occupancy or use of any of the Lease Premises or Acquired Real Property.

(e)      To the Knowledge of any of the Sellers, except as set forth on <u>Schedule 6.6,</u> the Lease Premises and Acquired Real Property comply in all material respects with all Laws, and Sellers have not received any written notice regarding any actual or alleged material violation or any material liabilities or potential liabilities (including, without limitation, any investigatory, remedial, or corrective obligations) under any Laws, in each case, relating to any Location, any Lease Premises or Acquired Real Property.

(f)      To the Knowledge of the Sellers, except as set forth on <u>Schedule 6.6</u> or <u>Schedule 6.12</u>, none of any Lease Premises or any Acquired Real Property is subject to any material damage or destruction from fire, flood or other casualty and all roofs, structural elements, HVAC and all other building systems and other Improvements are in good working order and condition, including all on-site and off-site utilities.

Section 6.7    <u>Taxes</u>.  Except with respect to any U.S. federal (and applicable state and local) Income Taxes imposed on Buyer or its shareholders as a result of the treatment, for U.S. federal (and applicable state and local) income tax purposes, of any of the Sellers as a "qualified subchapter S subsidiary" (within the meaning of Section 1361(b)(3)(B) of the Code) with respect to Buyer or otherwise as an entity disregarded as separate from Buyer, to Sellers' Knowledge: (a) there are no Encumbrances for Taxes on any of the Potential Acquired Assets other than statutory liens for current Taxes not yet due or Taxes contested in good faith; (b) each Seller has timely filed or caused to be timely filed with the appropriate Governmental Authority all material Tax Returns

required to be filed by or on behalf of such Seller with respect to or in connection with the Potential Acquired Assets, the Locations, the Sellers' business and the Assumed Liabilities; (c) such Tax Returns are true, complete and accurate in all material respects; (d) other than any Taxes the timely payment of which is precluded by the Bankruptcy Cases, each Seller has timely paid and discharged in full all Taxes payable by or on behalf of such Seller; (e) none of the Potential Acquired Assets include or consist of an interest in any partnership, corporation or other entity for Tax purposes; (f) no Tax Proceeding is pending or has been threatened in writing against or with respect to any Seller in connection with the Potential Acquired Assets, the Locations, the Sellers' business or the Assumed Liabilities; (g) neither the Sellers nor any of their Affiliates have received written notice of any material Tax deficiency outstanding, proposed, or assessed, with respect to the Potential Acquired Assets, the Locations, the Sellers' business, or the Assumed Liabilities; and (h) each Seller has complied in all material respects with all applicable Laws (including, without limitation, information reporting requirements) relating to the collection, withholding and remittance of Taxes with respect to or in connection with the Potential Acquired Assets, the Locations, the Sellers' business and the Assumed Liabilities.

Section 6.8    [Reserved].

Section 6.9    Brokers or Finders. Except as set forth on Schedule 6.9, (b) Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the Agency Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, (b) Sellers have not incurred any obligation or liability, contingent or otherwise, under any brokerage or listing agreements that will be binding upon Buyer, any applicable Assignee or any of the Potential Acquired Assets after the consummation of the transactions contemplated hereby with respect to any future transactions which cannot be terminated by written notice by Buyer at any time and (c) Sellers shall indemnify and hold harmless Buyer from any claims with respect to any such fees, commissions or other liabilities described in clauses (a) and (b).

Section 6.10    Employee and Employee Plan Matters.

(a)    No Seller is party to any collective bargaining, works council or similar Contract with any labor organization, union or association. There are no, and within the last three (3) years, there have been no, organizing activities or collective bargaining arrangements entered into with respect to the Sellers' business. No labor organization or group of employees of Sellers has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Sellers, threatened to be brought or filed, with the National Labor Relations Board or any other labor relations tribunal or authority. There is no, and within the last three (3) years, there has been no, labor dispute, strike, controversy, slowdown, work stoppage or lockout pending or, to the Knowledge of Sellers, threatened, against Sellers' business or any Seller in connection with such business. There are no pending labor union grievances or unfair labor practices against any Seller.

(b)    Sellers are in compliance in all material respects with all Employment Laws. Except as set forth on Schedule 6.10 or as would not have a Material Adverse Effect, to Sellers'

44

Knowledge, there are no pending employment-related lawsuits or administrative actions alleging violations of Employment Laws against any Seller in state or federal court or pending with any Government Authority (including, without limitation, the U.S. Equal Employment Opportunity Commission, the U.S. Department of Labor or any equivalent state or local agencies charged with investigating or adjudicating employee claims concerning alleged violations of Employment Laws).

(c)    Sellers have provided to Buyer on the date hereof, in writing, a true and correct list of each current employee of any Seller at any Location as of no more than five (5) Business Days prior to the date of this Agreement, with such list indicating each employee's job title, status (active or on statutory or employer approved leave and full-time or part-time), annual salary or wage rate, target incentive compensation, incentive compensation for the 2024 performance year, business location, exempt or non-exempt status under the Fair Labor Standards Act (as classified by Sellers), job band, annual vacation entitlement, accrued and unused vacation, paid time off and sick leave, applicable incentive plan and date of hire (original and most recent, as applicable).

(d)    To Sellers' Knowledge, there are no actions, suits, audits or investigations by any Governmental Authority, termination proceedings or other claims (except routine claims for benefits payable under the Employee Plans) pending or, to the Knowledge of the Sellers, threatened, other than any such investigations, proceedings or claims that would not reasonably be expected to result in a material Liability to any of the Sellers.

Section 6.11   Equipment.   To the Knowledge of the Sellers, except as set forth on Schedule 6.12, each item of Potential Acquired Asset consisting of Equipment with an individual value in excess of $25,000 is in a good general state of repair and good working order.

Section 6.12   Assumed Liabilities.   Sellers have delivered to Buyer copies of the PNC Mortgage Loan and the Huntington Lease, which copies are true and complete in all respects and have not been amended, supplemented or otherwise modified except as expressly set forth therein.

Section 6.13   No Other Representations or Warranties; No Survival.   Buyer acknowledges that, except for the representations and warranties contained in this Article VI, neither Sellers nor any other Person on behalf of Sellers makes any express or implied representation or warranty with respect to Sellers or with respect to any information provided by or on behalf of Sellers to Buyer. The representations and warranties of the Sellers will expire upon the earlier of (i) the Closing Date (with respect any Acquired Assets other than an Acquired Lease Premise, an Assigned Agreement assumed and assigned pursuant to Section 3.6 or any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7), the applicable Lease Assignment Date (with respect to each Acquired Lease and all related Acquired Assets), the date of such assumption and assignment (with respect to each Assigned Agreement assumed and assigned pursuant to Section 3.6), or the date of such election (with respect to any Equipment as to which Borrower elects to take ownership pursuant to Section 3.7) or the end of the Designation Rights Period (with respect to any Lease that is not an Acquired Lease) or, or (ii) the termination of this Agreement.

**ARTICLE VII**

**REPRESENTATIONS AND WARRANTIES OF BUYER AND GUARANTOR**

Each of Buyer and Guarantor hereby represents and warrants to Sellers that the statements contained in this Article VII are true and correct as of (i) the date hereof and (ii) the Closing Date:

Section 7.1    Organization and Good Standing.  ASI Purchaser LLC is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Guarantor is a corporation, duly incorporated, validly existing and in good standing under the laws of the State of Nevada. Each of Buyer and Guarantor has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

Section 7.2    Authority; Validity; Consents.  Each of Buyer and Guarantor has the requisite power and authority necessary to enter into and perform its obligations under this Agreement, the Agency Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement, the Agency Agreement and the other Transaction Documents by Buyer and Guarantor (as applicable) and the consummation by Buyer and Guarantor (as applicable) of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate actions in respect thereof.  This Agreement and the Agency Agreement have been duly and validly executed and delivered by Buyer and Guarantor and each other Transaction Document required to be executed and delivered by Buyer and/or Guarantor at any time will be duly and validly executed and delivered by Buyer and/or Guarantor (as applicable).  This Agreement, the Agency Agreement and (when duly executed by Buyer and/or Guarantor, as applicable) the other Transaction Documents constitute the legal, valid and binding obligation of Buyer and Guarantor (as applicable), enforceable against Buyer and Guarantor (as applicable) in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  Subject to requisite Bankruptcy Court approval, as applicable, Guarantor and Buyer are not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement, the Agency Agreement and the other Transaction Documents to which each is a party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a material adverse effect on Buyer's and Guarantor's right or ability to consummate the transactions contemplated hereby or thereby.

Section 7.3    No Conflict.  When the consents and other actions described in Section 7.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or materially conflict with, or require consent or the giving of any material notice under, or cause any acceleration of any material obligation of Buyer or Guarantor under (a) any organizational documents of Buyer or Guarantor (as applicable), (b) any Order or (c) any Law.

Section 7.4    <u>Availability of Funds</u>. Guarantor has as of the date of this Agreement, and Buyer will have at the Closing, sufficient cash in immediately available funds to pay the cash portion of the Purchase Price in accordance with the terms of the Agency Agreement and any other costs, fees and expenses required to be paid by Buyer under this Agreement and the other Transaction Documents.

Section 7.5    <u>Litigation</u>. There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 7.6    <u>Brokers or Finders</u>. Except for any brokers utilized by Buyer in the normal course of business (which brokers shall be compensated, if at all, by Buyer), (a) Buyer has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the Agency Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which any Seller is or will become liable, and (b) Buyer shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions.

Section 7.7    <u>Condition of Acquired Assets; Representations</u>. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in <u>Article VI</u> (subject to the disclosures set forth on the Schedules), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Acquired Assets are being transferred on an "as is", "where is" basis. Buyer acknowledges that it has conducted to its satisfaction its own independent investigation of the Acquired Assets and Assumed Labilities and, in making the determination to proceed with the transactions contemplated by this Agreement, Buyer has relied on the results of its own independent investigation. In connection with Buyer's investigation, Buyer has received or may receive from Sellers certain projections, forward-looking statements and other forecasts and certain business plan information. Buyer acknowledges that Sellers make no representation or warranty with respect to forward-looking estimates, projections, forecasts or plans (including, without limitation, the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans). Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including, without limitation, the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Buyer shall have no claim against anyone with respect thereto. Accordingly, Buyer acknowledges that Sellers make no representation or warranty with respect to such estimates, projections, forecasts or plans (including, without limitation, the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

Section 7.8    <u>No Survival</u>. The representations and warranties of Buyer will expire upon the earlier of (a) the latest Lease Assignment Date or, if later, the end of the Designation Rights Period or (b) the termination of this Agreement.

**ARTICLE VIII**

**ACTION PRIOR TO THE CLOSING DATE**

Section 8.1    Operations.

(a)    Prior to the Closing, Sellers covenant and agree (i) to use commercially reasonable efforts to maintain and preserve, and not commit any waste with respect to, the Potential Acquired Assets in their present condition (including, without limitation, by using its commercially reasonable efforts (A) subject to Section 2.2, to renew any Leases or other Potential Assigned Agreements that come up for renewal, solely to the extent so instructed by Buyer in writing, (B) to renew any registrations with respect to any Intellectual Property that come up for renewal and (C) to advance any pending applications with respect to any Intellectual Property, in each case other than reasonable wear and tear, casualty and condemnation (which shall be governed by Section 12.3), and sales of Inventory in the ordinary course of Sellers' business, (ii) without limiting the generality of the foregoing, not to (A) sell, lease (as lessor), license (as licensor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed any Encumbrance (other than Permitted Post-Closing Encumbrances) on, any Potential Acquired Assets, other than sales of Inventory in the ordinary course of Sellers' business, (B) except as required by clause (i) of this Section 8.1(a), amend, supplement, modify, terminate or enter into any Leases, IP Licenses or other Potential Assigned Agreements, (C) cancel or compromise any claim or waive or release any right, in each case that is related to any Potential Acquired Assets, (D) issue any gift cards, gift certificates, merchandise credits, return credits, customer membership or customer loyalty discount programs, coupons, groupons or other similar credits or programs, (E) grant or terminate any other interests in any Potential Acquired Asset (other than sales of Inventory in the ordinary course of the Sellers' business), (F) amend, terminate or seek or obtain an order approving rejection of a Lease or other Potential Assigned Agreement, in each case without the prior written consent of Buyer, (G) order addition goods or services from Magnussen or H317, amend the PNC Mortgage Loan or the Huntington Lease or otherwise take any action to increase or otherwise modify an Assumed Liability, (iii) to use commercially reasonable efforts to cause the landlord under the respective Leases and any applicable counterparty under the IP Licenses and any other Potential Assigned Agreements to perform such party's covenants, agreements and obligations under the respective Leases, IP Licenses and other Potential Assigned Agreements, (iv) not to take any action without Buyer's consent with respect to Taxes or Tax matters that could reasonably be expected to result in an Encumbrance (other than Encumbrances that will be fully discharged pursuant to the Approval Order) on the Acquired Assets or an increase in the Tax Liability of Buyer or any of its Affiliates, and (v) not to enter into any agreement or commitment to take any action prohibited by this Section 8.1(a).

(b)    Prior to the Closing, Sellers shall make available to Buyer a data room containing, to the extent in Sellers' possession, all material documents concerning title (including all surveys, and title policies, reports and commitments and all covenants, conditions, restrictions, encumbrances, reciprocal easement and operating agreements and other underlying documents referenced or disclosed therein), use, operation or management of any Acquired Real Property. Buyer shall have the right, but not the obligation, at its own cost and expense, to order and review title reports and/or surveys with respect to any Acquired Real Property and to examine and approve the title as to any Acquired Real Property and request that Sellers take appropriate curative action,

48

at Buyer's expense, with regard to any title exceptions, encumbrances or defects that Buyer objects to; provided, however, Sellers shall have no obligation to take any such curative action that is not necessitated by Seller's failure to comply with any of Seller's other obligations hereunder.

(c)    Without in any way limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (i) nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Sellers, the Sellers' business, the Acquired Real Property or the Locations (as applicable) prior to the applicable Closing Date and (ii) prior to the applicable Closing Date, Sellers shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the operations of Sellers, the Sellers' business or the Locations or the Acquired Real Property (as applicable) to the extent permitted by Law, including, without limitation, taking into account Sellers' status as debtors-in-possession in the Bankruptcy Cases. Notwithstanding anything herein to the contrary, Sellers shall be permitted to take all actions that are necessary or desirable to comply with the WARN Act, including, without limitation, providing any notices required under the WARN Act, and no such actions shall constitute a violation of this Section 8.1.

Section 8.2    Bankruptcy Court Filings and Approval.

(a)    Approval of Bid Protections.

(i)    In the event this Agreement is terminated by (A) Buyer pursuant to Section 12.1(b)(ii), Section 12.1(b)(iv), Section 12.1(b)(vi), Section 12.1(b)(viii) or Section 12.1(b)(ix), (B) Sellers pursuant to Section 12.1(c)(ii) or Section 12.1(c)(iii) at a time when Buyer would have been permitted to terminate pursuant to Section 12.1(b)(ii), Section 12.1(b)(iv), Section 12.1(b)(vi), Section 12.1(b)(viii) or Section 12.1(b)(ix) or (C) Sellers pursuant to Section 12.1(c)(iv), then in each case of the foregoing clauses (A), (B) and (C), upon consummation by Sellers of (x) a transaction or series of related transactions involving the sale, licensing or other disposition of all or any material portion of the Potential Acquired Assets or the assets subject to the Agency Agreement or (y) a Competing Bid (the transactions described in clauses (x) and (y), a "Subsequent Transaction"), Sellers shall promptly (and in any event within three (3) Business Days of such consummation), pay to Buyer the amount of the reasonable and documented expenses of Buyer incurred in connection with the transactions contemplated hereby up to an aggregate amount of $1,500,000 (the "Expense Reimbursement") solely out of and to the extent of the proceeds of the purchase price received by Sellers from such Subsequent Transaction, such payment of the Expense Reimbursement to be made by wire transfer(s) in immediately available funds to one or more bank accounts of Buyer (or any of its Affiliates) designated in writing by Buyer to Sellers.

(ii)    In addition to any payments that may be due pursuant to Section 8.2(a)(i), if this Agreement is terminated pursuant to Section 12.1, other than termination pursuant to Section 12.1(c)(i) or Sections 12.1(d), the Sellers shall purchase from Buyer, at cost, all Additional Agent Goods (as defined in the Agency Agreement) acquired by Buyer or any designee in connection with this Agreement and the Agency Agreement prior to the date of such termination (the "Augment Purchase"). The Augment Purchase shall be made on the third Business Day following the consummation of a Subsequent Transaction, solely

out of and to the extent of the proceeds of the purchase price received by Sellers from such Subsequent Transaction, by wire transfer(s) in immediately available funds to one or more bank accounts of Buyer (or any of its Affiliates) designated in writing by Buyer to Sellers.

(iii)    The Parties acknowledge and agree that (A) the Parties have expressly negotiated the provisions of this Section 8.2(a) and the payment of the Expense Reimbursement and the Augment Purchase are integral parts of this Agreement, (B) in the absence of the Expense Reimbursement and the Augment Purchase, Buyer would not have entered into this Agreement, and (C) the Expense Reimbursement and the Augment Purchase shall constitute allowed superpriority administrative expense Claims pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code, provided that such superpriority administrative expense Claim shall be subject and subordinate only to the Carve Out.

(iv)    Each Seller acknowledges and agrees that such Seller shall be jointly and severally liable for the entire the Expense Reimbursement and the Augment Purchase payable by Sellers pursuant to this Agreement.

(v)    The obligations of Sellers to pay the Expense Reimbursement and to consummate the Augment Purchase, as applicable, shall survive the termination of this Agreement in accordance with Section 12.2.    The Expense Reimbursement and the Augment Purchase shall be deemed earned upon entry of the Bid Procedures Order.

(vi)    Subject to Section 12.2, nothing in this Section 8.2 shall relieve Buyer or Sellers of any Liability for a breach of this Agreement or the Agency Agreement prior to the date of termination.    Upon payment of the Expense Reimbursement and the consummation of the Augment Purchase, as applicable, in accordance with this Section 8.2(a), Sellers and their respective Representatives and Affiliates, on the one hand, and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and the Agency Agreement prior to the Closing Date.

(b)    Competing Transaction.  This Agreement and the Agency Agreement are subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids in respect of all or any part of the Acquired Assets and the assets subject to the Agency Agreement (whether in combination with other assets of Sellers or their Affiliates or otherwise) (each a "Competing Bid").  From the date hereof (and any prior time) and until the Closing Date, Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any sale or other disposition of the Acquired Assets or the transactions contemplated by the Agency Agreement.  In addition, Sellers shall have the authority to respond to any inquiries or offers to purchase all or any part of the Acquired Assets (whether in combination with other assets of Sellers or their Affiliates or otherwise), perform the services contemplated by the Agency Agreement and perform any and all other acts related thereto, including, without limitation, as required under the Bankruptcy Code,

the Bid Procedures Order or other applicable Law, and including, without limitation, supplying information relating to the Sellers and their assets or businesses to prospective purchasers.

(c)    <u>Bankruptcy Court Filings</u>.

(i)    On or before the date that is one (1) day after the Petition Date, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bid Procedures Order (which shall, among other things, approve and authorize payment of the Expense Reimbursement and the Augment Repurchase in accordance with this <u>Section 8.2</u>) and the Approval Order (the "<u>Bid Procedures Motion</u>"). Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bid Procedures Order and the Approval Order, including, without limitation, a finding of adequate assurance of future performance by Buyer, including, without limitation, by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; provided that such actions shall not be required to include the provision of any additional consideration or any material modification of any term of this Agreement or the Agency Agreement. In the event the entry of the Bid Procedures Order shall be appealed, Sellers shall use their respective commercially reasonable efforts to defend such appeal.

(ii)    Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assigned Agreements and, subject to the consent of Buyer, to determine the amount of the Cure Costs; <u>provided</u>, that nothing herein shall preclude Sellers from filing such motions to reject any Contracts or Leases that have been designated for rejection by Buyer pursuant to <u>Section 2.4</u>. Sellers shall file such motions or pleadings seeking entry of an order, in form and substance reasonably acceptable to Buyer, pursuant to Section 365(d)(4) of the Bankruptcy Code, extending the Sellers' deadline to assume or reject the Leases to a date not sooner than the last date of the Designation Rights Period (the "<u>Extension Order</u>").

(iii)    Sellers shall cooperate with Buyer concerning the Bid Procedures Order, the Approval Order and any other orders (whether of the Bankruptcy Court or otherwise, and whether relating to the Bankruptcy Cases or otherwise) relating to the transactions contemplated by this Agreement, and the bankruptcy or other insolvency proceedings in connection therewith, and Sellers shall, to the extent reasonably practicable, provide Buyer with draft copies of all applications, pleadings, notices, proposed orders, and other documents relating to such proceedings at least two (2) Business Days in advance of the proposed filing date so as to permit Buyer sufficient time to review and comment on such drafts, and, with respect to all provisions that directly impact Buyer or directly relate to the transactions contemplated by this Agreement, such pleadings and proposed orders shall be in form and substance reasonably acceptable to Buyer. Sellers shall use commercially reasonable efforts to give Buyer reasonable advance notice of any hearings regarding the Bid Procedures Order, the Approval Order or any other orders (whether of the Bankruptcy Court or otherwise, and whether relating to the Bankruptcy Cases or otherwise) relating to the transactions contemplated by this Agreement.

51

(d)    <u>Bankruptcy Court Milestones</u>.  Sellers shall comply with the following timeline (the "<u>Bankruptcy Court Milestones</u>"), subject only, to the extent applicable, to the availability of the Bankruptcy Court:

(i)    As promptly as practicable but in no event later than one (1) day after the Petition Date, Sellers shall file with the Bankruptcy Court the Bid Procedures Motion, together with a fully executed form of this Agreement and the Agency Agreement;

(ii)    As promptly as practicable but in no event later than one (1) day after the Petition Date, Sellers shall file with the Bankruptcy Court a motion, in form and substance reasonably acceptable to the Buyer, pursuant to Section 365(d)(4) of the Bankruptcy Code, seeking entry of an order extending the Sellers' deadline to assume or reject the Leases and Executory Contracts to a date not sooner than the last day of the Designation Rights Period

(iii)    No later than December 9, 2025, the Bankruptcy Court shall have held a hearing to consider entry of the Bid Procedures Order;

(iv)    No later than December 10, 2025, Sellers shall obtain entry of the Bid Procedures Order;

(v)    No later than January 5, 2026, the auction undertaken pursuant to the Bid Procedures Order (the "<u>Auction</u>") (if necessary) shall have been held pursuant to the Bid Procedures Order;

(vi)    No later than January 7, 2026, the Bankruptcy Court shall have held the Sale Hearing to consider entry of the Approval Order; and

(vii)    No later than January 8, 2026, Sellers shall obtain entry by the Bankruptcy Court of the Approval Order.

(e)    <u>Approval Order</u>.  Provided Buyer is selected as the winning bidder in respect of the Acquired Assets, Sellers shall use commercially reasonable efforts to cause entry of the Approval Order and any other necessary orders to close the sale by the Bankruptcy Court as soon as reasonably practicable following the closing (or cancellation) of the Auction in accordance with the terms and conditions hereof.  Buyer and Sellers understand and agree that the transactions contemplated by this Agreement and the Agency Agreement are subject to approval by the Bankruptcy Court.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Approval Order.

(f)    Sellers shall not, without the consent of Buyer, voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any third party in pursuing or seeking, a conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 of the Bankruptcy Code or chapter 7 of the Bankruptcy Code, or the appointment of an examiner with expanded powers.

(g)    Sellers shall serve (i) true and correct copies of all applicable pleadings and notices in accordance with the Bid Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, and

any other applicable order of the Bankruptcy Court and (ii) such additional notices as Buyer may reasonably request.

(h)     In the event an appeal is taken or a stay pending appeal is requested from the Bid Procedures Order or the Approval Order, Sellers shall as promptly as practicable notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay.  Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from or stay request in respect of such order. Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal or stay request and obtain an expedited resolution of such appeal.

(i)     After entry of the Approval Order, Sellers shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Approval Order.

(j)     Sellers shall cause any plan of reorganization or liquidation approved in the Bankruptcy Cases to permit assumption and rejection of the Sellers' executory contracts and unexpired leases of real property (as applicable) through the end of the Designation Rights Period.

## ARTICLE IX

## ADDITIONAL AGREEMENTS

Section 9.1     Taxes.

(a)     Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, without limitation, goods and services tax, harmonized sales tax and land transfer tax) imposed on or payable in connection with the sale, transfer, assignment, conveyance or delivery of the Designation Rights, the Acquired Assets or the Assumed Liabilities ("Transfer Taxes") shall be borne (i) 50% by Buyer and (ii) 50% by Sellers, jointly and severally, and in each case shall be paid to the appropriate Taxing Authority promptly when due.  Sellers and Buyer shall  use reasonable efforts and cooperate in good faith in all matters relating to such Transfer Taxes (including, without limitation, with respect to the application of any exemption therefrom or reduction thereof).  Seller or Buyer, as applicable, shall prepare and, except to the extent required by applicable law to be filed by Buyer, Sellers shall file all necessary Tax Returns or other documents with respect to all such Transfer  Taxes; provided, however, that in the event any such Tax Return requires execution by any other Party, the preparing Party shall prepare and deliver to the other Parties a copy of such Tax Return at least three (3) Business Days before the due date thereof, and shall promptly execute such Tax Return and return it for filing.

(b)     Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable,  such information and assistance relating to the Acquired Assets, the Locations, the Sellers' business or the Assumed Liabilities as is  reasonably necessary for the preparation and filing of all Tax Returns, determination of any liability in respect of Taxes or the right to any refund, credit or prepayment in respect of Taxes, the making of any election relating to Taxes, and the preparation, prosecution or defense of or for any Tax Proceeding; provided,  however, that (other than as required pursuant to this Section 9.1(b)) neither Buyer nor

any Seller shall be required to disclose the contents of its income tax returns to any Person. Any out-of-pocket expenses incurred in furnishing such information or assistance pursuant to this Section 9.1(b) shall be borne by the Party requesting it.

(c)     For purposes of this Agreement, with respect to any Acquired Asset, the Sellers and Buyer shall apportion the liability for Property Taxes for Straddle Periods applicable to such Acquired Asset in accordance with this Section 9.1(c). The Property Taxes described in this Section 9.1(c) shall be apportioned between the Seller and Buyer as of the Closing Date, with Buyer liable for that portion of the Property Taxes for a Straddle Period (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Post-Assignment Tax Period) equal to the Property Taxes for such Straddle Period *multiplied by* a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of days in such entire Straddle Period. The Sellers shall be liable for that portion of the Property Taxes for a Straddle Period for which Buyer is not liable under the preceding sentence (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Pre-Assignment Tax Period). The Party responsible under applicable law for paying a Tax described in this Section 9.1(c) shall be responsible for administering the payment of such Tax.

(d)     The Sellers, on the one hand, or Buyer, on the other hand, as the case may be (the "Reimbursing Party"), shall provide reimbursement for any Tax paid by the other (the "Paying Party"), all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Agreement. Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and the Paying Party's and Reimbursing Party's respective liability therefor, although failure to do so shall not relieve the Reimbursing Party from its liability hereunder except to the extent the Reimbursing Party is actually prejudiced thereby.

(e)     If requested by Buyer, Sellers shall cooperate with Buyer in good faith to structure the transactions contemplated by this Agreement in a tax efficient manner for Buyer, its Affiliates, and its direct and indirect shareholders, which cooperation may include making or causing to be made and revoking or causing to be revoked any tax elections of Seller and its Affiliates.

Section 9.2    Payments Received. Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other and will account to the other for all such receipts.

Section 9.3    Assigned Agreements; Adequate Assurance of Future Performance. With respect to each Assigned Agreement, Buyer shall provide (and shall cause the applicable Assignee to provide) adequate assurance as required under the Bankruptcy Code of the future performance by Buyer and each Assignee of each such Assigned Agreement, including, without limitation, by demonstrating financial wherewithal to pay Buyer Cure Costs. Buyer and Sellers agree that they will promptly take (and Buyer shall cause the applicable Assignee to take) all

actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Agreements, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's, Assignee's and Sellers' Representatives available to testify before the Bankruptcy Court.

Section 9.4    Post-Closing Books and Records and Personnel. For thirty six (36) months after the end of the Designation Rights Period, (a) neither Buyer nor any Seller shall dispose of or destroy any of the business records and files of the Locations or relating to any Acquired Assets or Assumed Liabilities, including, without limitation, any Retained Books and Records, and (b) Buyer and Sellers (including, without limitation, any trust established under a chapter 11 plan of Sellers or any other successors of Sellers) shall allow each other, any applicable Assignee (to the extent requested by Buyer) and the Representatives of any of the foregoing reasonable access during normal business hours, and upon reasonable advance notice and to the extent permitted by applicable law, to all employees, files and any books and records (including, without limitation, any Retained Books and Records) and other materials included in the Potential Acquired Assets for purposes relating to the Bankruptcy Case, the wind-down of the operations of Sellers, the functions of any such trusts or successors, or other reasonable business purposes, including, without limitation, Tax matters, litigation, or potential litigation, each as it relates to the Potential Acquired Assets or the Assumed Liabilities, and Buyer and Sellers (including, without limitation, any such trust or successors) and such Representatives shall have the right to make copies of any such files, books, records and other materials. In addition, from and after the Closing Date or the applicable Lease Assignment Date for a period of sixty (60) days, Sellers will permit Buyer, any applicable Assignee (to the extent requested by Buyer) and their respective Representatives access to such personnel of Sellers during normal business hours as Buyer or any applicable Assignee may reasonably request to assist with the transfer of the applicable Acquired Assets (including, without limitation, any related Assigned Plans and Permits). Following the end of the Designation Rights Period, nothing in this Section 9.4 shall be construed to prevent Sellers from winding down their operations and dissolving their business entities as is determined by Sellers (in their sole discretion) to be in their best interests.

Section 9.5    Confidentiality. The terms of any confidentiality agreement to which Buyer (or an Affiliate of Buyer) is party in respect of any Seller (or any Affiliate thereof) shall continue in full force and effect until the Closing, at which time Buyer's obligations under any such confidentiality agreement shall terminate.

Section 9.6    License. The Buyer hereby grants the Sellers an irrevocable, nonexclusive, royalty-free, fully paid, worldwide license, with the right to sublicense to the Sellers' Subsidiaries, of all Acquired Intellectual Property and all IP Licenses now or hereafter constituting an Assigned Agreement, solely for the purpose of enabling Seller to provide transition services as contemplated by the Transition Services Agreement, which license shall extend for the duration of such transition services.

Section 9.7    Employee Contacts. From and after the date of this Agreement, the Buyer shall be permitted to discuss the possibility and terms of future employment with the Sellers' employees; provided that Buyer shall not make offers of employment to such employees until the Closing Date; provided, however, that Buyer shall not be precluded from making offers of

employment prior to such date to any such employee (i) whose employment by Sellers ceased prior to the making of such offer by Buyer or (ii) who responds to solicitation not specifically targeted at employees of Sellers (including by a search firm or recruiting agency); provided further that, for the avoidance of doubt, Buyer shall not be restricted from engaging in general solicitations or advertising not specifically targeted at employees of Sellers prior to such date.

## ARTICLE X

## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE

Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 10.1    Accuracy of Representations.  The representations and warranties of Sellers contained in this Agreement and the Agency Agreement shall be true and correct in all material respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date). Buyer shall have received a certificate of Sellers, signed by a duly authorized officer of Sellers, to that effect.

Section 10.2    Sellers' Performance.  Sellers shall have performed and complied with in all material respects the covenants and agreements that Sellers are required to perform or comply with pursuant to this Agreement and the Agency Agreement at or prior to the Closing, and Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

Section 10.3    No Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred any event, change, occurrence or effect that, individually or together with all other events, changes, occurrences or effect, has had, or would reasonably be expected to have, a Material Adverse Effect.

Section 10.4    No Order.   No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the Transactions (a "Closing Legal Impediment").

Section 10.5    Governmental Authorizations.  Any applicable waiting period or extension thereof under the HSR Act and any other waiting period under any applicable antitrust or competition Law shall have expired or been terminated and any other approval under any applicable antitrust or competition Law shall have been received.

Section 10.6    Sellers' Deliveries.  Without limiting Section 10.2, each of the deliveries required to be made to Buyer pursuant to Section 5.3 have been so delivered, except for such deliveries which, by their nature, cannot be made on or prior to the Closing.

Section 10.7    Extension of Deadline to Assume or Reject.  The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to Buyer, pursuant to Section 365(d)(4) of the Bankruptcy Code, extending the Sellers' deadline to assume or reject the Leases and Executory Contracts to a date not sooner than the last day of the Designation Rights Period.

Section 10.8    <u>Personally Identifiable Information</u>.  The only privacy policies of Sellers relating to Customer Information that were in effect at any time during the 12-month period prior to the Closing (with respect to Customer Information obtained during such period) are the privacy policies attached hereto as <u>Exhibit E</u>.  The Bankruptcy Court shall have entered an order (which may be the Approval Order) authorizing Buyer to treat in accordance with the terms set forth on <u>Exhibit F</u> attached hereto any of Sellers' Customer Information which is personally identifiable to any customer.

Section 10.9    <u>Approval Order</u>.  (a) The Bankruptcy Court shall have entered the Bid Procedures Order and the Approval Order and (b) neither the Bid Procedures Order nor the Approval Order shall be stayed or have been modified or vacated.

Section 10.10    <u>Agency Agreement</u>.  All conditions to the obligations of Agent set forth in Sections 10(b)(i), 10(b)(iii) and 10(b)(iv) of the Agency Agreement shall have been satisfied (or waived in accordance with the Agency Agreement).

Section 10.11    <u>Lease Termination</u>.  No Lease has been (a) terminated or rejected, other than as a result of its expiration in accordance with its terms as of the date hereof or (b) amended, in each case without the prior written consent of Buyer (including, without limitation, pursuant to the definitions of "Lease" and "Location").

## ARTICLE XI

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

Sellers' obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 11.1    <u>Accuracy of Representations</u>.  The representations and warranties of Buyer contained in this Agreement and the Agency Agreement shall be true and correct as of the date hereof and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date); <u>provided</u>, <u>however</u>, that the condition in this <u>Section 11.1</u> shall be deemed to be satisfied so long as any failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" set forth therein), individually or in the aggregate, has not had and would not reasonably be expected to prevent or materially impair the ability of Buyer to perform, or to consummate the transactions contemplated by this Agreement and the other Transaction Documents.  Sellers shall have received a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 11.2    <u>Buyer's Performance</u>.  Buyer shall have performed and complied with in all material respects the covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement and the Agency Agreement at or prior to the Closing, and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.3    <u>No Order</u>.  No Closing Legal Impediment shall be in effect.

Section 11.4    <u>Governmental Authorizations</u>. Any applicable waiting period or extension thereof under the HSR Act and any other waiting period under any applicable antitrust or competition Law shall have expired or been terminated and any other approval under any applicable antitrust or competition Law shall have been received.

Section 11.5    <u>Buyer's Deliveries</u>. Each of the deliveries required to be made to Sellers pursuant to <u>Section 5.2</u> shall have been so delivered, except for such deliveries which, by their nature, cannot be made on or prior to the Closing.

Section 11.6    <u>Approval Order</u>. (a) The Bankruptcy Court shall have entered the Bid Procedures Order and the Approval Order and (b) neither the Bid Procedures Order nor the Approval Order shall be stayed or have been modified or vacated.

Section 11.7    <u>Agency Agreement</u>. All conditions to the obligations of the Merchant (as defined in the Agency Agreement) set forth in Sections 10(b)(i), 10(b)(iii) and 10(b)(iv) of the Agency Agreement shall have been satisfied (or waived in accordance with the Agency Agreement).

## ARTICLE XII

## TERMINATION

Section 12.1    <u>Termination Events</u>. Anything contained in this Agreement to the contrary notwithstanding, this Agreement and the Agency Agreement may be terminated at any time prior to the Closing:

(a)    by either Sellers or Buyer:

(i)    if the Bankruptcy Court shall have stated unconditionally that it will not enter the Approval Order or if a Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any applicable Law (including, without limitation, any Order) which is in effect and has the effect of making the Transactions illegal or otherwise restraining or prohibiting consummation of the Transactions and which is not satisfied, resolved or preempted by the Approval Order; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement and the Agency Agreement pursuant to this <u>Section 12.1(a)(i)</u> shall not be available to any Party whose material breach of any of its representations, warranties, covenants or agreements contained herein and in the Agency Agreement results in or causes such event;

(b)    by Buyer:

(i)    in the event of any breach by any Seller of any of its agreements, covenants, representations or warranties contained herein or in the Agency Agreement that would result in the failure of a condition set forth in <u>Article X</u> to be satisfied, and the failure of Sellers to cure such breach by the earlier of (A) the Outside Date and (B) the date that is ten (10) days after receipt of the Buyer Termination Notice; <u>provided</u>, <u>however</u>, that (1) Buyer is not in breach of any of its representations, warranties, covenants or agreements contained herein and in the Agency Agreement in a manner that would result in the failure

of a condition set forth in Article XI to be satisfied, (2) Buyer notifies Sellers in writing (the "Buyer Termination Notice") of its intention to exercise its rights under this Section 12.1(b)(i) as a result of such breach, and (3) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Agency Agreement of which Sellers are allegedly in breach and the basis for Buyer's assertion of the existence of such breach;

  (ii) if Sellers withdraw or seek authority to withdraw the Bid Procedures Motion;

  (iii) if any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the applicable Sellers' business is appointed in any of the Bankruptcy Cases;

  (iv) if the Approval Order has not been entered on or before January 7, 2026 (or is stayed as of such date or has been modified or vacated on or prior to such date);

  (v) if (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is, without Buyer's prior written consent, (A) amended, modified or supplemented or (B) voided, reversed or vacated or is subject to a stay, or (ii) following entry by the Bankruptcy Court of the Approval Order, the Approval Order is, without Buyer's prior written consent, (A) amended, modified or supplemented or (B) voided, reversed or vacated or is subject to a stay

  (vi) if the Closing shall not have occurred by the close of business on January 9, 2026 (the "Outside Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 12.1(b)(vi) shall not be available to any Party whose material breach of any of its representations, warranties, covenants or agreements contained herein results in the failure of the Closing to be consummated by such time;

  (vii) in the event of the occurrence of any Major Casualty / Condemnation Event;

  (viii) if (x) Sellers enter into a definitive agreement with respect to, or file (or any other party files on behalf of Sellers) a motion or other request to approve, a Competing Bid or (y) the Bankruptcy Court enters an order approving a Competing Bid;

  (ix) if Buyer is not the Successful Bidder at the Auction; or

  (x) if any of the Bankruptcy Court Milestones are not met;

(c) by Sellers:

  (i) in the event of any breach by Buyer of any of its agreements, covenants, representations or warranties contained herein or in the Agency Agreement that would result in the failure of a condition set forth in Article XI to be satisfied, and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is ten (10) days after receipt of the Sellers' Termination Notice; provided, however, that

Sellers (1) are not themselves in breach of any of their representations, warranties, covenants or agreements contained herein and in the Agency Agreement, in each case in a manner that results in the failure of a condition set forth in Article X to be satisfied, (2) notify Buyer in writing (the "Sellers' Termination Notice") of their intention to exercise their rights under this Section 12.1(c)(i) as a result of the breach, and (3) specify in the Sellers' Termination Notice the representation, warranty, covenant or agreement contained herein or in the Agency Agreement of which Buyer is allegedly in breach and the basis for Sellers' assertion of the existence of such breach;

(ii)     if the Approval Order has not been entered on or before January 9, 2026 (or is stayed as of such date or has been modified or vacated on or prior to such date);

(iii)     if the Closing shall not have occurred by the close of business on January 9, 2026; provided, however, that the right to terminate this Agreement pursuant to this Section 12.1(c)(iii) shall not be available to any Party whose material breach of any of its representations, warranties, covenants or agreements contained herein results in the failure of the Closing to be consummated by such time; or

(iv)     if Sellers consummate a Competing Bid; or

(d)     by mutual written consent of Sellers and Buyer.

Section 12.2     Effect of Termination.  In the event of any termination of this Agreement pursuant to Section 12.1, this Agreement (other than the provisions set forth in this Section 12.2, Section 4.2 (with respect to the Deposit), Section 8.2(a), Section 12.3 and Article XIII) shall forthwith become null and void and be deemed of no further force and effect.  Subject to the provisions set forth in the immediately preceding sentence, there shall be no liability or obligation thereafter on the part of any Party.  Notwithstanding the foregoing, any such termination shall not limit any Party's liability for any breach prior to the time of such termination.  In the event of any termination of this Agreement pursuant to Section 12.1 (other than a termination by the Sellers pursuant to Section 12.1(c)(i)), Sellers shall promptly (and in no event later than 2 Business Days following such termination) return to Buyer any deposit delivered by Buyer to Sellers pursuant to the Bid Procedures Order.

Section 12.3     Casualty/Condemnation Events.

(a)     If a material portion of any Lease Premises or Acquired Real Property, any shopping center in which any Lease Premises or Acquired Real Property is located or the Potential Acquired Assets related to any of the foregoing is materially damaged or destroyed, or the physical condition thereof is materially and adversely changed (including, without limitation, as a result of failure of proper repair or maintenance or environmental contamination that occurs from and after the date hereof), or any Lease Premises or Acquired Real Property, or any shopping center in which any Lease Premises or Acquired Real Property is located or any other property reasonably necessary for the operation of any Location or Acquired Real Property (the absence of which would have an adverse impact on such Location or Acquired Real Property in any material respect), in each case is subject to a condemnation or other governmental taking of a material portion thereof (each of the foregoing, a "Casualty / Condemnation Event") at any time from the

date of this Agreement up to and including the Closing, Sellers shall provide notice of such Casualty / Condemnation Event to Buyer within three (3) Business Days of the occurrence of such Casualty / Condemnation Event. If such Casualty / Condemnation Event is such that (i) restoration of such Lease Premises or Acquired Real Property, shopping center or other property to substantially the same condition as prior to such Casualty / Condemnation Event would take six (6) months or longer, (ii) in the case of a condemnation, to the extent such Lease Premises, Acquired Real Property, shopping center or other property cannot be substantially restored to the same condition as prior to such condemnation, (iii) any applicable landlord shall have the right to terminate any Lease or (iv) any applicable landlord, lender or other third party is entitled to receive the awards or proceeds otherwise attributable to the leasehold interest (in the case of any Lease Premises) or any Acquired Real Property (and is not required to make such award or proceeds available for purposes of restoration and repair or replacement) (each, a "Material Casualty / Condemnation Event"), Buyer shall elect within ten (10) days after notice of such Casualty / Condemnation Event from Sellers (which notice, in the case of a Material Casualty / Condemnation Event, shall specify that such Casualty / Condemnation Event constitutes a Material Casualty / Condemnation Event), together with Sellers' best estimate of the net amount of the proceeds of the insurance award and/or condemnation award available to Buyer pursuant to Section 12.3(c) (including, without limitation, any deductions pursuant to Section 12.3(c)(ii)), to either (A) acquire such Acquired Real Property or such Designation Rights with respect to such Location at the Closing, along with the insurance proceeds or condemnation awards or proceeds relating to such Casualty / Condemnation Event pursuant to clause (m) of the definition of "Acquired Assets" (it being understood that no adjustment of the Purchase Price shall occur as a result thereof except as set forth in Section 12.3(a)(B)), (B) decline to acquire such Acquired Real Property or such Designation Rights with respect to such Location, in which case the Purchase Price shall be reduced by the portion thereof allocated to such Acquired Real Property or Location, as determined by agreement of the parties hereto or by the Bankruptcy Court, or (C) in the event of any Material Casualty / Condemnation Event which affects ten percent (10%) of the Locations on an aggregate basis or any Acquired Real Property (a "Major Casualty / Condemnation Event"), the Buyer may (instead of electing any of the rights pursuant to (A) and (B) above) elect to terminate this Agreement in its entirety. Sellers covenant and agree to give Buyer prompt written notice of each Casualty / Condemnation Event and each Material Casualty / Condemnation Event that they become aware of, together with its best estimate of net proceeds from any insurance and/or condemnation awards. For the avoidance of doubt, Casualty / Condemnation Events that are subject to this Section 12.3(a) are only those occurring during the period from the date of this Agreement up to and including the Closing.

(b)    In the case of a casualty or condemnation occurring prior to Closing other than a Material Casualty / Condemnation Event, (i) Sellers may elect to restore such Location or Acquired Real Property but shall have no obligation to do so (and shall give Buyer prompt written notice of such election), and (ii) if Buyer shall elect to acquire such Acquired Real Property or such Designation Rights pursuant to Section 12.3(a)(A) above Sellers shall, at the Closing, assign to Buyer all awards or other proceeds for such taking by eminent domain or condemnation or the right to receive proceeds of any insurance for such damage or destruction (to the extent not applied as provided in clause (i) of this Section 12.3(b) and not attributable to Sellers' lost rents or like amounts applicable to any period prior to the applicable Closing).

(c)    In connection with any assignment of awards, proceeds or insurance under this Section 12.3, (i) such assignment of proceeds or awards shall not include any awards, proceeds or insurance to the extent attributable to lost rents or similar costs applicable to any period prior to the Closing or, in the case of any Casualty / Condemnation Event other than a Material Casualty / Condemnation Event, paid in connection with repair, restoration or replacement, and (ii) to the extent that Buyer has received written notice thereof in reasonable detail not less than fifteen (15) days prior to the Closing, such assignment of proceeds or awards shall be reduced by the amount of (x) all actual and documented, reasonable out-of-pocket repair costs incurred by Sellers in connection with the repair or restoration of such damage or destruction, (y) all actual and documented, reasonable out-of-pocket collection costs of Sellers respecting any awards or other proceeds, and (z) any amounts required to be paid (and solely to the extent actually paid) by Sellers or the insurance company to the applicable landlord under the applicable Lease or to such Seller's or landlord's lender as required pursuant to any of such Seller's or lender's financing, as applicable.

(d)    Buyer shall have the right, prior to the Closing, to decline to acquire (i) Designation Rights with respect to any Lease and related Potential Acquired Assets or (ii) any Acquired Assets (including, without limitation, any Acquired Real Property), in which case, to the extent that the applicable Designation Rights, Lease, Potential Acquired Assets or Acquired Assets have any material value, the Purchase Price shall be reduced by the portion thereof allocated to such Location or such Acquired Assets, as determined by agreement of the parties hereto or by the Bankruptcy Court, in each case if and only if any Consent from any Person (other than a Governmental Authority) has not been obtained from such Person or has not otherwise been provided for pursuant to the Approval Order, the absence of which prevents the acquisition or exercise of the Designation Rights with respect to such Lease and related Potential Acquired Assets or the acquisition of such Acquired Assets; provided, that if the failure to obtain such Consent is curable, Sellers shall have until the earlier of (i) the Closing Date and (ii) ten (10) days after receipt of Buyer's notice of intent to decline to acquire pursuant to this Section 12.3(d) to obtain such Consent; and provided, further that, for the avoidance of doubt, the provisions of this Section 12.3(d) shall not apply with respect to any IP License.

(e)    Buyer may exercise its right to terminate this Agreement under Section 12.3(a)(C) or decline to acquire Designation Rights or Acquired Assets under Sections 12.3(a)(B) or 12.3(d) by giving written notice thereof from time to time to Sellers in the manner required under Section 13.2 specifying the related Designation Rights or Acquired Assets, if applicable, and the basis for its termination or declination in reasonable detail.

## ARTICLE XIII

## GENERAL PROVISIONS

Section 13.1    Public Announcements.  Except as required by applicable Law (including, without limitation, any Order by the Bankruptcy Court) or pursuant to filings by the Sellers with, or in any proceeding before, the Bankruptcy Court, the Sellers shall not issue any press release, provide any notice to customers or suppliers (in the case of notice to customers or suppliers, other than in the ordinary course of business consistent with past practice), or make any public announcement concerning this Agreement or the Transactions without Buyer's consent, such

consent not to be unreasonably withheld or delayed. For the avoidance of doubt, nothing herein shall restrict the Buyer from issuing any such press release, notice or public announcement.

Section 13.2   Notices. Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) by a nationally recognized courier for overnight delivery service or (c) by email. A notice or communication shall be deemed to have been effectively given (i) if in person, upon   personal delivery to the Party to whom the notice is directed, (ii) if by nationally recognized courier, one Business Day after   delivery to such courier and (iii) if by email, when delivered (provided that any notice, report or other communication delivered by email shall be promptly followed by delivery of such notice or communication by another means described herein if receipt thereof is not confirmed (including, without limitation, by read receipt)). Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received  shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

If to Sellers, then to:

American Signature, Inc.
c/o BRG
225 Franklin Street, 32nd Floor
Boston, MA 02110
Attn:  Mr. Rudolph Morando
Tel: (510) 285-3300
rmorando@thinkbrg.com

with copies (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Attention:  Laura Davis Jones
Facsimile:  (302) 652-4100
E-mail:  ljones@pszjlaw.com

Goodwin Procter LLP,
620 Eighth Avenue
New York, NY 10018,
Attn: Kizzy L. Jarashow, Esq. and Stacy Dasaro, Esq.
Tel: 212-459-7338
Email: kjarashow@goodwinlaw.com and sdasaro@goodwinlaw.com

Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor,
Wilmington, Delaware 19801
Attn: L. Katherine Good, Esq.
Tel: 302-984-6049
Email:  kgood@potteranderson.com

If to Buyer or Guarantor, then to:

ASI Purchaser LLC; SEI, Inc.
4300 East Fifth Avenue

Columbus, Ohio 43219Attention:  Legal Department
Email:  Notice@spgroup.com

with a copy (which shall not constitute notice) to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019
Attention:  Scott K. Charles; Neil M. Snyder
Facsimile:  (212) 403-2000
Email:  skcharles@wlrk.com; nmsnyder@wlrk.com

Section 13.3    <u>Amendment; Waiver</u>.    No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each Party. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement.

Section 13.4    <u>Entire Agreement</u>.    This Agreement (including, without limitation, the Schedules and the Exhibits) and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter. The representations, warranties, covenants and agreements contained in this Agreement (including, without limitation, the Schedules and the Exhibits) and the other Transaction Documents are intended, among other things, to allocate the economic cost and the risks inherent in the transactions contemplated hereby and thereby, including, without limitation, risks associated with matters as to which the Party making such representations and warranties has no knowledge or only incomplete knowledge, and such representations and warranties may be qualified by disclosures contained in the Schedules. Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 13.5    <u>Assignment</u>. Subject to Buyer's express right to assign any Acquired Lease to any Assignee, this Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Party (which consent maybe granted or withheld in the sole discretion of such other Party); <u>provided</u>, <u>however</u>, that Buyer shall be permitted, upon prior notice to Sellers but without consent of Sellers, to assign or delegate all or any part of its rights or obligations (including, without limitation, the right to take assignment of any Assigned Agreement or ownership of any other Acquired Asset) hereunder to any person or entity; <u>provided</u>, <u>further</u>, that no such assignment or delegation shall relieve Borrower or Guarantor of their obligations hereunder.

Section 13.6    <u>Severability</u>. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 13.7    <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the   negotiation, execution or performance of this Agreement (including, without limitation, any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into  this Agreement) shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to  Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; <u>provided</u>, <u>however</u>, that, if the Bankruptcy Cases are closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in a Delaware state court or a federal court sitting in the State of Delaware, and the Parties hereby (a) irrevocably and unconditionally submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding in the United States District Court for the District of Delaware) with respect to all Proceedings arising out of or relating to this Agreement and the transaction contemplated hereby (whether

65

based on contract, tort or other theory); (b) agree that all claims with respect to any such Proceeding shall be heard and determined in such courts and agrees not to commence any Proceeding relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or other theory) except in such courts; (c) irrevocably and unconditionally waive any objection to the laying of venue of any Proceeding arising out of this Agreement or the transactions contemplated hereby and irrevocably and unconditionally waives the defense of an inconvenient forum; and (d) agree that a final judgment in any such Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. The Parties agree that any violation of this <u>Section 13.7(b)</u> shall constitute a material breach of this Agreement and shall constitute irreparable harm.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND EACH OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 13.7</u>.

Section 13.8    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts (including, without limitation, via facsimile or other electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by each other Party. Delivery of an executed counterpart hereof by means of facsimile or electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 13.9    <u>Parties in Interest; No Third Party Beneficiaries</u>. Nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or a permitted assignee of a Party.

Section 13.10    <u>Fees and Expenses</u>. The Parties agree that, except as otherwise expressly provided in this Agreement, each Party shall bear and pay all costs, fees and expenses that it incurs, or which may be incurred on its behalf, in connection with this Agreement and the Transactions.

Section 13.11    <u>Non-Recourse</u>. All claims, obligations, liabilities or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with or relate in any manner to this Agreement, the negotiation, execution or performance of this Agreement (including, without limitation, any representation or warranty made in connection with or as an inducement to this Agreement) or the transactions contemplated hereby may be made only against (and are those solely of) the Persons that are expressly identified as Parties to this Agreement. No other Person,

including, without limitation, any of their Affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to, any of the foregoing shall have any liabilities (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with, or related in any manner to, this Agreement or based on, in respect of, or by reason of, this Agreement or its negotiation, execution, performance or breach.

Section 13.12  Schedules; Materiality.  The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, to the extent that such disclosure is sufficient to identify the Section to which such disclosure is responsive, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement.  The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 13.13  Specific Performance.  The Parties acknowledge and agree that (a) irreparable injury, for which monetary  damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this  Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement by the breaching Party or Parties.  If any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at law.

Section 13.14  Set-Off.  Buyer and Sellers agree that (A) if at any time Sellers hold any undisputed amounts due to Buyer under this Agreement or the Agency Agreement, Sellers may, in their discretion, after two (2) business days' notice to Buyer, offset such amounts being held by Sellers against any undisputed amounts due and owing by Buyer to, or required to be paid by Buyer to, Sellers hereunder or under the Agency Agreement, and (B) if at any time Buyer holds any undisputed amounts due to Sellers under this Agreement or the Agency Agreement, Buyer may, in its discretion, after two (2) business days' notice to Sellers, offset such amounts being held by Buyer against any undisputed amounts due and owing by Seller to, or required to be paid by Sellers to, Buyer hereunder or under the Agency Agreement.

Section 13.15  Deferred Completion of Certain Exhibits and Schedules.  Certain Exhibits and Schedules have not yet been completed, agreed upon or attached hereto (the "Deferred Exhibits and Schedules").  Buyer and the Sellers hereby agree that each of them will continue to work in good faith toward completion and mutual agreement on the form and content of the Deferred Exhibits and Schedules by no later than 11:59 pm prevailing Eastern time on December 3, 2025 (as such date may be extended with the consent of each of Buyer and the Sellers, the "Outside Time").  If Buyer and the Sellers timely reach such agreement, such mutually agreed Deferred Exhibits and Schedules shall be attached hereto as though they were attached to this Agreement at execution.  Should Buyer and the Sellers fail to reach mutual agreement on the Deferred Exhibits and Schedules by the Outside Time, this Agreement and the Agency Agreement shall automatically terminate without any further action by any Party and be of no further force or

effect. In such event, no Party shall have any rights, obligations, Claims or causes of action of any kind hereunder or relating hereto against any other party hereto.

## ARTICLE XIV

## GUARANTEE

Section 14.1    Guarantee.

(a)    Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Sellers the payment and performance of all of the payment and other obligations of Buyer in this Agreement (the "Guaranteed Obligations"), in each case when and to the extent that such Guaranteed Obligations become due and payable; provided that such guarantee shall be subject to the limits on the Guarantee Obligations set forth herein and, upon any payment or performance thereof, Guarantor shall succeed to the rights of Buyer hereunder.  Guarantor agrees that the guarantee set forth in this Section 14.1 is a present and continuing guarantee of payment and not of collection, and that Sellers shall not be required to prosecute collection, enforcement or other remedies against Buyer or any other person, or to enforce to resort to any other rights or remedies hereunder, before calling on Guarantor for payment or performance.  Guarantor agrees that, if for any reason, Buyer shall fail or be unable to pay or perform, punctually and fully, any of the Guaranteed Obligations as and when they become due and payable, Guarantor shall pay or perform (as applicable) such Guaranteed Obligations in full immediately upon demand. Guarantor agrees that its obligations pursuant to this Section 14.1 shall not be subject to any counterclaim, set-off, abatement, deferment or defense based upon any claim that Guarantor may have against Buyer (but shall be subject to the rights of set-off granted to Buyer herein).  The execution, delivery and performance by Guarantor of its obligations under this Agreement, and the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Guarantor.

(b)    Guarantor hereby waives with respect to the Guaranteed Obligations (i) any right to require Sellers to institute suit against, or to exhaust its rights and remedies against Buyer or any other Person or to exercise any right or power, or pursue any other remedy Sellers may have, (ii) all rights of subrogation, reimbursement, performance, contribution and indemnity whatsoever (whether arising under state or federal statutory or common law, including, without limitation, the Bankruptcy Code), and all rights of recourse to or with respect to any assets or property of Buyer, in each case arising from the guarantee contemplated hereby until the Guaranteed Obligation have been paid in full, (iii) any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and indefeasibly paid or are not due and payable by reason of a default of Sellers under the Agreement), (iv) any defense based upon any election of remedies which in any manner impairs, affects, releases or extinguishes Guarantor's subrogation rights or Guarantor's right to proceed against Buyer, (v) any rights to setoffs, recoupments or counterclaims against Sellers, (vi) any right Guarantor might have under any applicable law to revoke its guarantee hereunder, and (vii) any defense that may arise by reason of any expansion, increase, alteration or other modification of the Guaranteed Obligation or the extension of or any forbearance in enforcing the Guaranteed Obligations.

[Signature pages follow]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

**BUYER:**

**ASI PURCHASER LLC**

By: _____
Name: JEFFRY SWANSON
Title: MANAGER

**GUARANTOR:**

**SEI, INC.**

By: _____
Name: JEFFRY SWANSON
Title: VICE PRESIDENT

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

**SELLERS:**

**AMERICAN SIGNATURE, INC.**

By: _____
Name: Rudolph Morando
Title: Co-Chief Restructuring Officer

**AMERICAN SIGNATURE HOME INC.**

By: _____
Name: Tod H. Friedman
Title: General Counsel

**AMERICAN SIGNATURE USA INC.**

By: _____
Name: Tod H. Friedman
Title: General Counsel

**ASI PURE PROMISE INSURANCE LLC**

By: _____
Name: Tod H. Friedman
Title: General Counsel

**ASI ELSTON LLC**

By: _____
Name: Tod H. Friedman
Title: General Counsel

**ASI – LAPORTE LLC**

By: _____
Name: Tod H. Friedman
Title: General Counsel

**ASI POLARIS LLC**

By: _____
Name: Tod H. Friedman
Title: General Counsel

**ASI THOMASVILLE LLC**

By: _____
Name: Tod H. Friedman
Title: General Counsel

**AMERICAN SIGNATURE WOODBRIDGE LLC**

By: _____
Name: Tod H. Friedman
Title: General Counsel

*[Signature Page to Asset Purchase Agreement]*

## EXHIBIT A

**(Agency Agreement)**

## AGENCY AGREEMENT`

This Agency Agreement (this "Agreement") is made as of November 25, 2025, by and among (i) American Signature, Inc., an Ohio corporation, and its affiliates and subsidiaries identified on Annex 1 hereto (collectively, "Merchant"), (ii) ASI Purchaser LLC, a Delaware limited liability company (and/or its designee(s)) ("Agent"), and (iii) solely as to Section 18, SEI, Inc., a Nevada corporation (the "Guarantor").

## R E C I T A L S:

WHEREAS, on November 22, 2025 (the "Petition Date"), the entities comprising Merchant filed voluntary petitions for relief and commenced cases (the "Chapter 11 Cases") under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, contemporaneously herewith, Agent and Merchant have entered into that certain Asset Purchase Agreement, dated as of the date hereof (the "APA"), pursuant to which Agent intends (i) to acquire designation rights with respect to Merchant's corporate office and certain of its leased store and distribution center locations (including, without limitation, certain locations subleased to third-party tenants) and (ii) to acquire certain assets of, and certain rights from, and to assume certain liabilities of, Merchant, in each case, as more particularly specified therein;

WHEREAS, pursuant to the APA, Agent and Merchant have acknowledged and agreed that the consideration to be paid by Agent in respect of the transactions contemplated by the APA shall be paid at such times and in such a manner as set forth in the APA and this Agreement;

WHEREAS, Merchant operates retail stores and warehouses in the United States and desires that Agent act as Merchant's exclusive agent for the limited purposes of selling all of the Merchandise (as defined below) located in (i) Merchant's retail store location(s) identified on Exhibit 1A annexed hereto (each, a "Store" and, collectively, the "Stores") by means of a promotional "store closing," "sale on everything," "total liquidation," "total inventory blowout," "everything must go," "going out of business" or similarly themed sale (the "Promotional Store Advertising") and (ii) Merchant's distribution centers located at the locations listed on Exhibit 1B annexed hereto (the "Distribution Centers"), all in accordance with the terms of this Agreement and to the extent permitted by the Sale Guidelines (as defined below) (as further described below, the "Sale"); and

WHEREAS, Merchant and Agent acknowledge and agree that certain of Merchant's retail stores (other than the Stores) are currently undergoing liquidation or store closing sales as of the date hereof (the "Existing Closing Stores") pursuant to the terms of the Consulting Agreement, dated as of September 19, 2025 (as amended by the Amendment No. 1 to Consulting Agreement, dated as of November 5, 2025, the "Consulting Agreement"), between American Signature, Inc. and SB360 Capital Partners, LLC ("SB360"), and such liquidation and/or store closing sales shall not be affected by the transactions contemplated by this Agreement or the terms and conditions contained herein;

WHEREAS, Agent intends to delegate the conduct of the Sale to one or more national inventory liquidation firms, including SB360; provided, however, Agent expressly acknowledges that no such delegation shall be deemed to limit, release or otherwise reduce in any way Agent's obligations to Merchant hereunder;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    <u>Definitions, Exhibits, Interpretation</u>.

1.1    <u>Defined Terms</u>.  Capitalized terms used herein shall have the meanings ascribed to them as defined herein.

1.2    <u>Exhibits</u>.  The exhibits annexed to this Agreement, as listed below, are an integral part of this Agreement:

| | |
|---|---|
| Exhibit 1A | List of Stores |
| Exhibit 1B | Distribution Centers |
| Exhibit 2.1(b) | Sale Order |
| Exhibit 3.1(d) | Merchandise Floor and Ceiling Adjustment |
| Exhibit 3.1(e)(i) | Expected Mix |
| Exhibit 3.1(e)(ii) | Mix Adjustment |
| Exhibit 3.1(f) | Cost Factor Adjustment |
| Exhibit 3.3(a) | Accounts |
| Exhibit 4.1(n) | Occupancy Expense Schedule |
| Exhibit 5.2(b) | On-Order Merchandise Schedule |
| Exhibit 5.3(a) | Cost File |
| Exhibit 6.1 | Lease Expiration Dates |
| Exhibit 8.1(a) | Sale Guidelines |
| Exhibit 11.1(c) | Pre-Existing Liens |
| Exhibit 11.1(q) | Promotional Calendar |
| Exhibit 11.1(u) | Legal Matters |
| Exhibit 11.1(v) | Collective Bargaining Agreements |

1.3    <u>Interpretations</u>.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to a Section, Exhibit, clause or subclause, such reference shall be to a Section, Exhibit, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

2

(c)     The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)     The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)     The use of "or" herein is not intended to be exclusive.

(f)     The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)     Any reference herein to "Dollars" or "$" shall mean United States dollars.

(h)     Unless otherwise qualified, any reference to a business day means any day, other than a Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

(i)     Each of Merchant and Agent agree that the terms of this Agreement and the APA are intended to be mutually consistent and should be interpreted as such.  To the extent, however, of any irresolvable inconsistency between the terms and provisions of the APA and those of this Agreement as to matters which are addressed in this Agreement, the terms and provisions of this Agreement shall govern and control.

Section 2.     Appointment of Agent/Liquidation Sale Laws/Sale Order.

2.1

(a)     Subject to approval by the Bankruptcy Court of this Agreement and entry of the Sale Order, Merchant hereby appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited and exclusive purpose of conducting the Sale and disposing of the Merchandise and the Owned FF&E and certain other assets, all in accordance with the express terms and conditions of this Agreement.

(b)     In connection with the transactions contemplated by this Agreement and subject to Section 2.1(a), Merchant shall seek entry of an order approving this Agreement and the APA and authorizing Merchant and the Agent to conduct the Sale with respect to the Merchandise and to sell the Merchandise, the Owned FF&E and certain other assets in accordance with the terms hereof (the "Sale Order").  The Sale Order shall be substantially in the form annexed hereto as Exhibit 2.1(b) or otherwise in form and substance reasonably satisfactory to Merchant and satisfactory to Agent in its sole discretion.

(c)     Subject to entry of the Sale Order and subject to the terms hereof and the Sale Guidelines, Agent shall be authorized to advertise the Sale at the Stores as a "store

3

closing," "sale on everything," "total liquidation," "total inventory blowout," "everything must go," "going out of business" or similarly themed sale, and the Sale Order shall provide, among other things, that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including all laws and regulations relating to advertising, permitting, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "store closing," "sale on everything," "total liquidation," "total inventory blowout," "everything must go," "going out of business" or similar-themed sales (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines, and the Sale Order.

(d)     Except as otherwise specifically provided in this Agreement, Agent shall have no authority, and shall not represent that it has any authority, to enter into any contract, agreement, or other arrangement or take any other action by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent (which consent Merchant shall have the right to grant or refuse in its sole discretion). At all times during the Sale Term, Merchant will own title to the Merchandise and the Owned FF&E.

Section 3.     Consideration to Merchant and Agent.

3.1     Payments to Merchant.

(a)     As a guaranty of Agent's performance hereunder (including in its capacity as Agent) and as consideration under the APA, in addition to the payment of Expenses in accordance with Sections 4.1 and 4.2, Agent guarantees, subject to adjustment as expressly provided in this Agreement and the APA, that Merchant shall receive the Purchase Price (as defined in the APA) in accordance with the terms of the APA and this Agreement (including, without limitation, Section 3.3 hereof).

(b)     Agent shall be entitled to retain all Proceeds for its sole and exclusive benefit.

(c)     The Purchase Price will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (A) the amount of Gross Rings (as defined below), as adjusted for shrinkage per this Agreement; and (B) subject to and in accordance with Section 5.2(a), the aggregate Cost Value of the On-Order Merchandise and Distribution Center Merchandise that is received at the Stores;.

(d)     The Purchase Price has been fixed based upon the aggregate Cost Value of the Merchandise being between $89,500,000 (the "Merchandise Floor") and $93,500,000.00 (the "Merchandise Ceiling"). To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than the Merchandise Floor or greater than the Merchandise Ceiling, the Purchase Price shall be adjusted in accordance with Exhibit 3.1(d).

(e)     The Purchase Price has also been fixed based upon the mix of the Merchandise included in the Sale being consistent with the mix set forth on Exhibit 3.1(e)(i) (the

4

"Expected Mix"). To the extent that the mix of Merchandise included in the Sale is not consistent with the Expected Mix, the Purchase Price shall be adjusted in accordance with Exhibit 3.1(e)(ii).

(f)     The Purchase Price has also been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale as a percentage of the aggregate Retail Price of the Merchandise included in the Sale (the "Cost Factor") being 40.25% (the "Cost Factor Ceiling"). To the extent that the Cost Factor is greater than the Cost Factor Ceiling, the Purchase Price shall be adjusted in accordance with Exhibit 3.1(f).

(g)     The Purchase Price has also been fixed based upon the aggregate amount of Store-Level Cash (as defined in the APA) being $93,000.00 (the "Expected Cash Amount"). To the extent that the aggregate amount of Store-Level Cash acquired pursuant to the APA is greater than (or less than) the Expected Cash Amount, the Purchase Price shall be increased (or decreased) dollar-for-dollar by the amount of such difference.

(h)     (i) On the Sale Commencement Date, the Purchase Price shall be initially adjusted as contemplated by Sections 3.1(d) through 3.1(g) based upon an estimate derived from the Merchant's books and records. (ii) In connection with the Final Reconciliation, the Purchase Price shall be finally adjusted based upon the Final Inventory Report and the actual amount of Store-Level Cash in the Stores and the Distribution Centers.

(i)     The adjustments to the Purchase Price contemplated by Sections 3.1(d) through 3.1(g) shall be independent and cumulative. Notwithstanding anything to the contrary set forth herein, the cash component of the Purchase Price shall not be reduced, pursuant to the operation of the adjustments set forth in Section 3.1(d) through 3.1(g) in connection with the Final Reconciliation pursuant to Section 3.1(h)(ii), to an amount less than the amount of the Initial Purchase Price Payment.

(j)     Agent shall use Merchant's existing point-of-sale system for recording all sales and returns in the Stores.

3.2     Compensation to Agent. Subject to entry of the Sale Order:

(a)     Subject to the terms of this Agreement, Agent shall receive, as compensation for its services rendered to Merchant, all Proceeds and any other amounts payable to it pursuant to the terms hereof. Provided that no Event of Default has occurred and continues to exist on the part of Agent, all Merchandise remaining at the conclusion of the Sale ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims, interests and encumbrances of any kind or nature. Agent and its affiliates shall be authorized to sell or otherwise dispose (at its sole cost and expense) of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo. Agent shall also be permitted, at no cost to Agent, to abandon all Remaining Merchandise at the Stores and/or the Distribution Centers.

5

3.3     Time of Payments.

(a)     Payment of Purchase Price. Subject to satisfaction of the conditions precedent set forth in Section 10, not later than the Sale Commencement Date (such date, the "Payment Date"), Agent shall pay to Merchant an aggregate amount equal to the excess of (i) ninety percent (90%) of the Purchase Price (as adjusted on the Sale Commencement Date pursuant to Section 3.1(h)(i)) over (ii) the Assumed Liability Amount (as defined in the APA) (such excess, the "Initial Purchase Price Payment"). The Initial Purchase Price Payment shall be paid by wire transfer of immediately available funds to such account(s) as are designated on Exhibit 3.3(a) which shall be designated by Merchant no later than one (1) business day prior to the Sale Commencement Date. The unpaid balance of the Purchase Price (less the Assumed Liability Amount) shall be paid by Agent to Merchant, by wire transfer of immediately available funds to such account(s) as are designated on Exhibit 3.3(a) on the fifth business day following the issuance of the Final Inventory Report. In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise, then any such dispute shall be resolved in the manner and at the times set forth in Section 3.5; provided, however, that, notwithstanding any such dispute, Agent shall pay the undisputed portion of such balance to Merchant on the fifth business day following the issuance of the Final Inventory Report.

(b)     All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later than 2:00 p.m. (Eastern Time) on the date that such payment is due so long as all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

(c)     Merchant and Agent agree that (A) if at any time during the Sale Term, Merchant holds any undisputed amounts due to Agent, Merchant may, in its discretion, after two (2) business days' notice to such Agent, offset such Proceeds (or other such amounts) being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent to Merchant hereunder, and (B) if at any time during the Sale Term, Agent holds any undisputed amounts due to Merchant under this Agreement, Agent may, in its discretion, after two (2) business days' notice to Merchant, offset such amounts being held by such Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant to Agent hereunder.

3.4     Inventory Reconciliation. As soon as practicable, but in any event no later than thirty (30) days after the Sale Termination Date at all Stores and Distribution Centers, (i) Second Avenue Capital Partners LLC ("SACP"), as administrative agent and collateral agent (the "ABL Agent") for the lenders under that certain Credit Agreement, dated as of December 3, 2024 (as amended, supplemented or otherwise modified from time to time, the "ABL Credit Agreement"), (ii) SACP, as administrative agent and collateral agent (the "DIP Agent") for the lenders under Merchant's anticipated post-petition debtor-in-possession financing (the "DIP Financing"), (iii) Merchant and (iv) Agent shall review, reconcile and verify the final report of the aggregate Cost Value of the Merchandise (the "Final Inventory Report").

3.5    <u>Reconciliation Disputes</u>.  In the event that there is any dispute that Merchant and Agent are unable to resolve with respect to (i) this Agreement, (ii) the determination of the aggregate Cost Value of the Merchandise as reflected in the Final Inventory Report and/or (iii) the Final Reconciliation, such dispute shall be promptly (and in no event later than the third (3rd) business day following the request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.

Section 4.    <u>Expenses of the Sale</u>.

4.1    <u>Expenses</u>.  Agent shall be unconditionally responsible for all documented Expenses, which documented expenses shall be paid by Agent in accordance with <u>Section 4.2</u>. Agent shall be obligated to prefund an amount equal to thirty (30) days per diem Occupancy Expenses consisting of base rent, CAM, real estate taxes, and other expenses required by the applicable lease to be paid to the applicable landlord as a part of monthly rent payments, only in accordance with <u>Section 4.1(n)</u> on the Payment Date, which amount Merchant (as well as the ABL Agent and the DIP Agent on behalf of the creditors (including, without limitation, the DIP Agent and the ABL Agent, as applicable) under the DIP Financing or the ABL Credit Agreement (collectively, the "<u>Merchant Secured Creditors</u>")), agrees shall be applied to and credited against the first per diem Occupancy Expenses due by Agent.  As used herein, "<u>Expenses</u>" shall mean the operating expenses or expenses related to the Sale which arise or are incurred during the Sale Term and are attributable to the Sale limited to those set forth below:

(a)    actual payroll and commissions, if applicable, for all Store-level Retained Employees used in conducting the Sale for actual days/hours worked during the applicable Sale Term as well as payroll and the actual costs and expenses, to the extent retained by Agent for the Sale, for any of Merchant's former employees or temporary labor requested or obtained by Agent for purposes of the Sale;

(b)    actual amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, and vacation benefits that accrue during the applicable Sale Term, but excluding Excluded Benefits) for Retained Employees in the Stores used in the Sale, in an amount not to exceed, for any such Retained Employee, twenty-six and seven-tenths percent (26.7%) of the base payroll for such Retained Employee (the "<u>Benefits Cap</u>");

(c)    [intentionally omitted;]

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4;

(e)    Agent's advertising and promotional costs relating to the Sale, including, but not limited, direct mailings, email blasts, television, ROP and other advertising, and all Store interior and exterior signage and banners and sign walkers relating to the Sale;

(f)    credit and bank card fees, chargebacks and discounts with respect to Merchandise and Additional Agent Goods sold in the Sale;

7

(g)    bank service charges (for Store and corporate accounts and Agency Accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(h)    actual costs for additional Supplies requested by Agent and for use at the Stores during the Sale;

(i)    all fees and charges required for Agent to comply with Applicable General Laws in connection with the Sale;

(j)    Store cash theft and other store cash shortfalls in the registers;

(k)    actual costs relating to the processing, transfer and consolidation of Merchandise between and among the Stores, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating any such transfer of Merchandise among the Stores;

(l)    on-site supervision of the Stores and the Distribution Centers, including all wages, benefits, fees, deferred compensation, taxes, third-party payroll costs and expenses, and bonuses of Agent's field personnel, travel to, from and between the Stores, Merchant's corporate offices, and/or the Distribution Centers and all incidental out-of-pocket and expenses relating thereto (including corporate travel expenses to monitor and manage the Sale);

(m)    postage, courier, and overnight mail charges to and from or among the Stores, the Distribution Centers and central office to the extent relating to the Sale;

(n)    actual Occupancy Expenses for the Stores on a per Store, per category and per diem basis in an amount up to the per Store per category per diem amount set forth on Exhibit 4.1(n) annexed hereto during the applicable Sale Term;

(o)    Central Service Expenses equal to $250,000 per week for the Sale Term (prorated for partial weeks), which shall be payable to Merchant;

(p)    Agent's out-of-pocket costs and expenses, including legal fees and expenses, incurred in connection with the review of data, preparation, negotiation, and execution of this Agreement, the APA, the Sale Order and any ancillary documents and the Sale, and including Agent's actual cost of capital and insurance costs;

(q)    third-party payroll processing fees to the extent incurred in connection with the Retained Employees;

(r)    (i) Distribution Center Expenses in an amount up to the amount set forth on Exhibit 4.1(r) per week (prorated for partial weeks) for each Distribution Center (the "DC Cap") so long as Distribution Center Merchandise is being processed at, and transferred from, such Distribution Center (but not, for the avoidance of doubt, if Agent is solely selling Owned FF&E from such Distribution Center) (the "Operating Period"); provided that any portion of the DC Cap that is not expended with respect to a Distribution Center in any week may be applied to following weeks during the Operating Period at such Distribution Center on a cumulative basis, and (ii) Distribution Center Expenses in an amount up to the amount set forth on Exhibit 4.1(r) per week

8

(prorated for partial weeks) for each Distribution Center from and after the end of the Operating Period at such Distribution Center until the Vacate Date from such Distribution Center, in the case of each of clauses (i) and (ii), payable to Merchant in respect of the cost of Merchant providing Distribution Center Services;

(s)    expenses otherwise payable by Merchant to (i) Pure Protection (as defined below) with respect to the sale of warranty and protection programs during the Sale and (ii) Synchrony (as defined below) with respect to the provision of customer financing with respect to Merchandise sold during the Sale (other than any reserve, but, for the avoidance of doubt, such exclusion of the reserve shall apply only to the extent the imposition of such reserve is attributable to Merchant's conduct or activities prior to the Sale Commencement Date, rather than to Synchrony's underwriting of its financing activities and risk during the Sale itself);

(t)    expenses related to the sale of the Owned FF&E, provided that there should be no duplication of Store related expenses; and

(u)    the actual costs and expenses of Agent providing such additional services as the Agent deems appropriate for the Sale.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in Section 4.1 is also included within the categories of expenses described in Section 4.1(n), Section 4.1(o) or Section 4.1(r), then Section 4.1(n), Section 4.1(o) or Section 4.1(r) shall control, and such Expenses shall not be double counted.  There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category. Further, notwithstanding anything to the contrary herein, in no event shall Merchant be responsible for any incremental costs relating to the acquisition or sale or other disposition of Additional Agent Goods not expressly covered by the provisions of this Section 4.1.

As used herein, the following terms have the following respective meanings:

(i)    "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including use of and access to: central administrative personnel to process and perform sales, audit, banking and other normal ordinary course administrative services customarily provided to or for the benefit of operating the Distribution Centers and/or Stores, reasonably sized offices at Merchant's central administrative office facility to effect the Sale, MIS services, payroll processing, cash reconciliation and accounting services, inventory processing and handling, data processing and reporting, email preparation and distribution, information technology and e-commerce site updates and maintenance.

(ii)    "Distribution Center Expenses" means the actual costs and expenses, including use and occupancy expenses and Distribution Center employee payroll and other obligations, of the operations of the Distribution Centers, and the actual costs and expenses (including inbound or outbound delivery and freight) related to the processing, transfer, and consolidation of Merchandise, Additional Agent Goods, Merchant Consignment Goods, and supplies in the Distribution Centers and from the Distribution Centers to the Stores (and the provision of such services shall be referred to as collectively, the "Distribution Center Services").

9

(iii)    "Excluded Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iv)    "Occupancy Expenses" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, common-area maintenance, storage costs, real estate and use taxes, commercial rent tax, merchants' association dues and expenses, local, leased line, satellite broadband connections, local and long-distance telecom/telephone charges, charges for internet connections and other telecommunications services, security in the Stores (to the extent customarily provided in the Stores), including security systems, courier and guard service, building alarm service and alarm service maintenance, housekeeping and cleaning expenses, pest control services, snow and trash removal expenses, a pro rata portion of property insurance attributable to the Merchandise and the Owned FF&E subject to the Sale and a pro rata portion of comprehensive public liability insurance attributable to the Stores, personal property leases (including point of sale equipment), cash register maintenance, building maintenance, and rental for furniture, fixtures and equipment and all other categories of expenses at the Stores as set forth on Exhibit 4.1(n) annexed hereto, all of the foregoing as categorized and reflected on Exhibit 4.1(n) annexed hereto. Agent shall have no obligation to pay any rent or other occupancy expenses other than as expressly set forth on Exhibit 4.1(n).

"Expenses" shall not include: (i) Excluded Benefits; (ii) Central Service Expenses, except as provided in Section 4.1(o); (iii) any and all costs and expenses related to the corporate offices; (iv) Distribution Center Expenses in excess of the amount set forth in Section 4.1(r); (v) Occupancy Expenses, except as provided in Section 4.1(n); and (vi) any other costs, expenses or liabilities related to the Sale and not expressly set forth above, which shall be paid solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and the Sale Order. Notwithstanding anything to the contrary herein, to the extent that any Expense listed in Section 4.1 is also an Occupancy Expense, then Section 4.1(n) and Exhibit 4.1(n) shall control and such Expense shall not be double counted. There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category. Notwithstanding anything herein to the contrary, except as expressly set forth in the APA in connection with the designation rights or as expressly provided in the Full Month Rule, Agent shall not have any obligation to pay any Expenses (including, without limitation, Occupancy Expenses and Distribution Center Expenses) with respect to any Store or Distribution Center incurred after the Sale Termination Date at such Store or Distribution Center (which shall be the applicable Vacate Date for such Store or Distribution Center).

4.2    Payment of Expenses. Effective from and after the Sale Commencement Date:

(a)    Agent shall be responsible for the payment of all Expenses, whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Purchase Price. All Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter

reimbursed by Agent as provided for herein, immediately following the weekly sale reconciliation by Merchant and Agent pursuant to Section 8.6(a);

provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available. Agent and/or Merchant may review or audit the Expenses at any time.

Section 5.    Inventory Valuation; Merchandise.

5.1    [Intentionally Omitted.]

5.2    Merchandise Subject to This Agreement.

(a)    For purposes of this Agreement, "Merchandise" shall mean (A) all finished goods inventory located at the Stores as of the Sale Commencement Date; (B) Distribution Center Merchandise received at a Store during the applicable Sale Term,   (C) On-Order Merchandise received at the Stores on or before the date that is sixty (60) days after the Sale Commencement Date (such date, the "Receipt Deadline"); provided that On-Order Merchandise received in the Stores on or after the date that is forty-five (45) days after the Sale Commencement Date and on or before the Receipt Deadline shall be included in the Sale as Merchandise at the Cost Value and Retail Price of each such good multiplied by the inverse of the then prevailing Sale discount for each such good at the applicable Store as of the date of receipt in such Store; provided further that the aggregate Cost Value of On-Order Merchandise included in the Sale shall not exceed $5,000,000.00 (the "On-Order Cap") (D) Display Merchandise (other than Excluded Defective Merchandise); (E) Merchandise subject to Gross Rings; and (F) Defective Merchandise (other than Excluded Defective Merchandise).   Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to customers, sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, vehicles and other personal property (other than inventory) at the Stores, Distribution Center, and/or corporate offices (collectively, "FF&E") or improvements to real property; provided that, Agent shall be permitted to sell Owned FF&E as set forth in Section 15.9; (4) Excluded Defective Merchandise; (5) Merchant Consignment Goods; (6) Additional Agent Goods; (7) On-Order Merchandise received at any Store after the Receipt Deadline; (8) On-Order Merchandise in excess of the On-Order Cap; (9) non-merchandise and service departments referenced in the Cost File; (10) Fulfillment Merchandise; and (11) Broken Set Inventory.

(b)    As used in this Agreement, the following terms have the respective meanings set forth below:

"Broken Set Inventory" means (i) those items of inventory that are customarily sold as a set where one or more pieces of the set is not included in Merchandise or is not in the same location as the other pieces of the set; or (ii) those items of inventory where multiple pieces make up a single unit (i.e., tabletop and 4 legs) where one or more of the pieces is not included in Merchandise or is not in the same location as the other pieces of the unit. By way of example, Broken Set

11

Inventory shall include any table tops without bases, table bases without tops (other than stand-alone table bases designed for interchangeable tops), leafs to tables without corresponding tables, hutch tops without matching bases, foot boards without matching headboards, bed rails without beds, odd glass shelves and glass panels, glass tops without bases, upholstered furniture missing seat cushions, dining chairs without seat cushions or back panels, chairs missing legs, case furniture missing drawers, tops or sides, lamp shades without lamps, upholstered sectional furniture pieces or sections without matching components, miscellaneous parts bed slats, hooks, nuts, bolts, glass repair parts, shelves, drawer fronts, hardware, cushion cores, fabric panels, foam, dacron wrap, odd legs, wood panels, lamp parts, harps, and finials.

"Defective Merchandise" means any item of inventory which is not new, finished, first-quality, saleable goods sold in the normal or ordinary course. Examples of Defective Merchandise include goods that are used, damaged, defective, scratched, soiled, dented, shopworn, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mismated, near mates, parts, items typically sold as a set which are incomplete, or gift with purchase items. Display Merchandise shall not per se be deemed to be Defective Merchandise.

"Display Merchandise" means those items of inventory used in the ordinary course of business as displays or floor models, including inventory that has been removed from its original packaging for the purpose of putting such item on display, which goods are not otherwise damaged or defective. For the avoidance of doubt, Merchandise created for display and not saleable in the ordinary course of business shall not constitute Display Merchandise.

"Distribution Center Merchandise" means, those items of inventory identified by SKU on the Cost File, that were located in Merchant's Distribution Centers and, which goods, to the extent not delivered to the Stores prior to the Sale Commencement Date, shall be delivered by Merchant to the Stores in accordance with the Allocation Schedule.

"Excluded Defective Merchandise" means those items of (a) Defective Merchandise that are not saleable in the ordinary course because they are so damaged or defective that such inventory cannot reasonably be used for its  intended purpose, (b) Defective Merchandise or Display Merchandise for which Merchant and Agent cannot mutually agree upon the Cost Value, (c) inventory of any kind or nature, wherever located, that was, is, becomes during the Sale Term or reasonably could become subject to a claim of trademark (or other intellectual property) infringement by any third party, (d) used furniture, (e) returned bedding, (f) furniture or bedding that does not meet required governmental fire and safety codes for legal sale in given markets, (f) display racks, props and display-prop models (*i.e.*, sales aides such as bedding or furniture with cut-outs for internal display), (g) SKU's that were utilized as FF&E (*i.e.*, desks, chairs, tables, etc., that were taken from inventory and used in daily operations at the Stores and Distribution Centers), (h) fabric swatches and (i) any items identified as belonging to an "unsellable department" (including, without limitation, supplies, leather, RTA, special cost and traffic) in the Cost File.

"Fulfillment Merchandise" means those items of merchandise located in the Stores or the Distribution Centers that have been fully or partially earmarked or reserved from available merchandise by Merchant as of the Sale Commencement Date for fulfillment of Pre-Sale Orders (as defined below) made after the Petition Date.

12

"On-Order Merchandise" means items of inventory that were ordered by Merchant in the ordinary course of business as identified by SKU on Exhibit 5.2(b) which shall be mutually agreed by the parties, acting reasonably, which inventory was not received in the Stores or Distribution Centers as of the Sale Commencement Date, but which may be received in the Stores on or prior to the Receipt Deadline and shall be delivered to the Stores in accordance with Allocation Schedule.

5.3    Valuation.

(a)    For purposes of this Agreement, "Cost Value" shall mean with respect to each item of Merchandise in a SKU, the lower of (i) the lowest unit cost for each item of Merchandise in each such SKU as reflected in the Cost File and (ii) the Retail Price. "Cost File" means the files set forth on Exhibit 5.3(a), together with all updated files received on or prior to the Sale Commencement Date. The Merchant represents and warrants that the Cost File does not account for any advertising co-op allowances or discounts associated with expedited payment terms offered by any vendor, and, further, the Cost Value of any item of Merchandise shall not be adjusted for any such amounts. For purposes of this Agreement, "Retail Price" shall mean, with respect to each item of Merchandise, the lowest ticketed, hardmarked, shelf, hang-tag, stickered, file, SKU or PLU/scan; provided, however, that the Retail Price shall be determined with respect to the lowest price for each such item at a specific location, and no adjustment to the Retail Price shall be made with respect to different Retail Prices in respect of such items located at different locations; and provided, further, that the foregoing excludes temporary "point of sale" prices and prices offered during the liquidation sales at the Existing Closing Stores.

(b)    Merchant and Agent shall determine the applicable Cost Value of Display Merchandise and Defective Merchandise by mutual agreement; if Merchant and Agent are unable to so agree, or if an item is determined to be Excluded Defective Merchandise, such goods shall be excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder, including, without limitation, calculation of the Purchase Price and Proceeds.

(c)    Excluded Defective Merchandise located in the Stores (including Excluded Defective Merchandise constituting Distribution Center Merchandise or On-Order Merchandise delivered to the Stores) shall be identified by Agent (in consultation with Merchant) and recorded in a detailed log, to be maintained by Agent in a form reasonably acceptable to Merchant. Agent shall provide Merchant with a copy of any such log on a weekly basis during the Sale.

5.4    Excluded Goods. Subject to the terms of the APA, Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder. If Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale as "Merchant Consignment Goods" at prices mutually and through sales channels agreed upon by Merchant and Agent. Agent shall retain twenty percent (20%) of the sale price for all sales of Merchant Consignment Goods (less applicable Sales Taxes) (the "Consignment Fee"), and Merchant shall receive eighty percent (80%) of the receipts in respect of such sales (less applicable Sales Taxes). Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly sale reconciliation by Merchant and Agent pursuant to Section 8.6. If Merchant does not elect to have Agent sell goods not included

13

as Merchandise, then all such items will be removed by Merchant from the Stores at its expense as soon as practicable after the Sale Commencement Date. Except as expressly provided in this Section 5.4, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise. For the avoidance of doubt, no amounts received by Merchant or the Merchant Secured Creditors in respect of Merchant Consignment Goods hereunder shall be credited towards the Purchase Price.

5.5    Distribution Center Allocation. From and after the date hereof, Merchant shall reasonably cooperate with Agent to allocate inventory in the Distribution Centers to the Stores (and deliver it thereto). Within twenty-one (21) days following the Sale Commencement Date, Agent (in consultation with Merchant) shall deliver to Merchant a schedule for allocating and designating the shipment of the Distribution Center Merchandise and On-Order Merchandise to the Stores following the Sale Commencement Date so as to be received at the Stores by the Receipt Deadline, taking into account the Distribution Center's maximum weekly shipping capacity (the "Allocation Schedule"). To the extent Merchandise is not pre-ticketed prior to its receipt in the Distribution Centers, Merchant shall be responsible for ticketing Distribution Center Merchandise and/or On-Order Merchandise before the same is shipped to the Stores after the Sale Commencement Date.

Section 6.    Sale Term.

6.1    Term. (a) Subject to satisfaction of the conditions precedent set forth in Section 10, the Sale shall commence at each Store on the first business day following the entry of the Sale Order, but, subject to the entry of the Sale Order, in no event later than January 9, 2026 (the "Sale Commencement Date"). Subject to the prior expiration of the term of any Store or Distribution Center lease (as reflected on Exhibit 6.1 annexed hereto), Agent shall complete the Sale at each Store and vacate each Store and Distribution Center in accordance with the terms of Section 6.2 by no later than April 30, 2026, unless the Sale is extended by mutual written agreement of Agent and Merchant (such date, the "Sale Termination Date"; the period from the Sale Commencement Date to the Sale Termination Date as to any Store or Distribution Center being the "Sale Term" for such Sale or Distribution Center); provided that, to the extent that the lease with respect to any Store or Distribution Center is assumed and assigned in accordance with the terms of the APA, the Sale Term with respect to such Store or Distribution Center shall terminate no later than the date of such assignment, Merchant shall have no further obligations hereunder with respect to such Store or Distribution Center and the applicable assignee may waive all obligations of Agent arising under this provision without the consent of any other party (including Merchant). Notwithstanding the above and without impacting Agent's designation rights under the APA, Agent may, in its discretion, accelerate the Sale Termination Date and the end of the Sale Term at any Store or Distribution Center upon not less than five (5) business days' prior written notice (a "Vacate Notice") to Merchant, the end of such notice period being the "Vacate Date" for the applicable Store or Distribution Center. In the event Agent fails to provide Merchant with such timely notice, Agent shall be liable for and pay the actual amounts payable to landlords for the days by which notice of a Store or Distribution Center closing was less than five (5) business days.

6.2    Vacating the Stores and Distribution Centers. At the conclusion of the Sale, Agent agrees to leave the Stores and Distribution Centers in "broom clean" condition, ordinary wear and tear excepted, except for Remaining Merchandise, unsold items of FF&E and remaining Supplies,

14

and, except to the extent the designation rights period under the APA with respect a Store or Distribution Center will continue beyond the applicable Sale Termination Date, use commercially reasonable efforts to otherwise reasonably cooperate with Merchant in the surrender of possession of the applicable Store or Distribution Center to the relevant landlord (including the return of keys, to the extent in the possession of Agent, to the Landlord) and Merchant's rejection of the applicable lease by no later than the applicable Sale Termination Date for the applicable Store or Distribution Center; provided that, to the extent that the lease with respect to any Store or Distribution Center is assumed and assigned in accordance with the terms of the APA, Merchant shall have no further obligations hereunder with respect to such Store or Distribution Center and the applicable assignee may waive this requirement without the consent of any other party (including Merchant). Except to the extent the designation rights period under the APA with respect a Store or Distribution Center will continue beyond the applicable Sale Termination Date, Agent shall vacate each Store and Distribution Center on or before the applicable Sale Termination Date, as provided for herein, at which time Agent shall surrender and deliver the Store and Distribution Center premises and, to the extent in the possession of Agent, Store and Distribution Center keys to Merchant and use commercially reasonable efforts to otherwise reasonably cooperate with Merchant in the surrender of possession of the applicable Store or Distribution Center to facilitate Merchant's rejection of the applicable lease; provided that, to the extent that the lease with respect to any Store or Distribution Center is assumed and assigned in accordance with the terms of the APA, the applicable assignee may waive this requirement without the consent of any other party (including Merchant). Agent's obligations to pay all Expenses, including Occupancy Expenses, for any Store or Distribution Center shall continue only until the applicable Vacate Date for such Store or Distribution Center; provided, however, that, with respect to Occupancy Expenses, notwithstanding anything to the contrary set forth herein, if the Vacate Date with respect to any Store occurs during a calendar month and, as a result, Merchant is required to pay Occupancy Expenses to the applicable landlord for the entire calendar month (*i.e.*, "in for a day, in for a month"), the Agent's obligations to pay Occupancy Expenses in accordance with Section 4.1(n) for such Store shall continue until the last day of such calendar month (this proviso, the "Full Month Rule"). All assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, etc.) shall be returned by Agent to Merchant at the end of the Sale Term to the extent the same have not been consumed in the conduct of the Sale (e.g., Supplies) or sold in accordance with this Agreement or this Agreement provides for alternative treatment thereof. Agent shall be responsible for all Occupancy Expenses (irrespective of any per diem cap on Occupancy Expenses) for a Store or Distribution Center for which Merchant is or becomes obligated resulting from Agent's failure to vacate such Store or Distribution Center in a timely manner. Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent, or licensee thereof) to any Store or Distribution Center during the Sale Term, ordinary wear and tear excepted; provided that, to the extent that the lease with respect to any Store or Distribution Center is assumed and assigned in accordance with the terms of the APA, the applicable assignee may waive this requirement without the consent of any other party (including Merchant).

6.3   Gross Rings. Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing Sale discounts ("Gross Rings"), and (ii) cash reports of sales within such Store. Agent and Merchant shall keep a strict count of register receipts and reports to determine the actual Cost Value and Retail Price of the Merchandise sold by SKU. All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice. Any Merchandise included in the

15

Sale using the Gross Rings method shall be included in Merchandise using the aggregate Cost Value of the Merchandise (without taking into account any of Agent's point of sale discounts or point of sale markdowns) sold using the Gross Rings method plus a one quarter of one percent (0.25%) shrink adjustment.

Section 7.    Sale Proceeds.

7.1    Proceeds.  For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise and Owned FF&E made under this Agreement (inclusive of service and shipping income), exclusive of Sales Taxes; (b) all proceeds of Merchant's insurance for loss or damage to Merchandise or Owned FF&E or loss of cash arising from events occurring during the Sale Term; (c) proceeds received by Agent from the disposition of Remaining Merchandise; (d) proceeds from the sale of Additional Agent Goods; (e) the Consignment Fee; (f) proceeds of the sale during the Sale of any warranties or protection programs or any services, including delivery and repairs; and (g) any other amounts payable to Agent in accordance with the terms hereof.  For the avoidance of doubt, "Proceeds" shall not include (i) proceeds from sales at the Stores prior to the Sale Commencement Date, (ii) proceeds from the sale of Merchant Consignment Goods pursuant to Section 5.4 (other than the Consignment Fee), (iii) proceeds from the sale of Fulfillment Merchandise or (iv) any amounts paid by Agent in respect of the Purchase Price or Expenses.

7.2    Deposit of Proceeds.

(a)    After payment of the Initial Purchase Price Payment, unless and until Agent establishes its own accounts (including credit card accounts and systems), dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts") (other than Merchant's Designated Deposit Accounts), all Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, and owned and in the name of, Merchant, which accounts shall be designated solely for the deposit of Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts").

(b)    To the extent Agent elects to use Merchant's Designated Deposit Accounts as the Agency Accounts, on each business day following the Payment Date, Merchant shall promptly pay to Agent by wire transfer of immediately available funds all funds deposited in the Designated Deposit Accounts constituting Proceeds (including Proceeds from credit card sales but expressly excluding any proceeds of Merchant's inventory sold prior to the Sale Commencement Date that may be deposited therein, regardless of whether such proceeds are collected by Merchant after the Sale Commencement Date), together with all other amounts due to Agent hereunder (including proceeds from Additional Agent Goods), deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Merchant; provided, however, that, in the event (i) Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, and (ii) such accounts have amounts deposited therein by Merchant that do not constitute Proceeds and/or other amounts payable to Agent under this Agreement, then Merchant and Agent shall cooperate with

16

each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation of the amounts therein subject to remittance to Agent hereunder.

(c)    To the extent Agent elects to establish Agency Accounts, Merchant shall promptly, upon Agent's reasonable request, execute and deliver all documents reasonably required to open and maintain the Agency Accounts; provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts in which case Merchant's Designated Deposit Accounts shall be deemed to be Agency Accounts. Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and other amounts contemplated by this Agreement and the distribution of amounts payable hereunder. Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

7.3    Credit Card Proceeds. Agent shall have the right to either establish its own credit card facilities or to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the sale of Merchandise, Merchant Consignment Goods, the Additional Agent Goods, if any, Owned FF&E and other goods and services included in, or sold in connection with, the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request following the Payment Date and the payment of all amounts then due to Merchant by Agent, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

7.4    Proceeds Held "In Trust". If, notwithstanding the provisions of Sections 7.2 and 7.3, Merchant or the Merchant Secured Creditors receives or otherwise has dominion over or control of any Proceeds or other amounts due to Agent, Merchant or the Merchant Secured Creditors, as applicable, shall be deemed to hold such Proceeds and other amounts "in trust" for Agent and shall not commingle Proceeds or other amounts due to Agent with any of Merchant's or the Merchant Secured Creditors' other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.

17

Section 8.    Conduct of the Sale. From and after the entry of the Sale Order:

8.1    Rights of Agent. Subject to the provisions of this Agreement, the Sale Guidelines and the Sale Order, Agent shall be permitted to conduct the Sale as a "store closing," "sale on everything," "total liquidation," "total inventory blowout," "everything must go," "going out of business" or similarly themed sale, throughout the Sale Term. Agent shall conduct the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and, except as modified by the Sale Order, all governing laws and applicable agreements to which Merchant is a party. Agent shall conduct the Sale in accordance with the Sale Order and the sale guidelines attached hereto as Exhibit 8.1(a) which shall be mutually agreed by the parties, acting reasonably (the "Sale Guidelines"). In addition to any other rights granted to Agent hereunder in conducting the Sale, but subject to any applicable agreements to which Merchant is a party except as modified by the Sale Order, as applicable, Agent, in the exercise of its reasonable discretion, shall have and is hereby granted the right during the Sale Term:

(a)    to establish Sale prices for the sale of all Merchandise, Owned FF&E, Additional Agent Goods, warranties, protection programs and services, including delivery and repairs, and Store and Distribution Center hours which are consistent with the terms of applicable leases or other occupancy agreements and local laws or regulations, including Sunday closing laws.

(b)    except to the extent such intellectual property is acquired by Agent pursuant to the APA, to use, make, sell, offer for sale, import, reproduce, prepare derivative works of, distribute, perform, display and otherwise exploit without charge (except as otherwise expressly included as an Expense) during the Sale Term all FF&E, trademarks, intellectual property trade names, logos, customer lists, mailing lists, email lists and websites (in each case, whether owned or licensed by Merchant) relating to and used in connection with the operation of Merchant's business (provided, however, that Agent shall use commercially reasonable efforts to keep any such confidential information therein confidential and shall not rent, sell or otherwise share it with any third party except in the exercise of Agent's rights hereunder and that such access shall be provided solely through Merchant's outside advertisement services, and Agent shall not have direct access to any personally identifiable information contained therein), computer hardware and software, social networking and social media sites and accounts, existing supplies located at the Stores or Distribution Centers, intangible assets (including Merchant's name, logo and tax identification numbers), Store or Distribution Centers keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses (except as modified by the Sale Order); provided further that, subject to the terms and conditions of the APA and the Sale Order with respect to such intellectual property and information, such restrictions shall not apply to Agent from and after the transfer of ownership of such intellectual property and information to Agent in accordance with the terms of the APA and the Sale Order;

(c)    subject to Agent's payment (if applicable) of Expenses in accordance with Section 4.1(o), so long as such access does not unreasonably disrupt the business operations of Merchant, to use Merchant's central office facilities, central administrative services

18

and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant in house, at no additional cost to Agent; provided, however, that, in the event that Agent expressly requests Merchant to provide services other than those normally provided to the Stores and Distribution Centers and relating to the sale of merchandise by Merchant and expressly contemplated by this Agreement, Agent shall be responsible for the actual incremental cost of such services as an Expense;.

(d)     except as otherwise agreed by Agent, to establish and implement advertising, signage (including exterior banners and signs and sign walkers) and promotional programs at the Stores consistent with the a "store closing," "sale on everything," "total liquidation," "total inventory blowout," "everything must go," "going out of business" or similarly themed sale described herein, in accordance with and as otherwise provided and permitted in the Sale Guidelines and the Sale Order,  as and where applicable (including by means of media advertising, A-frame and similar interior and exterior signs and banners, use of sign walkers and similar signage);

(e)     to transfer Merchandise between and among the Stores, and, solely in accordance with the Allocation Schedule, between the Distribution Centers and the Stores;

(f)     to supplement (at Agent's sole cost and expense) the Merchandise at the Stores with Additional Agent Goods in accordance with Section 8.9 hereof; and

(g)     subject to entry of the Sale Order, to conduct the Sale in accordance with the provisions of the Sale Guidelines and Sale Order.

8.2     Terms of Sales to Customers.

(a)     Subject to Agent's compliance with applicable law (as determined with reference to the Sale Order and the Sale Guidelines), all sales of Merchandise will be "final sales" and "as is," and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.   All sales will be made only for cash, nationally recognized bank credit cards and, in Agent's discretion, personal checks or with proceeds of the Synchrony, if applicable, and/or Progressive consumer financing programs, provided, however, if Agent determines to accept personal checks, Agent (and not Merchant) shall bear the risk of nonpayment or loss with respect thereto. Agent shall not accept or honor any coupons issued by Merchant or Merchant's competitors; provided that Agent may elect in its sole discretion to accept any such coupons at the Stores so long as Merchant shall not have any obligation to reimburse Agent in respect thereof or to account for the use thereof; and provided further that in no event shall Agent's acceptance of any such coupons have an effect on the definition of Retail Price or be accounted for in determining the Retail Price of any item of Merchandise included in the Sale. Agent shall post signs in reasonable locations in the Stores indicating that coupons shall not be honored and stating that all sales are final; provided that Agent shall not be required to post such signs if it elects to accept such coupons. Agent shall clearly mark all tickets and receipts for the Merchandise sold at the Stores during the Sale Term, so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date.

(b)    <u>Gift Certificates and Other Programs</u>.  Agent shall not have any obligation to accept or honor any Merchant or third party gift certificates, gift cards, merchandise credits, customer rewards programs, rights to exchange, other promotional programs or merchandise guarantees or warranties issued by Merchant or any third party.  Notwithstanding anything to the contrary, neither Merchant nor Agent shall sell or otherwise issue any Merchant or third party gift certificates, gift cards or merchandise credits, customer rewards programs, rights to exchange, other promotional programs or, except as otherwise expressly set forth in <u>Section 8.11</u> hereof, any merchandise guarantees or warranties.

8.3    <u>Sales Taxes</u>.

(a)    During the Sale Term, all sales, excise, gross receipts, transfer and other taxes attributable to sales of Merchandise and Additional Agent Goods, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "<u>Sales Taxes</u>") shall be added to the sales price of Merchandise and Additional Agent Goods and collected by Agent, on Merchant's behalf, at the time of sale. All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "<u>Sales Taxes Account</u>"), as to which account Merchant shall have payment authority; <u>provided</u>, that, to the extent the Merchandise are sold on a wholesale basis, Agent shall complete all applicable forms, including resale certificates, and provide all completed forms to Merchant in connection with the Final Reconciliation.  Provided that Agent has complied with its obligations under this <u>Section 8.3</u>, Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account; provided that if Agent has collected Sales Taxes using a means other than Merchant's POS systems and failed to deposit such Sales Taxes in the Sales Taxes Account, Agent shall prepare and file applicable reports and documents required by the applicable taxing authorities with respect to such collected Sales Taxes and be responsible for the payment of such Sales Taxes.  Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this <u>Section 8.3</u> and except as otherwise provided herein, Agent shall have no further obligation to Merchant, the Merchant Secured Creditors, any taxing authority, or any other party, and Merchant (and, subject to the Sale Order, the Merchant Secured Creditors to the extent any received any funds on account of Sales Taxes) shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this <u>Section 8.3</u>, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless each Merchant Indemnified Party from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which any Merchant Indemnified Party sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a), it is hereby agreed that, as Agent is conducting the Sale solely as agent for Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Purchase Price) are not intended to represent the sale of tangible personal property.

8.4     Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Stores and the Distribution Center, including boxes, bags, paper, twine and similar sales materials (collectively, "Supplies"), but not including any gift certificates, merchandise credits, or the like located at the Stores.  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees, if reasonably requested by Agent, to provide Agent such Supplies, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor; provided that Merchant may require that Agent obtain such Supplies, at Agent's expense, from Merchant's vendors and, if reasonably requested by Agent, Merchant shall reasonably assist Agent in obtaining such Supplies from its vendors at Merchant's usual and customary costs therefor. Merchant does not warrant that the existing Supplies as of the Sale Commencement Date are or will be adequate for the purposes of the Sale or give any other assurances whatsoever regarding the Supplies (except as expressly set forth herein).

8.5     Returns of Merchandise.  Agent shall not have any obligation to accept any returns or exchanges of merchandise, including, without limitation, merchandise sold by Merchant prior to the Sale Commencement Date.

8.6     Sale Reconciliation.

(a)     Weekly Reconciliation.  On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant shall cooperate to reconcile Proceeds, Expenses, receipts of Gross Rings, Distribution Center Merchandise and/or On-Order Merchandise in the Stores and/or Additional Agent Goods, Merchant Consignment Goods and any sales of Owned FF&E, and proceeds thereof, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), all pursuant to procedures agreed upon by Merchant (in consultation with the ABL Agent and the DIP Agent) and Agent, with such information being set forth in a written reconciliation report and a copy thereof shall be provided to the ABL Agent and the DIP Agent.

(b)     Final Reconciliation.  Within thirty (30) days after the Sale Termination Date at all Stores and Distribution Centers, Merchant (in consultation with the DIP Agent) and Agent shall jointly prepare a final reconciliation of the Sale, including a summary of Proceeds, taxes, Expenses, and any other accountings required hereunder (the "Final Reconciliation"), the results of which shall be certified in writing by representatives of each of Merchant (in consultation with the ABL Agent and the DIP Agent) and Agent.  Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  Once executed by Merchant and Agent, such settlement and Final Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Sale Order).  In the absence of an order of the Bankruptcy Court or mutual agreement of Merchant (in consultation with the

21

ABL Agent and the DIP Agent) and Agent, no disputed amount(s) shall be paid until the dispute has been resolved by agreement of the parties or as determined in the manner prescribed in Section 3.5. During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant (in consultation with the ABL Agent and the DIP Agent) and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, taxes and Expenses to review and audit such records.

8.7    Force Majeure. If any casualty, act of terrorism, vandalism, riots, pandemic or act of God (or any governmental response to any of the foregoing) prevents or substantially inhibits the conduct of business in the ordinary course at any Store and/or Distribution Center for a period in excess of five (5) consecutive days (a "Force Majeure Event"), such Store and/or Distribution Center and the Merchandise located at such Store and/or Distribution Center shall, in Agent's discretion to be exercised by written notice to Merchant given not later than seven (7) days following the later of (a) the last day of the five (5) day period establishing such Force Majeure Event and (b) Agent's becoming aware of such Force Majeure Event, be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) subject to the terms of Section 7.1, the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Purchase Price shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or the Merchant Secured Creditors if the Merchant fails to do so) shall reimburse Agent for the amount the Purchase Price is so reduced prior to the end of the Sale Term. If a Store and/or Distribution Center is eliminated from the Sale due to a Force Majeure Event, Agent shall use its commercially reasonable efforts to transfer therefrom all Merchandise that is not the subject of insurance proceeds and include such Merchandise in the Sale at other Stores.

8.8    Merchant's Right to Monitor. Merchant, the ABL Agent and the DIP Agent shall each have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's, the ABL Agent's and/or the DIP Agent's presence does not unreasonably disrupt the conduct of the Sale. Merchant, the ABL Agent and the DIP Agent shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.9    Additional Merchandise.

(a)    Agent shall have the right to supplement the Merchandise in the Sale with additional goods procured by Agent which are of like kind, and no lesser quality to the Merchandise in the Sale ("Additional Agent Goods"). The Additional Agent Goods shall be purchased by Agent at Agent's sole expense (and such purchase price shall not constitute an Expense). Sales of Additional Agent Goods shall be run through Merchant's cash register systems; provided, however, Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise. Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods. Additionally, Agent shall provide signage in the Stores, as an Expense, notifying customers that the Additional Agent Goods have been included in the Sale.

22

(b)     [Intentionally omitted.]

(c)     [Intentionally omitted.]

(d)     Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  At all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds. The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

(e)     Merchant shall, at Agent's sole expense (and not as an Expense), insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to the same with Merchant's insurers.  Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods, which amount shall be deemed an Additional Agent Goods expense.

(f)     Merchant acknowledges, and the Sale Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code.  Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to the Sale Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods proceeds).

(g)     The ABL Agent and the DIP Agent, on behalf of the Merchant Secured Creditors, hereby acknowledge receipt of notice of the consignment of the Additional Agent Goods and consent to the payments to Agent of Additional Agent Goods proceeds.

8.10    Pre-Sale Orders and Expenses.

(a)     Merchant shall retain all responsibility for satisfying all customer orders for which a deposit was made prior to the start of the Sale (the "Pre-Sale Orders") or otherwise resolving those deposits; provided that Merchant shall not do so by delivering to customers in respect thereof any inventory located in the Stores or Distribution Centers (or on order or in transit thereto) except as expressly set forth in this Section 8.10 with respect to Pre-Sale Orders made after the Petition Date.

(b)     Subject to the provisions of this Section 8.10, during the first twenty-one (21) days of the Sale Term (the "On Hand Fulfillment Order Deadline"), Agent shall assist Merchant in connection with its efforts to fulfill Pre-Sale Orders made after the Petition Date with respect to which all of the goods related to such orders are on hand and earmarked or reserved at the Stores and Distribution Centers as of the Sale Commencement Date. The Fulfillment Merchandise related to such Pre-Sale Orders shall be electronically earmarked to fill the applicable

23

Pre-Sale Orders in a manner to be agreed upon by Merchant and Agent and shall be excluded from the definition of Merchandise hereunder. Agent shall use reasonable efforts to fulfill and deliver such Pre-Sale Orders. Any additional funds received from customers on account of such Pre-Sale Orders, net of any Fulfillment Processing Expenses, shall be remitted to Merchant on a weekly basis and included in the weekly reconciliation prepared pursuant to Section 8.7(a) hereunder. The Fulfillment Merchandise shall be excluded from the definition of Merchandise hereunder; provided, however, that if a customer cancels any such Pre-Sale Order or fails to take delivery of the applicable Fulfillment Merchandise on or prior to the On Hand Fulfillment Order Deadline, any unclaimed Fulfillment Merchandise for such order may, at the election of Merchant, be treated as Merchant Consignment Goods hereunder.

(c)    All expenses incurred in connection with fulfilling such Pre-Sale Orders, including but not limited to, sales taxes, credit card fees, labor and delivery and all sales commissions attributable to the Fulfillment Merchandise shall be borne and paid by Merchant, and Merchant shall pay or reimburse Agent not less frequently than on a weekly basis for, (i) any billed freight of the Fulfillment Merchandise required to fulfill said Pre-Sale Orders and (ii) any and all out-of-pocket expenses incurred by Agent to complete said Pre-Sale Orders, including, without limitation, any transfer expenses between locations, sales taxes, credit card fee or finance fees, sales personnel commission, preparation work, refinishing, administrative matters and salaries and wages relating to the completion and delivery of the Fulfillment Merchandise for such Pre-Sale Orders.

(d)    Prior to the Sale Commencement Date,  Merchant shall provide Agent with a complete and accurate written list of all Pre-Sale Orders made after the Petition Date outstanding as of the Sale Commencement Date, indicating (i) the name, address and phone number of each applicable customer, (ii) the item(s) purchased by each such customer, (iii) whether such item(s) are on hand and/or reserved at the Stores and Distribution Centers, (iv) the total amount of money accepted or received on deposit from each such customer, (v) the balance due from each such customer; (vi) any sales tax due for each such customer, (vii) any sales commission due; and (viii) any other information reasonably requested by Agent with respect thereto.

(e)    Except for the limited assistance expressly set forth in this Section 8.10, Agent shall not have any obligation to satisfy any Pre-Sale Order or otherwise resolve any related deposit. Without limiting the foregoing, Agent shall have no obligation to issue or process any refunds for Pre-Sale Orders, even if such Pre-Sale Orders cannot be satisfied.  To the extent that Merchant elects to issue a refund for a Pre-Sale Order, such refund shall not be for merchandise credit (unless Agent otherwise agrees, in which case the amount of such refund shall be credited in Agent's favor as part of the weekly sale reconciliations) and to the extent a cash or credit card refund is issued by Merchant (neither of which, for the avoidance of doubt, Merchant is obligated in any way to do), such refund shall not be paid from, or issued against Proceeds from the Sale.

8.11    Sale of Warranties and Protection Programs. Agent shall have the option, in its sole discretion, to continue with the sale of new warranties and protection programs for the Merchandise through Merchant's existing programs, including with Pure Protection (the "Pure Protection"), the proceeds of which shall be included in the calculation of Proceeds; provided however, any sale of new warranties or protection programs by Agent shall not be deemed an assumption by Merchant or Agent of any executory contract relating thereto. For the avoidance of

24

doubt, in no event shall Merchant be responsible for any of the costs or expenses of providing any warranty and/or protection programs or related services pursuant to this Section 8.11.

8.12    Delivery Services. Agent shall have the option, in its sole discretion, to request that Luxury (as hereinafter defined) continue to provide delivery services for the Merchandise through Merchant's existing delivery program with Luxury Delivery Services, Inc. ("Luxury"), with the fees, costs and expenses otherwise payable by Merchant to Luxury for such services to be paid by Agent as part of the Distribution Center Expenses payable pursuant to Section 4.1(r) and the proceeds received from customers for such services to be included in the calculation of Proceeds; provided however, any sale of delivery services by Agent shall not be deemed an assumption by Merchant or Agent of any executory contract relating thereto.

8.13    Customer Financing. Agent shall have the option, in its sole discretion, to make available financing to customers for purchases in the Sale through Merchant's existing programs, including with Synchrony Bank ("Synchrony"), to the extent such programs remain available during the Sale; provided however, any provision of customer financing shall not be deemed an assumption by Merchant or Agent of any executory contract relating thereto and in no event shall Merchant be responsible for funding or providing any portion of any financing so extended to customers as provided in this Section 8.13.

Section 9.    Employee Matters.

9.1    Merchant's Employees. Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and on the same terms and conditions as such employees were employed prior to the date of this Agreement, and Agent may (in consultation with Merchant) select and schedule the number and type of Merchant's employees required for the Sale, which number and type shall be based on appropriate staffing levels as determined by Agent in consultation with Merchant. In addition, if applicable, Agent may use the services of the Distribution Center employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and on the same terms and conditions as such individuals were providing services to Merchant prior to this Agreement and Agent may select and schedule the number and type of such individuals required for the Sale, which number and type shall be based on appropriate staffing levels as determined by Agent in consultation with Merchant. Agent shall identify any of (i) Merchant's employees at the Stores and all regional employees, in each case to be used in connection with the Sale, in each case, to the extent such employees do not terminate their employment with Merchant (each such employee, a "Retained Employee") and (ii) the Distribution Center employees to be used in connection with the Sale prior to the Sale Commencement Date, in each case, to the extent such employees do not terminate their employment with Merchant. Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of Merchant. Agent's selection and scheduling of Merchant's employees and Distribution Center employees shall at all times comply with all applicable laws and regulations. Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute

25

or law; nor shall Agent become liable under any employment agreement or be deemed a joint or successor employer with respect to such employees. Agent shall comply in the conduct of the Sale with all of Merchant's employee rules, regulations, guidelines and policies (and such rules as may be applicable to the Distribution Center employees) which have been provided to Agent in writing prior to the execution of this Agreement. Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Retained Employees prior to the Sale Termination Date at all Stores and Distribution Centers. Merchant shall not transfer any Retained Employee during the Sale Term without Agent's prior consent, which consent shall not be unreasonably withheld. During the Sale Term, Merchant shall process the payroll for all Retained Employees and, if applicable, any former employees and temporary labor engaged for the Sale.

9.2    <u>Termination of Employees</u>.  Agent may in its discretion stop using any Retained Employee or Distribution Center employees at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee or Distribution Center employees, Agent shall notify Merchant in writing at least seven (7) days prior thereto, so that Merchant may coordinate the termination of such employee or services of such individual; provided, however, that, in the event that Agent determines to cease using an employee or individual "for cause" (which shall consist of dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply; <u>provided further, however,</u> that Agent shall immediately notify Merchant in writing of the basis for such "cause" so that Merchant can arrange for termination of such employee or services of such individual.  From and after the date of this Agreement and until the Sale Termination Date at all Stores and Distribution Centers, Merchant shall not transfer or dismiss employees of the Stores or Distribution Center employees (except "for cause") without Agent's prior consent.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee or services of any Distribution Center employees, but rather may only cease using such employee or individual in the Sale and paying any Expenses with respect to such employee or individual.

9.3    <u>Payroll Matters</u>.  During the Sale Term, Merchant shall process the base payroll for all Retained Employees as well as payroll for any of Merchant's former employees or temporary labor retained by Agent for the Sale.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Merchant shall transfer, or, to the extent that the Payment Date has passed, Agent shall transfer, to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week which constitute Expenses hereunder.

9.4    <u>Employee Retention Bonuses</u>.    Agent may pay, as an Expense pursuant to <u>Section 4.1(d) (and only as such an Expense)</u>, retention bonuses ("<u>Retention Bonuses</u>") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of fifteen percent (15%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as it may determine in its discretion.  The amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date at all Stores and Distribution Centers, and shall be processed through Merchant's payroll system.  Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within

five (5) business days after the Sale Commencement Date. For the avoidance of doubt, Merchant shall not be responsible for any portion of the Retention Bonuses.

Section 10.    Conditions Precedent and Subsequent.

(a)    [Intentionally omitted.]

(b)    The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party (and any waiver by Merchant shall require the consent of the ABL Agent and the DIP Agent):

i.    All representations and warranties of Merchant to Agent (with respect to Agent's willingness) and Agent to Merchant (with respect to Merchant's willingness) hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof or as of the Sale Commencement Date.

ii.    The Bankruptcy Court shall have approved the Sale and entered the Sale Order on or before January 8, 2026.

iii.    Merchant shall have obtained the consent of the ABL Agent and the DIP Agent to this Agreement and the APA.

iv.    Merchant, Agent, the ABL Agent and the DIP Agent shall each have executed and delivered this Agreement (with all Exhibits attached hereto).

v.    (1) Merchant and Agent shall have executed the APA and (2) (A) with respect to Agent, the conditions to the obligations of Buyer (as defined in the APA) set forth in Article X of the APA shall have been satisfied (or waived in accordance with the APA) and (B) with respect to Merchant, the conditions to the obligations of the Sellers (as defined in the APA) set forth in Article XI of the APA shall have been satisfied (or waived in accordance with the APA).

Section 11.    Representations, Warranties and Covenants.

11.1    Merchant's Representations, Warranties, and Covenants.    Merchant hereby represents, warrants, and covenants in favor of Agent as follows

(a)    Merchant (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of Ohio or such entity's applicable jurisdiction of formation or organization (except as may be a result of the pendency of Merchant's Chapter 11 Cases); (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to

27

be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Except as may be required in connection with the issuance of the Sale Order: (i) Merchant has the right, power and authority to execute and deliver this Agreement, the APA and each other document and agreement contemplated hereby or thereby (collectively, together with this Agreement and the APA, the "Agency Documents") and to perform fully its obligations thereunder; (ii) Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (iii) each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable against it in accordance with its terms.

(c)     Merchant owns, and will own at all times during the Sale Term, good and marketable title to the Merchandise and the Owned FF&E, free and clear of all Liens of any nature, other than the Liens listed on Exhibit 11.1(c) (the "Preexisting Liens") and any applicable statutory Liens; provided, however, it is understood that with respect to On-Order Merchandise, Merchant shall not have title to such goods until such time as title passes as provided for under the respective vendor agreements and purchase order. Merchant shall not create, incur, assume or suffer to exist any Lien upon or with respect to any of the Merchandise or the Owned FF&E or the Proceeds other than as provided for herein (including Preexisting Liens). Any Sale Order shall provide that all such Liens shall be transferred to and attach only to the Purchase Price or other amounts payable to Merchant hereunder.

(d)     Merchant has maintained its pricing files (including the Cost File) in the ordinary course of business, and such files do not include any point of sale markdowns. Prices charged to the public for goods (whether in-store, by advertisement, or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns, advertised sales, and other customary in-store promotional or clearance activities). All pricing files (including the Cost File) are accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods (without consideration of point of sale markdowns). All pricing files and records (including, without limitation, the Cost File) relative to the Merchandise have been made available to Agent. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law with respect to the Merchandise, as such calculations have been identified to Merchant by its retained service provider.

(e)     Except with respect to Merchant's termination of point of sale events prior to the Sale Commencement Date in the manner previously disclosed to Agent, Merchant has not marked up or raised, and shall not up to the Sale Commencement Date mark up

28

or raise, the price of any items of Merchandise, or removed or altered any tickets or any indicia of clearance merchandise, except in the ordinary course of business and except for the effects of the termination of promotional events.

(f)     Through the Sale Commencement Date, Merchant shall ticket or mark all items of inventory received at the Stores prior to the Sale Commencement Date in a manner consistent with similar Merchandise located at the Stores and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.

(g)     Through the Sale Commencement Date, Merchant shall not purchase for or transfer to or from the Stores, any merchandise or goods outside the ordinary course, except for the transfer of Distribution Center Merchandise to the Stores prior to the Sale Commencement Date in a manner consistent with Merchant's ordinary course of business.

(h)     [Intentionally omitted.]

(i)     To Merchant's knowledge, all Merchandise is in material compliance with all applicable federal, state and local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date. Merchant owns or possesses all right, title and interest in and to all material permits, licenses, franchises, orders, consents, authorizations, registrations, certificates, variances, exceptions, approvals and similar rights obtained from governments and governmental agencies relating to the Stores and the Distribution Centers or the operations conducted at the Stores and the Distribution Centers, and all deposits or bonds in connection therewith (collectively, the "Permits") that are necessary to own and operate the Stores and the Distribution Centers, including, without limitation, all Permits required under any federal, state or local law relating to public health and safety, employee health and safety, pollution or protection of the environment, other than failures to so own or possess all right, title and interest that would not prevent or materially impair Merchant's consummation of the transactions contemplated by this Agreement. Merchant is in compliance with the terms and conditions of such material Permits and has received no notices (nor does it have any knowledge of any threatened notice) that it is in violation of any of the terms or conditions of such Permits, except for any noncompliance or violation that would not prevent or materially impair the Merchant's consummation of the transactions contemplated by this Agreement. Merchant has conducted and continues to conduct its business, in all material respects, in accordance with all applicable laws and governmental orders applicable to Merchant or any of its assets or properties, and to the best of its knowledge Merchant is not in material violation of any such law or governmental order, including, without limitation, any law, now or hereafter in effect and as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to the environment, labor, health, safety or hazardous materials, except for any noncompliance or violation of any applicable laws and governmental orders that would not prevent or materially impair Merchant's consummation of the transactions contemplated by this Agreement.

(j)     Subject to the provisions of the Sale Order, throughout the Sale Term, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, each of the Stores and Distribution Centers, the assets currently located at the

29

Stores and Distribution Centers, and the utilities and other services provided at the Stores and Distribution Centers. Merchant shall throughout the Sale Term, maintain in good working order, condition, and repair all cash registers, POS systems, heating systems, air conditioning systems, elevators, escalators, and all other mechanical devices necessary for the conduct of the Sale at the Stores. Except any amounts owing as a result of the commencement of the Chapter 11 Cases, and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale (other than those relating to any period prior to the commencement of the Chapter 11 Cases), subject to any restrictions that may be imposed under the Bankruptcy Code.

(k)    Subject to the Sale Order, Merchant will pay all self-insured or Merchant funded employee benefit programs for Retained Employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs, which costs, for the avoidance of doubt, shall be reimbursed by Agent in accordance with Section 4.1(b) of this Agreement.

(l)    Since October 15, 2025, Merchant has not intentionally taken, and shall not throughout the Sale Term intentionally take, any actions with the intent of increasing the Expenses of Sale, including increasing salaries or other amounts payable to employees, except (i) there may have been instances that, in an effort to encourage one or more employees to remain in Merchant's employ, Merchant increased the salaries of such employees (such action not being with any intent to increase any Expense of the Sale or in anticipation thereof); and (ii) to the extent an employee received an annual raise. Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale.

(m)    Except as may be impacted by the filing for chapter 11 protection or otherwise restricted by the chapter 11 filing, Merchant covenants to continue to operate the Stores in all material respects in the ordinary course of business from the date of this Agreement through the Sale Commencement Date by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public other than in the ordinary course of business (except for Merchant's pending advertisements as of the date of this Agreement and/or Merchant's promotions for the period through the Sale Commencement Date as set forth on Exhibit 11.1(q) which shall be mutually agreed by the parties, acting reasonably); (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies between or among Stores; and (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores without prior written notice to and consultation with (but not approval of) Agent. Since October 15, 2025, Merchant has not offered, and through the Closing Merchant shall not implement, discounts or promotions at any Store except (a) as set forth on Exhibit 11.1(q) and (b) promotions in relation to the store closing sales in the Existing Closing Stores pursuant to the Consulting Agreement.

(n)    [Intentionally omitted.]

(o)    [Intentionally omitted.]

30

(p)    Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Center or on order or in transit.

(q)    Merchant shall not prior to the Sale Termination Date at all Stores and Distribution Centers, offer any promotions or discounts at Merchant's retail stores, e-commerce sale channels, or other sales channels, except as detailed on Exhibit 11.1(q).

(r)    Merchant hereby covenants that it will use its commercially reasonable efforts to obtain from the Bankruptcy Court entry of an order under section 365(d)(4) of the Bankruptcy Code extending the time to assume or reject the leases associated with the Stores through and including a date that is 210 days from the Petition Date.

(s)    Supplies shall not, prior to the Sale Commencement Date, be transferred by Merchant to or from the Stores so as to alter the mix or quantity of supplies at the Stores from that existing on such date, other than in the ordinary course of business.

(t)    Merchant (i) shall not mark up or raise the price of any items of Merchandise, (ii) shall not take any hard mark-down price or otherwise permanently reduce the price on any items Merchandise, (iii) shall continue to sell inventory during such period at customary prices consistent with the ordinary course of business, and (iv) shall not remove or alter) any tickets or any indicia of clearance merchandise or point of sale promotion, except in the ordinary course of business.

(u)    Except for (i) the Bankruptcy Case and (ii) the matters set forth on Exhibit 11(u), no action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would materially adversely affect the conduct of the Sale; provided that any closure of a Store or Distribution Center shall be deemed to materially adversely affect the Sale.

(v)    Except as set forth on Exhibit 11(v), Merchant is not a party to any collective bargaining agreements with its employees.  No labor unions represent Merchant's employees at any Store or Distribution Center or any of Merchant's corporate offices.  There are currently no strikes, work stoppages, or other labor disturbances affecting any Store or Distribution Center or any of Merchant's corporate offices.

(w)    Except as set forth on Exhibit 6.1, no Store or Distribution Center lease or similar occupancy agreement has expired, nor shall expire at any time until the conclusion of the Sale Term in such Store or Distribution Center (by its terms or otherwise).

(x)    Except pursuant to the terms of this Agreement, Merchant shall not commence any store closing or liquidation sales (including pursuant to the Consulting Agreement) at any of the Stores or Distribution Centers. From and after the date of this Agreement, Merchant

31

shall not transfer any Merchandise in any of the Stores, any Distribution Center Merchandise or any On-Order Merchandise to any Existing Closing Store.

(y)     Merchant shall use commercially reasonable efforts (i) to cause Pure Protection, Luxury and Synchrony to continue to provide services to Merchant in a manner consistent with pre-petition practice and (ii) to amend the warranty and customer protection plans offered by Pure Protection so as to eliminate, with respect to any such plans sold during the Sale Term, any merchandise credit or other rebate to be issued to customers in connection therewith. Any reserve required to be established in connection with the continued provision of services by any such providers shall be funded by Merchant if Merchant determines it is in Merchant's best interest to do so, but, for the avoidance of doubt, if Merchant so determines it will fund any reserve, Merchant's obligation to so fund shall apply only to the extent the imposition of the same is attributable to Merchant's conduct and activities prior to the Sale.

(z)     Merchant (i) at the Sale Commencement Date will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the other Agency Documents, and (ii) at the Sale Commencement Date, will not have incurred any obligation, commitment, restriction or liability of any kind which would impair or adversely affect such funds, resources and capabilities.

(aa)    Merchant agrees and covenants that it shall retain sufficient funds to enable Merchant to fully satisfy and perform its obligations under this Agreement and Merchant shall use those funds to fully satisfy and perform its obligations under this Agreement.

11.2    Agent's Representations, Warranties and Covenants.  Each entity comprising Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Each entity comprising Agent: (i) is a corporation or limited liability company duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms. No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein. No contract

32

or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)    The Sale shall be conducted in compliance with all applicable federal, state and local laws, rules and regulations and Merchant's leases and other agreements, except as provided for in the Sale Guidelines and Sale Order.

Section 12.    Insurance.

12.1    Merchant's Liability Insurance. Merchant shall continue until the Sale Termination Date at all Stores and Distribution Centers, in such amounts as it currently has in effect, all of its liability insurance policies, including products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores, in each case in effect as of the date hereof, and shall endeavor to cause the Agent to be named as an additional insured (as its interest may appear) with respect to all such policies in connection with the applicable Stores. Merchant shall deliver to each Agent certificates evidencing such insurance setting forth the duration thereof and naming such Agent as an additional insured, in form reasonably satisfactory to such Agent. Merchant shall provide at least thirty (30) days' prior notice to each Agent of cancellation, non-renewal or material change of such policies during the Sale Term. In the event of a claim under any such policies, (a) Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder to the extent such claim arises from or relates to the alleged acts or omissions or negligence of Merchant or its employees (including Retained Employees), agents (other than Agent or Agent's employees), or independent contractors (other than Agent and supervisors hired by Agent in conjunction with the Sale) and (b) the Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts (which amounts shall constitute Expenses) to the extent such claim arises from or relates to the alleged acts or omissions of such Agent or its employees, agents, or independent contractors.

12.2    Merchant's Casualty Insurance. Merchant will continue throughout the Sale Term, at Agent's cost as an Occupancy Expense hereunder, all of its fire, flood, theft and extended coverage casualty insurance covering the Merchandise, in such amounts as it currently has in effect, which coverage may be reasonably reduced after consultation with Agent from time to time to take into account the sale of Merchandise. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise shall constitute Proceeds hereunder and any self-insurance amounts and the amount of any deductible or self-insured retention shall be paid by the Agent as an Expense. Merchant shall deliver to each Agent certificates evidencing such insurance, setting forth the duration thereof and naming such Agent as loss payee (as its interest may appear), in form and substance reasonably satisfactory to such Agent. Merchant shall provide at least thirty (30) days' prior notice to each Agent of

33

cancellation, non-renewal or material change during the Sale Term of such policies. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date at all Stores and Distribution Centers without the Agent's prior written consent.

12.3    Agent's Insurance. Each Agent shall maintain as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability insurance policies covering injuries to persons and property in or in connection with such Agent's agency at the applicable Stores, and shall cause Merchant to be named as additional insureds and loss payee with respect to such policies. Each Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as additional insured and loss payee, in form and substance reasonably satisfactory to Merchant. In the event of a claim under any such policies, the Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful acts or omissions or negligence of Merchant or Merchant's independent contractors or agents, other than Agent or Agent's employees, agents or independent contractors (including Merchant's employees under Agent's supervision).

12.4    Workers' Compensation Insurance. Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements. For the avoidance of doubt, costs and expenses with respect to workers' compensation insurance for Retained Employees shall be reimbursed in accordance with Section 4.1(b).

12.5    Administration of Claims. In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement. To the extent that Merchant and Agent agree that a claim constitutes a claim arising directly from the acts or omissions of Agent, or its supervisors, employees or agents located at the Stores or Distribution Centers (each, an "Agent Claim"), Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

Section 13.    Indemnification.

13.1    Merchant Indemnification. Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless of, from and against all claims, demands, penalties, losses, liability or damage, including reasonable attorneys' fees and expenses, directly or indirectly asserted against Agent or any Agent Indemnified Party, resulting from, or related to: (i) Merchant's material breach of or material failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's

34

satisfaction of its obligations pursuant to Sections 4.1(a) and 4.1(b), any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iii) subject to Agent's compliance with its obligations under Section 8.3, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iv) subject to Section 13.2(vii), any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including claims by employees arising under collective bargaining agreements, workers' compensation or under the WARN Act); (v) the gross negligence (including omissions) or willful misconduct of Merchant or its officers, directors, employees, individuals, agents (other than Agent) or representatives; (vi) claims from any of Merchant's customers for return of customer deposits or any other amounts in connection with any orders placed prior to the Sale Commencement Date, including but not limited to any unfulfilled Pre-Sale Orders; or (vii) any harassment or any other unlawful, tortious, or otherwise actionable treatment of Agent or any of its employees, agents, independent contractors, supervisors, or other officers, directors, or representatives by Merchant or any of its employees, agents, independent contractors, supervisors, or other officers, directors, or representatives; provided, however this Section 13.1 shall not apply to any claims, demands, penalties, losses, liability or damage resulting from, or related to, the gross negligence (including omissions) or willful misconduct of, or breach of this Agreement by any of the Agent Indemnified Parties.

13.2    Agent Indemnification. Agent shall indemnify and hold Merchant and its officers, directors, employees, agents (other than Agent) and representatives (each, a "Merchant Indemnified Party") harmless from and against all claims, demands, penalties, losses, liability or damage, including reasonable attorneys' fees and expenses, directly or indirectly asserted against Merchant or any Merchant Indemnified Party, resulting from, or related to: (i) Agent's material breach of or material failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment or engagement; (iii) any taxes or penalties arising out of Agent's failure to collect and/or remit Sale Taxes in accordance with Section 8.3 or in amounts required by applicable law; (iv) [intentionally omitted;] (v) any Agent Claims; (vi) the gross negligence (including omissions) or willful misconduct of Agent or its officers, directors, employees, agents or representatives; (vii) any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors, supervisors, or other officers, directors, or representatives of Agent; or (viii) any consumer warranty or product liability claims solely to the extent relating to the Additional Agent Goods; provided, however this Section 13.2 shall not apply to any claims, demands, penalties, losses, liability or damage resulting from, or related to, the gross negligence (including omissions) or willful misconduct of, or breach of this Agreement by any of the Merchant Indemnified Parties.

Section 14.    Defaults.    Each of the following shall constitute an "Event of Default" hereunder:

(a)    Merchant or Agent shall fail to perform in any material respect any of their respective material obligations hereunder if such failure remains uncured ten (10) days after receipt of written notice thereof to the defaulting party.

35

(b)    Any material representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term and, to the extent curable, continues uncured ten (10) days after written notice to the defaulting party.

(c)    Entry of an order converting the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code or the appointment a chapter 11 trustee.

(d)    The Sale is terminated prior to the Sale Termination Date at all Stores and Distribution Centers or materially interrupted or impaired for any reason other than (i) an Event of Default by Agent or (ii) any other material breach or material action by Agent not authorized under the Agency Agreement (including, without limitation, any material failure by Agent to comply with the terms, provisions, and/or requirements of the Sale Order and/or the Sale Guidelines).

In the event of an Event of Default (i.e., following the expiration of any notice and cure period applicable thereto), the non-defaulting party (or, in the case of (c), only the Agent) may, in its discretion, elect to terminate this Agreement upon seven (7) business days' additional written notice to the other party. Any party's damages or entitlement to equitable relief (including the right to terminate this Agreement) on account of an Event of Default shall be determined solely by the Bankruptcy Court. Notwithstanding the foregoing, this Agreement shall terminate automatically upon the termination of the APA in accordance with its terms prior to the Closing (as defined in the APA).

Section 15.    Miscellaneous.

15.1    Notices. All notices and communications provided for pursuant to this Agreement shall be in writing and shall be deemed duly given (a) on the day such communication was sent by email and received by the recipient thereof, (b) when delivered personally to the recipient by hand, (c) upon confirmation of receipt if sent by facsimile, or (d) one (1) business day after being sent to the recipient by recognized overnight delivery service (charges prepaid), as follows (with Merchant and Agent to receive all notices regardless of their origin):

If to Agent or Guarantor:

ASI Purchaser LLC; SEI, Inc.
4300 East Fifth Avenue
Columbus, Ohio 43219
Attention: Legal Department
Email: Notice@spgroup.com

With a copy to:

> WACHTELL, LIPTON, ROSEN & KATZ
> 51 West 52nd Street
> New York, NY 10019
> Attn: Scott K. Charles, Esq.; Neil M. Snyder, Esq.
> Tel: (212) 403-1000
> Email: skcharles@wlrk.com; nmsnyder@wlrk.com

If to Merchant:

> c/o BRG
> 225 Franklin Street,
> 32nd Floor
> Boston, MA 02110
> Attn: Mr. Rudolph Morando
> Tel: (510) 285-3300
> rmorando@thinkbrg.com

With copies to:

> PACHULSKI STANG ZIEHL & JONES LLP
> 919 Market Street, 17th Floor
> Wilmington, DE 19801
> Attn: Laura Davis Jones, Esq. and David M. Bertenthal, Esq.
> Tel: 302-778-6401
> Email: ljones@pszjlaw.com and dbertenthal@pszjlaw.com

> AND

> GOODWIN PROCTER LLP,
> 620 Eighth Ave.,
> New York, NY 10018,
> Attn: Kizzy L. Jarashow, Esq. and Stacy Dasaro, Esq.
> Tel: 212-459-7338
> Email: (kjarashow@goodwinlaw.com) and (sdasaro@goodwinlaw.com)

> AND

> POTTER ANDERSON & CORROON LLP
> 1313 North Market Street, 6th Floor,
> Wilmington, Delaware 19801
> Attn: L. Katherine Good, Esq.
> Tel: 302-984-6049
> Email: (kgood@potteranderson.com);

37

If to the ABL Agent or the DIP Agent:

    Second Avenue Capital Partners LLC
    75 Second Avenue, Suite 550
    Needham, Massachusetts 02494
    Attn: Mark Gallivan
    Tel: 508-468-4980
    Email: mgallivan@sacp.com

With a copy (which shall not constitute notice) to:

    Choate, Hall & Stewart LLP
    Two International Place
    Boston, MA 02110
    Attn: John F. Ventola, Esq; Jonathan D. Marshall, Esq.; Lucas B. Barrett, Esq.
    Tel: 617-248-5000
    Email: jventola@choate.com; jmarshall@choate.com; lbarrett@choate.com

    15.2  <u>Governing Law; Consent to Jurisdiction</u>. This Agreement shall be governed and construed in accordance with the laws of the State of New York without regard to conflict of laws principles thereof, except to the extent the laws of such State are superseded by the Bankruptcy Code. The parties agree that the Bankruptcy Court (and the District Court and Circuit Court of Appeals with appellate jurisdiction over the Bankruptcy Court) shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such courts with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party; provided, however, each such party hereby further agrees that should the Bankruptcy Court decline or refuse the exclusive jurisdiction granted to it above, exclusive jurisdiction of any disputes arising from or under this Agreement shall be in any state or federal court sitting City of Wilmington, Delaware and each party hereto hereby irrevocably accepts and submits in such circumstances to the exclusive jurisdiction of such courts with respect to any such action or proceeding. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND EACH OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

15.3     Entire Agreement. This Agreement, the APA, the Exhibits hereto, and the Agency Documents (subject, in each instance, to the Sale Order) contain the entire agreement between the parties hereto (other than any agreement of Agent which shall not in any way affect any of Merchant's rights hereunder) with respect to the transactions contemplated hereby and supersede and cancel all prior agreements, including all proposals, letters of intent or representations, written or oral, with respect thereto.

15.4     Amendments. This Agreement may not be modified except in a written instrument executed by each of Merchant, Agent and the Guarantor; provided that the rights and obligations of the DIP Agent, the ABL Agent or the applicable Merchant Secured Creditors may not be modified except in a written instrument executed by the DIP Agent and/or the ABL Agent, as applicable.

15.5     No Waiver. No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

15.6     Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon Agent, Merchant, the Guarantor, the DIP Agent, the ABL Agent and their respective successors and permitted assigns; provided, however, that this Agreement may not be assigned by Merchant, Agent, the Guarantor, the DIP Agent or the ABL Agent to any party without the prior written consent of the other, provided that, notwithstanding the foregoing, Agent may, in its sole discretion, (i) utilize subcontractors in performing the services contemplated hereby so long as Agent shall remain responsible for the performance of all such services and (ii) syndicate its rights and obligations hereunder with (and add as part of Agent hereunder) one or more additional national inventory liquidation firms; provided, further, that no assignment or delegation by any party permitted hereunder shall be deemed to limit, discharge, release or otherwise affect the assigning or delegating, as applicable, party's responsibility for the continued performance of its obligations under this Agreement. The Merchant Secured Creditors are an intended third-party beneficiary of this Agreement.     Merchant's officers, directors, employees, agents and representatives are intended third-party beneficiaries of Section 13.2 of this Agreement. Any assignee of any lease for any Store pursuant to the terms of the APA is an intended third-party beneficiary of Sections 6.1 and 6.2 as they relate to the relevant Store.

15.7     Execution in Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one agreement. This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

15.8     Section Headings. The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.9    FF&E.

(a)    FF&E Generally. Agent shall have the right to sell all FF&E owned by Merchant located at the Stores and Distribution Centers (collectively, the "Owned FF&E"). As an Expense hereunder, Agent shall be responsible for the payment of all costs and expenses associated with the disposition of Owned FF&E (including, without limitation, if applicable, all shipping and delivery costs incurred in connection therewith).

(b)    Abandonment of FF&E.    Notwithstanding anything in this Agreement to the contrary, Agent shall be authorized to abandon any and all FF&E, whether owned or not by Merchant, in place without any cost or liability to Agent following the Sale Termination Date at the applicable Store or Distribution Center. For the avoidance of doubt, except to the extent Agent uses the same during the Sale Term in a manner that is grossly negligent or involves willful misconduct or is otherwise at any time grossly negligent or commits willful misconduct in the handling or treatment thereof, Agent shall have no responsibility whatsoever with respect to FF&E that is not owned by Merchant.

15.10    Reporting. If requested, Agent shall furnish Merchant (and the DIP Agent) with weekly reports reflecting the progress of the Sale, which shall specify the Proceeds received to date and shall furnish Merchant and DIP Agent with such other information regarding the Sale as Merchant at any time (including, without limitation, following the conclusion of the Sale) reasonably requests. Agent will maintain and provide to Merchant at any time as Merchant may reasonably request sales records to permit calculation of and compliance with any percentage rent obligations under Store leases. During the course of the Sale, Merchant and the DIP Agent shall have the right to have representatives continually act as observers of the Sale in the Stores, so long as they do not interfere with the conduct of the Sale.

15.11    Related Parties. As set forth in greater detail in the declaration of Rudolph Morando filed on November 23, 2025 in the Chapter 11 Cases, each of the Agent, the Guarantor and SB360 is a related party of the Merchant.

15.12    Relationships. Nothing contained herein shall be deemed to create any relationship between the Merchant and Agent other than an agency relationship as expressly provided (and as limited) herein. Without limiting the foregoing, it is stipulated and expressly acknowledged that such parties are not partners or joint venturers.

Section 16.    Security Interest.

(a)    Subject to entry of the Sale Order and effective upon payment by Agent of the Initial Purchase Price Payment, and subject to the provisions (including the subordination provisions) of this Section 16, Merchant hereby grants to Agent first priority, senior security interests in and liens upon: (i) the Merchandise and Owned FF&E located at the Stores, the Distribution Center Merchandise and On-Order Merchandise delivered to the Stores; (ii) all Proceeds (including, without limitation, credit card Proceeds) from the sales pursuant hereto of the items described items in clause (i) immediately preceding; (iii) all Proceeds related to the sale of Additional Agent Goods from the Stores; (iv) the Consignment Fee; (v) all Proceeds relating to the sale during the Sale of any warranties or protection programs or any services, including

40

delivery and repairs; (vi) all other Proceeds of the Sale to the extent payable to Agent hereunder; and (vii) all "proceeds" (within the meaning of section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral", which Agent Collateral expressly excludes any amounts paid by Agent in respect of the Purchase Price and Expenses, proceeds of DIP financing and amounts collected by Merchant on account of assets or services not subject to this Agreement and any amounts in the Professional Fee Escrow Account (as defined in the interim order entered by the Bankruptcy Court approving the DIP Financing in the Bankruptcy Case (but excluding, in all events, any amounts in such Professional Fee Escrow Account representing amounts funded from and after the lien granted pursuant to this Section 16 becomes effective with any Agent Collateral (or any proceeds thereof)), to secure the full payment and performance of all obligations of Merchant to Agent hereunder.  Upon entry of the Sale Order and payment of the Initial Purchase Price Payment, the security interests and liens granted to Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(b)  Without any further act by or on behalf of Agent or any other party (including the Merchant Secured Creditors and Merchant), Agent's security interests in and liens upon the Agent Collateral created hereunder are (i) subject to entry of the Sale Order, validly created, (ii) effective upon entry of the Sale Order, perfected, and (iii) effective upon entry of the Sale Order, senior to all other Liens and security interests, provided, however, that (i) until the Merchant has received payment in full of the Purchase Price due to Merchant hereunder, the security interests and liens granted to Agent hereunder shall remain junior and subordinate in all respects to the Liens of the Merchant Secured Creditors in the Agent Collateral (other than the Additional Agent Goods and proceeds thereof, in which Merchant has no property or other interest and the Merchant Secured Creditors have no Lien) and the Agent Collateral (other than (i) the Additional Agent Goods and proceeds thereof, in which Merchant has no property or other interest and the Merchant Secured Creditors have no Lien; provided, however, and for the avoidance of all doubt, nothing in this Section 16 (or any thing else to the contrary in this Agreement), shall be deemed to in any way limit the obligations of the lenders under the DIP Financing with respect to the funding of the Professional Fee Escrow Account in the Bankruptcy Case)  and (ii) upon the Closing (as defined in the APA), the Merchandise located in the Stores, the Distribution Center Merchandise and On-Order Merchandise delivered to the Stores on or prior to the Receipt Deadline, the other Acquired Assets (as defined in the APA) and all proceeds thereof, which shall at such time have been sold to Agent pursuant to the terms of the APA and after which Merchant shall have no property or other interest therein and the Merchant Secured Creditors shall have no Lien thereon) but solely to the extent and amount of such unpaid portion of the Purchase Price (the "Agent's Payment Obligations") and (iii) upon payment in full of the Purchase Price, the Liens of the Merchant Secured Creditors, if any, in the Agent Collateral shall be junior and subordinate in all respects to the security interests and liens of Agent.

(c)  Merchant shall not sell, grant, assign or transfer any security interest in, or permit to exist any Lien on, any of the Agent Collateral other than in favor of Agent and the Merchant Secured Creditors; provided that Merchant has no property interest in and the Merchant Secured Creditors have no lien on the Additional Agent Goods and all proceeds thereof or, following the consummation of the transactions contemplated by the APA, the Merchandise located in the Stores, the Distribution Center Merchandise and On-Order Merchandise delivered

41

to the Stores on or prior to the Receipt Deadline, the other Acquired Assets (as defined in the APA) and all proceeds thereof.

(d)    In the event of an occurrence of an Event of Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(e)    "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Delaware.

Section 17.    Agent. All references to "Agent" hereunder shall mean ASI Purchaser LLC, a Delaware limited liability company (and/or, its designee(s)). Agent covenants and agrees that it will perform all obligations of "Agent" (as such term is defined in the APA) under the APA.

Section 18.    Guarantee. Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Merchant the payment and performance of all of the payment and other obligations of Agent in this Agreement (the "Guaranteed Obligations"), in each case when and to the extent that such Guaranteed Obligations become due and payable; provided that such guarantee shall be subject to the limits on the Guarantee Obligations set forth herein and, upon any payment or performance thereof, Guarantor shall succeed to the rights of Agent hereunder. Guarantor agrees that the guarantee set forth in this Section 18 is a present and continuing guarantee of payment and not of collection, and that Merchant shall not be required to prosecute collection, enforcement or other remedies against Agent or any other person, or to enforce or resort to any other rights or remedies hereunder, before calling on Guarantor for payment or performance. Guarantor agrees that, if for any reason, Agent shall fail or be unable to pay or perform, punctually and fully, any of the Guaranteed Obligations as and when they become due and payable, Guarantor shall pay or perform (as applicable) such Guaranteed Obligations in full immediately upon demand. Guarantor agrees that its obligations pursuant to this Section 18 shall not be subject to any counterclaim, set-off, abatement, deferment or defense based upon any claim that Guarantor may have against Agent (but shall be subject to the rights of set-off granted to Agent herein). By executing and delivering this Agreement, Guarantor hereby represents and warrants to Merchant that the execution, delivery and performance by Guarantor of its obligations under this Agreement, and the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Guarantor and that such authorization remains in full force and effect as of the date of this Agreement. Guarantor hereby waives, with respect to the Guaranteed Obligations, (i) any right to require Merchant to institute suit against, or to exhaust its rights and remedies against Agent or any other Person or to exercise any right or power, or pursue any other remedy Merchant may have, (ii) all rights of subrogation, reimbursement, performance, contribution and indemnity whatsoever (whether arising under state or federal statutory or common law, including, without limitation, the Bankruptcy Code), and all rights of recourse to or with respect to any assets or property of Agent, until the Guaranteed Obligations have been paid in full, (iii) any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and indefeasibly paid or are not due and payable by reason of a default of Merchant under the Agreement), (iv) any defense based upon any election of remedies which in any manner impairs, affects, releases or extinguishes Guarantor's subrogation rights or Guarantor's right to proceed against Agent, (v) any rights to setoffs,

42

recoupments or counterclaims against Merchant, (vi) any right Guarantor might have under any applicable law to revoke its guarantee hereunder, and (vii) any defense that may arise by reason of any expansion, increase, alteration or other modification of the Guaranteed Obligations or the extension of or any forbearance in enforcing the Guaranteed Obligations.

Section 19.    Overriding Provision Regarding ABL Agent, DIP Agent and Merchant Secured Creditors.  Notwithstanding anything to the contrary in this Agreement, upon payment in full of the DIP Financing and/or the indebtedness underlying the ABL Credit Agreement, all references herein to the ABL Agent, DIP Agent and/or the applicable Merchant Secured Creditors, as applicable, shall, as to all matters and actions thereafter occurring or contemplated to be taken hereunder be deemed deleted wherefrom and to be of no further force effect whatsoever and, for the avoidance of all doubt, the ABL Agent, DIP Agent and/or the applicable Merchant Secured Creditors, as applicable, shall upon payment in full of the respective indebtedness relating to them, have no further rights, claims or interests whatsoever under this Agreement.

Section 20.    Deferred Completion of Certain Exhibits.  Exhibit 2.1(b) has not yet been completed, agreed upon or attached hereto (the "Deferred AA Exhibit").  Merchant and Agent hereby agree that each of them will continue to work in good faith toward completion and mutual agreement on the form and content of the Deferred AA Exhibit by the Outside Time (as defined in the APA).  If the Merchant and Agent timely reach such agreement, such mutually agreed Deferred AA Exhibit shall be attached hereto as though it was attached to this Agreement at execution. Should the Merchant and Agent fail to reach mutual agreement on the Deferred AA Exhibit by the Outside Time, this Agreement and the APA shall automatically terminate without any further action by any party hereto and be of no further force or effect.  In such event, no party hereto shall have any rights, obligations, claims or causes of action of any kind hereunder or relating hereto against any other party hereto.

Section 21.    Non-Recourse.  All claims, obligations, liabilities or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with or relate in any manner to this Agreement, the negotiation, execution or performance of this Agreement (including, without limitation, any representation or warranty made in connection with or as an inducement to this Agreement) or the transactions contemplated hereby may be made only against (and are those solely of) the persons and/or entities (each, a "Person") that are expressly identified as parties to this Agreement (including, without, limitation, Guarantor).  No other Person, including, without limitation, any of their affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to, any of the foregoing shall have any liabilities (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with, or related in any manner to, this Agreement or based on, in respect of, or by reason of, this Agreement or its negotiation, execution, performance or breach.

43

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**MERCHANT:**

**AMERICAN SIGNATURE, INC.**

By: _____
Name:  Rudolph Morando
Title:  Co-Chief Restructuring Officer

**AMERICAN SIGNATURE HOME INC.**

By: _____
Name:  Tod H. Friedman
Title:  General Counsel

**AMERICAN SIGNATURE USA INC.**

By: _____
Name:  Tod H. Friedman
Title:  General Counsel

**ASI PURE PROMISE INSURANCE LLC**

By: _____
Name:  Tod H. Friedman
Title:  General Counsel

**ASI ELSTON LLC**

By: _____
Name:  Tod H. Friedman
Title:  General Counsel

4911-7915-1996.1 03721.00001          *[Signature page to Agency Agreement]*

**ASI – LAPORTE LLC**

By: _____
Name: Tod H. Friedman
Title: General Counsel

**ASI POLARIS LLC**

By: _____
Name: Tod H. Friedman
Title: General Counsel

**ASI THOMASVILLE LLC**

By: _____
Name: Tod H. Friedman
Title: General Counsel

**AMERICAN SIGNATURE WOODBRIDGE LLC**

By: _____
Name: Tod H. Friedman
Title: General Counsel

**ASI PURCHASER LLC**
**as Agent**

By: _____
Name: JEFFRY SWANSON
Title: MANAGER

**SEI, INC.**
**as Guarantor**

By: _____
Name: JEFFRY SWANSON
Title: VICE PRESIDENT

*[Signature Page to the Agency Agreement]*

Docusign Envelope ID: 9F9B64BF-8A8B-418D-BC37-9274CDFE6B69

CONSENTED AND AGREED TO BY:

SECOND AVENUE CAPITAL PARTNERS LLC,
as ABL Agent and DIP Agent

By:   Mark Gallivan

      Name:   Mark Gallivan
      Title:   Authorized Signer

**Exhibit 8.1(a)**

**Sale Guidelines[1]**

1.  The Sales shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2.  The Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday prior to the commencement of the Sales.

3.  On "shopping center" property, the Merchant and the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the applicable Merchant Lease for such premises or if distribution is customary in the "shopping center" in which such Store is located; *provided* that the Merchant and the Agent may solicit customers in the Stores themselves. On "shopping center" property, the Merchant and the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or otherwise agreed to by the landlord.

4.  At the conclusion of the Sale (or, if later, the end of the Designation Rights Period (as defined in the APA), the Merchant and the Agent shall vacate the Stores; *provided* that the Merchant may abandon any Remaining Merchandise or Owned FF&E not sold in the Sales following the Sale Termination Date, without cost or liability of any kind to the Merchant and the Agent. Any abandoned Remaining Merchandise or Owned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant and the Agent.

5.  The Merchant and the Agent may advertise the Sales as "store closing," "sale on everything," "total liquidation," "total inventory blowout," "everything must go," "everything on sale," "going-out-of-business," or similar-themed sales. The Merchant and the Agents may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.

6.  The Merchant and the Agent shall be permitted to utilize sign-walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its

---

[1] Capitalized terms used but not defined in these Sale Guidelines have the meanings given to them in the Agreement to which these Sale Guidelines are attached as Exhibit A.

display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (a) nonenclosed mall Stores and (b) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; *provided, however*, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, and shall not be wider than the storefront of the Store. In addition, the Merchant and the Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Merchant and the Agent any additional restrictions not contained in the applicable lease agreement.

7.     Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

8.     Except with respect to the hanging of exterior banners, the Merchant and the Agent shall not make any alterations to the storefront or exterior walls of any Store, except as authorized by the applicable lease.

9.     The Merchant and the Agent shall not make any alterations to interior or exterior Store lighting, except as authorized by the applicable lease. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

10.    The Merchant shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

11.    The Merchant and the Agent are authorized to enter into "side letters" with the landlord of any Store without further order of the Bankruptcy Court, provided that such agreements do not have a material adverse effect on the Sale.

12.    The Merchant and the Agent may advertise the sale of the Owned FF&E in a manner consistent with these Sale Guidelines. The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, provided, however, that the foregoing shall not apply to de minimis sales of Merchant owned Sale Assets made whereby the item can be carried out of the Store in a shopping bag.

13.    The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.