## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| American Signature, Inc., *et al.*,[1] | Case No. 25-12105 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 18, 104** |
| | **Hearing Date: Dec. 15, 2025 at 10:30 a.m. (ET)** |
| | **Obj. Deadline: Dec. 10, 2025 at 4:00 p.m. (ET)** |

## UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (A) ASSUME THE CONSULTING AGREEMENT, (B) CONDUCT STORE CLOSING SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, AND (C) GRANTING RELATED RELIEF

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, hereby objects (this "Objection") to the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Assume the Consulting Agreement, (B) Conduct Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (C) Granting Related Relief* [D.I. 18] (the "Motion"), and in support of this Objection respectfully states:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: American Signature, Inc. (6162); American Signature Home Inc. (8573); American Signature USA Inc. (6162); ASI Pure Promise Insurance LLC (6162); ASI Elston LLC (7520); ASI – Laporte LLC (6162); ASI Polaris LLC (6162); ASI Thomasville LLC (6162); and American Signature Woodbridge LLC (6162). The Debtors' business address is 4300 E. 5th Avenue, Columbus, OH 43235.

**PRELIMINARY STATEMENT**[2]

1.       The Court should deny final approval of the Motion because SB360 Capital Partners, LLC ("SB360," or, the "Consultant") is an estate professional subject to the disinterestedness requirements of section 327(a) of the Bankruptcy Code, which it does not and cannot satisfy.

2.       Courts in this district have applied a six-factor test articulated in *In re First Merchants Acceptance Corp.*, 1997 Bankr. LEXIS 2245, 1997 WL 873551 at *3 (D. Del. Dec. 15, 1997) to determine whether an entity is an "other professional person" within the meaning of section 327(a). The Consultant satisfies the *First Merchant* factors—whether the Consultant's proposed services are considered in isolation or in the broader context of the Consultant's myriad connections to the Debtors, their affiliates and their controlling stockholders.

3.       The Debtors concede (as they must) that the Consultant is their affiliate, and therefore an insider as that term is defined in the Bankruptcy Code. That connection—along with the many other overlapping interests described in more detail herein—disqualifies the Consultant from retention under section 327(a). Accordingly, the Motion must be denied.

4.       If the Court determines that the Consultant is not a professional subject to section 327(a), the Court should nonetheless deny the Motion. That is because the Motion is central to an integrated series of insider transactions and does not pass the heightened scrutiny the Court should apply pursuant to sections 363 and 365 of the Bankruptcy Code.[3]

---

[2] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them herein. Capitalized terms used but not otherwise defined in this Objection shall have the meanings ascribed to them in the Motion.

[3] As discussed further below, the U.S. Trustee contends the Court should evaluate the Motion using the Entire Fairness standard. *See In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 700 (Del. 2023) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983)).

5.      These chapter 11 cases are structured to benefit one group of insiders—the Schottenstein family—who stand on all sides of the case-defining transaction proposed in the Motion. Specifically, it is undisputed that the Schottenstein family:

(a)      wholly owns the Debtors indirectly "through various trusts";

(b)      wholly owns the Stalking Horse Bidder, directly or indirectly;

(c)      wholly owns the Stalking Horse Bidder's guarantor—SEI, Inc.— directly or indirectly; and

(d)      holds a 60% interest in Holdings indirectly "through various trusts."

Holdings, in turn, wholly owns both the proposed Consultant and Second Avenue Capital Partners LLC ("SACP") (the Debtors' prepetition ABL Agent/Lender and now DIP Agent/Lender).

6.      Stated differently, the Schottenstein family is (a) loaning its own entities money to fund chapter 11 cases in which (b) the Schottenstein family will purchase principally all assets of those same entities from themselves while simultaneously (c) paying fees to the Consultant (in which they hold a 60% interest) to liquidate those same entities. Where, as here, a controlling stockholder stands on all sides of a transaction, the Court should not defer to the Debtors' business judgment. Instead, the Court should apply the more exacting Entire Fairness standard and find that the Debtors have not met their burden thereunder. However, the U.S. Trustee submits that, under the facts and circumstances of these cases, the Debtors cannot meet their burden even under the more deferential business judgment standard.

7.      Accordingly, and for the reasons stated in more detail herein, the U.S. Trustee respectfully requests that the Court deny final approval of the Motion.

## JURISDICTION AND STANDING

8.      This Court has jurisdiction to hear and determine the Motion and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the

District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

9.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

10.     The U.S. Trustee has standing to be heard on this Objection pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## **BACKGROUND**

### A.      **The Chapter 11 Cases**

11.     On November 22, 2025 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code," or "Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing their respective above-captioned chapter 11 cases (the "Chapter 11 Cases").

12.     The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

13.     The U.S. Trustee appointed a committee of unsecured creditors on December 4, 2025. [D.I. 119]. No trustee or examiner has been appointed in the Chapter 11 Cases.

14.     On November 23, 2025, the Debtors filed the *Declaration of Rudolph Morando in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [D.I. 5] (the "<u>First Day Declaration</u>," or "<u>First Day Decl.</u>").

**B.     <u>The Motion and Consulting Agreement</u>**

15.     On November 24, 2025, the Debtors filed the Motion, which requests, among other things: (a) authority under section 365 of the Code to assume the Consulting Agreement and amendments thereto; and (b) to receive property outside the ordinary course of business from the Debtors under section 363 of the Code, whereby SB360 will liquidate certain of the Debtors' assets pursuant to certain sale guidelines.

16.     On December 3, 2025, in support of the Motion, SB360 submitted the *Declaration of SB360 Capital Partners, LLC In Support Of Debtors' Motion For Entry Of Interim And Final Orders Authorizing The Debtors To (A) Assume The Consulting Agreement, (B) Conduct Store Closing Sales, With Such Sales To Be Free And Clear Of All Liens, Claims, And Encumbrances, And (C) Granting Related Relief* [D.I. 116] (the "<u>Raskin Declaration</u>," or "<u>Raskin Decl.</u>").

17.     The Debtors have agreed to pay SB360 fees for its services under the Consulting Agreement including: "a fee to Consultant, equal to two percent (2.0%) of Gross Proceeds from the sale of Merchandise, plus the Pre-Sale Orders Handling Fee. In addition, Consultant shall retain (or be paid) ten percent (10%) of the Companies fee from the sales of Rugs." Mot. at p. 8 (summary chart "Compensation for Consultant"). The Consultant also is permitted to sell Additional Merchandise through the Debtors' points of Sale, in exchange for a payment to the Debtors of 7.0% of the gross proceeds (excluding Sale Taxes). *Id.* This provision revised a term from the Original Agreement providing for 50/50 sharing of the net proceeds from such sales. *Id.* at n.8.

18.    The Consulting Agreement was attached, along with its Amendment, to the Motion.

[D.I. 18-1]. Section 2 of the Consulting Agreement, titled "Consulting Services," sets forth the

activities of SB360:

2.1 Company hereby retains Consultant and Consultant hereby agrees to serve as the exclusive consultant to the Company in connection with the conduct of the Sale as set forth herein. With respect to the Sale and during the Sale Term, Consultant shall serve as the sole and exclusive consultant to the Company relative to the conduct of the Sale at the Stores or future stores which may be included within this Agreement in the Company's sole discretion.

2.2 On the terms and conditions set forth herein, commencing as of the Sale Commencement Date, the Consultant shall provide the Company with the following Services with respect to the conduct of the Sale:

(i) provision of qualified Supervisors to supervise and assist Company in its conduct of the Sale as further described in Section 2.3 below, including such lead, regional, financial, and field Supervisors as needed (after consultation with Company) *to assist* Company in conducting the Sale a*nd oversee the Sale process*;

(ii) provide the Company with such *oversight, supervision and guidance* with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and Owned FF&E from the Stores as may be required *to maximize Gross Proceeds and proceeds from Owned FF&E*;

(iii) *recommend and implement* appropriate point of purchase, point of sale and external advertising to effectively sell the Merchandise during the Sale Term, consistent with the theme of the Sale and the Sale Guidelines, it being understood that the *Sale will be advertised as specified by the Company on a per store basis as a "Total Inventory Blowout", "Store Closing", "Everything on Sale" or similar handles throughout the term of the Sale*;

(iv) *advise the Company* as to appropriate discounting of Merchandise, appropriate staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees;

(v) *recommend an acceptable sign package* to be used throughout the Sale Term subject to the Company's final approval

(vi) *oversee the display of Merchandise* in the Stores;

(vii) *assist Company in the formulation and implementation* of a loss prevention program designed to protect the Merchandise from theft or other shortages;

(viii) *assist Company with accounting functions for the Stores*, including evaluation of sales of Merchandise by category, sales reporting and monitoring of expenses, in each case using Company's infrastructure and IT systems;

(ix) to the extent requested by the Company, *recommend and implement the transfer and balancing of Merchandise between and among the Stores to maximize results during the Sale*;

(x) *participate in weekly calls with representatives of the Company*;

(xii) coordinate with Company regarding an advertising and signage program to direct customers to Company's on-going stores;

(xiii) with the permission of the Company, provide Additional Merchandise to be procured by the Consultant:

(xiv) leave the Stores in white box condition after the Sale Termination Date; and

(xiv) *provide such other related services deemed necessary or prudent by the Company and the Consultant, or as reasonably requested by the Company* under the circumstances giving rise to the Sale.

[D.I. 18-1 at ECF p. 30-31] (emphasis added).

19.     Section 10.8 of the Consulting Agreement, describing certain Affirmative Duties of the Company, covers implementation of the Agreement in the event of a "petition for reorganization." That section makes it the Debtors' responsibility to seek Court approval of the Agreement in a form reasonably acceptable to the Consultant, including various provisions that Consultant Payments govern over any "dip or cash collateral order." *Id.* at ECF p. 39.

20.     Section 12 of the Consulting Agreement includes "Miscellaneous" notice parties. These include, on behalf of the Debtors, Eric Jackson and Tod Friedman. [D.I. 18-1 at ECF p. 40]. Mr. Friedman uses an "@spgroup.com" email address. In 2023, public news reporting identified him as "the executive vice president and chief legal officer of Schottenstein Stores Corporation."[4]

---

[4] Columbus Jewish News, *Tod H. Friedman/Executive Vice President and Chief Legal Officer, Schottenstein Property Group and Value City Furniture/American Signature Furniture* (Mar. 23, 2023) (https://www.columbusjewishnews.com/features/special_sections/local_lawyers_super_attorneys/profiles/

Schottenstein Stores Corporation is ASI's parent entity. *See* [D.I. 5-1] (attaching an organizational chart). Mr. Friedman is also listed as a member of ASI's Board of Directors. *See* Raskin Decl. at ¶ 6.

21.    The Amendment to the Consulting Agreement implemented four categories of substantive changes: (1) deleting the definitions of Additional Merchandise Expenses, Additional Merchandise Proceeds, and Additional Merchandise Net Proceeds; (2) inserting a new Section 3.2 requiring funding of (a) a $125,000 "Prepayment" to the Consultant, and (b) an $800,000 payment for signage for additional stores; (3) removing the provision authorizing the Debtors to retain 50% of Additional Merchandise Net Proceeds and replacing it with a provision granting the Debtors 7.0% of gross proceeds (excluding Sales Taxes); and (4) allocating responsibilities regarding Pre-Sale Orders and certain orders placed during the first 18 days of the Sale Term. [D.I. 18-1 at ECF p. 47-50].

22.    Aaron Miller signed the as-filed Amendment on behalf of SB360. *Id.* at ECF p. 50. The Debtors did not countersign the filed Amendment. *Id.*

## C.    Affiliate Status, Common Control, and Other Governance Matters

### i.    Affiliate Status and Common Control

23.    "The Consultant is affiliated with the Debtors." Mot. at ¶ 8.

24.    The Schottenstein family indirectly owns the Debtors through various trusts. First Day Decl. at ¶ 35; Raskin Decl. at ¶ 19(a). The Schottenstein family also wholly owns ASI Purchaser, LLC, the proposed Stalking Horse Bidder. First Day Decl. at ¶ 35. The family appears to have formed the Stalking Horse Bidder as a new entity for the purpose of making the Stalking

---

tod-h-friedman-executive-vice-president-and-chief-legal-officer-schottenstein-property-group-and-value/article_7201dfac-c8c0-11ed-a903-0fdffc1ded18.html) (last accessed Dec. 4, 2025).

Horse Bid. The family also wholly owns SEI, Inc., which is the Stalking Horse Bidder's guarantor. *Id.*

25.     The Schottenstein family also hold a 60% interest in SB360 Holdings ("Holdings"). *Id.* The remaining 40% of Holdings is owned by entities controlled by the Miller family. *See* Raskin Decl. at ¶ 5 (referring to ownership of "SB360" but not distinguishing between Holdings and SB360 Capital Partners, LLC). Holdings, in turn, wholly owns both SB360 and SACP. *See* First Day Decl. at ¶ 20 n.2. SACP is the administrative agent and a lender in connection with the Debtors' first-lien Prepetition ABL Facility and now serves as the Debtors' DIP Agent and DIP Lender. *See* [D.I. 83] (the "Interim DIP Order").

26.     In summary, the Schottenstein family: (a) wholly owns the Debtors, the Stalking Horse Bidder and the Guarantor; and (b) through their 60% interest in Holdings, holds a majority interest in SB360, the Prepetition ABL Agent/Lender and the DIP Agent/Lender.

27.     The Debtors have also disclosed yet another affiliated entity—SACP SPV, LLC ("SACP SPV")—whose members include officers and employees of the Debtors, the Consultant and SACP. SACP SPV participates in loans made by SACP. Eric Jackson (CFO of the Debtors) and Jeff Swanson (a member of the Board of Directors of the Debtors) are members of SACP SPV. Mot. at ¶ 8 n.3. Mr. Jackson signed the Consulting Agreement on behalf of the Debtors. *See* [D.I. 18-1 at ECF p. 43]. Brian Strayton, who is listed as a current director and officer of the Debtors, "is a member of the Advisory Board for SB360's and SACP's investment committees and is a member of SACP SPV." Raskin Decl. at ¶ 19.g. In other words, directors and officers of both the Debtors and SB360 participate in and benefit from SACP's lending activities.

28.     Members of the Schottenstein family are or were active in the management of the Debtors and their affiliates. For example, "Jay Schottenstein is Chairman and CEO of SB360 and

was the Chairmen [sic] of the Board of Directors of the Debtors prior to the filing of the bankruptcy petition." Raskin Decl. at ¶ 19.b.

29.     Joseph Schottenstein "is the Chief Strategy Officer at SB360" and "holds many roles within the broader Schottenstein organization, including Chief Operating Officer and Executive Vice President of Acquisitions and Leasing at Schottenstein Property Group (SPG) and Schottenstein Realty LLC, as well as Executive Vice President of Schottenstein Stores Corporation and a member of its board of directors." *Id.* at ¶ 19.h. At some unspecified time "prior to the filing of the bankruptcy petition," Joseph Schottenstein resigned from "his position."[5] *Id.*

30.     Moreover, the Schottenstein family, through their entity Schottenstein Realty LLC and its subsidiaries and affiliates, "are the landlords for thirty-two' [sic] of the Debtors' retail store locations." *Id.* at ¶ 19.c.

31.     The various Schottenstein affiliates directly benefit from the connections described above. For example, SB360 disclosed that, "[t]hrough its affiliations with the Schottenstein family businesses, SB360 and its affiliates, received certain volume cost savings in connection with various business and employee insurance covering a larger group of the affiliated entities." *Id.* at ¶ 19.o.

    **ii.     Timing Regarding the Execution of the Consulting Agreement**

32.     The Prepetition ABL Documents, which the Debtors entered into in December 2024, required that "if the Debtors, as borrowers, sought to close more than 5 stores at a time," they "agreed to retain SB360 as consultant in connection therewith." *Id.* at ¶ 8 n.3 (disclosing this

---

[5] It is not clear which "position" Joseph Schottenstein resigned from given his numerous roles "within the broader Schottenstein organization" and whether he remains in any of those roles. As of December 10, 2025, Joseph Schottenstein is still listed as SB360's Chief Strategy Officer on the company's public website. *See* https://sb360.com/joseph-schottenstein/ (last visited on Dec. 10, 2025).

loan-to-liquidate provision for the first time eight days after the hearing on interim approval of the Motion).

33.     In September 2025, approximately nine months after entering into the Prepetition ABL Documents, the Debtors commenced store-closing sales at five of their locations. *Id.* at ¶ 8. At that time, the Debtors had not appointed the independent director or formed the Conflicts Committee (defined herein), had not retained BRG or appointed a Chief Restructuring Officer and had not retained SSG (or any other professional) to market the store closing opportunity to any unaffiliated liquidators.

34.     Instead, on or about September 19, 2025—apparently in compliance with the Prepetition ABL Documents—the Debtors executed the Consulting Agreement with SB360. [D.I. 18-1 at ECF p. 27]. The Amendment was "made as of November 5, 2025." *Id.* at ECF p. 47. The record in these cases reflects that no representative of Debtor American Signature Inc. ("ASI") executed the Amendment. *Id.* at ECF p. 50.

35.     After executing the Consulting Agreement, the Debtors engaged BRG to provide professional services in October 2025, but the parties did not execute an engagement agreement until November 7. *See Declaration of Rudolph Morando in Support of Debtors' Motion for Entry of an Order Authorizing the Retention and Employment of Berkeley Research Group, LLC to Provide Co-Chief Restructuring Officers and Additional Personnel for the Debtors, Effective as of the Petition Date* [D.I. 118-4] (the "Morando BRG Declaration") at ¶ 7.

36.     On November 11, 2025, Adam Zalev was appointed to the Board of Directors of ASI to serve as an independent director. First Day Decl. at ¶ 32. Eight days later, on November 19, the ASI Board of Directors constituted a conflicts committee ("Conflicts Committee") with Mr. Zalev as its sole member. *Id.* at ¶ 33. In that capacity, Mr. Zalev holds authority "to negotiate,

review, approve, and ratify all related party transactions." *Id*. The Conflicts Committee has not submitted any declaration in support of the Motion or otherwise provided evidence as to the work it has done on these issues.

37.     During the first day hearing on November 25, 2025, Mr. Morando testified on cross-examination that, to the best of his knowledge, Mr. Zalev did not have "any input into the terms of SB360's engagement as the proposed consultant." *See* Ex. A, 11/25/25 Hrg. Tr. at 83:12 – 84:8.[6] Mr. Morando further testified that he had prepared a comparable analysis as part of his evaluation of the terms of the Consulting Agreement on the Debtors' behalf. *See id.* at 78:15 – 80:17 & 86:4 – 90:13.

38.     However, the Debtors have not submitted any declaration of Mr. Morando detailing the comparable analysis. And during the November 25 hearing, Mr. Morando could not identify any instance—whether in the comparable analysis or his experience with restructuring matters that he considered—where the debtor sought to use an affiliate or insider as its liquidation consultant. *See* Ex. A, Tr. at 86:4 – 90:13. Mr. Morando testified that an unspecified "we" "did negotiate the fees" with respect to the Consulting Agreement. *Id.* at 78:15-22. The documentary evidence, the Consulting Agreement and the Amendment only memorialize changes to the Additional Merchandise provision, which modified the amount the Debtors would receive, required the Debtors to prefund certain expenses, and allocated certain responsibilities regarding Pre-Sale Orders and orders placed within the first 18 days of the sale term. [D.I. 18-1 at ECF p. 47-50].

39.     Neither Mr. Morando nor BRG were engaged when the Consulting Agreement was executed and when the Debtors became obligated to utilize SB360 as Consultant. *Compare*

---

[6] A true and correct copy of the November 25, 2025 hearing transcript is attached hereto as **Exhibit A** and incorporated herein by reference.

Morando BRG Decl. at ¶ 7 *with* [D.I. 18-1 at ECF p. 27 & 47]. Mr. Morando's testimony upon redirect examination only confirmed that he "had a number [of] conversations together about this" with the Conflicts Committee. Ex. A, Tr. at 91:3-19 (bracketed text added). Mr. Morando did not testify that the Conflicts Committee had expressly ratified the Consulting Agreement and Amendment. *See id.* Both the Consulting Agreement and Amendment predate Mr. Zalev's appointment as an independent director and designation as the sole member of the Conflicts Committee. It is unclear whether the Debtors or BRG asked Mr. Zalev to review or ratify the Prepetition ABL Documents, which obligate the Debtors to use SB360 as a consultant when simultaneously conducting more than five store-closing sales.[7]

### iii.    Interplay with the Bid Procedures and DIP Financing Relief

40.    On November 26, 2025, the Debtors filed the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter Into (I) Stalking Horse Asset Purchase Agreement and (II) Stalking Horse Agency Agreement and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [D.I. 108] (the "Bid Procedures Motion").

---

[7] The Debtors assert that "[t]he accelerated Maturity Date of the Prepetition ABL Obligations occurred prior to the Petition Date." First Day Decl. at ¶ 20. It is unclear when or why SACP accelerated the maturity date, including whether SACP did so before the Debtors engaged BRG or appointed the independent director. It is also unclear when the Debtors defaulted or what the nature of any such default was.

41. The Bid Procedures Motion provides that the Stalking Horse Bidder shall receive Bid Protections in the form of an Expense Reimbursement capped at $1.5 million and an "Augment Purchase," with such Bid Protections payable from the proceeds of a Subsequent Transaction. [D.I. 108 at p. 36]. The Augment Purchase "requires the Debtors to compensate the Stalking Horse Bidder for the Additional Agent Goods purchased by the Stalking Horse Agent in anticipation of the sales contemplated under the Stalking Horse Agency Agreement." Bid Procedures Mot. at ¶ 43. "Additional Agent Goods" means "goods procured by [the Stalking Horse Agent] which are of like kind, and no lesser quality to the Merchandise in the Sale." Stalking Horse Agency Agreement, § 8.9(A).[8] There is no apparent limit on the Augment Purchase. *See* Stalking Horse APA, § 8.2(a)(ii).

42. The Bid Procedures attached to the proposed Bid Procedures Order as Exhibit 1 provide that "[o]n or prior to December 25, 2025, the Stalking Horse Bidder will notify the Debtors of the amount of the Augment Purchase as of such date." Bid Procedures at § II.d n.5. The Stalking Horse Bidder "will also notify the Debtors of any additional Augment Purchases incurred after December 25, 2025, through January 2, 2026." *Id.* The Debtors will then, at some point (no deadline is provided in the Bid Procedures), "notify bidders and the DIP Agent of the amounts of the Augment Purchases that has [sic] been provided them by the Stalking Horse Bidder." *Id.*

43. The Bid Procedures also provide for "Consultation Parties," including "the DIP Agent and the Prepetition ABL Agent" (i.e., SACP) and the Committee. Bid Procedures, p. 14. The Bid Procedures do not impose any limitations on information sharing between SACP and the Stalking Horse Bidder (or any other Schottenstein entity).

---

[8] "Merchandise" is defined in section 5.2(a) of the Stalking Horse Agency Agreement.

44.     Notwithstanding the formation of the Stalking Horse Bidder as proposed purchaser and liquidating agent, the Debtors anticipate that the Stalking Horse Bidder will "delegate" responsibility for liquidating the Debtors' stores to SB360. Bid Procedures Mot., ¶ 8, n.3 ("[T]he Debtors anticipate that they will shortly enter into agreements" with the Stalking Horse Bidder to, among other things, "grant the Stalking Horse Bidder the right to act as the Debtors' agent for purposes of liquidating their inventory, furniture, fixtures and equipment at certain locations, *with respect to which [SB360] is expected to be delegated responsibility*.") (emphasis added).

45.     Further, the Debtor-in-Possession Credit Agreement between ASI and SACP [D.I. 14-1, Ex. 2] (the "DIP Credit Agreement") provides that SB360 will act as liquidation consultant on certain "Specified Store Closing Sales." DIP Credit Agreement, ECF p. 116. This includes, without limitation, sales at stores "designated" by ASI within three weeks after the Petition Date (subject to SACP's approval). *Id.* The DIP Credit Agreement further provides that any stores not acquired under a "Purchase Agreement"—whether with the Stalking Horse Bidder or otherwise— will automatically be deemed to be subject to Specified Store Closing Sales and liquidated by SB360 pursuant to the Consulting Agreement. *Id.*

## OBJECTION

I.      **The Court Should Deny the Motion Because SB360 is an Estate Professional and Cannot Satisfy the Disinterestedness Requirements of Section 327(a) of the Code**

46.     Section 327(a) of the Bankruptcy Code provides that the trustee or debtor-in-possession, "with the court's approval, may employ one or more attorneys, accountants, appraisers, *auctioneers, or other professional persons*, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a) (emphasis added).

47.     Additionally, Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that: "[a]n order approving the employment of attorneys, accountants, appraisers, *auctioneers*, *agents*, or other professionals pursuant to § 327 … of the Code shall be made only on application of the trustee or committee." Fed. R. Bankr. P. 2014(a) (emphasis added).

48.     An "agent" is defined as "someone who is authorized to act for or in place of another; a representative[.]" BLACK'S LAW DICTIONARY (12th ed. 2024). An "auctioneer" is defined as "[a] person legally authorized to sell goods or lands of other persons at public auction for a commission or fee." *Id.*[9]

49.     The term "disinterested person" is defined in Code section 101(14) as a person that:

(A)     is not a creditor, an equity security holder, or an insider;

(B)     is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(C)     does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

50.     Section 101(31)(B) of the Bankruptcy Code defines an "insider" for a corporation to include:

(i)     director of the debtor;

(ii)    officer of the debtor;

(iii)   person in control of the debtor;

---

[9] An auction is simply "[a] public sale of property to the highest bidder." BLACK'S LAW DICTIONARY (10th ed. 2014).

(iv)     partnership in which the debtor is a general partner;

(v)      general partner of the debtor; or

(vi)     relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. § 101(31)(B); *see also In re QDN, LLC*, 363 F. App'x 873, 876 n.4 (3d Cir. 2010) ("Limited liability companies are eligible to file bankruptcy petitions because they are sufficiently similar to a corporation and limit responsibility for the debts to the capital subscribed.") (citations omitted). The term "insider" also includes an "affiliate, or insider of an affiliate as if such affiliate were the debtor[.]" 11 U.S.C. § 101(31)(E).

51.     The purpose of section 327 is to ensure both that the person's employment is held to the strictest of fiduciary standards and that the professional possesses no conflict of interest with the estate. *See In re Cornerstone Prods., Inc*., 416 B.R. 591, 608 (Bankr. E.D. Tex. 2008) ("The purpose of § 327(a) is to ensure that any auctioneer or other professional appointed to represent the estate will tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities."); *In re Buchanan*, No. 98-10576-SSM, 1998 WL 1041291, at *2 (Bankr. E.D. Va. Aug. 11, 1998). Bankruptcy Rule 2014 dictates the manner in which a professional must be retained under section 327 and requires that the application state, among other things, the specific facts showing the necessity for the employment, the reasons for the selection, and any connections with parties in interest. *See* Fed. R. Bankr. P. 2014.

52.     Here, SB360 is a professional person that holds or represents an interest adverse to the Debtors' estates and is not a "disinterested person." Accordingly, SB360 cannot be employed under section 327(a) of the Bankruptcy Code.

53.     SB360 is the Debtors' affiliate. Mot. at ¶ 8. SB360 and the Debtors are both indirectly owned and controlled by the Schottenstein family. *See* First Day Decl. at ¶ 35; Raskin

Decl. at ¶ 5. The Debtors anticipate that if the Stalking Horse Bidder (also a Schottenstein entity) is the successful bidder for the Debtors' assets, it will "delegate" to SB360 the rights to liquidate the Debtors' stores under the Stalking Horse Agency Agreement. Mot. at ¶ 8, n.3. Numerous individuals—including without limitation Jay Schottenstein, Joseph Schottenstein, Brian Strayton, Tod H. Friedman and Eric Jackson—hold roles at affiliates of these Debtors (including SB360), and either held or continue to hold roles with the Debtors. The facts relevant to the retention of SB360 developed at a time when multiple such individuals (Joseph Schottenstein and Brian Strayton at a minimum) held director and officer positions at both SB360's parent and ASI. *See* Raskin Decl. at ¶¶ 6 & 19. Put simply, the Court would be well supported in finding that SB360 lacks disinterestedness on any number of bases.

54.     Courts in this district have also applied the factors set forth in *In re First Merchants Acceptance Corp.*, 97-1500 JJF, 1997 WL 873551, at *1 (D. Del. Dec. 15, 1997) to determine whether a particular entity was a "professional" under 327(a). Those factors are as follows:

> (i)     whether the employee controls, manages, administers, invests, purchases or sells assets that are significant to the debtor's reorganization;

> (ii)    whether the employee is involved in negotiating the terms of a Plan of Reorganization;

> (iii)   whether the employment is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations;

> (iv)    whether the employee is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate, i.e. the qualitative approach;

> (v)     the extent of the employee's involvement in the administration of the debtor's estate, i.e. the quantitative approach; and

(vi)     whether the employee's services involve some degree of special knowledge or skill, such that the employee can be considered a "professional" within the ordinary meaning of the term.

*Id.* at **3-5 (applying factors, concluding that proposed "consultant" was a professional within the meaning of section 327(a) and lacked disinterestedness, and denying motion to approve consultation agreement).

55.     Applied here, in evaluating the *First Merchants* factors, this Court can conclude that SB360 is a professional when SB360's proposed services are considered standing alone. If the Court broadens its analysis to account for the common control by the Schottenstein family over the Debtors and SB360, this fact renders SB360 an interested professional performing services central to the Debtors' Chapter 11 Cases and, by extension, prohibited from employment under 11 U.S.C. § 327(a).

56.     Evaluating the factors only as to SB360's proposed services: (a) SB360 is currently liquidating 33 stores; (b) the Debtors will delegate to SB360 responsibility for additional liquidations pursuant to the Stalking Horse Agency Agreement if the Stalking Horse Bid succeeds; and (c) the DIP Credit Agreement provides that SB360 will conduct all Specified Store Closing Sales, including at *all* stores that are not acquired pursuant to a Purchase Agreement. Moreover, the closing of stores and liquidation of inventory is definitionally outside the routine maintenance of the Debtors' business operations, and much argument was made during the first day hearing about the value of services that SB360 or its competitors might bring to this and similar situations. Thus, the first, third, fourth and fifth *First Merchants* factors are all satisfied. As to the sixth *First Merchants* factor—and although the *Brookstone* decision found that factor unhelpful—SB360 has specialized knowledge and skills warranting a finding that it is a professional.

57.     Considering the totality of the connections among the Debtors, SB360, SACP, the Stalking Horse and the Schottenstein family, all six factors from *First Merchants* weigh in favor of finding that SB360 is a professional that must be retained under section 327(a) of the Code.

58.     The first and second factors are satisfied because all of the foregoing parties are affiliates ultimately under common control with equity ownership resting in the Schottenstein family. The Schottenstein entities are making decisions about the permitted path forward for the Debtors, they hold the purse strings through the DIP financing, and they have set aggressive milestones requiring certain actions occur lest the Debtors default on their secured obligations. If a plan is proposed, input will be required from multiple entities in the Schottenstein group. *E.g.*, DIP Credit Agreement, § 8.01(u)(ii)-(iv) (providing, among other things, that an Event of Default shall occur thereunder upon "the entry of an order in any of the Chapter 11 Cases confirming a plan that … is not acceptable to [SACP] in its Permitted Discretion[.]").

59.     The third factor is satisfied because, as noted above, liquidation of stores and store closures are not the ordinary course of business, and the Consultant has an active role in determining strategy with property covered by the closings. In the broader context, SB360 is also earmarked to be delegated additional work if the Stalking Horse is the winning bidder, but at an additional level of removal from the relief at bar with the Motion.

60.     The fourth factor is satisfied because the Schottenstein group has discretion per the DIP financing to fund these cases. Should the Debtors oppose requests from SACP, then the Debtors risk a default.

61.     The fifth factor is satisfied because SB360 is the proposed professional, its affiliated Stalking Horse Bidder is poised to purchase additional assets and delegate additional work to

SB360, SACP is the DIP Agent and Lender, and the ultimate parent of all the foregoing entities also wholly owns the Debtors.

62.     The sixth factor, like the third factor, remains satisfied because of SB360's expertise, but with the added context of the additional services to be delegated to SB360 pursuant to the Bid Procedures and DIP Credit Agreement, which further illustrates the pervasive influence of Schottenstein family interests over these Chapter 11 Cases.

63.     Accordingly, and for all the reasons stated above, the U.S. Trustee submits that SB360 is a "professional" under section 327(a) of the Code, and its retention should be evaluated through that section's statutory framework. Because SB360 is an affiliate of the Debtors, with common directors and officers present, it is not disinterested. Moreover, SB360 holds or represents a material adverse interest by virtue of its generating additional fees from further store closings/liquidations. This dictates that SB360 cannot be retained under section 327(a) of the Bankruptcy Code, and consequently the Court should deny the Motion on a final basis.

**II.     Alternatively, the Court Should Deny the Motion Because the Insider Transactions Contemplated Therein Are Subject to the Entire Fairness Standard, and the Debtors Have Failed to Meet Their Burden Thereunder**

64.     If the Court determines that SB360 is not a professional subject to the retention requirements of section 327(a) (which the Court should not do), the Court should nonetheless reject deference to the Debtors' business judgment and deny the Motion. That is because the Motion and Consulting Agreement are part of an integrated series of insider transactions that are subject to Entire Fairness review, and the Debtors have not met (and cannot meet) their burden thereunder. However, even if the Court applies business judgment review, the Motion cannot pass muster for the reasons described in more detail herein.

A.    **The Court Should Not Defer to the Debtors' Business Judgment**

65.    A debtor in possession "is bound by a duty of loyalty that includes an obligation to refrain from self dealing, [and] to avoid conflicts of interests and the appearance of impropriety," including in the exercise of the debtor's business judgment. *See In re Coram Healthcare Corp.*, 271 B.R. 228, 235 (Bankr. D. Del. 2001). And so long as the debtor remains in possession, "it is clear that the corporation bears essentially the same fiduciary obligation to the creditors as does the trustee for the Debtor out of possession." *Id.* Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate" on behalf of the debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (*quoting In re CoServ, LLC*, 273 (B.R. 487, 497 (Bankr. N.D. Tex. 2002).

66.    The Third Circuit applies the business judgment standard in assessing the decision of a trustee or debtor in possession to assume or reject an executory contract. *See Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp. (In re Sharon Steel)*, 872 F.2d 36, 39 (3d Cir. 1989); *City of Rockford v. Mallinckrodt PLC (In re Mallinckrodt PLC)*, No. 21-167-LPS, 2022 WL 906458, 2022 U.S. Dist. LEXIS 54785, at *15 & *19 (D. Del. Mar. 28, 2022) (citing *In re Culp*, 545 B.R. 827, 844 (D. Del. 2016) (§ 363(b)), *aff'd*, 681 F. App'x 140 (3d Cir. 2017); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (D. Del. 2006) (§ 365(a); *In re Fed. Mogul Glob., Inc.*, 293 B.R. 124, 126 (D. Del. 2003)).[10] "Business judgment" is defined as "the presumption that in making

---

[10] In the *Mallinckrodt* case, the district court affirmed another novel use of sections 363 and 365 and held that section 503 of the Code did not apply or override those sections. *See* 2022 WL 906458 at *9 (affirming bankruptcy court's order pursuant to sections 363 and 365 approving payment of certain fees in connection with an RSA). The facts of the *Mallinckrodt* case and the transactions at issue are completely different from those presented in these Chapter 11 Cases, and in any event the court's analysis there is not binding on this Court. *See Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991) ("There is no such thing as 'the law of the District.'"); *see also Seneca Res. Corp. v. Twp. of Highland*, 863 F.3d 245, 257 (3d Cir. 2017) ("[A] decision of a federal district court judge is not binding precedent in either a

business decisions *not involving direct self-interest or self-dealing*, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest." *In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) (cleaned up) (emphasis added) (quotations and citations omitted).

67.     But that relatively deferential standard does not apply where a party makes "an adequate showing" that the directors breached their duty of loyalty, good faith or care in reaching a decision. *Rafool v. Goldfarb Corp. (In re Fleming Packaging Corp.)*, 351 B.R. 626, 634 (Bankr. C.D. Ill. 2006). For example, board decisions are not entitled to deference under the business judgment rule where the directors: (i) committed fraud or corporate waste; (ii) engaged in self-dealing; (iii) made decisions affected by a conflict of interest; (iv) acted in bad faith or with a corrupt motive; or (v) reached their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available. *See id.* (holding that in the foregoing scenarios, "[t]he protection against judicial review of the substantive merits of a board decision afforded by the business judgment rule does not apply[.]").[11]

68.     Here, the uncontested facts detailed above provide an adequate showing of a self-dealing transaction with a grossly negligent process. Accordingly, the Court should reject deference to the Debtors' business judgment in connection with the Motion and Consulting Agreements.

---

different judicial district, the same judicial district, or even upon the same judge in a different case.") (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)); *In re U.S. Wireless Corp.*, 384 B.R. 713, 723 n.62 (Bankr. D. Del. 2008) ("In the Third Circuit . . . the decision of a district court is not binding on a bankruptcy court.") (citing *Threadgill*).

[11] Matters "related to the assumption or rejection of executory contracts" may proceed by motion practice, which "provid[es] a better fit" than commencing an adversary proceeding. *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 188 F.3d 116, 124 (3d Cir. 1999).

69.     Moreover, the Court should not apply business judgment review where a debtor's discretion is cabined by other statutory requirements under the Bankruptcy Code:

> Termination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503, which, in relevant part, permits the payment of post-petition administrative expenses only to the extent that they constitute "the actual, necessary costs and expenses of preserving the estate," [citations]. In light of this statutory requirement, we rejected application of a business judgment rule, under which a requested termination fee would be approved if the debtor had a good faith belief that the fee would benefit the estate. [Citation]. "The allowability of break-up fees," we said, instead "depends upon the requesting party's ability to show that the fees are actually necessary to preserve the value of the estate."

See *In re Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018) (cleaned up) (citations omitted).

70.     Applying the Third Circuit's reasoning in *Energy Future Holdings Corp.* to these Chapter 11 Cases, the Court should likewise reject application of the business judgment rule to the self-dealing transaction the Debtors seek to ratify through section 365. *See id.* at 314 ("[I]t is ultimately within a bankruptcy court's discretion to approve or deny a termination fee based on the totality of the circumstances of the particular case").

71.     Rather, under the facts and circumstances of these cases, the Court should apply a more exacting standard. Specifically, and as addressed in <u>Section II.B</u> *infra*, because the same controlling stockholders stand on both sides of the transaction proposed in the Motion, that transaction is subject to Entire Fairness review under corporate law principles. And the Debtors have not met (and cannot meet) their burden under that standard.

**B.**    **The Court Should Apply the Entire Fairness Standard Based on Corporate Law Principles and Deny Assumption or Performance of the Consulting Agreement Because the Debtors Have Not Met Their Burden**

    **i.**    **The Consulting Agreement is Reviewable Under the Entire Fairness Framework and is a Transaction Between the Debtors and an Entity Under Common Control**

72.    While the Entire Fairness standard is most often analyzed in the context of non-bankruptcy corporate transactions, the Bankruptcy Court may evaluate claims that would be brought by shareholders outside of insolvency to determine whether creditors are adversely impacted. *See Liquid. Tr. of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Gp. (In re Hechinger Inv. Co. of Del., Inc.)*, 327 B.R. 537, 547-48 (D. Del. 2005).

73.    In discussing the zone of insolvency and the evaluation of claims, the district court in *Hechinger* observed that:

> If a company reaches the point of insolvency, the directors continue to have the task of attempting to maximize the economic value of the firm. That much of their job does not change. But the fact of insolvency does necessarily affect the constituency on whose behalf the directors are pursuing that end. By definition, the fact of insolvency places the creditors in the shoes normally occupied by the shareholders—that of residual risk-bearers. Where the assets of the company are insufficient to pay its debts, and the remaining equity is underwater, whatever remains of the company's assets will be used to pay creditors, usually either by seniority of debt or on a pro rata basis among debtors of equal priority.

*Id.* (citing *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 2004 WL 2647593, at *13 (Del. Ch. 2004); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communs. Corp.*, 1991 Del. Ch. LEXIS 215, Civ. A. No. 12150, 1991 WL 277613, at *34 & n.55 (Del. Ch. Dec. 30, 1991) ("Where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residual risk bearers, but owes its duty to the corporate enterprise", including the corporation's creditors); *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc.*, 178 B.R. 956, 968-69 (D. Del. 1994)).

74.    The Entire Fairness standard is described in many Delaware State corporate decisions. *See, e.g.*, *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 700 (Del. 2023) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983)). "Delaware decisions have applied the entire fairness framework to compensation arrangements, consulting agreements, services agreements, and similar transactions between a controller or its affiliate and the controlled entity." *In re Vaxart, Inc. S'holder Litig.*, 2021 Del. Ch. LEXIS 279, at *52 (Del. Ch. Nov. 30, 2021) (quotation and citation omitted).

75.    "Delaware cases consistently have looked to who wields control over the corporation and have imposed the risk of fiduciary liability on that individual." *See, e.g.*, *In re EZCORP Inc.*, No. 9962-VCL, 2016 Del. Ch. LEXIS 14, at *29 and n.2 (Del. Ch. Jan. 25, 2016) (collecting cases); *see also Shandler v. DLJ Merch. Banking, Inc.*, 2010 Del. Ch. LEXIS 154, 2010 WL 2929654, at *15 (Del. Ch. July 26, 2010) ("Fairly read, the complaint alleges that DLJ, Inc. presided over a family of entities that it dominated and controlled, including the entities that together owned 74% of Insilco's equity. Using their unified power in a concerted way, DLJ controlled Insilco and directed its business strategy, including causing it to employ the DLJ Advisors. … I believe that Shandler has pled sufficient facts from which it can be inferred that the DLJ Funds were instrumentalities operated for the benefit of DLJ, Inc. and DLJMB.").

76.    Here, the Motion seeks approval of assumption or continued performance of the Consulting Agreement. That agreement (and its Amendment) is under the umbrella of reviewable transactions in the corporate context. *See, e.g.*, *Vaxart*, 2021 Del. Ch. LEXIS 279, at *52. And it is undisputed that the Debtors are undertaking obligations with an affiliate (SB360) under common control with the Debtors. *See* Raskin Decl. at ¶¶ 5-6.

> **ii.     The Court Should Deny Final Approval of the Consulting Agreement Because It Fails Under Both Prongs of the Entire Fairness Analysis**

77.     Entire fairness has two elements: "fair dealing and fair price." *See Burtch v. Opus LLC (In re Opus E. LLC)*, 698 F. App'x 711, 718 (3d Cir. 2017) (unpublished opinion) (citing *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011)). "Evidence of fair dealing includes the use of an arm's length bargaining process." *Opus*, 698 F. App'x at 718 (citing *Kahn v. Lynch Comm'n Sys., Inc.*, 669 A.2d 79, 82 (Del. 1995)). Fair dealing also encompasses "reliance on accurate and complete information." *Id.* at 718-19 (citing *e.g., Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 748 (Del. Ch. 2007)). Fair price "relates to the economic and financial considerations" of the proposed transaction. *See id.* at 719 (quoting *Weinberger.*, 457 A.2d at 711).

78.     Entire Fairness is an "exacting" standard and "requires the director to show that the deal was objectively fair, not just that he believed it to be so." *Id.* (citing *In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 78 (D. Del. 2002)). The standard "remains applicable even when an independent committee is utilized." *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997) (citing *Weinberger*, 457 A.2d at 710). That is because "the underlying factors which raise the specter of impropriety can never be completely eradicated and still require careful judicial scrutiny." *Id.* ("This policy reflects the reality that … the controlling shareholder will continue to dominate the company regardless of the outcome of the transaction.") (citing *Citron v. E.I. Du Pont de Nemours & Co.*, Del. Ch., 584 A.2d 490, 502 (1990)).

79.     The controlling or dominant shareholder initially bears the burden of proving entire fairness. *Id.*; *see also In re Match Grp., Inc. Deriv. Litig.*, 315 A.3d 446, 451 (Del. 2024) (controlling stockholder "bears the burden of demonstrating the most scrupulous inherent fairness

of the bargain.") (cleaned up).[12] "Under this onerous standard, 'not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair.'" *RPA Asset Mgmt. Servs., LLC v. Siffin (In re MTE Hldgs., LLC)*, Nos. 19-12269 (CTG), 21-51255 (CTG), 2024 Bankr. LEXIS 1574, at *57 (Bankr. D. Del. June 14, 2024) (quoting *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006)).

80.     Additionally, the Third Circuit has recognized that multi-step transactions—such as the DIP financing, Consulting Agreement and Bid Procedures relief sought in the Chapter 11 Cases—can be collapsed when they are "part of one integrated transaction." *In re Hechinger Inv. Co. of Del., Inc.*, 327 B.R. at 546 (citing *United States v. Tabor Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986); *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 212-13 (3d Cir. 1990); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) (stating that collapsing a transaction is most frequently applied to "lenders who have financed leveraged buyouts of companies that subsequently become insolvent")). When considering whether to "collapse" transactions in this manner, the court's focus is "not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction." *In re Hechinger Inv. Co. of Del., Inc.*, 327 B.R. at 546 (holding that transactions should be collapsed where the parties "all knew about the multiple steps," and "[e]ach step … would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent[.]." (cleaned up) (quotations and citations omitted).

---

[12] Under certain circumstances not applicable here, the controlling shareholder can shift the initial burden to the party challenging the transaction. *See Kahn*, 694 A.2d at 429 (citations and quotations omitted). But "to obtain the benefit of burden shifting, the controlling shareholder must do more than establish a perfunctory committee of outside directors." *Id.* (cleaned up) (citations omitted).

81.     Applied here, the Court should deny final approval of the Motion and the Consulting Agreement because the proposed transactions fail both prongs of Entire Fairness review.

82.     Initially, the Consulting Agreement was not subject to a fair bargaining process. In December 2024, the Debtors agreed to hire SB360, an affiliate, as a condition of obtaining a secured lending facility from another affiliate, SACP. Raskin Decl. at ¶ 8 n.3. Neither BRG nor the Conflicts Committee were involved in that initial agreement. In September 2025, the Debtors commenced store-closing sales at five locations. First Day Decl. at ¶ 31. The Debtors did not market the store closing opportunity to non-affiliated liquidators. Ex. A, Tr. at 89:25 – 90:13. Instead, they engaged SB360 consistent with their obligations under the Prepetition ABL Documents and at a time when no apparent mechanism existed to mitigate the Schottenstein family's interests in both sides of the transaction. *Id.* at ¶¶ 31-33 (describing the necessity for and circumstances of the appointment of the independent director and constitution of the Conflicts Committee two months later).

83.     Likewise, when the Debtors purportedly executed the Amendment in November of 2025, they still had not yet constituted the Conflicts Committee. *Id.* And no party has produced evidence that Mr. Zalev—whether in his capacity as independent director or sole Conflicts Committee member—did indeed review and approve the terms of the Consulting Agreement and Amendment, much less the underlying Prepetition ABL Documents. Ex. A, Tr. at 84:1-15, 91:5-19.

84.     Consequently, the "process" that the Debtors ask this Court to approve occurred over the course of three to six days in November—between the constitution of the Conflicts Committee on November 19 and the filing of the Motion on November 24. First Day Decl. at

¶¶ 31-33.[13] With respect to the Consulting Agreement, the Conflicts Committee's role would have necessarily been limited to retroactive approval of a self-dealing transaction that was already a *fait accompli*. And as noted above, there is no testimony or other evidence that the Conflicts Committee completed that retroactive review and approval. Ex. A, Tr. at 84:1-15, 91:5-19. The inadequacy of this process is further compounded when the Motion is viewed (correctly) as part of an integrated transaction with the DIP financing and Bid Procedures Motion. The Motion, the DIP financing documents and the Bid Procedures Motion *run to a combined 664 pages*. Over the course of three to six days, the Conflicts Committee supposedly exercised "full authority" on the Debtors' behalf over the negotiation, review, approval and ratification of all of these transactions.

85.    The Debtors and SB360 have argued that displacing SB360 would be value destructive. Even if true, that does not ameliorate the fact that multiple individuals who financially benefit from SB360's engagement served as officers and directors of the Debtors until around the Petition Date. This includes:

(a)    Jay Schottenstein as Chairman and CEO of SB360 and the Debtors;

(b)    Joseph Schottenstein as Chief Strategy Officer at SB360, COO at Schottenstein Property Group and Schottenstein Realty, and Executive Vice President at Schottenstein Stores Corporation and a member of its board, while an officer or director at the Debtors;

(c)    Brian Strayton as an SB360 Advisory Board member and member of SACP's investment committees and member of SACP SPV, while a "Current D&O"; and

(d)    additional entities that may benefit from these series of transactions.

---

[13] It is unclear when the Conflicts Committee retained counsel to assist in its review and whether that further shortened the process. First Day Decl. at ¶ 34.

*See* Raskin Decl. at ¶ 19. Further, BRG was not officially retained until November, and the Conflicts Committee was not in place until three days prior to the Petition Date despite the depth and breadth of the interrelated parties and transactions.

86.    Put simply, the Debtors have failed to meet their burden of establishing that they ran a fair process. This is an independent basis upon which the Court can deny final approval of the Motion.

87.    Even if the Court determines that the Debtors ran a fair process (which the Court should not do for all the reasons articulated above), the Court should nonetheless deny the Motion for the separate reason that the Consulting Agreement does not include a fair price. As to fair price, Mr. Morando's November 25 testimony confirms that BRG (i) did not consider SB360's status as a statutory affiliate of the Debtors when evaluating SB360's proposed compensation, and (ii) did not adjust the cases included in its comp analysis to reflect SB360's affiliate status. Ex. A, Tr. at 86:4 – 90:13. Nonetheless, the Debtors rely on that unfiled comp analysis in defense of their business judgment. But the uncontroverted documentary evidence suggests that, rather than improving the terms of the Consulting Agreement, the Debtors relinquished rights to a "50/50" split of net proceeds on the Additional Merchandise in favor of a 7% payment on gross proceeds for the same term of the Consulting Agreement. [D.I. 18-1 at ECF p. 47-50].

88.    The U.S. Trustee identified on the record at the November 25 hearing (*see* Ex. A, Tr. at 117:12 – 120:8) the only instance the U.S. Trustee can recall in this District where a debtor's affiliate served as its liquidation consultant: *In re HDC Holdings II LLC*, Case No. 24-12307-TMH ("*HDC Holdings*"). In that case, Hilco Merchant Resources LLC served as a consultant for HDC Holdings II, LLC and its affiliated debtors-in-possession while itself being an affiliate of the Debtors' majority equity holder. *See* Case No. 24-12307-TMH [D.I. 12 at ¶ 9] (the "HDC Holdings

Motion"). The HDC Holdings debtors benefitted from Hilco foregoing a fee of 1.5-2.5% of gross proceeds from earlier sales services, and ultimately only paid expenses of the sales process. *See id.* at Exhibit 1 (Amendment to Letter Agreement).

89.    In summary, the Court should deny final approval of the Motion because the Debtors have failed to establish that the Consulting Agreement reflects a fair process and fair price. Viewed in the correct light, the Motion and Consulting Agreement are part of an integrated transaction with the DIP financing and Bid Procedures. Through that integrated transaction, the Schottenstein family will sell the assets and agency rights of the Debtors (which they wholly own) to the Stalking Horse Bidder (which they wholly own), who will then "delegate" such agency rights to SB360 (in which the Schottenstein family holds a 60% interest), who will also have its Consulting Agreement assumed. The Schottenstein family will then retain all upside from the sale transaction and resulting liquidations. The Debtors' eleventh-hour formation of the Conflicts Committee does not cure the deficiencies with this integrated transaction. That is because the Conflicts Committee did not have an opportunity to bargain against the Schottenstein family's myriad interests in the related transactions, and neither Mr. Zalev nor the Debtors have produced any contrary evidence. *See* Ex. A, Tr. at 83:12 – 84:8; *see also Kahn v. Tremont Corp.*, 694 A.2d at 428. No evidence exists that shows "even an honest belief that the transaction was entirely fair," let alone that "the transaction itself [is] objectively fair." *See RPA Asset Mgmt. Servs., LLC v. Siffin (In re MTE Hldgs., LLC)*, Nos. 19-12269 (CTG), 21-51255 (CTG), 2024 Bankr. LEXIS 1574, at *57 (Bankr. D. Del. June 14, 2024).

90.    Accordingly, applying the Entire Fairness framework to the Motion and Consulting Agreement, the Court should deny final approval of the Motion.

**C.    The Court Should Deny the Motion Even Under the Business Judgment Standard**

91.    As noted above, the Third Circuit ordinarily applies the business judgment standard in assessing the decision of a trustee or debtor in possession to assume or reject an executory contract. *See, e.g.*, *In re Sharon Steel*, 872 F.2d at 39. Under that standard, the Court must find that the Debtors are acting on an informed basis, in good faith and with the honest belief that assumption of the Consulting Agreements is in the best interests of the Debtors and their estates. *In re Network Access Sols., Corp.*, 330 B.R. at 75.

92.    Here, for all the reasons articulated in <u>Sections II. A-B</u> *supra*, the Court should find that the Debtors have failed to meet their burden even under this more lenient standard.

## <u>RESERVATION OF RIGHTS</u>

93.    The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights to (i) amend or supplement this Objection, and (ii) conduct discovery.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) denying the Motion on a final basis; and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: December 10, 2025

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: */s/ Malcolm M. Bates*
Malcolm M. Bates
Timothy J. Fox, Jr. (DE Bar No. 6737)
Trial Attorneys
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Telephone: (302) 573-6491
Email:   Malcolm.M.Bates@usdoj.gov
         Timothy.Fox@usdoj.gov

## CERTIFICATE OF SERVICE

I, Malcolm M. Bates, hereby certify that on December 10, 2025, I caused to be served a copy of the foregoing Objection by electronic service on the registered parties via the Court's CM/ECF system and courtesy copies were served via email on parties in interest.

Dated: December 10, 2025

*/s/ Malcolm M. Bates*
Malcolm M. Bates