**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>American Signature, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-12105 (JKS)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 108**<br><br>**Hearing Date: Dec. 15, 2025 at 10:30 a.m. (ET)**<br><br>**Obj. Deadline: Dec. 5, 2025 at 10:00 a.m. (ET)[2]** |

**UNITED STATES TRUSTEE'S OBJECTION TO THE
MOTION OF THE DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING
BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER
INTO (I) STALKING HORSE ASSET PURCHASE AGREEMENT AND
(II) STALKING HORSE AGENCY AGREEMENT AND TO PROVIDE BID
PROTECTIONS THEREUNDER, (C) SCHEDULING AN AUCTION AND APPROVING
THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION
AND ASSIGNMENT PROCEDURES, AND (E) SCHEDULING A SALE HEARING
AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF;
(II)(A) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, INTERESTS, AND ENCUMBRANCES AND (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: American Signature, Inc. (6162); American Signature Home Inc. (8573); American Signature USA Inc. (6162); ASI Pure Promise Insurance LLC (6162); ASI Elston LLC (7520); ASI – Laporte LLC (6162); ASI Polaris LLC (6162); ASI Thomasville LLC (6162); and American Signature Woodbridge LLC (6162). The Debtors' business address is 4300 E. 5th Avenue, Columbus, OH 43235.

[2] Extended for the U.S. Trustee by consent of the Debtors to December 10, 2025 at 4:00 p.m.

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, hereby objects (this "Objection") to the above-captioned Debtors' motion seeking the entry of orders, among other things, approving bid procedures for the sale of the Debtors' Aggregate Assets [D.I. 108] (the "Motion"),[3] and in support of this Objection respectfully states:

## PRELIMINARY STATEMENT

1. This Court should deny the Motion for at least the following separate and independent reasons:

   (a) **The Stalking Horse Bidder is not entitled to the Bid Protections.** The Debtors seek authority to provide the Stalking Horse Bidder with an Expense Reimbursement capped at $1.5 million and an Augment Purchase with no apparent limit. But the Stalking Horse Bidder and the Debtors share the same owners. No bid protections were required to induce the Stalking Horse Bidder to serve in its role because the Debtors' owners formed it and wholly own it for that express purpose. The Court should deny this relief because the Bid Protections are not actually necessary to preserve the estates and will chill bidding.

   (b) **The Bid Protections are not entitled to superpriority expense status.** If the Court is inclined to approve the Bid Protections (which the Court should not do), the U.S. Trustee objects to the Bid Protections receiving superpriority expense status, which is not authorized by any provision of the Bankruptcy Code.

   (c) **The Debtors must provide evidence regarding the sale of personally identifiable information.** The assets to be sold include personally identifiable information ("PII") of the Debtors' customers, but the Debtors have not provided competent evidence regarding whether the Sale requires the appointment of a consumer privacy ombudsman ("CPO"). The Court should require the Debtors to make an adequate evidentiary record before approving the Bid Procedures.

   (d) **The Court should not grant an insider of the Stalking Horse Bidder and the Debtors consultation rights.** The proposed Bid Procedures provide for "Consultation Parties" who enjoy consultation rights with respect to, among

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

other things, the evaluation of bids and implementation of the Bid Procedures. These Consultation Parties include the Debtors' "DIP Agent and Prepetition ABL Agent." As described in more detail herein, the DIP Agent/Prepetition ABL Agent is an insider of both the Stalking Horse Bidder and the Debtors. The Bid Procedures do not include any safeguards against information sharing or collusion by the Stalking Horse Bidder and its insider, nor would any such safeguards likely be effective given the nature of the overlapping interests at play. Granting consultation rights to the Stalking Horse Bidder's insider under these facts and circumstances will only further discourage competitive bidding.

2. The U.S. Trustee has provided the Debtors with additional informal comments and objections regarding the proposed Bid Procedures and related documents. The parties continue to discuss these comments and objections in good faith. While the U.S. Trustee is hopeful that the parties will resolve these remaining comments and objections prior to the hearing currently scheduled for December 15, the U.S. Trustee reserves the right to raise any and all objections at that hearing.

3. Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court deny the Motion.

## JURISDICTION AND STANDING

4. This Court has jurisdiction to hear and determine Motion and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

5. Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

6. The U.S. Trustee has standing to be heard on this Objection pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## BACKGROUND

**A.    The Chapter 11 Cases**

7. On November 22, 2025, the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code," or "Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing their respective above-captioned chapter 11 cases (the "Chapter 11 Cases").

8. The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9. On December 4, 2025, pursuant to section 1102(a)(1) of the Bankruptcy Code, the U.S. Trustee appointed an official committee of unsecured creditors in the Chapter 11 Cases (the "Committee"). D.I. 119.

10. As of the date hereof, no trustee or examiner has been appointed in the Chapter 11 Cases.

**B.    The Schottenstein Family Wholly Owns, or Holds a Majority Interest in, All Parties to the Proposed Sale and Related Transactions**

11. The Schottenstein family indirectly owns the Debtors through various trusts. *Declaration of Rudolph Morando in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [D.I. 5] (the "Morando Declaration," or "Morando Decl."), ¶ 35; *Declaration of SB360 Capital Partners, LLC in Support of Debtors' Motion for Entry of Interim and Final Orders*

*Authorizing the Debtors to (A) Assume the Consulting Agreement, (B) Conduct Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (C) Granting Related Relief* [D.I. 116] (the "Raskin Declaration," or "Raskin Decl."), ¶ 19(a).

12. The Schottenstein family also wholly owns ASI Purchaser, LLC, the proposed Stalking Horse Bidder. Morando Decl., ¶ 35. The family appears to have formed the Stalking Horse Bidder as a new entity for the purpose of making the Stalking Horse Bid. The family also wholly owns SEI, Inc., which is the Stalking Horse Bidder's guarantor. *Id.*

13. The Schottenstein family also holds a 60% interest in SB360 Holdings ("Holdings").[4] *Id.* Holdings, in turn, wholly owns both Second Avenue Capital Partners LLC ("SACP") and SB360 Capital Partners, LLC ("SB360"). *Id.* SACP is the administrative agent and a lender in connection with the Debtors' first-lien Prepetition ABL Facility (*id.* at ¶ 20) and now serves as the Debtors' DIP Agent and DIP Lender. D.I. 83 ("Interim DIP Order").

14. In September 2025, the Debtors commenced store-closing sales at five of their locations. Raskin Decl., ¶ 8. The Prepetition ABL Documents, which the Debtors entered into in December 2024, required the Debtors to retain SB360 as a "consultant" in connection with such sales. *Id.* at ¶ 8 n.3 (disclosing this loan-to-liquidate provision for the first time). In November 2025, the Debtors added twenty-eight locations to the store-closing sales on which SB360 served as consultant. *Id.* at ¶ 10. The Debtors obtained interim approval from the Court for SB360 to continue in its role as consultant on such store-closing sales. D.I. 18 (the "Store Closing Motion"); D.I. 104 (interim order).

15. Notwithstanding the formation of the Stalking Horse Bidder as proposed purchaser and liquidating agent, the Debtors anticipate that the Stalking Horse Bidder will "delegate"

---

[4] The remaining 40% interest in Holdings is held by Miller family entities. Raskin Decl., ¶ 5.

responsibility for liquidating the Debtors' stores to SB360. Store Closing Mot., ¶ 8, n.3 ("[T]he Debtors anticipate that they will shortly enter into agreements" with the Stalking Horse Bidder to, among other things, "grant the Stalking Horse Bidder the right to act as the Debtors' agent for purposes of liquidating their inventory, furniture, fixtures and equipment at certain locations, *with respect to which [SB360] is expected to be delegated responsibility.*") (emphasis added).

16.     In summary, the Schottenstein family: (a) stands on all sides of the proposed sale and related transactions, and (b) owns all or a majority of the interests in each of the relevant players (Debtors/Sellers, Stalking Horse Bidder, Guarantor, Prepetition ABL Agent/Lender, DIP Agent/Lender, and SB360).

C.     **Specific Provisions of the Proposed Bid Procedures**

    i.     **Bid Protections**

17.     The Motion provides that the Stalking Horse Bidder shall receive Bid Protections in the form of an Expense Reimbursement capped at $1.5 million and an "Augment Purchase," with such Bid Protections payable from the proceeds of a Subsequent Transaction. Mot., p. 36. The proposed Bid Procedures Order provides that these Bid Protections "shall constitute allowed superpriority expense claims against the Debtors' estates pursuant to sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code," subject to the carve out in the Interim DIP Order. Bid Procedures Order, ¶ M.

18.     The Augment Purchase "requires the Debtors to compensate the Stalking Horse Bidder for the Additional Agent Goods purchased by the Stalking Horse Agent in anticipation of the sales contemplated under the Stalking Horse Agency Agreement." Mot., ¶ 43. "Additional Agent Goods" means "goods procured by [the Stalking Horse Agent] which are of like kind, and

6

no lesser quality to the Merchandise in the Sale." Stalking Horse Agency Agreement, § 8.9(A).[5] There is no apparent limit on the Augment Purchase. *See* Stalking Horse APA, § 8.2(a)(ii).

19.  Qualified Bids must be "in an amount not less than the sum of" the Purchase Price (as defined in the Stalking Horse Agreements), plus the Expense Reimbursement and Augment Purchase, plus $250,000. Bid Procedures Order, Ex. 1 (the "Bid Procedures"), § II.d. Qualified Bids must pay all DIP Obligations, Prepetition ABL Obligations, the Expense Reimbursement and the Augment Purchase in cash. *Id.*

20.  The Bid Procedures provide that "[o]n or prior to December 25, 2025, the Stalking Horse Bidder will notify the Debtors of the amount of the Augment Purchase as of such date." *Id.* at § II.d n.5. The Stalking Horse Bidder "will also notify the Debtors of any additional Augment Purchases incurred after December 25, 2025, through January 2, 2026." *Id.* The Debtors will then, at some point (no deadline is provided in the Bid Procedures), "notify bidders and the DIP Agent of the amounts of the Augment Purchases that has [sic] been provided them by the Stalking Horse Bidder." *Id.*

21.  The proposed deadline for potential bidders to deliver Preliminary Bid Documents is December 23, 2025. Mot., p. 10. The proposed Bid Deadline is December 30. *Id.*

22.  The Stalking Horse APA provides that "[t]he Expense Reimbursement and the Augment Purchase shall be deemed earned upon entry of the Bid Procedures Order." Stalking Horse APA, § 8(a)(v).

---

[5] "Merchandise" is defined in section 5.2(a) of the Stalking Horse Agency Agreement.

    **ii.    Sale of PII**

23.    The proposed sale includes the sale of PII. The "Acquired Assets" (as defined in the Stalking Horse APA) include "all Intellectual Property[.]" Stalking Horse APA, § 3.1(a). "Intellectual Property," in turn, includes "all customer contact information (including, without limitation, *personally identifiable information* such as name, email address, phone numbers)[.]" *Id.* at § 1.1, p. 11 (emphasis added).

24.    Section 10.8 of the Stalking Horse APA provides that the Debtors' operative privacy policies are attached thereto as Exhibit F, but no exhibits are included in the version filed on the case docket. *Id.* at § 10.8.

25.    The privacy policy on the American Signature Furniture website, dated as of May 27, 2022 (the "ASF Privacy Policy"), provides that "[w]e will not sell or share any of your personal information with any non-affiliated company or agency except as in accordance with this Privacy Policy[.]"[6] The ASF Privacy Policy does not include any additional information regarding the sale of PII.

26.    The privacy policy on the Value City Furniture website (the "Value City Privacy Policy," and together with the ASF Privacy Policy, the "Privacy Policies") is also dated as of May 27, 2022 and is substantially the same as the ASF Privacy Policy.[7]

    **iii.    Consultation Parties**

27.    The Bid Procedures provide for "Consultation Parties," including "the DIP Agent and the Prepetition ABL Agent" and the Committee. Bid Procedures, p. 14.

---

[6] https://www.americansignaturefurniture.com/privacy-policy (last visited Dec. 5, 2025).

[7] https://www.valuecityfurniture.com/privacy-policy (last visited Dec. 5, 2025)

28. The Consultation Parties enjoy consultation rights with respect to, among other things:

(i)      the evaluation of Bids [*id.* at p. 6];

(ii)     the designation of Qualified Bidders [*id.* at p. 8];

(iii)    the time and place of the Auction [*id.* at p. 10];

(iv)    the determination of Baseline Bid(s) and Successful Bid(s) [*id.*];

(v)      the conduct of the Auction including the determination of the Prevailing Highest Bid [*id.* at p. 11]; and

(vi)    modifications of the Bid Procedures including "rejecting any or all Bids or Qualified Bids (other than the Stalking Horse Bid)" [*id.* at p. 14].

29. The Bid Procedures do not impose any limitations on information sharing between the DIP Agent/ABL Agent and the Stalking Horse Bidder (or any other Schottenstein entity).

## OBJECTION[8]

### I. The Stalking Horse Bidder is Not Entitled to Bid Protections

30. Bid protections must be sought and analyzed under Bankruptcy Code section 503(b). *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("[A] bidder must seek a break-up fee under 11 U.S.C. § 503(b)[.]") (citing *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl., Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999)).

31. The Court's analysis of bid protections under section 503(b) "must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re*

---

[8] This Objection is limited to the relief sought with respect to the Debtors' proposed Bid Procedures. For the avoidance of doubt, the U.S. Trustee reserves the right to object at the appropriate time to the sale relief sought in the Motion.

9

*O'Brien*, 181 F.3d at 535. "[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503[.]" *In re Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018).

32. A break-up fee must be structured to encourage, not discourage, competing bids. *See In re O'Brien*, 181 F.3d at 535 ("[T]he assurance of a break-up fee may serve to induce an initial bid (a permissible purpose), it may also serve to advantage a favored purchaser over other bidders by increasing the cost of acquisition to the other bidders (an impermissible purpose)."). Even if a break-up fee would benefit the estate, the Court must still determine "whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is actually necessary to preserve the value of the estate." *In re Energy Future Holdings*, 904 F.3d at 314 (*citing In re O'Brien*, 181 F.3d at 535 (quotation marks omitted)).

33. Here, the Court should not approve the proposed Bid Protections because they are not actually necessary to preserve the value of the estate and will chill bidding.

34. Initially, the proposed sale is an insider transaction subject to heightened scrutiny.[9] It is undisputed that the Stalking Horse Bidder and the Debtors share common ownership (along with the Guarantor, the Prepetition ABL Agent/Lender, the DIP Agent/Lender, and SB360). And SB360—also a Schottenstein entity—is running both waves of the prepetition store-closing sales commenced in September and November 2025. The Schottenstein family, and by extension their wholly owned Stalking Horse Bidder, had access to all relevant information regarding the Debtors, the Aggregate Assets, the prepetition liquidations, the liquidations contemplated by the Stalking Horse Bid and all other material aspects of the proposed sale. Thus, the burden on the Stalking

---

[9] The U.S. Trustee reserves all rights to object at the appropriate time regarding the appropriate standard that the Court should use to evaluate the proposed sale.

10

Horse Bidder to conduct due diligence was significantly lower than it would have been on a true third-party purchaser. Moreover, this is a self-interested transaction through which the Schottenstein family will be selling the assets and agency rights of the Debtors (which they wholly own) to the Stalking Horse Bidder (which they wholly own), while retaining all upside from the sale transaction and resulting liquidations. The Bid Protections were not required to induce them to bid and are not actually necessary to preserve the value of the estates.

35. The Bid Protections will also chill bidding. Qualified Bids must include a cash component sufficient to pay both the Expense Reimbursement and the Augment Purchase in full. But the Stalking Horse Bidder will not disclose the amount of the Augment Purchase (which does not appear to be capped) until Christmas Day.[10] That is five days before the proposed Bid Deadline on December 30. And the Bid Procedures do not impose a deadline on the Debtors to communicate the amount of the Augment Purchase to potential bidders. Even if the Debtors did so immediately, Christmas Day is a banking holiday. Any potential bidders seeking to fund a bid with financing commitments would have two business days to obtain unconditional financing with all necessary approvals. Moreover, the Stalking Horse Bidder will not disclose the full amount of the Augment Purchase until January 2, 2026—i.e., three days *after* the proposed Bid Deadline. It is unclear how the Debtors expect potential bidders to submit Qualified Bids when the bidders will not even know the minimum required bid amount before the Bid Deadline. The Court should not approve these Bid Protections because they will discourage competitive bidding. *See In re O'Brien*, 181 F.3d at 535.

---

[10] The Bid Protections provide that "on or prior to" December 25 the Stalking Horse Bidder will advise the Debtors of the amount of the Augment Purchase as of that date. Practically speaking, the Stalking Horse Bidder will not know the amount of the Augment Purchase "as of December 25" until that date.

11

## II. The Bid Protections are Not Entitled to Superpriority Expense Claim Status

36. If the Court is inclined to approve the Bid Protections (which the Court should not do), the Court should not grant such Bid Protections superpriority expense status.

37. The Bankruptcy Code provides for "superpriority" claim status only in sections 364(c)(1) and 507(b). Those sections exclusively address (a) parties providing postpetition financing, and (b) secured creditors who have received insufficient "adequate protection" for the postpetition diminution in value of their collateral. The Stalking Horse Bidder is neither. The Debtors do not provide any authority in support of granting the Bid Protections superpriority expense claim status. In fact, the Debtors do not even mention this request for relief in the Motion. Any order the Court enters approving the Bid Procedures should expressly provide that this request for relief is denied and that the Bid Protections shall receive ordinary administrative expense status.

## III. The Debtors Must Provide Evidence Regarding the Sale of PII

38. The Bidding Procedures Motion does not provide sufficient information for the Court or parties in interest to determine whether a CPO needs to be appointed to protect individuals' PII. Section 363(b)(1) of the Bankruptcy Code provides:

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate,
>
> except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless –
>
> > (A) such sale or lease is consistent with such policy; or
> >
> > (B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease –

> (i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and
>
> (ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

11 U.S.C. § 363(b)(1).

39. Section 332 of the Bankruptcy Code provides:

> (a) If a hearing is required under section 363(b)(1)(B), the court shall order the United States Trustee to appoint, not later than 7 days before the commencement of the hearing, 1 disinterested person (other than the United States Trustee) to serve as the consumer privacy ombudsman in the case and shall require that notice of such hearing be timely given to such ombudsman.
>
> (b) The consumer privacy ombudsman may appear and be heard at such hearing and shall provide to the court information to assist the court in its consideration of the facts, circumstances, and conditions of the proposed sale or lease of personally identifiable information under section 363(b)(1)(B).

11 U.S.C. § 332(a), (b).

40. Here, the Debtors have failed to provide any evidence that the proposed Bid Procedures and Stalking Horse Agreement comply with the applicable privacy policy or policies. To the contrary, the publicly available Privacy Policies restrict the Debtors' ability to sell PII.

41. The Court should not approve the proposed Bidding Procedures unless the Debtors (i) establish through admissible evidence that a CPO is not required under the Bankruptcy Code, or (ii) amend the Proposed Order to direct the U.S. Trustee to appoint a CPO. Because an evidentiary predicate is necessary on this point, the U.S. Trustee reserves argument until the record at the hearing is closed.

## IV. The Court Should Not Authorize an Affiliate of the Stalking Horse Bidder to be a Consultation Party with Respect to the Bidding Procedures and Sale

42. The Bid Procedures provide that the Prepetition ABL Agent / DIP Agent (i.e., SACP) shall be a Consultation party. In that capacity, SACP will have consultation rights with respect to, among other things, the evaluation of bids, the scheduling and conduct of the Auction and the selection of Successful Bidder(s). This includes, specifically, evaluating the adequacy of other parties' bids and determining whether to reject any or all Qualified Bids.

43. The Court should not grant this relief because SACP is an insider of the Stalking Horse Bidder and the Debtors. It should not have the ability to block and tackle for the Stalking Horse Bidder in the evaluation of competing bids and facilitation of an Auction.

44. Moreover, the Bid Procedures provide no guardrails to prevent information sharing between the Stalking Horse Bidder and SACP. Nor would any such guardrails likely have any effect, given that the Stalking Horse Bidder, SACP and the Debtors all share common ownership. The Court should not grant SACP consultation rights because it will only further chill bidding.

## RESERVATION OF RIGHTS

45. The U.S. Trustee leaves the Debtors to their burden of proof and reserves and all rights to (i) amend or supplement this Objection, and (ii) conduct discovery.

[*Remainder of Page Intentionally Left Blank*]

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) denying the Motion; and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: December 10, 2025

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: */s/ Malcolm M. Bates*
Malcolm M. Bates
Timothy J. Fox, Jr. (DE Bar No. 6737)
Trial Attorneys
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Telephone: (302) 573-6491
Email:   Malcolm.M.Bates@usdoj.gov
             Timothy.Fox@usdoj.gov

## **CERTIFICATE OF SERVICE**

    I, Malcolm M. Bates, hereby certify that on December 10, 2025, I caused to be served a copy of the foregoing Objection by electronic service on the registered parties via the Court's CM/ECF system and courtesy copies were served via email on parties in interest.


Dated: December 10, 2025                                    */s/ Malcolm M. Bates*
                                                                     Malcolm M. Bates