**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AMERICAN SIGNATURE, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25–12105 (JKS)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 108**<br>**Hearing Date: December 15, 2025 at 10:30 a.m. (ET)** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
BID PROCEDURES AND STALKING HORSE AGREEMENT**

The Official Committee of Unsecured Creditors (the "Committee") of American Signature, Inc., *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") by and through its proposed undersigned counsel, hereby files this objection (the "Objection") to the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into (I) Stalking Horse Asset Purchase Agreement and (II) Stalking Horse Agency Agreement and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and*

---

[1]    The Debtors in these chapter 11 cases (these "Chapter 11 Cases") are: American Signature, Inc.; American Signature Home Inc.; American Signature USA Inc.; ASI Pure Promise Insurance LLC; ASI Elston LLC; ASI – Laporte LLC; ASI Polaris LLC; ASI Thomasville LLC; and American Signature Woodbridge LLC.

*Unexpired Leases; and (III) Granting Related Relief* (the "<u>Motion</u>").[2]  In support of this

Objection, the Committee respectfully states as follows:

**<u>PRELIMINARY STATEMENT</u>**[3]

1.     Having been formed less than one week ago and faced with the prospect

of a full chain liquidation to commence in 4 weeks run by and for the benefit of the very family

that owns the Debtors, the Committee comes to the table with a healthy dose of skepticism.  The

Committee submits that the best outcome for all stakeholders would be a going-concern sale or

restructuring that preserves jobs for employees, maintains a tenant for landlords and a buyer for

vendors.  While the Committee does not yet know for certain if such outcome is possible, it

appears highly doubtful given the proposed sale process.

2.     The facts of these Chapter 11 Cases are straightforward and undisputed.

The Schottenstein family owns and, up until a month ago, controlled, the Debtors.  They control

the prepetition ABL lender, the DIP lender, the Debtors' proposed liquidator, and stalking horse

purchaser.  The Schottensteins did not retain a financial advisor or CRO until one month before

the bankruptcy, did not engage an investment banker until 12 days before the bankruptcy, and

did appoint an independent director until 11 days before the bankruptcy.  And unlike the

overwhelming majority of chapter retailers, the Debtors conducted no prepetition marketing

process.

3.     Instead, three days after the Petition Date, the Debtors entered into a

stalking horse bid with a newly formed Schottenstein entity to conduct a full-chain liquidation of

---

[2]     Docket No. 108.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the First Day Declaration (as defined below), as applicable.

[3]     Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in this Objection.

2

the Debtors with uncertain value remaining for unsecured creditors owed more than $230 million.  In addition to acquiring real estate, IP and other assets, the Schottenstein's also seek to acquire all potential estate claims and causes of action against themselves and any related parties.

4.    Constrained by a Schottenstein backed DIP that provides only $8 million in liquidity and strict milestones, the Debtors seek approval of bid procedures that will provide just 4 weeks for bidders to engage, conduct diligence and submit a bid.  Given these incredible limitations over the holiday season, and in the absence of any prepetition marketing, the proposed timeline is unlikely to yield competitive bidding or generate value for unsecured creditors.  The timeline is inconsistent with recent precedent and fails to meet the heightened level of scrutiny applied when evaluating an insider transaction.  If the Schottensteins want the benefits of a chapter 11 sale, the *quid pro quo* is a process that provides a meaningful opportunity for potential buyers to assess the business and for the Committee to investigate the insider claims the Debtors seek to sell.

5.    The Debtors will likely contend that insufficient liquidity exists to extend the process beyond January 9.  However, unlike the typical chapter 11 case, funding for the Debtors', or the lack thereof, is entirely within the Schottensteins' control.  If additional liquidity is needed, the Schottensteins are the very parties with both the ability and economic incentive to provide it.  The Debtors should not be permitted to rely on a liquidity claim manufactured by the Schottensteins to force an insider-driven transaction on an impractically short timeline.

6.    The Committee understands the Schottensteins' desire to consummate a quick sale with little or no marketing that will insulate them from liability.  To be clear, having been formed less than one week ago, the Committee has not assessed whether the Schottensteins'

3

conduct, in any of their different capacities, gives rise to viable claims. But the Schottensteins' efforts to insulate themselves from claims is subject to heightened scrutiny and must be viewed in light of the potential impact on unsecured creditors. If a sale by early January was critical from a business perspective, the Schottensteins' should have commenced these cases earlier or, at the very least, conducted prepetition marketing. Having failed to do so, the Schottensteins must provide the Debtors and the Committee time and resources to conduct a real sale process and a reasonable investigation. Otherwise, the Schottensteins should not receive the panoply of benefits afforded them by the bankruptcy process and section 363 of the Bankruptcy Code.

7.      The Committee has other discrete concerns regarding the bid procedures that are addressed in detail below. These include: (i) the proposed $1.5 million expense reimbursement for the Schottensteins to diligence a company they have owned for decades; (ii) the impact on bidding caused by the Schottensteins' right to augment inventory before the sale is even approved; and (iii) the ability of Schottenstein controlled parties to be consultations parties. The Committee believes these issues can be resolved through negotiation or addressed by the Court at the hearing on the Motion.

8.      The Committee is prepared to work with the Debtors and the Schottenstein controlled entities to consensually address these concerns to ensure a fair process and maximize value for all stakeholders.

## BACKGROUND

### I.    General Background

9.      On November 22, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.  Since the Petition Date, the Debtors have remained in possession of their assets and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.     On December 4, 2025, the Office of the United States Trustee for Region 3 appointed a seven-member Committee consisting of: (i) Man Wah MCO; (ii) H317 Logistics, LLC; (iii) Riverside Furniture Corp.; (iv) Holland House; (v) Tempur World, LLC; (vi) Everest Technologies, Inc.; and (vii) Realty Income Corp.[4]

11.     On December 5, 2025, the Committee selected Kelley Drye & Warren LLP as its lead counsel and Cole Schotz P.C. as co-counsel.  On December 8, 2025, the Committee also selected Province, LLC as its financial advisor.

### II.    Company History and the Schottenstein Family

12.     The Debtors are a national home furnishings retailer founded in 1948 by the Schottenstein family, operating under the Value City Furniture and American Signature Furniture brands.[5]  As of the Petition Date, the Debtors operated more than 120 stores across 17 states, and employed approximately 3,000 employees.[6]

---

[4]      Docket No. 119.

[5]      *See Declaration of Rudolph Morando in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), ¶¶6, 12, 14.  Docket No. 5.

[6]      *Id.* ¶6.

4910-8741-4655

13.    The Debtors are wholly owned and controlled by members of the Schottenstein family through Schottenstein Stores Corporation and other affiliates.[7]  Jay L. Schottenstein serves as Chairman and Chief Executive Officer of Schottenstein Stores Corporation and his sons hold multiple positions within the broader Schottenstein organization.[8]

14.    In September 2025, the Debtors retained SB360 Capital Partners, LLC ("SB360"), an insider controlled by the Schottenstein family, to assist in closing five underperforming locations, which later increased to 33 locations.[9]

15.    Sales have steadily declined since 2022.[10]  Notwithstanding this known decline, the Debtors waited until October 2025, approximately 4 weeks before the Petition Date, to engage Berkeley Research Group, LLC ("BRG") to have Rudolph Morando and Stephen Coulombe serve as co-chief restructuring officers.[11]

16.    On November 10, 2025, less than two weeks before the Petition Date, the Debtors retained SSG Capital Advisors, LLC ("SSG") as investment bankers to develop a postpetition sale and marketing plan.[12]  SSG did not conduct any prepetition marketing process.

---

[7]    *Id.* ¶18.

[8]    *See Declaration of SB360 Capital Partners, LLC in Support of Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Assume the Consulting Agreement, (B) Conduct Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (C) Granting Related Relief*, ¶19(b). Docket No. 116; SB360, Profile of Jay L. Schottenstein (2025), https://sb360.com/jay-l-schottenstein/.  The Schottenstein family is the owner and operator of other well-known retail brands.  Jay Schottenstein is currently Executive Chairman and CEO of American Eagle Outfitters, Inc., Executive Chairman of Designer Brands, Inc., and Chairman of Schottenstein Property Group.

[9]    *Id.* ¶31; *see also Debtors' Motion for Entry of Interim and Final Order Authorizing the Debtors to (A) Assume the Consulting Agreement, (B) Conduct Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (C) Granting Related Relief.* Docket No. 18.

[10]    *Id.* ¶28-29.

[11]    First Day Declaration, ¶31.

[12]    *Id.* ¶38.

17. On November 11, 2025, recognizing the total lack of independent oversight of the insider-dominated transactions, the Debtors appointed Adam Zalev as the independent director (the "Independent Director").[13]  Just before the Petition Date, the Debtors formed a conflicts committee comprised solely of Mr. Zalev.  Mr. Zalev's role is to review and approve the conflicted transactions between the Debtors and the purchaser, liquidator, DIP lender, prepetition lender, and landlords – all entities controlled by the Schottenstein family.[14]

18. One day later, on November 12, 2025, the Schottensteins formed ASI Purchaser LLC (the "Schottenstein Buyer").  Less than 2 weeks after forming the buyer, appointing the Independent Director and retaining SSG, on November 25, the Debtors and the Schottenstein Buyer entered into an asset purchase agreement and agency agreement (the "APA"). [15]

## III.    The Schottenstein Sale and Bid Procedures

19. The Debtors and SSG did not conduct any prepetition marketing process. The sale is an acquisition of discrete assets, including valuable owned real estate, some of which is owned by the Schottensteins, intellectual property, and accounts receivable.  The sale contemplates a full chain liquidation to be conducted by the Schottenstein Buyer or its designee, including SB360, during a designation rights period ending April 30.

20. Notably, the sale will release every conceivable claim against the Schottensteins, the Schottenstein Lender, the Schottenstein Buyer, SB360, Schottenstein Stores, all of their affiliates, direct and indirect equity holders, directors, officers, advisors, and any

---

[13]     *Id*. ¶32.

[14]     *Id*. ¶35.

[15]     Motion, ¶17.

7

company created for the benefit of any of the foregoing (collectively, the "Schottenstein Parties").

21.     The proposed purchase price is $147.9 million, including $83.2 million in cash and $64.7 million in assumed liabilities.  Only $70 million of the cash purchase price is guaranteed, with the remainder subject to downward adjustment based on schedules to the agency agreement that the Debtors have not produced to the Committee .[16]

22.     The APA grants the Schottenstein Buyer the unlimited right to augment the merchandise being liquidated.[17]  If the APA is terminated, the Debtors must pay the Schottenstein Buyer for any augmented goods, at cost, which may be in the millions (the "Augment Purchase").  The Schottenstein Buyer will notify the Debtors of the Augment Purchase on Christmas Day, but there is no date set for the Debtors to advise interested bidders.

23.     The APA further obligates the Debtors to pay a $1.5 million expense reimbursement fee for expenses incurred by the Schottenstein Buyer in conducting diligence on a company the Schottensteins have owned since 1948 (the "Expense Reimbursement," and together with the Augment Purchase, the "Bid Protections").[18]

24.     It bears emphasis that the Debtors did not begin marketing their assets until at least November 26, when the Motion was filed.  At most, the timeline provides 34 days for SSG market the business to third parties and even less time for third parties to conduct diligence and bid:[19]  The proposed timeline is below:

---

[16]     Stalking Horse APA, § 4.1.

[17]     Agency Agreement, §8.9

[18]     Motion, ¶¶43-47; Stalking Horse APA, § 8.2(a)(i).

[19]     Motion, ¶13.

8

| Date | Event |
|------|-------|
| December 30, 2025 | Bid Deadline<br>Sale Objection Deadline |
| January 5, 2026 | Auction (if necessary) |
| January 7, 2026 | Sale Hearing |
| January 9, 2026 | Sale Closing Date |

## IV.   Prepetition Debt

25.   On December 3, 2024, the Debtors entered into an asset-based lending facility (the "Schottenstein ABL Facility") with Second Avenue Capital Partners, LLC (the "Schottenstein Lender"), an entity owned and controlled by the Schottensteins.[20]  Pursuant to the Schottenstein ABL Facility, the Schottenstein Lender provided up to $50 million in aggregate revolving commitments (the "Prepetition ABL Obligations").[21]  These obligations matured and were accelerated prior to the Petition Date.[22]  As of the Petition Date, approximately $39 million was outstanding under the Schottenstein ABL Facility.[23]  The obligations under the Schottenstein ABL Facility are purportedly secured by first priority liens on certain specified Debtors' assets, excluding the Term Loan Collateral (defined below).[24]

26.   In December 2014, the Debtors, Schottenstein Stores, and PNC Bank, N.A., ("PNC") entered into a letter of credit facility.  As of the Petition Date, PNC had issued letters of credit totaling $24 million, which are cash collateralized by funds deposited at PNC.

---

[20]      First Day Declaration, ¶20.

[21]      *Id.* ¶20.

[22]      *Id.* ¶19.

[23]      *Id.*

[24]      *Id.* ¶20.

27.     On July 14, 2022, the Debtors entered into a term loan credit agreement (the "Term Loan") with PNC.  As of the Petition Date, approximately $54 million was outstanding under the Term Loan.[25]  The obligations under the Term Loan are purportedly secured by first priority liens on collateral described in the Term Loan documents (the "Term Loan Collateral").

28.     At some point during the two years preceding the Petition Date, the Schottensteins provided $51 million in unsecured loans to the Debtors, approximately half of which was repaid prior to the Petition Date.[26]

29.     The Debtors estimate they owed trade and other general unsecured creditors approximately $210 million as of the Petition Date, excluding the Schottenstein unsecured loans and rejection damages. The $210 million includes $80 million of trade debt and $130 million unknown debt.  The Debtors have yet to file the schedules of assets and liabilities so the Committee has no real visibility into the claims pool.

## V.     The DIP Facility

30.     To fund the sale process to the Schottenstein Buyer, the Debtors obtained the DIP Facility from the Schottenstein Lender.[27]  The DIP Facility rolls-up all outstanding

---

[25]    *Id*. ¶19.

[26]    The First Day Declaration notes that approximately $24 million remains in unsecured debt owed to various equity holders.  *See* First Day Declaration, at ¶ 30.  However, the DIP Credit Agreement attached as Exhibit 2 to the DIP Financing Motion defines "Schottenstein Indebtedness" as "unsecured Indebtedness of the Borrower and its Subsidiaries owing to Schottenstein Stores in the principal amount of $25,269,054.24 outstanding as of the Closing Date."

[27]    *Motion of the Debtors for Entry of Interim and Final Orders Under Bankruptcy Code Sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*, ¶9 [Docket No. 14].  On November 26, 2025, the DIP Financing Motion was approved on an interim basis (the "Interim DIP Order"). [Docket No. 83].

obligations under the Schottenstein ABL Facility, including interest and fees, and provides $8 million in new money.[28]

31.     The order approving the DIP Facility (the "<u>DIP Order</u>") will truncate the Challenge Period by 33 days, to January 7, the proposed sale hearing date.[29]   Under the Local Rules, the Challenge Period would expire on February 9.

32.     The DIP Facility will materially improve the Schottenstein Lender's position by replacing its more limited prepetition collateral package with liens on previously unencumbered assets, including Chapter 5 avoidance actions.[30]   The current budget provides no detail on the payment of administrative claims, including stub rent and 503(b)(9) claims.[31]

## <u>OBJECTION</u>

### A.     The Sale Timeline Should Not Be Approved

33.     The principal goal of chapter 11 is the preservation of businesses as going concerns.[32]   To effectuate this goal, bankruptcy courts, have discretion and latitude in conducting a sale.   However, courts have consistently held that bid procedures must facilitate an open and fair public sale designed to maximize value for all creditors.[33]

---

[28]     Interim DIP Order, ¶3.

[29]     Id. ¶44 n.9.

[30]     *Id.* ¶6.

[31]     *Id*. Ex. 3.

[32]     *In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 373 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988).

[33]     *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS 2764, at *253-54 (Bankr. D. Del. Aug. 15, 2007) (internal quotations omitted) (debtor "had a fiduciary duty to protect and maximize the estate's assets") (citing *In re Mushroom Transp. Co., Inc*., 382 F.3d 325, 339 (3rd Cir. 2004)); *Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3rd Cir. 2003) (same); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998 (noting that the purpose of bidding procedures is to facilitate an open and fair public sale designed to maximize value for the estate); *In re Reading Broad., Inc.*, 386 B.R. 562, 575 (Bankr. E.D. Pa. 2008) (same); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107

34.     The Committee has substantial concerns regarding the proposed sale timeline, which are exacerbated by the many hats being worn by the Schottensteins in these cases and the overall relief they seek.  When a section 363 sale benefits an insider, the sale is not subject to a deferential business judgement standard.[34]  Instead, both the sale and the sale process are subject to heightened scrutiny.[35]  And when a sale includes insider releases, bankruptcy courts expect that potential insider claims will be investigated by an estate fiduciary before the sale is approved.[36]

35.     The overlapping, insider controlled nature of these Chapter 11 Cases warrants heightened scrutiny.  The Debtors, who were until November 11 of this year, controlled by the Schottensteins, failed to retain an investment banker in the months leading up to the Petition Date.  Instead,  SSG was engaged only 12 days prior to Petition Date and conducted no prepetition marketing.  The Debtors did not engage with any third parties before entering into the stalking horse agreement with the Schottensteins.  In addition, the Schottensteins or their affiliates:

- dictate the DIP financing and the Debtors' liquidity;
- conduct the current GOB sales;

---

F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code is to enhance the value of the estate at hand").

[34]    *See, e.g.*, *In re AIG Fin. Prods. Corp.*, 651 B.R. 463, 476 (Bankr. D. Del. 2023); *Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009); *Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005).

[35]    *In re Crown Vill. Farm, LLC*, 415 B.R. at 93 (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *In re Papercraft Corp.*, 211 B.R. at 823 ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein.").

[36]    *See, e.g.*, *Exaeris, Inc.*, 380 B.R. at 746 (refusing to approve insider sale that would release insider causes of action without meaningful investigation); *In re Family Christian, LLC*, 533 B.R. 600, 628-29 (Bankr. W.D. Mich. 2015) (refusing to approve insider sale releasing insider claims without investigation and recognizing court's expectation that "the [c]ommittee present evidence in support of the alleged good faith nature of the proposed transaction").

12

- control the post-sale liquidation of inventory; and
- control the investigation by purchasing estate claims against themselves under the APA.

36.    These facts alone warrant the Court's careful scrutiny of the sale process. Importantly, (i) SSG had not fully developed a list of potential purchasers when the Motion was filed, and (ii) the Debtors seek at most a 4-week process for buyer outreach, diligence and bid development, over the holiday season.  While the Committee has had mere days to asses the sale process, this timeline appears insufficient to achieve the goals of the chapter 11 process.

37.    The Debtors' argument that the sale process is consistent with the market is meritless.  The Debtors assert that courts routinely approve similar transactions and cite 15 cases in support.  First, none of these cases involved a stalking horse bid from an insider.  As set forth below, in 12 of the 15 cases, an investment banker was engaged prepetition and conducted a meaningful prepetition marketing process of not less than 7 weeks, and on average at least 3-4 months.  In the 3 cases where there was no prepetition marketing process, the postpetition marketing process spanned at least two months.  In short, the Debtors' own cited comparables do not support the 4-week process being proposed here.[37]

---

[37]    *See In re GigaMonster Networks*, LLC, No. 23-10051 (JKS) (Bankr. D. Del. Feb. 8, 2023), ECF Nos. 3, 12, 113, 235; *In re Medly Health Inc.*, No. 22- 11257 (KBO) (Bankr. D. Del. Jan. 18, 2023), ECF Nos. 3, 15, 312, 402; *In re RTI Holding Co., LLC*, No. 20- 12456 (JTD) (Bankr. D. Del. Nov. 20, 2020), ECF Nos. 3, 355, 585; *In re BL Restaurants Holding, LLC*, No. 20-10156 (MFW) (Bankr. D. Del. Feb. 28, 2020), ECF Nos. 4, 17, 227, 402*; In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Feb. 4, 2020), ECF Nos. 23, 802, 854*; In re Consolidated Infrastructure Group, Inc.*, No. 19-10165 (BLS) (Bankr. D. Del. Apr. 24, 2019), ECF Nos. 54, 151, 200; *In re Hobbico, Inc.*, No. 18-10055 (KG) (Bankr. D. Del. Mar. 14, 2018), ECF Nos. 34, 192, 243, 316; *In re California Proton Treatment Center, LLC*, No. 17-10477 (LSS) (Bankr. D. Del. Apr. 12, 2017), ECF Nos. 2, 77, 96, 158, 364; *In re United Road Towing, Inc.*, No. 17-10249 (LSS) (Bankr. D. Del. Mar. 6, 2017), ECF Nos. 2, 57, 66, 131, 268, 279, ; *In re Constellation Enterprises LLC*, No. 16-11213 (CSS) (Bankr. D. Del. Jun. 15, 2016), ECF Nos. 12, 88, 260, 284, 511; *In re Mabvax Therapeutics Holdings, Inc.*, No. 19-10603 (CSS) (Bankr. D. Del. Apr. 8, 2019), ECF Nos. 10, 17, 78, 141 ; *In re Things Remembered, Inc.*, No. 19-10234 (CSS) (Bankr. D. Del. Mar. 13, 2019), ECF Nos. 4, 21, 23, 100, 150, 292; *In re Charlotte Russe Holding, Inc.*, No. 19-10210 (LSS) (Bankr. D. Del. Feb. 21, 2019), ECF Nos. 3, 199, 319, 367; *In re Maurice Sporting Goods, Inc.*, No. 17- 12481 (CSS) (Bankr. D. Del. Dec. 12, 2017), ECF Nos. 2, 125, 227; *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) (Bankr. D. Del. Oct. 6, 2016), ECF Nos. 3, 196, 506, 548.

| Case | Length of Prepetition Marketing Process | Length of Post-Petition Marketing Process |
|------|-----------------------------------------|-------------------------------------------|
| *In re GigaMonster Networks, LLC* , No. 23-10051 (JKS) | 12 months | 6 weeks |
| *In re Medly Health Inc.* , No. 22-11257 (KBO) | 5 months | 8 weeks |
| *In re RTI Holding Co., LLC* , No. 20-12456 (JTD) | 4 months | 3 months |
| *In re BL Restaurants Holding, LLC* , No. 20-10156 (MFW) | 4 months | 2.5 months |
| *In re Forever 21, Inc.* , No. 19-12122 (KG) | None | 14 weeks |
| *In re Consolidated Infrastructure Group, Inc.* , No. 19-10165 (BLS) | None | 3 months |
| *In re Hobbico, Inc.* , No. 18-10055 (KG) | 3 months | 11 weeks |
| *In re California Proton Treatment Center, LLC* , No. 17-10477 (LSS) | None | 7 months |
| *In re United Road Towing, Inc.* , No. 17-10249 (LSS) | 6 months | 6 weeks |
| *In re Constellation Enterprises LLC* , No. 16-11213 (CSS) | None | 2 months |
| *In re Mabvax Therapeutics Holdings, Inc.* , No. 19-10603 (CSS) | 18 months | 6 weeks |
| *In re Things Remembered, Inc.* , No. 19-10234 (CSS) | 7 months | 4 weeks |
| *In re Charlotte Russe Holding, Inc.* , No. 19-10210 (LSS) | 3 months | 4 weeks |
| *In re Maurice Sporting Goods, Inc.* , No. 17-12481 (CSS) | 6 months | 5 weeks |
| *In re Golfsmith Int'l Holdings, Inc.* , No. 16-12033 (LSS) | 3 months | 16 weeks |

38.    Earlier this year, in *JOANN*, Judge Goldblatt confronted an expedited sale process where the Debtors had conducted a 4-week prepetition marketing process and proposed a 4-week postpetition marketing and bid process.[38]    The Joann debtors and the committee ultimately agreed to a modified timeline.  In approving the bid procedures, Judge Goldblatt relied heavily on the creditors' committee's consent and on the prepetition marketing process:

> The time line on which we're going forward is awfully fast. And I'm okay with it under the circumstances of this case, **but it's really only because I think that the agreement of the Committee and the term lenders to this schedule provides me with real market evidence that there's sufficient reason to proceed as rapidly as we are**….
>
> **I've got to say the record before me, it's not just the agreement of the parties, it's also the evidentiary record including the evidence of the pre-petition marketing and the status of those efforts and the testimony, that proceeding in the manner that is proposed is -- does as much as can reasonably be done to maximize the possibility of a value maximizing sale**.[39]

---

[38]    *In re Joann Inc., et al.*, No. 25-10068 (CTG) (Bankr. D. Del. 2025).

[39]    *In re JOANN Inc.,* No. 25-10068, p.99:1-6, p.100: 2-8 (Bankr. D. Del. February 14, 2025) (emphasis added) ( the "JOANN Hearing Transcript "). An excerpt of the transcript is attached hereto as Exhibit A.

39.     As Judge Goldblatt further made clear, when a lender seeks to sell its collateral and receive the benefits of a chapter 11 process, it is required to "pay the freight" which includes developing a fair process that is designed to maximize value:

> The basic rule of thumb is that to the extent a pre-petition secured lender seeks to obtain through the bankruptcy process a value maximizing sale of its collateral, it's required to pay the freight associated with obtaining that relief. And as I see it, paying the freight has 2 elements. First it has to involve a process that ensures that the price obtained is the highest and best use -- is the highest and best price available for all constituencies not simply an amount sufficient to satisfy its claim, **and that will often then require, you know, some effort of marketing here.[40]**

40.     The Debtors will likely point to liquidity constraints as the justification for the expedited timeline.  But given the facts and circumstances of these Chapter 11 Cases, those liquidity constraints were and remain fully within the control of the Schottensteins.  If prepetition liquidity was a concern, the Schottenstein controlled board should have taken action sooner, and not waited until the last minute to retain financial advisors and investment bankers.  This is at best a self-inflicted wound and at worst an orchestrated effort to extract value and secure releases to the detriment of unsecured creditors.  Moreover, the Schottenstein's control the post-petition financing and could fund a more fulsome process in line with established precedent.  Their refusal to do so, however, cannot justify the current sale process.

41.     Other than manufactured liquidity constraints, there is no magic to a January 9 sale closing.  The deadline will not allow the Debtors to exit unprofitable leases by month end, an-oft cited reason to justify a timeline.  The business is also not rushing to emerge from the shadow of chapter 11 as a going-concern.  This is a discrete purchase of select assets

---

[40] *Id.* p.99:17-25, p.100:1 (emphasis added).   The second part of paying the freight is to ensure the administrative solvency of the estates.  The Committee will address these concerns in connection with the proposed DIP financing.

and a full chain liquidation with a slim hope of some go-forward enterprise if the Schottensteins so choose with no commitment to do so. The Debtors' employees, landlords, vendors, and other unsecured creditors deserve a value maximizing process. And potentially interested parties deserve a fulsome opportunity to analyze the Debtors' assets and entertain better bids. Otherwise, the Schottensteins should not receive the protections of chapter 11 and should seek to foreclose outside of bankruptcy.

**B.      The Sale Should Be Extended to Align with the Challenge Deadline**

42.      One of the more offensive aspects of the proposed sale, is the Schottenstein's desire to acquire all estate clams and causes of action against themselves and all related parties. While final approval of the DIP is not currently before the Court, the Committee must raise these concerns now in order to have a fair opportunity to conduct a reasonable investigation before estate claims are sold. The Schottensteins have two options: either exclude them from the sale or extend the sale process.

43.      This Court's local rules require debtors to disclose, and explain the justification for, any provisions or findings that bind the estate or other parties with respect to the validity, perfection or amount of a secured creditor's prepetition lien or the waiver of claims against the secured creditor without giving an official committee case at least 75 days from entry of the initial interim order to investigate such matters.[41] Such minimum investigation period in these cases would run through February 9. The Debtors, however, seek to truncate the Challenge Deadline to four weeks by having the Challenge Deadline expire as of the proposed January 7

---

[41]      Del. Bankr. L.R. 4001-2(a)(i)(Q).

16

sale hearing date.  The Debtors fail to provide any justification for the truncated Committee challenge period.[42]

44.     The Schottensteins should not be permitted to truncate the Challenge Deadline under the guise of an exigency that was manufactured by the very parties that will benefit from it.  The Committee is, at a minimum, entitled to the full 75-day period to conduct a thorough investigation of the secured lender given the unique realities of these cases.

45.     The Committee requests that the sale hearing date be deferred to allow the Committee a reasonable opportunity to conduct its investigation and, if appropriate, assert a challenge and any potential estate claims.

### C.     The Bid Protections Must be Rationalized

46.     The Debtors have an obligation to develop a bid process that will maximize value.[43]  Courts have routinely held that bid procedures that have a chilling effect on the bidding process should not be approved.[44]  The Debtors, however, have failed to demonstrate that: (i) the Bid Protections are "actually necessary to preserve the value of the Debtors' estates" under section 503(b) of the Bankruptcy Code; and (ii) even if such protections are necessary, to preserve value, that the protections do "not give an advantage to a favored purchaser over other bidders by increasing the cost of the acquisition."[45]

---

[42]     As the Committee will address in its DIP objection absent a consensual resolution, the investigation budget is woefully inadequate and the Committee's proposed overall carveout is insufficient as compared to the proposed carve-out for the Debtors' professionals.

[43]     *In re Mataldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009).

[44]     *In re President Casinos, Inc.*, 314 B.R. at 786 (declining to approve bid procedures that chilled bidding); *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009) (unless the bid process remains fair and equitable, competitors will refrain from participating which is necessary to assure the highest possible value); *In re America West Airlines, Inc.*, 166 B.R. 908, 912-13 (Bankr. D. Ariz. 1994) (denying bid procedures that did not induce competitive bidding).

[45]     *See In re O'Brien Env'l Energy, Inc.,* 181 F.3d 527, 535 (3d Cir. 1999).

47.     The Debtors rely on case law suggesting that bid protections may be appropriate where they induce an initial bid that otherwise would not exist or where a stalking horse's diligence creates a baseline for the company's valuation that assists other potential bidders.[46]  The Debtors have made no attempt to show how either rationale applies to this case.

48.     The Bid Protections did not induce the Schottenstein Buyer to execute the APA.  This is the Schottensteins' business and they seek to preserve value for themselves and obtain expedited releases.  They certainly do not need a $1.5 million expense reimbursement to conduct diligence on a company they controlled since 1948.

49.     Further, the proposed Augment Purchase creates an uncertain and uncapped hurdle for competing bidders.  No party, including the Court, will know the actual amount of the Augment Purchase as of the hearing on this Motion. While the Committee does not dispute the wisdom of preparing for liquidation sales if that is the ultimate outcome, it must have parameters to avoid chilling bidding.

**D.     The Bid Procedures Must be Modified Prior to Approval**

50.     In addition to extending the timeline, the Court should not approve the Motion without the following modifications:

- Consultation Rights: The Bid Procedures should be revised to provide the Committee with consultation rights with respect to all aspects of the sale process and auction.  Given the Debtors' conflict and affiliation with the Schottenstein Buyer, the Schottenstein Lender should not have any consultation rights unless the Schottenstein Buyer's bid is withdrawn.[47]

---

[46]    Motion, ¶¶45-46; *see also O'Brien,* 181 F.3d at 533 (holding that bid protections must be necessary to preserve the value of a debtor's estate); *In re Aeropostale, Inc.*, Case No. 16-11275 (Bankr. D. Del. June 29, 2016) Docket No. 527 (bid procedures must reflect option to select stalking horse bidder and award protections, which proved unnecessary).

[47]    JOANN Hearing Transcript, p. 98:12-17 (declining to allow the insider-lender to serve as a consultation party and noting that "you have to be either a buyer or a seller, not both").

18

- <u>Independent Director</u>.  The Bid Procedures should confirm that all actions or decisions to be taken by the Debtors shall be taken by the Independent Director.

- <u>Sale Objection Deadline</u>:  The Bid Procedures currently set an objection deadline of December 30, the same date as the Bid Deadline and six days prior to the Auction. Neither the Committee nor creditors should be required to file objections to the sale until after the Auction has been conducted and the terms of the winning bid are known.  Similarly, contract counterparties should be given sufficient time after the selection of the winning bidder to object to adequate assurance concerns. Any adjournment of the sale dates should be filed with the Court to ensure all stakeholders receive proper notice.

- <u>Qualified Bids</u>:  The Debtors must provide the Committee with copies of all bids within one hour of receipt of the Bids given the truncated sale timeline.

- <u>Bid Protections</u>:  If the Court approves the Bid Protections, the Committee should have an opportunity to review the Schottenstein Buyer's invoices and 14 days object to the reasonableness of any fees or expenses.

- <u>Credit Bid</u>:  Any right to credit bid must be subject to the Committee's challenge rights under section 363(k) of the Bankruptcy Code and the DIP Order.

- <u>Adequate Assurance of Future Performance</u>:  The Bid Procedures should set (i) a firm deadline for Debtors to provide adequate assurance of future performance; and  (ii) a cure and assumption objection deadline allowing counterparties sufficient time to review and object.  Any potential Assumption and Assignment Notice shall contain information of adequate assurance of future performance to the applicable lease counterparties pursuant to section 365 of the Bankruptcy Code.

- <u>Potential Lease Assignment</u>:  If the Debtors seek to approve a sale to the Backup Bidder at the Sale Hearing and a lease counterparty objects to the assignment of its lease, the hearing on that objection shall be held on at least seven days' notice to the applicable lease counterparty and shall not be heard at the Sale Hearing.

### **RESERVATION OF RIGHTS**

51.    The Committee expressly reserves the right to (i) supplement or amend this Objection at any time prior to the hearing on this Motion, and (ii) raise any additional or future objections to the Motion as may be warranted.

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court (i) deny the Motion unless modified as set forth herein; and (ii) grant such other and further relief as the Court deems just and proper.

[*Signature Page Follows*]

Dated: December 10, 2025
      Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ Stacy L. Newman*
Justin R. Alberto (No. 5126)
Stacy L. Newman (No. 5044)
Carol E. Thompson (No. 6936)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
Email: jalberto@coleschotz.com
      snewman@coleschotz.com
      cthompson@coleschotz.com

- and -

Seth Van Aalten (admitted *pro hac vice*)
Sarah A. Carnes (admitted *pro hac vice*)
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: 212-752-8000
Facsimile: 212-752-8393
Email: svanalten@coleschotz.com
      scarnes@coleschotz.com

-and-

**KELLEY DRYE & WARREN LLP**
Eric R. Wilson (admitted *pro hac vice*)
Jason R. Adams (admitted *pro hac vice*)
Maeghan J. McLoughlin (admitted *pro hac vice*)
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Telephone: (212) 808-7800
Email: ewilson@kelleydrye.com
      jadams@kelleydrye.com
      mmcloughlin@kelleydrye.com

*Proposed Counsel to the Official*
*Committee of Unsecured Creditors of American*
*Signature, Inc., et al.*

4910-8741-4655