**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AMERICAN SIGNATURE, INC., *et al.*,[1] | ) | Case No. 25-12105 (JKS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

Hearing Date: January 7, 2026 at 11:00 a.m. (ET)
Objection Deadline: December 31, 2025 at 4:00 p.m. (ET)

**DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO EMPLOY AND RETAIN A&G REALTY PARTNERS, LLC AS REAL ESTATE CONSULTANT AND ADVISOR FOR THE DEBTORS EFFECTIVE AS OF THE PETITION DATE AND (B) WAIVING CERTAIN REPORTING REQUIREMENTS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

as follows in support of this application (the "Application"):[2]

**Relief Requested**

1.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"):  (a) authorizing the Debtors to retain and employ A&G Realty Partners,

LLC ("A&G") as real estate consultant and advisor, effective as of the Petition Date (as defined

below), pursuant to the terms of the real estate services agreement attached hereto as **Exhibit B**

(the "Services Agreement"),[3] (b) approving the provisions of the Services Agreement, including

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  American Signature, Inc. (6162); American Signature Home Inc. (8573); American Signature USA Inc. (6162); ASI Pure Promise Insurance LLC (6162); ASI Elston LLC (7520); ASI – Laporte LLC (6162); ASI Polaris LLC (6162); ASI Thomasville LLC (6162); and American Signature Woodbridge LLC (6162).  The Debtors' business address is 4300 E. 5th Avenue, Columbus, OH 43235.

[2]     A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Rudolph Morando in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") [Docket No. 5].  Capitalized terms used but not otherwise defined in this Motion have the meanings ascribed to them in the First Day Declaration.

[3]     Any references to, or summaries of, the Services Agreement in this Application are qualified by the express terms of the Services Agreement, which shall govern if there is any conflict between the Services Agreement and such

4910-5701-6193.4 03721.00001

but not limited to the proposed compensation arrangement, (c) approving a waiver of certain reporting requirements, and (d) granting related relief.  In support of this Application, the Debtors submit the Declaration of Emilio Amendola (the "Amendola Declaration"), which is attached hereto as **Exhibit C**.

<b><u>Jurisdiction and Venue</u></b>

2.      The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

---

summaries or references herein.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Services Agreement.

**Background**

5.      On November 22, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On November 25, 2025, the Court entered an order [Docket No. 72] authorizing the procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  On December 4, 2025, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 119] (the "Committee").  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

6.      Debtor American Signature, Inc., together with its subsidiaries ("ASI" or the "Company") is a residential furniture company operating across its Value City Furniture ("VCF") and American Signature Furniture ("ASF") brands and serving as a furniture destination consumers can rely on for style, quality, and value.  Headquartered in Columbus, Ohio, the Company operates more than 120 stores across 17 states, with the largest concentrations in Ohio (20), Michigan (16), and Illinois (11).  The Company employs approximately 3,000 team members.

**A&G's Qualifications**

7.      In consideration of the various landlord issues that have arisen prepetition and that will arise during the pendency of these chapter 11 cases, the Debtors have determined, in consultation with their advisors and in the exercise of their business judgment, that the services of experienced real estate consultants will substantially enhance their attempts to maximize the value of their estates.

8.      The Debtors chose to retain A&G as their real estate consultant and advisor due to A&G's experience and knowledge of the real estate market, business reputation, and experience in providing services regarding the review, analysis, and negotiation of lease and real property agreements, both in and out of chapter 11 cases.  A&G evaluates, restructures, facilitates the acquisition of, and disposes of all types of real estate.  The principals of A&G have over fifty years combined of commercial real estate experience and have extensive knowledge and expertise in the retail industry.  As a diversified real estate consulting and advisory firm, the Debtors believe that A&G is well-qualified to provide the services required by the Debtors during these chapter 11 cases.

9.      Additionally, A&G has significant experience in the disposition and renegotiation of leases and properties in bankruptcy.  A&G's professionals have assisted, advised, or been retained as real estate consultants in a variety of bankruptcy cases involving issues relating to the review, analysis, and renegotiation of real property and lease agreements.

10.      Moreover, A&G has worked with the Debtors since the Services Agreement was executed and, as a result, has gained extensive knowledge regarding the Debtors and their real estate portfolio.  Therefore, the Debtors believe that A&G is uniquely qualified to perform the services contemplated by the Services Agreement and to represent the Debtors' interests in these chapter 11 cases in a cost-effective, efficient, and timely manner.  Additionally, the Debtors believe that the engagement of A&G is critical to their efforts successfully to navigate through the chapter 11 process.

11.      Since its engagement, A&G has worked effectively with the Debtors' senior management to review the real estate data provided by the Debtors with respect to their leasehold interests and to assist the Debtors with developing a go-forward strategy with respect to such

properties.  In that capacity, A&G has gained institutional knowledge regarding the Debtors' leases

(the "Leases") and the properties subject to the Leases, and the value associated therewith.

### Services to Be Provided

12.    Since its engagement, A&G has been assisting the Debtors with their real estate

analysis and with developing a go-forward disposition strategy to be implemented through these

chapter 11 cases.  In furtherance thereof, A&G has been involved in the Debtors' lease-related

efforts since its retention and, as a result of A&G's prepetition services provided to date, A&G has

acquired knowledge of the Debtors' Leases and the Debtors' goals and objectives with respect

thereto.  During A&G's engagement, A&G will provide the following services (collectively, the

"Services") in connection with the Debtors' Leases on a postpetition basis, subject to order of the

Court:

    a.    assist the Company with real estate strategy;

    b.    consult with the Company to discuss the Company's goals, objectives, and financial parameters in relation to the Leases;

    c.    provide ongoing advice and guidance related to individual financial and non-financial lease restructuring opportunities;

    d.    negotiate with the landlords of the Leases (collectively, the "Landlords" and, individually, a "Landlord") on behalf of the Company to obtain Lease Terminations acceptable to the Company;

    e.    negotiate with the Landlords on behalf of the Company to obtain Lease Modifications acceptable to the Company;

    f.    negotiate with the Landlords on behalf of the Company to obtain Early Termination Rights acceptable to the Company;

    g.    if requested by the Company, market the Leases in a manner and form as determined by A&G and approved by the Company, and negotiate with the Landlords and other third parties on behalf of the Company to assist the Company in obtaining Lease Sales acceptable to the Company;

    h.    if requested by the Company, negotiate with Landlords on behalf of the Company to assist the Company in obtaining Landlord Consents acceptable to the Company in its sole discretion;

i.      if requested by the Company, prepare a valuation of one or more of the     Leases (the "Valuation"); and

j.      provide regular update reports to the Company regarding the status of the Services.

13.      The Services are necessary to enable the Debtors to maximize the value of their Leases and are in the best interests of the Debtors, their estates, and their creditors.  Therefore, the Debtors have requested that A&G perform the Services set forth in the Services Agreement and summarized herein, subject to the Court's approval of this Application, and A&G has stated its willingness and ability to act as the Debtors' real estate consultant and advisor in these chapter 11 cases.

14.      Should the Debtors request additional services (the "Additional Services") from A&G not contemplated by the Services Agreement, the Debtors and A&G, subject to further Court approval, will mutually agree upon such services and fees for those services and will document such additional services in a separate agreement.

15.      The Services provided by A&G will complement and not duplicate the services to be rendered by any other professional retained in these chapter 11 cases.  The Debtors will coordinate with A&G and the Debtors' other professionals to minimize unnecessary duplication of efforts among the Debtors' professionals.

**Terms of Retention**

**A.     Professional Compensation and Expense Reimbursement**

16.      Subject to the Court's approval, the Debtors will compensate A&G in accordance with the terms and conditions set forth in the Services Agreement, including Schedule B thereto. It is contemplated that A&G shall be compensated in accordance with the proposed fee structure set forth below (the "Fee Structure"):

a.      Retainer.  The Company shall pay A&G a retainer (the "Retainer") in the amount of one hundred thousand dollars ($100,000) upon execution of the Services

Agreement.  A&G may, but shall not be required to, apply the Retainer against invoices issued by A&G to the Company.  The Company shall replenish the Retainer to the extent applied within five (5) business days of the date of the invoice.  Furthermore, to the extent any invoice exceeds the amount of any Retainer applied, in addition to replenishing the Retainer, the Company shall pay the difference between the invoice amount and the Retainer to A&G within five (5) business days of the date of the invoice.

b.  Lease Terminations.  For each Lease Termination obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee (the "Lease Termination Fee" in the amount of four percent (4%) of the Occupancy Cost Savings and Gross Proceeds, per Lease (with any broker fee to be paid by A&G); *provided, however*, if a Lease Termination involves a sublease or assignment, A&G shall earn and be paid a fee in the amount of four percent (4%) of the total base rent to be paid by (a) the sublessee for the initial term of the sublease, or (b) the assignee for the entire Lease Term, including base rent for any options exercised by the sublessee or assignee upon execution of the sublease or assignment, as the case may be (collectively, the "Base Lease Income"); *and provided further*, that in the event a subtenant or assignee of a Lease is procured through such subtenant or assignee's broker, the Lease Termination Fee shall equal to six percent (6%) of all Base Lease Income, out of which A&G shall pay such broker's commission and retain the balance as compensation to A&G.

c.  Monetary Lease Modifications.  For each Monetary Lease Modification obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee in the amount of four percent (4%) of the Occupancy Cost Savings, per Lease.

d.  Non-Monetary Lease Modifications.  For each Non-Monetary Lease Modification obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee in the amount of $1,500, except that for any Lease extensions, the fee shall be the greater of $2,500 and four percent (4%) of Occupancy Cost Savings for the extended Lease term.

e.  Early Termination Rights.  For each Early Termination Right obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee in the amount of one-half (½) of one (1) month's Gross Occupancy Cost, per Lease.

f.  Property Sales.  For each Property Sale obtained by A&G on behalf of the Company to an entity unaffiliated with the Schottenstein Property Group ("SGP"), A&G shall earn and be paid a fee of three percent (3%) of the Gross Proceeds thereof.  For each Property Sale obtained by A&G on behalf of the Company to an entity affiliated with SGP (an "SGP Entity"), A&G shall earn and be paid a minimum fee of $350,000 (the "Minimum Sale Fee"), *provided, however*, in the event an SGP Entity is the "stalking horse" bidder of any Property or Properties (the "Stalking Horse Bid"), competitive bidding against the Stalking Horse Bid ensues and the SGP Entity emerges as the successful bidder for the Property or Properties (the "Successful Bid"), A&G shall earn and be paid a fee in the amount of the Minimum

7

Sale Fee plus three percent (3%) of the difference between the Gross Proceeds set forth in the Stalking Horse Bid and the Gross Proceeds set forth in the Successful Bid.

g.    Lease Sales.  For each Lease Sale obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee in the amount of three percent (3%) of the Gross Proceeds, with a minimum fee of seven hundred fifty dollars ($750) per Lease.

h.    Landlord Consents.  If requested by the Company, for each consent obtained by A&G to extend the Company's time to assume or reject a Lease as a part of any applicable Chapter 11 case, A&G shall earn and be paid a fee in the amount of five hundred dollars ($500) per Lease.

i.    Valuations.  A&G shall earn and be paid a fee of $500 per Lease.

17.    A&G also intends to seek reimbursement for its reasonable out-of-pocket expenses incurred in connection with its retention and provision of Services.  This includes, but is not limited to, responding to any litigation or other type of inquiry, deposition, or otherwise relating to the Services or the Services Agreement.  Any reimbursable expenses shall be paid to A&G within five business days upon receipt of invoice, except as may be approved or directed otherwise in these chapter 11 cases.

18.    To the extent A&G uses the services of independent contractors (the "Contractors") in these chapter 11 cases pursuant to the Services Agreement, A&G shall be responsible for the performance of and payment of any fees to such Contractors independently of the Fee Structure between the Debtors and A&G.  A&G will not pass through the cost of such Contractors to the Debtors and will not seek reimbursement from the Debtors.  A&G will ensure that the Contractors are subject to conflict checks with respect to the parties related to their involvement in these chapter 11 cases.

19.    The Fee Structure described herein and as set forth in the Services Agreement is consistent with and typical of arrangements entered into by A&G and other real estate consultants when rendering similar services to clients such as the Debtors.  A&G and the Debtors believe that

the foregoing compensation arrangement is both reasonable and market-based.  The Fee Structure has been agreed upon by the parties on an arm's-length basis in view of the substantial commitment of professional time and effort that will be required of A&G and its professionals hereunder as well as the expedited time frame in which they must perform the Services.

20.     Due to the transactional nature of the services that A&G provides under the Services Agreement, A&G's professionals do not bill clients on an hourly basis while performing such services.  A&G's real estate expertise was an important factor in determining the Fee Structure, and the Debtors believe that the ultimate benefit to their estates resulting from A&G's Services cannot be measured by reference to the number of hours to be expended by A&G's professionals in the performance of such services.  Further, the Debtors believe that the terms of the Services Agreement are reasonable and are an exercise of their sound business judgment that will maximize value for the Debtors, and their estates and creditors.

21.     Based upon the nature of the Services to be provided by A&G and the fact that the Fee Structure was developed because A&G does not bill clients on an hourly basis, the Debtors seek relief from having A&G maintain time records or file interim fee applications; *provided* that A&G will file a final fee application with a summary of fees earned and expenses incurred along with a summary of what fees and expenses have been paid.

### B.     Allowance of Fees and Expenses

22.     Local Rule 2016-2(d) imposes certain information requirements on professionals' compensation requests, including that professionals report their billed activity in one-tenth of an hour increments, that all activity descriptions be divided into general project categories, that each activity include a time allotment, and certain billing requirements tied to an assumed schedule of hourly rates, among others.  Local Rule 2016-2(h), however, provides that "[a]n employed professional person or entity within the scope of this Local Rule may request that the Court waive,

for cause, one or more of the information requirements of this Local Rule" in the motion seeking court approval for the retention of such professional entity.

23.     Pursuant to Local Rule 2016-2(h), the Debtors and A&G submit that cause exists to waive the information and reporting requirements imposed by Local Rule 2016-2(d) with respect to A&G.  As set forth in the Amendola Declaration, A&G believes that it would be unduly burdensome and time-consuming for A&G to record their activities in compliance with the information requirements set forth in Local Rule 2016-2(d).  It is standard in A&G's industry for professionals providing services relating to lease modifications and concessions to be compensated on a fixed fee percentage basis, rather than on an incremental hourly basis, for such services.  As described above, A&G and the Debtors have agreed that, consistent with industry practice, A&G will be primarily compensated on a fixed fee percentage basis for its Services.

24.     The Debtors propose that for compensation paid for all Services, and for all expenses incurred in connection with the Services, A&G be paid one-hundred percent (100%) of the amount due upon submission of an acceptable invoice to the Debtors.  Upon completion of its work for the Debtors, A&G will file a final fee application for review by the Court and parties in interest pursuant to section 328(a) of the Bankruptcy Code for all Services.

25.     The Debtors further propose that A&G be required to submit monthly, interim, and final fee applications with regard to any Additional Services on an hourly basis only, and that the time detail provided with such fee application be provided in summary format.

26.     Specifically, A&G will submit time records setting forth the hours spent on each activity and a description of the services provided, but will not break out their time into one-tenth of an hour increments.

27.     The Debtors submit that applications submitted in the manner set forth above will provide the Court and other parties in interest with sufficient information to monitor the amount and types of services rendered to the Debtors by A&G.  *See, e.g.*, *In re Destination Maternity Corp.*, No. 19-12256 (BLS) (Bankr. D. Del. Dec. 11, 2019) [Docket No. 484] (authorizing A&G to (a) file a final fee application for compensation upon completion of the services and (b) submit monthly, interim, and final fee applications for additional services provided on an hourly basis only with the time detail provided in summary fashion); *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Nov. 7, 2018) [Docket No. 766] (approving a fee structure on a flat fee percentage basis and authorizing A&G to file fee applications for final allowance of compensation and reimbursement of fees and expenses).  Accordingly, the Debtors request that the Court modify the requirements set forth in Local Rule 2016-2(d) and permit A&G to receive compensation and submit fee applications in the manner set forth herein.

28.     Except as described herein, no commitments have been made or received by A&G, nor any member thereof, as to compensation or payment in connection with these cases other than in accordance with the provisions of the Bankruptcy Code and orders of this Court.

29.     A&G has not shared or agreed to share any of its compensation from the Debtors with any other person, other than principals and employees of A&G, as permitted by section 504 of the Bankruptcy Code.

### Payment Prior to the Petition Date

30.     Before the Petition Date, A&G received a retainer in the sum of $100,000 for invoices to be issued after the Petition Date.  A&G did not receive any payments from the Debtors during the 90-day period preceding the Petition Date other than the retainer.

**A&G's Disinterestedness**

31.     The Debtors have numerous creditors and other parties in interest that they maintain business relationships with.  To the best of the Debtors' knowledge, information, and belief, other than as set forth in the Amendola Declaration attached hereto, A&G (a) has no connection with the Debtors, their creditors, other parties in interest, or the attorneys or accountants of any of the foregoing, or the United States Trustee or any person employed in the Office of the United States Trustee; (b) does not hold any interest adverse to the Debtors' estates; and (c) believes it is a "disinterested person" as defined by section 101(14) of the Bankruptcy Code.  Accordingly, the Debtors believe that A&G is "disinterested" as such term is defined in section 101(14) of the Bankruptcy Code.

32.     Given the large number of parties in interest in these chapter 11 cases, and despite the efforts to identify and disclose A&G's relationships with parties in interest in these chapter 11 cases, A&G is unable to state with certainty that every client relationship or other connection has been disclosed in the Amendola Declaration.  The Debtors have been informed that A&G will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new material facts or relationships are discovered or arise, A&G will promptly inform the Court, as required by Local Rule 2014-1(a).

**The Requested Relief is Reasonable and in the Best Interests of the Debtors**

33.     The Debtors believe that the Fee Structure is reasonable and should be approved under section 328(a) of the Bankruptcy Code.  The Fee Structure is reasonable in light of, among other things: (a) industry practice, (b) market rates charged for comparable services both in and out of the chapter 11 context, and (c) A&G's substantial experience with respect to real estate consulting and advisory services.  The Fee Structure appropriately reflects the nature and scope of

services to be performed by A&G in these chapter 11 cases and the fee structure typically utilized by A&G.

34. The terms and conditions of the Services Agreement were negotiated by the Debtors and A&G at arm's-length and in good faith. The Debtors respectfully submit that the provisions contained in the Services Agreement, viewed in conjunction with the other terms of A&G's proposed retention, and as modified in the Proposed Order, are reasonable and in the best interests of the Debtors, and their estates and creditors in light of the fact that the Debtors require A&G's services to maximize the value of the Debtors' estates for all parties in interest.

35. A&G's extensive knowledge of the Debtors and their Leases will be beneficial to the Debtors' estates and creditors and will help eliminate additional time to bring another firm up to date on the Debtors and their Leases. Further, A&G is well-qualified to perform all services contemplated by the Services Agreement and to represent the Debtors' interests in these chapter 11 cases, in a cost-effective, efficient, and timely manner. Accordingly, as part of this Application, the Debtors respectfully request that the Court approve the terms of the Services Agreement.

## The Requested Relief is Reasonable and in the Best Interests of the Debtors

36. The Debtors and A&G intend that all of the services that A&G will provide to the Debtors will be appropriately directed by the Debtors so as to avoid duplication of efforts by and among the other professionals retained in these chapter 11 cases and performed in accordance with applicable standards of the profession. A&G will work with the Debtors' management team, board of directors, and other professionals to avoid duplication of services among professionals. The Debtors believe that the services to be provided by A&G will complement and will not be duplicative of any services of the Debtors' other professionals.

13

**Basis for Relief**

37.     The Debtors seek approval of the retention and employment of A&G as real estate consultant and advisor pursuant to sections 327(a) and 328(a) of the Bankruptcy Code.  Section 327(a) of the Bankruptcy Code empowers the debtor, with the Court's approval, to employ professionals "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."  11 U.S.C. § 327(a).

38.     Section 101(14) of the Bankruptcy Code defines a "disinterested person" as a person that:

> (A) is not a creditor, an equity security holder, or an insider;
>
> (B) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
>
> (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

39.     Further, section 1107(b) of the Bankruptcy Code provides that "a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b).  A&G's prepetition relationship with the Debtors is, therefore, not an impediment to A&G's retention as the Debtors' postpetition real estate consultants and advisors.

40.     Section 328(a) of the Bankruptcy Code provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis" subject

14

to later reevaluation by the Court.  11 U.S.C. § 328(a).  Accordingly, section 328 of the Bankruptcy Code permits the compensation of professionals, including real estate advisors, on more flexible terms that reflect the nature of their services and market conditions.  As the Fifth Circuit recognized in *In re National Gypsum Co.*, 123 F.3d 861 (5th Cir. 1997):

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants reasonable compensation based on relevant factors of time and comparable costs, etc. Under present § 328, the professionals may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

*Id.* at 862 (citations omitted).

41.    Owing to this inherent uncertainty, courts have approved arrangements similar to the Fee Structure under section 328 of the Bankruptcy Code where such arrangements contain "reasonable" terms and conditions.

42.    Furthermore, under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, a relevant change was made to section 328(a), which is highlighted in bold below:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a **fixed or percentage fee basis**, or on a contingent fee basis.

43.    This change removes any doubt regarding the Debtors' ability to retain A&G, with Court approval, on a fixed or percentage fee basis, such as the Fee Structure described above.

44.    Bankruptcy Rule 2014 requires that an application for retention include "specific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for

15

compensation, and, to the best of the applicant's knowledge, all of the [firm]'s connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Fed. R. Bankr. P. 2014.   This Application, the Amendola Declaration, and the Services Agreement set forth the information required under Bankruptcy Rule 2014.

45.   The Debtors respectfully submit that they should be authorized to retain and employ A&G in accordance with the terms and conditions of the Services Agreement.  First, as discussed above and in the Amendola Declaration, A&G satisfies the disinterestedness standard in section 327(a) of the Bankruptcy Code.  Moreover, during the course of its engagement, A&G has become familiar with the Debtors' Leases and the Debtors, goals, objectives, and financial parameters with respect thereto, and has already committed a significant amount of time and effort with respect to the services contemplated under the Services Agreement.  A&G's Services are needed postpetition to continue assisting with negotiations with landlords and other third parties, to assist the Debtors in obtaining Lease modifications and other concessions, and to provide advice regarding Lease-related matters, and to enable the Debtors to discharge their duties as debtors and debtors in possession.  Additionally, A&G has experience and a reputation in providing real estate consulting services to debtors and creditors in bankruptcy reorganizations and other restructurings.

46.   Accordingly, the Debtors believe that A&G is well qualified to provide its services to the Debtors in a cost-effective, efficient, and timely manner.

47.   Additionally, the terms and conditions of the Services Agreement were negotiated by the Debtors and A&G at arm's-length and in good faith.  In light of the foregoing, and given the numerous landlord and lease-related issues that A&G may be required to address in its performance of the Services and the severe time constraint, A&G's commitment to the variable

16

level of time and effort necessary to address all such issues as they arise, and the market prices for A&G's services for engagements of this nature, the Debtors believe that the terms and conditions of the Services Agreement are fair, reasonable, and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.

48.     The Debtors further believe that the compensation structure set forth in the Services Agreement appropriately reflects the nature and scope of Services to be provided by A&G, A&G's experience as a real estate advisor in chapter 11 cases, and the fee and expenses typically utilized by A&G and other leading real estate consultants and advisors.

49.     The Debtors submit that the employment and retention of A&G, effective as of the Petition Date and on the terms and conditions set forth herein and in the Services Agreement, are in the best interest of the Debtors, their estates, creditors, stakeholders, and other parties in interest, and therefore, should be approved.

### Request for Waiver of Bankruptcy Rule 6004(h)

50.     Under Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed R. Bankr. P. 6004(h).  As set forth above, the continued retention of A&G, particularly in the early stage of these chapter 11 cases, is essential to ensuring the effective management of these chapter 11 cases and the preservation of the value of the Debtors' estates.  Thus, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

### Notice

51.     The Debtors will provide notice of this Application to:  (a) the Office of the United States Trustee; (b) counsel to the Committee; (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of

Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) counsel to the DIP Agent and the Prepetition ABL Agent; (h) counsel to the Prepetition Term Agent; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

52.    No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.


Dated:  December 17, 2025                                  Respectfully submitted,

                                                          American Signature, Inc., *et al.*,
                                                          Debtors and Debtors in Possession

                                                          */s/ Rudolph Morando*
                                                          Rudolph Morando
                                                          Co-Chief Restructuring Officer

18