## Exhibit 1



# REAL ESTATE SERVICES AGREEMENT WITH AMERICAN SIGNATURE FURNITURE, INC.

This Real Estate Services Agreement including the Schedules attached hereto and incorporated herein (collectively the "Agreement") is made as of November ___, 2025 (the "Agreement Date"), by and between **A&G REALTY PARTNERS, LLC**, a New York limited liability company, with its principal place of business at 445 Broadhollow Road, Suite 420, Melville, New York 11797 ("A&G"), and **AMERICAN SIGNATURE FURNITURE, INC.**, a _____ corporation, with its principal place of business at 4300 E. 5th Avenue, Columbus, Ohio 53235 (including its affiliates and subsidiaries, collectively the "Company" and, together with A&G, collectively, the "Parties" and, individually, a "Party").

WITNESSETH:

**WHEREAS,** the Company is the lessee or sublessee of certain non-residential real property leases identified on Schedule A (collectively, the "Leases" and, individually, a "Lease") and fee owner of certain real property more particularly identified on Schedule B (each a "Property" and, collectively, the "Properties");

**WHEREAS,** the Company desires to: (i) reduce or amend its obligations under the Leases by modifying the terms and conditions thereof or reduce risk and provide optionality under certain Leases; (ii) obtain the right to terminate certain Leases prior to their expiration date; (iii) in the event of a Chapter 11 bankruptcy proceeding, sell certain of the Leases (including, designation rights); (iv) in the event of a Chapter 11 bankruptcy proceeding, obtain landlord consents for extensions of time to assume or reject certain Leases ("Landlord Consents"); and (v) obtain other real estate consulting and advisory services as set forth herein; and

**WHEREAS,** under the terms and conditions contained in this Agreement, the Company desires to retain A&G and A&G is willing to provide the Services (as defined below).

**NOW THEREFORE,** in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Services to be Provided.  In accordance with the terms and conditions of this Agreement, A&G will provide the following services (the "Services"):

   a)  assist the Company with real estate strategy;

   b)  consult with the Company to discuss the Company's goals, objectives and financial parameters in relation to the Leases;

   c)  provide ongoing advice and guidance related to individual financial and non-financial lease restructuring opportunities;

   d)  negotiate with the landlords of the Leases (collectively, the "Landlords" and, individually, a "Landlord") on behalf of the

Company to obtain Lease Terminations (as defined below) acceptable to the Company;

e) negotiate with the Landlords on behalf of the Company to obtain Lease Modifications (as defined below) acceptable to the Company;

f) negotiate with the Landlords on behalf of the Company to obtain Early Termination Rights (as defined below) acceptable to the Company;

g) if requested by the Company, market the Leases in a manner and form as determined by A&G and approved by the Company, and negotiate with the Landlords and other third parties on behalf of the Company to assist the Company in obtaining Lease Sales (as defined below) acceptable to the Company;

h) if requested by the Company, negotiate with Landlords on behalf of the Company to assist the Company in obtaining Landlord Consents (as defined below) acceptable to the Company in its sole discretion;

i) if requested by the Company, prepare a valuation of one or more of the Leases (the "Valuation"); and

j) provide regular update reports to the Company regarding the status of the Services.

2.    Term of Agreement.  Subject to Section 16 herein, this Agreement shall be for a term of one (1) year following the Agreement Date (the "Term"). In the event the Services are not completed at the end of the Term, the Agreement may be extended or renewed by written agreement of the Parties.

3.    Compensation.  The compensation for the Services is set forth on Schedule C, which is attached hereto and incorporated herein (the "Compensation"). The Company acknowledges that the calculations necessary to determine Compensation are predicated on Company Information (as that term is defined below) provided by the Company to A&G. Any material discrepancies, inaccuracies or omissions in the Company Information may affect the Compensation payable to A&G.

4.    Additional Services.  A&G may provide additional services requested by the Company that are not otherwise specifically provided for in this Agreement. Any additional services will be agreed upon mutually by the Parties and documented in a separate agreement.

5.    Recordkeeping.  The Services to be provided by A&G pursuant to this Agreement are, in general, transactional in nature. Accordingly, A&G will not bill the Company by the hour or maintain time records.

6.    Expenses and Disbursements. The Company shall reimburse A&G for A&G's reasonable out-of-pocket expenses incurred in connection with its retention and provision of Services. This includes, but is not limited to, responding to any litigation or other type of inquiry, deposition or otherwise relating to the Services or this Agreement. Any reimbursable expenses shall be paid to A&G within five (5) business days upon receipt of invoice, except as may be approved or directed otherwise in the Company's chapter 11 bankruptcy proceeding (if any).

7.    Exclusive. During the Term of this Agreement, A&G shall have the sole and exclusive authority to perform the Services for the Leases set forth on Schedule A and the Properties set forth on Schedule B. The Company shall forward to A&G all relevant inquiries regarding the Leases and Properties made to the Company, its representatives or related parties. Upon the Parties' mutual written consent, Schedule A and Schedule B may be amended from time to time during the Term of this Agreement to add additional Leases or Properties, or to delete any Leases or Properties, as the case may be.

The Company acknowledges that A&G may be engaged to provide the same or similar services as those referenced herein to other persons or entities and that any such engagement shall not constitute or be deemed to be a violation of this Agreement, provided that it is not a conflict of interest or otherwise does not materially interfere with A&G's ability to provide the Services.

8.    Company Representative. Eric Jackson will be the Company's representative (the "Company Representative") in dealing with A&G. The Company reserves the right, at any time and from time to time, upon written notice to A&G, to designate a successor representative or an additional representative and to limit the authority of the Company Representative in any respect. A&G will report regularly to the Company Representative in order to keep him fully apprised of A&G's performance. The designated principal representative for A&G will be Emilio Amendola. If A&G seeks to change its principal representative, the Company agrees to reasonably consent to any proposed replacement.

9.    Company Cooperation. The Company shall: (a) provide A&G with all reasonable applicable information concerning the Leases and Properties necessary for the performance of A&G's obligations hereunder, including, but not limited to (i) copies of the Leases and any Lease abstracts, (ii) populating an Excel spreadsheet provided by A&G with, among other things, current rents, taxes and other charges relating to the Leases, rent bumps, percentage rent and breakpoints, premises size, the commencement and expiration dates of the Leases, any Lease options, up to date Landlord contact information (including name, email and phone number information for each Landlord), any outstanding or deferred rent, and any default letters sent by Landlords, (iii) Property appraisals, condition reports, environmental surveys, any land surveys and any other surveys, reports or other documents relating to the Properties and/or regulations, local ordinances or laws and rules that relate to the Properties; (b) provide access to A&G to any internal lease administration reporting and tracking systems; and (c) prepare a field

4

questionnaire which will include, but not be limited to, information regarding (I) the quality of the Stores/Properties and shopping centers in which they are located, (II) major co-tenants in each shopping center, (III) whether each Store/Property is free standing, drive through or in-line, (IV) historical financial performance and financial projections for each Store, (V) competition data (including proximity to the Store), and (VI) last remodel of each Store (the "Field Questionnaire"); and (c) provide such other information as A&G requests for the performance of its Services (collectively, the "Lease and Property Information").

All information provided by the Company to A&G, including, but not limited to, the Company's goals and objectives, financial information and the Lease and Property Information referenced above, shall collectively be referred to as "Company Information." It is understood and agreed by the Parties that A&G shall have no obligation to verify the accuracy of such information and that A&G shall have no liability whatsoever resulting from, whether directly or indirectly, the inaccuracy or incompleteness of the Company Information. Both Parties understand and agree that A&G bases its Services on the Company Information and any material inaccuracies, discrepancies or omissions in the information may delay or impede A&G's ability to render the Services. If any of the Company Information turns out to be inaccurate, the Company shall provide such internal personnel and administrative support as necessary to correct the information or upon the written request of the Company authorize A&G to make the necessary corrections (for which A&G's hourly rate shall be $500). Furthermore, both Parties understand and agree that the commencement of this Agreement and the continuation of its Services are contingent upon A&G's receipt of the Company Information.

Additionally, the Company agrees to assist A&G in the performance of its Services, including but not limited to, by providing (i) a response, within five (5) business days of A&G's transmittal to the Company of a deal sheet for each Lease, which states whether a proposed Service is approved or not, (ii) all necessary legal support to review expeditiously Documents (as defined below) submitted by A&G in connection with a Service and getting all Documents in form and substance acceptable to the Company executed accurately and expeditiously, and (iii) promptly reconciling "cure" disputes (formal or informal) with the respective Landlord, timely causing any proposed Lease purchasers/assignees to provide "adequate assurance of future performance" and diligently resolving any objections to "adequate assurance of future performance" by a Landlord. The Company acknowledges and agrees that time is of the essence with respect to the foregoing. In addition, the Company shall track the status of all Documents through an A&G legal tracking report provided by A&G.

10.    Use of Company Name. A&G may use the Company's name and logo to identify the Company as one of A&G's clients.

11.    Co-Brokers. The Company acknowledges and agrees that A&G shall be entitled to associate with local licensed real estate agent(s) or broker(s) as may be reasonable

and proper to discharge A&G's duties hereunder; provided, however, no such association shall in any way diminish the responsibilities of A&G hereunder, and it is understood between the Parties that the Company will look solely to A&G for performance of its obligations hereunder. A&G shall be responsible for compensating such agent(s) or broker(s) from the compensation payable to A&G hereunder, but in no event shall the Company be obligated in any way for the payment of any separate and/or additional compensation or reimbursement of expenses to such agent(s) or broker(s).

12.   No Authority to Execute Agreements. A&G shall have no right or power to enter into any agreement in the name of or on behalf of the Company or to otherwise obligate the Company in any manner unless authorized in writing.

13.   Meetings. After the commencement of the Agreement, A&G shall meet with, in a manner agreed to by the Parties, the Company's Representative(s) to review the Company's goals, objectives and financial parameters. Thereafter, A&G will meet with or participate in telephone conferences with the Company's Representative(s) regarding the status of the Services as mutually agreed to by the Parties.

14.   Disclosures/Reports. All information, advice, recommendations (whether written or oral) or any reports, presentations or other communications that A&G provides under the terms of this Agreement are solely for the benefit of the Company in connection with the Services rendered by A&G hereunder and no such opinion, advice, recommendations or reports shall be used for any other purpose, or reproduced, disseminated, quoted or referred to at any time, in any manner, other than as provided herein, without the prior written consent of A&G. Notwithstanding the foregoing, the Company may provide such information, advice and recommendations to its Board of Directors, attorneys and other retained professionals (the "Company Representative Group") as required to effectuate the Services; provided, however, the Company acknowledges that the reports generated and supplied to the Company by A&G in connection with the Services contain proprietary work product of A&G and agrees that it will not reverse engineer such work product or use/disclose it to any person other than in connection with said person's evaluation of the Services; and provided, further, that both Parties understand and agree that A&G shall have no liability to the Company Representative Group and that no member of the Company Representative Group is intended to be a third-party beneficiary to this Agreement.

If the Company receives a subpoena, summons or court order by any federal, state or other regulatory agency having jurisdiction over the Company relating in any respect to A&G or its Services, the Company shall promptly notify A&G, if legally permissible, so that A&G may obtain, at its sole cost, a protective order for such information. If A&G is unable to obtain a protective order and the Company is required to provide information regarding A&G and/or the Services, the Company agrees to provide only that information which is legally required and to use reasonable efforts to ensure the confidentiality of such information and documentation.

15. Independent Contractor. Each Party acknowledges and agrees that the arrangements contemplated herein are and will be for the provision of the Services and that nothing contained herein shall create or be construed as creating a contract or other arrangement of employment between the Company and A&G. A&G shall provide the Services as an independent contractor and not as an employee, agent, partner or joint venture of the Company.

16. Early Termination. Either Party may terminate this Agreement without cause upon thirty (30) days' prior written notice in accordance with the notice provision below. Additionally, if either Party fails to perform its obligations in accordance with the terms herein and does not cure such failure within ten (10) days after written notice of default, the other Party will have the right to terminate this Agreement by notice of termination to the non-performing Party, effective ten (10) days after the date of such notice. Additionally, if for any reason either Party becomes unable to perform its duties as a result of a legal, contractual or regulatory restriction, such Party shall have the right to terminate this Agreement. Any rights or obligations incurred or accrued by either Party prior to termination shall survive termination of this Agreement.

17. Assignment. Neither Party may delegate or assign its rights and obligations under this Agreement in whole or in part to an unaffiliated third party without the prior written consent of the other Party.

18. Bankruptcy.

   a. In the event the Company files for bankruptcy protection during the Term of this Agreement, the Company agrees to apply promptly to the bankruptcy court presiding over its case (the "Bankruptcy Court") for an order, in a form acceptable to A&G, authorizing the Company to retain A&G effective as of the filing date and to compensate A&G in accordance with the terms of this Agreement, and to use its best efforts to obtain such order. The Company agrees to (a) seek the hiring and retention of A&G under sections 327 and 328 of the Bankruptcy Code and (b) file any applications necessary and otherwise assist A&G in obtaining Bankruptcy Court approval of the payment of its fees and costs hereunder. The Company agrees to provide A&G with a copy of the pleadings requesting retention of A&G prior to submission to the Bankruptcy Court for A&G's review and comments and advise A&G of any objection or hearings pertaining to A&G's retention. The order authorizing A&G's retention must be acceptable to A&G and A&G's obligations hereunder are conditioned upon the grant of such order. Furthermore, if such order is not obtained within sixty (60) days from the date that it is filed, A&G shall have the right to terminate this Agreement at any time thereafter. If an acceptable order is not obtained authorizing A&G's services and fees as set forth herein, the Company agrees to amend the application in conjunction with, and the approval of, A&G and request a hearing to review the application. If the Company is unable to obtain an acceptable order authorizing the hiring and retention of A&G under the

terms of this Agreement and the Agreement is terminated, A&G reserves the right to seek a substantial contribution claim for any rights or obligations incurred or accrued prior to such termination.

    b.   Before finalizing any cash collateral/debtor in possession financing budget with its secured lender, the Company shall provide A&G with a reasonable opportunity to review and provide input into the budget regarding its estimated fees and expenses during the relevant budget period(s).

19.    <u>Notices.</u>  Unless otherwise expressly provided herein or waived in writing by the Party to whom notice is given, any notice or other communication required or permitted hereunder will be effective if given in writing (i) when delivered by hand; (ii) three days after sent by certified mail, return receipt requested; (iii) when delivered by electronic email communication to the email address set forth below and verified by confirmed receipt; or (iv) one day after delivery to a commercial overnight courier, and addressed to the Parties as follows:

To the Company:        American Signature Furniture, Inc.
                               4300 E. 5th Avenue
                               Columbus, Ohio 53235
                               Attn:  Eric Jackson, Chief Financial Officer
                               Email:  Eric.jackson@americansignature.com

To A&G:                   A&G Realty Partners, LLC
                               445 Broadhollow Road, Suite 420
                               Melville, New York 11747
                               Attn:  Emilio Amendola
                               Email:  emilio@agrep.com

20.    <u>Representations. Warranties and Covenants</u>. Each Party has all requisite power and authority to enter into this Agreement. This Agreement has been validly authorized by all necessary corporate action and constitutes a legal, valid and binding agreement of the Company and A&G. Each Party represents that this Agreement does not and will not violate any applicable law or conflict with any agreement, instrument, judgment, order or decree to which it is a party or by which it is bound.  Furthermore, each Party represents and agrees that it will comply with all applicable laws, rules, regulations, orders or decrees during the term of this Agreement in performing its obligations hereunder. Each Party agrees to deal with the other fairly and in good faith so as to allow each Party to perform their duties and earn the benefit of this Agreement.  A&G agrees to utilize commercially reasonable efforts and diligence to achieve the purpose of this Agreement.

21.    <u>Survival of Fee</u>.  In the event that following the termination or earlier expiration of this Agreement, the Company or its successors or assigns, enters into a transaction with a Landlord or other third party (including a purchaser of any Property) and A&G has substantially performed the Services, which is the proximate cause of the transaction being entered into with such Landlord or other third party (including a

purchaser of any Property) and the result of which would have entitled A&G to a Fee pursuant to this Agreement, then in that event, A&G shall be entitled to and paid its Fee pursuant to the terms of this Agreement notwithstanding the fact that the Agreement has terminated or expired (the "Survival of Fee"). Such Survival of Fee will terminate 120 days after the termination or earlier expiration of this Agreement.

22.    Intellectual Property.  A&G may use data, software, designs, utilities, tools, models, systems and other methodologies that it owns or licenses in performing the Services hereunder. Notwithstanding the delivery of any reports by A&G to the Company, A&G shall retain all intellectual property rights in such materials (including any improvements or knowledge developed while performing the Services) and in any working papers compiled in connection with the Services.

23.    Indemnification.  The Company agrees to indemnify A&G and its affiliates, officers, directors, employees, agents and independent contractors, and hold each of them harmless from and against all third party claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted against, resulting from (directly or indirectly), or related to the Services or actions or omissions of A&G or the Company taken pursuant to this Agreement or in any written agreement entered into in connection herewith except to the extent that such claims or liabilities arise as a direct result of A&G's fraud, gross negligence or willful misconduct.

24.    Limitation on Liability.   Neither Party shall be responsible for any indirect, incidental, consequential, exemplary, punitive or other special damages (including, but not limited to, loss of profits and damage to reputation or business) arising under or by reason of this Agreement, the Services or any act or omission hereunder. Neither Party shall be liable if it is unable to perform its responsibilities hereunder as a result of events beyond its control.  Furthermore, in no event shall A&G's liability for a default or breach of this Agreement exceed the amount of Fees paid to A&G hereunder.

25.    Binding Effect. No Third-Party Beneficiaries.  This Agreement binds and inures to the benefit of the Parties hereto and their respective successors and permitted assigns and except as expressly provided herein, is not intended to confer any rights or remedies upon any person not a party to this Agreement.

26.    Waivers and Amendments.  Waiver by either Party of any default by the other Party shall not be deemed a waiver of any other default. This Agreement (including the Schedule (s) attached hereto) may not be waived, amended, or modified by either Party unless in writing and signed by the Parties hereto.

27.    Severability.  If any provision, or any portion of any provision, contained in this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, then it is the intent of the Parties to modify or limit such provision or portion thereof so as to be valid and enforceable to the extent permitted under applicable law. In the

event that such provision or portion thereof cannot be modified, then such provision or portion thereof shall be deemed omitted, and this Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

28. Entire Agreement. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof. All prior agreements, representations, statements, negotiations, understandings, and undertakings are superseded by this Agreement.

29. Counterpart Execution/Facsimile and Electronic Signatures. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which together shall constitute one document. Facsimile and electronic signatures on this Agreement and any document contemplated hereby shall be deemed to be original signatures.

30. Informal Dispute Resolution. Upon the written notice by a Party to the other Party of a dispute arising out of or relating to this Agreement, each Party will appoint one or more designated representatives (at least at the level of Vice President) to discuss and attempt to resolve the dispute for a period of up to fourteen (14) days. No formal proceedings for the judicial resolution of such dispute, except for the seeking of injunctive or equitable relief, may be commenced by either Party unless either designated representative concludes in good faith that prompt and amicable resolution through continued discussion is unlikely. The Parties shall refrain from exercising any termination right and shall continue to perform their respective obligations under this Agreement while the Parties endeavor to resolve any dispute under this Section 30; provided, that any Party alleged to be in breach promptly makes good faith efforts to cure such breach and pursue such cure in good faith.

31. Governing Law. This Agreement shall be governed by the laws of the State of New York without reference to its conflict of laws rules. Any dispute arising out of or relating to this Agreement that is not timely resolved through the informal dispute resolution process set forth in Section 30 shall be resolved by binding arbitration with the proceedings to be conducted in New York City, New York, by one arbitrator, following the applicable rules of the American Arbitration Association, and administered by a respectable dispute resolution provider as reasonably selected by the Party commencing the proceedings. To the extent arbitration proceedings are not feasible or if to enforce an arbitration award or otherwise, any court action under this Agreement shall be brought in the federal or state courts of the State of New York. In the event the Company files a Chapter 11 bankruptcy petition, then the Bankruptcy Court shall have exclusive jurisdiction over any matters arising out of or relating to this Agreement.

32. Waiver of Jury Trial. Each of the Parties unconditionally waives, to the fullest extent allowed by law, the right to a jury trial in connection with any claim arising out of or related to this Agreement.

33. <u>Headings/Tenses</u>.  The section headings and use of defined terms in the singular or plural or past or present tenses in this Agreement are solely for the convenience of the Parties.  To the extent that there may be any inconsistency between the headings and/or the tenses and the intended meaning, the intent of the Parties or the provision, the terms of such provision shall govern.

34. <u>No Presumptions</u>.  This Agreement shall be deemed drafted by both Parties and there shall be no presumption for or against either Party in the interpretation of this Agreement.


IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized representatives effective as of the Agreement Date.

AMERICAN SIGNATURE FURNITURE, INC.

By:
Name: Eric Jackson
Title: CFO

A&G REALTY PARTNERS, LLC

By:
Name: Emilio Amendola
Title: Co-President

**Schedules**

Schedule A    Leases
Schedule B    Real Property
Schedule C    Compensation

## SCHEDULE A
### Leases

| Store ID | Store Name | Region / Territory | Gross Sq Ft | Street Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|
| 15 | Sandusky | CLEVELAND | 40,000 | 202-24 East Market Street | Sandusky | OH | 44870 |
| 19 | Columbus East | COLUMBUS | 41,714 | 6067 East Main Street | Columbus | OH | 43213 |
| 21 | Clarksville | LOUISVILLE | 27,065 | 945 E Lewis and Clark Pkwy | Clarksville | IN | 47129 |
| 23 | Springdale | CINCINNATI | 64,165 | 94 West Kemper Road | Springdale | OH | 45246 |
| 26 | Parkersburg | Parkersburg-Marietta | 42,283 | 400 Lakeview Center | Parkersburg | WV | 26101 |
| 27 | Preston - Louisville | LOUISVILLE | 38,876 | 3426 Preston Highway | Louisville | KY | 40213 |
| 28 | Beavercreek | DAYTON | 47,453 | 2675 Fairfield Commons Blvd | Beavercreek | OH | 45431 |
| 29 | Ft. Wayne | FT. WAYNE | 65,093 | 811 Northcrest Shopping Center | Ft. Wayne | IN | 46805 |
| 31 | Toledo North | TOLEDO | 50,713 | 4475 Monroe Street | Toledo | OH | 43613 |
| 34 | Columbus West | COLUMBUS | 55,050 | 4300 W. Broad St. | Columbus | OH | 43228 |
| 36 | Akron | CLEVELAND | 35,835 | 790 Howe Ave | Cuyahoga Falls | OH | 44221 |
| 38 | Greenwood - Indy | INDIANAPOLIS | 42,342 | 1218 US 31 North | Greenwood | IN | 46142 |
| 41 | St Clairsville | WHEELING | 35,524 | 50471 Valley Plaza Drive | St. Clairsville | OH | 43950 |
| 47 | Pittsburgh | PITTSBURGH | 57,466 | 451 Clairton Blvd | Pittsburgh | PA | 15236 |
| 49 | Sterling Heights | DETROIT | 42,660 | 33377 Van Dyke Avenue | Sterling Heights | MI | 48312 |
| 51 | Dixie - Louisville | LOUISVILLE | 37,351 | 9070 Dixie Highway | Louisville | KY | 40258 |
| 52 | Lexington | LEXINGTON | 35,888 | 3220 Nicholasville Road | Lexington | KY | 40503 |
| 55 | Canton | CLEVELAND | 50,000 | 5577 Dressler Road NW | Canton | OH | 44720 |
| 56 | Southbend | SOUTH BEND | 58,097 | 5865 Grape Road | Mishawaka | IN | 46545 |
| 57 | Huntington | Charleston Wv-Hunt. | 45,006 | 1423 Roby Road, Route 60 | Huntington | WV | 25705 |
| 59 | Baltimore West #2 | BALTIMORE | 59,072 | 5840 Baltimore National Pike | Baltimore | MD | 21228 |
| 60 | Brookpark - Cleveland | CLEVELAND | 47,795 | 7500 Brookpark Road | Brooklyn | OH | 44129 |
| 61 | Burbank - Chicago | Chicago | 65,247 | 8310 South Cicero Avenue | Burbank | IL | 60459 |
| 64 | Calumet City - Chicago | Chicago | 43,351 | 2100 159th Street | Calumet City | IL | 60409 |
| 65 | Northlake - Chicago | Chicago | 50,324 | 49 West North Avenue | Northlake | IL | 60164 |
| 66 | Monroeville - Pittsburgh | PITTSBURGH | 53,516 | 3801 William Penn Highway | Monroeville | PA | 15146 |
| 68 | Taylor | DETROIT | 48,344 | 23859 Eureka Road | Taylor | MI | 48180 |
| 69 | Glen Burnie - Baltimore | BALTIMORE | 57,862 | 22 Mountain Road | Glen Burnie | MD | 21060 |
| 71 | Centerville - Dayton | DAYTON | 51,282 | 2070 Miamisburg-Centerville Rd | Centerville | OH | 45459 |
| 74 | Washington D.C. #1 | Washington D.C. | 36,708 | 8301 Annapolis Road | New Carrollton | MD | 20784 |
| 75 | Fairview Heights | ST. LOUIS | 48,640 | 10705 Lincoln Trail | Fairview Heights | IL | 62208 |
| 76 | Buffalo Thruway | Buffalo-Niagara Falls | 57,867 | 800 Thruway Plaza Drive | Cheektowaga | NY | 14225 |
| 77 | Merrillville | Chicago | 49,845 | 2580 East 79th Avenue | Merrillville | IN | 46410 |
| 78 | Rochester | Rochester Ny | 49,950 | 3160 West Ridge Road | Greece | NY | 14626 |
| 80 | Eastgate | CINCINNATI | 56,201 | 650 Eastgate Dr. S Suite A | Cincinnati | OH | 45245 |
| 86 | Castleton | INDIANAPOLIS | 51,768 | 5450 East 82nd Street | Indianapolis | IN | 46250 |
| 87 | St. Peters | ST. LOUIS | 47,656 | 202 Mid Rivers Mall Drive | St. Peters | MO | 63376 |
| 88 | Evansville | EVANSVILLE | 52,814 | 5330 East Indiana Street | Evansville | IN | 47715 |
| 89 | Bear | PHILADELPHIA | 51,773 | 301 Governors Place | Bear | DE | 19701 |
| 90 | Hagerstown | Hagerstown | 51,014 | 1581 Wesel Blvd | Hagerstown | MD | 21740 |
| 91 | Aurora - Chicago | Chicago | 47,630 | 4380 East New York Street | Aurora | IL | 60504 |
| 92 | Mechanicsburg | HARRISBURG | 50,432 | 6500 Carlisle Pike, Suite 400 | Mechanicsburg | PA | 17050 |
| 95 | Potomac Mills | Washington D.C. | 54,213 | 2500 Prindz William Parkway | Woodbridge | VA | 22192 |
| 96 | Boardman | Youngstown-Warren | 51,041 | 443 Boardman-Poland Road | Boardman | OH | 44512 |
| 97 | Mentor - Cleveland | CLEVELAND | 49,800 | 7767 Mentor Avenue | Mentor | OH | 44060 |
| 98 | Henrietta | Rochester Ny | 49,186 | 1000 Hylan Drive Suite 206 | Henrietta | NY | 14623 |
| 99 | Virginia Beach | Norfolk-Nwprt Nws | 53,843 | 2720 North Mall Drive | Virginia Beach | VA | 23452 |
| 100 | Waldorf | Washington D.C. | 54,877 | 1200 Smallwood Drive | Waldorf | MD | 20603 |
| 101 | Dearborn | DETROIT | 49,734 | 5701 Mercury Drive | Dearborn | MI | 48126 |
| 102 | Chippewa | ST. LOUIS | 51,769 | 7077 Chippewa Street | St. Louis | MO | 63119 |
| 104 | Falls Church | Washington D.C. | 51,904 | 5516 Leesburg Pike | Falls Church | VA | 22041 |
| 105 | Sawmill | COLUMBUS | 49,182 | 3700 West Dublin Granville Rd | Columbus | OH | 43235 |
| 106 | Chesapeake | Norfolk-Nwprt Nws | 58,182 | 1412 Greenbrier Pkwy, Unit 100 | Chesapeake | VA | 23320 |
| 107 | Orland Park | Chicago | 52,260 | 15770 South La Grange Road | Orland Park | IL | 60462 |
| 109 | Newport News | Norfolk-Nwprt Nws | 56,268 | 12149 Jefferson Blvd | Newport News | VA | 23602 |
| 110 | Pineville | Charlotte-Gastonia | 57,440 | 9527 South Boulevard | Charlotte | NC | 28273 |
| 112 | University - Charlotte | Charlotte-Gastonia | 57,314 | 8101 N. University City Blvd | Charlotte | NC | 28213 |
| 113 | Utica | DETROIT | 55,952 | 45350 Utica Park Blvd | Utica | MI | 48315 |
| 116 | Robinson Township | PITTSBURGH | 52,368 | 1400 Park Manor Blvd | Pittsburgh | PA | 15205 |
| 121 | Man O War | LEXINGTON | 48,767 | 2321 Sir Barton Way, Suite 170 | Lexington | KY | 40509 |
| 122 | Plainfield | INDIANAPOLIS | 48,959 | 2437 East Main Street | Plainfield | IN | 46168 |
| 123 | North Olmsted | CLEVELAND | 52,277 | 4700 Great Northern Blvd | North Olmsted | OH | 44070 |
| 124 | Amherst | Buffalo-Niagara Falls | 50,576 | 4220 Maple Road | Amherst | NY | 14226 |
| 125 | Florence | CINCINNATI | 49,352 | 8032 Burlington Pike | Florence | KY | 41042 |
| 126 | Chagrin Highlands | CLEVELAND | 48,866 | 4095 Richmond Road | Warrensville Heights | OH | 44122 |
| 129 | Richmond | Richmond | 61,970 | 9110 West Broad Street | Richmond | VA | 23294 |
| 130 | White Marsh | BALTIMORE | 52,477 | 5240 Campbell Blvd Suite E | Nottingham | MD | 21236 |
| 131 | Joliet | Chicago | 47,863 | 3355 Mall Loop Drive | Joliet | IL | 60431 |
| 132 | Harrisburg | HARRISBURG | 52,365 | 5047 Jonestown Road | Harrisburg | PA | 17112 |
| 144 | Suffolk | Norfolk-Nwprt Nws | 46,925 | 4300 Portsmouth Blvd, Ste 200 | Chesapeake | VA | 23321 |
| 148 | Gurnee Mills | Chicago | 78,630 | 6116 Grand Ave | Gurnee | IL | 60031 |
| 151 | Frederick | Washington D.C. | 48,394 | 5500 Buckeystown Pike, Ste 800 | Frederick | MD | 21703 |
| 156 | Midlothian | Richmond | 34,517 | 1250 HUGUENOT RD. | Midlothian | VA | 23113 |
| 158 | Columbia-Sandhill | Columbia Sc | 28,988 | 240 FORUM DRIVE | Columbia | SC | 29229 |
| 159 | Polaris Town Center | COLUMBUS | 55,538 | 1091 Gemini Place | Columbus | OH | 43240 |
| 160 | Elston | Chicago | 32,560 | 2536 North Elston Ave | Chicago | IL | 60647 |
| 162 | Ballwin | ST. LOUIS | 40,480 | 13961 Manchester Rd. | Ballwin | MO | 63011 |
| 163 | Rockville | Washington D.C. | 54,309 | 12055 ROCKVILLE PIKE | Rockville | MD | 20852 |
| 165 | Easton | COLUMBUS | 53,533 | 3740 Easton Market Unit 28 | Columbus | OH | 43219 |
| 166 | Schaumburg | Chicago | 42,165 | 1015 E. Golf Rd | Schaumburg | IL | 60173 |
| 167 | St.Ann | ST. LOUIS | 42,000 | 970 Northwest Plaza | St. Ann | MO | 63074 |
| 168 | Downers Grove | Chicago | 35,540 | 1508 Butterfield Rd | Downers Grove | IL | 60515 |
| 169 | Shelbyville | LOUISVILLE | 37,415 | 4623 Shelbyville Rd | Louisville | KY | 40207 |
| 170 | Columbia-Harbison | Columbia Sc | 46,004 | 140 Columbiana Dr | Columbia | SC | 29212 |
| 171 | Chesterfield | DETROIT | 69,392 | 50400 Gratiot Ave | Chesterfield | MI | 48051 |
| 172 | Clinton Township | DETROIT | 68,187 | 33801 S Gratiot Ave | Clinton Twp | MI | 48035 |
| 173 | Flint 2 | Flint-Saginaw-Bay Cty | 56,578 | 4577 Miller Rd | Flint | MI | 48507 |

| Store ID | Store Name | Region / Territory | Gross Sq Ft | Street Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|
| 174 | Lansing 2 | LANSING | 109,065 | 8748 W Saginaw Hwy | Lansing | MI | 48917 |
| 175 | Novi 2 | DETROIT | 112,770 | 27775 Novi Rd | Novi | MI | 48377 |
| 176 | Traverse City | Traverse City-Cadillac | 63,112 | 1775 Oak Hollow Dr | Traverse City | MI | 49686 |
| 177 | Ann Arbor | DETROIT | 69,731 | 425 E Eisenhower Pkwy | Ann Arbor | MI | 48108 |
| 178 | Westland 2 | DETROIT | 80,515 | 8300 N Wayne Rd | Westland | MI | 48185 |
| 179 | Kentwood | Gr Rpds-Kala-Battle | 79,212 | 4375 28th St SE | Grand Rapids | MI | 49512 |
| 180 | Holland | TOLEDO | 91,336 | 1301 E. Mall Dr | Holland | OH | 43528 |
| 181 | Portage | Gr Rpds-Kala-Battle | 50,680 | 550 Ring Rd | Portage | MI | 49024 |
| 183 | Saginaw 2 | Flint-Saginaw-Bay Cty | 43,125 | 2780 Tittabawassee Rd | Saginaw | MI | 48604 |
| 184 | Cranberry Twp | PITTSBURGH | 24,634 | 20111 Route 19 Suite B | Cranberry Twp | PA | 16066 |
| 185 | Bel Air | BALTIMORE | 25,195 | 559 Baltimore Pike | Bel Air | MD | 21014 |
| 186 | Fredericksburg #2 | Washington D.C. | 33,179 | 1731 Carl D Silver Pkwy | Fredericksburg | VA | 22401 |
| 188 | Canton MI | DETROIT | 32,000 | 42595 Ford Rd | Canton | MI | 48187 |
| 406 | Tampa-Dale Mabry | Tampa-St. Pete-Clrwtr | 48,288 | 15018 North Dale-Mabry Highway | Tampa | FL | 33618 |
| 407 | Altamonte Springs | ORLANDO | 50,000 | 150 S SR 434 #1080 | Altamonte Springs | FL | 32714 |
| 412 | Tropicaire | Miami-Ft. Laud-Hllywd | 51,250 | 7775 SW 40th Street | Miami | FL | 33155 |
| 413 | Kennesaw | Atlanta | 51,684 | 840 Barrett Pkwy NW, Suite 250 | Kennesaw | GA | 30144 |
| 415 | Fort Myers | Ft. Myers-Naples | 50,728 | 13711-2 South Tamiami Trail | Fort Myers | FL | 33912 |
| 416 | Jacksonville | JACKSONVILLE | 54,272 | 9400 Atlantic Blvd, Suite 100A | Jacksonville | FL | 32225 |
| 418 | Duluth | Atlanta | 55,000 | 3900 Venture Drive | Duluth | GA | 30096 |
| 420 | Camp Creek | Atlanta | 50,512 | 3755 Carmia Drive Suite 1000 | Atlanta | GA | 30331 |
| 424 | Sarasota | Tampa-St. Pete-Clrwtr | 43,442 | 5455 University Parkway | University Park | FL | 34201 |
| 431 | Southlake | Atlanta | 36,778 | 1972 Mt. Zion Road | Morrow | GA | 30260 |
| 433 | Smyrna | Atlanta | 42,945 | 2540 Cumberland Blvd | Smyrna | GA | 30080 |
| 443 | Alpharetta | Atlanta | 41,530 | 7461 North Point Pkwy | Alpharetta | GA | 30022 |
| 447 | Jacksonville-Argyle Village | JACKSONVILLE | 45,485 | 6001 Argyle Forest Blvd | Jacksonville | FL | 32244 |
| 448 | Stonecrest Lithonia | Atlanta | 49,319 | 2918 Turner Hill Rd St.2918 | Lithonia | GA | 30038 |
|  | **Non Retail** |  |  |  |  |  |  |
|  | Columbus Central Delivery | COLUMBUS | - | 3232 Alum Creek Dr | Columbus | OH | 43207 |
|  | Springdale - Delivery | CINCINNATI | - | 94 West Kemper Road | Springdale | OH | 45246 |
|  | Chicago Delivery Center | Chicago | - | 11501 West Irving Park Road | Franklin Park | IL | 60131 |
|  | White Marsh Delivery Center | BALTIMORE | - | 10000 Franklin Sq Dr, Suite 200 | Nottingham | MD | 21236 |

## SCHEDULE B
## Real Property

| Store ID | Store Name | Region / Territory | Gross Sq Ft | Street Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|
| 405 | Brandon | Tampa-St. Pete-Clrwtr | 53,085 | 161 Brandon Town Center Drive | Brandon | FL | 33511 |
| 408 | Colonial Drive | ORLANDO | 50,475 | 7463 West Colonial Drive | Orlando | FL | 32818 |
| 409 | Sandlake Rd - Orlando | ORLANDO | 50,821 | 730 Sand Lake Road, Suite #100 | Orlando | FL | 32809 |
| | Thomasville DC | Georgia | 274,080 | 121 Plantation Oak Drive | Thomasville | GA | 31792 |
| | Laporte DC | Indiana | 512,400 | 33 Industrial Parkway | LaPorte | IN | 46350 |

## SCHEDULE C
## Compensation

### A.    Definitions

"Document" - shall be defined as an amendment or agreement generated by the Company, a Landlord or third party, which modifies a Lease or the Company's obligations under a Lease in any manner or which effectuates a Lease Sale or any part thereof. It also includes any agreement that effectuates a Property Sale. For the avoidance of doubt, a Document also shall include any letter agreement or other binding written communication (including, but not limited to, an e-mail communication) from a Landlord or third party consenting to the applicable Service.

"Early Termination Right" - shall be defined as the tenant's exclusive right to terminate the Lease prior to the expiration date of the Lease.

"Gross Occupancy Cost" – shall be defined as the sum of the remaining base rent, any annual increases, percentage rent, CAM, taxes payable directly to the Landlord, insurance, rental tax, marketing and merchants' association charges, utility charges, HVAC usage charges, trash removal charges, sprinkler usage charges, unpaid rents, or any other sums due to the Landlord under a particular Lease as of the Agreement Date. For clarification purposes, Gross Occupancy Cost is calculated using the first date that the Service commences (i.e., the date that the rent reduction commences) through the earlier of the end of the Lease term in effect as of the Agreement Date (or longer if a Lease extension is also requested and negotiated by A&G on behalf of the Company) or when the Service is no longer in effect. CAM, taxes, insurance, marketing and merchants' association charges and all other applicable charges will be calculated using the last available full year charge for each item (which may be a calendar year or a lease year, depending upon which is the most recent full year charge available). In the event that rent increases periodically based upon the change in the Consumer Price Index (CPI), the assumed annual CPI increase shall be four percent (4%).

"Gross Proceeds" – shall be defined as the total consideration paid or payable to the Company by a landlord, investor, purchaser, or any other party to either waive, terminate, sublease, or purchase a Lease (or any rights related to a Lease) or Property. It includes, but is not limited to, cash and any other form of currency paid or waived by the Landlord, sub-tenant or other third party to the Company in relation to a Lease Termination, Lease Sale or Property Sale. This list is not meant to be exhaustive and Gross Proceeds shall include any consideration or other quantifiable economic benefit paid or payable to the Company in conjunction with a Lease Termination, Lease Sale or Property Sale, including all (i) Company debt assumed, satisfied or paid by a purchaser or which remains outstanding at closing (including, without limitation, the amount of any indebtedness "credit bid" at any sale), and (ii) amounts placed in escrow and deferred, contingent payments and installment payments.

"Lease Modification" – shall be defined as any alteration, amendment or modification to

the terms and conditions of a Lease agreement as in effect as of the Agreement Date.

"Lease Sale" – shall be defined as the sale or assignment, whether all or part, of a Lease and includes the sale of designation rights.

"Lease Termination" – shall be defined as the disposition, whether all or part, of a Lease through assignment, sublease, termination, or otherwise.

"Monetary Lease Modification" – shall be defined as any modification to or inclusion of additional provisions relating to the monetary terms of a Lease, including, but not limited to, reduction in Lease Term, reduction in Lease space, deferral of/reduction of/abatement of/waiver of/free rent or other Lease charges (including any previously deferred rent payment due or other Lease charges), reduction or elimination of any outstanding monetary amounts due under a Lease (whether or not incurred as of the date of this Agreement), reduction in square footage of premises covered by a Lease, the granting of tenant allowance or capital improvement dollars from the Landlord, the waiver of Company's capital expenditure obligations, extensions of existing rent reductions past their original end date, reduction in CAM charges, taxes, elimination of percentage rent, conversion to percentage rent, reductions in or returns of security deposits and FF&E if otherwise non-refundable (either pursuant to the terms of the Lease or as determined by the Landlord), or any other amendment to a Lease that results in Occupancy Cost Savings to the Company.

"New Gross Occupancy Cost" – shall be defined as the reduced Gross Occupancy Cost which results from a Lease Modification or any other amendment to the Lease.

"Non-Monetary Lease Modification" – shall be defined as any modification to the non-monetary terms of a Lease agreement, including, but not limited to, change of use, co-tenancy clause, or sublease rights, the negotiation of a lease extension, the granting of an additional option term or terms, an amendment to the current option term or terms (Early Termination Right fees are set forth separately for Fee purposes), relocation of Lease spaces that do not result in a reduction in Gross Occupancy Cost, the elimination of the Company's future obligation for repairs, replacements, maintenance or alterations to the subject premises, and any other amendments to the Lease that is or would be beneficial to the Company that do not fall within the above definition of Monetary Lease Modifications.

"Occupancy Cost Savings" – shall be defined as the difference between the original Gross Occupancy Cost and the New Gross Occupancy Cost for the period from the earlier of the effective date of a Document, the date in which the Lease Modification or other Service becomes effective or the date in which A&G becomes entitled to its Fees under the terms herein, through the end of the Lease Term or the Revised Lease Term pursuant to the terms of the Services, less any payment(s) or costs payable by the Company to effectuate the Lease Modification or other Service, excluding legal fees. "Lease Term" shall be defined as the commencement date and expiration date of the Lease as set forth in the Lease as of the Agreement Date. "Revised Lease Term" shall be defined as the new Lease expiration

date pursuant to any Lease extensions obtained by A&G on behalf of the Company. For example, if a Service includes a Monetary Lease Modification and an extension of the Lease, the Occupancy Cost Savings shall be applicable through the duration of the Lease extension (i.e., the Revised Lease Term).

Occupancy Cost Savings include, but are not limited to, reduction in term, reduction in Lease space, deferral of/reduction of/abatement of/waiver of/free rent or other Lease charges (including any previously deferred rent or other Lease charges), reduction or elimination of any outstanding monetary amounts due under a Lease (whether or not incurred as of the date of this Agreement), reduction of unamortized tenant allowance, reduction or elimination of the obligation to repay tenant allowance to the Landlord, reduction or elimination of the requirement to improve the Lease space that have a direct monetary benefit to the Company, the granting of tenant allowance or capital improvement dollars from Landlord or Landlord improvements to the property, the waiver of Company's capital expenditure obligations, reduction in square footage of premises covered by a Lease, extensions of existing rent reductions past their original end date, any lease extensions that result in a rent decrease, reduction in CAM charges, taxes, elimination of percentage rent, conversion to percentage rent, or any or any other amendment to a Lease that results in direct monetary savings to the Company.

For Occupancy Cost Savings resulting from the extension of a rent reduction past the Lease Term in effect as of the Agreement Date, the savings shall be based upon the original rent and option rent set forth in the Lease, allocated proportionately to the time period during the Lease Term and the extended term, as the case may be. For example purposes only, if A&G obtains a 4-year rent reduction and only 2 years remain on the Lease Term, A&G's Fee will be based upon the blended Occupancy Costs Savings resulting from the reduced rent as compared to the rent in effect during the Term for a period of 2 years, and the Occupancy Costs Savings resulting from the reduced rent as compared to the option rent set forth in the Lease, provided the Company exercises such option. For Occupancy Cost Savings resulting from lease extensions where there is no rent increase, the savings shall be based upon the option price for the period of the duration of the extension or if there is no option price, the rent price for the immediately preceding period increased by an assumed annual CPI increase of four percent (4%).

In the event base or gross rent (i.e., contract rent) is converted to percentage rent based on sales, Occupancy Cost Savings will be calculated based on the difference between the contract rent and the percentage rent using sales figures for the twelve (12) months ended October 31, 2025.

"Property Sale" - shall be defined as the sale, or any other transfer of ownership, of any Property.

B.     **Fees**

A&G shall be compensated for the Services as follows (the "Fees"):

1. Retainer. The Company shall pay A&G a retainer (the "Retainer") in the amount of one hundred thousand dollars ($100,000) upon execution of this Agreement. A&G may, but shall not be required to, apply the Retainer against invoices issued by A&G to the Company. The Company shall replenish the Retainer to the extent applied within five (5) business days of the date of the invoice.  Furthermore, to the extent any invoice exceeds the amount of any Retainer applied, in addition to replenishing the Retainer, the Company shall pay the difference between the invoice amount and the Retainer to A&G within five (5) business days of the date of the invoice.

2. Lease Terminations. For each Lease Termination obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee (the "Lease Termination Fee") in the amount of four percent (4%) of the Occupancy Cost Savings and Gross Proceeds, per Lease (with any broker fee to be paid by A&G); provided, however, if a Lease Termination involves a sublease or assignment, A&G shall earn and be paid a fee in the amount of four percent (4%) of the total base rent to be paid by (a) the sublessee for the initial term of the sublease, or (b) the assignee for the entire Lease Term, including base rent for any options exercised by the sublessee or assignee upon execution of the sublease or assignment, as the case may be (collectively, the "Base Lease Income"); and provided further, that in the event a subtenant or assignee of a Lease is procured through such subtenant or assignee's broker, the Lease Termination Fee shall equal to six percent (6%) of all Base Lease Income, out of which A&G shall pay such broker's commission and retain the balance as compensation to A&G.

3. Monetary Lease Modifications. For each Monetary Lease Modification obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee in the amount of four percent (4%) of the Occupancy Cost Savings, per Lease.

4. Non-Monetary Lease Modifications. For each Non-Monetary Lease Modification obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee in the amount of $1,500, except that for any Lease extensions, the fee shall be the greater of $2,500 and four percent (4%) of Occupancy Cost Savings for the extended Lease term.

5. Early Termination Rights.  For each Early Termination Right obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee in the amount of one-half (½) of one (1) month's Gross Occupancy Cost, per Lease.

6. Property Sales. For each Property Sale obtained by A&G on behalf of the

Company to an entity unaffiliated with the Schottenstein Property Group ("SGP"), A&G shall earn and be paid a fee of three percent (3%) of the Gross Proceeds thereof. For each Property Sale obtained by A&G on behalf of the Company to an entity affiliated with SGP (an "SGP Entity"), A&G shall earn and be paid a minimum fee of $350,000 (the "Minimum Sale Fee"), provided, however, in the event an SGP Entity is the "stalking horse" bidder of any Property or Properties (the "Stalking Horse Bid"), competitive bidding against the Stalking Horse Bid ensues and the SGP Entity emerges as the successful bidder for the Property or Properties (the "Successful Bid"), A&G shall earn and be paid a fee in the amount of the Minimum Sale Fee plus three percent (3%) of the difference between the Gross Proceeds set forth in the Stalking Horse Bid and the Gross Proceeds set forth in the Successful Bid.

7.  Lease Sales. For each Lease Sale obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee in the amount of three percent (3%) of the Gross Proceeds, with a minimum fee of seven hundred fifty dollars ($750) per Lease.

8.  Landlord Consents - If requested by the Company, for each consent obtained by A&G to extend the Company's time to assume or reject a Lease as a part of any applicable Chapter 11 case, A&G shall earn and be paid a fee in the amount of five hundred dollars ($500) per Lease.

9.  Valuations. A&G shall earn and be paid a fee of $500 per Lease.

C.  **Payment of Fees**.

A&G shall provide the Company with a deal sheet with the terms of the proposed Lease Termination, Lease Modification, Early Termination Right, or Landlord Consent (the "Deal Sheet"). For clarification purposes, a Deal Sheet can include, but not be limited to, an email or other written communication from A&G setting forth the terms of the proposed Service.

If: (i) the Company approves the terms of the Deal Sheet and the Landlord or other third party (if applicable) submits, approves or executes a Document that reflects the Company accepted Deal Sheet; (ii) the Company approves a Document that embodies a Lease Termination, Lease Modification, Early Termination Right, or Landlord Consent to be transmitted to a Landlord and that Landlord agrees to all the material terms of such Document with no contingencies pursuant to Landlord's signature to the Document or confirming email; or (iii) the Company begins to receive the benefit of the terms set forth in the Deal Sheet, A&G shall be entitled to, and be paid, its Fees in accordance with the above Fee structure. For the avoidance of doubt, A&G shall be entitled to its Fees notwithstanding the fact that the Service transaction is not fully executed by the Company. A Service may incur more than one Fee.

The Company shall pay A&G's invoices within five (5) business days of the Company's

receipt thereof, except that for Lease Sales or Property Sales, A&G shall be paid its fee upon the closing of the applicable sale except, in each case, as may be approved or directed otherwise in the Company's chapter 11 bankruptcy proceeding (if any).