**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN SIGNATURE, INC., *et al.*, | Case No. 25-12105-JKS |
| Debtors.[1] | (Jointly Administered) |
| | **Hearing Date: February 25, 2026 at 10:30 a.m. (ET)**<br>**Objection Deadline: February 4, 2026 at 4:00 p.m. (ET)** |

**MOTION OF SYNCHRONY BANK FOR ADEQUATE PROTECTION
AND STAY RELIEF IN CONNECTION WITH CREDIT CARD PROGRAM**

Synchrony Bank ("**Synchrony**") hereby files this *Motion for Adequate Protection and Stay Relief in Connection with Credit Card Program* (the "**Motion**"). In support, Synchrony respectfully submits the following:

## I.      JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over these chapter 11 cases and this motion under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

2.      Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: American Signature, Inc. (6162); American Signature Home Inc. (8573); American Signature USA Inc. (6162); ASI Pure Promise Insurance LLC (6162); ASI Elston LLC (7520); ASI – Laporte LLC (6162); ASI Polaris LLC (6162); ASI Thomasville LLC (6162); and American Signature Woodbridge LLC (6162). The Debtors' business address is 4300 E. 5th Avenue, Columbus, OH 43235.

## II.   PRELIMINARY STATEMENT

3.      Synchrony is entitled to adequate protection of funds held in trust for Synchrony by American Signature, Inc. ("**American Signature**") and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**"). Synchrony is also entitled to confirmation that the automatic stay does not apply to its rights of recoupment or, alternatively, to stay relief with respect to its rights of setoff.

4.      American Signature and Synchrony are parties to the Private Label Credit Card Consumer Program Agreement dated as of December 12, 2012 (as amended, the "**Agreement**"). Under the Agreement, when a customer purchased goods or services from the Debtors on financing terms, Synchrony advanced a loan to the customer and paid the proceeds of the loan directly to the Debtors. The Debtors are then required to reimburse Synchrony if the transaction is later charged back, as might occur if the customer returns the goods or disputes the charge. In the ordinary course of business, the Debtors and Synchrony regularly settled their contractual duties to each other by recouping obligations of the Debtors against obligations of Synchrony, resulting in net settlements in favor of one or the other.

5.      Synchrony is entitled to confirmation that the automatic stay does not apply to its right to recoup the cost of customer disputes, returns, chargebacks, and other amounts payable by the Debtors against amounts otherwise payable to the Debtors under their existing contract. To the extent that Synchrony's rights are classified as setoffs rather than recoupments, Synchrony is entitled to stay relief under sections 362 and 553 of the Bankruptcy Code.

6.      The Debtors also hold, and are required to pay to Synchrony, payments intended for Synchrony that were received on Synchrony's behalf by the Debtors. Customers borrowing money are required to repay the loans from Synchrony and are able to make payments directly to Synchrony. As a convenience for customers, and as a way for Debtors to draw customers into their

stores, the Debtors also accepted payments from customers on Synchrony's behalf. The Agreement requires the Debtors to hold those payments in trust for Synchrony. They do not belong to the Debtors and the Debtors have no right, title, or interest in or to customer payments.

7.     Synchrony is entitled to adequate protection of customer payments that the Debtors received and are holding trust for Synchrony. To the extent that the Debtors do not pay such amounts over to Synchrony then Synchrony is entitled to adequate protection of its interests.

### III.     RELEVANT FACTS

**A.     Background**

8.     The Debtors are in the business of selling consumer goods at retail. Synchrony establishes programs to extend and service bank card and private label credit programs to qualified consumer customers for the purchase of products from various merchants.

9.     On November 22, 2025 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Court, opening nine cases (collectively, the "**Cases**") that are jointly administered under case number 25-12105-JKS.

10.     American Signature and Synchrony are parties to the Agreement. (Declaration of Corey Fitzgerald (Fitzgerald Decl.) ¶ 5, Jan. 20, 2026.) The Agreement is governed by Utah law. (Fitzgerald Decl. Ex. 1, at 34, Agreement § 13.4.) Pursuant to the Agreement, Synchrony provided a private label revolving consumer credit program (the "**Program**") to qualified consumer customers of the Debtors. (Fitzgerald Decl. ¶ 9.)

**B.     Recoupment Under the Agreement**

11.     When a customer used a private-label card (collectively, the "**Cards**") to make a purchase from the Debtors, the Debtors transmitted the request to Synchrony, which confirmed whether Synchrony was prepared to advance credit to the customer to finance the purchase. (Fitzgerald Decl. ¶ 10.) If Synchrony was prepared, and other conditions are satisfied, then

Synchrony confirmed to the Debtors that it was willing to make a loan for the benefit of the Debtors and their customers. (Fitzgerald Decl. ¶ 10.)

12.    When the Debtors accepted a payment made by a customer using a Card, the Debtors recorded the amount of the payment. (Fitzgerald Decl. ¶ 11.) Each day, the Debtors transmitted a report to Synchrony that contained a list of charge-transaction data, including the aggregate amounts of loans made under the Cards. (Fitzgerald Decl. ¶ 11.) Later that day, Synchrony made a payment to the Debtors that was calculated based on the sum of payments made using the Cards, as reflected in the Debtors' report, less credits, fees, and other amounts deducted by Synchrony in accordance with the Agreement. (Fitzgerald Decl. ¶ 11.) The parties agreed that this process is appropriately considered recoupment.

> Notwithstanding any other provision of this Agreement, Bank will have the right to net, setoff or recoup any amounts due to it under this Agreement against any amounts owing to Retailer under this Agreement. Each party further acknowledges that, for purposes of determining their rights of recoupment hereunder, Retailer's payment obligations to Bank hereunder, including Bank's right to receive chargebacks and credits under this Agreement, and Bank's obligation to settle with Retailer for Charge Transaction Data pursuant to the preceding Section 3.1, shall be deemed to be a "single integrated transaction". Nothing in this Section or any other provision of this Agreement is intended to limit Bank's common law rights of setoff and recoupment.

(Fitzgerald Decl. Ex. 1, at 5–6, Agreement § 3.2(b).) Unlike some credit card-processing agreements, under the Agreement, Synchrony was not merely a conduit for loans made by other entities. (Fitzgerald Decl. ¶ 12.) Synchrony did not just process credit card transactions. (Fitzgerald Decl. ¶ 12.) Synchrony itself was extending credit to American Signature's customers for the benefit of American Signature, which the customers are required to repay to Synchrony. (Fitzgerald Decl. ¶ 12.)

**C.    Customer Payments**

13.    Although customers may make payments to Synchrony directly, and many do, as a convenience to customers the Debtors and Synchrony agreed that the Debtors could accept payments on Synchrony's behalf.

> Retailer shall make available to Accountholders at all Store Locations the address to be used for making payments on Accounts directly to Bank; provided, that except as provided below, during the Term, Retailer may accept at any of its Store Locations payments on an Account by the underlying Accountholder or any person acting on behalf of such Accountholder (an "In-Store Payment"). If any such In-Store Payment is made (or Retailer otherwise receives any payment on an Account), Retailer shall give the Accountholder a receipt therefor and shall be deemed to hold such In-Store Payment as property of, and in trust for, Bank until (i) such payment is delivered to Bank, or (ii) Bank is informed of the amount of such payment in accordance with Section 6.17(b) and has effected a setoff of the amount of such payment against a settlement payment due Retailer pursuant to Section 3.1(b). If at any time, based upon Bank's good faith interpretation of any law, rule, regulation, guideline or order, Bank determines that, as a result of such law, rule, regulation, guideline or order, Retailer's acceptance of In-Store Payments is detrimental to the interests of Bank, or if Bank determines that there has been a material deterioration in the financial condition of Retailer, then, at Bank's request, Retailer shall cease accepting In-Store Payments and shall direct Accountholders to make all payments in respect of Accounts directly to Bank.

(Fitzgerald Decl. Ex. 1 at 19, Agreement § 6.17(a).) Other provisions of the Agreement confirm that the Debtors do not have any other interest in customer funds beyond that as trustees for Synchrony.

> Bank is and will be the sole and exclusive owner of all Accounts and Account Documentation, and will be entitled to receive all payments made by Cardholders on Accounts. Bank shall be identified as the creditor and owner of the Accounts for all purposes, and Retailer shall not represent or imply otherwise. Retailer acknowledges that it has no right, title or interest in any Accounts or Account Documentation and will not, at any time, have any right to any proceeds or payments made under the Accounts unless Retailer subsequently purchases or otherwise acquires such Accounts from Bank.

(Fitzgerald Decl. Ex. 1, at 12, Agreement § 6.1(a).) When Synchrony was notified that the Debtors received a payment from a customer, Synchrony credited that customer's account in the ordinary course of business. (Fitzgerald Decl. ¶ 13.) If the Debtors do not turn over the funds that they hold in trust with respect to such customer, then the result is a total loss to Synchrony. (Fitzgerald Decl. ¶ 13.) Although Synchrony bears the credit risk associated with a customer's failure to make a payment at all, the Debtors are responsible if they accept a payment and do not turn it over to Synchrony. (Fitzgerald Decl. ¶ 13.)

**D.    Chargebacks**

14.    American Signature bears the risk that customers will decide to reverse the transactions for purchases made at American Signature, as they are authorized to do under some circumstances per the terms of the Cards and applicable law. (Fitzgerald Decl. ¶ 14.) This risk is referred to as "chargeback" risk. (Fitzgerald Decl. ¶ 14.) If a customer disputes a transaction and asks Synchrony to reverse the obligation to pay Synchrony, the customer notifies Synchrony. (Fitzgerald Decl. ¶ 14.) Synchrony then informs American Signature, and—assuming the dispute is valid and is included in Synchrony's chargeback rights under the Agreement—American Signature is responsible for compensating Synchrony for the cost of the chargeback. (Fitzgerald Decl. ¶ 14.)

15.    Because American Signature is in bankruptcy, it may not have the money necessary to meet its obligation to compensate Synchrony for the cost of chargebacks. (Fitzgerald Decl. ¶ 15.) Once the Debtors cease operations, they will not be available to answer questions about chargebacks, increasing the risk that Synchrony will be forced to accept chargebacks that could otherwise have been reasonably disputed or declined. (Fitzgerald Decl. ¶ 15.) That could leave Synchrony exposed to the cost of chargebacks without an effective mechanism for obtaining reimbursement from American Signature. (Fitzgerald Decl. ¶ 15.)

16.     The risk to Synchrony is particularly severe in this case because of the nature of the Debtors' business. (Fitzgerald Decl. ¶ 16.) The Debtors frequently accepted payment from their customers weeks or months before they delivered the furniture that those customers ordered. (Fitzgerald Decl. ¶ 16.) That means Synchrony disbursed funds to the Debtors on the date of the sale and relied on the Debtors to deliver the goods and services that they promised. (Fitzgerald Decl. ¶ 16.) If the Debtors liquidate or are otherwise not able to deliver furniture to customers, then those customers will have the right to dispute the charges on the lines of credit extended by Synchrony. (Fitzgerald Decl. ¶ 16.) In the ordinary course of business, the Debtors would compensate Synchrony for the costs of the associated chargebacks, but in a liquidation, that may not be possible, creating the risk of administrative insolvency for the Debtors' estates. (Fitzgerald Decl. ¶ 16.) For those reasons, liquidation sales of furniture businesses, such as the Debtors' business, creates both an increased risk of chargebacks and an increased risk that those chargebacks will not be paid. (Fitzgerald Decl. ¶ 16.)

**E.     Going-Out-of-Business Sales**

17.     When a retailer holds a going-out-of-business sale, there is an increased risk in chargebacks if customers do not receive their delivery or if they would like a refund because their only recourse is through Synchrony as the retailer no longer exists to handle such disputes. (Fitzgerald Decl. ¶ 17.) This is why Synchrony specifically negotiated for provisions in the Agreement placing strict limits on such sales. (Fitzgerald Decl. ¶ 17.)

18.     Every time that the Debtors submitted charge-transaction data to Synchrony in connection with their requests to Synchrony to make a loan, the Debtors represented and warranted, among other things, that:

> All purchases included in the Charge Transaction Data constitute
> bona fide, arms-length sales by Retailer of the goods or services
> described therein in the ordinary course of Retailer's business (and

do not include any purchases conducted in connection with any GOB Sale that is not an Authorized Liquidation Sale); except in the case of Undelivered Goods, Retailer has delivered all the products and fully performed all the services covered by the Charge Transaction Date.

(Fitzgerald Decl. Ex. 1 at 28–29, § 11.2(a).) A "GOB Sale" is "any sale of goods which is advertised or presented to the public as a liquidation or 'going out of business' sale." (Fitzgerald Decl. Ex. 1 at 40.) An "Authorized Liquidation Sale" is a sale that would otherwise be a GOB Sale but that meets certain criteria indicative of a scenario where Debtors were merely closing a subset of stores instead of going out of business entirely, including that no more than 10 percent of American Signature's stores conducted such a sale within 180 days; that no outside liquidator was used except in an advisory or administrative capacity; and that no such sale involved goods supplied by an aggregator, liquidator, or a similar entity. (Fitzgerald Decl. Ex. 1 at 38–39.) Those provisions were important to Synchrony because of the substantial risk associated with prohibited sales. (Fitzgerald Decl. ¶ 17.)

19.     Before and after the bankruptcy, the Debtors breached those representations and warranties by commencing liquidation sales at 33 of their more than 120 stores while continuing to request loans from Synchrony. (*See* Rudolph Morando Decl., D.I. 5 at ¶¶ 6, 9, Nov. 23, 2025.) Synchrony was not required to make loans based on transactions based on inaccurate representations and warranties. (*See* Fitzgerald Decl. Ex. 1, Agreement at 21–25 (identifying termination rights), 4 (Synchrony only required to pay settlements to American Signature if "no circumstance exists that would entitle Bank to give notice of termination of this agreement . . . .")). Nor was Synchrony required to surrender its rights to net, recoup, and setoff the proceeds of loans against chargebacks, refunds, program fees, and other amounts payable to Synchrony under the Agreement. (Fitzgerald Decl. Ex. 1, at 5–6, Agreement § 3.2(b).)

20.     Synchrony was not required to continue to advance credit to customers of the Debtors after the Petition Date because the Agreement "is a 'financial accommodation' contract (as such term is used in Section 365(c)(2) of Title 11 of the United States Code) for the benefit of Retailer." (Fitzgerald Decl. Ex. 1 at 34, Agreement § 13.6.) The Debtors referred to the Agreement as a "Finance Contract" in their Notice of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amounts dated January 2, 2026. (D.I. 290 at 13.)

21.     Synchrony was also not obligated to pay to the Debtors a volume discount for the program year ending November 1, 2025, because the Debtors were in "material breach of the Agreement and the breach has not been cured" under Section 4.5 of the Agreement, as amended by the Sixth Amendment. (Fitzgerald Decl. Ex. 8 at 1 § 1.2.) The Debtors' material breaches include their presentation of transactions in violation of the representations and warranties that they were required to make with respect to each such transaction.

### F.     Preservation of Rights

22.     Synchrony promptly took steps to preserve its rights under the Agreement and applicable law. (Fitzgerald Decl. ¶ 21.) Synchrony paid $3,387,470.41 to American Signature on November 24, 2025 in connection with Synchrony's financing of the purchase of goods and services on November 22 and 23, 2025, and then Synchrony placed an administrative freeze on $3,256,907.91 associated with Synchrony's financing of the purchase of goods and services after November 23, 2025 by customers of the Debtors. (Fitzgerald Decl. ¶ 21.)

23.     Synchrony negotiated with the Debtors promptly after the Debtors filed bankruptcy for adequate protection to allow the program to be used post-petition for going-out-of-business sales that violate the Agreement. (Fitzgerald Decl. ¶ 22.) But the Debtors refused to agree to reasonable protections, such as a process where Synchrony would fund transactions after the Debtors could demonstrate that the corresponding goods sold had been delivered. Instead, the

9

Debtors informed Synchrony on November 26, 2026 that the Debtors would no longer accept the Synchrony card for transactions (even though the Debtors continued to accept payments from customers intended for Synchrony). (Fitzgerald Decl. ¶ 22.) Synchrony placed a temporary administrative hold on payment of such amounts to the Debtors to preserve its rights of recoupment and setoff. Communications with the Debtors resulted in language that preserved Synchrony's rights in all respects.

24. On January 8, 2026, the Court entered the Final Order Under Bankruptcy Code Sections 105, 361, 362, 364, 503, 506, 507, and 552, and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (b) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, and (IV) Granting Related Relief (the "**DIP Order**") (D.I. 350). Paragraph 55(a) of the DIP Order contains language specifically protecting Synchrony's rights of setoff and recoupment with respect to the Agreement. (D.I. 350 at 72.) Among other things, the DIP Order also expressly preserved and reserved and did not affect "[a]ll of Synchrony's rights, remedies, claims, defenses, and other relief arising from or related to the Program Agreement . . . ." (D.I. 350 at 73.)

25. Likewise, paragraph 52(g) of the Final Order Authorizing the Debtors to (A) Assume the Consulting Agreement, (B) Conduct Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (C) Granting Related Relief entered on January 8, 2026, with respect to the Debtors' closing sales expressly provided that nothing contained in the sale motion or in the order or any action taken pursuant to the relief granted would be deemed to be a waiver of limitation of any rights of any party (including Synchrony) against the Debtors. (D.I. 352 at 21–22.)

10

### G.   Reconciliation of Amounts Owed

26.   As of January 13, 2026, Synchrony is owed no less than $3,066,993.15 by American Signature in connection with program fees, refunds, fraud and dispute chargebacks, and miscellaneous adjustments to prior transactions. "Program fees" refers to the merchant fee payable to Synchrony in connection with the Agreement owed to Synchrony on the gross sales; "refunds" refers to customers who request and receive refunds on transactions; and "fraud and dispute chargebacks" refers to chargebacks arising after a customer disputes a charge and the dispute is decided in the customer's favor. (Fitzgerald Decl. ¶ 18.) The Debtors are also holding no less than $1,102,873.16 in customer payments intended for Synchrony, which the Debtors are required to hold in trust for Synchrony. (Fitzgerald Decl. ¶ 18.) Such amounts have also been divided between amounts relating to sales that occurred before and after the Petition Date for program fees, refunds, fraud and dispute chargebacks, and miscellaneous adjustments to prior transactions. (Fitzgerald Decl. ¶ 23.)

27.   As of January 13, 2026, Synchrony has been given notice that customers dispute no less than $6,314,768.26 in transactions with the Debtors that have not yet been resolved. (Fitzgerald Decl. ¶ 18.) Of that amount, $6,044,696 is derived from sales that occurred before the bankruptcy. (Fitzgerald Decl., Ex. 15.) Between January 5 and January 12, 2026, approximately 86 percent of disputes closed during that period were resolved in favor of the customers. (Fitzgerald Decl. ¶ 19.) If that occurs with respect to the $6,314,768.26 in unresolved disputes outstanding as of January 13, 2026, then it will result in additional chargebacks totaling approximately $5,430,700.70 owed by American Signature to Synchrony. (Fitzgerald Decl. ¶ 19.)

28.   Synchrony estimates that customers will dispute additional transactions before their time for doing so elapses under their contracts with Synchrony, and to the extent those disputes are resolved in favor of the customers, then that will result in substantial additional chargebacks owed

by American Signature to Synchrony. (Fitzgerald Decl. ¶ 20.) There is a high likelihood of chargebacks because of the nature of the Debtors' business, which frequently involved the sale of goods and services well before delivery, and because of the Debtors' liquidation. (Fitzgerald Decl. ¶¶ 15–17.)

29.    Under Section 4.6 of the Sixth Amendment to the Agreement, as an incentive for American Signature to enter into the amendment, Synchrony paid $3,000,000 to American Signature. (Fitzgerald Decl. Ex. 8 at 3.) If the agreement terminated before June 30, 2026, American Signature was required to repay an amount equal to 1/33 of $3,000,000, multiplied by the number of months, rounded up to the nearest integer (not to exceed 33) remaining before June 30, 2026. (Fitzgerald Decl. Ex. 8 at 3.) On or about November 26, 2025, American Signature stopped accepting Synchrony's cards, and on December 29, 2025, American Signature delivered notice to Synchrony that it would not renew the Agreement beyond its expiration on June 30, 2026. (Fitzgerald Decl. ¶ 22.) The amount owed under Section 4.6 of the Sixth Amendment is $636,363.64 based on the formula found in that section and a termination date of November 26, 2025.

30.    Although the Debtors are or should be aware that they owe substantial obligations to Synchrony in connection with the Program, the Debtors nevertheless identified the amount necessary to cure outstanding defaults as "zero" when they filed their Notice of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amounts dated January 2, 2026. (D.I. 290 at 13.) Synchrony does not know what basis the Debtors had that.

## IV.    ARGUMENT

### A.    The Court should compel the Debtors to turn over trust funds received from customers to adequately protect Synchrony's interests in those funds.

31.    The Debtors should be required to turn over to Synchrony all payments from customers intended for Synchrony, which the Debtors held in trust for Synchrony.

32.    Funds that a debtor holds in trust are not property of the debtor's bankruptcy estate, whether the trust is express, statutory, or constructive. *Redrock Admin. Servs. LLC v. Magna Ent. Corp.* (*In re Magna Ent. Corp.*), 438 B.R. 380, 387 (Bankr. D. Del. 2010) (trust funds are excluded from a debtor's estate whether "'held in express trust'" or "'in constructive trust.'" (quoting *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993)); *see also Off. Comm. of Unsecured Creditors of The IT Grp., Inc. v. Jointa Galusha, LLC* (*In re IT Grp., Inc.*), 326 B.R. 270, 275 (Bankr. D. Del. 2005) (funds that debtor, in its capacity as prime contractor on construction projects, held in trust for benefit of unpaid subcontractors pursuant to provisions of New York lien law did not constitute "interest of the debtor in property," for preference-avoidance purposes). "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section [section 541 of the Bankruptcy Code] only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d).

33.    To the extent that a debtor proposes to use, sell, or lease property in which someone else has an interest, the Court "shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Adequate protection may be supplied by a debtor in several ways, but giving the other party an administrative claim is not among them. 11 U.S.C. § 361.

34.     Synchrony is entitled to adequate protection of its interests in customer payments. As with most lines of credit, after borrowing money from Synchrony, customers are required to repay the money. Sometimes customers instead make those payments to the Debtors. The Agreement requires the Debtors to receive and hold all in-store payments in trust for Synchrony. (Fitzgerald Decl. Ex. 1, at 19, Agreement § 6.17(a).) The Debtors have no interest in such payments. (Fitzgerald Decl. Ex. 1, at 12–13, Agreement § 6.1.) The Debtors should turn over customer payments held in trust for Synchrony. The Agreement requires them to do so and there is no obvious alternative mechanism for the Debtors to provide Synchrony with adequate protection.

**B.      Synchrony has the right to recoup or set off amounts owed by the Debtors against daily settlements and other amounts potentially payable to the Debtors.**

35.     Synchrony has contractual and equitable rights to exercise the defenses of recoupment and setoff with respect to amounts owed by the Debtors. (Fitzgerald Decl. Ex. 1, at 4–5, Agreement § 3.2(b).)

36.     State law defines Synchrony's setoff and recoupment rights. *See In re Orexigen Therapeutics, Inc.*, 596 B.R. 9, 14 (Bankr. D. Del. 2018), *aff'd*, No. BR 18-10518-KG, 2020 WL 42824 (D. Del. Jan. 3, 2020), *aff'd*, 990 F.3d 748 (3d Cir. 2021) (a party must have setoff rights under applicable nonbankruptcy law to acquire setoff rights under section 553); *In re Am. Remanufacturers, Inc.*, 451 B.R. 349, 370 (Bankr. D. Del. 2011) ("Recoupment rights are determined by state law.").

37.     Utah law governs the Agreement. (Fitzgerald Decl. Ex. 1, at 34, Agreement § 13.4.) Under Utah law, "recoupment" includes circumstances in which a party receives a rebate on the other party's claim arising from the same transaction, whereas a "setoff" is a counterclaim that a

14

party may have against another to be used in full or partial satisfaction of whatever is owed. *Mark VII Fin. Consultants Corp. v. Smedley*, 792 P.2d 130, 132 (Utah Ct. App. 1990).

       **1.**       **Synchrony does not need relief from the automatic stay to recoup amounts otherwise payable to the Debtors.**

38.      The Court should enter an order recognizing that Synchrony does not need relief from the automatic stay to exert its contractual and equitable defenses of recoupment. It is well-settled that recoupment is available as a defense against a claim by a debtor in bankruptcy. *See Reiter v. Cooper*, 507 U.S. 258, 265 n.2 (1993). Recoupment is an equitable remedy that permits the offset of mutual debts when the respective obligations are based on the same transaction or occurrence, even if debt arose pre-petition and the other arose post-petition, so long as both arose from the same transaction. *In re HQ Glob. Holdings, Inc.*, 290 B.R. 78, 80–81 (Bankr. D. Del. 2003). Recoupment is particularly appropriate where (as here) a contract expressly acknowledges that amounts owed under that contract may be recouped against each other. *Id.* at 82–83; *see also Megafoods Stores, Inc. v. Flagstaff Realty Assocs. (In re Flagstaff Realty Assocs.)*, 60 F.3d 1031, 1035 (3d Cir. 1995) (reversing district court and vindicating creditor's right of recoupment; "[b]oth the claim for repair costs and the rent arise from the lease, and it would be inequitable for the landlord to receive rent without compensating tenant for undertaking the repairs.").

39.      Synchrony has a recoupment defense to the payment of any amounts to the Debtors because of the Debtors' unperformed obligations under the Agreement. That is because both the Debtors' obligations, and Synchrony's corresponding defenses to payment, arise out of the same contract. *See Collard v. Nagle Constr.*, 57 P.3d 603, 609 (Utah App. 2002) (recoupment is permitted where the parties' claims arose from the same contract). Synchrony entered into a single contract with American Signature that governed the extension of credit by Synchrony to the Debtors' customers. Synchrony regularly paid the Debtors all amounts charged to the cards even though the

parties understood that subsequent reconciliations would be necessary to reduce overpayments to the Debtors arising from chargebacks, refunds, and other amounts owed to Synchrony under the contract. The Agreement ratifies Synchrony's recoupment defenses in connection with those reconciliations. (Fitzgerald Decl. Ex. 1, at 4–5, Agreement § 3.2(b).) In fact, the Debtors expressly agreed Synchrony's payment obligations shall be deemed a "single integrated transaction" for purposes of its right to recoupment. (Fitzgerald Decl. Ex. 1, at 4, Agreement § 3.2(b).)

40.    Notwithstanding the Agreement's express ratification of Synchrony's recoupment defenses, Synchrony enjoys a right to recoupment that "is inherent in all contractual matters and is not dependent upon express provisions." *Freston v. Gulf Oil Co.-U.S.*, 565 P.2d 787, 789 (Utah 1977). Under Utah law, recoupment is classically applied to overpayments. *See, e.g.*, *id.* at 789 (affirming judgment on allowing for the recoupment of royalty overpayments under a petroleum lease). That is the situation here. Synchrony paid American Signature up front and, in some instances, ended up overpaying because American Signature did not actually deliver the goods or customers demanded refunds. Withholding the sums of future payments until the amount owed to Synchrony is recovered is expressly permitted by Utah law, under which it would be inequitable for the Debtors to retain that which is not theirs. *See id.*

41.    In a similar case, a Delaware court recognized and applied the doctrine of recoupment by authorizing a mortgage servicer to recoup advances made to third parties. *See Mortg. Lenders Network USA, Inc. v. Wells Fargo Bank* (*In re Mortg. Lenders Network USA, Inc.*), 406 B.R. 213, 264–65 (Bankr. D. Del. 2009). The contract with the mortgage servicer contemplated advances being paid and then recouped from future loan payments made by the borrowers. *Id*. Synchrony and the Debtors agreed to a similar arrangement; Synchrony would advance money in a daily settlement with the understanding that some of those advances would be

16

recouped in future settlements because of chargebacks, refunds, and other amounts payable under the Agreement. (Fitzgerald Decl. ¶ 11.)

42.     Synchrony did not and does not need stay relief to exercise its recoupment defenses. Those defenses extend to all amounts that Synchrony would be required to pay to the Debtors under the daily settlements if not for the Debtors' failure to pay and perform its obligations.

**2.     Synchrony would have rights of setoff under sections 362 and 553 of the Bankruptcy Code even in the absence of a right of recoupment.**

43.     To the extent the doctrine of recoupment does not apply, Synchrony is entitled to exercise contractual and equitable rights of setoff, including rights recognized under section 553 of the Bankruptcy Code.

44.     The automatic stay "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that rose before the commencement of the case …." 11 U.S.C. § 553(a). "'A creditor who has the right to set off may obtain relief from the automatic stay in order to implement the setoff.'" *In re Garden Ridge Corp.*, 338 B.R. 627, 631–32 (Bankr. D. Del. 2006) (quoting *In re Daisy Quick Dye* (*In re Dye*), No. 03–12516C–13G, 2004 WL 2249503, at *7 (Bankr. M.D.N.C. Oct. 5, 2004)), *aff'd*, 399 B.R. 135 (D. Del. 2008), *aff'd*, 386 Fed. App'x 41 (3d Cir. 2010). Under Utah law, setoff is both a contractual and equitable right. *See Bichler v. DEI Sys., Inc.*, 220 P.3d 1203, 1207 (Utah 2009) ("The doctrine of setoff … is essentially an equitable one requiring that the demands of mutually indebted parties be set off against each other and that only the balance be recovered in a judicial proceeding by one party against another." (alteration in original) (internal quotation marks omitted)).

45.     To enforce a setoff right, a creditor must show its claim against the debtor and the debt owed by the debtor are "mutual." *Garden Ridge Corp.*, 338 B.R. at 633. Mutuality is satisfied

when the offsetting obligations are held by the same parties in the same capacity, are valid and enforceable, and both offsetting obligations arise either prepetition or post-petition, even if they arose at different times out of different transactions. *In re Women First Healthcare, Inc.*, 345 B.R. 131, 134–35 (Bankr. D. Del. 2006); *see also Styler v. Jean Bob Inc.* (*In re Concept Clubs, Inc.*), 154 B.R. 581, 586 (D. Utah 1993) (setoff arises from different transactions between the same parties and may be asserted to reduce a creditor's claim against the debtor under Utah common law). A prima facie case demonstrating a right of setoff shifts the burden to the debtor to show cause why relief from the stay should not be granted to permit the offset. *See In re Rivera*, 345 B.R. 229, 234 (Bankr. E.D. Cal. 2005); *In re Ealy*, 392 B.R. 408, 414 (Bankr. E.D. Ark. 2008) (collecting cases).

46.     In *Telephone Warehouse*, a group of creditors sought to modify the stay to set off various amounts owed to the debtor for services rendered pre-petition under dealer agreements between the parties for the sale of cellular phones and other products. *In re Tel. Warehouse, Inc.*, 259 B.R. 64, 68–69 (Bankr. D. Del. 2001). This court granted the creditors' motion to set off (and recoup) amounts owed to them by the debtor from amounts owed to the debtor because the creditors and debtor held mutual obligations in the same capacity, and the parties' obligations both arose pre-petition. *Id.* at 69. The court noted that "the timing of payment does not affect when the obligation arose." *Id*. That is because "for setoff purposes, a debt arises when all transactions necessary for liability occur, regardless of whether the claim was contingent, unliquidated, or unmatured when the petition was filed." *Id*. (internal quotation marks and citation omitted).

47.     Under Utah setoff law, a court held that a claimant could offset obligations owed to the debtor before the bankruptcy against attorneys' fees and costs incurred after the bankruptcy because both were treated as arising prepetition under a pre-petition contract. *Scott v. Majors*, 980

18

P.2d 214, 220–21 (Utah App. 1999). The reasoning behind this was that all the attorneys' fees, costs and damages due to the creditor were pre-petition claims because the debtor's original breach of the contract occurred before the bankruptcy petition was filed, which made the debtor absolutely liable for the fees, costs and damages arising from that breach. *Id.* at 220. The fact that the attorneys' fees were incurred during the period in which the automatic stay was in place did not affect the right of setoff of mutual debts because the genesis of the obligation to pay those fees arose before the bankruptcy. *Id.* at 220–21. In other words, the automatic stay does not affect a creditor's setoff rights under Utah law as long as the two obligations coexisted, even if one obligation remained contingent and unliquidated as of the date of the bankruptcy.

48.     The Court should enter an order granting stay relief to the extent necessary to permit Synchrony to offset its pre-petition claims against the Debtors' pre-petition obligations. Synchrony has both a contractual and equitable right to exercise rights of setoff. (Fitzgerald Decl. Ex. 1, at 4–5, Agreement § 3.2(b).)

* * *

19

## V.      CONCLUSION

49.      For the foregoing reasons, the Court should grant Synchrony's Motion and enter an order substantially in the form presented by Synchrony with this Motion.

Dated: January 21, 2026
       Wilmington, Delaware

**ESBROOK P.C.**

*/s/ Scott J. Leonhardt*
Scott J. Leonhardt (4885)
800 N. King Street, Suite 301
Wilmington, DE 19801
Tel: (302) 308-8174
Scott.Leonhardt@esbrook.com

-and-

**DAVIS WRIGHT TREMAINE LLP**
Hugh McCullough
Attorneys for Synchrony Bank
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
206-622-3150

*Counsel for Synchrony Bank*