Docusign Envelope ID: A44AA3A8-6AA8-4B46-837F-35EF314E9D1C

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN SIGNATURE, INC., *et al.*, | Case No. 25-12105-JKS |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. ___** |

## DECLARATION OF COREY FITZGERALD

I, Corey Fitzgerald, declare as follows:

1.      I am a VP, Credit Underwriting for Synchrony Bank ("**Synchrony**"). I am over 18 years of age and I am competent to testify to the matters set forth in this declaration.

2.      I make this declaration from my personal knowledge acquired in the course of my duties with Synchrony through personal observation, discussions with appropriate personnel, and my review of records Synchrony creates and maintains in the ordinary course of its business.

3.      I have been employed by Synchrony and its predecessors-in-interest for nine years. During that time, I have been responsible for negotiating and supporting private-label and co-branded credit card programs like the one made available to American Signature, Inc. ("**American Signature**") and its affiliates in bankruptcy (collectively, the "**Debtors**").

4.      I am familiar with Synchrony's record-keeping practices. The business records submitted with this declaration are all records (a) made at or near the time of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: American Signature Inc. (6162); American Signature Home Inc. (8573); American Signature USA Inc. (6162); ASI Pure Promise Insurance LLC (6162); ASI Elston LLC (7520); ASI – Laporte LLC (6162); ASI Polaris LLC (6162); ASI Thomasville LLC (6162); and American Signature Woodbridge LLC (6162). The Debtors' business address is 4300 E. 5th Avenue, Columbus, OH 43235.

events and acts recorded, by individuals with personal knowledge of the events and acts, (b) were created or collected as part of Synchrony's regular practices, and (c) were kept by Synchrony in the course of its regularly conducted business activities.

5.        American Signature and Synchrony are parties to the Private Label Credit Card Consumer Program Agreement dated as of December 12, 2012 (as amended, the "**Agreement**"). True and correct copies of redacted excerpts of the Agreement and amendments are attached as **Exhibits 1** through **11** to this declaration.

6.        The Agreement contains a number of material, confidential, and nonstandard terms extensively negotiated between the parties (the "**Confidential Information**"). The Confidential Information includes but is not limited to pricing and other economic terms, financial covenants, and other economic terms and rights. In light of the highly competitive market in which Synchrony competes and the highly competitive nature of the financial service industry generally, and the type, specificity, and extent of the commercial and financial information contained in the Confidential Documents, there exists a material likelihood of substantial competitive injury to Synchrony if the Confidential Information is made publicly available.

7.        The Confidential Information has always been treated as confidential and proprietary by Synchrony. Disclosure of the Confidential Information would help Synchrony's competitors and potential customers when negotiating certain financial and commercial terms with Synchrony, significantly affecting the ability of Synchrony to competitively negotiate future arrangements. This would put Synchrony at a substantial competitive disadvantage when negotiating future agreements with other parties, particularly because Synchrony's competitors treat similar information as confidential.

8.      Disclosure of the Confidential Information would also reveal to Synchrony's competitors its proprietary financial and business strategies, thus materially impacting Synchrony's competitive position.

9.      Pursuant to the Agreement, Synchrony provided a private label revolving consumer credit program (the "**Program**") to qualified consumer customers of the Debtors.

10.     When a customer used a private label card (collectively, the "**Cards**") to make a purchase from the Debtors, the Debtors transmitted the request to Synchrony, which confirmed whether Synchrony is prepared to advance credit to the customer to finance the purchase. If Synchrony was prepared, and other conditions were satisfied, then Synchrony confirmed to the Debtors that it was willing to make a loan to benefit the Debtors and their customers.

11.     When the Debtors accepted a payment made by a customer using a Card, the Debtors recorded the amount of the payment. Each day, the Debtors transmitted a report to Synchrony that contained a list of charge transaction data, including the aggregate amounts of loans made under the Cards. Later that day, Synchrony made a payment to the Debtors that was calculated based on the sum of payments made using the Cards, as reflected in the Debtors' report, less credits, fees, and other amounts deducted by Synchrony in accordance with the Agreement.

12.     Unlike some credit card processing agreements, under the Agreement, Synchrony was not merely a conduit for loans made by other entities. Synchrony did not just process credit card transactions. Synchrony itself was extending credit to American Signature's customers for the benefit of American Signature, which the customers are required to repay to Synchrony.

13.     When Synchrony was notified that the Debtors received a payment from a customer, Synchrony credited that customer's account in the ordinary course of business. If the Debtors did not turn over the funds that they held in trust with respect to that customer, then the result was a total loss to Synchrony. Although Synchrony bore the credit risk associated with a customer's failure to make a payment at all, the Debtors were responsible if they accepted a payment and did not turn it over to Synchrony.

14.     American Signature bears the risk that customers will decide to reverse the transactions for purchases made at American Signature, as they are authorized to do under some circumstances per the terms of the Cards and applicable law. This risk is referred to as "chargeback" risk. If a customer disputes a transaction and asks Synchrony to reverse the obligation to pay Synchrony, the customer notifies Synchrony. Synchrony then informs American Signature, and—assuming the dispute is valid and is included in Synchrony's chargeback rights under the Agreement—American Signature is responsible for compensating Synchrony for the cost of the chargeback.

15.     Because American Signature is in bankruptcy, it may not have the money necessary to meet its obligation to compensate Synchrony for the cost of chargebacks. Once the Debtors cease operations, they will not be available to answer questions about chargebacks, increasing the risk that Synchrony will be forced to accept chargebacks that could otherwise have been reasonably disputed or declined. That could leave Synchrony exposed to the cost of chargebacks without an effective mechanism for obtaining reimbursement from American Signature.

16.     The risk to Synchrony is particularly severe in this case because of the nature of the Debtors' business. The Debtors frequently accepted payment from their

customers weeks or months before they delivered the furniture that those customers ordered. That means Synchrony disbursed funds to the Debtors on the date of the sale and must rely on the Debtors to deliver the goods and services that they have promised. If the Debtors liquidate or are otherwise not able to deliver furniture to customers, then those customers will have the right to dispute the charges on the lines of credit extended by Synchrony. In the ordinary course of business, the Debtors would compensate Synchrony for the costs of the associated chargebacks, but in a liquidation that may not be possible, creating the risk of administrative insolvency for the Debtors' estates. For those reasons, liquidation sales of furniture businesses, such as the Debtors' business, creates both an increased risk of chargebacks and an increased risk that those chargebacks will not be paid.

17.     When a retailer holds a going-out-of-business sale, there is an increased risk in chargebacks if customers do not receive their delivery or if they would like a refund because their only recourse is through Synchrony as the retailer no longer exists to handle such disputes. This is why Synchrony specifically negotiated for provisions in the Agreement place strict limits on such sales. Those provisions were important to Synchrony because of the substantial risk associated with prohibited sales.

18.     As of January 13, 2026, Synchrony is owed no less than $3,066,993.15 by American Signature in connection with program fees, refunds, fraud and dispute chargebacks, and miscellaneous adjudgments to prior transactions. "Program fees" refers to the merchant fee payable to Synchrony in connection with the Agreement owed to Synchrony on the gross sales; "refunds" refers to customers who request and receive refunds on transactions from the Debtors; and "fraud and dispute chargebacks" refers to chargebacks arising after a customer disputes a charge and the dispute is decided in the

customer's favor. The Debtors are also holding no less than $1,102,873.16 in customer payments intended for Synchrony, which the Debtors are required to hold in trust for Synchrony. Attached as **Exhibit 12** is a true and correct copy of a spreadsheet showing how those amounts are calculated.

19.    As of January 13, 2026, Synchrony had been given notice that customers dispute no less than $6,314,768.26 in transactions with the Debtors that have not yet been resolved. Attached as **Exhibit 13** is a true and correct copy of the disputed transactions making up that amount. Between January 5 and January 12, 2026, approximately 86 percent of disputes closed during that period were resolved in favor of the customers. If that occurs with respect to the $6,314,768.26 in unresolved disputes outstanding as of January 13, 2026, then it will result in additional chargebacks totaling approximately $5,430,700.70 owed by American Signature to Synchrony.

20.    Synchrony believes that customers will dispute additional transactions before their time for doing so elapses under their contracts with Synchrony, and to the extent to those disputes are resolved in favor of the customers, then that will result in additional chargebacks, which could be substantial.

21.    Synchrony promptly took steps to preserve its rights under the Agreement and applicable law. Synchrony paid $3,387,470.41 to American Signature on November 24, 2025 in connection with Synchrony's financing of the purchase of goods and services on November 22 and 23, 2025, and then Synchrony placed an administrative freeze on $3,256,907.91 associated with Synchrony's financing of the purchase of goods and services after November 23, 2025 by customers of the Debtors.

6

22.     Synchrony negotiated with the Debtors promptly after the Debtors filed bankruptcy for adequate protection to allow the program to be used post-petition for going-out-of-business sales that violate the Agreement. But the Debtors refused to agree to reasonable protections, such as a process where Synchrony would fund transactions after the Debtors could demonstrate that the corresponding goods sold had been delivered. Instead, the Debtors informed Synchrony on November 26, 2026 that the Debtors would no longer accept the Synchrony card for transactions (even though the Debtors continued to accept payments from customers intended for Synchrony). After American Signature informed Synchrony that it stopped accepting Synchrony's cards, American Signature delivered notice to Synchrony on December 29, 2025, that it would not renew the Program Agreement beyond its expiration on June 30, 2026. A true and correct copy of that notice is attached as **Exhibit 14**.

23.     As of January 16, 2026, Synchrony has determined the pre- and post-bankruptcy sales that created amounts owed by American Signature in connection with program fees, refunds, fraud and dispute chargebacks, and miscellaneous adjustments to prior transactions under the Agreement. Synchrony has also determined the dollar amount associated with pre-bankruptcy and post-bankruptcy open disputes. Attached as **Exhibit 15** is a true and correct copy of a spreadsheet showing the breakdowns for each category.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED at _____1:55 PM EST_____ this 21st day of January, 2026.

Signed by:

*Corey Fitzgerald*

0322794CCD42410...

COREY FITZGERALD

8