# EXHIBIT 1

*Execution Version*

**PRIVATE LABEL CONSUMER CREDIT CARD PROGRAM AGREEMENT**
(*American Signature Furniture*)

This **PRIVATE LABEL CONSUMER CREDIT CARD PROGRAM AGREEMENT** is made as of December 12, 2012, by and between American Signature, Inc., an Ohio corporation ("Retailer"), with its principal place of business at 4300 E. 5th Avenue, Columbus, Ohio 43219, and GE Capital Retail Bank, a federal savings bank with its principal place of business at 170 Election Road, Suite 125, Draper, Utah 84020 ("Bank"). Certain capitalized terms used in this Agreement are defined in the attached Appendix A.

WHEREAS, Retailer is in the business of selling furniture and related products.

WHEREAS, among other things, Bank establishes programs to extend and service customized credit programs to qualified consumer customers for the purchase of products from various merchants.

WHEREAS, the parties hereto desire to enter into this Agreement pursuant to which Bank will provide a customized private label revolving credit card program to qualified consumer customers of Retailer.

In consideration of the following terms and conditions, and for good and valuable consideration the receipt and sufficiency of which is acknowledged, Retailer and Bank agree as follows:

## ARTICLE 1 - ESTABLISHMENT AND SCOPE OF THE PROGRAM

**1.1     Establishment of the Program.** Bank and Retailer are entering into this Agreement to establish a private label revolving consumer credit program, which will be made available to qualified consumer customers of Retailer for the financing of purchases of products and services from Retailer all in accordance with the terms of this Agreement (collectively, the "Program").

**1.2     Scope of the Program.**

(a)     During the Term, Retailer shall make the Program available to its customers, including processing Account applications and accepting Credit Cards in accordance with the Operating Procedures at all Store Locations and Bank will extend credit directly to Cardholders under the Program to finance purchases from Retailer.

(b)     The Program is intended to be used by Cardholders for purchases made primarily for personal, family or household use and Bank does not intend to extend credit under the Program for purchases made primarily for commercial and business purposes. Retailer acknowledges that Bank's obligation to continue to extend credit under the Program is contingent on Retailer continuing to sell the type of goods and services generally similar to those sold by Retailer as of the Program Commencement Date.

## ARTICLE 2 - RESPONSIBILITIES UNDER THE PROGRAM

**2.1    Bank's Responsibilities.** During the Term, Bank's responsibilities in conducting the Program include the following:

(a)    Extend consumer credit to qualified customers of Retailer in accordance with this Agreement and the Cardholder Agreements.

(b)    Establish (and modify from time to time in its discretion) Cardholder finance charge rates and other fees and Account terms.

(c)    Develop, produce and deliver to Retailer at a central location, Bank's credit applications and Cardholder Agreements and other standard Program materials.

(d)    Produce and distribute Credit Cards and Credit Card carriers in accordance with a design provided by Retailer that meets Bank's specifications.

(e)    Establish (and modify from time to time in its discretion) the credit criteria used to evaluate applications for Cardholder Agreements.

(f)    Assign (and modify from time to time in its discretion) credit lines, authorize charges, and service Accounts.

(g)    Prepare and mail periodic billing statements to Cardholders with Active Accounts.

(h)    Provide toll-free numbers for customer and store inquiries.

(i)    Receive and post payments, collect Accounts, and take all further actions Bank deems necessary or appropriate in connection with Account administration.

(j)    Ensure that all Cardholder Agreements, applications, billing statements and solicitations conducted by Bank, and all of Bank's activities in originating and administering Accounts, comply with all applicable laws.

**2.2    Retailer's Responsibilities.** Retailer's responsibilities in conducting the Program include the following:

(a)    In consultation with Bank, provide to Bank a design meeting Bank's specifications for use in producing Credit Cards (as well as for producing other Retailer-branded Program materials).

(b)    Accept Credit Cards for customer purchases from Retailer at Store Locations in accordance with and otherwise conduct its activities relating to the Program in compliance with the Operating Procedures. In the absence of a Credit Card (or in the case of Absentee Purchases), follow the procedures for "card not present" purchase transactions as provided for in the Operating Procedures.

2

(c)     Promote the Program and the use of Credit Cards to its customers, including by producing customized store signage and application holders, media advertising and through other promotional methods.

(d)     Train its personnel sufficiently so as to be able to properly fulfill Retailer's responsibilities under the Program.

(e)     Except for Account applications sent directly to Bank by applicants, transmit all Account applications to Bank electronically and otherwise process and retain such applications in accordance with procedures reasonably determined by Bank.  With respect to any credit approval mechanism or process employed by Bank in connection with the Program, Retailer acknowledges that it is a "service provider" for Bank for purposes of communicating credit decisions to Retailer's customers.

(f)     Only submit Charge Transaction Data in respect of products or services reasonably related to the types of products or services offered for sale by Retailer at Store Locations (or as otherwise permitted hereunder) as of the Program Commencement Date.

(g)     Perform its responsibilities under this Agreement and the Program, and conduct its activities as a Retailer, including its policies, products, business, point-of-sale and sales practices, and advertising, in compliance with all applicable laws.

(h)     Only use documents and forms in connection with the Program that were provided to Retailer, or approved in writing, by Bank (and only the latest version of such documents), and; refrain from modifying any such approved documents or forms without Bank's prior written consent.

(i)     Cooperate in the resolution of any Cardholder disputes; respond within fifteen (15) days to any dispute forwarded to Retailer from Bank, and; forward to Bank promptly after receipt by Retailer copies of any communication relating to an Account received from any person.

(j)     Maintain a policy for the exchange, return, and adjustment of products and services which is adequately communicated to customers and is in accordance with all applicable laws (in connection therewith Retailer represents and warrants that, as of the Program Commencement Date, the return policy in effect is the same as that delivered by Retailer to Bank prior thereto); notify Bank in advance of (if practicable), but in any event within fifteen (15) days after, any change in such return policy following the Program Commencement Date; provide a credit to the applicable Account upon the exchange or return of a good or service financed on such Account (but do not credit an Account in any case where the purchased good or service was not originally financed on an Account), and; include the resulting credit in the next transmission of Charge Transaction Data to Bank (but in no event more than one (1) day after the credit was issued).

(k)     Retain copies of all charge slips, credit slips, applications and Cardholder Agreements, and, in the case of any Internet Purchase subject to a promotional credit offer (but only to the extent the parties have implemented the Internet Purchase structure set forth in paragraph D of Appendix C), electronic evidence of each applicant's consent to the electronic

3

delivery of Internet Promotional Disclosures, as well as of such Cardholder's consent to the terms of such Internet Promotional Disclosures, in each case, for at least twenty-five (25) months (or such longer period as may be required by law); except as otherwise provided for herein in connection with disputes or chargebacks, provide copies of any of the foregoing to Bank within twenty (20) days after Bank's request, and; in consultation with Bank, produce and use charge slips and credit slips which are able to be captured and reproduced electronically via signature capture technology or other methods.

(l)     Establish connectivity to Bank's systems for purposes of processing applications and sending Charge Transaction Data to Bank.

## ARTICLE 3 - SETTLEMENT AND PAYMENT TERMS

### 3.1     Settlement Procedures.

(a)     Retailer will transmit Charge Transaction Data to Bank daily and otherwise in accordance with the Operating Procedures. If Charge Transaction Data is received by Bank's processing center before 5:00 p.m. (central time) on any business day, Bank will process the Charge Transaction Data and initiate payment on the second business day thereafter. If the Charge Transaction Data is received after 5:00 p.m. (central time) on any business day, or at any time on a day other than a business day, Bank will process the Charge Transaction Data and initiate payment on the third business day thereafter.

(b)     Provided no circumstance exists that would entitle Bank to give notice of termination of this Agreement, upon receipt, verification and processing of Charge Transaction Data by Bank during the Term, Bank will remit to Retailer in respect of such Charge Transaction Data an amount equal to the sum of the total charges identified in such Charge Transaction Data less the sum of (i) the total amount of any credits included in such Charge Transaction Data, (ii) the applicable Program Fees, and (iii) at Bank's option, any other amounts then owed by Retailer to Bank (including, without limitation, amounts charged back to Retailer pursuant to Article 7 and any In-Store Payments). Bank shall not be obligated to fund any Charge Transaction Data submitted by Retailer more than one hundred eighty (180) days after the date of the applicable purchase transaction.

### 3.2     Bank Payment Terms.

(a)     Bank will transfer funds payable to Retailer under this Agreement via Automated Clearing House ("ACH") deposit to an account maintained in the name of Retailer pursuant to written instructions delivered to Bank by Retailer.

(b)     Notwithstanding any other provision of this Agreement, Bank will have the right to net, setoff or recoup any amounts due to it under this Agreement against any amounts owing to Retailer under this Agreement. Each party further acknowledges that, for purposes of determining their rights of recoupment hereunder, Retailer's payment obligations to Bank hereunder, including Bank's right to receive chargebacks and credits under this Agreement, and Bank's obligation to settle with Retailer for Charge Transaction Data pursuant to the preceding Section 3.1, shall be deemed to be a "single integrated transaction". Nothing in this Section or

4

any other provision of this Agreement is intended to limit Bank's common law rights of setoff and recoupment.

**3.3    Retailer Payment Terms.**  Unless otherwise provided for elsewhere in this Agreement, any amounts payable by Retailer to Bank under this Agreement will be due when invoiced by Bank and shall be paid in immediately available funds within fifteen (15) days after the date of such invoice.  Unless the parties otherwise agree, Retailer will transfer funds payable to Bank under this Section 3.3 via wire transfer to a deposit account maintained in Bank's name pursuant to written instructions delivered to Retailer by Bank.

**3.4    Program Fees.**  Retailer shall pay to Bank the Program Fees applicable to each submission to Bank of Charge Transaction Data.

(a)    The Program Fee applicable to all purchases subject to the Base Rate in any submission of Charge Transaction Data shall be an amount equal to the product of (a) the Base Rate, and (b) the aggregate amount of charges on all Accounts reflected in such Charge Transaction Data (excluding any charges for which the parties have established a Promotional Rate), less the aggregate amount of any credits on Accounts reflected in such Charge Transaction Data.

(b)    The Program Fee applicable to each purchase subject to a Promotional Rate in any submission of Charge Transaction Data shall be an amount equal to the product of (a) the applicable Promotional Rate, and (b) the amount of the charge subject to such promotion.

**3.5    Promotional Rates and Base Rates.**

(a)    The Promotional Rates available under the Program as of the Program Commencement Date are set forth on Schedule 3.5.

(b)    Subject only to the provisions of Section 3.5(e) and Section 3.6 below, Bank agrees not to alter the Promotional Rates described on the attached Schedule 3.5 prior to the end of the first Program Year.  Beginning at the end of the first year of the Program and as of each anniversary of the Program Commencement Date thereafter prior to the termination of the Agreement, Bank, in conjunction with Retailer, will review and evaluate the effectiveness of the Program generally (including the Approved Credit-Based Promotion sales mix, the overall level of sales charged to Accounts, and Account fraud and credit losses during such period), as well as evaluating the performance of each Approved Credit-Based Promotion during such period. Based on such review, Bank may, after consultation with and not less than thirty (30) days prior notice to Retailer (unless a shorter notice period becomes necessary in order for Bank to avoid violating applicable law), for any Approved Credit-Based Promotion, terminate such promotion or adjust the Promotional Rate applicable thereto.  The provisions of Section 9.2(k) shall apply to any Promotional Rate adjustments made by Bank pursuant to this Section 3.5(b).  Unless agreed to in writing by Retailer, Bank shall not adjust the Base Rate during the Term.

(c)    If Bank and Retailer agree to offer any additional Approved Credit-Based Promotion not included on Schedule 3.5, Bank will establish in writing, with acknowledgment by Retailer, the Promotional Rate applicable to the calculation of the Program Fee payable by Retailer for qualifying purchases, as well as such other terms and conditions as the parties shall

5

agree. Bank's approval of any billing and credit terms for any promotion is not intended to be and will not be construed to be an approval of any materials created by Retailer for use in advertising or soliciting participation in such promotions. With respect to any newly introduced Approved Credit-Based Promotion agreed to by Bank pursuant to this Section 3.5(c), if (i) the applicable promotion is of the type included on Schedule 3.5 as of the Program Commencement Date (*i.e.*, WPDI or EPNI), and (ii) the promotional term (*i.e.*, number of months) of such newly introduced Approved Credit-Based Promotion is between the promotional terms for any two Approved Credit-Based Promotions then set forth on Schedule 3.5, then the Promotional Rate for such newly introduced Approved Credit-Based Promotion shall fall at a point determined by Bank between such then-existing Promotional Rates. Unless Bank expressly agrees in writing to the contrary, each newly introduced Approved Credit-Based Promotion shall be deemed incorporated into Schedule 3.5 and shall be subject to the pricing adjustment provisions set forth in Sections 3.5 and 3.6.

(d)  Any Charge Transaction Data that does not meet the coding requirements (*i.e.*, transaction code or minimum purchase requirements) of any Approved Credit-Based Promotion will automatically default and be subject to the Base Rate; provided however, that if Bank honors any such incorrectly coded Approved Credit-Based Promotion, Retailer shall pay to Bank the incremental difference between the Program Fee at the Base Rate and the Program Fee applicable to the Promotional Rate honored by Bank, if any.

(e)  If (i) at any time, any law, rule or regulation applicable to Bank (or to the credit extended under the Program) is enacted, and (ii) Bank determines, in good faith, that such law, rule or regulation has had, or is reasonably likely to have, a material adverse effect on Bank's ability to provide the Program, or to offer certain Approved Credit-Based Promotions under the Program, or on Program economics, then Bank may make such adjustments to the Promotional Rates then available under the Program, or discontinue or replace any impacted Approved Credit-Based Promotions, as Bank reasonably believes are necessary to comply with the applicable law, rule or regulation and/or to compensate Bank for any reduction in Program revenue or increase in Program costs that have resulted or are expected to result from the implementation of such law, rule or regulation. Bank may only implement any such substitutions, replacements, terminations or adjustments to the Approved Credit-Based Promotions and/or Promotional Rates under the Program (x) after the enactment of any such law, rule or regulation, (y) upon or after Bank's implementation of the changes to its private label card business generally (including the Program) that are expected to give rise to the reduction in Program revenue or increase in Program costs, and (z) on not less than sixty (60) days' prior written notice to Retailer. Prior to implementing any such revisions, Bank shall provide to Retailer Bank's pro forma calculation of the financial impact on the Program such law, rule or regulation has had, or is expected to have and on which Bank relied in making its substitution, replacement, termination or adjustment decision(s).

**3.6  Interest Rate Adjustor.**  Without limiting Bank's right to adjust Promotional Rates as set forth in Section 3.5, as of the end of the first calendar quarter following the Program Commencement Date, and as of the end of each calendar quarter thereafter, Bank may adjust the Promotional Rate for each Approved Credit-Based Promotion then offered to Cardholders by Bank based on movements in the Twelve Month LIBOR. As of the end of each quarter, the Promotional Rates set forth on Schedule 3.5 shall be adjusted as follows: (x) any prior

6

adjustment to such Promotional Rates pursuant to this Section 3.6 shall be eliminated, and (y) with respect to each such Promotional Rate, Bank shall adjust (either up or down) such Promotional Rate by:

(i) in the case of a Promotional Rate applicable to a "with pay" Approved Credit-Based Promotion of less than twelve (12) months in duration, 0.020% (2 basis points) for every 0.25% (25 basis points) movement in the Twelve Month LIBOR above or below the Base Twelve Month LIBOR, *multiplied by*, the number of months in such Approved Credit-Based Promotion;

(ii) in the case of a Promotional Rate applicable to a "with pay" Approved Credit-Based Promotion of twelve (12) months or more in duration, 0.014% (1.4 basis points) for every 0.25% (25 basis points) movement in the Twelve Month LIBOR above or below the Base Twelve Month LIBOR, *multiplied by*, the number of months in such Approved Credit-Based Promotion;

(iii) in the case of a Promotional Rate applicable to an "equal pay" Approved Credit-Based Promotion of less than thirty-six (36) months in duration, 0.008% (0.8 basis points) for every 0.25% (25 basis points) movement in the Twelve Month LIBOR above or below the Base Twelve Month LIBOR, *multiplied by*, the number of months in such Approved Credit-Based Promotion

(iv) in the case of a Promotional Rate applicable to an "equal pay" Approved Credit-Based Promotion of thirty-six (36) months or more in duration, 0.006% (0.6 basis points) for every 0.25% (25 basis points) movement in the Twelve Month LIBOR above or below the Base Twelve Month LIBOR, *multiplied by*, the number of months in such Approved Credit-Based Promotion

(iv) in the case of a Promotional Rate applicable to a "fixed pay" Approved Credit-Based Promotion, 0.003% (0.3 basis points) for every 0.25% (25 basis points) movement in the Twelve Month LIBOR above or below the Base Twelve Month LIBOR, *multiplied by*, the number of months in such Approved Credit-Based Promotion

For purposes of effecting the above calculation, Bank shall establish the Twelve Month LIBOR for any quarter (the "COF Quarter") as of the last business day of the calendar quarter immediately preceding the COF Quarter and shall apply the revised Promotional Rates resulting from such calculation as of the first day of the second month in the COF Quarter. If the cost of funds adjustment calculation set forth in this Section 3.6 results in a Promotional Rate that is less than zero, such Promotional Rate shall, irrespective of such calculation, be deemed to equal zero and Bank shall have no obligation to rebate any amounts to Retailer in connection with the applicable Approved Credit-Based Promotion related to such Promotional Rate. For the avoidance of doubt, (i) the adjustment (either up or down) to any Promotional Rate pursuant to this Section 3.6 will be in addition to any other prior adjustments (either up or down) made to any Promotional Rate pursuant to Section 3.5, and (ii) no adjustment pursuant to this Section 3.6 shall eliminate any prior adjustments (either up or down) made to any Promotional Rate pursuant to Section 3.5.

7

Each adjustment to the Promotional Rates pursuant to this Section 3.6 shall be applied prospectively only.  For clarification purposes only, examples of the foregoing calculations are set forth on Schedule 3.6.

## ARTICLE 4 - OTHER PROGRAM ECONOMICS

**4.1     Signing Bonus.**



**4.2     Allocation of Program Expenses.**  Unless otherwise specifically provided in this Agreement, each party will be responsible for all costs and expenses incurred by it in connection with complying with its responsibilities under this Agreement.

**4.3     Solicitation of Cardholders for Other Products.**

(a)     Bank (or its designees) may (i) solicit Cardholders for and offer to Cardholders (or arrange for a third party to solicit and/or provide) financial or credit products and services offered by Bank or its affiliates, as well as Debt Cancellation Programs, Value-Added Programs or such other products that do not compete with the products or services produced or sold by Retailer. Bank may not use the Retailer Marks in any such solicitations without the express written consent of Retailer and Bank shall follow any guidelines provided by Retailer in respect thereof.

(b)     Except as set forth in the next sentence, Bank will be entitled to retain for its account any proceeds generated from the provision of the goods and services referred to in Section 4.3(a).  With respect to the sale of Debt Cancellation Programs conducted within Store Locations (it being agreed that the decision to sell Debt Cancellation Programs within Store Locations shall be subject to the prior written agreement of the parties), and with respect to solicitations of any of the other goods and services referred to in Section 4.3(a) in any circumstance in which Retailer has consented to the use of the Retailer Marks in connection with such solicitation, unless otherwise agreed to by the parties in writing, Bank and Retailer shall share equally in the after tax net income generated by the sale of such goods and/or services.

## ARTICLE 5 - PROMOTION OF THE PROGRAM

**5.1     Annual Marketing Plans.**  During the Term, Bank and Retailer will work together in good faith to agree for each Program Year on a marketing plan to promote the

8

Program and each party agrees to implement such marketing plan. Bank and Retailer may from time to time also mutually agree on additional specific marketing activities for the Program (and will not unreasonably withhold consent to any specific marketing plan proposed by the other party). Unless otherwise agreed to by Bank in writing (and except as set forth in Section 5.2), the costs of implementing each marketing plan (or for implementing any marketing or promotional initiatives developed by the parties outside of such plan) shall be paid for from the Marketing Fund or by Retailer.

### 5.2   Marketing Fund.

(a)   During the Term, Bank will allocate to a record maintained on the books of Bank (such record is referred to herein as the "Marketing Fund") as follows:



(b)   The cost and expenses of all marketing promotions provided for in any marketing plan will be reimbursed out of any then available funds in the Marketing Fund. Neither party shall have any obligation to pay more for any such marketing promotion than the amount allocated at such time to the Marketing Fund; provided, that the parties may mutually agree to share or otherwise allocate the costs of implementing any marketing promotion (whether or not set forth in any marketing plan) to the extent the cost of such marketing promotion is expected to exceed the funds then available in the Marketing Fund.

(c)   Except for the right to require Bank to make payments from such fund from time to time in accordance with Section 5.2(b) hereof, Retailer shall have no right, title or interest in or to the Marketing Fund or in or to any amounts which have been allocated thereto. Any amounts previously allocated to the Marketing Fund but not used as of the earlier of (x) ninety (90) days after the end of any Program Year (and assuming such previously allocated Marketing Funds are the first to be expended during such ninety (90) day period) or (y) the date of termination of this Agreement, shall be withdrawn and retained by Bank for its own account without obligation to account therefor to Retailer.

### 5.3   Program Promotion Fund.

(a)   As an incentive for Retailer to offer Approved Credit-Based Promotions to Cardholders, Bank shall make available the following amounts at the following times (such amounts are referred to herein as the "Program Promotion Fund"):

(i)   For the first Program Year, within thirty days after the date hereof, ████████████████████████; and

(ii)   For each Program Year after the first Program Year, within 30 days after the beginning of such Program Year, Bank shall allocate (retroactive to the beginning of such Program Year) ████████████████████████████

9



(b)     Retailer shall have no right, title or interest in or to the Program Promotion Fund (except to the extent such Fund provides Retailer with the right to receive reduced Promotional Rates as provided for in this Section 5.3) and Bank shall withdraw the availability of any amounts in the Program Promotion Fund which are not used within ninety (90) days after the end of any Program Year.  In addition, any amounts previously made available in the Program Promotion Fund but not used by Bank as of the expiration or earlier termination of the Term, shall also be withdrawn.

(c)     The Program Promotion Fund shall be solely for use in connection with reimbursing Bank for the cost of reducing the Program Fees payable by Retailer to Bank in connection with Approved Credit-Based Promotions as set forth in this Section.  If Retailer elects to reduce the Promotional Rate associated with a particular Approved Credit-Based Promotion, Retailer shall notify Bank in writing of its election in advance of the initiation of such promotion; provided that, (i) only Approved Credit-Based Promotions with a promotional term of eighteen (18) months or longer are subject to such reduction, and (ii) Retailer shall not be allowed to reduce the Promotional Rate with respect to a particular Approved Credit-Based Promotion by more than fifty percent (50%).  Subject to the provisions of this Section, upon receipt of any such notice, Bank, prior to the initiation of the subject Approved Credit-Based Promotion, shall reduce the applicable Promotional Rate as requested by Retailer, unless Bank reasonably determines that the amount of the corresponding reimbursement payment to Bank would exceed the amount available at such time in the Program Promotion Fund (which determination shall be based on Bank's forecast of the likely reimbursement obligation resulting from a particular Approved Credit-Based Promotion).  The foregoing notwithstanding, if Retailer elects to run a promotion for which it will be seeking a reduced Promotional Rate during the first thirty (30) days of any Program Year (i.e., before the allocation to the Program Promotion Fund), Bank shall reduce the Promotional Rate as requested, and shall nonetheless reimburse itself from the Program Promotion Fund following the applicable allocation; provided that, if no allocation is due for that particular Program Year (or if the allocation is insufficient), Retailer shall reimburse Bank for the amount of the Promotional Rate reduction in accordance with Section 5.3(d).  Each reimbursement payment to Bank hereunder will be deemed to result in a corresponding reduction in the amount available in the Program Promotion Fund.

10

(d)     Within thirty (30) days after the end of each calendar month, Bank will send to Retailer a report that sets forth (i) the amount that was available in the Program Promotion Fund at the beginning of such month, (ii) the Program Fees that were or were to be paid to Bank with respect to such month from the Program Promotion Fund based on Retailer-selected Approved Credit-Based Promotions in effect during such month, and (iii) the month-end availability in the Program Promotion Fund (the "Monthly Summary"). If, during any calendar month, the amount in the Program Promotion Fund is insufficient to fully satisfy the amount due Bank in respect of reduced Program Fees for such month, then Bank shall generate and send with the applicable Monthly Summary an invoice pursuant to Section 3.3 for any Program Fees that will be due from Retailer to Bank for such month and Retailer shall pay each such invoice upon receipt in accordance with Section 3.3.

**5.4     Responsibility of Retailer to Promote the Program.**

(a)     Without limiting Retailer's obligations under any marketing plan, Retailer will actively support and promote the Program by, among other things:

(i)     encouraging the establishment and use of Accounts as the preferred method of payment for Retailer's products and services (through, for example, offering or providing value propositions and other customer incentives);

(ii)     providing and utilizing store signage, credit advertisements, promotional inserts, statement messages and other marketing materials promoting Program; and

(iii)     maintaining an advertisement on the homepage of the Retailer Website notifying users of the availability of the Program.

(b)     Retailer will not seek or obtain any special agreement or condition from, nor discriminate in any way against, Cardholders or any person with respect to the terms of any Account transaction. Retailer will not charge any credit surcharge, application, processing or other Program related fee to Cardholders.

## ARTICLE 6 - OTHER AGREEMENTS

**6.1     Ownership of Accounts; Credit Losses.**

(a)     Bank is and will be the sole and exclusive owner of all Accounts and Account Documentation, and will be entitled to receive all payments made by Cardholders on Accounts. Bank shall be identified as the creditor and owner of the Accounts for all purposes, and Retailer shall not represent or imply otherwise. Retailer acknowledges that it has no right, title or interest in any Accounts or Account Documentation and will not, at any time, have any right to any proceeds or payments made under the Accounts unless Retailer subsequently purchases or otherwise acquires such Accounts from Bank. Retailer further acknowledges that neither the Cardholder Information nor any of the Account Documentation nor any of the information included in the Account Documentation will be deemed to be Confidential Information of Retailer for purposes of Section 13.1 hereof. Retailer authorizes and empowers Bank to sign and endorse Retailer's name upon any checks, drafts, money orders or other forms of payment in respect of any Account that may have been issued by the Cardholder in Retailer's

11

name. This limited power of attorney conferred in this Section 6.1 is deemed a power coupled with an interest and will be irrevocable prior to the Final Liquidation Date.

(b)    Bank will bear all credit losses on Accounts without recourse to Retailer (other than as permitted by Bank's chargeback rights in Article 7 and other than credit losses incurred after the Accounts are purchased or otherwise acquired by Retailer or a third party).

**6.2    Ownership and Use of Cardholder Information.**  Bank is the sole and exclusive owner of all lists of Cardholders and applicants generated by the Program (including, without limitation, names, addresses, telephone numbers, e-mail addresses, dates of birth, social security and similar numbers, and account and similar access numbers) (the "Cardholder Information").  Retailer owns its own customer list and nothing herein shall limit Retailer's rights in or use of any customer list of Retailer to the extent the information therein is generated by Retailer independently of the Program.  Further, Bank's ownership of the Cardholder Information notwithstanding, Retailer may use any Cardholder contact information (e.g., name, address, telephone number and e-mail address) contained in the Cardholder Information during the Term to promote the Program and to promote the products and services sold by Retailer under the Program.  During the Term, Bank may use the Cardholder Information to exercise its rights and fulfill its obligations under this Agreement and with respect to the administration and liquidation (including sale) of Accounts after the expiration or earlier termination of the Term.

**6.3    Cardholder Terms.**  Bank may establish and modify the ordinary finance charge rates applicable to credit extended to Cardholders.  Bank may also establish (and modify from time to time) all other terms upon which credit will be extended to Cardholders, including without limitation, repayment terms, default finance charges, late fees, overlimit charges, returned check charges, and other ordinary fees and charges. Bank shall notify Retailer prior to amending or modifying the finance charge rates and fees extended to Cardholders and following any such amendment or modification, the rates and fees extended to Cardholders under the Program shall be similar in all material respects to the finance charge rates and fees extended to cardholders by Bank under the other private label programs within the furniture industry administered by Bank's Sales Finance business unit.  Anything in the foregoing to the contrary notwithstanding, Retailer acknowledges that the implementation of rates and fees and other consumer terms across Bank's furniture industry programs within its Sales Finance business may be staggered and that changes to the Program will reflect the expected changes that, ultimately, will be implemented in all material respects for such programs.

**6.4    Credit Criteria.**  Bank shall establish in its discretion and may modify from time to time any or all of the credit criteria used in evaluating applicants under the Program (including, without limitation, the creditworthiness of individual applicants, the range of credit limits to be made available to individual Cardholders and whether to suspend or terminate the credit privileges of any Cardholder).  Bank shall not administer or otherwise apply its credit criteria to Account applicants and Cardholders in an unlawful or illegal manner.  Bank will notify Retailer regarding any changes to the credit criteria used for the Program which, in Bank's reasonable opinion, could reasonably be expected to have a material adverse effect on the Program.  Bank acknowledges that, as is provided for in Section 9.2(n) of this Agreement, certain changes to the credit criteria used for the Program may entitle Retailer to termination rights under such Section.

12

**6.5     Operating Procedures.** Bank will develop and provide to Retailer, and may amend from time to time upon notice to Retailer, operating procedures (the "Operating Procedures") governing the flow of application information and Charge Transaction Data, the logistics and specific procedures involved in the establishment and maintenance of Accounts under the Program and settlement procedures for charges submitted to Bank. The Operating Procedures will include any supplemental procedures developed or required from time to time by Bank (or by Bank and Retailer, as the case may be) in connection with Retailer's request to provide for purchases or accept applications through any Retailer website, by mail or by telephone.

**6.6     Credit Review Point.** Bank shall provide a credit allocation for the Program in the amount of the Credit Review Point which, as of the Program Commencement Date, shall be ███████████). Bank will not be obligated to make any extension of credit under the Program if, after such extension, the aggregate Indebtedness for all Accounts would exceed the Credit Review Point for the Program then in effect. Bank shall also have no obligation to extend further credit under the Program at any time after the occurrence of any event that would allow Bank to give notice of termination hereunder. If at any time the aggregate Indebtedness with respect to all Accounts equals or exceeds eighty percent (80%) of the Credit Review Point then in effect, then within ninety (90) days thereafter, Bank will select one of the following options and give Retailer written notice of its selection:

(a)     Bank may increase the Credit Review Point to an amount that will accommodate the then outstanding Indebtedness, and anticipated growth in such Indebtedness (as applicable), based on Bank's good faith projections. If Bank selects this option, then Bank's written notice to Retailer will include the amount of the increased Credit Review Point.

(b)     Bank may elect not to increase the Credit Review Point, in which case, Retailer will be entitled to terminate this Agreement in accordance with the provisions of Section 9.2(j).

**6.7     Retailer Financial Reports.**

(a)     If at any time during the Term Retailer is not obligated to, or for any other reason does not, file periodic financial reports with the Securities and Exchange Commission pursuant to the reporting requirements of Section 13 or Section 15(d) of the Securities Exchange Act of 1934, as amended, Retailer will, as soon as practicable, but in any event not more than one hundred twenty (120) days after the end of each fiscal year, deliver to Bank its audited annual financial statements, including its audited consolidated balance sheet, income statement and statement of cash flows and financial position. Without limiting the foregoing, the financial statements delivered by Retailer under this Section 6.7(a) shall contain all information necessary for Bank to independently calculate Retailer's compliance with the financial covenants set forth on Appendix D.

(b)     Retailer shall satisfy and fully perform each of the financial covenants contained on the attached Appendix D as and to the extent provided for therein; provided, that Bank's sole remedy in respect of a default by Retailer of this Section 6.7(b) shall be the termination rights set forth in Section 9.2(m).

13

**6.8** **Program Monitoring and Review.** Retailer will permit Bank's representatives to visit Store Locations during normal business hours with reasonable advance notice. Further, Retailer will permit Bank, and hereby authorizes Bank, to audit and monitor the administration and promotion of the Program through anonymous requests to open or utilize credit card accounts under the Program and by other means. Retailer agrees to cooperate with Bank to ensure ongoing security and protection of applicant and cardholder data and to ensure that the Program complies in all respects with all applicable laws. Such cooperation shall include without limitation, ensuring that credit-related disclosures comply with Bank-provided models and that Retailer's associates are properly trained to offer credit fairly and without discriminating against any applicant. Retailer will, and will cause its vendors, agents and subcontractors to, provide access to such information and resources as are necessary to confirm compliance and data security, and will make changes recommended by Bank with regard to data security and compliance with all applicable laws.

**6.9** **Inserts and Billing Messages.**

(a) For each billing statement sent to Cardholders during a billing cycle during the Term, Bank will make available to Retailer a space for two (2) customized messages on the billing statement and Bank will include as many Retailer inserts into each billing statement as possible (but in no event more than six (6) without causing the weight of the billing statement package to exceed one ounce; provided that if Bank is required by law to send a notice in such month (or if Bank reasonably believes a notice is necessary or desirable to protect Bank's interest in the Accounts), then such notice shall take priority over any proposed insert or statement message as applicable. If Retailer wishes Bank to include Retailer's inserts in any billing statements in which the inclusion of such inserts will cause the postage on such billing statements to exceed one ounce, then Retailer will provide at least five (5) days prior notice to Bank to enable Bank to adjust its process and Retailer will pay the overweight postage charges resulting therefrom. The foregoing notwithstanding, Bank is not required to include any Retailer statement messages or billing inserts unless Bank receives such statement messages or copies of the billing inserts at least fifteen (15) days prior to the calendar month for the scheduled mailing date. Retailer will provide copies of all billing inserts to Bank at its own cost.

(b) The form of customized messages and all billing inserts will comply with Bank's specifications as provided to Retailer from time to time, and Bank shall have the right to reject any message or billing statement that Bank reasonably believes is detrimental to the image of the Bank or the Program. For the avoidance of doubt, for purposes of Retailer's rights under this Section, only billing inserts and statement messages regarding the Program, or goods and services available for purchase from Retailer under the Program, shall qualify for inclusion in Cardholder billing statements.

**6.10** **Extended Warranties.**

(a) Retailer will be permitted to finance on Accounts gift certificates, cash cards and stored value cards so long as (i) Retailer remains in compliance with the financial covenants set forth on Appendix D (or, in any circumstance in which Retailer has delivered a Letter of Credit to Bank, the applicable Letter of Credit Amount is sufficient, in Bank's good faith opinion, to mitigate the associated risk of loss), and (ii) the amount of gift certificates, cash

14

cards and stored value cards financed on Accounts during any calendar quarter remains at or below 2% of total Net Program Sales for such quarter.

(b)     Except as set forth below in this Section 6.10, Retailer will not permit the sale of extended warranties or service contracts, or any other future service or delivery obligation, to be charged to Accounts without Bank's prior written consent; provided, however, Bank hereby consents to Retailer's offering of extended warranties to Accountholders under an extended warranty program provided by American Bankers Insurance Company of Florida ("Assurant Solutions") (including any replacement thereto as contemplated below, an "Extended Warranty Program"). Bank shall have the right to audit any Extended Warranty Program (or any successor thereto agreed to by Bank) not more than once in any calendar year (except following the occurrence and continuation of a default hereunder in which case no such limitation shall apply) at Bank's expense. Further, Retailer shall notify Bank promptly (and in advance to the extent practicable) of any material change in the Extended Warranty Program involving Assurant Solutions that is in effect as of the date of this Agreement, or of Retailer's intention to select a new insurer, underwriter or other financially responsible party. Retailer will only be permitted to continue to finance extended warranties or service contracts on Accounts under the Extended Warranty Program, or to expand the Extended Warranty Program to add another insurer or underwriter (or replace the existing insurer or underwriter) if the insurer, underwriter or other financially responsible party has, (i) in the case of an insurer or underwriter, a rating of "Secure" or better, as determined by the A.M. Best rating service (or any successor rating service thereto or, if A.M. Best ceases to publish such ratings, any similar rating provided by a rating service reasonably determined by Bank), or, (ii) in the case of any other financially responsible party, a credit rating of "BBB" (as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. (or any successor thereto or, in Bank's discretion, any similar rating determined through a rating system reasonably determined by Bank) (each of the foregoing minimum ratings are referred to herein as the "Financial Strength Threshold"). Retailer shall be responsible for ensuring that (x) all extended warranties and service contracts financed on Accounts, and (y) the administration of such extended warranties and service contracts by the insurer, underwriter or other financially responsible party, fully comply with all applicable laws, rules and regulations. If at any time the insurer or underwriter of the Extended Warranty Program fails to satisfy the Financial Strength Threshold, Bank may notify Retailer that Bank is no longer willing to authorize, and Retailer shall cease, financing on Accounts warranties provided under such Extended Warranty Program.

(c)     Without limiting the provisions of Section 6.10(b), Bank shall reasonably consider a request by Retailer to self-insure the Extended Warranty Program. Bank's consideration of any such request shall take into account, among any other applicable considerations, Retailer's then-existing financial strength, the risk exposure to Bank represented by such Extended Warranty Program, and the extent of any credit enhancement from Retailer (e.g., a letter of credit) Bank deems reasonably appropriate.

(d)     Nothing in this Section 6.10 shall restrict Retailer from selling products subject to normal manufacturer's warranties included in the standard purchase price.

**6.11    Third Party Participation.** As of the date of this Agreement, Retailer represents and warrants that no affiliate of Retailer is engaged in the business of selling goods or services to

retail consumers other than those affiliates, if any, whose existence and retail consumer sales activities have been disclosed to Bank prior to the date hereof. Retailer shall not after the Program Commencement Date permit any affiliate to charge any purchase to an Account or to submit any Charge Transaction Data to Bank without (i) the prior written consent of Bank; (ii) such affiliate having entered into a written agreement with Bank to be a "Retailer" hereunder (on such modified terms and conditions as Bank may require); and (iii) such affiliate having executed or authorized the filing of such additional documents (including but not limited to UCC financing statements) as Bank may require. Retailer has not and will not permit any licensee, subtenant or third party operating in or from a Store Location to accept Credit Cards for purchases by Cardholders without first obtaining Bank's prior written approval.

### 6.12   Sales Taxes and Related Record Retention.

(a)   Retailer will pay when due any sales taxes relating to the sale of goods or services financed on Accounts. Retailer agrees that Bank shall be entitled to any and all recoveries of taxes of any type that were imposed on the sale of goods or services attributable to any Account that Bank determines to be non-collectable during the Term through any and all potential means, including, but not limited to, refunds, deductions, credits or audit offsets to the extent permissible by law. Retailer shall waive its right to collect and shall cooperate with Bank in the recovery of any and all such taxes by any and all such means, including but not limited to executing any and all forms or other documentation deemed necessary by Bank or required by any taxing authority, and retaining and timely producing all supporting documentation and data relative to such Accounts. Bank shall reimburse Retailer (i) the market value of the time spent by Retailer's personnel in responding to and meeting Bank's requests pursuant to this Section 6.12 and (ii) for all reasonable expenses incurred by Retailer for copying, mailing or transmitting such documentation or data at the direction of Bank as contemplated by this Agreement.

(b)   Retailer will retain a record of each purchase included in any Charge Transaction Data submitted to Bank under the Program for at least four (4) years from the date of each purchase (which record may be maintained in electronic format, but must show the Account number, amount of sales, use or excise tax included in each such purchase and the street address of the Store Location where each such purchase was made (or a store number or other information from which the street address of the location of the sale can be readily ascertained). Retailer will provide such information to Bank within twenty (20) days after Bank's request.

### 6.13   Use of Names and Marks; Public Statements.

(a)   Retailer hereby grants Bank a nonexclusive, royalty-free, worldwide license to use the Retailer Marks in connection with the establishment, administration and operation of the Program and the ownership and liquidation of the Accounts (including, without limitation, the exercise by Bank of all of its rights under this Agreement and under applicable law, and the fulfillment of all of Bank's obligations under this Agreement and under applicable law). Bank will use the Retailer Marks in accordance with the reasonable written instructions provided to Bank by Retailer. Bank is not acquiring any right, title or interest in the Retailer Marks, and will not take any action inconsistent with the Retailer's ownership of the Retailer Marks. Any goodwill arising from Bank's use of the Retailer Marks will inure solely to the benefit of Retailer.

16

(b)     Without the prior written consent of Bank, Retailer may not use Bank's (or any affiliate thereof) names or any related marks, logos or similar proprietary designations; provided, that Retailer may use Bank's business name, in the nominative sense, in connection with any credit disclosure verbiage included in any advertising of the Program (or any Approved Credit-Based Promotion offered thereunder) by Retailer.  If Bank consents to a use other than in the nominative sense, Retailer shall comply with all guidelines provided to Retailer by Bank (including on any website designated by Bank) applicable to such use.  Any such consent, including any limitations, shall remain valid until the earlier of termination of this Agreement or Bank's written withdrawal thereof.

(c)     The parties shall consult with each other before they, or any affiliate or agent, draft any press release or public statement with respect to this Agreement or the Program and no such press release or public statement shall be issued prior to receiving express written approval of the other, except, in each case, as may be required by applicable law or regulation.

**6.14    Intellectual Property.**  All technology, software, or other material developed, invented, created or authored by either party in connection with the Program shall belong solely and exclusively to the developing party, including all intellectual property rights relating thereto.

**6.15    Securitization.**  Bank and its affiliates may securitize, participate or otherwise convey or transfer an interest in, or pledge or create a lien in respect of, any or all of the Accounts and/or Indebtedness at any time during the Term; provided, that no such action will adversely affect any of the rights of Retailer to purchase the Accounts and Indebtedness in accordance with the terms of this Agreement.  Retailer agrees to cooperate with Bank and its affiliates and use commercially reasonable efforts (without being required to incur any material out-of-pocket costs) to assist Bank and its affiliates in connection with any such matter.

**6.16    Grant of Security Interest/Precautionary Filing.**

(a)     Both (i) against the possibility that it is determined that Article 9 of the UCC applies or may apply to the transactions contemplated hereby, and (ii) to secure payment of and performance by Retailer of any and all indebtedness, liabilities or obligations, now existing or hereafter arising pursuant to this Agreement, including indebtedness, liabilities and obligations that may be deemed to exist in the event of the applicability of Article 9 of the UCC to, and any recharacterization of, any transactions contemplated hereby, Retailer grants to Bank a security interest in all of Retailer's right, title and interest, if any, now existing or hereafter arising in all (i) Accounts, Account Documentation and Indebtedness, (ii) all deposits, credit balances and reserves on Bank's books relating to any such Accounts (including the Marketing Fund and Collateral Account), (iii) all goods financed on Accounts and returned to Retailer by Cardholders for which Retailer has not repaid Bank, and (iv) all proceeds of any of the foregoing.

(b)     Retailer represents and warrants that it has not and will not grant any security interest to or authorize the filing of any financing statement in favor of any person that attaches to or covers any of the property set forth in the preceding subsection (a) or that would attach to or cover such property, if contrary to the intent of the parties to this Agreement, Retailer

17

was determined to have any rights therein, other than any security interests or financing statements that have lapsed or been terminated.

(c)     Retailer agrees to cooperate fully with Bank, as Bank may reasonably request, in order to give effect to the security interests granted by this Section 6.16. Retailer hereby authorizes Bank to file such UCC financing statement or comparable statements as Bank deems necessary or appropriate to perfect such security interests. Retailer represents and warrants that as of the date hereof the following is the true and correct corporate name, structure and state of organization of Retailer is accurately set forth in the preamble paragraph hereto. Retailer agrees to provide Bank with thirty (30) days' prior written notice of any change in any of the foregoing corporate name, or any state of incorporation.

(d)     Unless Bank shall have otherwise consented in writing, Retailer shall not create, assume or suffer to exist any lien on any of its right, title or interest under this Agreement or in the proceeds thereof.

(e)     Upon termination of this Agreement and on the earlier of (i) the Final Liquidation Date, or (ii) the date on which Bank no longer owns any Accounts, within thirty (30) days of Retailer's written request therefor, Bank shall file a UCC termination statement terminating any UCC financing statements filed pursuant to this Section 6.16.

### 6.17   In-Store Payments.

(a)     Retailer shall make available to Accountholders at all Store Locations the address to be used for making payments on Accounts directly to Bank; provided, that except as provided below, during the Term, Retailer may accept at any of its Store Locations payments on an Account by the underlying Accountholder or any person acting on behalf of such Accountholder (an "In-Store Payment"). If any such In-Store Payment is made (or Retailer otherwise receives any payment on an Account), Retailer shall give the Accountholder a receipt therefor and shall be deemed to hold such In-Store Payment as property of, and in trust for, Bank until (i) such payment is delivered to Bank, or (ii) Bank is informed of the amount of such payment in accordance with Section 6.17(b) and has effected a setoff of the amount of such payment against a settlement payment due Retailer pursuant to Section 3.1(b). If at any time, based upon Bank's good faith interpretation of any law, rule, regulation, guideline or order, Bank determines that, as a result of such law, rule, regulation, guideline or order, Retailer's acceptance of In-Store Payments is detrimental to the interests of Bank, or if Bank determines that there has been a material deterioration in the financial condition of Retailer, then, at Bank's request, Retailer shall cease accepting In-Store Payments and shall direct Accountholders to make all payments in respect of Accounts directly to Bank.

(b)     Notice of each In-Store Payment with respect to any Account shall be transmitted to Bank within one (1) business day of each such payment's receipt by Retailer (which notice shall include the amount and Account to which such transaction relates). An In-Store Payment will be credited to the relevant Account as of the date Bank applies the amount of such payment to reduce amounts payable by Bank to Retailer (or if no such application is made, as of the date Bank receives such In-Store Payment from Retailer).

**6.18    Relationship Managers.** Bank and Retailer shall each designate one employee (with sufficient authority to facilitate decision-making on behalf of Bank and Retailer, respectively, and with sufficient knowledge and experience to effectively and efficiently manage the relationship contemplated hereby) who shall be charged with day-to-day administrative responsibility for the Program (each, a "Relationship Manager") during the Term, and who shall make available a sufficient amount of his or her working time, attention, skill, and efforts necessary to furthering the interests of the Program. Either party may replace its Relationship Manager at any time upon notice to the other party, so long as the replacement Relationship Manager meets the foregoing qualifications.

**6.19    Periodic Program Reports.** Following the end of each calendar month during the Term, Bank will prepare and send to Retailer a report containing information about the Program during such period. The specific form and content of such report shall be determined by Bank and Retailer, subject to Bank's available internal customer reporting capabilities as in effect on the Program Commencement Date (as the same may be amended from time to time), but in any event shall include (i) applicant and Cardholder demographics for such period, (ii) information pertaining to sales volume charged to Accounts for such period, (iii) application approval rate information for such period, and (iv) a summary of other pertinent statistical data pertaining to the Program for such period. Retailer may request from time to time additional reports from Bank relating to the Program and Bank shall use its commercially reasonable efforts to provide such reports, subject to Bank's available internal customer reporting capabilities as in effect at such time.

## ARTICLE 7 - CHARGEBACKS

**7.1    Chargeback Rights.** Subject to Section 7.2, Bank will have the right to chargeback to Retailer any Indebtedness, if with respect to the corresponding charge or credit or the related Charge Transaction Data or the underlying transaction:

(a)    The Cardholder disputes a charge and Retailer cannot provide Bank with the applicable charge slip, or the Accountholder's consent to the Internet Promotional Disclosures (but, in the case of the Internet Promotional Disclosures, only to the extent the parties have implemented the Internet Purchase structure set forth in paragraph D of Appendix C), that resolves the dispute within fifteen (15) days after Bank's request;

(b)    The Cardholder or any person disputes the existence of an Account and Retailer cannot provide Bank with an executed application that resolves the dispute within fifteen (15) days after Bank's request;

(c)    The Cardholder disputes the amount of an Account and/or refuses to pay alleging dissatisfaction with products or services received, Retailer's failure to deliver or provide the product or service in the manner or timeframe agreed upon with the Cardholder, a breach of any warranty or representation by Retailer in connection with the transaction, or an offset or counterclaim based on an act or omission of Retailer, provided that (i) Bank has provided Retailer with an opportunity to respond, and (ii) any such dispute(s) constitutes a bona fide claim presented by a Cardholder in good faith in the reasonable opinion of Bank;

19

(d)     Retailer failed to comply with any procedure(s) set forth in the Operating Procedure(s) in any material respect (as determined by Bank in its good faith discretion) with respect to any charge, credit, or Account, or Bank determines that any charge, credit or Account was subject to any acts of fraud performed by or in collusion with Retailer's employees, contractors or agents;

(e)     The Cardholder disputes the amount or existence of, or otherwise refuses to pay, all or any portion of the Indebtedness resulting from a Card-Not-Present Purchase; or

(f)     Bank determines that any warranty made by Retailer pursuant to Section 11.2 was false or inaccurate in any respect when made.

In its reasonable discretion, Bank may compromise and settle any claim made by any Cardholder (including claims made on behalf of an authorized user) relating to such Cardholder's Account. No such compromise or settlement will impair Bank's right to chargeback under this Section 7.1 any portion of such Account not paid pursuant to any such settlement or compromise. If the full amount or any portion of any charge is charged back, Bank will assign, without recourse, all rights to payment for the amount charged back to Retailer upon the request of Retailer.

### 7.2     Fraud Losses on Accounts.

(a)     Notwithstanding Bank's right to chargeback to Retailer any Indebtedness resulting from an Internet Purchase under Section 7.1(e), if Bank determines in its reasonable discretion that the basis for such chargeback right constitutes Uncontrollable Fraud, then, with respect to each such incidence of Uncontrollable Fraud during any Program Year (and without limiting Retailer's obligation with respect to amounts payable for any other reason under Section 7.1(e), including without limitation amounts payable as a result of fraud performed by or in collusion with Retailer's employees, contractors or agents), Bank's right to chargeback the related charge or credit resulting from such Internet Purchase under Section 7.1(e) shall be deemed waived in such case until the Fraud Cap then in effect for such Program Year has been reached. Once the Fraud Cap has been reached for any Program Year, Retailer shall be responsible and liable for all subsequent chargebacks attributable to Uncontrollable Fraud and shall pay Bank such amount as set forth in Section 7.2(b). As used herein, the following terms shall have the following meanings: (i) "Uncontrollable Fraud" shall mean, with respect to any Internet Purchase, acts of fraud perpetrated in connection with such Internet Purchase, by persons other than employees, contractors or agents of Retailer, which acts of fraud occur despite Retailer's full compliance with this Agreement and the Operating Procedures then in effect (in calculating fraud losses, an incident of Uncontrollable Fraud will be attributed to the Program Year in which the fraudulent act was discovered); and (ii) "Fraud Cap" means, for any Program Year, an amount equal to the product of (A) Net Program Sales for such Program Year, and (B) 0.15% (15 basis points); beginning after the end of the first Program Year, the percentage used in calculating the Fraud Cap shall be subject to review and adjustment by Bank at the beginning of each Program Year.

(b)     To the extent, for any Program Year, Bank's losses resulting from Uncontrollable Fraud exceed the Fraud Cap for such Program Year, Retailer shall pay to Bank promptly upon demand, the amount by which such losses exceed the Fraud Cap.

## ARTICLE 8 - EXCLUSIVITY

Retailer will not (and will cause its affiliates not to) (a) directly or indirectly, accept for payment, promote, sponsor, solicit, permit solicitation of, or make available to retail consumer customers of Retailer or any of its affiliates or otherwise provide, any consumer credit or charge program that bears, uses or refers to any trade names of Retailer, or in any way competes with the Program (including, without limitation, any credit facility part of any industry program, credit card network or the like), other than (i) any program offered by Bank or an affiliate of Bank, (ii) any generally accepted multi-purpose credit or charge cards or by generally accepted multi-purpose debit or secured cards in each case, such as American Express, MasterCard, Visa and Discover cards (provided that none of the cards referred to in this clause (ii) may be "co-branded," "sponsored" or "co-sponsored" with Retailer or bear Retailer's name or marks), or (iii) a Second Source Program, or (b) promote any other charge or credit payment vehicle not otherwise prohibited hereby (*e.g.* general purpose credit cards) more favorably than Accounts and Credit Cards as a method for the payment of Retailer's goods and services.

## ARTICLE 9 - TERM/TERMINATION

**9.1      Program Term.** The initial term of this Agreement shall commence on the Program Commencement Date and shall end on September 30, 2018 (the "Initial Term"). Thereafter, the term of this Agreement shall automatically renew for additional one (1) year terms (each such one-year period, a "Renewal Term", and all such Renewal Terms, if any, collectively with the Initial Term, the "Term"), unless either party shall give written notice to the other party, at least six (6) months prior to the end of the scheduled expiration of the Initial Term or the then-current Renewal Term, as applicable, of its intention to terminate the Program, in which case, this Agreement shall terminate as of the end of the Initial Term or the then-current Renewal Term, as applicable.

**9.2      Termination of Agreement.** Notwithstanding anything in Section 9.1 to the contrary, this Agreement may be terminated prior to the end of any Term as provided below:

(a)      If a party breaches any covenant or agreement contained in this Agreement (i) which does not involve the payment of money to the other party hereto and, if susceptible of cure, such breach continues for a period of thirty (30) days after the non-breaching party has given written notice of the breach, or (ii) which involves the payment of money to the other party hereto and such breach continues for a period of five (5) days after the non-breaching party has given written notice of the breach, then, in either case, the non-breaching party shall have the right to terminate this Agreement. The foregoing clause (ii) notwithstanding, the failure of a party to make a payment due hereunder shall not give rise to a termination right in the other party if the amount which such party has failed to pay is less than $25,000 and such party, acting in good faith, has delivered a written notice to the other party contesting its obligation to make such payment.   In any case, to be effective, a termination notice must be delivered within sixty (60) days after the expiration after the applicable notice periods. This Agreement will terminate one hundred and twenty (120) days after delivery of such notice of termination.

(b)      If any representation or warranty made by a party proves not to have been true and correct in all material respects as of the date when made, then the other party shall have

21

the right to terminate this Agreement. In order to be effective, the notice of termination must be delivered within sixty (60) days after the date such other party first becomes aware that such representation or warranty is not true and correct. This Agreement will terminate one hundred and twenty (120) days after delivery of such notice of termination.

(c)     If a party (i) is no longer Solvent; (ii) generally does not pay its debts as such debts become due, or admits in writing its inability to pay its debts generally; (iii) makes a general assignment for the benefit of its creditors, (iv) has any proceeding instituted by or against it seeking to adjudicate it bankrupt or insolvent or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property; or (v) takes any corporate action to authorize any of the actions set forth above in (i) through (iv) above, then the other party shall have the right to terminate this Agreement. In order to be effective, the notice of termination must be delivered within one hundred and eighty (180) days after such other party becomes aware of the occurrence of such event; provided, that in the case of an occurrence under clause (iv), this Agreement shall terminate automatically unless the parties shall mutually agree in writing to continue the Program. In any case in which notice is required for termination, this Agreement will terminate upon delivery of such notice.

(d)     If, with respect to Retailer, any of the following events occur, then Bank shall have the right to terminate this Agreement: (i) any person or group of persons, other than a subsidiary or affiliate of Retailer's parent corporation as of the date hereof, acquires, after the date of this Agreement, beneficial ownership of fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of Retailer entitled to vote generally in the election of directors; (ii) the stockholders of Retailer approve a reorganization, merger or consolidation (each a "Reorganization"), in each case through which the persons who were the respective beneficial owners of the voting securities of Retailer immediately prior to such Reorganization do not beneficially own, following such Reorganization, directly or indirectly, more than fifty percent (50%) of the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors of the corporation, as a result of such Reorganization; or (iii) all or substantially all of the assets or property of Retailer are sold or otherwise disposed of in one transaction or series of related transactions. In order to be effective, the notice of termination must be delivered within one hundred and eighty (180) days after Bank becomes aware of the occurrence of such event. This Agreement will terminate one hundred and twenty (120) days after delivery of such notice of termination.

(e)     If a party is in default under any material loan agreement, indenture or other instrument relating to any indebtedness for borrowed money and such default gives any person, either with or without notice and without giving effect to any extension of any grace period, the right to accelerate such indebtedness, then the non-defaulting party hereunder shall have the right to terminate this Agreement. In order to be effective, the notice of termination must be delivered within ninety (90) days after such non-defaulting party becomes aware of the occurrence of such event. This Agreement will terminate thirty (30) days after delivery of such notice, unless the underlying default is cured during such thirty (30) day period.

22

(f)    If a material adverse change has occurred in the operations, financial condition, business or prospects of a party hereto, which the other party has determined, in good faith, has had, or is reasonably likely to have, a material adverse effect on the ongoing operation or continued viability of the Program, then the other party shall have the right to terminate this Agreement. In order to be effective, the notice of termination must be delivered within ninety (90) days after the terminating party makes such determination. This Agreement will terminate ten (10) days after delivery of such notice of termination.

(g)    Bank shall have the right to terminate the Agreement upon written notice if (i) usury rates for the State of Utah (or any other State in which the Bank may choose to locate) change, laws regulating Bank's rate or fee structure change, or federal or state laws, regulations or other authority preempt the exportation of Bank's rate or fee structure; (ii) Bank determines, in good faith, that any of the foregoing has had, or is reasonably likely to have, a material adverse effect on Bank's ability to provide the Program or perform the transactions contemplated hereby or on Program economics; (iii) Bank has sought to engage Retailer in a good-faith renegotiation of the terms of this Agreement; (iv) the parties hereto have not agreed to modifications to the terms of this Agreement that Bank reasonably believes necessary to prevent a material adverse effect on the economics of the Program or on Bank (or on its ability to perform the transactions contemplated by this Agreement) resulting from the change in usury rates or other laws regulating Bank's rate or fee structure or the exportation thereof; and (v) either Bank is required to initiate changes to the Program to comply with applicable law or more than one hundred and twenty (120) days have passed since Bank first sought to engage Retailer in a good faith renegotiation of the terms of this Agreement.

(h)    If any judicial or administrative agency or body determines that the Program does not qualify (or if Bank reasonably determines that there is a material risk that the Program will not qualify) as an "open-end" credit facility under Regulation Z, 12 C.F.R. 226.2(a)(20), then Bank shall have the right to terminate this Agreement. In order to be effective, the notice of termination must be delivered within sixty (60) days after such determination. This Agreement will terminate upon delivery of such notice of termination.

(i)    If a final judgment or judgments for the payment of money is rendered against Retailer and the same is not either (i) covered by insurance where the insurer has affirmatively and expressly accepted liability therefore or (ii) vacated, stayed, bonded, paid, or discharged prior to expiration of the applicable appeal period, then Bank shall have the right to terminate this Agreement. In order to be effective, the notice of termination must be delivered within sixty (60) days after Bank becomes aware of the occurrence of such event. This Agreement will terminate one hundred and twenty (120) days after delivery of such notice of termination.

(j)    If Bank declines to increase the Credit Review Point then in effect pursuant to Section 6.6(b), then Retailer may terminate this Agreement. In order to be effective, the notice of termination must be delivered within sixty (60) days after Bank notifies Retailer pursuant to Section 6.6(b). This Agreement will terminate one hundred and eighty (180) days after Retailer's delivery of such notice of termination; provided, that as of the first date on which the aggregate Indebtedness for all Accounts exceeds the Credit Review Point then in effect, the

23

Agreement shall automatically terminate unless the parties shall mutually agree in writing to continue the Program.

(k)    Retailer shall have the right to terminate the Agreement as set forth below if Bank elects to increase the Promotional Rate set forth on Schedule 3.5 pursuant to Section 3.5(b) (in each case "New Pricing"); provided, that Retailer may not elect to terminate this Agreement under this Section 9.2(k) unless such New Pricing would, assuming implementation of such New Pricing on the date such New Pricing is proposed (even if Bank's notice of New Pricing indicates a later effective date), result in a Threshold Increase (as defined below) with respect to any Promotional Rate, which calculation shall exclude (i) any adjustments pursuant to Section 3.5(e), and (ii) any cost of funds adjustments contemplated in Section 3.6. If during any Program Year there has been a Threshold Increase with respect to any Promotional Rate, Retailer may only terminate this Agreement under this Section 9.2(k) after it has completed the "Competitive Pricing Procedures". For purposes of this Section 9.2(k), "Competitive Pricing Procedures" means the following procedures, which Retailer may elect to implement if a Threshold Increase occurs during any Program Year and Retailer asserts that such New Pricing is non-competitive. In such case, Retailer shall have thirty (30) days from the date of Bank's notice of its New Pricing within which to notify Bank in writing of Retailer's objection to the New Pricing. If Retailer sends such a notice, then for a period of thirty (30) days from the date of such notice (the "Negotiation Period"), Retailer and Bank will use commercially reasonable efforts to negotiate mutually agreeable New Pricing. If Retailer and Bank are unable to agree on New Pricing by the end of the Negotiation Period, then either party may, during the thirty (30) days immediately following the end of the Negotiation Period, give a written notice of termination to the other party. This Agreement will terminate one hundred and eighty (180) days after any such termination notice. In each case, regardless of whether Retailer terminates this Agreement, the New Pricing shall become effective immediately upon the expiration of the Negotiation Period (unless Retailer does not notify Bank within the 30 day period mentioned above that it is engaging the Competitive Pricing Procedures, in which case the New Pricing will become effective on the date set forth in Bank's notice of New Pricing) and shall remain effective until the Final Liquidation Date or the date when Bank and Retailer agree on other pricing. As used in this Section 9.2(k), "Threshold Increase" means, for any Promotional Rate and for any Program Year, an increase in such Promotional Rate during such Program Year that results in such Promotional Rate being more than five percent (5%) higher than such Promotional Rate was as of the end of the immediately preceding Program Year. By way of example only, if during a Program Year Bank increases a Promotional Rate from 4.50% up to 5.00% (an increase of more than 5%), then a Threshold Increase shall have occurred.

(l)    Either Bank or Retailer shall have the right to terminate the Agreement upon written notice to the other party hereto, if the performance by the other party of its obligations under this Agreement is prevented or materially impeded, without ability to cure, for a period of not less than 60 consecutive days by a Force Majeure Event; provided that during such sixty (60) day period, the impacted party's failure to perform shall not constitute a default hereunder so long as such party is using its commercially reasonable efforts to attempt to cure such failure.

(m)    Bank shall have the right to terminate the Agreement upon fifteen (15) business days' prior written notice to Retailer if Retailer fails to satisfy the financial covenants

24

set forth in Appendix D as and to the extent required therein; provided, that if during such fifteen (15) business day period Retailer provides to Bank an Eligible Letter of Credit in an amount equal to the then-current Letter of Credit Amount (as defined in Appendix E), then, as to the specific reporting period within which such default occurred, such default shall be deemed cured. The terms and conditions applicable to any such Letter of Credit are set forth on Appendix E attached hereto.

(n)     Retailer shall have the right to terminate the Agreement in the event (i) Bank shall make any change in the credit criteria for new Applications that, if applied to the immediately preceding sixty (60) day period, would have resulted in an approval rate during such period that was at least five hundred basis points (500bps) lower than the actual approval rate during such period (provided that, Retailer's termination right shall not apply with respect to adjustments to Bank's credit criteria as may be required by law or pursuant to the order or direction of any governmental authority having jurisdiction over Bank (but only if such law or order is generally applicable to similarly situated financial institutions and not just Bank)), and (ii) Bank shall not have undertaken to cure such event within thirty (30) days after notice from Retailer of its objection to such change and/or its intention to terminate the Agreement under this Section or such event shall not have been actually cured by Bank within forty-five (45) days after the date of such notice.  By way of example, if Bank's credit criteria adjustments would have resulted in a reduction in approval rates for Account applicants from 62% to 56% (a drop of 600bps), the termination provisions set forth in this Section would apply.  In order to be effective, the notice of termination must be delivered within one hundred twenty (120) days after Bank has notified Retailer of such material change in the credit criteria, as provided for in Section 6.4.  This Agreement will terminate one hundred twenty (120) days after delivery of such notice of termination, subject to Bank's right to cure such event as set forth above.

(o)     If the "Payment Solutions" division (defined as the business unit of GE Capital Corporation (the entity that, directly or indirectly, owns and/or controls Bank) that focuses primarily on large ticket promotional consumer financing) sells all or substantially all of the portfolio of credit card accounts originated by such business unit's private label credit business, including the portfolio of Accounts originated through the Program (a "Portfolio Divestiture"), then Retailer shall have the right to terminate this Agreement; provided, that such termination right shall not apply (and the provisions of Section 13.3 also shall not preclude the assignment of this Agreement) if, in connection with such Portfolio Divestiture, substantially all of the business assets corresponding to such Portfolio Divestiture (i.e., the systems, the customer service function, the processing function, the collections function, etc., and the corresponding employees) also are acquired by the same entity that acquires the portfolio of Accounts originated through the Program.  In order to be effective, Retailer's notice of termination must be delivered to Bank within one hundred and eighty (180) days after Retailer becomes aware of the occurrence of such event.  This Agreement will terminate one hundred and twenty (120) days after delivery of such notice of termination.

25

## ARTICLE 10 – POST TERM PROVISIONS

**10.1    Purchase of Accounts by Retailer upon Termination.**

(a)    Retailer will have the option, exercisable as provided below, to purchase, or to arrange for the purchase of, not less than all of the Accounts and related Indebtedness (other than Accounts that have been written-off by Bank) upon the termination or expiration of this Agreement for a purchase price payable in immediately available funds in an amount equal to the sum of (i) the Unamortized Incentive Bonus (subject to Section 10.2(b)), and (ii) the greater of (x) the fair market value of such Accounts (appraisal process to be reasonably determined by the parties and shall be consistent with appraisal processes typically used in sales of credit card account portfolios) and (y) one hundred percent (100%) of the Aggregate Outstanding Indebtedness with respect to such Accounts as of the date of purchase, or such other price as the parties may mutually agree in their respective sole discretion.  Anything in this Section 10.1 to the contrary notwithstanding, Bank shall have no obligation to sell, and Retailer shall have no option to purchase (or arrange for the purchase of) the Accounts and related Indebtedness under this Section unless Aggregate Outstanding Indebtedness as of the date of Retailer's notice to Bank under Section 10.1(b) below exceeds One Hundred Million Dollars ($100,000,000).

(b)    Retailer's option to purchase, or arrange for the purchase of, the Accounts and Indebtedness under Section 10.1(a) may be exercised as follows (it being agreed that Retailer shall have no obligation to purchase the Accounts and Indebtedness):

(i)    If the Agreement is expiring based on either party's decision not to renew it under Section 9.1, Retailer must exercise its purchase option, if at all, by giving notice of such election within one hundred and eighty (180) days prior to the expiration of the Agreement.  Retailer must thereafter complete such purchase on the first business day after the expiration of this Agreement.

(ii)    If the Agreement terminates pursuant to Section 9.2 following the delivery of a termination notice by Retailer, Retailer must exercise its option, if at all, by giving notice of such election with such termination notice.  Retailer must thereafter complete such purchase within one hundred twenty (120) days after the effective date of such termination.

(iii)    If the Agreement terminates pursuant to Section 9.2 following the delivery of a termination notice by Bank, Retailer must exercise its option, if at all, by giving notice of such election within thirty (30) days following delivery of such notice of termination.  Retailer must thereafter complete such purchase within one hundred twenty (120) days after the effective date of such termination.

(c)    If Retailer exercises its right to purchase, or arrange for the purchase of, the Accounts and Indebtedness under Section 10.1(b):

(i)    Retailer and Bank agree to work in good faith to prepare the necessary purchase documents on terms and conditions that are reasonable and customary for the industry.

26

(ii)    Retailer will bear all expenses of conversion of the Accounts and Indebtedness to Retailer or its designee.

### 10.2    Bank's Rights Upon Termination.

(a)    If Retailer does not exercise its option to purchase, or arrange for the purchase of, the Accounts and Indebtedness under Section 10.1 upon the expiration or earlier termination of the Agreement, subject to the provisions of Section 10.2(b), Retailer shall repay to Bank within ten (10) business days after the effective date after such expiration or termination, the Unamortized Incentive Bonus, and Bank will have the right, in addition to and without waiving any other rights it may have under the terms of this Agreement or applicable law, to (a) liquidate any or all of the Accounts, (b) convert the Accounts to another credit or charge program maintained by Bank or any of its affiliates, or (c) sell the Accounts, whether by securitization or otherwise to any third party; provided, that Bank shall not sell the Account portfolio to any furniture retailer that does business in the states in which Retailer has Store Locations.  Retailer will cooperate with Bank and take any action reasonably requested by Bank, and Bank may use the Retailer Marks, if any, to communicate with Cardholders and authorized users, in connection with any such liquidation, substitution or sale, as well as in connection with Bank's billing and Account administration needs as and to the extent the Retailer Marks were used immediately prior to the expiration or earlier termination of the Program.

(b)    If Retailer's obligation to repay the Unamortized Incentive Bonus pursuant to either Section 10.1(a) or 10.2(a) occurs during the first eighteen (18) months following the Program Commencement Date, then the payment called for in such Sections shall be made by Retailer to Bank on the first to occur of (i) the date that is not later than the end of the nineteenth (19th) full calendar month after the Program Commencement Date, and (ii) ten (10) days after the first date on which Retailer is released from, or otherwise satisfies in full, its obligations in respect of the World Financial Liquidation Fees.  The foregoing notwithstanding, if Retailer has certified to Bank as provided for in Section 4.1 that (x) Bank's payment to World Financial Network National Bank in accordance with Section 4.1 satisfies all obligations with respect to World Financial Liquidation Fees, or (ii) Retailer has been released from, or  has otherwise fully satisfied, its obligations in respect of the World Financial Liquidation Fees (and such certification pre-dates Retailer's Unamortized Incentive Bonus repayment obligations under Sections 10.1(a) or 10.2(a), as applicable), then the repayment provisions of this Section 10.2(b) shall not apply and Retailer shall repay the Unamortized Incentive Bonus in accordance with Section 10.1 or Section 10.2(a), as applicable.

### 10.3    Survival Provisions.

(a)    Except as is expressly provided to the contrary in this Agreement, all of the terms, conditions and covenants of this Agreement (including the applicable provisions of Section 2.2 that relate to Retailer's retail practices, Cardholder transactions, billing, customer servicing, settlement, chargeback and dispute handling) will continue in effect following the expiration or termination of the Term until the Final Liquidation Date.

(b)    In addition, all warranties, representations and indemnities contained in this Agreement, and the parties' obligations under Sections 6.1 (Ownership of Accounts), 6.2

(Ownership and Use of Cardholder Information), 6.12 (Sales Taxes and Related Record Retention), 6.13 (Use of Names and Marks), 6.14 (Intellectual Property), and Articles 10 and 13, will survive the termination of this Agreement and the Final Liquidation Date.

## ARTICLE 11 - REPRESENTATIONS AND WARRANTIES

**11.1   Representations and Warranties.**  Each party makes the following representations and warranties to the other party as of the date of this Agreement, and Retailer makes such representations and warranties on and as of each date on which Charge Transaction Data is transmitted to Bank:

(a)      The complete legal name, correct organizational type and jurisdiction of incorporation or organization for such party are accurately set forth in the preamble paragraph hereto.  Such party is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or organization, as the case may be.

(b)      Such party has the requisite organizational power and authority to conduct its business as presently conducted and hereafter contemplated to be conducted and to execute, deliver and perform this Agreement.

(c)      This Agreement has been duly executed and delivered by such party, and constitutes the legal, valid, and binding obligation of such party, enforceable against such party in accordance with its terms.

(d)      The execution and delivery of this Agreement by such party and the consummation of the transactions contemplated hereby do not and will not (i) conflict with the organizational documents of such party, (ii) conflict with, or result in a breach of any provisions of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under any material agreement of such party; or (iii) constitute a violation of any material order, judgment or decree to which such party is bound.  No consent, approval, permit, waiver, authorization, notice or filing is required to be made or obtained in connection with the execution, delivery and performance by such party of this Agreement.

(e)      All information furnished by such party to the other for purposes of or in connection with this Agreement is true and correct in all material respects and no such information omits to state a material fact necessary to make the information so furnished not misleading.  Except as disclosed to the other party, there is no fact known to such party (including, without limitation, threatened or pending litigation) that could materially or directly adversely affect the financial condition, business, property, or prospects of such party.

**11.2   Presentment Warranties.**  With respect to each submission of Charge Transaction Data to Bank, Retailer represents and warrants as follows with respect to such Charge Transaction Data and each underlying transaction:

(a)      All purchases included in the Charge Transaction Data constitute bona fide, arms-length sales by Retailer of the goods or services described therein in the ordinary course of Retailer's business (and do not include any purchases conducted in connection with any GOB Sale that is not an Authorized Liquidation Sale); except in the case of Undelivered

28

Goods, Retailer has delivered all the products and fully performed all the services covered by the Charge Transaction Data;

(b) The charges included in the Charge Transaction Data did not involve a cash advance or goods or services not listed in the applicable invoice or receipt; only goods and services sold by Retailer are included in the Charge Transaction Data; the charges represent the entire purchase price of the goods and services identified in the Charge Transaction Data other than a bona fide down payment, deposit, or similar payment paid by cash or check, or financed by any means other than the Account;

(c) To the best of Retailer's knowledge, the goods and services covered by the Charge Transaction Data were sold by Retailer to Cardholders or authorized users for personal, family or household purposes;

(d) Except in the case of an Absentee Purchase, Retailer obtained a signed invoice or receipt for each charge included in the Charge Transaction Data;

(e) All purchases included in the Charge Transaction Data occurred no earlier than three (3) days prior to the submission of such Charge Transaction Data; and all transactions included in the Charge Transaction Data were conducted in accordance with the Operating Procedures, this Agreement and all applicable laws; and

(f) Each invoice or receipt included in the Charge Transaction Data (or, in the case of Absentee Purchases, the purchase information in the Charge Transaction Data) is not invalid, illegible, inaccurate or incomplete and has not been materially altered since being signed or submitted by the Cardholder; the Account number and name of the Cardholder has been accurately printed on each charge slip and has been included in each transmission of Charge Transaction Data; Retailer has obtained a valid authorization from Bank for each purchase (unless otherwise waived by Bank).

**11.3 Undelivered Goods.** From time to time, but in no event more than twice during any calendar year, as Bank may reasonably request (and within fifteen (15) days of any such request), Retailer will prepare and send to Bank a summary report in form and content acceptable to Bank setting forth as of the last day of the most recent calendar quarter the Average Delivery Days After Purchase for all Undelivered Goods as of the end of such quarter. If, as of the end of any calendar quarter during the Term, Retailer's report establishes that the Average Delivery Days After Purchase exceeds ten (10) days, then Bank shall be allowed to increase the Letter of Credit Amount by an amount equal to Bank's reasonable estimate of the increased exposure represented by such excess number of days. Such increase in the Letter of Credit Amount shall remain in effect, and shall be adjusted accordingly, for each quarter in which the Average Delivery Days After Purchase exceeds ten (10) days.

## ARTICLE 12 - INDEMNIFICATION

**12.1 Indemnification by Retailer.** Retailer agrees to indemnify, defend and hold harmless Bank, its affiliates, and their respective employees, officers, directors and agents, from and against any and all Damages to the extent such Damages arise out of, are connected with, or result from:

(a)     Any breach by Retailer of any of the terms, covenants, representations, warranties or other provisions contained in this Agreement;

(b)     Any products or services sold by Retailer (including, without limitation, any failure to provide the service as promised, any product defects, or product liability or warranty claims relating thereto);

(c)     Any act or omission, where there was a duty to act, by Retailer or its employees, officers, directors or agents including without limitation, the failure of Retailer to comply with any law, rule or regulation applicable to Retailer;

(d)     Any advertisements, solicitations or other promotions of the Program or of goods or services eligible for purchase under the Program conducted by or on behalf of Retailer (excluding those conducted by Bank);

(e)     The acquisition by Retailer from Bank, in connection with a charge or credit to an Account, of a Cardholder's Account number by telephone, through the internet or by some other means (with respect to any circumstance in which the Cardholder is physically present at a Store Location, but states that he or she does not have his or her Credit Card);

(f)     Bank's use of the Retailer Marks in accordance with the terms of this Agreement;

(g)     Any activities, acts or omissions of any third party to whom Cardholder Information is transferred or made available by or on behalf of Retailer, including without limitation, information transferred or made available to a third party by Bank at Retailer's request; or

(h)     Retailer's acceptance of In-Store Payments.

The foregoing indemnity obligation of Retailer shall not apply to any Damages of Bank to the extent caused by the gross negligence, willful misconduct or illegal acts of Bank.

**12.2    Indemnification by Bank.** Bank agrees to indemnify, defend and hold harmless Retailer, its affiliates, and their respective employees, officers, directors and agents, from and against any and all Damages to the extent such Damages arise out of, are connected with or result from:

(a)     Any breach by Bank of any of the terms, covenants, representations, warranties or other provisions contained in this Agreement;

(b)     Any act or omission, where there was a duty to act, by Bank or its employees, officers, directors, or agents, including without limitation, the failure of Bank to comply with any law, rule or regulation applicable to Bank;

(c)     Any failure of the form of credit applications or Cardholder Agreement as prepared by Bank to comply with the Consumer Credit Protection Act, the Truth in Lending Act,

30

the Fair Debt Collection Practices Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act and the regulations implementing each of them;

(d)    Any advertisements, solicitations or other promotions by or on behalf of Bank (other than those conducted by Retailer) of the Program; or

(e)    Any activities, acts or omissions of any third party to whom Cardholder Information is transferred or made available by or at the request of Bank (excluding Cardholder Information transferred by Bank to Retailer or any third party at Retailer's request).

The foregoing indemnity obligation of Bank shall not apply to any Damages of Retailer to the extent caused by the gross negligence, willful misconduct or illegal acts of Retailer.

### 12.3    Indemnification Procedures.

(a)    A party entitled to indemnification will give prompt written notice to the indemnifying party of any claim, assertion, event, condition or proceeding by any third party concerning any liability or damage as to which it may request indemnification under this Article 12. The failure to give such notice will not relieve the indemnifying party from liability hereunder unless and solely to the extent the indemnifying party did not know of such third party claim and such failure results in the forfeiture by the other party of substantial rights and defenses.

(b)    An indemnifying party will have the right, upon written notice to the indemnified party, to conduct at its expense the defense against such third party claim in its own name, or, if necessary, in the name of the indemnified party. When the indemnifying party assumes the defense, the indemnified party will have the right to approve the defense counsel (such approval not to be unreasonably withheld) and the indemnified party will have no liability for any compromise or settlement of any third party claim that is effected without its prior written consent (such consent not to be unreasonably withheld), unless the sole relief provided is monetary damages that are paid in full by the Indemnifying Party and such compromise or settlement includes a release of each indemnified party from any liabilities arising out of the third party claim. If the indemnifying party delivers a notice electing to conduct the defense of the third party claim, the indemnified party will, at the indemnifying party's expense, cooperate with and make available to the indemnifying party such assistance, personnel, witnesses and materials as the indemnifying party may reasonably request. If the indemnifying party does not deliver a notice electing to conduct the defense of the third party claim, the indemnified party will have the sole right to conduct such defense and the indemnified party may pay, compromise or defend such third party claim or proceeding at the indemnifying party's expense. Regardless of which party defends the third party claim, the other party will have the right at its sole expense to participate in the defense assisted by counsel of its own choosing.

## ARTICLE 13 - MISCELLANEOUS

### 13.1    Confidentiality.

(a)    All material and information supplied by one party to another party under this Agreement, including, but not limited to, information concerning a party's marketing plans,

31

objectives or financial results ("Confidential Information"), is confidential and proprietary. All such information will be used by each party solely in the performance of its obligations and exercise of its rights pursuant to this Agreement. Each party will receive Confidential Information from the other party in confidence and will not disclose such Confidential Information to any third party, except (i) as contemplated under this Agreement; (ii) as may be agreed upon in writing by the party providing such Confidential Information; (iii) in the case of Bank to an affiliate of Bank; (iv) to the extent necessary, in exercising or enforcing its rights; or (v) as required by law. Each party will use its reasonable best efforts to ensure that its respective officers, employees, and agents take such action as will be necessary or advisable to preserve and protect the confidentiality of Confidential Information. Upon written request after the Final Liquidation Date, each party will destroy or return to the party providing such Confidential Information all such Confidential Information in its possession or control. Confidential Information will not include information in the public domain and information lawfully obtained from a third party. Notwithstanding the foregoing, if Retailer engages in the Competitive Pricing Procedures in accordance with Section 9.2(k), then at Retailer's request and upon execution by the parties of a mutually agreeable confidentiality agreement, Bank will provide to a third party issuer of private label credit programs designated by Retailer, such information about the Program as Bank deems appropriate, in its sole discretion, to enable such third party to make a Competing Offer.

(b)     Section 13.1(a) to the contrary notwithstanding, if Retailer is obligated to file periodic reports with the Securities and Exchange Commission, then Retailer shall have the right to file a copy of this Agreement with the applicable commission or governmental agency to the extent necessary, in Retailer's reasonable opinion, to comply with any applicable disclosure laws or regulations (including any reporting requirement of the Securities Exchange Commission), or any listing requirement of any stock exchange, including NASDAQ, applicable to Retailer; provided, that Retailer shall (i) notify Bank in writing not less than thirty (30) days prior to any such filing of this Agreement, (ii) redact such terms of this Agreement as Bank may reasonably request prior to any such filing, and (iii) file a confidential treatment request reasonably acceptable to Bank with respect to such redacted document as part of any such filing.

**13.2    Binding Effect.** This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns.

**13.3    Assignment.** Subject only to an assignment made by Bank in the context of a sale of the character described in the proviso contained in Section 9.2(o), neither Bank nor Retailer may assign its rights or delegate its obligations under this Agreement without the prior written consent of the other party, which consent will not be unreasonably withheld, provided that Bank may, without such consent (i) assign all or part of its rights and delegate some or all of its obligations under this Agreement to an affiliate; (ii) engage third parties to perform, on behalf of Bank, some or all of Bank's obligations under this Agreement, including, without limitation the servicing and administration of Accounts; and (iii) assign all or some of its rights hereunder to any person acquiring any or all Accounts after the termination or expiration of this Agreement. Notwithstanding any assignment, Bank will remain liable for all of its obligations under this Agreement.

**13.4   Governing Law.** Except to the extent superseded by federal law applicable to banks or savings associations, this Agreement and all rights and obligations hereunder, including, but not limited to, matters of construction, validity and performance, shall be governed by and construed in accordance with the laws of the State of Utah, without regard to principles of conflicts of laws. THE PARTIES HERETO WAIVE THEIR RIGHT TO REQUEST A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING IN ANY COURT OF LAW, TRIBUNAL, OR OTHER LEGAL PROCEEDING ARISING OUT OF OR INVOLVING THIS AGREEMENT, OR ANY DOCUMENT DELIVERED IN CONNECTION HEREWITH, OR RELATING TO ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**13.5   Privacy.**

(a)     Retailer and Bank will only use, maintain and/or disclose Cardholder Information in compliance with all applicable privacy and security laws and with the policies set forth in this Section 13.5 and related disclosures made by Bank (collectively, the "Bank Privacy Disclosures"), and each will ensure that persons to whom it transfers Cardholder Information do the same. Retailer acknowledges that it is subject to the reuse and redisclosure provisions of the Gramm-Leach-Bliley Act (the "Gramm-Leach-Bliley Act" as defined in Title V, Subtitle A of 15 U.S.C. 6801 et seq. (as it may be amended from time to time) and the implementing privacy and security regulations issued pursuant to the Gramm-Leach-Bliley Act (as the same may be amended from time to time)), and that it will ensure that Cardholder Information received from Bank under the "private label exception" found in the Gramm-Leach-Bliley Act is used only in connection with the Program and for no other purpose.

(b)     Retailer and Bank will each establish and maintain appropriate administrative, technical and physical safeguards to protect the security, confidentiality and integrity of the Cardholder Information. These safeguards will be designed to protect the security, confidentiality and integrity of the Cardholder Information, ensure against any anticipated threats or hazards to its security and integrity, and protect against unauthorized access to or use of such information or associated records which could result in substantial harm or inconvenience to any Cardholder or applicant.

(c)     Retailer and Bank will each ensure that any third party to whom it transfers or discloses Cardholder Information signs a written contract with the transferor in which such third party agrees to (i) restrict its use of Cardholder Information to the use specified in the written contract; (ii) to comply with all applicable laws (including, without limitation, privacy and security laws and the reuse and redisclosure provisions of the Gramm-Leach-Bliley Act) and the Bank Privacy Disclosures, and (iii) implement and maintain appropriate safeguards as stated in paragraph (b) above. Information transferred by Bank on Retailer's behalf or at Retailer's direction will be considered information transferred by Retailer hereunder. Retailer agrees to transfer or make available to third parties only such Cardholder Information as is reasonably necessary to carry out the contemplated task.

(d)     Retailer and Bank shall notify the other party immediately following discovery or notification of any actual or threatened breach of security of the systems maintained by the Retailer and Bank, respectively. The party that suffers the breach of security (the

33

"Affected Party") agrees to take action immediately, at its own expense, to investigate the actual or threatened breach, to identify and mitigate the effects of any such breach and to implement reasonable and appropriate measures in response to such breach. The Affected Party also will provide the other party with all available information regarding such breach to assist that other party in implementing its information security response program and, if applicable, in notifying affected Cardholders. For the purposes of this subsection (d), the term "breach of security" or "breach" means the unauthorized access to or acquisition of any record containing personally identifiable information relating to a Cardholder, whether in paper, electronic, or other form, in a manner that renders misuse of the information reasonably possible or that otherwise compromises the security, confidentiality, or integrity of the information.

(e)     Notwithstanding anything else contained in this Agreement, neither Bank nor Retailer will, and neither of them will be obligated to, take any action that either of them believes in good faith would violate, or is reasonably likely to cause either of them to violate, any applicable law (including, without limitation, privacy and security laws and the reuse and redisclosure provisions of the Gramm-Leach-Bliley Act) or the Bank Privacy Disclosures, or that would cause either of them to become a "consumer reporting agency" for purposes of the federal Fair Credit Reporting Act, as it may be amended from time to time.

(f)     Retailer and Bank, respectively, will use reasonable measures designed to properly dispose of all records containing personally identifiable information relating to Cardholders, whether in paper, electronic, or other form, including adhering to policies and procedures that require the destruction or erasure of electronic media containing such personally identifiable information so that the information cannot practicably be read or reconstructed.

**13.6    Financial Accommodation.** Retailer acknowledges that this Agreement is a "financial accommodation" contract (as such term is used in Section 365(c)(2) of Title 11 of the United States Code) for the benefit of Retailer.

**13.7    No Third Party Beneficiaries.** Except as otherwise expressly set forth in this Agreement, this Agreement does not confer upon any person, other than the parties, any rights or remedies under this Agreement.

**13.8    Amendments.** Except as otherwise expressly provided for herein with respect to amendments to the Promotional Rates on Schedule 3.5, this Agreement, including the attached Appendices and Schedules, may not be amended except by written instrument signed by Retailer and Bank.

**13.9    No Partnership.** Nothing contained in this Agreement will be construed to constitute Retailer and Bank as partners, joint venturers, principal and agent, or employer and employee.

**13.10    Notices.** All notices and communications given under this Agreement must be in writing and must be sent by hand, by certified mail, return receipt requested, or by nationally recognized overnight courier service addressed to the party to whom such notice or other communication is to be given or made as such party's address as set forth below and will be deemed given, (a) in the case of hand delivery, upon delivery or refusal of delivery, (b) in the

34

case of nationally recognized overnight courier, one (1) business day after being sent, and (c) in the case of certified mail, three (3) days after being sent, as follows:

if to Retailer:

American Signature, Inc.
4300 E. 5th Avenue
Columbus, Ohio 43219
Attn. Executive Vice President and
    Chief Financial Officer

if to Bank:

GE Capital Retail Bank
170 Election Road
Suite 125
Draper, Utah 84020
Attn: President

with a copy to:

American Signature, Inc.
4300 E. 5th Avenue
Columbus, Ohio 43219
Attn. Deputy General Counsel

GE Capital -- Payment Solutions
950 Forrer Boulevard
Kettering, Ohio 45420
Attn: Counsel / Risk Group

And

GE Capital -- Payment Solutions
777 Long Ridge Road
Stamford, Connecticut 06902
Attn: General Counsel

provided, however, that a party may notify the other party in writing (in accordance with the notice provisions in this Section) from time to time of an alternative address for notices under this Section and, in such case, notices hereunder will be effective if sent to the last address so designated.

    **13.11 Incorporation of Appendices.** Each of the Appendices attached hereto is hereby incorporated by reference. In addition to the other terms and conditions of this Agreement, the supplemental terms and conditions set forth on Appendix B shall apply to all Telephone/Mail Transactions. In addition to the other terms and conditions of this Agreement, the supplemental terms and conditions set forth on Appendix C shall apply to all Internet Transactions. To the extent that the terms and conditions of either Appendix B or Appendix C conflict with the terms and conditions set forth elsewhere in this Agreement, the terms and conditions of Appendix B and Appendix C will control.

    **13.12 Nonwaiver; Remedies Cumulative; Severability.** All remedies are cumulative and not exclusive, and no delay in exercising a right will be deemed a waiver thereof. If any provision of this Agreement is held to be invalid, void or unenforceable, all other provisions will remain valid and be enforced and construed as if such invalid provision were never a part of this Agreement.

    **13.13 Damages Waiver.** Notwithstanding anything to the contrary in this Agreement, Bank and Retailer shall not be liable to the other under or in connection with this Agreement or

the Program for any indirect or consequential or other damages relating to prospective profits, income, anticipated sales or investments, or goodwill, or for any punitive or exemplary damages; provided, that the damages limitation set forth in this Section 13.13 shall not apply to any Damages arising out of the failure of the parties under Article 8, Section 13.1 or 13.5, or from Damages which result from an obligation of Bank or Retailer to pay any third party damages claims to the extent such third party claims otherwise fall under Bank's or Retailer's respective indemnity obligations hereunder.

**13.14  Entire Agreement.**  This Agreement (together with the schedules, exhibits and appendices attached to this Agreement) is the entire agreement of the parties with respect to the subject matter of this Agreement and supersedes all other prior understandings, writings and agreements whether written or oral.

**13.15  Further Assurances.**  Retailer and Bank agree to execute all such further documents and instruments and to do all such further things as any other party may reasonably request in order to give effect to and to consummate the transactions contemplated by this Agreement.

**13.16  Obligations Subject to Law.**  All obligations of either party hereunder shall be subject to all applicable law including any changes or amendments thereto and either party may take any actions that it in good faith believes are required by then Applicable Law or the direction of any regulatory authority or, in Bank's case, to prevent the occurrence of an "unsafe or unsound" banking practice (as defined in 12 U.S.C. § 1818).

**13.17  Internet Gambling.**  Retailer covenants that it shall not permit any transaction through any Retailer Sales Channel (including, for the avoidance of doubt, through the Retailer Website), and shall not submit any Charge Transaction Data, with respect to which any Credit Card was used to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made.

**13.18  Interpretation of Agreement.**  Each party acknowledges and agrees that it materially participated in the preparation of this Agreement and that, accordingly, (a) neither party is the drafting party with respect to this Agreement, and (b) any ambiguity or conflict included herein shall not be interpreted so as to be negatively attributed to either party hereto as the drafting party.

**13.19  Multiple Counterparts.**  This Agreement may be executed in any number of multiple counterparts, all of which will constitute but one and the same original.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, Retailer and Bank have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**GE CAPITAL RETAIL BANK**                          **AMERICAN SIGNATURE, INC.**

By: _____                          By: _____

Name: _Glenn P Marino_                              Name: _Edward E. Cornell_

Title: _EVP_                                        Title: _Executive VP & CFO_

Approved MLG 12/12/12 Legal Dept.

37

## Appendix A

## Definitions

A.      **Certain Defined Terms.**  As used in this Agreement, the following terms will have the following meanings:

"Absentee Purchase" means a purchase of any of products or services from Retailer charged to an Account where the Account information necessary to effect the purchase is provided on the telephone, by mail or through any Retailer Website.

"Account" means the legal relationship established by and between a Cardholder and Bank pursuant to a Cardholder Agreement, together with all Indebtedness owing thereunder from time to time and any current or future guaranties, security or other credit support therefor.

"Account Documentation" means any and all Account information, credit applications, Cardholder Agreements, Charge Transaction Data, charge slips, credit slips, payments, credit information and documents or forms of any type and in any media relating to the Program, excluding materials used for advertising or solicitations.

"Active Account" means, as of any given date, any Account (other than an Account that has been written off in accordance with Bank's write-off policies) that had a debit or credit balance at any time after the beginning of the complete billing cycle immediately preceding such date.

"Adjusted Incentive Bonus" means, as of any date, an amount equal to the Incentive Bonus minus the aggregate of (a) the portion of the Incentive Bonus, if any, that, pursuant to Section 4.1, Bank pays to World Financial Network National Bank in respect of the World Financial Liquidation Fees, plus (b) any other amounts that Retailer has certified to Bank in writing pursuant to Section 4.1 within the first nineteen (19) months after the Program Commencement Date that Retailer paid to World Financial Network National Bank during such nineteen (19) month period in respect of the World Financial Liquidation Fees.

"Aggregate Outstanding Indebtedness" means, as of any date of determination, an amount equal to the aggregate amount of Indebtedness on all Accounts (other than Accounts that have been written off by Bank) as of such date.

"Agreement" means this Private Label Consumer Credit Card Program Agreement, including all schedules and appendices, as it may be amended from time to time.

"Approved Credit-Based Promotion" means any credit-based promotion set forth on Schedule 3.5 as of the date hereof, as well as any other credit-based promotion that the parties agree to add to such Schedule pursuant to Section 3.5(c).

"Authorized Liquidation Sale" means, with respect to any Store Location, any sale that otherwise qualifies as a GOB Sale, but with respect to which all of the following apply:  (i) including the GOB Sale at such Store Location, no more than ten percent (10%) of Retailer's

38

Store Locations have conducted GOB Sales during the one hundred eighty (180) day period prior to the commencement of such GOB Sale, (ii) such GOB Sale is conducted by Retailer's employees and does not involve the use of any outside Liquidator (other than in an advisory or administrative capacity), and (iii) such GOB Sale only involves the sale of Retailer's goods (including goods from other Store Locations) and does not include any goods supplied (or sold to Retailer) by an aggregator, Liquidator or a similar entity.  For the avoidance of doubt, if more than ten percent (10%) of Retailer's Store Locations have conducted GOB Sales during any one hundred eighty (180) day period, no GOB Sale from and after the date such threshold is crossed shall be deemed an Authorized Liquidation Sale (including such sales that are in process). Notwithstanding the foregoing, (i) the parties may mutually agree in writing in advance of any proposed GOB Sale to increase the number of GOB Sales that will qualify as Authorized Liquidation Sales during any one hundred eighty (180) day period, which agreement shall not be unreasonably withheld or delayed, and (ii) if a Store Location is being closed for the purpose of being relocated within ten (10) miles from the closed location within one hundred twenty (120) days following such closing, such closing and GOB Sale shall not be included as a GOB Sale for purposes of determining the number of permitted GOB Sales in this definition.

"Average Delivery Days After Purchase" means, with respect to all Undelivered Goods as of any date of determination, (i) the sum of the number of days between (x) the submission of the Charge Transaction Data corresponding to each Undelivered Good, and (y) such date, *divided by* (ii) the aggregate number of individual Undelivered Goods that have yet to be received by the applicable Cardholders as of such date.

"Bank" means the entity referred to as "Bank" in the recitals, together with its successors and permitted assigns.

"Base Rate" means the percentage set by Bank used in calculating the Program Fee payable in connection with each submission by Retailer to Bank of Charge Transaction Data pertaining to purchases not made pursuant to an Approved Credit-Based Promotion.  The Base Rate shall be set at zero percent (0%) for the Term.

"Base Twelve Month LIBOR" means 1.05%.

"Card-Not-Present Purchases" means a purchase of Retailer's products and/or services financed on an Account (i) where the person transacting such purchase does not present a Credit Card relating to such Account, but states that he or she is a Cardholder or an authorized user, and Retailer does not do all of the following:  (a) check such person's identification, (b) confirm such person's identity and status as a Cardholder or an authorized user prior to such purchase in accordance with the Operating Procedures, and (c) obtain such person's signature on the invoice; or (ii) where such purchase constitutes an Absentee Purchase.

"Cardholder" means any natural person who has entered into a Cardholder Agreement with Bank or which is or may become obligated under or with respect to an Account.

"Cardholder Agreement" means the open-end revolving credit agreement, in either tangible or electronic form, between Bank and each Cardholder pursuant to which such

39

Cardholder and its authorized user(s), if any, may make purchases on credit provided by Bank under the Program.

"Cardholder Information" has the meaning given to it in Section 6.2.

"Charge Transaction Data" means Account and related Cardholder and/or authorized user identification and transaction information transmitted by Retailer to Bank with regard to a charge or a credit to an Account.

"Confidential Information" has the meaning given to it in Section 13.1.

"Credit Card" means the plastic card issued by Bank under the Program exclusively for use with the Program which evidences the right of a Cardholder and, if the Cardholder has so designated, any authorized user(s) to make purchases of goods and services from Retailer under the Program.

"Credit Review Point" means Four Hundred Million Dollars ($400,000,000) or such other higher amount as Bank, in its sole discretion, may from time to time specify to Retailer in writing.

"Damages" means any and all losses, liabilities, costs, and expenses (including, without limitation, reasonable attorneys' fees and expenses, reasonable out-of-pocket costs, interest and penalties), settlements, equitable relief, judgments, damages, claims (including, without limitation, counter and cross-claims, and allegations whether or not proven) demands, offsets, defenses, actions, or proceedings by whomsoever asserted.

"Debt Cancellation Program" means any program which may be offered through Bank pursuant to Section 4.3 under which Bank, any affiliate of Bank, or any third party makes available debt cancellation coverage to Cardholders.

"Final Liquidation Date" will mean the first day after the termination or expiration of this Agreement on which Bank no longer owns any Active Accounts.

"Force Majeure Event" means any of the following: acts of God, fire, earthquake, explosion, accident, terrorism, war, nuclear disaster, riot, material changes in applicable laws or regulations, including, but not limited to, a change in state or federal law, or other event beyond a party's reasonable control, rendering it illegal, impossible or untenable for such party to perform as contemplated in, or to offer the Program on the terms contemplated under, this Agreement.

"GOB Sale" means any sale of goods which is advertised or presented to the public as a liquidation or "going out of business" sale.

"Incentive Bonus" has the meaning given in Section 4.1.

"Indebtedness" means any and all amounts owing from time to time with respect to an Account whether or not billed, including, without limitation, any unpaid balance, finance charges

40

(inclusive of finance charges subject to possible reversals due to unexpired Approved Credit-Based Promotions), late charges, and NSF fees.

"In-Store Payment" has the meaning given in Section 6.17.

"Internet Promotional Disclosures" has the meaning given in paragraph D of Appendix C.

"Internet Purchase" has the meaning given in paragraph I of Appendix C.

"Liquidator" means, a third party sales agent or similar party (other than an affiliate of Retailer) selling the goods of Retailer, on behalf of or as agent for Retailer, at Store Locations which are liquidating in connection with a GOB Sale or similar sale, and which may include the sale of goods delivered on consignment or goods belonging to any similar party.

"Marketing Fund" has the meaning given in Section 5.2.

"Net Program Sales" means, for any given period, the aggregate amount of sales to Cardholders resulting in charges to Accounts during such period less aggregate credits to Accounts during such period, in each case as reflected in the Charge Transaction Data.

"New Pricing" has the meaning given in Section 9.2(k).

"Operating Procedures" has the meaning given in Section 6.5.

"Program" has the meaning given to it in Section 1.1.

"Program Commencement Date" means April 1, 2013.

"Program Fee" means a fee payable in connection with each submission by Retailer to Bank of Charge Transaction Data pertaining to a purchase financed on an Account, calculated as set forth in Section 3.4. For clarity, unless the parties agree in writing to adjust the Base Rate, no Program Fee shall be due on transactions to which the Base Rate applies.

"Program Year" means (a) prior to March 31, 2018, each twelve month period between anniversaries of the Program Commencement Date, with the first such period beginning on the Program Commencement Date, (b) the six month period from April 1, 2018 to September 30, 2018, and (c) each Renewal Term.

"Promotional Rate" means the percentage set by Bank used in calculating the Program Fee payable in connection with each submission by Retailer to Bank of Charge Transaction Data pertaining to a purchase that is subject to an Approved Credit-Based Promotion.

"Retailer" has the meaning given to it in the recitals.

"Retailer Marks" means the names and any related marks, tradestyles, trademarks, service marks, logos or similar proprietary designations as the same currently exist and as they may be amended or adopted by Retailer from time to time hereafter.

41

"Retailer Website" means the internet website with the internet address www.asfurniture.com, and any other internet website maintained, operated or controlled by Retailer that Bank agrees in writing may constitute the Retailer Website.

"Second Source Program" means any consumer credit program that is available only to persons who submitted properly completed credit applications to, and were rejected by, Bank immediately preceding such person's application to such other credit program.

"Solvent" means, as to any person, (i) that the present fair salable value of such person's assets exceeds the total amount of its liabilities; (ii) that such person is generally able to pay its debts as they come due; and (iii) that such person does not have unreasonably small capital to carry on such person's business as theretofore operated and as thereafter contemplated. The phrase "present fair salable value of such person's assets" means that value that could be obtained if such person's assets were sold within a reasonable time in one or more arm's-length transactions in an existing and not theoretical market.

"Store Location" means those retail stores owned or operated by Retailer within the United States.

"Term" has the meaning given to it in Section 9.1.

"Twelve Month LIBOR" means, for any date, the twelve (12) month "London Interbank Offered Rate" (LIBOR) as published in *The Wall Street Journal* in its "Money Rates" section (or if *The Wall Street Journal* shall cease to be published or to publish such rates, in such other publication as Bank may, from time to time, specify) on such date, or if *The Wall Street Journal* is not published on such date, on the last day before such date on which *The Wall Street Journal* is published whether or not such rate is actually ever charged or paid by any entity.

"Unamortized Incentive Bonus" shall mean an amount, calculated as of the effective date of the termination of this Agreement, equal to either,

(a) in the case of a termination (i) by Bank pursuant to Sections 9.2(a), 9.2(b) or 9.2(m), and (ii) with respect to which Bank provides a termination notice within the first thirty-six (36) months after the Program Commencement Date, (x) one sixty-sixth (1/66th) of the Incentive Bonus, *multiplied by* (y) the number of months, if any, rounded up to the next integer, that are included in the period beginning on the date of expiration or early termination of this Agreement and ending on September 30, 2018; or

(b) in the case of a termination for any reason not included in clause (a) above (and regardless of when during the Initial Term such termination occurs), (x) one sixty-sixth (1/66th) of the Adjusted Incentive Bonus, *multiplied by* (y) the number of months, if any, rounded up to the next integer, that are included in the period beginning on the date of expiration or early termination of this Agreement and ending on September 30, 2018.

"Undelivered Good" means an item purchased from Retailer and financed on an Account, (i) with respect to which the Cardholder did not take possession of the item at the time the purchase was completed, and (ii) the Charge Transaction Data for which has been submitted to Bank.

42

"Value-Added Program" means any products or services that enhance the features of the Program or an Account.

"World Financial Liquidation Fees" means any and all liquidation fees Retailer becomes obligated to pay to World Financial Network National Bank ("World Financial") pursuant to the provisions of Schedule 9.6 of that certain Private Label Credit Card Program Agreement between World Financial and Retailer dated as of August 1, 2006 (the "World Financial Contract") following the termination of the World Financial Contract.  With respect to the World Financial Liquidation Fees, Retailer shall make the certifications called for in the last sentence of Section 4.1.

**B.**    **Miscellaneous.**  As used in this Agreement, (i) all references to the plural number shall include the singular number (and vice versa); (ii) all references to the masculine gender shall include the feminine gender (and vice versa) and (iii) all references to "herein," "hereof," "hereunder," "hereinbelow," "hereinabove" or like words shall refer to this Agreement as a whole and not to any particular section, subsection or clause contained in this Agreement. References herein to any document including, without limitation, this Agreement shall be deemed a reference to such document as it now exists, and as from time to time hereafter the same may be amended.  References herein to a "person" or "persons" shall be deemed to be references to an individual, corporation, limited liability company, partnership, trust, unincorporated association, joint venture, joint-stock company, or any other form of entity. Captions of the sections of this Agreement are for convenience of reference only and are not intended as a summary of such sections and do not affect, limit, modify or construe the contents thereof.

43

## Appendix B
## Additional Terms and Conditions Applicable to Telephone/Mail Transactions

In addition to the other terms and conditions of this Agreement, the following supplemental terms and conditions will apply to all Telephone/Mail Transactions. To the extent that any such terms and conditions conflict with the terms and conditions set forth elsewhere in this Agreement, the terms and conditions in this Appendix will control:

A.  **Accepting Telephone/Mail Transactions.** Retailer may begin making available and accepting Telephone/Mail Applications only on or after the date (the "Telephone/Mail Application Start Date") when mutually agreeable procedures for Telephone/Mail Applications have been established and Retailer and Bank have agreed in writing that they wish to begin processing Telephone/Mail Applications. At all times during the Telephone/Mail Application Period, Retailer will make applications available to its customers in a manner reasonably acceptable to Bank for processing as Telephone/Mail Applications. Without limiting the foregoing, during the Telephone/Mail Application Period, Retailer will include Program information and applications and Cardholder Agreements in its catalogs. At all times during the Telephone/Mail Purchase Period, Retailer shall make available and promote the use of the Credit Card for Telephone/Mail Purchases.

B.  **Processing Telephone/Mail Transactions.** Retailer may begin submitting Telephone/Mail Purchases to Bank only on or after the date (the "Telephone/Mail Purchase Start Date") when mutually agreeable procedures for Telephone/Mail Purchases have been established and Retailer and Bank have agreed in writing that they wish to begin processing Telephone/Mail Purchases. Retailer will process all Telephone/Mail Purchases and Telephone/Mail Applications in accordance with the terms of this Agreement, the Operating Procedures, and any specific procedures governing Telephone/Mail Transactions developed by Bank and Retailer. Without limiting the foregoing, (i) if a prospective Cardholder is submitting a Telephone/Mail Application by telephone, Retailer will ensure that all consumer credit disclosures, as provided to Retailer by Bank from time to time, have been made to the prospective Cardholder as part of such telephone call, and (ii) Retailer will cause all Telephone/Mail Applications to be separately tagged with a special processing indicator and all Telephone/Mail Purchases to be separately tagged with a unique store of sale number.

C.  **Definitions.** As used in this Appendix, the following terms shall have the following meanings:

"Telephone/Mail Application" means any application which is received by Bank through any of the following:  (a) telephone, (b) facsimile, (c) mail, or (d) other land-based delivery modality, including, without limitation, overnight courier or delivery service, messenger or the like.

"Telephone/Mail Purchase" means the purchase of goods or services from Retailer charged to an Account where the Account information necessary to effect the purchase is provided through any of the following:  (a) telephone, (b) facsimile, (c) mail, or (d) other land-

44

based delivery modality, including, without limitation, overnight courier or delivery service, messenger or the like.

"Telephone/Mail Transactions" means both Telephone/Mail Purchases and Telephone/Mail Applications.

"Telephone/Mail Application Period" means the period commencing on the Telephone/Mail Application Start Date and continuing until the expiration or termination of this Agreement.

"Telephone/Mail Purchase Period" means the period commencing on the Telephone/Mail Purchase Start Date and continuing until the expiration or termination of this Agreement.

**Appendix C**
**Additional Terms and Conditions Applicable to Internet Transactions**

In addition to the other terms and conditions of this Agreement, the following supplemental terms and conditions will apply to all Internet Transactions. To the extent that any such terms and conditions conflict with the terms and conditions set forth elsewhere in this Agreement, the terms and conditions in this Appendix will control.

A.    **Internet Applications; Link to Bank Webpage.** Retailer may begin linking customers that visit the Retailer Website to the Bank Webpage to submit Internet Applications to Bank only on or after the date (the "Internet Application Start Date") when mutually agreeable procedures for Internet Applications have been established and Retailer and Bank have agreed in writing that they wish to begin processing Internet Applications. During the Internet Application Period, Retailer shall maintain a logo advertisement in a prominent position on the home page of the Retailer Website, which logo advertisement shall promote the Credit Card and contain an imbedded link to a webpage hosted by Bank or its agent (the "Bank Webpage"). The link contained in such logo advertisement shall link directly to the Bank Webpage with no intermediate links. Prior to Retailer initiating any Internet Application, Bank shall have approved in writing the placement and design of the logo advertisement on the Retailer Website's home page, such approval not to be unreasonably withheld. If for any reason during the Internet Application Period, the logo advertisement referred to above shall cease to be displayed on the Retailer Website's homepage or in the agreed upon manner, Retailer shall immediately notify Bank. Retailer shall not permit any link to the Bank Webpage to exist: (i) on the Retailer Website at any time other than during the Internet Application Period; or (ii) on any internet website (other than the Retailer Website) maintained, operated or controlled by Retailer or under any Retailer Mark (an "Other Retailer Website").

B.    **Bank Webpage.** Bank shall have the sole right to determine the design and content of the Bank Webpage. During the Internet Application Period: (i) Bank shall maintain and operate the Bank Webpage; (ii) Retailer shall use reasonable efforts to conform the Retailer Website to be reasonably compatible with the Bank Webpage; and (iii) Bank shall provide to Retailer prior notification of planned changes in the Bank Webpage to permit Retailer to make any required changes in the Retailer Website.

C.    **Internet Purchases; Link to Authorization Technology.** Retailer may begin submitting Internet Purchases to Bank only on or after the date (the "Internet Purchase Start Date") when mutually agreeable procedures for Internet Purchases have been established and Retailer and Bank have agreed in writing that they wish to begin processing Internet Purchases. At all times during the Internet Purchase Period, Retailer shall design, maintain and operate the Retailer Website so that use of the Credit Card will be the default payment option. The design of such a default payment option feature shall be developed by Retailer and subject to Bank's approval, which approval shall not be unreasonably withheld. Retailer acknowledges that Bank may require that some or all Internet Purchases be authorized through payment authorization technology selected by Bank (the "Payment Authorization Technology"). During the Internet Purchase Period: (i) Retailer shall use reasonable efforts to conform the Retailer Website to be reasonably compatible with the Payment Authorization Technology; and (ii) Bank shall provide to Retailer prior notification of planned changes in the Payment Authorization Technology to

46

permit Retailer to make any required changes in the Retailer Website. During the Internet Purchase Period, Retailer also shall place a logo advertisement in a prominent position on the Retailer Website encouraging Retailer's customers to use a Credit Card.

**D.     Internet Promotional Disclosures.** If Bank and Retailer agree to an Internet Purchase solution that involves Retailer hosting and displaying the Internet Promotional Disclosures on the Retailer Website, then the terms and conditions of this paragraph D shall apply. In the case of any Internet Purchase, Retailer shall be responsible for (i) providing the credit promotion disclosures (the "Internet Promotional Disclosures") applicable to any purchase (whether such purchase is to be made at the time of the Cardholder's application for credit or otherwise), (ii) establishing whether the Cardholder is willing to accept receipt of such Internet Promotional Disclosures electronically and, if so, obtaining a recordable record of such consent, (iii) obtaining such Cardholder's consent to the terms set forth in such Internet Promotional Disclosures, and (iv) retaining the evidence of both such consents (consent to electronic receipt of the Internet Promotional Disclosures and consent to the terms thereof) as and to the extent set forth in Section 2.2(k). Retailer shall only use Internet Promotional Disclosures in the form and content as provided to Retailer by Bank (and only the latest version of such forms and content) and shall refrain from modifying the form or content of any such approved Internet Promotional Disclosures. Retailer shall at all times use Bank's most current web services interface, and shall comply within the time frames reasonably established by Bank with any and all display and flow requirements provided to Retailer by Bank in connection with the retrieval from Bank's system of the then-current Internet Promotional Disclosures, the display of such Internet Promotional Disclosures on the Retailer Website, and the adequacy and functionality of the acceptance procedures for the Internet Promotional Disclosures by Cardholders.

**E.     Processing Internet Transactions.** Retailer will process all Internet Transactions in accordance with the terms of this Agreement, the Operating Procedures, and any specific procedures governing Internet Transactions developed by Bank and Retailer. Without limiting the foregoing, Retailer will cause all authorizations processed through the internet and all Internet Purchases to be separately tagged with a unique store of sale number. The parties acknowledge that the infrastructure required for Internet Transactions is dynamic and agree to cooperate in implementing enhancements and developments with respect to the operation and security of Internet Transaction processing under the Program.

**F.     Security.** Retailer shall develop, maintain and operate the Retailer Website so that all Internet Purchases processed through the Retailer Website will be transmitted and accepted on a secure basis which ensures, among other things, that such information cannot be altered, viewed or captured by an unauthorized party. For its part, Bank agrees that the direct access medium or method used to store, present or transmit Internet Applications, terms and conditions, and/or Account information will be secured in a manner which ensures that such information cannot be altered, viewed or captured by an unauthorized party.

**G.     Fraud Mitigation.** Retailer and Bank agree to cooperate in a commercially reasonable manner by committing systems and other resources, and by providing information with respect to the development, establishment and implementation of fraud mitigation strategies in connection with Internet Transactions. Retailer and Bank further agree to use commercially reasonable efforts to implement such mitigation strategies as are developed from time to time.

47

**H.      No Other Retailer Websites.**  Without Bank's prior written consent, Retailer shall not, during the Internet Purchase Period, sell, lease, rent or license any products or services on or through, or otherwise maintain, control or operate, any Other Retailer Website.

**I.      Definitions.**  As used in this Appendix, the following terms shall have the following meanings:

"Internet Application" means any application which is received by Bank through any of the following:  (a) the Retailer Website; (b) any electronic means other than facsimile, including, without limitation, the internet, e-mail, kiosks located within or without of a Store Location, wireless devices other than telephones, and other electronic data transmission devices.

"Internet Application Period" means the period commencing on the Internet Application Start Date and continuing until the expiration or termination of this Agreement.

"Internet Purchase" means the purchase of goods or services from Retailer charged to an Account where the Account information necessary to effect the purchase is provided through the Retailer Website.

"Internet Purchase Period" means the period commencing on the Internet Purchase Start Date and continuing until the expiration or termination of this Agreement.

"Internet Transactions" means both Internet Purchases and Internet Applications.

**Appendix D**
**Financial Covenants**

**I.      Minimum Tangible Net Worth:**

Retailer shall, at the end of each fiscal quarter of Retailer, maintain Tangible Net Worth equal to or greater than ███████████████████████████████ ).

**II     Reporting**

In order to establish compliance with the financial covenants set forth above, Retailer shall deliver to Bank: (i) within forty five (45) days after the end of each fiscal quarter of Retailer (other than Retailer's fourth fiscal quarter), a certificate, signed by Retailer's Chief Financial Officer and in a form reasonably satisfactory to Bank, establishing Retailer's compliance or non-compliance with the Financial Covenant for such fiscal quarter, and (ii) within ninety (90) days after the end of Retailer's fourth fiscal quarter during each fiscal year, a certificate, signed by Retailer's Chief Financial Officer, establishing Retailer's compliance or non-compliance with the Financial Covenant for such fiscal quarter.

**III.    DEFINITIONS**

As used in this Appendix, the following terms have the following meanings:

"Intangible Assets" means, with respect to any entity and as of any date of determination, the sum of (a) all of such entity's assets which should be classified as intangible assets (such as goodwill, patents, trademarks, copyrights, franchises, and deferred charges including unamortized debt discount and research and development costs) in accordance with GAAP, (a) cash held in a sinking or other similar fund established for the purpose of redemption or other retirement of capital stock, and (c) to the extent not already deducted from total assets, reserves for depreciation, depletion, obsolescence or amortization of properties and other reserves or appropriations of retained earnings which have been or should be established in connection with business operation.

"Net Worth" means, with respect to any entity and as of any date of determination, all items which should be included as assets of such entity, less all items which should be included as liabilities of such entity.

"Tangible Net Worth" means, with respect to any entity and as of any date of determination, the Net Worth of such entity, less the amount of such entity's Intangible Assets.

**Appendix E**
**Letter of Credit Terms and Conditions**

(a)     If Retailer so elects following a Letter of Credit Event, Retailer shall deliver to Bank within ten (10) business days of such Letter of Credit Event an Eligible Letter of Credit in an amount equal to (i) if such Eligible Letter of Credit is required during the first Program Year, ███████████████████████████), or (ii) if such Eligible Letter of Credit is required after the First Program Year (and for any adjustments thereafter), the product of Net Program Sales for the immediately preceding twelve-month period *multiplied* by three percent (3%) (such amount, including as adjusted pursuant to the next sentence and any additional amount contemplated by Section 11.3, the "Letter of Credit Amount"). During any Letter of Credit Period, Bank shall have the right to re-calculate the Letter of Credit Amount at the end of every other calendar quarter; provided, that Bank may recalculate the Letter of Credit Amount more frequently if Bank reasonably determines that such recalculation is appropriate based on a material increase in Net Program Sales during any quarter (but in no event may Bank conduct any such recalculation more frequently than quarterly). If, during the Letter of Credit Period, an event shall occur which would cause any Letter of Credit previously delivered to Bank to cease to be an Eligible Letter of Credit or no longer be in an amount equal to or greater than the Letter of Credit Amount (including as a result of any recalculation under the preceding sentence), then within ten (10) business days of the earlier of (i) the date on which Retailer first learns of the occurrence of such event; or (ii) the date on which Retailer first receives notice thereof from Bank, Retailer shall cause a substitute Eligible Letter of Credit to be issued and delivered to Bank in a face amount equal to or greater than the Letter of Credit Amount. On or before forty-five (45) days prior to the expiration of each Letter of Credit provided to Bank, Retailer shall cause a substitute Eligible Letter of Credit to be issued and delivered to Bank in a face amount equal to or greater than the Letter of Credit Amount. Any amounts drawn under a Letter of Credit hereunder in excess of the amounts due Bank hereunder shall be held by Bank in a non-interest bearing account on Bank's books (the "Collateral Account") and shall secure Retailer's full and prompt payment of all further amounts due hereunder. If, during the Letter of Credit Period, Retailer fails to pay any amounts hereunder when due, Bank may immediately, and without prior notice to Retailer, further draw on the Letter of Credit or, if applicable, debit any such unpaid amount from any amounts then remaining in the Collateral Account. In addition, if, during the Letter of Credit Period, Retailer fails to provide a substitute or replacement Eligible Letter of Credit as required by this Appendix E or if Retailer is in default under the Agreement, including filing for bankruptcy protection or having an involuntary bankruptcy proceeding initiated against it, Bank may draw on the full amount available under the Letter of Credit, apply any amounts received in such drawing against Retailer's outstanding obligations hereunder, and credit the Collateral Account with the amount equal to any remaining balance. Bank's security interest in the Collateral Account shall be in addition to any right of setoff or recoupment that Bank may otherwise have under the Agreement or applicable law. The obligations under this Appendix E shall apply at all times until the end of the Letter of Credit Period, at which time, Bank shall (x) surrender any outstanding Letter of Credit to Retailer, and (y) pay to Retailer an amount equal to the amount remaining in the Collateral Account, if any. The foregoing notwithstanding, if after Bank shall have surrendered any Letter of Credit hereunder following the successful completion by Retailer of a Remediation Period, Retailer shall again fail to satisfy the financial covenants set forth in Appendix D, the provisions of Section 9.2(m) and this Appendix E shall again apply.

50

(b)     For the purposes of this Appendix E, the following terms shall have the following meanings:

"Eligible Letter of Credit" means a standby irrevocable Letter of Credit substantially in the form attached as Exhibit A hereto, issued by a bank reasonably acceptable to Bank and which shall be chartered under the laws of the United States and maintain offices located in the continental United States.

"Letter of Credit" means each letter of credit provided by Retailer to Bank in support of Retailer's obligations under the Agreement, as the same may be amended from time to time.

"Letter of Credit Event" means Retailer's breach of the financial covenant set forth in Appendix D.

"Letter of Credit Period" means the period of time between the occurrence of a Letter of Credit Event and the earlier of (i) the end of any Remediation Period, and (ii) after the termination of this Agreement, the later of the date which is (x) one hundred eighty (180) days after such termination, and (y) sixty (60) days after the expiration of any credit promotional period relating to a purchase financed under the Program, unless Bank, in its sole discretion, determines to shorten such period.

"Remediation Period" means a four (4) successive full fiscal quarter (of Retailer) period beginning after the occurrence of a Letter of Credit Event throughout which Retailer has been in full compliance with the financial covenants set forth in Appendix D.

# EXHIBIT A
# FORM OF LETTER OF CREDIT

IRREVOCABLE TRANSFERABLE STANDBY LETTER OF CREDIT

```
ISSUE DATE:    MONTH XX, 200XX              NUMBER: SC XXXX
BENEFICIARY:   GE CAPITAL RETAIL BANK
               ATTN:RISK MANAGEMENT
               950 FORRER BLVD.
               KETTERING, OH  45420
APPLICANT:     _____
               _____
               _____
```

AMOUNT:        USD XXXXXXXXX.00 (XXXXXXXXXXXXXXXXX EXACTLY   U.S. DOLLARS )
EXPIRY DATE:   MONTH XX, 20__              AT OUR COUNTERS
(INCLUDING EACH ANNIVERSARY THEREOF TO THE EXTENT NO NOTICE OF NON-RENEWAL
HAS BEEN GIVEN AS SET FORTH BELOW, THE "STATED EXPIRY DATE")
WE HEREBY ESTABLISH OUR IRREVOCABLE TRANSFERABLE STANDBY LETTER OF CREDIT NO.
SC XXXX IN YOUR FAVOR WHICH IS AVAILABLE BY PAYMENT AGAINST PRESENTATION OF
BENEFICIARY'S DRAFTS AT SIGHT DRAWN ON [BANK NAME AND ADDRESS] AND BEARING
THE CLAUSE "DRAWN UNDER [BANK NAME] STANDBY LETTER OF CREDIT NO. SC XXXX", TO
BE ACCOMPANIED BY THE FOLLOWING REQUIRED DOCUMENT(S):
1. A CERTIFICATE FROM ANY OFFICER OF THE BENEFICIARY CERTIFYING TO THE EFFECT
EITHER:
  (A) THAT "RETAILER" (AS DEFINED IN THE GE AGREEMENT) HAS FAILED TO RENEW THE
LETTER OF CREDIT OR PROVIDE A SUBSTITUTE LETTER OF CREDIT, IN ACCORDANCE WITH
THAT CERTAIN PRIVATE LABEL CONSUMER CREDIT CARD PROGRAM AGREEMENT DATED AS OF
XXXXXXXXXXX, 200XX, BETWEEN RETAILER AND BENEFICIARY, AS AMENDED, THE "GE
AGREEMENT") AND THAT THE AMOUNT OF THE DRAFT IS LESS THAN OR EQUAL TO THE
FULL UNDRAWN AMOUNT OF THE LETTER OF CREDIT; OR
(B) THAT RETAILER HAS FAILED TO PAY ALL OR ANY PORTION OF THE AMOUNTS DUE
UNDER THE GE AGREEMENT, AND THAT THE AMOUNT OF THE DRAFT IS EQUAL TO OR LESS
THAN SUCH PAST DUE AMOUNTS; OR
(C) THAT RETAILER HAS BREACHED OR OTHERWISE FAILED TO SATISFY ANY OBLIGATION
ATTRIBUTABLE TO IT UNDER THE GE AGREEMENT, AND THAT THE AMOUNT OF THE DRAFT
IS LESS THAN OR EQUAL TO THE FULL UNDRAWN AMOUNT OF THE LETTER OF CREDIT; OR
(D) THAT RETAILER HAS FILED (OR IS THE SUBJECT OF AN INVOLUNTARY PROCEDURE
WITH RESPECT TO) BANKRUPTCY OR SIMILAR PROTECTION AND THAT THE AMOUNT OF THE
DRAFT IS LESS THAN OR AT EQUAL TO THE FULL UNDRAWN AMOUNT OF THE LETTER OF
CREDIT.
PARTIAL/MULTIPLE DRAWINGS: ALLOWED
THIS LETTER OF CREDIT SHALL BE AUTOMATICALLY EXTENDED FOR AN ADDITIONAL
PERIOD OF ONE (1) YEAR FROM THE STATED EXPIRATION DATE UNLESS AT LEAST ONE
HUNDRED TWENTY (120) DAYS PRIOR TO SUCH EXPIRY DATE WE SEND YOU A NOTICE BY
REGISTERED MAIL OR CERTIFIED COURIER THAT WE ELECT NOT TO EXTEND THIS LETTER
OF CREDIT FOR SUCH AN ADDITIONAL PERIOD.  SUCH NOTICE SHALL BE DELIVERED TO:
GE MONEY BANK, 950 FORRER BLVD., KETTERING, OH 45420 ATTN: RISK MANAGEMENT,
WITH A COPY TO GENERAL COUNSEL, AT 777 LONG RIDGE ROAD, STAMFORD, CONN,
06902, OR SUCH OTHER ADDRESS(ES) AS YOU MAY DESIGNATE TO US IN WRITING FROM
TIME TO TIME.
EXCEPT AS STATED HEREIN, THIS UNDERTAKING IS NOT SUBJECT TO ANY CONDITION OR
QUALIFICATIONS.  OUR OBLIGATION UNDER THIS LETTER OF CREDIT IS IN NO WAY
CONTINGENT UPON REIMBURSEMENT WITH RESPECT THERETO.
SPECIAL CONDITIONS:

A. THIS LETTER OF CREDIT IS TRANSFERABLE, IN WHOLE BUT NOT IN PART, ONE OR MORE TIMES, TO ANY SUCCESSOR UNDER THE GE AGREEMENT. IN VIEW OF THE FACT THAT THIS LETTER OF CREDIT IS ISSUED IN TRANSFERABLE FORM, IF IT IS YOUR INTENTION TO TRANSFER YOUR INTEREST THEREUNDER, YOU MUST RETURN THE CREDIT TO US FOR ENDORSEMENT, AMENDMENT OR RE-ISSUANCE, AND FURNISH US WITH YOUR INSTRUCTIONS, USING THE ATTACHED FORM. ANY COSTS AND EXPENSES OF SUCH TRANSFER ARE FOR ACCOUNT OF THE BENEFICIARY.
B. PRESENTATION OF THIS LETTER OF CREDIT AND SUCH DRAFT AND CERTIFICATE MAY BE MADE BY FACSIMILE TRANSMISSION TO FAX NO._____. SUCH PAYMENT REQUEST MUST ALSO BE SENT TO OUR OFFICE BY OVERNIGHT COURIER FOR RECEIPT BY US WITHIN ONE BUSINESS DAY AFTER THE DATE OF SUCH FACSIMILE TRANSMISSION.
C. IF THIS LETTER OF CREDIT IS LOST, BENEFICIARY MAY OBTAIN A REPLACEMENT UPON OUR RECEIPT FROM YOU OF (I) A WRITTEN REQUEST THEREFOR AND (II) A REASONABLY ACCEPTABLE INDEMNITY.
THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (2007 REVISION), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 600 (THE "UCP") AND AS TO MATTERS NOT GOVERNED BY THE UCP, SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF [_____].  IF THIS LETTER OF CREDIT EXPIRES DURING AN INTERRUPTION OF BUSINESS AS DESCRIBED IN ARTICLE 36 OF SUCH PUBLICATION NO. 600, WE HEREBY SPECIFICALLY AGREE TO EFFECT PAYMENT AFTER THE RESUMPITON OF BUSINESS.
SHOULD YOU HAVE ANY QUESTIONS REGARDING THIS LETTER OF CREDIT, PLEASE CONTACT OUR INTERNATIONAL DEPARTMENT AT [_____].
WE HEREBY ENGAGE WITH YOU THAT ALL DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS CREDIT WILL BE DULY HONORED IF DRAWN AND PRESENTED FOR PAYMENT AT OUR OFFICE AT [_____] OR BY FACSIMILE AS PROVIDED FOR ABOVE ON OR BEFORE THE STATED EXPIRY DATE OF THIS CREDIT.

_____          _____
AUTHORIZED SIGNATURE                      AUTHORIZED SIGNATURE
LETTER OF CREDIT NUMBER SC XXXX           PAGE 2 OF 2

**SCHEDULE 3.5**
**To**
**Credit Card Program Agreement**
**Initial Promotional Rates**

**PROMOTIONAL RATES**

| Term | WPDI | EPNI | FPWI* |
|---|---|---|---|
| 6 month | 0.39% | N/A | N/A |
| 12 month | 2.90% | N/A | N/A |
| 18 month | 6.99% | N/A | N/A |
| 24 month | 8.41% | 8.44% | N/A |
| 36 month | N/A | 9.99% | N/A |
| 48 month | N/A | 12.99% | N/A |
| 60 month | N/A | 15.79% | 3.99% |

WPNI = With Payment Deferred Interest
EPNI = Equal Payment No Interest
FPWI = Fixed Payment With Interest

- FPWI is with a 9.99% APR to customer.

54

## SCHEDULE 3.6
## To
## Credit Card Program Agreement

## Interest Rate Adjustor Calculation Examples

<u>Hypothetical</u>:  12 Month No Pay Deferred Interest Promotion

| | 12 Month LIBOR Rate | Promotional Rate |
|---|---|---|
| Program Commencement Date | 5.00%  (Base 12 Month LIBOR) | 5.000% |
| One Month (Quarter) Later | 5.35% | 5.168% |
| Two Months (Quarters) Later | 4.70% | 4.832% |

55