# EXHIBIT 5

EXECUTION COPY

## FOURTH AMENDMENT TO PRIVATE LABEL
## CONSUMER CREDIT CARD PROGRAM AGREEMENT
*(American Signature Furniture)*

This Fourth Amendment to Private Label Consumer Credit Card Program Agreement (this "Amendment" or "Fourth Amendment") is between Synchrony Bank, formerly known as GE Capital Retail Bank ("Bank"), and American Signature, Inc. ("Retailer"), is made as of March 16, 2018 and amends the Private Label Consumer Credit Card Program Agreement made as of December 12, 2012 (as amended, modified and supplemented from time to time, the "Agreement"). Capitalized terms used herein and not otherwise defined have the meanings given them in the Agreement.

WHEREAS, Bank and Retailer desire to amend the Agreement to extend the term of the Agreement and to address certain other issues set forth below.

NOW, THEREFORE, in consideration of the mutual promises and subject to the terms and conditions hereinafter set forth, the parties hereby agree as follows:

## I.    AMENDMENTS TO THE AGREEMENT

**1.1    References to GE Capital Retail Bank.** Each and every reference to "GE Capital Retail Bank" in the Agreement is deleted and replaced with "Synchrony Bank".

**1.2    Elimination of Credit Review Point.** The parties agree that the concept of a Credit Review Point is being eliminated from the Agreement. Accordingly, Section 6.6 and Section 9.2(j) are deleted in their entirety and marked as "intentionally omitted" and the definition of Credit Review Point in Appendix A is deleted in its entirety.

**1.3    Addition of New Section 4.4.** The following New Section 4.4 is hereby added to the Agreement:

**4.4    Fourth Amendment Extension Bonus.**

(a)  As an incentive for Retailer to enter into the Fourth Amendment, Bank will pay to Retailer an extension bonus in an amount of ███████0 (the "Fourth Amendment Extension Bonus") within 30 days after each party executes the Fourth Amendment.

(b)  Upon a Repayment Event, Retailer will pay to Bank, within ten (10) business days after the effective date of such Repayment Event, the Unamortized Fourth Amendment Extension Bonus. "Unamortized Fourth Amendment Extension Bonus" means, on the date of a Repayment Event, an amount, not to exceed the amount of the Fourth Amendment Extension Bonus actually paid, equal to (xx) one-sixtieth (1/60) of the Fourth Amendment Extension Bonus, multiplied by (yy) the number of months, rounded up to the next integer, remaining before September 30, 2023." "Repayment Event" means the Agreement is terminated prior to September 30, 2023 (other than as a result of a termination resulting from a breach by Bank)."

**1.4    Addition of New Section 4.5.** Effective for the Program Year beginning April 1, 2018, the following new Section 4.5 is hereby added to the Agreement:

**4.5    Volume Discount.** Provided that Retailer is not in material breach of the Agreement and the breach has not been cured, Bank will pay to Retailer, within thirty (30) days after the end of each Program Year, beginning with the Program Year that begins on April 1, 2018, an amount (a "Volume Discount") equal to (a) the Net Program Sales for the previous Program Year, multiplied by (b) the Multiplier determined in accordance with the following table based on the Net Program Sales for the previous Program Year:



If the last Program Year is less than 12 months, the thresholds in the first column in the table above will be pro rated in proportion to the duration of the last Program Year (for example, if the last Program Year is only 6 months, the thresholds will be divided in half).

**1.5    Amendment to Section 6.8.** Section 6.8 is deleted and replaced with the following:

**6.8    Compliance Requirements.**

(a)    <u>Access.</u> Retailer will permit Bank, and hereby authorizes Bank, to monitor the administration and promotion of the Program through anonymous requests to open or utilize Accounts. In addition, Retailer will permit Bank's representatives to visit Retailer's locations, and use commercially reasonable efforts to permit Bank's representatives to visit the relevant locations of its Third Party Vendors during normal business hours with reasonable advance notice and provide access to Retailer (and Third Party Vendor) records relating to the Program to Bank or Bank's regulators to the extent access is reasonably requested by Bank or Bank's regulators. Retailer further agrees to cooperate with Bank (at Bank's request) to ensure ongoing security and protection of applicant and accountholder data and to ensure that the Program complies in all respects with all applicable laws. Retailer will, and will use commercially reasonable efforts to cause its vendors, agents and subcontractors to, make changes reasonably recommended by Bank with regard to data security and compliance with all applicable laws.

(b)    <u>Advertising.</u> Retailer will ensure that credit-related advertising and other disclosures or processes applicable to the Program created by Retailer comply with

2

applicable law. Retailer will (A) as directed by Bank, either (i) submit any credit-related advertising and disclosures applicable to the Program for prior review (but, for the avoidance of doubt, not consent) by Bank (pursuant to a review process developed by Bank and incorporated in the Operating Procedures, as the same may be updated from time to time on a prospective basis upon at least 30 days prior written notice to Retailer), or, (ii) follow the most current versions of advertising templates provided to Retailer by Bank, and, in either case, (B) use the Bank-approved advertising, templates, and other disclosures or processes in the manner reasonably directed by Bank. If Bank informs Retailer in writing (which may be done by email) of any errors or compliance violations in Retailer's credit-related advertising or disclosures, Retailer will correct the error(s)/violation(s) as soon as reasonably practical.

(c)     POS Process. Retailer will ensure that its point-of-sale (POS) processes and systems comply with all applicable laws. Additionally, Retailer will provide reasonable assistance to Bank so that Bank may, in its discretion and at its expense, review Retailer's POS processes or sample transactions to ensure compliance. Retailer will address, reasonably promptly after notification thereof, any deficiency in Retailer's POS processes or systems that results or would reasonably be expected to result in any transaction or the Program failing to be in full compliance with all applicable laws. Without limiting Bank's rights under this Agreement, Bank may, at Bank's commercially reasonable discretion, suspend or modify Retailer's ability to offer promotions under the Program until any deficiencies are corrected. Retailer will notify Bank of any changes to its POS process with as much advance notice as is reasonably practicable; provided that the notice will be at least 60 days in advance of any POS change implementation that would be reasonably expected to impact the Program.

(d)     Employee Incentives. Retailer will not implement or operate an employee incentive program that is related to the Program unless such employee incentive program has been mutually agreed upon by the parties in writing in advance.

(e)     Required Disclosures. Retailer will provide all required disclosures and materials for credit applications and purchases as directed by Bank.

**1.6**     **Amendment to Section 6.7(a).** Section 6.7(a) is deleted in its entirety and replaced with the following:

(a)     Retailer will, as soon as practicable, but in any event not more than one hundred twenty (120) days after the end of each fiscal year, deliver to Bank its audited annual financial statements, including its audited consolidated balance sheet, income statement and statement of cash flows and financial position. In addition, Retailer will deliver to Bank within sixty (60) days after the end of each of its fiscal quarters, its unaudited quarterly financial statements, including its unaudited consolidated balance sheet, income statement and statement of cash flows and financial position. Without limiting the foregoing, the financial statements delivered by Retailer under this Section 6.7(a) shall contain all information necessary for Bank to independently calculate Retailer's compliance with the financial covenants set forth on Appendix D.

**1.7     Amendment to Section 6.17.** The following new Section 6.17(c) is hereby added to the Agreement:

(c)     Notwithstanding anything to the contrary, Retailer will (i) only accept an authorized form of tender (e.g. cash or check) and will notify Bank of the receipt and tender type of any In-Store Payment, and (ii) track receipt of cash and prepare/file currency transaction reports as required by applicable law.

**1.8     Amendment to Section 9.1.** Section 9.1 is hereby deleted in its entirety and replaced with the following:

**9.1 Program Term.** This Agreement shall continue through the end of the day on September 30, 2023 (the "Initial Term"), and shall automatically renew for additional one (1) year terms (each such period, a "Renewal Term", and all such Renewal Terms, if any, collectively with the Initial Term, the "Term"), unless either party shall give written notice to the other party at least 180 days prior to the end of the scheduled expiration of the end of the Initial Term or the then-current Renewal Term of its intention to terminate the Program, in which case this Agreement shall terminate as of the end of the Initial Term or the then-current Renewal Term, as applicable.

**1.9     Amendment to Section 9.2(g).** Section 9.2(g) is deleted and replaced with the following:

(g)     Either party shall have the right to terminate this Agreement upon not less than ninety (90) days' prior written notice if at any time there is a Change in Law, whether or not such change has gone into effect, and the impacted party reasonably determines that such change has had, or is reasonably likely to have, a material adverse effect on impacted party's rights or obligations under the Program, or the economic benefit of the Program to the impacted party, provided that the impacted party has first sought to engage the other party in a good faith renegotiation of the terms of this Agreement and the parties have not agreed within ninety (90) days on modifications sufficient to prevent a material adverse effect on the impacted party's rights or obligations under the Program or the economic benefit of the Program to the impacted party.  As used in this Section 9.2(g)), "Change in Law" means a change in any applicable law (it being agreed that a new interpretation thereof shall also be considered a Change in Law), applicable to the impacted party or to the credit extended under the Program.

**1.10    Amendment to Section 9.2(h).** The reference in Section 9.2(h) to "12 C.F.R. 226.2(a)(20)" is deleted and replaced with the following:  "12 C.F.R. 1026.2(a)(20) effective April 1, 2018."

**1.11    Amendments to Appendix A.**

a)     Effective February 1, the definition of "Base Twelve Month LIBOR" is hereby deleted in its entirety and replaced with the following:

"Base Twelve Month LIBOR" means 2.50% (250 basis points).

4

b) The following definition is added in the appropriate alphabetical location:

"Program Year" means each twelve month beginning on April 1 of a year and ending on March 31 of the following year.

"Volume Discount" is defined in Section 4.5.

c) The following is added to the end of Part B of Appendix A:

"Further, as used in this Agreement, references to "applicable law" or "law" will be deemed to include and refer to all federal, state and local statutes, codes, ordinances, regulations, laws (including laws relating to fair lending and unfair, deceptive or abusive acts or practices), published regulatory guidelines and regulatory interpretations, judicial or administrative orders and interpretations, and regulatory guidance provided to Bank, including regulations and regulatory guidance pertaining to bank safety and soundness, orders or directives and examination report comments.")."

**1.12 Amendment to Appendix D.** Effective as of February 1, 2018, Appendix D is deleted and replaced with new Appendix D attached hereto as Attachment 1.

**1.13 Amendment to Schedule 3.5.** Effective as of February 1, 2018, Schedule 3.5 is deleted and replaced with new Schedule 3.5 attached hereto as Attachment 2. Within 30 days after the execution of the Fourth Amendment, Bank will pay Retailer any amounts owed due to backdating of changes in the Promotional Rates.

**1.14 Deletion of Schedule 3.6.** Schedule 3.6 is deleted in its entirety.

## II. GENERAL

**2.1 Authority for Amendment.** Retailer represents and warrants to Bank that the execution, delivery and performance of this Amendment has been duly authorized by all requisite corporate action on the part of Retailer and upon execution by all parties, will constitute a legal, binding obligation of Retailer. Bank represents and warrants to Retailer that the execution, delivery and performance of this Amendment has been duly authorized by all requisite corporate action on the part of Bank and upon execution by all parties, will constitute a legal, binding obligation of Bank.

**2.2 Effect of Amendment.** Except as specifically amended hereby, the Agreement, and all terms contained therein, remains in full force and effect. The Agreement, as amended by this Amendment, constitutes the entire understanding of the parties with respect to the subject matter hereof.

**2.3 Binding Effect; Severability.** Each reference herein to a party hereto shall be deemed to include its successors and assigns, all of whom shall be bound by this Amendment and in whose favor the provisions of this Amendment shall inure. In case any one or more of the provisions contained in this Amendment shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

5

**2.4    Further Assurances.** The parties hereto agree to execute such other documents and instruments and to do such other and further things as may be necessary or desirable for the execution and implementation of this Amendment and the consummation of the transactions contemplated hereby and thereby.

**2.5    Governing Law.** This Amendment shall be governed by and construed in accordance with the laws of the State of Utah, without regard to principles of conflicts of laws.

**3.6    Counterparts.** This Amendment may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized officers, all as of the day and year first above written.

**AMERICAN SIGNATURE, INC.**                    **SYNCHRONY BANK**

By: _____                    By: _____
Name: ___Eric Jackson___                         Name: ___Arthur S. Kort___
Title: ___CFO___                                 Title: ___SVP___

6

Attachment 1 to Fourth Amendment

**Appendix D**
**Financial Covenants**

## I.   FINANCIAL COVENANT(S)

**Minimum Current Ratio:** Retailer shall maintain, as of the end of each fiscal quarter during the Term, a Minimum Current Ratio of 1.0 to 1.0.

## II.   REPORTING

In order to establish compliance with the Financial Covenant(s) set forth above, Retailer shall deliver to Bank (i) within 60 days after the end of each fiscal quarter of Retailer, a certificate, signed by the Chief Financial Officer of Retailer and in a form reasonably satisfactory to Bank, establishing Retailer's compliance or non-compliance with the Financial Covenant(s) for such fiscal quarter, and (ii) within 120 days after the end of Retailer's fourth fiscal quarter during each fiscal year, a certificate, signed by the Chief Financial Officer of Retailer and in a form reasonably satisfactory to Bank, establishing Retailer's compliance or noncompliance with the Financial Covenant(s) for such fiscal quarter. Unless otherwise specifically set forth to the contrary, all financial calculations contemplated herein shall be performed in accordance with GAAP.

## III.   DEFINITIONS

"GAAP" means generally accepted accounting principles applicable in the United States, applied consistently with and using the same assumptions and methodologies as used in the historical preparation of Retailer's financial statements.

"Minimum Current Ratio" means, with respect to any entity at any time, (i) the sum of such entity's current assets as determined in accordance with GAAP, *divided by* (ii) the sum of such entity's current liabilities as determined in accordance with GAAP.

7

Attachment 2 to Fourth Amendment

**SCHEDULE 3.5**
**To**
**Credit Card Program Agreement**

**Program Fee Percentages**

**A.**    **"Core Credit Offer" or Base Rate: 0%**

**B.**    **Promotional Rates**



The Retailer Promotion Fee Percentages set forth in the table above are subject to revision as set forth in Sections 3.5(b), 3.5(e) and 3.6.

Specials. Beginning with the Program Year that starts on April 1, 2018, Retailer will have the right to reduce any Promotional Rates for a credit-based promotion in Section B with a promotional term 48 Months or 60 Months (as the Promotional Rates may be adjusted from time to time pursuant to any of the other Section of this Schedule) so as to reduce such Promotional Rate by 15% below the Promotional Rate actually set forth in Section B (each such reduced rate is referred to as a "Special Discount Rate") for up to 10% of Net Program Sales in any Program Year.

For purposes of calculating each Special Discount Rate, such Special Discount Rate will be carried out to two decimal places and rounded to the nearest basis point. If, as of the end of any calendar quarter, Net Program Sales with respect to which one or more Special Discount Rates applied at any time during the immediately preceding calendar quarter ("Special Discount Sales") exceed 10% of total Net Program Sales for such calendar quarter (the "Special Discount Cap"), Retailer will pay to Bank within 30 calendar days, or Bank may deduct the amount owed from settlements, the difference between the non-discounted Retailer Fees Percentages and the Special Discount Rates for the Special Discount Sales that exceed 10% of Net Program Sales for the calendar quarter. If either party has sent a notice of termination or non-renewal of the Agreement, Retailer will not allow transactions using the Special Discount Rates to exceed 15% of total Net Program Sales in any calendar month.