## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| American Signature, Inc., *et al.*,[1] | Case No. 25-12105 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 555** |
| | **Hearing Date: TBD** |
| | **Obj. Deadline: March 6, 2026 at 4:00 p.m. (ET) Extended for UST to March 11, 2026** |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER: (I) SETTING BAR DATES FOR FILING PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENT UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE; (II) SETTING A BAR DATE FOR THE FILING OF PROOFS OF CLAIM BY GOVERNMENTAL UNITS; (III) SETTING A BAR DATE FOR THE FILING OF REQUESTS FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIMS; (IV) ESTABLISHING AN AMENDED SCHEDULES BAR DATE AND A REJECTION DAMAGES BAR DATE; (V) APPROVING THE FORM OF AND MANNER FOR FILING PROOFS OF CLAIM; (VI) APPROVING A NOTICE OF BAR DATES; AND (VII) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, hereby objects (this "Objection") to the *Debtors' Motion for Entry of an Order: (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code; (II) Setting a Bar Date for the Filing of Proofs of Claim by Governmental Units; (III) Setting a Bar Date for the Filing of Requests for Allowance of Administrative Expense Claims; (IV) Establishing an Amended Schedules Bar Date*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: American Signature, Inc. (6162); American Signature Home Inc. (8573); American Signature USA Inc. (6162); ASI Pure Promise Insurance LLC (6162); ASI Elston LLC (7520); ASI – Laporte LLC (6162); ASI Polaris LLC (6162); ASI Thomasville LLC (6162); and American Signature Woodbridge LLC (6162). The Debtors' business address is 4300 E. 5th Avenue, Columbus, OH 43235.

*and a Rejection Damages Bar Date; (V) Approving the Form of and Manner for Filing Proofs of Claim; (VI) Approving a Notice of Bar Dates; And (VII) Granting Related Relief* [D.I. 555] (the "Motion"), and in support of this Objection respectfully states:

## PRELIMINARY STATEMENT

1.      Establishing a bar date to enable a chapter 11 debtor to determine the universe of claims is typically an unobjectionable event in a chapter 11 case. But in the present case, because the Debtors have scheduled known customer deposit claims as "contingent," the bar date will become a trap for unwary customers, risking substantial disallowance of undisputed priority claims by default. The U.S. Trustee objects to the Motion to the extent that it makes these known customer creditors file proofs of claim or risk disallowance, as the Debtors already have the necessary information regarding these claims.

## JURISDICTION AND STANDING

2.      This Court has jurisdiction to hear and determine the Motion and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

3.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

4.      The U.S. Trustee has standing to be heard on the Motion pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d

294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## **BACKGROUND**

### A.      **The Chapter 11 Cases**

5.      On November 22, 2025 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code," or "Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing their respective above-captioned chapter 11 cases (the "Chapter 11 Cases").

6.      The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.      The U.S. Trustee appointed a committee of unsecured creditors on December 4, 2025. [D.I. 119]. No trustee or examiner has been appointed in the Chapter 11 Cases.

8.      On November 23, 2025, the Debtors filed the *Declaration of Rudolph Morando in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [D.I. 5] (the "First Day Declaration," or "First Day Decl.").

### B.      **The Customer Deposits**

9.      On the Petition Date, the Debtors were a residential furniture company. First Day Dec. ¶ 6. The Debtors sold furniture to customers both in brick-and-mortar and online stores. *Id.* ¶ 11.

10.      The Debtors collected deposits from customers, which were applied to the purchase price. *Motion 0f Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to*

*Honor, Maintain, and Administer Customer Programs and Related Prepetition Business Practices, and (II) Granting Related Relief* [D.I. 15] (the "Cust. Prog. Mot.") , ¶ 16. As of the Petition Date, the Debtors were holding approximately $57.9 million in customer deposits. *Id.*

11.     The Debtors sought authority to continue to fulfill customer orders through December 22, 2025. *Id.* The Court entered interim and final orders permitting the Debtors to do so. [D.I. 17, 284].

12.     The Debtors filed their Schedules on December 20, 2025. The Schedules for American Signature Inc. list 36,852 customer deposit claims, totaling $57,708,590.49. Of this amount, the Debtors list $50,569,832.22 as entitled to priority. [D.I. 228].

13.     The Debtors listed all 36,853 customer deposit claims as "contingent." *Id.*

14.     At the meeting of creditors conducted pursuant 11 U.S.C. §341, the Debtors testified that they listed the customer deposit claims as "contingent" because some of the orders "were going to be fulfilled." Jan. 9, 2026 Transcript of Section 341 Meeting ("341 Trans."), p. 29-30, attached hereto as Exh. A. The Debtors acknowledged that not all orders would be fulfilled. *Id.* at p. 30, ll 2-3.

15.     The Debtors further testified that customers whose purchases were not fulfilled should file a proof of claim for the return of their deposit. 341 Trans. p. 45, ll 20 – 24.

16.     Upon information and belief, the Debtors have delivered all furniture orders that will be delivered. The U.S. Trustee understands the Debtors take the position that approximately 10,000 customer deposit claims remain, leaving approximately $15 million in customer deposit claims outstanding.

**C.**     **The Bar Date Motion**

17.     The proposed order setting a bar date requires all parties whose claims are listed as "contingent" in the Debtors' schedules to file a proof of claim. Mot., Exh. A, ¶ 8

18.     Further, the proposed order specifically requires customers asserting deposit claims to include specific information in their proof of claim:

> ***Section 507(a)(7) Claim***. Any Proof of Claim asserting a customer deposit claim entitled to priority under section 507(a)(7) must also include the total value of the deposit paid prior to the Petition Date and attach documentation supporting proof of the purchase.

*Id.*, ¶9.c.

*19.*     The proposed notice of the bar date does not reference customer deposit claims until page 6 thereof, under the heading, "Section 507(a)(7) Claim." *Id.*, at Exh. C.

20.     The proposed order provides that any party required to file a proof of claim or request for an administrative claim that fails to do so by the bar date "shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors (or filing a Proof of Claim or Administrative Claim request with respect thereto), and the Debtors and their property shall be forever discharged from any and all indebtedness or liability with respect to or arising from such claim, provided that late-filed proofs of claim shall be treated in accordance with section 726(a)(3) of the Bankruptcy Code." *Id.*, at Exh. A ¶ 16. Further, the order provides that any party required to file a proof of claim but fails to do so "shall be prohibited from voting to accept or reject any plan filed in these Chapter 11 Cases, participating in any distribution in these Chapter 11 Cases on account of such claim, or receiving further notices regarding such claim." *Id.*, at Exh. A ¶17.

## **OBJECTION**

I.    **Known Customer Deposit Claimants Should Not Be Required To File Proofs of Claim.**

21.    Debtors are required to file schedules of their assets and liabilities. 11 U.S.C. § 521(a)(1)(B); Fed.R.Bank.P. 1007. The debtors have the burden to use reasonable diligence in completing their schedules and lists. *In re Fauchier*, 71 B.R. 212, 215 (B.A.P. 9th Cir. 1987*); In re Pick & Save, Inc.,* 478 B.R. 110, 119 (Bankr. D.P.R. 2012); *Matter of Springer*, 127 B.R. 702, 707 (Bankr. M.D. Fla. 1991). The duty is a continuing one, and debtors have a duty to amend their schedules as they become aware of new facts. *Pick & Save*, 478 B.R. at 119.

22.    When the debtor lists a claim on its schedule in a fixed amount, and does not list the claim as contingent, unliquidated or disputed, the entry on the schedule is *prima facie* evidence of the claim, and the creditor need not file a proof of claim. Bankr. R. Fed. P. 3003(b)(1). A creditor whose claim is not listed on a debtor's schedule, or is listed as disputed, contingent or unliquidated, must file a proof of claim. Bankr. R. Fed. P. 3003(c)(2). The court sets the deadline to file proofs of claim. Bankr. R. Fed. P. 3003(c)(3). A creditor who is required to file a proof of claim but fails to do so "will not be treated as a creditor for that claim for voting and distribution." Fed. R. Bankr. P. 3003(b)(1).

23.    Deposits provided by an individual in connection with the purchase of property are entitled to priority up to $3,800. 11 U.S.C. § 507(a)(7).

24.    In the present case, the Debtors listed all of the customer deposit claims as "contingent." They listed the claims as contingent because the Debtors continued to fulfill orders

after the Petition Date, and to the extent a customer received its purchased furniture, it would not be entitled to a return of the deposit.[2]

25.     The Debtors are aware of the remaining customer deposit claims. The amount of the deposits are known, fixed, liquidated and undisputed. The Debtors are no longer operating and no longer have the ability to fulfill any orders. As such, to the extent that the claims were contingent as of the date the schedules were filed, they are no longer contingent.

26.     The purpose of a bar date is to fix the claims against the estate. Congress has determined that creditors holding claims that the Debtors know, and that are not unliquidated, disputed or contingent, are not required to file proofs of claim. Requiring such creditors to file proofs of claim to preserve their rights would not aid the Debtors in determining the quantum of claims against the estate but would create substantial risk that valid claims are disallowed simply by procedural default.

27.     In the present case, there is no benefit in requiring the remaining customers whose deposit claims were scheduled but who did not receive their furniture to file claims, other than eliminating valid priority claims due to a procedural default. The Debtors are aware of these claims, are aware of the amount of the claims, are aware that they did not fulfill the orders, and do not dispute the claims.

---

[2] It is not clear that the possibility that the Debtors would fulfill the delivery obligation renders the claims "contingent." "It is generally agreed that a debt is contingent if it does not become an obligation until the occurrence of a future event." *In re Alecto Healthcare Services, LLC*, Civ. No. 23-1442-GBW, 2025 WL 961482, *10 (D. Del. Mar. 31, 2025). Here, the future event could potentially *eliminate* the claim, but the future event was not necessary to create the claim. In addition, a claim that was contingent as of the Petition Date can become non-contingent after the Petition Date. *Id.* In the present case, even if the claims were contingent as of the Petition Date due to the possibility that the Debtors could fulfill the order, the Debtors no longer have the ability to fulfill the orders and, by extension, the remaining claims are no longer contingent.

28.     The customers, however, will need to understand the notice, understand the need to file a claim, properly and timely file a claim, and know to assert priority treatment under Section 507(a)(7). The failure to do so will result in the disallowance of valid priority claims. Further, requiring customers that are unfamiliar with the claims process to file one may operate to increase administrative costs in these cases by creating issues where parties assert additional unsupported amounts and/or otherwise assert claims which require more work to reconcile than stipulating to the validity of claims in the relevant liability schedule.

29.     Permitting the estate to eliminate known, valid priority claims on procedural default grounds would result in a windfall to lower priority creditors. It is inequitable to require customers holding known claims to file proofs of claim or risk losing same.

30.     There is an easy and equitable solution that would permit the estate to determine the claims asserted against it and provide finality without placing an undue burden on known priority claimants. The Debtors could file a list of known customer deposit claims that have not been satisfied through delivery of the purchased furniture, and the bar date order could exempt such creditors from the requirement to file a proof of claim. Any creditor who asserts that it provided a deposit and did not receive its furniture but is not on the list would be required to file a claim. Critically, however, the thousands of creditors whose claims are known to the Debtors would not risk losing their claims, or the priority status of their claims, by missing a deadline or filling out the forms incorrectly.

## II.     The Bar Date Order Cannot Automatically Disallow and Discharge Late Claims.

31.     The proposed order seeks to disallow any claim filed after the bar date and to discharge the Debtors on such claims. Further, the order provides that a late-filed claim will not be entitled to vote on any plan or participate in any distributions of the Debtors' assets.

32.     The Bankruptcy Rules provide that a creditor who is required to file a proof of claim but fails to do so "will not be treated as a creditor for that claim for voting and distribution." Fed. R. Bankr. P. 3003(b)(1).

33.      However, a proof of claim that is filed, but is filed after the bar date, is deemed allowed until an objection is filed on notice. 11 U.S.C. §502(a) & (b)(9). Thus, the Code and the Rules make a distinction between a claim that is not filed and one that is filed late. A late-filed claim is nevertheless allowed until it is objected to on notice.  *See In re Alecto Healthcare Servs., LLC,* Case No. 23-10787 (JKS), Letter Ruling Dated March 20, 2024 (attached hereto as Exh. B), at p. 6-7 (recognizing that Section 502(b)(9) requires notice and a hearing before a late-filed claim can be disallowed). As such, the bar date order cannot automatically disallow late-filed claims or rule that such claims shall not be entitled to vote or participate in distributions.

34.     Further, the Debtors have sold substantially all of their assets. As such, they are not entitled to a discharge, even in a confirmed plan. 11 U.S.C. § 1141(d)(3). A bar date order should not provide a discharge that the Debtors are otherwise not entitled to receive.

## **RESERVATION OF RIGHTS**

35.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights to (i) amend or supplement this Objection and (ii) conduct discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order (i) denying the Motion and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: March 11, 2026

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: */s/ Linda J. Casey*
Linda J. Casey
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Telephone: (302) 573-6491
Email:   Linda.Casey@usdoj.gov

**EXHIBIT A**

<pre>
 1

 2                        DISTRICT OF DELAWARE

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 25-12015 (JKS)
 4   AMERICAN SIGNATURE, INC.,   .
     et al.,                     .  (Jointly Administered)
 5                               .
                                 .  Room Number 2207
 6                               .  844 King Street, Suite 2207
                                 .  Lockbox 35
 7              Debtor.          .  Wilmington, Delaware 19801
                                 .
 8                               .  Friday, January 9, 2026
     . . . . . . . . . . . . . . . .  1:00 p.m.
 9

10                    TRANSCRIPT OF 341 MEETING
                 BEFORE MALCOLM BATES, OFFICE OF THE
11                    UNITED STATES TRUSTEE

12   APPEARANCES:

13   For the Debtors:         Laura Davis Jones, Esquire
                              PACHULSKI STANG ZIEHL & JONES, LLP
14                            919 North Market Street, 17th Floor
                              Wilmington, Delaware 19899
15

16   For the U.S. Trustee:    Malcolm Bates, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
17                            J. Caleb Boggs Federal Building
                              844 King Street, Suite 2207
18                            Lockbox 35
                              Wilmington, Delaware 19801
19

20   Audio Operator:          Electronic Recording

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

2

INDEX

MOTIONS:                                                    PAGE

341 Creditors' Meeting                                        3

       EXAMINATION OF RUDOLPH J. MORANDO, JR.

            Examination by Mr. Bates                          8


  Transcriptionist's Certificate                            110

1        (Proceedings commenced.)

2        MR. BATES:  Okay.  It is a little bit after 1:00.

3   We're going to go on the record here.

4        Good afternoon to everyone who is currently

5   participating in this 341 meeting.

6        We are here for the meeting of creditors for

7   American Signature, Inc. and its affiliated debtors and

8   debtors in possession.

9        Before I go any further, I had received a comment

10  that there may have been some issues with my audio coming

11  through to participants in the meeting.  Could I have

12  Ms. Davis Jones or Mr. Morando just let me know if I'm coming

13  through on their end?

14        MS. DAVIS JONES:  You're coming in fine.  Thank

15  you.

16        MR. BATES:  Thank you very much.

17        MR. MORANDO:  Agreed.

18        MR. BATES:  The debtor's Chapter 11 cases are

19  being jointly administered under Case Number 25-12105 now

20  pending before Judge Stickles in the United States Bankruptcy

21  Court for the District of Delaware.

22        Today is January 9, 2026.  It's a little bit after

23  1:00 p.m., Eastern Time.

24        Again, my name is Malcolm Bates.  I am a trial

25  attorney with the United States Trustee's Office for the

1 District of Delaware.

2          Can I have debtors' counsel enter their appearance

3 for the record and introduce their witness, please?

4          MS. DAVIS JONES:  Absolutely.  Good afternoon.

5          This is Laura Davis Jones, of Pachulski Stang

6 Ziehl & Jones, counsel for the debtors.

7          Our witness is Rudy Morando.  He is one of the co-

8 CROs of the debtors.

9          MR. BATES:  Thank you very much, Ms. Davis Jones.

10          Before we begin, I have a couple housekeeping

11 matters to go through.

12          If there is -- there is significant interest in

13 the meeting today.  We've already got over 500 participants.

14 I -- as I've noted several times before we went on the

15 record, due to the level of interest and the fact that people

16 are continuously joining and leaving the meeting as we go

17 along, I've muted everyone as they enter the room to prevent

18 distracting background noise and to facility a more

19 streamlined meeting of creditors today.

20          I'm going to be taking the examination of the

21 debtors' witness first.  Creditors, if they wish, will have

22 an opportunity to question the debtors' witness once I've

23 concluded that examination, and I'll go into a little bit

24 more detail about that in a second.  But if you're wondering

25 why you're unable to take yourself off mute, that's why.

1    Please note that neither my office nor the debtors

2  can give legal advice to members of the general public.

3  Additionally, the debtors may not be able to answer all

4  specific questions regarding individual claims and parties

5  should consider contacting debtors' counsel directly offline

6  to discuss certain issues further, in particular, as it

7  pertains to any of their specific claims in this case.

8    The purpose of the 341 meeting is to assess the

9  financial condition of the debtors.  If any party's line of

10  questioning begins to get too far afield from that purpose, I

11  will instruct the party to cease that line of questioning and

12  move on to other appropriate topics or otherwise allow

13  another party to ask questions.

14    Although we appreciate everyone's participation,

15  please note that listening to or observing the 341 meeting is

16  not required to preserve any legal rights a party may have

17  with respect to the debtors.

18    If you have called in or joined the meeting to

19  avoid any impairment of your rights in these cases and do not

20  wish to listen to my examination or ask any questions of your

21  own, please feel free to disconnect from the meeting at any

22  time.  You will not be waiving any rights in these cases.

23    As far as creditor participation, once my

24  examination is concluded, I, once again, note that we are in

25  the neighborhood of 500 participants today.  So while I would

1  like to give creditors a full and fair opportunity to examine

2  the witness as they see fit, there's simply no way that I

3  could possibly give all the creditors who have joined today

4  the opportunity to question the witness so I may be required

5  to cut off questioning at a certain point if we're going on

6  too long or if we're retreading the same ground many times.

7        And I'd like to emphasize that the debtors may not

8  be able to address questions about your specific claims on

9  this call today.  There are tens of thousands of creditors in

10  this case so it might be more productive for you to follow up

11  with the debtors directly offline following the meeting to

12  the extent that your questions are not answered by anything

13  that I go over during my examination.

14        Mr. Ataviano (phonetic), you've been unmuted.  Did

15  you have a question, sir?

16        MR. ATAVIANO:  Yes.  I am -- actually joined the

17  meeting as like a recent former employee.  I don't know if

18  there's any -- like if I'm not supposed to be here or if

19  there's any like issues, you know, about, you know, like,

20  different like paychecks I was supposed to like receive --

21        MR. BATES:  Let me stop you there, Mr. Ataviano.

22  I'm sorry to cut you off but, again, just because there are

23  so many participants, I'd like to address this question

24  head-on, and at that point, I'm going to stop taking

25  questions from creditors and go into my examination.

1          To be clear, no one is required to be here but

2 this is a public proceeding.  There's nothing preventing you

3 from being here.  You are not waiving any rights in the case

4 by participating or not participating today.  The purpose of

5 this meeting is simply to assess the financial condition of

6 the debtor.

7          So if the other creditors whose hands are raised

8 have questions about their specific claims, I'm not going to

9 be able to address that at this time and I would ask you to

10 just wait until I've concluded my examination and if you'd

11 still like to ask questions of the debtors' witness, you can

12 do so at that time.

13          I appreciate everyone's patience as we work

14 through this.  There's obviously significant interest in the

15 341 meeting today and I'd like to get through my examination

16 to give creditors as much time as possible, to the extent

17 they're interested in questioning the witness.

18          Okay.  You will still be able to listen to the

19 meeting even when you're muted, as you can probably already

20 tell.  If you do determine to question the witness or if

21 you're otherwise speaking, please identify yourself for the

22 record.  So state your name before you start speaking.  If

23 you become disconnected before the meeting is finished,

24 you're welcome to reconnect.

25          This Section 341 meeting of creditors will be

1   recorded by the U.S. Trustee's Office.  Any other recordings

2   are prohibited.

3            Okay.  With that, I'd like to swear in the

4   witness.

5            Mr. Morando, would you kindly raise your right

6   hand, sir?

7          RUDOLPH J. MORANDO, JR., DEBTORS' WITNESS, SWORN

8              MR. BATES:  Thank you, sir.

9                            EXAMINATION

10  BY MR. BATES:

11  Q    Good afternoon, again, Mr. Morando.  Long time no see.

12  A    Likewise.

13  Q    I appreciate your participation today.  I'm going to

14  try and make my portion of this as painless as possible.

15       Could you just please state your full name for the

16  record?

17  A    Sure.  Rudolph James Morando, Jr.

18  Q    And what is your title with these debtors, sir?

19  A    Co-Chief Restructuring Officer.

20  Q    And how long have you held that position?

21  A    My engagement letter was signed around November

22  7/November 8, 2025.

23  Q    And who at the debtors appointed you to that position?

24  A    The management team.

25  Q    And would that include --

1   A     The board of directors.

2   Q     Thank you.  Okay.  That was in November.  And that was

3   following a prior agreement between your firm, BRG, and the

4   debtors that I believe was executed in October, is that

5   correct?

6   A     That's correct, yeah.  Mid-October was the first time

7   that my firm was engaged.  At that point, it was really to

8   evaluate strategic options for the business and then

9   approximately two to three weeks after that initial

10  engagement we were -- the role was kind of morphed into this

11  co-CRO engagement that was signed around November 7.

12  Q     And that was when the debtors' determined or it became

13  more likely that they were going to be pursuing a

14  restructuring or a Chapter 11, correct?

15  A     Correct.

16  Q     And did that second agreement sort of replace or

17  supersede the original agreement?

18  A     That's correct.

19  Q     Has your firm been fully paid up for all prepetition

20  work?

21  A     Yes.

22  Q     And to be a little more granular on that point, BRG is

23  being paid flat fees for co-CRO services and then I believe

24  hourly fees for other personnel in the case, correct?

25  A     Correct.

1  Q     And they had also been receiving -- I think it was a
2  similar fee structure pursuant to that initial October
3  letter.  Is that also your understanding?
4  A     Correct.
5  Q     And your -- the firm is fully paid up for the fees due
6  and owing under both of those agreements prepetition,
7  correct?
8  A     Yes.  Yes.
9  Q     Thank you.  Can you briefly describe the duties that
10 you have in your current position?
11 A     Yeah.  So as co-chief restructuring officer, I oversee
12 operations of the business, primarily focused around the
13 bankruptcy and restructuring efforts.  So that entails
14 everything from working on the day-to-day with the management
15 team, working through the bankruptcy process with counsel,
16 managing cash on a daily basis, and the like.
17 Q     Mr. Morando, are you a creditor of the debtors?
18 A     No.
19 Q     Are you a shareholder of any of the debtors?
20 A     No.
21 Q     Are you indebted to any of the debtors?
22 A     No.
23 Q     Have you, in your personal capacity, ever lent money to
24 any of the debtors?
25 A     No.

1   Q      What about BRG?  Have they lent money to the debtors?

2   A      No.

3   Q      Do the debtors have any claims against you that you are

4   aware of?

5   A      No.

6   Q      And have you personally guaranteed any debts of the

7   debtors at any time?

8   A      No.

9   Q      Okay.  I'm going to be asking you some questions about

10  the Schedules of Assets and Liabilities and the Statement of

11  Financial Affairs that the debtors have filed in these cases.

12  Do you have those documents in front of you?

13  A      I do not, but I can view my screen --

14  Q      Okay.

15  A      -- thing here that -- but I'm happy to --

16  Q      Okay.  That might be the easiest thing to do here.

17  A      Sure.

18  Q      Give me one moment, sir.  Okay.

19         All right.  Are you able to see what is on my screen

20  here?

21  A      Yes, I can see.  Yes.

22  Q      Okay.  And this is a document styled as the SOFA-28

23  attachment filed in Case Number 25-12105-JKS.  Do you see

24  that?

25  A      Yes, I do.

1 Q    And this was filed at Docket Number 229 in that case,

2 correct?

3 A    Yes.

4 Q    And this is a list of current partners, officers,

5 directors, and shareholders of debtor, American Signature,

6 Inc., correct?

7 A    Correct.

8 Q    Is this a correct list of ASI's -- and let me pause

9 there.  If I use the vernacular ASI will you understand that

10 to mean debtor, American Signature, Inc.?

11 A    Yes.

12 Q    Okay.  Is this a correct list of ASI's current

13 directors and officers, other than yourself?

14 A    Yes, to the best of my understanding it is.

15 Q    Okay.  And we can treat that as sort of a standing

16 qualification for your answers today.

17 A    Um-hum.  Yes, that's fine.

18 Q    I'm going to ask you some questions about ASI's other

19 directors and officers, similar to the ones I just asked

20 about you, sir.

21 A    Sure.

22 Q    So, first, this reflects that Schottenstein Stores

23 Corporation owns 100 percent of ASI, right?

24 A    Correct.

25 Q    It also reflects that Adam Zalev is the sole

1  independent director of the -- of ASI, is that right?

2  A    That's also correct.

3  Q    Does ASI currently have any other directors?

4  A    Yeah.  So if we just focus on the board of directors,

5  that board is comprised of four individuals, one of which is

6  the independent director, Adam Zalev.

7      The three others are Eric Jackson, the company's chief

8  financial officer.  The third is Jeff Swanson, who's the

9  assistant secretary of the board.  And then the last is

10 Tod Friedman, who's the chief legal officer.

11 Q    Okay.  And all three of those individuals are listed on

12 this schedule, correct?

13 A    Correct, all four.

14 Q    Thank you.  Was there any change in the composition of

15 the board of directors from prebankruptcy?

16 A    Yes.  There were resignations and additions.  So I

17 believe Jay Schottenstein resigned from the board,

18 Jonathan Schottenstein, who was then president of the

19 company, resigned from the board, our independent director

20 was added, again, Adam Zalev.

21 Q    Thank you, sir.  Are -- and to sort of go back to that

22 litany of questions that we were discussing earlier, are any

23 of the directors and officers listed here creditors of the

24 debtors, to the best of your knowledge?

25 A    Not that I'm aware of, other than, you know, just being

1   on payroll or things like that, the normal operation of

2   business.

3   Q      Understood.  Are any of them indebted to the debtors?

4   A      Not that I'm aware of.

5   Q      Have any of them made loans to the debtors?

6   A      Not that I'm aware of.

7   Q      Okay.  Do the debtors have any claims against or

8   potential claims against any of these directors and officers

9   to the best of your knowledge, information, or belief?

10  A      Not that I'm aware of.

11  Q      Did any of the directors and officers personally

12  guarantee any debts of the debtors?

13  A      Not that I'm aware of.

14  Q      Okay.  The other debtors have different directors and

15  officers, correct?  Like I'll go to the same attachment for

16  debtor, American Signature, Inc. Elston, and it's a slightly

17  different list, correct?

18  A      Correct.  It does vary by each of the debtors.

19  Q      So is it maybe more accurate to say that there's a

20  different combination of certain of ASI's directors and

21  officers?

22  A      That's correct.

23  Q      Okay.

24  A      I mean the way that I would describe it is ASI is the

25  primary operating entity of the business.

1 Q     Okay.

2 A     So that is where most of the financial activity takes

3 place.

4 Q     Um-hum.

5 A     It's also where most of the employees are employed, so

6 that list is broader.

7 Q     Okay.

8 A     The other entities are all owned by ASI and are mostly

9 just holding companies, so no real operating activity and a

10 much smaller list of officers or directors.

11 Q     Okay.  And I expect we'll come back to that point in a

12 moment but thank you for that response.

13 A     Sure.

14 Q     Okay.  And the other directors and officers of the

15 other debtor entities, those are all reflected in the SOFA-28

16 attachments that were filed by those debtors, just like we're

17 looking at right here?

18 A     Yes.  To the best of my knowledge, correct.

19 Q     Okay.  If I were to ask you that same litany of

20 questions about the other debtors' directors and officers

21 regarding shareholder status, creditor status, that sort of

22 thing, would all your answers be the same?

23 A     Yes.

24         MR. BATES:  Okay.  I'm going to pause here just to

25 note that I'm not going to be responding to creditor

1 │ questions during my examination.  If you continue to have a

2 │ question once I've concluded, I can take you off mute to

3 │ address your question at that time.

4 │          But for right now, I'm just going to proceed with

5 │ my examination of the witness.  I appreciate everyone's

6 │ patience.

7 │          Thank you.

8 │ BY MR. BATES:

9 │ Q     Mr. Morando, how many employees do the debtors

10 │ currently have?

11 │ A     Approximately 3,000.

12 │ Q     And do you know how -- approximately how many they had

13 │ a year ago?  I know that's -- that predates your role by a

14 │ little bit but to the best of your knowledge?

15 │ A     I don't know that it would have changed materially.  I

16 │ mean -- well, I guess, the -- what I would say is at the time

17 │ of the filing, we had approximately 3,000.  I expect that

18 │ that number has fallen, you know, a little bit since then

19 │ over the last month or so as a result of store closures and

20 │ just normal attrition.

21 │ Q     Right.  And so there were not significant layoffs

22 │ prepetition, is that right to him.

23 │ A     Not that I'm aware of.

24 │ Q     Okay.  Thank you.

25 │          As we just discussed, ASI is wholly owned by

1  Schottenstein Stores Corporation, correct?

2  A     Correct.

3  Q     And then ASI wholly owns all of the other debtors,

4  right?

5  A     Yes.

6  Q     Okay.  Do you have the debtors' petitions in front of

7  you, sir?

8  A     I do not.

9  Q     Let me ask you this.  You signed the petitions filed on

10 behalf of all the debtors, right?

11 A     Yes.

12 Q     At the time you signed each of the Chapter 11 petitions

13 filed in these cases, was all the information contained in

14 those petitions true and correct to the best of your

15 knowledge, information, and belief?

16 A     Yes.

17 Q     Could you briefly provide an explanation as to why

18 these debtors filed for Chapter 11?

19 A     Sure.  As I noted at my First Day testimony, this is a

20 business like many retailers that had a tremendous boost as a

21 result of COVID and, you know, 2021 as an example, revenue of

22 the business was up significantly, and as a result, BSGNA,

23 the corporate overhead, the expenses of this business also

24 grew.

25       Since 2021, the business has steadily declined, meaning

1  its revenue has fallen every single year, and the business

2  has been unable to take cost of the business fast enough.

3  Ultimately, that created a liquidity crunch and required the

4  company to file for bankruptcy.

5  Q    Okay.  Thank you, sir.

6      I'm going to briefly stop sharing and hopefully I will

7  not be bothered anymore as we continue.  Okay.  Let me re-

8  share.

9      Okay.  Are you still able to see my screen,

10  Mr. Morando?

11  A    I am, yes.

12  Q    Great.  All right.  With that throat clearing out of

13  the way, I'll start to get into the schedules and statements

14  here.

15  A    Sure.

16         MR. BATES:  Once I admit in Ms. Lewis.  Okay.

17  BY MR. BATES:

18  Q    I'd like to start with the schedules and SOFA filed by

19  ASI and, in particular, the global notes.  I just have a

20  couple questions about this.  I promise.  We're not going to

21  spend all day in here.  Okay.

22      Do you see this paragraph 12 that I have highlighted on

23  my screen?

24  A    Yeah.  I'm just trying to enlarge it a little bit so I

25  can read it.

1  Q     Sure.  And I apologize for that here.  Is that better?

2  A     Yes, I -- yes.  Yes, that is, and I can see it.

3  Q     Okay.  This paragraph essentially says that the debtors

4  requested authority to pay certain amounts pursuant to the

5  First Day Orders in these cases and then it says, "The

6  schedules and statements reflect the debtors' outstanding

7  liabilities and your amounts owed as of the petition date,

8  without reducing liabilities on account of any payments

9  authorized under the First Day Orders.  If liabilities on

10 account of prepetition wages and benefits have been satisfied

11 in full, they are not listed on the schedules and statements,

12 unless otherwise noted."

13           Did I read that right?

14 A     Correct.

15 Q     In reviewing the Schedule E/F, I didn't see anything

16 that appeared to be priority claims for employee wages or

17 anything like that.

18     I just wanted to confirm whether the debtors were fully

19 paid up on employee wage claims that were authorized by the

20 First Day Orders?

21 A     To the best of my knowledge, yes.

22 Q     Okay.  Thank you.

23     Okay.  The next provision I'd like to go to is right

24 here under this paragraph 15 and, in particular, it's this

25 paragraph -- subparagraph (d).  Can you see that okay?

1  A      I can.

2  Q      Okay.  I'll just read this into the record.  This says,

3  "Notwithstanding that the debtors have made reasonable

4  efforts to correctly characterize, classify, categorize, or

5  designate certain claims, assets, executory contracts,

6  unexpired leases, and other items reported in the schedules

7  and statements, the debtors, nonetheless, may have improperly

8  characterized, classified, categorized, or designated certain

9  items.  The debtors, thus, reserve all rights to

10 recharacterize, reclassify, recategorize, or redesignate

11 items reported in the schedules and statements at a later

12 time as is necessary and appropriate."

13       Did I read that right?

14 A      You did.

15 Q      Would you have signed the schedules and statements

16 filed in these cases if it didn't include this provision?

17 A      No.

18 Q      Did -- were the schedules and statements for each of

19 the debtors true and correct to the best of your knowledge at

20 the time you signed them?

21 A      Yes.  I mean there were some minor corrections that we

22 made after the initial filing but it was more for

23 labeling --

24 Q      Sure.

25 A      -- than anything else.  There was nothing significant

1  that had changed.

2  Q     Right.  I think there was an Amended A/B filed for ASI,

3  is that right?

4  A     Correct.

5  Q     But at the time that you had signed the initial

6  schedules, the information that was available to you, to the

7  best of your knowledge, was true and correct and then you,

8  perhaps --

9  A     Yes.

10  Q     -- refiled --

11  A     Yeah.

12  Q     -- after discovering that something needed to be

13  changed, is that fair?

14  A     Yes.

15  Q     Okay.  Speaking of that Amended A/B, that's where I'd

16  like to start.

17  A     Sure.

18  Q     Okay.  I'm in Part 3, Item 11.  You can probably see

19  the highlighting on my screen.

20  A     Um-hum.

21  Q     I just have a couple questions about 11(a) and 11(b)

22  here, the -- 11(a), 90 days old or less, and 11(b) over 90

23  days old.  These both relate to affiliate accounts

24  receivable?

25  A     Yeah.

1 Q      So in 11(a), 90 days old or less, there's about just

2 over 3 million affiliated accounts receivable and it looks

3 like under 11(b), there's about 48 million in affiliated

4 accounts receivable that's over 90 days old, is that right?

5 A      Correct.

6 Q      How did ASI handle affiliate A/R in the ordinary course

7 pre-bankruptcy?

8 A      So it was tracked and managed by the accounting team.

9 Can you just kind of specify a little bit more about exactly

10 kind of where you're going with the question?

11 Q      Sure.  I think my next question would be -- I don't

12 believe these are scheduled as obligations of the affiliates.

13 Are these like affiliate debtor obligations or are they owed

14 by other entities?

15 A      No, no.  I think the way you describe it is correct.

16 When you think about the real -- I mean a lot of this is just

17 accounting.  When you think about the real receivables of

18 this business that we manage on a day-to-day basis, it's

19 really, you know, credit card receivables that are coming in

20 front the transactions.

21      That's really the heart of kind of the receivables in

22 this business.

23 Q      So is the purpose of these amounts more or less to do a

24 true-up of how those funds kind of come into the debtor

25 enterprise, so to speak?

1  A      Yeah, that's fair.

2  Q      Are these amounts going to be -- and this may be cart

3  before horse, but to the best of your knowledge sitting here

4  today, are these amounts that would be treated as

5  intercompany claims in connection with any Plan filed in

6  these cases?

7  A      Correct.

8  Q      Okay.  My next question is about this highlighted Item

9  25 in the Schedule A/B, the Amended A/B.

10         This item asks, "Has any property listed in Part 5 been

11  purchased within 20 days before the bankruptcy was filed?"

12         Debtors have responded yes.  They identified inventory

13  and supplies.  The book value is listed as

14  undetermined/current values listed as undetermined.  Do you

15  see that?

16  A      I do.

17  Q      Have the debtors developed and understanding as to the

18  value of the inventory and supplies referenced here since

19  these schedules were filed?

20  A      Not at this time.  We're still working through that.

21  Q      Okay.  Do you have a rough idea?

22  A      No, I think we still need to continue doing our work

23  there to -- before I opine on it.

24  Q      Okay.  That's fair enough.

25         Okay.  The next question is about this Part 11, all

1  other assets, Item 71, Notes Receivable.  71.1 lists a

2  Schottenstein Realty, LLC note receivable with a face amount

3  of about $5 million and the debtors current -- the current

4  value of the debtors' interest is listed as a little over 3

5  million.  Could you just explain what this is, please?

6  A    Yeah.  My understanding is this is related to a sale

7  leaseback with Schottenstein Realty.  As part of that

8  transaction, there was a promissory note created in the

9  amount of approximately $5 million.  And you can see that,

10  you know, as of the filing, that promissory note was reduced

11  to approximately $3 million.

12  Q    Okay.  Understood.

13       I'm going to get into these Schedule A/B attachments

14  here and, in particular, this Amended Schedule A/B 55, which

15  pertains to the debtors' real property, there are one, two,

16  three, four, five properties that have been removed from the

17  initial attachment that was filed here.

18       Could you just say a little bit about that, please?

19  A    I think these are expired leases that were, you know,

20  incorrectly included the first time around, should not have

21  been initially listed.

22  Q    Okay.  I'm actually going to jump to ASI's Schedule D,

23  and I just want to confirm you can still see everything on my

24  screen here.

25  A    I can.

1 Q      Hopefully not my question outline.

2 A      But I can.

3 Q      Okay.  Really only one question about this.  I'm

4 looking at Part 1.  This is Item 2.3, Secured Claim Held by

5 Second Avenue Capital Partners, LLP.

6       There's a field here that asks whether the creditor is

7 an insider or related party of ASI.  It was listed as no

8 here.  I'm wondering why that was.

9 A      Yeah, I think it's just a mistake.  Second Avenue is

10 definitely an affiliate.

11 Q      Okay.  I think we've tread that ground many times in

12 this case.  I won't belabor the point there.

13 A      Yes.

14 Q      I'm going to jump to the E/F and, of course, I've --

15 this is, of course, like 200 pages long so you're just going

16 to have to bear with me for a second.

17 A      No worries.  I understand.

18 Q      Really only a couple questions here, notwithstanding

19 all the highlighting.

20 A      Um-hum.

21 Q      And, of course, I've blown straight past it.  Okay.

22       Yeah, okay.  I'm looking at Item 3.733.  This is a --

23 I'm going to -- and I'll skip to the punchline.  I'm looking

24 at Items 3.733, 3.734, 3.735, and 3.736, and these all appear

25 to be promissory note claims -- unsecured promissory note

1  claims held by an entity called Schottenstein SEI, LLC.

2  A    Um-hum.

3  Q    If you add these up, I think you get to about 13.8

4  million, if I'm not mistaken.  Yeah, I think that's right.

5       Can you just tell me what this entity is and what these

6  notes relate to?

7  A    Yeah.  So there are certain Schottenstein entities that

8  actually provided liquidity infusions in the business

9  historically and Schottenstein SEI, LLC is one of them.

10      It's really just one of their many accounts used to,

11  you know, hold capital to make these types of investments

12  into the business.

13 Q    I think your First Day Declaration reflected that there

14 was about $51 million or so invested into the debtors'

15 prepetition.  Is that your understanding?

16 A    Yeah.  So I -- if my memory -- if my recollection is

17 correct, we went back and looked at infusions going back from

18 affiliates going back about 27 months before the filing.

19 Q    Okay.

20 A    And that did total approximately $51 million.  Some of

21 that had been repaid.  I think the net outstanding balance on

22 the company's balance sheet is approximately 25, $26 million.

23 Q    Okay.  Do you know when approximately that -- was that

24 repaid like within the last -- with the trailing 12 months

25 before the filing?

1   A       Some of it was.

2   Q       Okay.  And I would -- I think we'll get to that but I

3   would expect that some of that is reflected in the SOFA?

4   A       Correct.

5   Q       The Statement of Financial Affairs?

6   A       Yeah.  I know what you meant.

7   Q       I know what you meant.  It's for the benefit of the

8   creditors and my record.  I sometimes get a little too --

9   A       Yep.  I'm good.

10  Q       -- casual.  Okay.

11          I'm going to jump ahead a little bit.  Okay.  Same

12  questions with respect to this entity.  This is Unsecured

13  Claims Numbers 3.741, 3.742, and 3.743.  These are all

14  unsecured promissory note claims held by an entity called

15  SEI, Inc.  These total about -- I'll represent to you a

16  little over $6 million.

17          Are these subject to the same explanation you just

18  provided with respect to --

19  A       Yes.

20  Q       -- Schottenstein SEI?

21  A       To the best of my knowledge, that's correct.

22  Q       Okay.  And just to confirm my understanding of your

23  testimony, it's that after suring these figures up and

24  accounting for some that have been repaid prepetition, there

25  was about 25, 26 maybe of these unsecured promissory note

1  claims out there?

2  A     Yes, that's my understanding.

3  Q     Thank you.

4        I'm going to jump now to the Schedule E/F attachment

5  -- Part 1 attachment.  Can you see that okay?

6  A     I can.

7  Q     This is even smaller than the other text so I will zoom

8  up.  I promise.

9  A     I can see it fine.

10  Q     Okay.  So let me -- this might be the easiest way to do

11  this.  Yeah, that will save me a lot of scrolling.  Okay.

12        So this is labeled Schedule E/F, Part 1, Creditors Who

13  Have Priority Unsecured Claims.  Do you see that?

14  A     I do.

15  Q     So this is an attachment that lists creditors who have

16  priority unsecured claims against ASI, right?

17  A     Yes.

18  Q     Or perhaps against, I don't know, some combination of

19  the debtors.  I'm not sure.  But they're -- in any event,

20  they're scheduled for ASI.

21  A     Yes.

22  Q     If you look at this column here -- and, of course, it

23  highlights everything.  This column here, basis for claim --

24  A     Customer deposit, yes.

25  Q     -- are all these claims customer deposit claims?

1   A      Yes.

2   Q      Okay.  If you look in this first column here under

3   line, do you see it right here where it says 2.36852?

4   A      I do.

5   Q      And that means the debtors believe there are

6   approximately 36,852 of these customer deposit claims, right?

7   A      Correct.

8   Q      Okay.  And then do you see this -- there are a couple

9   of skinnier columns here.  The one says contingent.  One says

10  unliquidated.  One says disputed.  You can see that okay?

11  A      Yep.  Yes.

12  Q      And in every row under the column for contingent

13  there's an X, right?

14  A      Correct.

15  Q      And is that true for all 36,852 of these claims?

16  A      That's correct.

17  Q      Okay.  Are these claims labeled contingent because the

18  customers have not yet received the products for which they

19  paid a deposit?

20  A      It was labeled -- Laura, were you going to say

21  something?

22           MS. DAVIS JONES:  No, I'm fine.  Sorry about that.

23           MR. BATES:  No problem.

24           THE WITNESS:  That's okay.

25           Yeah, they were labeled contingent because some of

1  these orders were going to be fulfilled.

2  Q    But not all, right?

3  A    Not all.

4  Q    Okay.  Do you see down here in this row for totals,

5  these two values?

6  A    I do.

7  Q    Okay. Let's start with the column labeled Total Claim

8  first.

9       Okay.  Do you understand the numbers in that column to

10 reflect the total amount of each customer's deposit paid to

11 the debtors?

12 A    Yes.

13 Q    And at the very bottom it says that the combined total

14 of the customer deposit claims is $57,708,590.49, right?

15 A    Correct.

16 Q    In the very last column of this attachment it's labeled

17 Priority Amount.  Do you see that?

18 A    I do.

19 Q    And do you understand the numbers in that column to

20 reflect the total amount of each customer's claim that is

21 entitled to priority status under Section 507(a) of the Code?

22 A    That's correct.

23          MR. BATES:  That's the Bankruptcy Code, for the

24 benefit of the creditors.

25 BY MR. BATES:

1  Q    Mr. Morando, you've been a professional or chief

2 restructuring officer in numerous bankruptcy cases, correct?

3 A    Yes.

4  Q    Do you have an understanding of what it means for

5 claims that have priority status under Section 507(a) of the

6 Bankruptcy Code?

7         MR. DAVIS JONES:  And I'm going to caution you,

8 Mr. Morando -- this is Laura Jones.  You can answer to the

9 extent you know, but I'm going to caution you as to attorney-

10 client privilege.

11         MR. BATES:  And let me -- thank you,

12 Ms. Davis Jones.

13         MR. BATES:  Let me jump in before you say

14 anything, Mr. Morando.

15         To the extent I ask you any question that

16 implicates attorney-client privileged information, I'll ask

17 you to cabin your response to non-privileged information to

18 the -- able -- the extent that you're able to do so.  Does

19 that make sense?

20         THE WITNESS:  Yeah, that makes sense.

21         MR. BATES:  And to be clear --

22         THE WITNESS:  I trust that Laura will jump in and

23 speak up.

24         MS. DAVIS JONES:  Correct.

25 BY MR. BATES:

1    Q      I expect you're right about that.  And I would also

2    just -- again, while we're doing this, because I am asking

3    about a specific provision of the Code, I'm asking for your

4    understanding of what it means to have  priority status under

5    Section 507(a).

6           So if you're able to answer that question, please go

7    ahead.

8    A      Yeah.  Let me just explain what the priority amount

9    reflects.

10   Q      Sure.

11   A      And then I think that'll answer your question.

12          So the way the schedule was created was based on our

13   understanding that customers have a priority claim up to a

14   certain amount, per the Bankruptcy Code, and that amount is

15   $3,800, and you can see that in a couple of the cells on the

16   right.

17          If a customer were to have a deposit of say $4,600,

18   then they would have a priority claim for the first 3,800 and

19   they would have an unsecured claim for the remaining $800.

20   So anything above 3,800 becomes an unsecured claim.

21          That's my understanding of how this schedule was

22   created.

23   Q      Okay.  Thank you for that explanation.

24   A      Sure.

25              MS. DAVIS JONES:  And this is Laura Jones.

1    I'm going to just reserve on that priority amount.

2  I actually thought that number was a little lower.  But

3  whatever it is, it is.  He has explained though -- Mr. -- I'm

4  sorry.  Our CRO has explained what his understanding of that

5  schedule is.

6        MR. BATES:  Thank you, Ms. Davis Jones.

7        And, you know, we read the paragraph where the

8  debtor reserved rights to make their amendments.  They're

9  certainly entitled to do so.  If you do expect to amend that

10  or if you do believe that's -- that number is incorrect, we

11  would ask you to amend it to reflect the correct number.

12        MS. DAVIS JONES:  Understood.

13  BY MR. BATES:

14  Q    And just for purposes of today's meeting though,

15  Mr. Morando, the bottom line figure under the priority amount

16  column is $50,569,832.22, is that right?

17  A    Yes, at the time of the filing.  That's correct.

18        MR. BATES:  Okay.  And, again, for purposes of

19  today's meeting, this is what we've got in front of us,

20  understanding that the debtors may seek to amend this later.

21  BY MR. BATES:

22  Q    But my understanding then is that the sort of delta

23  between the total customer deposits and the amount of those

24  customer deposits in the aggregate that are entitled to the

25  priority treatment that you just described is about $7

1  million?  A little bit more than that, right?

2  A    Yes.

3  Q    Okay.

4  A    That are treated to the -- I guess as unsecured claims,

5  as I said.

6  Q    Right.  The -- that would fall into that nonpriority

7  unsecured bucket you were talking about, correct?

8  A    Correct.

9  Q    Okay.  Thank you for that clarification.

10      I'm going to pull up the American -- what appears to be

11  the American Signature website, look to that in a second.

12  A    Um-hum.

13  Q    So this is the website located at

14  shopvcf.com/whatsnext.  Do you see that?

15  A    I do.

16  Q    And at the very top of this landing page, we see two

17  logos.  One  is for Value City Furniture.  One is for

18  American Signature Furniture.  Can you see that?

19  A    I do.

20  Q    And we've got this big splash graphic in the middle of

21  the landing page that says Going Out of Business, Everything

22  Must Go, so on.  Do you see that?

23  A    Correct.  I do.

24  Q    To the best of your knowledge, is this the debtors'

25  public-facing website?

1  A     Correct.  At the end of December, our fully functioning

2  website was removed and replaced with this landing page,

3  which will direct customers to respective stores and to make

4  sure that it's clear that liquidations have begun at all

5  locations effective today.

6  Q     And you can access this website from the claims agent

7  or Chapter 11 case website that's hosted by Verita, correct?

8  A     Correct.

9  Q     Okay.  I'm going to scroll down here.  You should see a

10 header that says "Closing Sales Now Underway at All American

11 Signature Furniture and Value City Furniture Locations."  Do

12 you see that?

13 A     I do.

14 Q     Just under that, it says, "In November 2025, American

15 Signature, Inc. began a court-supervised process to

16 facilitate a sale.  As a result of this process, American

17 Signature, Inc. is winding down operations and closing all

18 remaining American Signature Furniture and Value City

19 Furniture locations.  Closing sales will continue while

20 inventory lasts."

21       Did I read that correctly?

22 A     Yes.

23 Q     I beg your pardon, sir.  I'm going to scroll down here.

24 There's another header that says "Frequently Asked

25 Questions."  Do you see that?

1  A      I do.

2  Q      I keep asking you if you see this.  Is this zoomed in

3  enough for you, sir?

4  A      Yep, it's fine.

5  Q      Okay.

6  A      I'll let you know if I can't see it.

7  Q      Okay.  Thank you.

8  A      Thank you.

9  Q      And we've got -- one of the FAQs here, this says, "I

10 placed a deposit on a product.  Will my order be fulfilled

11 and delivered as expected?"

12        And the response to that FAQ is, "We are doing our best

13 to fulfill customer orders for products that are currently in

14 stock."

15        Did I read all of that correctly?

16 A      You did.

17 Q      And my understanding was that -- of your testimony was

18 that the debtors think that they're going to be able to

19 fulfil some, but not all, of these orders for which they

20 received customer deposits, is that correct?

21 A      Correct.  We are no longer receiving new inventory and

22 that -- it will impact our ability to fulfill all orders.

23 Q      Can I just ask on that point, and I don't know if this

24 affects anything.  With respect to the going-out-of-business

25 sale, store closing sales, my understanding was that the

1  liquidator, or whatever entity may end up holding the rights

2  to liquidate or conduct a liquidation sale, is going to bring

3  in new inventory.  Is that understanding correct?

4  A    Yeah.  What you're referring to is what, you know, we

5  call augment inventory.

6  Q    Yes.

7  A    And that is correct.  They do have the ability to bring

8  in new inventory.  That new inventory is designed to drive

9  traffic into the stores, not necessarily to fulfill existing

10  orders.

11  Q    Okay.  I think you just answered my next question but I

12  just want to be clear on this point.  That means that, as you

13  sit here today, your understanding is that the

14  debtors/liquidators are not going to be using that augment to

15  bring in new inventory to fulfill any preexisting orders for

16  which the debtors may have received a deposit, is that right?

17  A    To the best of my knowledge, that's correct.

18  Q    Okay.  Thank you for that clarification.

19       If you go down here, there's a further response to this

20  FAQ that says, "If we are unable to fulfill an order that a

21  customer placed a deposit for, they may be able to file a

22  claim.  Additional information on how to file a claim is

23  available at..." and then it's got the URL for the Chapter 11

24  case website, correct?

25  A    Correct.

1  Q     Okay.  All right.  A little lower down the page,

2  there's another FAQ that says, "Can I get a refund on my

3  deposit if my item is no longer available?"  Did I read that

4  right?

5  A     Correct.

6  Q     Okay.  First response under this is, "We are not

7  offering refunds at the time."  Do you see that?

8  A     Yes.

9  Q     And then I think it has, if not verbatim, very similar

10 language about, you know, if we're not able to fulfill your

11 order, you may be able to file a claim, right?

12 A     Yes, correct.

13 Q     And when it says file a claim, can I just clarify?  The

14 debtors mean they can -- that these creditors, that -- the

15 customer deposit creditors can file a -- what's called a

16 proof of claim in the Chapter 11 case, right?

17 A     Correct.

18 Q     And the idea here is that they would file a proof of

19 claim for the amount of the -- whatever they believed to be

20 the correct amount of their deposit, right?

21 A     That's right.

22 Q     Okay.  I don't even know where I'm at now.  Okay.

23 There we go.

24       Is the debtors' position that -- to the best of your

25 understanding, is the debtors' position that customer

1  deposits are property of their bankruptcy estate?

2          MS. DAVIS JONES:  This is Laura Jones.

3          That's a legal question and I don't think

4  Mr. Morando can answer that.

5          MR. BATES:  I'm just asking for his understanding.

6          THE WITNESS:  I don't know.

7  BY MR. BATES:

8  Q    We went over the Amended Schedule A/B that was filed

9  here.  I'm going to jump back to that for just a second.

10         The debtors had received -- let me just be clear on

11 this point.  The $57 million reflected in that attachment to

12 the E/F, that's money the debtors had already received,

13 correct?

14 A    Correct.

15 Q    Are those funds, or what may be remaining of those

16 funds, reflected anywhere in the Schedule A/B?

17 A    Can you make it a little bit bigger?

18 Q    Sure.  And it might not be here.  I mean it could be

19 somewhere else.  I will defer to you as the person who

20 reviewed and signed these.  And I --

21         MS. DAVIS JONES:  Mr. Morando --

22         THE WITNESS:  It's not listed here.

23 BY MR. BATES:

24 Q    Okay.  Do you know whether it's listed anywhere in

25 ASI's Schedule A/B?

1    MS. DAVIS JONES:  Mr. Morando, I'm going to ask

2   you to answer that if you know.  It's not really a quiz on

3   SOFAs and schedules.

4    MS. BATES:  I understand, Ms. Davis Jones.  I'm

5   just trying to understand if these funds, to the extent they

6   are property of the estate, where they might be reflected in

7   the A/B.

8    MS. DAVIS JONES:  Understood, and if I can just

9   finish my comment.  I -- what I was going to say is if

10  Mr. Morando cannot find it quickly on here, unless you want

11  him to take the time, I'll be glad to follow up with it and

12  answer where they're reflected, to the extent they were

13  required to be reflected.

14    MR. BATES:  Well, if they're assets of the estate,

15  we would expect them to be in the A/B, certainly.  But why

16  don't we start with Mr. Morando's understanding and if he

17  can't answer, then we can follow up with the debtors offline

18  on this.

19    THE WITNESS:  Yeah.  To the best of my knowledge,

20  they're not listed here.

21  BY MR. BATES:

22  Q    Okay.  Thank you, Mr. Morando.

23    When making the deposits that are reflected in that

24  attachment to the E/F, to the best of your knowledge, did

25  customers enter into any agreements or contracts with the

1   debtors about -- you know, that sort of govern the terms of

2   those customer deposits?

3   A     I don't know the answer to that one.

4           MR. BATES:  Ms. Davis Jones, do you happen to know

5   the answer to that question?

6           MS. DAVIS JONES:  I do not.  I have not been

7   present when furniture has been sold in the store so I do not

8   know what contract is given, but I can surely find that out.

9           MR. BATES:  Okay.  I'll make a note of that and I

10  can send you an email on that once we conclude today.

11          Thank you.

12          MS. DAVIS JONES:  Sure.

13  BY MR. BATES:

14  Q     I believe you answered this question, Mr. Morando, but

15  I want to be crystal-clear on this.  Are the debtors still

16  fulfilling orders related to these customer deposit claims?

17  A     As of today, we're moving to a full liquidation.

18  Q     Does that mean that they've stopped --

19  A     We're still working through that, Mr. Bates.

20  Q     Okay.  So I guess just so I understand, maybe let's

21  start with this.  Before yesterday's hearing -- so I guess

22  before January -- or gosh, that was two days ago.  Time

23  flies.

24          Before January 7, 2026, the debtors were still

25  fulfilling these orders or fulfilling some of these orders,

1 correct?

2 A    That's correct.  The amount that you referenced

3 earlier, the 57 million in customer deposits has been reduced

4 significantly --

5 Q    Um-hum.

6 A    -- since the time of the filing.

7 Q    Do you know roughly how much it's been reduced by?

8 A    I don't know the exact number but more than -- I don't

9 know.  Well more than half.

10 Q    Okay.  I'll add that to the list of things I can follow

11 up on.

12 A    Sure.

13 Q    But to get to the second portion of the question that I

14 think I was leading up to, following the hearing on

15 January 7th -- obviously, the posture of the case has changed

16 a little bit.

17       So are the debtors no longer fulfilling the orders that

18 are captured in that attachment, or is that sort of an open

19 question for the debtors right now?

20 A    We're still working through that, Mr. Bates.

21 Q    Okay.  I think you answered this.  Well, I'm going to

22 get the information about the pre-January 7th stuff, but do

23 the debtors have any sense of what percentage of these orders

24 they will be able to fulfill by the time they've completed

25 their store closing process?

1   A      I'm not in a position to answer that now.

2   Q      Have the debtors undertaken that analysis?

3   A      It's underway.  My understanding is that a significant

4   portion will be satisfied, if not have already been

5   satisfied.

6   Q      Are the debtors still accepting new customer deposits?

7   A      No.

8   Q      Do you know when they stopped accepting customer

9   deposits?

10  A      As soon as -- or shortly after I was appointed CRO we

11  put in a policy where we could only take orders from product

12  that was in stock.  Now, that process wasn't perfect but it

13  was designed to -- you know, the hope was that we would be in

14  a position where we could fulfill all orders taken.

15  Q      That was before the bankruptcy filing, right?  And I

16  apologize if I cut you off there.  Were you -- did you have

17  more to say?

18  A      That's correct.  That is correct.  That was, you know,

19  within a week or so of me being retained as CRO.

20  Q      Okay.  And just because I did talk over you there and

21  for the sake of a clear record, my question was that policy

22  you just described, it went into effect before the Chapter 11

23  filing, right?

24  A      Correct.

25  Q      Thank you, sir.

1      We've been talking a little bit about how the posture

2  of the case changed after a hearing a couple days ago.  Could

3  you say a little bit about that?

4  A      When we filed for bankruptcy back on November 22nd, it

5  was done, you know, while we were very far along in

6  negotiating a stalking horse bid, and that is -- was with a

7  company called ASI Purchaser.

8      When we filed, shortly thereafter, we fully executed

9  that agreement, meaning we had a stalking horse to buy most

10  of the assets of this business and we used that as the basis

11  to run a sales process.

12      We retained an investment banker before the filing,

13  SSG.  SSG went out and targeted over 230 financial

14  institutions, strategic investors, to see if they had an

15  interest in buying this company and the intent was -- the

16  hope was that we would have real interest in this company and

17  an operating business that could move forward after the

18  auction.

19      That did not happen.  There were no bidders that

20  expressed interest at a level that was in excess of the

21  stalking horse bid.  In fact, there was very little interest

22  at all in the business, other than in a subset of leases or

23  some small furniture, fixtures, and equipment.

24      And as a result, earlier this week at the hearing, you

25  know, everyone heard that we would be pivoting to a full

1  store liquidation that would commence today.

2        So earlier this week, I let all employees know of that.

3  We have signage being delivered to stores.  We're working

4  with our liquidation firms.  That process is being led by

5  SB360, but they're also working in conjunction with Gordon

6  Brothers, Hilco.

7        So three of the largest liquidation firms in the

8  country are leading this process for us and that, again,

9  kicked off today.  It will likely run through March.  It will

10  vary by store.  But that is the process that is underway.

11  Q    Okay.  Thank you very much for that explanation.

12  A    Sure.

13  Q    Just last question before we move off this attachment

14  regarding customer deposit claims.  With the understanding in

15  mind about the process you just outlined and whatever may

16  come after that in the Chapter 11 case, do you -- are you

17  able to provide sort of -- just a high-level summary of what

18  the debtors' plan may be for addressing the remaining

19  customer deposit claims in the Chapter 11 cases?

20  A    I think customers that have not had orders fulfilled

21  should plan on submitting a claim, as you outlined earlier,

22  through the company's claim agent, Verita.

23  Q    The debtors have not filed a motion to establish a bar

24  date in the case yet, right?

25              THE WITNESS:  That --

1       MS. DAVIS JONES:  That's correct.

2       THE WITNESS:  That's correct.

3       MR. BATES:  Okay.  Thank you, both.

4  BY MR. BATES:

5  Q    Are -- will the debtors be providing notice to all of

6  the customers whose claims are listed in that attachment with

7  respect to the need to file a proof of claim?

8       MS. DAVIS JONES:  This is Laura Jones.

9       We are -- as you may know, Mr. Bates, we are in

10 active discussions with our Creditors' Committee here, as

11 well as other parties.  So they -- where we are with status

12 of a bar date or an administrative bar date, the Plan and all

13 that is still all under discussion.

14      MR. BATES:  Sure.  And I'm not asking about

15 anything related to a specific bar date or anything like

16 that.  I guess I'm just wondering if the debtors are planning

17 to provide notice to these creditors, all of whose claims are

18 marked as contingent and would, therefore, you know, be

19 subject to a claim objection if they didn't file a proof of

20 claim.

21      MS. DAVIS JONES:  And the decision hasn't been

22 made yet on what we're going to do with respect to a bar

23 date.

24      MR. BATES:  Okay.  Understood.  Okay.

25      (Pause)

1    MR. BATES:  All right.  I'm going to jump to the

2  SOFA-4 attachment.  This is for Debtor ASI, and I'll

3  apologize again.  I think this is -- we just keep getting

4  smaller and smaller with the font here but, you know, it's a

5  Russian nesting doll of font size but -- okay.

6  BY MR. BATES:

7  Q    I'm going to go through a couple questions here and

8  then I'm -- we're coming near the end of my line of

9  questioning here, Mr. Morando, and I appreciate your

10  patience.

11  A    Sure.

12  Q    Okay.  You're going to see a lot of highlighting here

13  that I'm not going to ask any questions about, and just very

14  limited questions.  As I go through, I just want to confirm

15  certain amounts and what they related to.

16    The first is highlighted here.  This is a payment to

17  Eric Duerksen, and I apologize if I'm saying that name wrong.

18  A    It's okay.

19  Q    This is dated 11/21/2025 in the amount of a little --

20  nearly $92,000.

21  A    Um-hum.

22  Q    This is labeled a retention payment.  Do you see that?

23  A    I do.

24  Q    Can you just tell me what that payment relates to?

25  A    Yeah.  Shortly after being retained as CRO, I worked

1  with the management team to develop a list of approximately

2  33 individuals that would be critical for any go-forward

3  process and, you know, as a result of what could be an

4  imminent bankruptcy filing, we wanted to retain those key

5  employees for a period of time.

6         So there are 33 employees that received a retention

7  payment prior to the filing.  The total amount was, you know,

8  I think approximately 1.4, $1.5 million, and was used to

9  retain those 33 individuals for a period of six months.

10 Q     Okay.  So when would that expire?  May of this year or?

11 A     Correct, after the full kind of store liquidation

12 process.

13 Q     As contemplated with the filing?

14 A     Correct.

15 Q     Okay.

16 A     And if -- you know, if I deem that we no longer need

17 those employees, then we can let them go.  They would keep

18 their retention payment but we would not have to pay them for

19 go-forward services.

20        Alternatively, if an employee who received that payment

21 resigns, there's clawback language where they would have to

22 pay back a prorated amount to the estate.

23 Q     Okay.  Did -- that's very helpful.

24        Did they -- did the recipients of these retention

25 payments have to do anything other than remain with the

1  debtors through the six-month term of the agreement?

2  A    They are -- for -- so for seven -- I think it was

3  approximately seven senior executives; they had to forego

4  some deferred compensation that exceeded the amounts of the

5  retention payments.

6       So the -- you know, there were claims that were

7  extinguished as part of this process that were in excess of,

8  you know, the 1.3 or 1.4 million that was paid to these

9  individuals.

10 Q    I think that answers my next question, which is the --

11 that comp wasn't just further delayed?  That's been wiped

12 out?

13 A    Correct.  Totally wiped out.

14 Q    Okay.  If I refer to the program you just outlined as

15 the retention bonus program or if I refer to those payments

16 as, you know, the retention bonuses, will you understand what

17 I'm referring to?

18 A    Yes, I will.

19 Q    Okay.  I think that will streamline this exercise quite

20 a bit.

21 A    Sure.

22 Q    Okay.  There's a payment on this page to George Hunter.

23 Was that part of the retention bonus program?

24 A    Correct.

25 Q    This is not -- this predates the payment in time, but I

1    saw -- let me get to the payment first before I start

2    talking.

3    A      Um-hum.

4    Q      There's a payment here to Jay Schottenstein on March

5    14, 2025, $1,165,656.  This is a bonus payment from SPG to

6    Mr. Schottenstein in his capacity as a former corporate

7    officer.

8           So I'll take this in parts.  SPG, this is Schottenstein

9    Property Group, correct?

10   A      Correct.

11   Q      And the March 14th date, I saw several bonuses that

12   were paid out on this date.  I'm wondering if there was a

13   particular event that triggered these bonuses or this was

14   like a typical year -- mid-year bonus?  You know, did you --

15   do you have an understanding of what this payment was for?

16   A      So this is well before my time.

17   Q      Right.

18   A      But my understanding is these are SPG bonuses that

19   historically have been paid through ASI and reimbursed by

20   SPG.

21          So my understanding is these bonuses; in particular,

22   the one you've highlighted, has already been repaid --

23   Q      Okay.

24   A      -- by them.

25   Q      That answered my next question.

1        But you don't know what it relates to?  It's just an

2  SPG bonus, whatever that may be?

3  A     Correct.

4  Q     Okay.  I understand.

5        I think -- okay.  The John Hughes payment, retention

6  payment on 11/21, was this part of the retention bonus

7  program?

8  A     Yep, correct.  Anything you see coded as that retention

9  payment --

10 Q     Yep.

11 A     -- should be what I described earlier.

12 Q     Okay.  I did have a question here.  This payment to

13 Joseph Schottenstein, this is the only payment to

14 Joseph Schottenstein that's in the SOFA-4 attachment?

15 A     Um-hum.

16 Q     It's dated June 1, 2025.  So, again, this precedes you

17 by several months.  $1,253 paid to him in his capacity as a

18 former corporate officer -- and then I'm just a little bit

19 confused by -- let's start with the memo here.  Do you have

20 any idea what this could refer to?

21 A     So I don't.

22 Q     Okay.

23 A     What I -- this is just me thinking out loud so --

24 Q     And let me stop you there.  I don't want you to -- you

25 are under perjury here so I don't want you to speculate.  If

1   you don't know, that's fine.

2   A     So I don't know what this is for.

3   Q     Okay.  Understood.

4         Do you know when Joseph Schottenstein was an officer of

5   ASI?

6   A     I don't.  I think this predates my involvement.

7   Q     Okay.  And the reason for the question --

8   A     What I do know is he is no longer on the board or a

9   director or an officer of this entity.

10  Q     Okay.  Is -- okay.  You don't know, so it's irrelevant.

11  I can follow up offline on that.

12  A     Yeah, I don't know and it's $1,000 so --

13  Q     I know.  I'm not super concerned about the amount.

14  A     -- I didn't want to spend a lot of time on it.

15  Q     No, I -- yeah, exactly.  I'm more interested in when he

16  was an officer, how long that lasted, what his role was, that

17  sort of thing.

18  A     Yeah.

19  Q     But I can get that information separately.

20  A     I have to follow up and get back to you on that.

21  Q     I appreciate that.  Thank you.

22        Next thing is there are several payments to Jubilee

23  Limited Partnership.  Do you know what that entity is?

24  A     I believe this is another entity that has historically

25  -- you know, holds real estate, provides loan -- and provides

1  capital to ASI.

2  Q    Okay.  And then this payment in particular, it's a

3  little over $3 million.  I'm just wondering if you are

4  familiar with, you know, the loan that this is referencing.

5  A    Not off the top of my head.

6  Q    Okay.

7  A    So, no.

8  Q    That's fine.  If you don't know, I can follow up.

9        Do you know if the Jubilee entity made any other loans

10 during this period to the debtor, and that would be the one

11 year preceding the petition date?

12 A    I don't know.

13 Q    Okay.  There's a payment on this page to

14 Patrick Sanderson.

15 A    Also a retention payment.

16 Q    Thank you for saving me the time.

17       A bunch of payments to SB360 Holdings, the

18 consultant/liquidator/designee.

19 A    Um-hum.

20 Q    Can you just tell me -- I've got one highlighted here.

21 A    Yes.  So these amounts will be for different things.

22 Q    Yes.

23 A    You kind of see the -- so my understanding -- again,

24 this is before my time.

25 Q    Um-hum.

1  A      But my understanding is that SB360 had worked with ASI

2  to secure inventory from one of its key furniture vendors.  I

3  believe it was in Ashley.  And the way that that worked was

4  they money came in, purchased the inventory, and then was --

5  a repayment schedule with some nominal interest rate.

6          My understanding is that was approximately $4 million

7  and has been paid back in full.

8  Q      Okay.

9  A      But the intent with this specific -- this is just

10 simply a repayment -- a partial repayment of that loan to

11 purchase that inventory.

12 Q      Okay.  So SB360 would front the money for that and then

13 get like cost, plus, when it was being --

14 A      That's correct.

15 Q      -- paid back?

16 A      Yeah, that's right.  I mean I haven't reviewed the

17 underlying agreement but that's my understanding.

18 Q      Right.  I won't commit you to the, you know, ordinary

19 course meaning of those terms but just speaking, you know,

20 casually --

21 A      Yes.

22 Q      -- to the fact -- okay.

23 A      That's the nature of the payment.

24 Q      Understood.  The coding itself is not super helpful to

25 me so I'm wondering if you know what MD is.

1  A      No, but I can find out and get back to you.

2  Q      Okay.  That -- my --

3  A      It just -- I think it just was like a merchandise

4  payment.  MD is just merchandise.

5  Q      Okay.

6  A      If that's helpful, so.

7  Q      And then we -- if we look down here -- I don't know if

8  you're able to read what I've got highlighted here, but there

9  -- there's coding for loan payment and --

10 A      Can you make it a little bit bigger?

11 Q      Yeah.  Coding is for loan payment, FC, EX, and MD.  To

12 the extent you're able to tell me what any of those things

13 are.

14 A      So I'll get you the breakdown of -- MD is merchandise.

15 FC is like a foreign payment.

16 Q      Um-hum.

17 A      Loan payment is loan payment.

18 Q      Yeah.

19 A      EX is expenses.  I think they're for slightly different

20 things.

21 Q      Okay.  All right.  I will follow up on that.

22 A      Like expenses, as an example, would be liquidator fees.

23 Q      Okay.  For the I guess first or second wave of

24 prepetition store closing sales?

25 A      Correct.  And you'll see -- you know, if you look at

1  the last two rows of the SB Holdings --

2  Q      Yeah.

3  A      -- even though they're not highlighted, but you'll see

4  that those are also labeled as X.

5  Q      Right.

6  A      125,000 was the retainer payment.  800,000 was the

7  payment for going-out-of-business signage.

8  Q      Yeah, I understood that to be what was captured in the

9  November amendment to the consulting agreement.

10 A      Right.  Yeah, right.

11 Q      That -- those ones, I have some background on, not the

12 other ones.  Okay.  All right.  I'm going to jump a few pages

13 ahead here.

14        So this dovetails with my questions about the Schedule

15 E/F.  There are a couple payments here to -- this is to SEI,

16 Inc. and they're all labeled loan payment.

17        To the best of your knowledge, are these all sort of

18 part of the same structure that we were discussing earlier

19 with respect to those unsecured notes that SEI made to the

20 debtors prepetition?

21 A      Well, yeah.  This is the repayment of those, correct.

22 Q      Yeah, right.  And so --

23 A      Partial repayment.

24 Q      And sorry to cut you off.  So what's in the F -- E/F

25 now is what remains outstanding after these payments have

1  been made?

2  A      Correct.

3  Q      Okay.  Steven Rabe, was he also a participant in the

4  retention bonus program?

5  A      Correct.

6  Q      Okay.  Mr. Morando, the other debtors also filed

7  Schedules of Assets and Liabilities and Statements of

8  Financial Affairs, right?

9  A      Yes.

10  Q      And you signed all of those?

11  A      Yes.

12  Q      As a representative example, here are the Schedules and

13  Assets of Liabilities for Debtor ASI Elston, LLC, Case Number

14  25-12100.  Can you see that okay?

15  A      Yes, I can.

16           MR. BATES:  I'm just going to scroll down to the

17  summary of assets and liabilities here.

18           Just for the benefit of the creditors, sort of a

19  cover page for what they're about to read in the Schedules of

20  Assets and Liabilities.

21  BY MR. BATES:

22  Q      Can you see that all of the boxes here say zero dollars

23  and zero cents?

24  A      Yes.

25  Q      Does that mean that this particular debtor, to the best

1  of your knowledge, information, and belief has no assets and

2  no liabilities?

3  A    Yeah.  As I alluded to earlier, most of the debtors,

4  with the exception of ASI, are holding companies.  This one,

5  in particular, holds one ground lease.

6  Q    Um-hum.

7  A    And there's no financial activity as a result of it.

8  Q    Thank you for that.

9       And so can you -- can we just sort of add this point in

10 your testimony?  Can you just say a little bit more about

11 that structure, who the subsidiary debtors are, what -- how

12 they kind of factor into the overall enterprise and, you

13 know, why everything is concentrated in ASI the way it is in

14 these schedules and SOFAs?

15 A    Yeah.  So I was not the originator of this structure.

16 What I can tell you is we have nine debtors as part of this

17 bankruptcy.  The only one that has any operating activity

18 where all of the money flows in and out of is American

19 Signature, Inc.

20      The other eight entities are holding companies that

21 were created for a variety of different reasons.

22      So I just walked you through Elston.  Elston was a

23 ground lease for one specific location that we have.  That's

24 true of LaPorte.  LaPorte is another one of our locations.

25 This LLC was created specifically for that entity.

1    There's another ASI, POLARIS, I believe, that at one

2  point, the company held stock in a business called Lovesac

3  that has since been, you know, liquidated.  It was some time

4  ago.  It has no operating basis, but that was the nature of

5  it.

6    Pure Promise is the company's warranty provider.  So

7  think of that as, you know, of an entity created for, you

8  know, insurance for that warranty business.

9    That's really the nature of kind of these debtors.

10  Again, the only one that has operating activity, to the best

11  of my knowledge, is American Signature, Inc.

12  Q    And so that's why they were, you know, what I would

13  characterize as extremely fulsome disclosures in the

14  schedules and SOFA filed by ASI and why maybe there isn't as

15  much information in these other schedules and SOFAs?

16  A    Correct.

17  Q    Okay.  I appreciate the explanation.

18  A    Sure.

19    MR. BATES:  That is all I've got for purposes of

20  today on the debtor's schedules and SOFAs.  I've flagged a

21  couple issues that I'm going to following up with you and

22  Ms. Davis Jones and perhaps the other debtor professionals

23  about offline.

24    But I will end my questioning there for purposes

25  of today's meeting.

1           In a moment, I'm going to open the floor, and I

2   ought to not put my question outline right there.

3           THE WITNESS:  Mr. Bates, is it possible to take a

4   one-minute bio-break, or is that not allowed?

5           MR. BATES:  You know, I'm done.  There's no

6   question pending so maybe -- and I'm seeing some hands go up

7   here.  Maybe it is best if you'd like to take five minutes.

8   Would that be enough time, sir?

9           THE WITNESS:  Yeah.  All I need is one minute and

10  I'll be right back.

11          MR. BATES:  Okay.  Excellent.

12          At this time, we're going to take a -- we'll call

13  it one to five-minute break and then I'm going to resume the

14  meeting and then we'll let creditors start taking questions

15  after I lay down some ground rules.  Okay?

16          MS. DAVIS JONES:  Thank you.

17      (Recess taken)

18      (Proceedings resumed)

19          MR. BATES:  Okay.  Mr. Morando, are you there?

20      (No verbal response)

21          MR. BATES:  Oh, you know what, let me -- I'll do

22  that.

23          MS. DAVIS JONES:  Can you hear me?

24          MR. BATES:  I can hear you, Ms. Davis Jones.

25          Is Mr. Morando there?  I believe he is.

1          MS. DAVIS JONES:  I don't know.  I can -- I do not

2    see him on the screen.

3          MR. BATES:  I have to search him.  Hold on.

4          MS. DAVIS JONES:  Yeah, I know that if I put my

5    phone on mute, it would -- then you were constantly on mute.

6    You couldn't get back on.

7          MR. BATES:  Okay.

8          MS. DAVIS JONES:  So that's why I stayed live

9    here, despite being in a hallway.

10          MR. BATES:  Oh, I know what it is.  Hold on one

11    second.  Okay.

12          Mr. Morando, you should be able to unmute now.

13          THE WITNESS:  I'm here.

14          MR. BATES:  We got there eventually, sir.

15          THE WITNESS:  We did.

16          MR. BATES:  Okay.  All right.  I'm about to open

17    the line to creditors.  I'm going to sort of march down the

18    hands as I see them here.

19          Before I do that, I just want to remind creditors

20    that the debtors can't provide legal advice to anybody on the

21    line and, also, that the debtors may not be able to address

22    questions about individual claims in these cases.

23          As you saw when I was conducting my examination,

24    there's over 36,000 customer deposit claims alone.  We

25    couldn't possibly sit here and address all 36,000 of those

1  today, as much as I would like to give the creditors a full

2  opportunity to question the witness.

3          So I'm going to start allowing creditors to

4  question as they would like, subject to my right to continue

5  the meeting to a later date to facilitate further

6  questioning, as necessary, and, you know, out of respect for

7  the witness's schedule and to enable us to sort of proceed as

8  in a streamlined a fashion as possible.

9          So please bear those issues in mind as you're

10  questioning.

11          With that, we're going to start with Mr. Ataviano.

12          MS. DAVIS JONES:  Mr. Bates, I was going to --

13  just one thing up front, if I may?

14          MR. BATES:  Please.

15          MS. DAVIS JONES:  It might be helpful.

16          I know a number of people have emailed me -- this

17  is Laura Davis Jones, and have gotten responses that way.  A

18  number of people have called and we're getting back to those.

19  You know, it's hundreds and hundreds of calls, obviously, and

20  we're working through them to get back.

21          So I'll -- I think what I'll do right now, if it's

22  okay with you, Mr. Bates, is I will give people my email

23  address again --

24          MR. BATES:  Um-hum.

25          MS. DAVIS JONES:  -- so that they can send their

1  question in writing.  They'll at least have a record that

2  they sent a question and we can try to get back to them or

3  they could follow up if they haven't heard from us, you know,

4  within a day or two.

5          That email is L-J-O-N-E-S@P, as in Paul, S, as in

6  Sam, Z, as in Zebra, J, as in Jones, L-A-W.com.  And what I

7  do with that information -- much of it is -- I'm just going

8  to have to tell people to file a claim.  But some people have

9  written to us and said they weren't sure if their claim was

10 accepted by the claims agent and I was able to give them an

11 email address to help them get that confirmed.

12         Some were not sure what the timing of things were

13 and so forth so, hopefully, that maybe cuts down some of the

14 questions people have.

15         MR. BATES:  Thank you, Ms. Davis Jones.

16         I'm going to send you a message in just a moment,

17 but I do appreciate you providing that information.

18         Would you all just give me one second?

19     (Pause)

20         MR. BATES:  Okay.  If you're able to access the

21 chat for Zoom, I'm going to put the link to the case website.

22 If you've not already found the case website, you can

23 navigate there to view every single document that's been

24 filed in these cases absolutely free.

25         You can also file a proof of claim using this

1    website.  Again, absolutely free of charge.  You can view the

2    schedules and statements there, as well as the petitions.

3            So I would encourage everyone to use that link, to

4    the extent they have questions about specific claims and then

5    follow up with debtors' counsel as they see fit.

6            And with that, I am going to start allowing

7    creditors to question the witness, subject to my earlier

8    caveats and, first, I'll unmute Mr. Ataviano.

9            MR. ATAVIANO:  Yes, hi.  So as I was saying

10   before, yes, I was a former employee.  Well, as of recently,

11   I was the employee at the 4220 Maple Road location in

12   Amherst.

13           So I worked until the final day and I did sign

14   something like when I first heard about the going-out-of-

15   business that we were entitled to.  Like employees were

16   entitled to like a $300 bonus check and I was told that by

17   people that worked in the building that it was supposed to be

18   baked into our paycheck -- next paycheck but I never received

19   an extra -- the extra $300 bonus or I don't know if there's

20   like any other like thing on top of the $300 bonus due to the

21   -- what's going on with the bankruptcy.

22           I just wanted to inquire about that.

23           THE WITNESS:  So I think what you're referring to,

24   Mr. Ataviano, is the retention payments to store employees as

25   a result of an employee staying through their duration of

1 their store's liquidation, is that correct?

2            MR. ATAVIANO:  Yes, I believe so.  I worked up

3 until the final day of my store's operation.

4            THE WITNESS:  Okay.  I mean what I would ask you

5 to do -- I don't know about your specific claim, but what I

6 would ask you to do is to email Mrs. Jones, as she outlined

7 earlier --

8            MR. ATAVIANO:  Um-hum.

9            THE WITNESS:  -- and we can work internally to

10 track down your last day of employment and the requirements

11 of earning that retention payment and --

12            MR. ATAVIANO:  Okay.

13            THE WITNESS:  -- if it's payable, then we're happy

14 to work to get that resolved.

15            MR. ATAVIANO:  Okay, cool.  May I have the email

16 address again one more time, please?

17            MS. DAVIS JONES:  Laura.  It's L --

18            MR. ATAVIANO:  Um-hum.

19            MS. DAVIS JONES:  -- J, J-O-N-E-S --

20            MR. ATAVIANO:  J -- so L-J-O-N-E-S --

21            MS. DAVIS JONES:  -- @ --

22            MR. ATAVIANO:  -- @ --

23            MS. DAVIS JONES:  -- P, as in Paul --

24            MR. ATAVIANO:  Um-hum.

25            MS. DAVIS JONES:  -- S, as in Sam --

1          MR. ATAVIANO:  Um-hum.

2          MS. DAVIS JONES:  -- Z, as in Zebra --

3          MR. ATAVIANO:  Um-hum.

4          MS. DAVIS JONES:  -- J, as in Jones --

5          MR. ATAVIANO:  Um-hum.

6          MS. DAVIS JONES:  -- L-A-W.

7          MR. ATAVIANO:  L-A-W, you said?

8          MS. DAVIS JONES:  Yes.

9          MR. ATAVIANO:  Um-hum.

10          MS. DAVIS JONES:  Dot com.

11          MR. ATAVIANO:  W.com.  Okay.  All right.  I will

12   email about that.

13          Thank you.  I appreciate it.

14          MS. DAVIS JONES:  Absolutely.

15          MR. BATES:  Thank you, Mr. Ataviano.

16          Okay.  I just want to reiterate one more time that

17   if you do have questions about a specific claim, it would

18   probably be most beneficial for you to follow up with the

19   debtors' professionals directly.

20          But with that, I will unmute the next person with

21   their hand raised, who is Alex.

22          Go ahead.

23          UNIDENTIFIED SPEAKER:  Hello.  So I have a couple

24   of quick questions.

25          So I did file a claim through this Verita Global

1   and so what would be the next step?  Like is there any other

2   type of contact information that I need, besides this email

3   address for the attorney?

4          MS. DAVIS JONES:  This is Laura Jones.

5          No.  I mean, frankly, all you needed to do was get

6   that claim on file.  Now what will happen, as Mr. Bates was

7   talking about earlier, there's a sale hearing coming up in

8   February.  Then issues have to be sorted out, figure out

9   where the case is going, and so forth, and then you'll get

10  further notice.

11         So if you've gotten your claim on file, that's the

12  step you needed to take at this point and, in fact, somebody

13  asked earlier about -- I think it was Mr. Bates asked about

14  has there been a deadline for setting claims, what's called a

15  bar date, and the answer to that is no.

16         But even though I don't represent any of you, I

17  always encourage folks to just file your proof of claim while

18  you think about it so that it doesn't fall through the

19  cracks.  So you did the right thing filing your claim.

20         MR. BATESS:  I'll thank Ms. Davis Jones for that

21  explanation, which is I think extremely helpful, and just add

22  on to it that, as I mentioned before, neither myself nor

23  Ms. Davis Jones can provide anybody here legal counsel about

24  this case.

25         So to the extent you need legal advice, the only

1   thing that we can advise you is to speak to competent

2   bankruptcy counsel.  But I do appreciate her response to that

3   question.

4           Did you have anything else, sir?

5           UNIDENTIFIED SPEAKER:  I think she pretty much

6   answered it all.

7           MR. BATES:  Thank you very much.

8           Okay.  Next is -- and I'm going to have a standing

9   apology here to everyone for mispronouncing any of your

10  names.  This is Ed Sensabaugh (phonetic).

11          MR. SENSABAUGH:  Hey, yes.  Thank you.  And you

12  pronounce it great.

13          MR. BATES:  Excellent.

14          MR. SENSABAUGH:  I purchased a couch set for

15  $6,896 and some cents on the -- October 25th.  I got the

16  thing saying they filed Chapter 11.

17          My question was there's a priority claim amount

18  and then that is secured and then there's the unsecured.  I'm

19  worried that I'm not going to get -- I haven't received any

20  of the furniture.  I paid it right when I went into the

21  store.  I paid the 6,000 in advance and they said we'll ship

22  the stuff and then they filed Chapter -- can I expect to get

23  all my money back or just maybe the secured and not

24  unsecured?  I don't know.

25          MS. DAVIS JONES:  This is Laura Davis Jones.

1          Unfortunately, way too early to know.  And I think

2   what Mr. Bates said earlier about the priority claims, that's

3   not a secured claim.  It just means it's an unsecured claim

4   that comes ahead of other plain unsecured claim.

5          But as he said, you know, you could talk to

6   counsel about that.  But file your proof of claim, but way

7   too early for us to be able to tell what the return is going

8   to be on priority unsecured claims or general unsecured

9   claims.

10          MR. BATES:  Does that answer your question, sir?

11          MR. SENSABAUGH:  Yeah, I guess.  I'll have -- I'll

12   go through the filing a claim and see what I get.

13          MR. BATES:  Thank you, sir.

14          I would, again, thank Ms. Davis Jones for that

15   explanation and just add that, to the extent your question

16   is, you know, when am I going to get paid on my claim, I

17   completely agree with Ms. Davis Jones that it's far too early

18   in the case to tell when and in what amount you may be able

19   to recover on your claim in this case.

20          So no one will be able to answer that question for

21   you today, unfortunately.  We understand that that's not

22   necessarily the most helpful response but, unfortunately,

23   that's the reality of the Chapter 11 case.

24          I'm going to move to the next creditor with their

25   hand raised.  This is Donna Evers-Southard.

1        MS. EVERS-SOUTHARD:  Hello.  So how is the

2   priority amount determined?  Is that something set by the

3   Bankruptcy Courts in certain cases or --

4        MS. DAVIS JONES:  No, it is a -- it is an amount

5   that is set forth in the Bankruptcy Code.

6        MS. EVERS-SOUTHARD:  Okay.

7        MS. DAVIS JONES:  It's statutory.  It's a Federal

8   Code statute.

9        MS. EVERS-SOUTHARD:  Okay.  And then just as a

10  sidebar to Mr. Morando, you were engaged on November 7th and

11  I bought my furniture cash November 14th, so that notice did

12  not go out -- it went out over a week after you had -- were

13  engaged.

14       And then also to Ed, you can also file a claim

15  with your bank, which I did, and they have sent me my money

16  back, pending on what's going on here.

17       So thank you.

18       MR. BATES:  Okay.  Next is John Knapp.  Go ahead,

19  sir.

20       MR. KNAPP:  Hi.  My name is John Knapp and I'm an

21  attorney from PeopleReady, Inc., which provides temporary

22  staffing services, and I just had some questions relating to

23  payments for that, and the first one has to do with one of

24  the First Day Orders, which is a Wage Order that was entered

25  recently on a final basis and has a $95,000 line item for a

1  supplemental workforce compensation.

2          Mr. Morando, I wondered if you knew whether

3  PeopleReady was going to be paid on its prepetition claim out

4  of that supplemental workforce compensation authorization.

5          THE WITNESS:  Mr. Knapp, I don't know about your

6  specific claim but happy to research it with counsel and get

7  back to you.

8          MR. KNAPP:  Okay.  I guess my follow-up question

9  is I -- PeopleReady has been continuing to provide temporary

10 staffing services during the bankruptcy and just wondered if

11 you knew anything about the status of payment on those claims

12 as they're invoiced, you know, during the bankruptcy, and it

13 sounds like it's probably something you'd have to look into

14 as well.

15          THE WITNESS:  That's correct.

16          MR. KNAPP:  Okay.  And just now that it's in a

17 liquidation phase -- and I understand PeopleReady is

18 continuing to be asked to provide the temporary staffing

19 services.

20          Should they have any concern about whether it's

21 going to get paid for providing those services during this

22 liquidation period or just do you feel confident that, you

23 know, suppliers of services like this should, you know, keep

24 on keeping on and they'll be taken care of?

25          THE WITNESS:  Okay.  Our intent is to pay for

1  services received after filing for bankruptcy.  There's no

2  guarantee, but that is our intent.

3           MR. KNAPP:  Um-hum.  Okay.  Well, thanks for

4  answering those questions.  I really appreciate it.

5           THE WITNESS:  Of course.

6           MR. BATES:  Thank you, sir.

7           And, again, starting to sound like a broken record

8  and I apologize for that, but it's very unlikely that the

9  debtors will be able to address questions about specific

10 claims on this call today.  I just wanted to make that clear.

11          Next will be Kayla Marshall.

12          MS. MARSHALL:  Hi.  Good afternoon.

13          This is a general question as to exchanges.  I

14 understand that they are trying to get the products out for

15 any in-stock items.

16          We're -- we have an exchange and that product is

17 in-store but I guess based on the stay, that's -- that was in

18 place due to the bankruptcy.  They weren't able to get the

19 product out to us.

20          So, specifically, with exchange -- exchanges, how

21 is that working?  Are they now able to ship the product to

22 us?

23          THE WITNESS:  Exchanges are no longer allowed

24 within the stay, Ms. Marshall, so I would encourage you to

25 file a claim using the Verita website.

1              MS. MARSHALL:  Okay.  I filed a claim so you're

2    just -- so at this point, we won't be receiving that product,

3    even though they have it in stock?

4              THE WITNESS:  Correct.  There are no exchanges

5    taking place at this time.

6              MS. MARSHALL:  Even though the exchange has

7    already been processed?  They were to deliver it last week

8    and then there's a stay on the case so we weren't able to

9    receive the product.  They're still not able to ship it out

10   to us?

11             THE WITNESS:  So, Ms. Marshall, what I'd ask you

12   to do is email counsel with the details of your specific

13   claim and we can look into it.

14             MS. MARSHALL:  Okay.  Thank you.

15             THE WITNESS:  Of course.

16             MR. BATES:  Thank you, Ms. Marshall.

17             Next will be Arlene Robinson.

18             MS. ROBINSON:  Hi.  I just have a clarification

19   question.

20             MR. BATES:  Sure.

21             MS. ROBINSON:  You had stated -- I think it's

22   Mr. Rudy, that deposits were not taken if they didn't have

23   the items in stock, right?

24             THE WITNESS:  Yeah.  The -- what I said was as

25   soon as I was appointed, or shortly after being appointed as

1  CRO, we asked the company to put a policy in place that an

2  order would not be taken unless we had the product in stock.

3  It doesn't mean that a deposit wouldn't be taken.  It means

4  that an order would not be taken.

5          The intent was to make sure it would have put us

6  in the best position possible to fulfill orders that were

7  received after -- you know, after I was appointed CRO.

8          MS. ROBINSON:  Okay.  So an order was not taken.

9  So, basically, if you did not have the furniture in stock,

10 they would not take that order, right?

11          THE WITNESS:  Correct.

12          MS. ROBINSON:  Okay.  All right.  Thank you.

13          THE WITNESS:  Um-hum.

14          MR. BATES:  Thank you, ma'am.

15          Next will be iPhone.

16          THE WITNESS:  iPhone 1 or iPhone --

17          MR. BATES:  I'm not sure.  They've been requested

18 to unmute.  So, iPhone, if you are ready to go, you are up to

19 bat.

20      (No verbal response)

21          MR. BATES:  All right.  Hearing nothing, I think

22 we're going to --

23          UNIDENTIFIED SPEAKER:  I'm sorry.

24          MR. BATES:  Oh, there you go.

25          UNIDENTIFIED SPEAKER:  I just wanted to know -- I

 1  got the letter.  I had ordered a bedroom set and they kept

 2  saying that they had to get a nightstand from out of the

 3  country because they didn't have any here.

 4          Make a long story short, I did not want any of the

 5  other merchandise because it didn't have the matching

 6  nightstand.  Now, is -- do I put a claim on that -- or I

 7  guess I'm not really understanding why I got this letter, to

 8  be honest.

 9          I got a bedroom set.  I have it.  I have the card.

10  They sent me a letter stating that I can no longer use that

11  card anywhere so -- yeah.

12          MR. BATES:  When you say a card, ma'am -- and this

13  is Malcolm Bates.

14          When you say a card, ma'am, do you mean a gift

15  card?

16          UNIDENTIFIED SPEAKER:  No, sweetheart.  It's the

17  signature card.

18          MR. BATES:  Understood.  I'll --

19          UNIDENTIFIED SPEAKER:  The Value City card.

20          MR. BATES:  Okay.  I'll let the debtor and

21  professionals address that.

22          Thank you.

23          UNIDENTIFIED SPEAKER:  Um-hum.

24          MS. DAVIS JONES:  This is Laura Davis Jones.

25          The only thing I was going to say is if the

1  company still owes you money or you still have a claim

2  against the company, then you should file a proof of claim.

3           You were given the notice because at one point you

4  had bought furniture or you had been involved, you know,

5  either as an employee or a vendor or a customer, or what have

6  you --

7           UNIDENTIFIED SPEAKER:  Customer.

8           MS. DAVIS JONES:  -- of ASI or Value City.

9           So if the -- of the nine debtors Mr. Morando

10  talked about that are listed on that notice, if any of them

11  you have a claim against, you should file a proof of claim.

12           If you do not have a claim against them, then it's

13  just to give you notice that they filed.

14           UNIDENTIFIED SPEAKER:  Okay.  Now, how does that

15  work?  I have merchandise.  Am I -- do I have to pay the

16  whole balance because they're in bankruptcy, or how does that

17  work?  Are they expecting the full amount now or do I still

18  get to pay it over time with the agreement that we had in the

19  beginning?

20           THE WITNESS:  Are you -- just so I understand --

21           UNIDENTIFIED SPEAKER:  The credit card.  Like

22  I've --

23           THE WITNESS:  You're referring -- are you

24  referring to a company-branded credit card that you used to

25  purchase --

1    UNIDENTIFIED SPEAKER:  Yes.

2    THE WITNESS:  -- the furniture?

3    UNIDENTIFIED SPEAKER:  Um-hum.

4    THE WITNESS:  You have the furniture.  You are now

5  asking do I need to make the payments on the credit card?

6    UNIDENTIFIED SPEAKER:  Do I have to pay the whole

7  payment now because they're in bankruptcy or do I still get

8  to pay it on long-term as the agreement was --

9    THE WITNESS:  You --

10    UNIDENTIFIED SPEAKER:  -- that I signed?

11    THE WITNESS:  You continue to make payments based

12  on the agreement you signed.  I believe that question is

13  answered --

14    UNIDENTIFIED SPEAKER:  Okay.

15    THE WITNESS:  -- on the company's website but --

16    UNIDENTIFIED SPEAKER:  Okay.

17    THE WITNESS:  -- if you have specific follow-up

18  questions, again, just email our counsel and, you know, we're

19  happy to work through it.

20    UNIDENTIFIED SPEAKER:  Okay.  Appreciate you.

21    Thank you.

22    THE WITNESS:  Sure.

23    (Pause)

24    MR. BATES:  Okay.  I believe next would be

25  J.  Rowe (phonetic).

1          MS. ROWE:  Hi, there.

2          My question is Mrs. Jones said earlier that she

3   had an email that we could use to find out if our claim was

4   accepted, so I believe I've filed my claim but I was trying

5   to verify that it had been received.

6          MR. BATES:  Yeah.  Ms. Rowe, I just sent that to

7   you -- the email address to you directly.

8          I'll leave it to Ms. Davis Jones to answer whether

9   she's confirming if individual creditors' claims have been

10  accepted.

11         MS. DAVIS JONES:  No, I think what Mr. Bates just

12  sent you is perfect.  That's the entity that would confirm

13  that they've received it.

14         MS. ROWE:  Okay.  So I could email you and you'll

15  be able to send me somewhere to confirm that my claim --

16         MS. DAVIS JONES:  You'll be -- no.  Mr. Bates just

17  -- Mr. Bates, where did you put this, in the chat room?

18         MR. BATES:  I had received a message from Ms. Rowe

19  directly and, Ms. Rowe --

20         MS. ROWE:  Yes.

21         MR. BATES:  -- I just sent you a link to the

22  submit an inquiry page on the case website --

23         MS. ROWE:  Yes.

24         MR. BATES:  -- which is where you should be able

25  to submit this question.

1          MS. ROWE:  Yes.

2          MR. BATES:  Does that answer your question, ma'am?

3          MS. ROWE:  Okay.  I just wanted -- yeah, that's

4  fine.  I'll go there and check and I'll email her if I need

5  to.

6          Thank you.

7          MR. BATES:  Thank you very much.

8          I believe this is iPhone 2.

9          MR. BULLOCK:  Hello.  Can you hear me?

10          MR. BATES:  Yes, sir.

11          MR. BULLOCK:  How are you?  This is Mr. Bullock.

12  I'm in Richmond, Virginia.

13          I purchased, cash, my items on November 2nd, which

14  predates the actual time that you all filed for bankruptcy.

15  Does that mean that I am now under those guidelines or

16  limitations in regards to receiving a refund, because I went

17  back and forth and I talked to the person, my sales rep,

18  multiple times and at that time when I first bought it with

19  cash, I was told I can get my refund, a full refund, you

20  know, no questions asked, but I haven't received my furniture

21  yet and no one could actually confirm whether or not I'm

22  going to receive it.

23          So I have moved on since that time.  You know, it

24  was back in early November.  I did file a claim, which is why

25  I believe I received the notice in the mail to participate in

1   this Zoom meeting.

2           So with me participating, does that verify whether

3   or not you received my claim?  Is that why I received this

4   paperwork?

5           MR. BATES:  Let me --

6           MS. DAVIS JONES:  Well --

7           MR. BATES:  -- jump in on that last part first.

8           You received the notice because the case had filed

9   and the debtors are subject to certain requirements under the

10  Bankruptcy Code to provide notice to those that they believe

11  may hold claims in the cases of this meeting.

12          The purpose of this meeting is for creditors to be

13  able to participate in a public forum as to the debtors'

14  financial condition and their mandatory disclosures in the

15  bankruptcy case.

16          You do not gain or lose any rights by

17  participating or observing in the 341 meeting.  Neither does

18  your participation today confirm that they received your

19  claim.

20          You'll have to submit a claim either through the

21  case website or through the procedures that are going to be

22  outlined in what I presume is a forthcoming motion to

23  establish a bar date or a deadline to file a claim in the

24  Chapter 11 case.

25          So you don't gain or lose any rights by coming

1  here today.

2          MR. BULLOCK:  Understood.  I did that because my

3  sales rep couldn't answer any of my questions and couldn't

4  care and see whether or not I'm going to receive my

5  merchandise and I was advised to -- you know, they gave me a

6  card with Verita's --

7          MR. BATES:  Yeah.

8          MR. BULLOCK:  -- number and I filed a claim.

9          MR. BATES:  Okay.

10          MR. BULLOCK:  But here I am, wondering am I still

11  under those guidelines because I bought my furniture before

12  you actually filed for bankruptcy.

13          So I want -- I would like -- I mean -- and I'm

14  sure you all are going to hear this a lot but I would like a

15  full refund but, you know, do I have to wait?

16          MS. DAVIS JONES:  This is Laura Jones.  I'll take

17  that.

18          The answer is yes, you're going to have to wait,

19  and I do not know what amount of refunds or not customers are

20  going to receive.

21          As we said earlier, it's way too early to know how

22  the sale will do, how the claims will sort out, and so forth.

23          So all you can do at this point, from my

24  perspective, and as Mr. Bates said -- you might want to talk

25  to your own counsel, is to make sure you get your claim on

1   file.

2          But this is not going to -- this is not going to

3   happen soon.  This takes a -- this is going to take quite a

4   while to get through the claims and that type of thing and

5   what it sorts out to be, it's just too early to tell.

6          MR. BULLOCK:  Is there any way to verify if I will

7   receive my furniture?

8          THE WITNESS:  Not at this time.

9          MR. BULLOCK:  You can't verify if I'm going to get

10  my furniture and you can't verify if I'm going to get my

11  money back?

12         THE WITNESS:  Correct.

13         MS. DAVIS JONES:  Yes, that's correct.

14         THE WITNESS:  You did file the claim?

15         MR. BULLOCK:  I did file.  No, I did that part.

16  But --

17         THE WITNESS:  Okay.  Good.

18         MR. BULLOCK:  Yeah, okay.

19         MR. BATES:  All right.  Thank you, sir.

20         The next is going to be T. Huff.

21         MS. HUFF:  Hi.  I just had a few -- a couple

22  questions or statements about some questions that Mr. Bates

23  had that were answered I think improperly because I did -- I

24  purchased my furniture in November.  I paid cash for my --

25  for part of my purchases and my TV stand was supposed to be

1  delivered in December.  It got changed to January 26th.

2        I called the Value City the second week of

3  December and they told me that everything was fine; it was

4  still going to be delivered.  However, it was not delivered

5  and I didn't receive the letter until I think December 31st

6  in the mail, stating that they were filing bankruptcy.

7        So as soon as I did that, I called the store.

8  They said they -- you know, they weren't going to be

9  delivering my furniture, I wasn't going to get my money back,

10 and there was nothing they can do to help me.

11       So I guess my statement is is that they said they

12 were doing everything that they could do to fulfill orders

13 when, in fact, they were not.

14       I called other stores that were still open when I

15 got off of the phone with Value City in Florence and they

16 actually had a floor model of the TV stand in Springdale,

17 where originally my furniture was supposed to be delivered

18 from, and I was -- I had to repurchase that piece if I wanted

19 the same furniture to -- the same piece to match all of my

20 other furniture and I had to pay the delivery charge also on

21 that.

22       So I guess when I'm filing my claim -- I was

23 trying to file my claim and it wouldn't let me submit some

24 things.  But when I go to file my claim, do I get to file my

25 claim for the Premier Promise that I paid for and do I get to

1  pay -- to file my claim for my delivery service that I paid

2  for?

3          MS. DAVIS JONES:  Yeah.  This is Laura Davis

4  Jones.

5          There's no limits on what you can file your claim

6  for.  Whatever you think you are owed, you should file your

7  claim.  And if you -- as Mr. Bates suggested, talking to your

8  own counsel is always a good idea too and -- but file your

9  claim for whatever you believe the debtors owe you.

10          MS. HUFF:  Okay.  I just know that -- I feel like

11  you guys are misrepresenting, saying that you guys were

12  trying to fulfill the orders when, in fact, my order was not

13  being filled.  If they had the product in the store that it

14  was supposed to be shipped from and they canceled it, when I

15  talked to them in the second week in December and they

16  canceled my order after that without even telling me, then I

17  don't feel like they tried very hard to fulfill those orders.

18          So I think they're misrepresenting --

19          MS. DAVIS JONES:  Understood.

20          MS. HUFF:  -- representing -- yeah.

21          I feel like I -- I actually originally bought the

22  furniture on November 15.  So I just feel like they're not

23  representing and telling the whole truth of trying to fulfill

24  the customers' orders and I wanted that on record.

25          MS. DAVIS JONES:  Understood.

1          MR. BATES:  Thank you, Ms. Huff.

2          That is officially part of the record in these

3     proceedings.  Do you have any other questions?

4          MS. HUFF:  No.  Thank you very much.

5          MR. BATES:  Thank you.

6          Okay.  Before we continue, I would just like to

7     reiterate that the debtor is very likely not going to be able

8     to answer questions about individual claims, as we've

9     discussed several times.

10          There are tens of thousands of claimants in this

11    case.  I want to give creditors an opportunity to weigh in

12    but we're coming up on two hours now and, unless creditors

13    have questions that go to the financial condition or other,

14    you know, disclosures in this case and that sort of thing, I

15    would encourage people to follow up with debtors' counsel or

16    their other representatives offline or to submit an inquiry

17    through the case website, which will -- is much more likely

18    to yield you a response that you can actually do something

19    with in these cases.

20          So with that in mind, I'm going to continue and

21    Bill Diamond is next.

22          MR. DIAMOND:  Good afternoon.

23          I just have a general question.  Obviously, we're

24    all going through the same stuff, but I did make a -- there

25    was a purchase that was made in October 28th, paid in full.

1  It was canceled when we got wind of the bankruptcy coming so

2  we went in and canceled it mid-November and they were already

3  prepping and gave us the information to file a claim.

4          I just wanted to make sure, you know, that's where

5  I should be at this point is just the claim.

6          MS. DAVIS JONES:  Yes.

7          MR. DIAMOND:  Okay.  Thank you very much.

8          MS. DAVIS JONES:  You're welcome.

9          MR. BATES:  Thank you, Mr. Diamond.

10          Next is Anita B. Maryland.

11          MS. MARYLAND:  Hi.  Yeah, I want to -- Bill, what

12  he just said and T. Huff said -- I actually purchased the

13  furniture in September and were given a -- the delivery date

14  of November 26.  And then on November 21st, I was informed

15  about your bankruptcy.  I find that very suspect.

16          If I bought it completely in September, paid for

17  in full, you should have been able to deliver it.  You should

18  have been able to deliver it, which you were not.

19          And I -- even as I found out, I was willing to go

20  out in the store and if what I had saw was still there, the

21  product, I would have just bought that suit and just been

22  like hey, okay, I'll just take the floor model.

23          But your store had sold part of that, which was

24  very, to me, unprofessional.  If you're going to do it, then

25  you should -- if you're going to do something like that, then

1  you need to call that company and say hey, we did never -- we

2  never -- would you like the furniture out of the store, one

3  way or the other.

4         And then now I'm concerned because it sounds like

5  -- and I hope it's not true, that you're not going to give me

6  all my money back.  I think that's insane.  I want all my

7  money back, every dollar.  I want interest.  I will certainly

8  be looking into other attorneys to see my options.

9         Thank you for this.

10        MR. BATES:  Thank you, ma'am.

11        Next is Pat.

12        UNIDENTIFIED SPEAKER:  Hi.  Can you hear me?

13        MR. BATES:  We can.

14        UNIDENTIFIED SPEAKER:  Okay.  I just got a general

15 question.

16        I ordered furnitures back in September, over

17 $11,000 and I got also my furnitures except one nightstand,

18 that it was actually out of stock and was coming from

19 overseas.  It was supposed to be delivered the 27th of

20 January and I found out that it's no longer coming in.  So

21 that's fine.

22        I -- this amount was financed through Synchrony

23 Bank so I've been making a one-year zero percent interest-

24 free, and I've been making payment of two grand each month to

25 Synchrony Bank.

1    I'm just asking now at this point is it a claim I

2  need to file or do I go and ask to get -- or maybe short that

3  money -- or take that money from Synchrony Bank or they

4  already paid Value City so now I no longer can go to

5  Synchrony Bank?  I'm not quite sure who I should claim in my

6  claim from.

7    THE WITNESS:  You should continue to pay your

8  Synchrony credit card.

9    UNIDENTIFIED SPEAKER:  Okay.  Which I'm doing.

10    THE WITNESS:  And you should file a claim for the

11  furniture --

12    UNIDENTIFIED SPEAKER:  Okay.

13    THE WITNESS:  -- you did not receive.

14    UNIDENTIFIED SPEAKER:  Okay.  So just -- the

15  claim is what I need to go through also for the one item?

16    THE WITNESS:  Correct, which you can do using the

17  Verita website that --

18    UNIDENTIFIED SPEAKER:  Okay.  Okay.

19    THE WITNESS:  -- we shared.

20    UNIDENTIFIED SPEAKER:  Thank you.

21    THE WITNESS:  Sure.

22    MR. BATES:  Thank you, Pat.

23    To follow up on the last point, the --

24  Mr. Morando made there, if you are able to view the chat in

25  this Zoom call, which you can do by clicking on the chat icon

1  on the bottom of your screen, there should be a chat labeled

2  everyone and in there you should see a link to the case

3  website.

4          Once again, you can review everything filed in the

5  case at that link and you can also file a proof of claim in

6  the case.

7          I'd also like to reiterate that to the extent your

8  question is I believe I'm owed money, what should I do, the

9  only advise that anyone on this call is going to be able to

10 give you today is to file a proof of claim which, again, you

11 can do through the case website or through other means.

12         If you are interested in exploring other rights

13 you may have in the case against the debtors or otherwise,

14 the only advise that we can give you on this call is to speak

15 to competent bankruptcy counsel.

16         So I would just like to reiterate that before we

17 continue with creditor inquiries.

18         I'd also like to pause -- we've been going for

19 nearly two hours now, to see if the witness is okay to

20 continue or if he needs a short break.

21         THE WITNESS:  No.  I'm okay to continue.

22         MR. BATES:  Okay.  I'm going to let this go until

23 about 3:15, Eastern Time, so about 20 more minutes, at which

24 point I'm going to need to continue the meeting to a date to

25 be determined, both to address the issues that were left open

 1  during my examination and to address any further inquiries

 2  from creditors.

 3          I will continue allowing creditors to ask

 4  questions until that time, but I just wanted to make that

 5  clear on the record before we continue.

 6          The next is Alpa P.D. (phonetic).

 7          UNIDENTIFIED SPEAKER:  Hello?  Yes.  I'm --

 8          MR. BATES:  We can hear you.

 9          UNIDENTIFIED SPEAKER:  -- trying to see how to

10  file a claim and it ask -- it's got ID/email address.  What

11  is the ID they're asking for?  Hello?

12          MS. DAVIS JONES:  Hi.  This is Laura Jones.

13

14  apologize.

15          UNIDENTIFIED SPEAKER:  Okay.

16          MR. BATES:  Ms. Davis Jones, this is a question

17  about the claims filing portal on the Verita website,

18  correct?

19          UNIDENTIFIED SPEAKER:  Right.  And it has ID/email

20  address.  So what ID -- I know my email address but what ID

21  are they requesting?

22          MR. BATES:  I am not 100 percent sure but I

23  believe that at some point in the case, Verita will be

24  providing PINs associated with specific claims that the

25  debtors know about and include it in their schedules.

1          Does that sound right to the debtors'

2   professionals?

3          MS. DAVIS JONES:  Yes.

4          MR. BATES:  Okay.  So that might be -- that might

5   be what goes in that field.  You can also see underneath

6   those two empty fields, sir, that you can request a PIN to

7   file a claim or you can retrieve a PIN to file a previous

8   claim.

9          So that might be another way for you to obtain a

10  way to -- obtain a unique PIN to file a claim on the case

11  website.

12         UNIDENTIFIED SPEAKER:  But here's what I'm asking.

13  I mean looking at the format here, it asks for the ID/email

14  and then beneath that it says PIN and then it does say

15  request a PIN.  But if I just put my email address in and ask

16  -- request a PIN to file a claim, will it get to -- through

17  to them?  Will I have to put a PIN number in order for them

18  to -- for me to request this PIN?

19         MR. BATES:  My understanding of how this is --

20  this would work is that you -- and I'll ask the debtors'

21  professionals to correct me if I'm wrong, is you would first

22  request a PIN using your email address.  You would then use

23  the PIN you receive to file your claim and that would likely

24  create a unique way to identify your claim on the debtors'

25  side of this system so that they, you know, know who filed

1  the claim and can associate the claim amount and claim basis

2  with you specifically as a creditor.

3          I'll ask Ms. Davis Jones or Mr. Morando if their

4  understanding is different.

5          THE WITNESS:  Yeah, I'm on the website right now,

6  Mr. Bates, and I think the -- you answered it correctly,

7  which is you should enter your email address, click on where

8  it says request a PIN to file a claim --

9          UNIDENTIFIED SPEAKER:  Okay.

10          THE WITNESS:  -- below the PIN box.  They will

11 then email you the PIN and then you can properly file your

12 claim.

13          UNIDENTIFIED SPEAKER:  Okay.  All right.  Well,

14 thank you very much.

15          MR. BATES:  Thank you, sir.

16          UNIDENTIFIED SPEAKER:  Thank you.

17          MR. BATES:  Okay.  Next it's going to be

18 Mantha Prozonth (phonetic).

19          MR. PROZONTH:  Hi.  I bought a couch which got

20 delivered, fortunately, but it is defective.  I was not

21 getting any support regarding that and when I went to the

22 store, they said that, you know, they cannot do anything

23 about it and file a claim.

24          But then I see the website like, you know, if it

25 is delivered and if it is there, they're going to repair it

1  or provide the services at least.  And I also bought the

2  (indiscernible).

3          So I'm confused whether if they'll still fix it or

4  is it just a claim that is only the available option without

5  -- with the ones that are defective.  Will those be at least

6  fixed because I asked for that option to be returned.  They

7  said they cannot do that, too.

8          So I'm stuck with the one that doesn't work

9  properly at all.

10          THE WITNESS:  I may have missed it, but did you

11  say that you purchased the warranty?

12          MR. PROZONTH:  Yeah, I purchased the warranty.

13          THE WITNESS:  All right.  So what I would ask you

14  to do is just email counsel the specific details and then we

15  can follow up with you.

16          MR. PROZONTH:  Okay.  Thank you.

17          And this couch has not been -- I mean it's not

18  been even -- three to four months since I have received it

19  and -- but (indiscernible) and they did not actually exchange

20  the different (indiscernible).  They said they can only fix

21  it when it -- in -- still, they didn't -- it doesn't work

22  yet, so that's how it is.

23          THE WITNESS:  I understand.  Yeah, you could just

24  email us the specific details, we're happy to help you

25  through that.

1          MR. PROZONTH:  Great.  Thank you so much.

2          MR. BATES:  Okay.  Thank you.

3          I'm going to address a couple questions I've been

4  receiving through direct chats before I move on to the next

5  creditor just because I'm able to.

6          I received a question, does it matter which debtor

7  I select since the top three listed are all American

8  Signature names.

9          You should be receiving instructions with -- in

10  connection with a Bar Date Motion that spell this out.  But

11  your claim ought to be filed against the debtor that you

12  believe owes you money.  I believe, based on Mr. Morando's

13  testimony, that would most likely be the American Signature,

14  Inc. entity but, again, I just don't know because I can't

15  answer questions about specific claims.  That is my

16  understanding as to that particular question.

17          I believe that's maybe the only one I can address

18  right now.

19          Okay.  Let's go to Cordell's iPad.

20          UNIDENTIFIED SPEAKER:  Good afternoon.  How are

21  you doing?

22          MR. BATES:  Good afternoon, sir.

23          UNIDENTIFIED SPEAKER:  I recently purchased dining

24  room sets back in September but I never received anything.  I

25  paid cash for it.  I have my receipts and I tried to -- I did

1   do the claim online but when I tried to do the receipts as

2   well, it wouldn't let me do it.

3           But I wanted to know how would I go about showing

4   the receipts and who do I have to send them to?

5           MS. DAVIS JONES:  I would attach those to your

6   proof of claim.

7           UNIDENTIFIED SPEAKER:  I tried to do that and it

8   wouldn't let me do it.  I filed the claim and everything but

9   it wouldn't let me attach the receipts.

10           THE WITNESS:  Two options.  One is I think you can

11   contact Verita directly.  The second is I believe on their

12   website, you also have an option to mail in your claim.  You

13   could take a photocopy of the receipt and mail that in as

14   kind of a redundancy plan.

15           UNIDENTIFIED SPEAKER:  Okay.  So do y'all have

16   the --

17           THE WITNESS:  If you click on the --

18           UNIDENTIFIED SPEAKER:  -- website?

19           THE WITNESS:  If you click on the Verita link that

20   Mr. Bates --

21           UNIDENTIFIED SPEAKER:  Um-hum.

22           THE WITNESS:  -- attached in the chat --

23           UNIDENTIFIED SPEAKER:  Um-hum.

24           THE WITNESS:  -- you should be prompted to log in.

25   But I think as part of that, you'll see an option to mail in

1 your claim.

2          UNIDENTIFIED SPEAKER:  Okay.

3          THE WITNESS:  And I would encourage you to both

4 reach out to Verita.  Email counsel your specific concerns so

5 we can address it internally.  And then as a third resort,

6 just --

7          UNIDENTIFIED SPEAKER:  And what's her email?

8          THE WITNESS:  Do we want to just add it to the

9 chat, Laura?

10          MS. DAVIS JONES:  What's that?  My email?

11          MR. BATES:  I had asked Ms. Davis Jones if there

12 was like an email that -- for the broader professionals team

13 here but if you like, I can also put your email in the chat,

14 Ms. Davis Jones.

15          MS. DAVIS JONES:  Oh, that's fine.  That's fine.

16          MR. BATES:  Okay.

17          For the benefit of all creditors on the line, once

18 again, if you go to the chat, the everyone chat, which you

19 can access by hovering over the bottom of your screen, you

20 will see first a link to the case website where you can

21 submit a claim, review filings, all those good things.  You

22 will also see the email address for debtors' counsel.

23          So if your question relates to your specific

24 claim, the treatment of your claim, how you should go about

25 submitting your claim, I would encourage you to resort to

1   that case website and the email address, rather than

2   questioning the witness, who will not be able to answer

3   questions about your specific claim, in all likelihood.

4            UNIDENTIFIED SPEAKER:  All right.  Well, thank

5   y'all so much.

6            MR. BATES:  Thank you, sir.

7            Okay.  I had another question.  If I had a return

8   that was for about $2,000, can I just go back in the store

9   and buy something else of that value for the liquidation

10  sale.

11           Mr. Morando, could I -- I interpret that as a

12  question about whether the debtors are accepting store credit

13  or something to that effect.  Is that a question that you're

14  prepared to address?

15           THE WITNESS:  The answer, Mr. Bates, is no, not at

16  this time.  Customers are directed to file a claim.

17           MR. BATES:  Thank you very much.

18           Let me see if I drew any other questions I can --

19       (Pause)

20           MR. BATES:  Mr. Morando and Ms. Davis Jones,

21  there's one other question I think maybe you can address.

22           Will creditors receive confirmation emails when

23  they submit claims through the Verita case website?

24           MS. DAVIS JONES:  My understanding is you don't

25  receive a -- and this is just my understanding.  You don't

1  receive a confirmation but you do have their address and if

2  you have any concern about it, whether it went through or

3  what have you, you can write them and they will respond.

4        But I think the -- and, Mr. Morando, I don't know

5  if you know more than I do, but I think the website itself,

6  it gives you the place to file the claim and it shows whether

7  you filed it or not.

8        MR. BATES:  Yeah, I would add to that last part of

9  Ms. Davis Jones' response that if you did not receive a

10 confirmation email, if you go to the case website, in the

11 menu you should see two options, one for claims/creditor

12 search and one for claims register, and you should be able to

13 locate your claim at one or both of those links on the case

14 website and confirm whether it was effectively filed.

15       So I would just direct individual creditors to

16 those links on the case website.

17       Okay.  I'm going to go to Lisa Raymond.

18       MS. RAYMOND:  Hi there.  Sorry, I'm a little under

19 the weather.

20       My first question is can we expect -- I have --

21 I've gotten two claims.  I filed a federal claim and I also

22 went to Synchrony and filed a dispute of charges for the

23 charges on my Value City Furniture credit card.  So I've got

24 two claims going right now.

25       Can we expect the proceedings today to hasten the

1  process of Synchrony getting a response from American

2  Signature/Value City that I'm not getting my stuff, because

3  Synchrony is waiting for Value City to respond to my claim

4  and their claim that I need a refund is my first question, or

5  is this proceeding just part of the process and will have no

6  impact on when Synchrony will get back to me?

7        They're telling me that they -- Value City has 60

8  days to respond to their inquiry and then they'll cut my

9  claim loose and I'll be able to get my money back.

10        MS. DAVIS JONES:  You got two totally different

11  processes going on there.

12        MS. RAYMOND:  Right.

13        MS. DAVIS JONES:  Yeah.  So I do not think having

14  the 341 meeting today is going to change that timing at all.

15        MS. RAYMOND:  Okay.  Okay.  All right.  So just --

16  so I'm going to -- I'm waiting it out 60 days?

17        And then my other question is, hopefully, when

18  Synchrony says, yes, you can get your money back, they're --

19  I haven't looked into this thus far but it -- just in case

20  anybody else is in the same boat, I should go in and cancel

21  my claim from the federal standpoint because I don't want to

22  get double money back.

23        If I can get my money back from the credit card, I

24  don't need to pay attention to the federal claim, is that

25  correct?

1          MS. DAVIS JONES:  This is Laura Jones.

2          I can only speak to the bankruptcy claim side.

3   And if you are -- if you have a claim, if you're owed money

4   or otherwise have a claim against the debtor, you should file

5   your proof of claim.

6          MS. RAYMOND:  I mean I did.  I filed that.  I just

7   wanted to, you know, make sure that if I get my credit card

8   money back, that I can just go ahead and file -- and cancel

9   my federal claim.

10         MS. DAVIS JONES:  Yeah, if you get your -- if you

11  no longer are owed the money that you filed a claim for --

12         MS. RAYMOND:  Right.

13         MS. DAVIS JONES:  -- or it changes, yes, you

14  should file a modified claim --

15         MS. RAYMOND:  Okay.

16         MS. DAVIS JONES:  -- because you're filing those

17  claims under penalty of perjury so --

18         MS. RAYMOND:  Right.  Right.  Yep.  Yep.

19         MS. DAVIS JONES:  Yep.

20         MS. RAYMOND:  Okay.  Cool.  Yep.  Will do.

21         And then my last one is, as I was listening to

22  everybody, the Value City Furniture, American City -- or

23  American Signature credit card is now defunct?  Did I hear

24  that correct?  Like even if I -- I paid $400 towards my

25  balance.  So if I have $400 on this credit card that I needed

1  to use, I couldn't use it anywhere, correct?

2          THE WITNESS:  The credit card is not defunct, as I

3  understand it.

4          MS. RAYMOND:  Okay.

5          THE WITNESS:  The way I understand it is we are

6  not issuing new credit cards in our stores.  If any customer

7  has taken that credit card and used that to finance the

8  purchase of the furniture, they should continue to pay that.

9          MS. RAYMOND:  Yeah.  And just so everybody knows,

10 in my position -- this might not be for everybody, but it's a

11 credit card.  Pretty standard.  If you are filing a claim and

12 disputing charges on your credit card, I was told numerous

13 times that, right now, I do not need to make payments on that

14 credit card until my dispute is either accepted or rejected

15 and at that point, I'll have to go from there.

16          So I'm not worried about it quite yet, so.  All

17 right.  I think that's all my questions.

18          MR. BATES:  Thank you, Ms. Raymond.

19          I would just add to the end of that that you

20 should speak to, you know, your legal and financial

21 representatives before making a decision about anything to do

22 with this case or your obligations with respect to a credit

23 card, and my advice would be not -- to not simply rely on

24 others' experience but to make sure that you are covering

25 your bases there.

1           I have a question I received directly that I think

2    will apply to a lot of the hands that remain raised so I will

3    just put it to the witness directly.

4           If online tracking still indicates a day for

5    arrival, does that mean the order will be fulfilled?

6           THE WITNESS:  No, I don't think we can commit to

7    that at this time.

8           MR. BATES:  Is your understanding, Mr. Morando,

9    that it's -- that the debtors cannot confirm at this point

10   whether any specific order is going to be fulfilled based on

11   what has happened to date?

12          THE WITNESS:  That is correct.

13          MR. BATES:  Okay.  I received another message that

14   a creditor apparently has a non-personal claim question.

15          I'm going to jump ahead a little bit and unmute

16   Portia Thomas.

17          MS. THOMAS:  Hello.  How are you?

18          MR. BATES:  Hello.

19          MS. THOMAS:  My question is I see that -- I hear

20   everyone's claim and I see that whether or not they have

21   purchased furniture fully or whatever it may be before or

22   after the actual initial bankruptcy filing, they have not

23   been able to receive their furniture.

24          Stores continue to be open, right?  I've actually

25   went into a store recently and they told me hey, this

1  furniture is in the store -- it's in stock and if you want

2  it, hey, I encourage you to jump on it.

3          So my question is if you're not able to fulfill

4  these orders at the moment, whether they were purchased

5  before or after the bankruptcy, why are the other stores that

6  are open and accepting money from any other consumers?  Like

7  how is that fair for us and how are the future consumers,

8  whatever, that don't know too much about what's going on here

9  able to be protected?

10          THE WITNESS:  So the stores, as a result of the

11  hearing earlier this week, have pivoted to a full

12  liquidation, which means every piece of inventory in the

13  stores and the distribution center are going to be sold over

14  the next few months.  So that's why we're going to continue

15  to sell product is because we have to.

16          In terms of how do you get protected, I mean the

17  only thing I can say is what I have been saying, which is you

18  should go to the Verita link and you should file your claim

19  for whatever you believe is owed to you.

20          MS. THOMAS:  Okay.  So, basically, when it comes

21  to future orders, we're able to go in the store -- consumers

22  are able to go in the store and their orders should be

23  fulfilled?  But as far as anyone that's purchased an order or

24  is looking for their furniture, they just have to file a

25  claim, correct?

 1            THE WITNESS:  Correct.

 2            MS. THOMAS:  Okay.

 3            MR. BATES:  Does that answer your questions,

 4 Ms. Thomas?

 5            MS. THOMAS:  Yeah, I guess that he answered the

 6 best way he could.  I understand.

 7            MR. BATES:  That's fair enough.  Thank you very

 8 much.

 9            I have another question I received directly that I

10 think will apply to a lot of the hands raised, so I'll put it

11 to the witness directly.

12            Mr. Morando, at this time, are repairs being made

13 for defective furniture?

14            THE WITNESS:  What I would suggest to anyone who

15 has a warranty program, reach out to the warranty provider

16 and work through them directly to address those needs.

17            If that is insufficient, they can email counsel

18 directly, as we've outlined on this call, and we'll

19 investigate internally.

20            MR. BATES:  Thank you, Mr. Morando.

21            I'm going to go to Chrissy next.

22            MS. ROBINSON:  Hello.  Can you hear me?

23            MR. BATES:  Yes.

24            MS. ROBINSON:  Okay.  Well, just like a few other

25 folks, I purchased my furniture through Synchrony Bank and

1  I've filed a dispute.  However, I have not received any

2  information as to whether or not -- and I did file a claim

3  and I have not received any information as to whether or not

4  my claim was accepted.

5          So when I filled out the claim, I included

6  Synchrony Bank as the person that should get the money

7  because I didn't want to get the money and then they do not

8  honor my -- you know, my dispute.

9          Is that correct, or do I need to go back in and

10 make a modification and put my name as the person that should

11 receive the payment if there's going to be ever any payment?

12         And, secondly, you're referencing that we should

13 contact counsel.  So we're put in this -- into this situation

14 and you're saying that you can't basically give us any

15 information other than what you're saying but we need to go

16 and seek counsel if we need further information.

17         So not only are we out of money, now you're asking

18 us to go and pay for legal services.  How is that fair, you

19 know?  And I'm sorry I'm -- this is my son's first apartment,

20 furniture, with special needs.  So I'm already, you know,

21 having anxiety with that.

22         So I know I'm throwing out a lot but far as the

23 claim, how -- should I re-do the claim or do I need to leave

24 it as it is?  I did send Ms. Jones an email while we were on

25 the call.  Maybe she can respond and let me know.  It's under

1  Chrissy or Crystal Robinson, Chrissy0328.  If she can

2  respond, that would be great.

3          But, you know, what are we to do at this point,

4  you know?

5          MS. DAVIS JONES:  Yeah.  This is Laura Jones.

6          With respect to a claim, if the claim -- if you

7  made the claim such that payment would go to Synchrony and

8  not you, being you're filing the claim, I would probably file

9  a modified claim and put your name on so at least they know

10  who should get the money if any comes back, but that's just

11  my thought.

12          With respect to having to incur additional legal

13  fees, I hear you, but you don't really want to be taking

14  advice from the company's lawyers.

15          MS. ROBINSON:  No.

16          MS. DAVIS JONES:  We're trying to help you out

17  some but it -- it's always prudent to get your own

18  independent advice.

19          MS. ROBINSON:  And also, you know, far as I'm

20  hearing folks that have ordered furniture back last year,

21  back in the fall.  Well, I ordered furniture back in November

22  and I really feel that they should have let me know that this

23  -- my furniture was not in stock before they even charged my

24  credit card.

25          They -- I really feel that the company knew that

1  they were having financial issues and that this was the route

2  that they were going to go.  And to be, you know, clearly

3  into eight grand in debt when I'm trying to purchase a house

4  as well, that's sitting on my credit that I have no -- you

5  know, that I don't have the furniture and no movement on,

6  it's really damaging and it's unfair, and I know that's

7  subjective but it is what it is.

8            That's it.

9            MR. BATES:  Okay.  Thank you, ma'am.

10            Okay.  It's about 3:15 p.m., ET.  We've been going

11  for a little more than two hours here.  There are several

12  items that remain open, from the perspective of the U.S.

13  Trustee, and that will need to be addressed by my office and

14  the debtors.

15            I'm going to continue this meeting to a date to be

16  determined based on scheduling and availability of the debtor

17  and their witness.

18            I will note that to the extent the debtors are

19  able to resolve all remaining open items following this call,

20  it's possible that we will not be convening an additional

21  meeting of creditors here.

22            So the -- it's -- if there will be a further

23  meeting of creditors, you will receive an additional notice

24  with the date and time.  If there will not, you will receive

25  a notice stating that the meeting has been closed based on

1  the debtors' follow-up responses to my office's inquiries.

2        I would like to thank all the creditors who have

3  participated in some or all of the meeting today.  I

4  understand that it took a long time and I appreciate

5  everyone's patience and willingness to ask questions.

6        Before we log off, I would remind everyone that

7  there is a chat that has the link to the case website and

8  then as well as the email address for debtors' counsel.

9        I would also like to extend my thanks to debtors'

10  counsel for her active participation today and, of course, to

11  the witness for his patience and candor during our

12  examination and the examination of the various creditors.

13        Thank you again, everyone, for your participation.

14  With that, we're going to go -- well, let me pause before I

15  do that.

16        Is there anything that remains open from the

17  perspective of Ms. Davis Jones or Mr. Morando?

18        MS. DAVIS JONES:  Not from me.  Thank you.

19        MR. BATES:  Okay.  Thank you all again.

20        Oh, sorry.  Mr. Morando, I cut you off.  Go ahead,

21  sir.

22        THE WITNESS:  Not from me either.

23        MR. BATES:  Okay.  Thank you all again for your

24  participation today.

25        With that, we're going to go off the record and

1    I'll be ending the meeting for purposes of today's session.

2              Thank you.

3              THE WITNESS:  Thank you.

4         (Proceeding concluded)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ Tammy Kelly                        February 6, 2026

8    Tammy Kelly

9    Court Transcriptionist

10   For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT B**



UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

J. KATE STICKLES
JUDGE

824 N. MARKET STREET
WILMINGTON, DELAWARE
(302) 252-3820

March 20, 2024

RE:    *In re Alecto Healthcare Services, LLC*, Case No. 23-10787
Confirmation Ruling

Dear Counsel:

This is the Court's ruling following the March 4, 5, and 13, 2024 hearing[1] (the "<u>Confirmation Hearing</u>") on confirmation of the *Small Business Debtor's Plan of Reorganization* (the "<u>Plan</u>").[2] The Court is writing for the benefit of the parties and assumes familiarity with the facts as well as the bankruptcy case.

The Debtor commenced this bankruptcy case under subchapter V of Title 11 on June 16, 2023 (the "<u>Petition Date</u>"). On September 14, 2023, the Debtor filed its Plan,[3] which was subsequently modified.[4] The Plan provides that Classes 1 (Priority Non-Tax Claims), 2 (Secured Claims), and 4 (Equity Interests) are unimpaired, and Class 3 (General Unsecured Claims) is impaired. The Debtor forwent solicitation of votes on the Plan and seeks confirmation pursuant to 11 U.S.C. § 1191(b).

A. <u>Record and Evidence Presented</u>

In preparation for the Confirmation Hearing, the Court reviewed and considered, among other things, the Plan, including the exhibits, the reservation of rights filed by the Subchapter V Trustee and the United States Trustee (the "<u>U.S. Trustee</u>"),[5] the objection and amended objection filed by the United States of America,[6] and the objection and supplemental objection filed by the

---

[1] The Transcripts of the March 4, 5, and 13, 2024 proceedings are docketed at D.I. 330, 331, and 342, respectively. The Transcripts are cited herein as "Date Tr. page:line (witness)."

[2] D.I. 261 (the "<u>Plan</u>").

[3] D.I. 154.

[4] D.I. 261.

[5] D.I. 295 and 298.

[6] D.I. 279 and 297.

Reed Action Judgment Creditors (the "Reed Creditors").[7]  The Court also reviewed the declarations of Michael Sarrao and Steven Balasiano in support of the confirmation of the Plan,[8] as well as the Debtor's memorandum in support of confirmation.[9]

At the Confirmation Hearing, the Court listened to the witnesses, who were subject to cross-examination, and reviewed the documents admitted into evidence.[10]  Witnesses in support of confirmation of the Plan included: (i) Jeff McCutcheon, Debtor's executive compensation expert; (ii) Leanne Gould, Gould Consulting Services ("GCS"), Debtor's forensic investigation consultant; (iii) Steven Balasiano, Debtor's independent director/manager,[11] and (iv) Michael Sarrao, Debtor's Vice President, General Counsel, and Secretary.

Following the close of evidence, on March 13, 2024, the Court heard arguments presented by counsel for the Debtor, the Reed Creditors, the U.S. Trustee, and the United States of America, as well as the recommendation of the Subchapter V Trustee.[12]

## B.  **The Confirmation Standards**

The Plan is non-consensual and does not satisfy sections 1129(a)(8) and (10) of the Bankruptcy Code.  Section 1191(b) of the Bankruptcy Code, however, allows a plan to be confirmed on a non-consensual basis, provided that, the requirements of section 1129(a), other than subsections (8), (10), and (15), are satisfied, and the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

Under section 1191(c), the fair and equitable requirement imposes a projected disposable income requirement, a feasibility finding, and appropriate remedies if payments are not made.  Here, as discussed below, the Plan satisfies those requirements.

---

[7] D.I. 299 and 315.

[8] D.I. 307 and 308, respectively.  The Balasiano Declaration was not admitted into evidence.  *See* D.I. 329.

[9] D.I. 310.

[10] D.I. 329.

[11] 03/04/2024 Tr. 70:10-73:4 (Balasiano); 03/04/2024 Tr. 73:15-16 (Balasiano) ("I was initially retained to perform an analysis of a settlement between Sherman/Grayson and Alecto."); 03/04/2024 Tr. 74:16-22 (Balasiano) ("Later in August, it might be a week or two weeks later . . . my charge expanded to review the Alecto bankruptcy and in particular look at potential fraudulent conveyance actions and director and officer or any type of breach of fiduciary duties that the directors or officers may have acted with during the course prior to the bankruptcy."); 03/04/2024 Tr. 74:25-75:4 (Balasiano) ("I have been charged with the duty of investigation or have the investigation performed as well as to the extent there are findings of malfeasance in any way, shape or form that I would commence that litigation.").

[12] The Subchapter V Trustee supports confirmation under section 1191(b), however, does not take a position with respect to the proposed Debtor Releases or the best interests of creditors.  The Court views the Subchapter V Trustee's recommendation as neutral.

The Debtor bears the burden of establishing the Plan's compliance with 11 U.S.C. §§ 1129(a) and 1191 by a preponderance of the evidence, whereas the objectors to the Plan bear the burden of producing evidence to support their objections.[13]

### 1. **Projected Disposable Income**

The projected disposable income requirement in section 1191(c)(2) requires that the Plan provide that all of the projected disposable income of the debtor to be received in the three-year period after the first payment under the plan is due, or such longer period not to exceed 5 years as the Court may fix, will be applied to make payments under the plan. Alternatively, the plan may provide that the value of property to be distributed under the plan within the plan period is not less than the projected disposable income of the debtor.

The Plan, including the revised Income Statement[14] at Exhibit C (the "Income Statement"), satisfies the projected disposable income requirement. The Plan provides that all of the Debtor's disposable income in the three-year period following the Effective Date of the Plan will be applied to make payments under the Plan in accordance with section 1191(c)(2).[15]  Mr. Sarrao also testified that payments will include any excess disposable income beyond projections[16] and the Debtor is prepared to file post-confirmation reports reflecting the Debtor's income and expenses.[17]

### 2. **Feasibility**

Section 1191(c)(3) of Bankruptcy Code sets forth the subchapter V feasibility requirement that "(A) [t]he debtor will be able to make all payments under the plan; or (B)(i) there is a reasonable likelihood that the debtor will be able to make all payments under the plan . . . ."[18]

The feasibility requirement of section 1191(c)(3) "fortifies the more relaxed feasibility test that section 1129(a)(11) contains."[19]  The feasibility test set forth in section 1129(a)(11) requires only

---

[13] *See In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003).

[14] D.I. 316 (Notice of Filing of Amended Exhibits C and G to Small Business Debtor's Plan of Reorganization Proposed by the Debtor) at Exs. 1 (Clean) and 2 (Blackline).

[15] 03/05/2024 Tr. 22:22-25 (Sarrao) (the Plan provides for "all of the debtor's disposable income.").

[16] 03/05/2024 Tr. 22:22-25 (Sarrao) ("[I]t's all of the debtor's disposable income. … [I]n the case of this, if we didn't have to pay, the disposable income would increase, it would be more. … [I]t's whatever the disposal income is.").

[17] 03/05/2024 Tr. 74:24-75:1 (Sarrao) (Q: "Is the debtor prepared to file reports with the company's income and expenses after confirmation?" A: "Yes.").

[18] 11 U.S.C. § 1191(c)(3)(A-B(i)) (emphasis added).

[19] *In re Samurai Martial Sports, Inc.*, 644 B.R. 667, 698 (Bankr. S.D. Tex. 2022) (footnote omitted); *see also In re Pearl Res. LLC*, 622 B.R. 236, 269 (Bankr. S.D. Tex. 2020) (footnotes and citations omitted) ("Section 1191(c)(3) adds two additional factors to the "fair and equitable" analysis. First, § 1191(c)(3)(A) requires that the debtor be able to make all payments under the plan, or that there is a reasonable likelihood that the debtor will be able to make all payments under the plan. The new requirement fortifies the more relaxed feasibility test that § 1129(a)(11) contains.) Section 1129(a)(11) requires only that confirmation is not likely to be followed by liquidation or the need

that the Bankruptcy Court determine that the Plan may be implemented and has a "reasonable assurance of success."[20] "[I]t is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous."[21]

The Debtor's Income Statement[22] projects Debtor's net income in years 1, 2 and 3 of the Plan, in the amount of $463,913, $748,514, and $704,083, respectively. Mr. Sarrao testified the vast majority of Debtor's revenue comes from the management contract with St. Rose Hospital that runs through May 31, 2025, subject to a two-year renewal through May 31, 2027.[23] He believes the contract will be extended through 2027.[24]

Mr. Sarrao also explained that the Income Statement reflects more available income than initially projected as a result of certain reduced operating expenses, including: Dr. Reddy's reduced salary;[25] reduced payroll taxes, salary, and PTO due to the termination and/or retirement of employees; reduced tax preparation fees due to eliminated entities; and reduced insurance expenses due to the closing of the sale of the Wilson N. Jones Hospital ("WNJ") operated by Sherman/Grayson Hospital, LLC, an affiliate of the Debtor.[26]

In addition, Mr. Sarrao testified that the Income Statement reflects an increase in bankruptcy professional fees and the addition of a control group reserve, a contingent liability, related to a pension plan that is sponsored by Alecto Healthcare Services Ohio Valley.[27] He explained that any contingent liability not paid becomes disposable income to be distributed under the Plan.[28]

The Court finds, based on the Plan, Income Statement, and Mr. Sarrao's testimony, the Debtor has, by a preponderance of the evidence, carried its burden of demonstrating that there is a

---

for further reorganization unless the plan proposes it. … The feasibility requirement for confirmation requires a showing that the debtor can realistically carry out its plan. Though a guarantee of success is not required, the bankruptcy court should be satisfied that the reorganized debtor can stand on its own two feet.")

[20] *In re Indianapolis Downs LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (citing *Kane v. Johns-Manville Corp.* (*In re Johns–Manville Corp.*), 843 F.2d 636, 649 (2d Cir. 1988)),

[21] *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) (citations omitted).

[22] D.I. 316 (Notice of Filing of Amended Exhibits C and G to Small Business Debtor's Plan of Reorganization Proposed by the Debtor) at Exs. 1 (Clean) and 2 (Blackline).

[23] JX12 (Amended Management Services Agreement St. Rose Hospital, Hayward, CA); 03/05/2024 Tr. 18:6-8 (Sarrao).

[24] 03/05/2024 Tr. 17:7-22 (Sarrao).

[25] The Reed Creditors and the U.S. Trustee objected to the proposed compensation of the Debtor's post-confirmation officers, as set forth in Art. VIII.7 of the Plan. At the commencement of the Confirmation Hearing, the Debtor announced that the CEO's proposed salary had been reduced from $750,000 to $550,000 per year and that Messrs. Reddy and Williams would not receive any salary increase in the next 3 years.

[26] 03/05/2024 Tr. 19:11-21:2 (Sarrao). Sherman/Grayson Hospital, LLC ("Sherman/Grayson") is also in bankruptcy in this Court. Case No. 23-10810. In that case, the sale of WNJ closed on January 1, 2024; however, prior to closing, the purchaser operated WNJ. *See* Del. Bankr. Case No. 23-10810, D.I. 60, 161, and 314.

[27] 03/05/2024 Tr. 20:9-13; 21:3-22:16 (Sarrao).

[28] 03/05/2024 Tr. 22:20-25 (Sarrao).

reasonable likelihood that the Debtor will be able to make all payments under the Plan.  Thus, the Plan meets the feasibility requirements of sections 1129(a)(11) and 1191(c)(3)(A).

### 3.  Remedies

Section 1191(c)(3)(B) requires that the plan provide appropriate remedies if the debtor does not make required payments under a plan.  Article VII.5 of the Plan provides remedies upon default in satisfaction of section 1191(c)(3)(B).

### 4.  Unfair Discrimination

Under the Plan, Class 1 (Allowed Priority Non-Tax Claims) and Class 2 (Allowed Secured Claims) will receive a 100% recovery; Class 3 (Allowed General Unsecured Claims) will receive a pro rata share of the Debtor's projected disposable income, an approximate 3–10% recovery of the total general unsecured claims; and Class 4 (Equity Interest Holders) will retain their equity ownership interest in the Debtor.  The Plan's treatment of Claims and Equity Interests is proper because all similarly situated holders of Claims and Equity Interests will receive substantially similar treatment.  No party has challenged the proposed classification and/or treatment under the Plan.  The Court finds that the Plan does not discriminate unfairly and meets the requirements of 11 U.S.C. §§ 1191(b) and 1129(b)(1).

## C.  Best Interests of Creditors - 11 U.S.C. § 1129(a)(7)

A plan satisfies the best interest of creditors when, "with respect to each impaired class of claims or interests . . . each holder of a claim or interest of such class . . . will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 . . . ."[29]

Exhibit G to the Plan, the Revised Liquidation Analysis,[30] dated March 3, 2023 (the "Liquidation Analysis"), projects that $265,338 will be available for payment of claims in chapter 7, while $2,079,010 will be available for payment of claims under the Plan.[31]  No evidence has been presented to refute the Debtor's projections.  Mr. Sarrao testified creditors would receive more in a chapter 11 than chapter 7, stating: "I think very little, if anything, would be distributed to the creditors if there was a Chapter 7."[32]  Moreover, no credible evidence validates a finding that conversion to chapter 7 would be in the best interests of creditors.

---

[29]  11 U.S.C. § 1129(a)(7)(A)(ii).

[30]  D.I. 316 (Notice of Filing of Amended Exhibits C and G to Small Business Debtor's Plan of Reorganization Proposed by the Debtor) at Exs. 3 (Clean) and 4 (Blackline).

[31]  Id.

[32]  3/5/2024 Tr. 24:6-9; 25:12-21 (Sarrao).

## D. Confirmation Objections

Numerous Plan objections have been resolved and those resolutions are included in a revised proposed confirmation order (the "Proposed Confirmation Order")[33] or noted on the record at the Confirmation Hearing.  Below is the Court's ruling with respect to each pending objection.

### 1. U.S. Trustee Objection to the Process Regarding Amended Proofs of Claim

The U.S. Trustee objects to Article IV.3.f. of the Plan and paragraph 50 of the Proposed Confirmation Order that prohibit amendments to claims and automatically disallows post-Effective Date amendments to claims.  Paragraph 50 of the Proposed Confirmation Order[34] provides, in part: "Any amendment to a proof of Claim filed after the Effective Date shall be ineffective unless approved by the Bankruptcy Court after notice and an opportunity for hearing."

The U.S. Trustee argues that the proposed language violates 11 U.S.C. § 502 because a claim is deemed allowed until objected to and it is a debtor's responsibility to object to late-filed amended claims.  The U.S. Trustee contends that replacing the phrase "disallowed in full and expunged" with the term "ineffective," does not resolve the procedural deficiency.

The Debtor argues against an unlimited right to file and/or amend a claim and maintains that finality is required in the claims administration process.  The Debtor further contends that while the issue is procedural; it could have a substantive impact because "real money" is spent to defend claims and late filed claims could increase the claims pool and cause disgorgement of claims already paid.  The Debtor cites various cases in support of its position.

The cases cited in support of the Debtor's position, which bar the filing of an amended claim post-Effective Date, are inapposite.  In *Holstein v. Brill*[35] and *IRT Partners, L.P. v. Winn-Dixie Stores, Inc.*,[36] the Seventh and Eleventh Circuits, respectively, held that *res judicata* should preclude post-confirmation amendment of claims absent some compelling reason.  Likewise, in *Kaiser Group International*,[37] the debtor sought to estimate a claim and cited to the *Holstein* holding in a footnote.  None of those cases involved a procedure or addressed a plan provision that automatically expunged, disallowed, or deemed "ineffective" an amended claim filed after the Effective Date.

A properly filed proof of claim is deemed allowed unless a party in interest objects, at which point the court must determine the amount of the claim to be allowed.[38]  Section 502(b) requires

---

[33] D.I. 334.

[34] *Id.*

[35] *Holstein v. Brill*, 987 F.2d 1268 (7th Cir.1993).

[36] *IRT Partners, L.P. v. Winn-Dixies Stores, Inc. (In re Winn-Dixie Stores, Inc.)*, 639 F.3d 1053, 1056 (11th Cir. 2011).

[37] *In re Kaiser Grp. Int'l, Inc.*, 289 B.R. 597 (Bankr. D. Del. 2003).

[38] 11 U.S.C.A. § 502(a), (b).

"notice and a hearing" prior to the disallowance of a claim.  The language at issue in paragraph 50 is inconsistent with the Bankruptcy Code.  For these reasons, the Court sustains the U.S. Trustee's objection.

### 2.  Reed Creditors

The Reed Creditors object to the proposed Debtor Releases and Injunction provisions in the Plan and assert that the Plan was not filed in good faith.  Each issue will be addressed.

#### a.  Debtor Releases

The Reed Creditors object to the proposed Debtor Releases, Plan Art. VII.2, that release Debtor's insiders in consideration for payment of $25,000 (the "Settlement Consideration"), a sum they argue will yield no benefit to creditors.  They argue that they have identified at least two potential causes of action against the members of Alecto Healthcare Services, LLC (the "Alecto Members"): (1) a $22 million fraudulent conveyance claim involving the Debtor's transfer of Sunrise Real Estate Holdings, LLC to the Alecto Members while the Debtor was insolvent, for which GCS acknowledges in its report (the "GCS Report") that reasonably equivalent value was not received in that transaction; and (2) breach of fiduciary duty claims against Alecto Members arising from Alecto's advancement of funds to affiliates while it was insolvent or in the zone of insolvency instead of making payment to Alecto's creditors.

Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[39] Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[40]

The Court determines if the released claims fall into the lowest point of reasonableness for a settlement.[41]  "When determining whether to approve a settlement, the bankruptcy court should consider: (1) the probability of success in the litigation; (2) the complexity, expense, and delay of the litigation involved; (3) the possible difficulties in collection; and (4) the paramount interests of creditors."[42]  "The court does not have to be convinced that the settlement is the best possible

---

[39] *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004).

[40] *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (footnote and citation omitted).

[41] *Coram Healthcare Corp.*, 315 B.R. at 330 (citations omitted).

> Where a compromise is part of a plan of reorganization, however, the court has the duty "to determine that a proposed compromise forming part of a reorganization plan is fair and equitable."  The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019, though the court should consider all factors relevant to a "full and fair assessment of the wisdom of the proposed compromise."

*Id.* at 334–35 (citations omitted).

[42] *Coram Healthcare Corp.*, 315 B.R. at 330 (citations omitted); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996)).

compromise, but only that the settlement falls within a reasonable range of litigation possibilities."[43]  Courts generally defer to a trustee's business judgment when there is a legitimate business justification for the trustee's decision.[44]

In determining the reasonableness of the settlement, the Court reviews the underlying claims alleged by the Reed Creditors that were investigated by the independent director.

### 1) Fraudulent Conveyance Action[45]

The Reed Creditors assert that the June 2019 transfer of Sunrise REH and Plaza MOB (the "Sunrise Transfer") was a fraudulent conveyance.  The GCS Report concludes that the Sunrise Transfer was completed "without receiving reasonably equivalent value in exchange."[46]

The Debtor responds that *even if* there was not reasonably equivalent value for the Sunrise Transfer, it does not matter because the Debtor was not insolvent in June 2019, as required by California law.

The California Fraudulent Transfer Act contains two possible applications in determining whether the Sunrise Transfer was a fraudulent conveyance.  California Civil Code section 3439.04 applies to present and future creditors and section 3439.05 applies only to present creditors.  The parties did not distinguish between the two statutes in their papers or arguments. The Court reviews both.

Section 3439.04, provides that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . .[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."[47]  No evidence was presented indicating that the Debtor intended or, in fact, would become insolvent as a result of the Sunrise Transfer.[48]

Section 3439.05 states a fraudulent transfer is "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without

---

[43] *In re Wash. Mut, Inc.*, 442 B.R. 314, 338 (Bankr. D. Del. 2011) (citations omitted).

[44] *Martin*, 91 F.3d at 3953.

[45] The Debtor argued that only the California Uniform Fraudulent Transfer Act could be applicable to the Reed Creditors' assertion, and the Reed Creditors argue solvency under the Uniform Fraudulent Transfer Act applies. California Civil Code 3439.05 and the Uniform Fraudulent Transfer Act, for the purposes of the Court's analysis are substantially similar.  As validity of the claim hinges on solvency, under either statute, the result would be the same.

[46] JX96.003.

[47] Cal. Civ. Code § 3439.04.

[48] 03/04/2024 Tr. 29:3-31:34 (Sarrao).

receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."[49]    Under California law:

> (a) A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.
> ...
> (c) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.
> (d) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.[50]

Mr. Balasiano, the Debtor's independent director responsible for examining the transaction, testified that he conducted an investigation as to potential fraudulent conveyance claims, including discussions with Ms. Gould (who had performed an analysis of the transactions going back four years prior to the bankruptcy filing),[51] his counsel, and Debtor's counsel.[52]  He also reviewed the GCS Report, P&L balance sheet, cash flow, and tax returns.[53]  Mr. Balasiano relied upon the Debtor's 2019 balance sheet, which reflects the Debtor had an equity value of at least $9.4 million;[54] and the Debtor's 2019 tax returns, which show assets in excess of $18 million.[55]  He concluded the Debtor had a positive balance sheet for 2019 (and 2020) and was able to pay its debts as they became due.[56]  Both the balance sheet reflecting assets in excess of liabilities and the payment of debts as they become due are acceptable methods for calculating solvency under the California fraudulent conveyance statute.[57]

Based on his investigation, Mr. Balasiano concluded that "there was no actionable cause of action that could be brought as a result of that transaction [Sunrise Transfer]" because "[t]he company was solvent."[58]  He reasoned that: "In order to bring a fraudulent conveyance action

---

[49] Cal. Civ. Code § 3439.05(a).

[50] Cal. Civ. Code § 3439.02.  *See also In re Beverly*, 374 B.R. 221, 238 n. 18 (B.A.P. 9th Cir. 2007), *aff'd in part, dismissed in part*, 551 F.3d 1092 (9th Cir. 2008) (applying this statute to a fraudulent transfer analysis).

[51] JX96.002 (GCS Report).

[52] 03/04/2024 Tr. 76:25-77:20 (Balasiano).

[53] 03/04/2024 Tr. 78:4-14 (Balasiano).

[54] 03/04/2024 Tr. 89:11-24 (Balasiano); 03/05/2024 Tr. 33:22-35:5; 44:17-46:21 (Sarrao); JX2 (Alecto Healthcare Services, LLC Income Statement FY19).

[55] JX1.010 (2019 Tax Return for Alecto Healthcare Services LLC prepared by MossAdams) and JX41 (Alecto Healthcare Services Balance Sheet Summary (in millions), dated 12/31/2019).

[56] 03/04/2024 Tr. 80:11 (Balasiano).

[57] Cal. Civ. Code § 3439.02.  *See also In re Beverly*, 374 B.R. at 238.

[58] 03/04/2024 Tr. 80:3-16 (Balasiano).

there are two factors. One is there has to be a transfer for lack of reasonably equivalent value and, number two, the company has to be insolvent at the time of that transfer. Clearly, the second fact[or] of the test was not satisfied her[e]."[59]

The burden of proving insolvency is on the creditor by a preponderance of the evidence.[60] "As a general rule 'solvency and not insolvency is presumed.'"[61] Here, the Reed Creditors did not carry their burden to prove by a preponderance of the evidence that the Debtor was insolvent at the time of the Sunrise Transfer.

The Court finds that Mr. Balasiano's determination that there is "no actionable cause of action that could be brought" for fraudulent conveyance is a reasonable basis for the settlement.[62]

## 2) **Breach of Fiduciary Duties**

Next, the Reed Creditors assert that the Debtor is releasing viable claims against the Alecto Members for Breach of Fiduciary Duties arising from Alecto's advancement of funds to its affiliates while Alecto was allegedly insolvent or in the zone of insolvency instead of making payment to its creditors. The crux of this allegation is that more than $5 million was advanced to Sherman/Grayson after the Reed Creditors obtained their approximately $3.2 million judgment against Alecto in November 2022, and before the Petition Date. Essentially, the Reed Creditors allege that the Debtor favored propping-up Sherman/Grayson, it's affiliate, over the Reed Creditors, it's creditor.

In Delaware, "limited liability company managers owe fiduciary duties akin to those owed by directors of a corporation."[63] "Without language in an LLC agreement to the contrary, the managers of a Delaware LLC owe traditional fiduciary duties of care and loyalty."[64]

"The fiduciary duty of due care requires that directors of a Delaware corporation both: (1) use that amount of care which ordinarily careful and prudent men would use in similar

---

[59] 03/04/2024 Tr. 80:11-16 (Balasiano). The Debtor asserted that *even if* the Sunrise Transfer was a fraudulent conveyance, the property was transferred back to the Debtor in 2021. And, as the 2021 transfer resulted in more equity for the Debtor than the 2019 Sunrise Transfer, such transfer should be "set off" against the 2021 transfer back to the Debtor. The Court is *not* assessing the merits of the Sunrise Transfer (nor the 2021 return transfer). Here, the Court is determining whether the settlement of the causes of action in the Releases (in exchange for the Settlement Consideration) is in "the lowest point in the range of reasonableness." *Wash. Mut., Inc.*, 442 B.R. at 328 (citations omitted). As a result, the Court need not address the "set off" argument.

[60] *See Stearns v. Los Angeles City Sch. Dist.*, 53 Cal. Rptr. 482, 509 (Cal. Ct. App. 1966) (citations omitted); *Whitehouse v. Six Corp.*, 48 Cal. Rptr. 2d 600, 606 (Cal. Ct. App. 1995), *as modified* (Nov. 29, 1995), *as modified on denial of reh'g* (Dec. 19, 1995).

[61] *Stearns*, 53 Cal. Rptr. at 509 (citing *Hasenjeager v. Voth*, 267 P. 146, 147 (Cal. Ct. App. 1928)).

[62] 03/04/2024 Tr. 80:3-9 (Balasiano); *Wash. Mut., Inc.*, 442 B.R. at 328 (citations omitted).

[63] *Mehra v. Teller*, No. CV 2019-0812-KSJM, 2021 WL 300352, at *28 (Del. Ch. Jan. 29, 2021) (footnote omitted).

[64] *77 Charters, Inc. v. Gould*, No. CV 2019-0127-JRS, 2020 WL 2520272, at *9 (Del. Ch. May 18, 2020) (citations omitted).

circumstances; and (2) consider all material information reasonably available."[65] The business judgment standard is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[66] A court will not disturb the business decisions of loyal and informed directors "if they can be attributed to any rational business purpose."[67]

The fiduciary duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[68] A director is "being independent only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations."[69]

Mr. Balasiano also investigated the breach of fiduciary duty claims[70] and concluded:

> [there were] no breach of fiduciary duties, no breach of duty -- no
> breach of loyalty, and no breach of duty of care by the directors
> and the officers in this case. All of the activities that were done, all
> the funds that were allocated to the different subsidiaries,
> especially to the Sherman/Grayson, which I believe is the biggest
> issue in the case right here, right now, especially to
> Sherman/Grayson were allocated in a fashion with the appropriate
> judicious business judgment. The actions that the business
> members took were daily conversations, daily decisions that were
> undertaken in order to keep Sherman/Grayson Hospital afloat to
> enable to sell it as a going concern.[71]

After speaking with his counsel, the Debtor's counsel, and officers and employees of the Debtor; examining documents, including those related to Sherman/Grayson;[72] and reviewing the decisions made by the Alecto Members, Mr. Balasiano determined that the Alecto Members acted within their business judgment.[73] He reasoned that a going concern sale is typically better for a company than a liquidation or closure, and in this case, the Alecto Members were cognizant of approximately $30 million in collateral liabilities (such "Springing Liabilities" are discussed

---

[65] *Bridgeport Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 568 (Bankr. D. Del. 2008) (citation omitted).

[66] *Gantler v. Stephens*, 965 A.2d 695, 705–06 (Del. 2009) (footnote omitted).

[67] *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971).

[68] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994) (citations omitted).

[69] *Id.* at 364 (citations omitted).

[70] 03/04/2024 Tr. 74:14-75:3 (Balasiano).

[71] 03/04/2024 Tr. 83:4-16 (Balasiano).

[72] 03/04/2024 Tr. 80:20-82:1 (Balasiano).

[73] 03/04/2024 Tr. 83:2-16 (Balasiano).

11

below) from the potential closure of WNJ.[74]  The Alecto Member's determined that supporting WNJ would allow a purchaser to assume many, if not all, of these Springing Liabilities.[75]  Based on his investigation, Mr. Balasiano concluded that the Alecto Members acted within their fiduciary duties and pursuant to their business judgment.  Mr. Balasiano concluded that there was no valid cause of action for breach of fiduciary duties and the release of such claims appropriate.[76]

In addition, Mr. Balasiano testified about the costs of potential litigation.  He said litigation could give rise to indemnification under the Operating Agreement which would further deplete assets of Alecto.[77]  Although there is insurance, the insurer would be entitled to review for coverage.[78]  Mr. Balasiano concluded the financial resources of the Debtor could be drained.[79]

Mr. Balasiano's reasoning is supported by Mr. Sarrao who testified that Alecto Managers spoke nearly every business day regarding the oversight and management of the business[80] and were aware of the potential harm to Alecto if it stopped funding the affiliates.[81]  He explained the following Springing Liabilities were considered in the Alecto Members' decision-making process:

- Alecto guaranteed the real estate lease at the WNJ facility.  This lease obligation would be an approximate $7.2 million liability of Alecto.[82]

- Alecto, as guarantor, would be liable under a "put option" for the hypothetical fair market value of a facility adjacent to WNJ if it did not operate for 12 months.[83]  Mr. Sarrao estimates this liability between $13-15 million.[84]

---

[74] 03/04/2024 Tr. 83:17-84:14 (Balasiano).

[75] 03/05/2024 Tr. 52:20-53:2 (Sarrao).

[76] 03/04/2024 Tr. 83:2-84:4 (Balasiano).

[77] 03/04/2024 Tr. 107:12-16 (Balasiano).

[78] 03/04/2024 Tr. 107:22-108:17 (Balasiano).

[79] 03/04/2024 Tr. 85:3-9 (Balasiano).

[80] 03/05/2024 Tr. 15:17-16:5 (Sarrao).

[81] *See, e.g.,* 03/05/2024 Tr. 52:20-53:17 (Sarrao) (describing obligations from Sherman/Grayson that the Debtor would become liable for without providing funding to Sherman/Grayson); *see also Asmussen v. Quaker City Corp.*, 156 A. 180, 181 (Del. Ch. 1931) (holding that directors of insolvent corporations may appropriately prefer particular creditors); *Pennsylvania Co. for Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.*, 174 A. 112, 115-16 (Del. Ch.1934) (finding that the board's preference of one creditor over another could be a breach of fiduciary duty if motivated by self-interest). *See also Nelson v. Emerson*, No. CIV.A. 2937-VCS, 2008 WL 1961150, at *9 n. 59 (Del. Ch. May 6, 2008).

[82] 03/05/2024 Tr. 53:8-17 (Sarrao).  JX18 (Lease Agreement between MPT of Sherman Alecto Hospital, LLC and Sherman/Grayson Hospital, LLC dated Oct. 31, 2014).

[83] 03/05/2024 Tr. 55:13-22 (Sarrao).

[84] 03/05/2024 Tr. 55:3-22; 58:2-15 (Sarrao). 03/04/2024 Tr. 84:7-12 (Balasiano).  JX10 (Ground Lease Agreement for 300 N. Highland Dr., Sherman, TX); JX19 (Assumption and Assignment of MOB Ground Lease); JX20 (Guaranty).

- During the COVID-19 pandemic, WNJ was a recipient of Medicare advance payments under the CAAP program from CMS.[85] Mr. Sarrao believes CMS would pursue Alecto for return of these advance payments if WNJ did not pay them.[86] Mr. Sarrao estimates this liability to be over $5 million if WNJ closed.[87]

- Mr. Sarrao testified that, at any given time, there is approximately $800,000 of accrued payroll at WNJ and that such payroll would become the responsibility of Alecto if WNJ did not pay the accrued payroll.[88]

- Mr. Sarrao believes that there is approximately $1 million of accrued pay roll taxes that would become the responsibility of Alecto.[89]

- Mr. Sarrao testified that WNJ accrued approximately $775,000 in PTO (paid time off) for its employees that would become the responsibility of Alecto if WNJ closed.[90]

- Mr. Sarrao testified that Alecto would be liable for up to $500,000 in accrued real estate taxes if WNJ closed and did not pay its taxes.[91]

- Mr. Sarrao testified if WNJ closed (i) there would be wind-down costs associated with the computer systems and paper records at WNJ which contain protected health records; (ii) pharmaceuticals, including radioactive materials, would have to be handled in accordance with applicable law; (iii) WNJ patients would have to be transferred to other facilities; and (iv) WNJ's facility secured and equipment disposed of during closure. Mr. Sarrao estimates these expenses would be approximately $3 million.[92]

- Mr. Sarrao testified approximately $1 million of personal property taxes would be due and owning and would become the responsibility of Alecto.[93]

- Mr. Sarrao testified Alecto would face approximately $3-3.2 million of possible WARN Act claims if WNJ closed without any advance notice to employees.[94]

---

[85] 03/05/2024 Tr. 58:16-22 (Sarrao). Referring to the "COVID-19 Accelerated and Advance Payment" from the Centers for Medicare & Medicaid Services. *See* https://www.cms.gov/medicare/payment/covid-19/covid-19-accelerated-and-advance-payments/covid-19-accelerated-and-advance-payment-caap-and-repayment-reporting.

[86] 03/05/2024 Tr. 59:3-5 (Sarrao).

[87] 03/05/2024 Tr. 58:18-59:12 (Sarrao).

[88] 03/05/2024 Tr. 59:15-21 (Sarrao).

[89] 03/05/2024 Tr. 61:5-8 (Sarrao).

[90] 03/05/2024 Tr. 59:18-21 (Sarrao).

[91] 03/05/2024 Tr. 59:25-60:7 (Sarrao).

[92] 03/05/2024 Tr. 60:8-24 (Sarrao).

[93] 03/05/2024 Tr. 60:25-61:5 (Sarrao).

[94] 03/05/2024 Tr. 61:10-62:3 (Sarrao).

Mr. Sarrao testified that in his business judgment, and the business judgment of the board of managers, when Alecto found a buyer for WNJ, the sale would absorb many of the Springing Liabilities[95] (which indeed occurred in the Sherman/Grayson bankruptcy case).

Mr. Sarrao further testified about the negative impact of the COVID-19 pandemic on hospital operations and profits, including (i) increased labor and supply costs (particularly, traveling nurses and respiratory therapist); (ii) static reimbursement rates from insurance and Medicare; (iii) decreased patients; (iv) closure of more profitable hospital departments, such as the psychiatric in-patient ward and elective surgeries.[96]  These COVID-related pressures, and resulting decline in profits, were considered and impacted the Alecto Managers' exercise of their business judgment in determining how to expend limited financial resources.[97]

There is no evidence that the Alecto Managers did not consider all information reasonably available to them, or that they were negligent in determining whether to make transfers to Sherman/Grayson.  Similarly, no evidence was presented that the managers acted in their own self-interests rather than the interests of Debtor.

### 3) *Zenith* Factors

In addition to analyzing the Debtor Releases under the business judgment standard, some courts within the Third Circuit assess the propriety of a debtor release under the five *Zenith* factors:

> (1) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.[98]

No one *Zenith* factor is dispositive, nor is a plan proponent required to establish each factor for the release to be approved.[99]  Applying *Zenith*, two factors are neutral.  Factor 1, whether there is an identity of interest between the Debtor and non-debtors, is neutral because it is subject to debate[100] and the parties have not provided sufficient evidence on the issue.  Similarly, factor 4 is neutral because no creditors voted to accept or reject the Plan.

---

[95] 03/05/2024 Tr. 64:16-23 (Sarrao).  The Sherman/Grayson sale of the WNJ hospital closed on January 1, 2024. Del. Bankr. Case No. 23-19810, D.I. 314.

[96] 03/05/2024 Tr. 178:15-81:12 (Sarrao).

[97] 03/05/2024 Tr. 178:6-183:4 (Sarrao).

[98] *Coram Healthcare Corp.*, 315 B.R. at 335 (*citing In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)).

[99] *In re Wash. Mut. Inc.*, 442 B.R. at 346.

[100] JX13 (Alecto Healthcare Services LLC Amended and Restated Operating Agreement, § 7.8) (specifying certain indemnification obligations that the Debtor has in relation to the Released Parties).

Two factors weigh in favor of releases. Factor 2, the substantial contribution factor, weighs in favor because the "Released Parties" are contributing the Settlement Consideration for distribution to the creditors under the Plan.[101] Mr. Balasiano, the independent director tasked with reviewing claims, determined in his business judgment that the alleged claims were not actionable;[102] under the circumstances, the Court finds the contribution to be substantial. Factor 3, the uncontroverted testimony established that, absent the releases, the Debtor would not proceed with the Plan.[103] If this case is converted to Chapter 7, the Liquidation Analysis reflects no recovery for unsecured creditors.[104]

Factor 5 weighs against releases. All claim holders will be paid in full except those in Class 3 who will receive a pro rata recovery over a three-year plan period.[105]

On balance, the *Zenith* factors favor approval of the Debtor Releases.

### 4) Conclusion Regarding Debtor Releases

In sum, Mr. Balasiano, the Debtor's independent director, determined in his business judgment and based on his independent investigation, that there was not an actionable claim for fraudulent conveyance or breach of fiduciary duties, and that the release of such claims was appropriate. No contrary evidence was presented.

Based on the evidence, and considering the *Zenith* standard, the Court finds that the proposed settlement falls within a reasonable range of litigation possibility. Under the *Martin* factors, the claims have very little probability of success on the merits, if any.[106] Absent the settlement, the Debtor would face increased expense, inconvenience and delay attending to litigation.[107] These are complex claims that could cause delay in the distribution of any assets to the creditors. Additionally, the creditors will receive the Settlement Consideration as part of the disposable income of the Debtor. There was no evidence regarding the possibility of collection on any

---

[101] Plan (D.I. 261) at Art. IV.5; Sarrao Declaration (D.I. 307) at ¶ 69; 03/04/2024 Tr. 80:3-9, 83:2-7 (Balasiano); 03/05/2024 Tr. 176:2-4 (Sarrao).

[102] 03/04/2024 Tr. 80:3-9; 83:2-7.

[103] 03/05/2024 Tr. 73:18-74:1 (Sarrao) ("Q. Are the releases in conjunction and exculpation each an (indiscernible) part of the debtor[']s plan? A. From my view, yes. Q. And has the board considered whether to proceed with the plan if each of those provisions is not approved? A. It has. Q. And what would the [board] do if these were not approved? A. It would likely not proceed with the plan as it's structured right now.").

[104] Plan (D.I. 261) at Art. IV.5; *see also* 03/05/2024 Tr. 22:20-25 (Sarrao).

[105] Plan (D.I. 261) at Art. IV.1-2.

[106] *See generally In re World Health Alts., Inc.*, 344 B.R. 291, 302 (Bankr. D. Del. 2006) ("Factor one favors settlement because there is a low probability of litigation success. A sufficient degree of uncertainty exists as to whether the Committee, or a chapter 7 trustee, could prevail on any of the potential causes of action against CapSource. Moreover, the Court finds that the probability of successfully challenging CapSource's liens is low.")

[107] *Id.* ("Substantial expenditure of money may not be warranted in light of the low probability of success and the estate's limited resources.")

judgment, so this factor is neutral. The other three *Martin* factors weigh in favor of approving the settlement.

The Settlement Consideration is a substantial contribution because there are no actionable causes of action that could be brought based on these purported claims. As a result, the Debtor Releases are a valid exercise of the Debtor's business judgment, are fair, reasonable, and in the best interest of the Debtor's estate. The sole remaining objection to the Debtor Releases is overruled.

### b. Injunction

The Reed Creditors object to the Injunction in Section VII.4 of the Plan. They argue the Injunction creates the equivalent of non-consensual third-party release because it enjoins creditors from pursuing the Released Parties.[108] Paragraph 69 of the Proposed Confirmation Order, which was revised to resolve certain objections, states: "Nothing in the Plan or herein shall be interpreted to provide any third-party releases, however no party may bring a derivative claim of the Debtor or its estate against any of the Released Parties for any Claim arising prior to the Effective Date."[109]

As a general matter, creditors, such as the Reed Creditors, of an insolvent corporation (or a corporation operating in the zone of insolvency) cannot bring direct causes of action (including fraudulent conveyance and breach of fiduciary duty claims) against such corporation's officers and directors.[110] Such claims must be brought derivatively.[111]

As the Court finds that the Debtor's settlement by release of the above-described claims is appropriate and the only way for the Reed Creditors to bring such claims is derivatively (i.e., standing in the shoes of the Debtor), the objection to the proposed injunction is overruled.

### c. Good Faith - 11 U.S.C. §1129(a)(3)

Section 1129(a)(3) requires a plan to be "proposed in good faith and not by any means forbidden by law." At the Confirmation Hearing, the Reed Creditors argued the Debtor cannot satisfy the good faith requirement.

First, the Reed Creditors argue that this case involves process, evidence, and legal failures in the Debtor's efforts to obtain releases through the Plan in favor of its insiders. They assert that the independent director could not fulfill his role as a fiduciary to creditors because he failed to evaluate the potential causes of action independently, engaged in a "cursory" analysis, and was unable to articulate why he determined those claims were not viable. They also argue that Mr. Sarrao is not an expert on solvency and is conflicted as a potential target of a possible breach of fiduciary duty claim. As detailed above, Mr. Balasiano, an independent director, with fiduciary

---

[108] Plan (D.I. 261) at Art. VII.4.

[109] D.I. 334.

[110] *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 100–01 (Del. 2007).

[111] *Id.* at 101.

duties, investigated and analyzed the potential claims and concluded there were no actionable causes of actions that could be brought.[112]  Likewise, Mr. Sarrao relied upon documents prepared in the ordinary course of business and his experience with the Debtor's business.  The Court found both Messrs. Balasiano's and Sarrao's testimony to be credible.

Second, the Reed Creditors argue the $25,000 consideration for the release of claims will "yield no benefit to creditors."  They argue this recovery is "paltry" compared to a potential $1.9 million recovery if the fraudulent conveyance and breach of fiduciary duty claims were successfully prosecuted.  Again, considering Mr. Balasiano's determination regarding the claims, $25,000 for the release of the purported claims is substantial and yields a recovery to creditors.

Finally, the Reed Creditors argue that preserving causes of action for the Reorganized Debtor amounts to benefitting the insiders.  However, the Reed Creditors never presented any evidence or otherwise explained how the plan fails to satisfy section 1129(a)(3).  In contrast, the evidence shows that the Plan "comports with . . . [the] principal purpose of the Bankruptcy Code," which "is to grant a fresh start to debtors."[113]

For these reasons, the Court finds that the Plan "has been proposed in good faith and not by any means forbidden by law."[114]  The Reed Creditors' objection is overruled.

**E.   Conclusion**

Based on the record before the Court, and as explained above, the Court finds that the Plan satisfies the requirements of the Bankruptcy Code.  The Court will confirm the Plan, subject to modification of the Proposed Confirmation Order.  A hearing will be held on **March 25, 2024, at 11:00 am (Prevailing Eastern Time)** to discuss the language of the Proposed Confirmation Order.[115]

Regards,

J. Kate Stickles
United States Bankruptcy Judge

cc: Counsel on attached Service List via E-mail

---

[112]  Mr. Balasiano, an attorney, serves as trustee and independent director in bankruptcy cases, including evaluating potential causes of action.

[113]  *See City of Chicago v. Fulton*, 141 S. Ct. 585, 593 (2021) (citation omitted).

[114]  11 U.S.C. § 1129(a)(3).

[115]  To the extent unresolved, the Court will address the objection of the United States of America and the U.S. Trustee to Article VI.c. of the Plan and paragraph 53 of the Proposed Confirmation Order relating to forfeiture of undeliverable or unclaimed distributions.

## Service List

**Counsel to the Debtor**
Jeffrey R. Waxman, Esquire
Tara C. Pakrouh, Esquire
Christopher M. Donnelly, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
jwaxman@morris.james.com
tpakrouh@morrisjames.com
cdonnelly@morrisjames.com

**Counsel for Debtor's Independent Director/Manager**
Justin R. Alberto, Esquire
Cole Schotz P.C.
500 Delaware Ave., Suite 1410
Wilmington, DE 19801
JAlberto@coleschotz.com

**Subchapter V Trustee**
Jami Nimeroff, Esquire
Brown McGarry Nimeroff LLC
919 N. Market Street, Suite 420
Wilmington, DE  19801
JNimeroff@bmnlawyers.com

**United States Trustee**
Linda Casey, Esquire
Office of the United States Trustee
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE  19801
Linda.Casey@usdoj.gov

**Counsel for the United States of America**
Brian M. Boynton, Esquire
Kirk T. Manhardt, Esquire
Marc S. Sacks, Esquire
Stanton C. Mcmanus, Esquire
U.S. Department of Justice –
  Civil Division Commercial
Litigation Branch
P.O. Box 875, Ben Franklin Station
Washington, DC  20044
stanton.c.mcmanus@usdoj.gov

-and-

Leah V. Lerman, Esquire
U.S. Department of Justice Civil Division
P.O. Box 875 Ben Franklin Station
Washington, DC  20044-0875
Leah.V.Lerman@usdoj.gov

**Counsel for the Reed Action Judgment Creditors**
William D. Sullivan, Esquire
William A. Hazeltine, Esquire
Sullivan Hazeltine Allinson LLC
919 North Market Street, Suite 420
Wilmington, DE  19801
bsullivan@sha-llc.com
whazeltine@sha-llc.com

-and-

Colten L. Fleu, Esquire
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV  25301
colten@msjlaw.org

-and-

John Stember, Esquire
Maureen Davidson-Welling, Esquire
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
jstember@stembercohn.com
mdavidsonwelling@stembercohn.com