**EXHIBIT A**

WBD (US) 4929-9600-5036

# LEASE AGREEMENT

**LANDLORD:** DECAR REALTY

**TENANT:**    SCHOTTENSTEIN STORES CORPORATION D/B/A
VALUE CITY FURNITURE

**PREMISES:** 8301 Annapolis Road
New Carrollton, Maryland

## TABLE OF CONTENTS

Section 1 .............................................Premises

Section 2 ................................................. Term

Section 3 ................................... Commencement Date

Section 4 ................................... Renewal Options

Section 5 ...................................... Minimum Rent

Section 6 ................................... Percentage Rent

Section 7 ...................... Security Deposit - Deleted

Section 8 ................................. Right To Remodel

Section 9 ......................................... Utilities

Section 10 ........................................... Glass

Section 11 .............................. Personal Property

Section 12 .............................. Right to Mortgage

Section 13 .......................... Sublease or Assignment

Section 14 ..................................... Common Areas

Section 15 ...................... Operation of Common Areas

Section 16 ......... Common Area Maintenance, Tenant's Share

Section 17 ................................. Eminent Domain

Section 18 ................................. Tenant's Taxes

Section 19 .................................. Risk of Goods

Section 20 ................................ Use and Occupancy

Section 21 ........................................ Nuisances

Section 22 ......................... Waste and Refuse Removal

Section 23 ................................ Fire and Casualty

Section 24 ................................ Landlord Repairs

Section 25 ................................ Tenant's Repairs

Section 26 ....... Covenant of Title and Peaceful Possession

Section 27 .................. Tenant's Insurance; Indemnity

Section 28 .............................. Real Estate Taxes

Section 29 ................ Tenant's Insurance Contribution

Section 30 ......................................... Fixtures

Section 31 ......................................... Surrender

Section 32 ..................................... Holding Over

Section 33 ........................................... Notice

Section 34 ........................................... Default

Section 35 ........................... Waiver of Subrogation



Section 36 ............... Liability of Landlord; Exculpation

Section 37 .................................... Rights Cumulative

Section 38 ................................. Mitigation of Damages

Section 39 ............................................. Signs

Section 40 ................................... Entire Agreement

Section 41 ........................... Landlord's Lien - Deleted

Section 42 ............................. Binding Upon Successors

Section 43 ............................... Hazardous Substances

Section 44 ................................. Transfer of Interest

Section 45 ................................. Access to Premises

Section 46 ........................................... Headings

Section 47 .......................................... Non-Waiver

Section 48 ..................................... Short Form Lease

Section 49 ........................................... Brokerage

Section 50 ............................. Acceptance of Premises

Section 51 .......................................... Exclusivity

Section 52 ................................. Personal Liability

Exhibit A .......................................... Site plan

Exhibit B ............................... Tenant's set of plans

Exhibit C ................................... 'No-build' areas

Exhibit D ................................. Pylon sign panel



## L E A S E

**THIS AGREEMENT OF LEASE**, made this _____ day of December, 1993, by and between DECAR REALTY, (hereinafter referred to as "Landlord"), with offices at c/o I. Neuman & Sons, Inc., 122 E. 42nd Street, Suite 3009, New York, New York 10017 and SCHOTTENSTEIN STORES CORPORATION, a Delaware Corporation D/B/A VALUE CITY FURNITURE, with offices at 1800 Moler Road, Columbus, Ohio 43207 (hereinafter referred to as "Tenant").

### WITNESSETH:

### SECTION 1. PREMISES

(a) Landlord, in consideration of the rents to be paid and covenants and agreements to be performed by Tenant, does hereby lease unto Tenant the premises (hereinafter referred to as the "premises" or "demised premises") in the Plaza 30 Shopping Center (hereinafter referred to as the "Shopping Center"), at 8301 Annapolis Road, in the City of New Carrollton, and State of Maryland, together with the non-exclusive right to use the common areas as set forth in Section 14 hereof. The location, size, and area of the demised premises and of the Shopping Center are shown on Exhibit "A" attached hereto and made a part hereof.

(b) The demised premises shall have a ground floor area of approximately 37,250 square feet.

### SECTION 2. TERM

The term of this Lease shall be for a period of ten (10) years, commencing the earlier of: (i) the day Tenant opens for business; or (ii) ninety (90) days after possession (the "commencement date").

### SECTION 3. DELIVERY OF POSSESSION

(a) Landlord agrees to use its best efforts to deliver to Tenant possession of the demised premises no later than 01-15-94 ready for occupancy. The premises shall be free of any violation of laws, ordinances, regulations and

building restrictions relating to the possession or use of the demised premises.

(b)    Tenant shall use its best efforts to complete all work  to be done by Tenant within ninety (90) days after the date possession of the demised premises has been delivered to Tenant, at Tenant's expense in accordance with the provisions of this Lease and as set forth in the  set of plans attached hereto as Exhibit "B" and made a part hereof.

(c) From the date upon which the demised premises are delivered to Tenant for its work until the commencement date of the lease term, Tenant shall observe and perform all of its obligations under this Lease (except its obligation to operate and to pay minimum rent, percentage rent, its prorata share of maintenance costs, provided for in Section 16 hereof, its prorata share of real estate taxes provided for in Section 28 hereof and its prorata share of insurance provided for in Section 29 hereof).

### SECTION 4. RENEWAL OPTIONS

(a) Provided Tenant is not in default under this Lease, Tenant may, by giving written notice to the Landlord at least six (6) months on or before the expiration of the original term of this Lease, extend such term for a period of five (5) year(s) upon the same covenants and agreements as are herein set forth, except that the minimum rent during the first renewal term shall be increased to Fifteen Thousand Five Hundred Twenty and 83/100 Dollars ($15,520.83) each month.

(b) Provided Tenant is not in default under this Lease and has exercised its first option to renew hereunder, Tenant may, by giving written notice to the Landlord at least six (6) months on or before the expiration of the first extended term of this Lease, extend such term for an additional period of five (5) year(s) upon the same covenants and agreements as the first extended term except that the minimum rent (as increased pursuant to subparagraph

2



(a) above) during this second renewal term shall be further increased to Seventeen Thousand Seventy Two and 92/100 Dollars ($17,072.92) each month.

## SECTION 5. MINIMUM RENT

(a) Tenant agrees to pay to Landlord, as minimum rent for the demised premises, equal consecutive monthly installments of Twelve Thousand Four Hundred Sixteen and 67/100 Dollars ($12,416.67), commencing on the commencement date, and continuing on the first day of each calendar month during years one (1) through five (5) of the initial term of this Lease, and monthly installments of Thirteen Thousand Nine Hundred Sixty Eight and 75/100 Dollars ($13,968.75) each calendar month during years six (6) through ten (10) of the initial term of this Lease.    All such rental shall be payable to Landlord in advance, without prior written notice or demand.    As used in this Lease, the term "minimum rent" means the minimum rent set forth in this subparagraph (a) as adjusted pursuant to Section 4 hereof.

(b) If the Lease term shall commence on a day other than the first day of a calendar month or shall end on a day other than the last day of a calendar month, the minimum rental for such first or last fractional month shall be such proportion of the monthly minimum rental as the number of days in such fractional month bears to the total number of days in such calendar month.

(c) Until further notice to Tenant, all rental payable under this Lease shall be payable to Landlord and mailed to Landlord at Decar Realty, c/o I. Neuman & Sons, Inc., 122 E. 42nd Street, Suite 3009, New York, New York  10017.

## SECTION 6. PERCENTAGE RENT

(a) Tenant shall pay to Landlord as additional rent, a percentage rental of two and one half percent (2 1/2%) of the "gross receipts" as hereinafter defined, which exceed (i) Five Million Nine Hundred Sixty Thousand and no/100 Dollars ($5,960,000.00) during each lease year of years one (1) through five (5) of the initial term; (ii) Six Million

3

Seven Hundred Five and no/100 Dollars ($6,705,000.00) during each lease year of years six (6) through ten (10) of the initial term; (iii) **Seven Million Four Hundred Fifty Thousand and no/100 Dollars ($7,450,000.00)** during **each** lease year of the first renewal term; and (iv) **Eight Million One Hundred Ninety Five Thousand and no/100 Dollars ($8,195,000.00)** during each lease year of the second renewal term.

(b) For purposes hereof, a lease year shall consist of a consecutive twelve (12) calendar month period commencing on the commencement of the term of this Lease; provided, however, that if this Lease commences on a day other than the first day of a calendar month, then the first lease year shall consist of such fractional month plus the next succeeding twelve (12) full calendar months, and the last lease year shall consist of the period commencing from the end of the preceding lease year and ending with the end of the term of the Lease, whether by expiration of term or otherwise. In the event percentage rental shall commence to accrue on a day other than the first day of a lease year, the percentage rental for such lease year shall be adjusted on a prorata basis, based upon the actual number of days in such lease year.

(c) Each lease year shall constitute a separate accounting period, and the computation of percentage rental due for any one period shall be based on the gross receipts for such lease year.

(d) The term "gross receipts" as used in this Lease is hereby defined to mean the gross dollar aggregate of all sales or rental or manufacture or production of merchandise and all services, income and other receipts whatsoever of all business conducted in, at or from any part of the demised premises, whether for cash, credit, check, charge account, gift or merchandise certificate purchased or for other disposition of value regardless of collection. Should any departments, divisions or parts of Lessee's business be

4

conducted by any subleases, concessionaires, licensees, assignees or others, then there shall be included in Lessee's "gross sales," all "gross sales" of such department, division or part, whether the receipts be obtained at the demised premises or elsewhere in the same manner as if such business had been conducted by Lessee. Gross Receipts shall exclude the following: (i) any sales tax, gross receipts tax or similar tax by whatever name called, the amount of which is determined by the amount of the sale made, and which Tenant is required to account for, and pay over to, any governmental agency; (ii) transfers of merchandise made by Tenant from the demised premises to any other stores or warehouses of Tenant; (iii) credits or refunds given to customers for merchandise purchased from Tenant and thereafter returned or exchanged; (iv) receipts from vending machines and any public telephones; (v) delivery charges; (vi) fabric coating charges; (vii) finance charges; (viii) sales to Tenant's employees; and (ix) customer credit insurance.

Tenant shall be permitted to deduct from any percentage rental owed Landlord, any prorata contribution for taxes, insurance and/or common area maintenance costs that Tenant has previously paid to Landlord during that lease year. Tenant shall also be permitted to deduct any HVAC expenditures that are Landlord's responsibility as defined under Section 25 (b) of this Lease.

(e) The percentage rental, if any, shall be paid within thirty (30) days after the end of each lease year, accompanied by a statement in writing signed by Tenant setting forth its gross receipts from the sale of all items for such lease year. Tenant shall keep at its principal executive offices, where now or hereafter located, true and accurate accounts of all receipts from the demised premises. Landlord, its agents and accountants, shall have access to such records at any and all times upon reasonable advance notice during regular business hours for the purpose of

examining or auditing the same. Tenant shall also furnish to Landlord any and all supporting data in its possession relating to gross sales and any deductions therefrom as Landlord may reasonably require. Landlord agrees to keep any information obtained therefrom confidential, except as may be required for Landlord's tax returns, or in the event of litigation or arbitration where such matters are material.

(f) Tenant shall at all times maintain accurate records which shall be available for Landlord's inspection at any reasonable time.

(g) If Landlord, for any reason, questions or disputes any statement of percentage rental prepared by Tenant, then Landlord, at its own expense, may employ such accountants as Landlord may select to audit and determine the amount of gross sales for the period or periods covered by such statements. If the report of the accountants employed by Landlord shall show any additional percentage rents payable by Tenant, then Tenant shall pay to Landlord such additional percentage rents plus interest at one (1) point over the prime rate, commencing on the date such percentage rentals should have been paid, within thirty (30) days after such report has been forwarded to Tenant, unless Tenant shall, within said thirty (30) day period, notify Landlord that Tenant questions or disputes the correctness of such report. In the event that Tenant questions or disputes the correctness of such report, the accountants employed by Tenant and the accountants employed by Landlord shall endeavor to reconcile the question(s) or dispute(s) within thirty (30) days after the notice from Tenant questioning or disputing the report of Landlord's accountants. In the event that it is finally determined by the parties that Tenant has understated percentage rent for any Lease year by three percent (3%) or more, Tenant shall pay the cost of the audit. Furthermore, if Tenant's gross sales cannot be verified due to the insufficiency or inadequacy of Tenant's

records, then Tenant shall pay the reasonable cost of the audit.

**SECTION 7. SECURITY DEPOSIT** – DELETED

**SECTION 8. RIGHT TO REMODEL**

Tenant may, with Landlord's prior written approval and at Tenant's expense, make repairs and alterations to the interior of the demised premises and remodel the interior of the demised premises, excepting structural and exterior changes, in such manner and to such extent as may from time to time be deemed necessary by Tenant for adapting the demised premises to the requirements and uses of Tenant and for the installation of its fixtures, appliances and equipment. Tenant will indemnify and save harmless the Landlord from and against all mechanics liens or claims by reason of repairs, alterations or improvements which may be made by Tenant to the demised premises. Any structural or exterior alteration may only be made by Tenant with the prior written approval of Landlord, which approval shall not be unreasonably withheld or delayed so long as in conformity with image and harmony of the exterior of the shopping center as a whole. Inasmuch as any such alterations, additions or other work in or to the demised premises may constitute or create a hazard, inconvenience or annoyance to the public and other tenants in the Shopping Center, Tenant shall, if so directed in writing by Landlord, erect barricades, temporarily close the affected portion of the demised premises to the public or take whatever measures are necessary to protect the building containing the demised premises and the public for the duration of such alterations, additions or other work. If Landlord determines, in its sole judgment, that Tenant has failed to take any of such necessary protective measures after written notice thereof, Landlord may do so and Tenant shall reimburse Landlord for the reasonable cost thereof within ten (10) days after Landlord bills Tenant therefor.

**SECTION 9. UTILITIES**

The Tenant agrees to be responsible and pay for all public utility services rendered or furnished to the demised premises during the term hereof, including, but not limited to, heat, water, gas, electric, steam, telephone service and sewer services, together with all taxes, levies or other charges on such utility services when the same become due and payable. Landlord shall cause all such utility services to be separately metered prior to the commencement date, at Landlord's expense.

**SECTION 10. GLASS**

The Tenant shall maintain the glass part of the demised premises, promptly replacing any breakage and saving the Landlord harmless from any loss, cost or damage resulting from such breakage or the replacement thereof.

**SECTION 11. PERSONAL PROPERTY**

The Tenant further agrees that all personal property of every kind or description that may at any time be in or on the demised premises shall be at the Tenant's sole risk, or at the risk of those claiming under the Tenant, and that the Landlord shall not be liable for any damage to said property or loss suffered by the business or occupation of the Tenant caused in any manner whatsoever.

**SECTION 12. RIGHT TO MORTGAGE**

(a) Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any deed of trust, mortgage or mortgages now or hereafter placed upon Landlord's interest in the demised premises; provided, however, that no default by Landlord under any deed of trust, mortgage or mortgages, shall affect Tenant's rights under this Lease, so long as Tenant performs the obligations imposed upon it hereunder and is not in default hereunder, and Tenant attorns to the holder of such deed of trust or mortgage, its assignee or the purchaser at any foreclosure sale. Tenant shall execute any reasonable instrument

8

presented to Tenant for the purpose of effecting such subordination.     It is a condition, however, to the subordination and lien provisions herein provided, that Landlord shall procure from any such mortgagee a non-disturbance agreement in writing, which shall be delivered to Tenant or contained in the aforesaid subordination agreement, providing in substance that so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this Lease and is not in default under the terms hereof, its tenancy will not be disturbed nor this Lease affected by any default under such mortgage.    Notwithstanding anything contained in this Lease to the contrary, Tenant shall not have the right to terminate this Lease in accordance with the provisions contained herein in the event this Lease is assigned as additional security for any loan secured by Landlord's interest in the demised premises.

(b) Wherever notice is required to be given to Landlord pursuant to the terms of this Lease, Tenant will likewise give such notice to any mortgagee of Landlord's interest in the demised premises upon notice of such mortgagee's name and address from Landlord.    Furthermore, such mortgagee shall have the same rights to cure any default on the part of Landlord that Landlord would have had.

**SECTION 13. SUBLEASE OR ASSIGNMENT**

(a)   The Tenant shall not, and shall not have the power to, transfer, assign, sublet, mortgage or hypothecate this Lease or the Tenant's interest in and to the Demised Premises without first procuring the written consent of the Landlord which may be arbitrarily withheld except as specifically provided in this Article 13, and except that Tenant may sublet an aggregate of 25% of the Demised Premises, without Landlord's consent.   This prohibition includes any subletting attempted or purported transfer, assignment or subletting agreement, mortgage or

9

hypothecation other than as specifically permitted in this Article, without the Landlord's prior written consent which may be arbitrarily withheld except as provided in this Article, shall be void and confer no rights upon any third person. The consent by Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. If this Lease is assigned, Landlord may collect rent from the assignee, and apply the net amount collected to the rent herein reserved, but no such action shall be deemed a waiver of this provision or the acceptance of the assignee, as Tenant. No assignment or subletting, even if approved by Landlord or permitted under this lease, shall relieve Tenant or any Guarantor from its covenants and obligations under this lease or any applicable guaranty.

(b) Provided Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have the right to assign this lease to a parent corporation, affiliate or subsidiary of Tenant, or as part of a merger or consolidation or to an acquiring entity, in connection with the sale or transfer on an arms-length basis of substantially all of the business operations of Tenant, without the consent of Landlord.

(c) Each assignment or subletting, to which consent is required shall be by instrument in writing in form reasonably satisfactory to Landlord and Tenant and shall provide information to Landlord about the proposed assignee or sublessee reasonably requested by Landlord. Each assignee shall agree in writing for the benefit of the Landlord herein to assume, to be bound by, and to perform the terms, covenants and conditions or this lease to be done, kept and performed by the Tenant, including the payment of all amounts due or to become due under this lease directly to the Landlord, upon consummating the assignment and not prior to obtaining the Landlord's written consent thereto. Failure to first obtain in writing Landlord's

consent where required, or failure to comply with the provisions of this Article shall operate to prevent any such assignment, subletting, mortgage or hypothecation from becoming effective. Tenant shall supply Landlord with a copy of all mortgage, hypothecation, assignment or subletting agreements.

(d) In the event that Landlord shall not respond to Tenant's request for assignment or request to sublease more than 25% of the Demised Premises within thirty (30) days of a request submitted as provided in subparagraph c above, or shall unreasonably refuse to grant consent to an assignment or subletting request, then Tenant shall have the right to cancel this lease on thirty (30) days' notice to Landlord, given within thirty (30) days after Landlord arbitrarily refuses Tenant's request or so fails to respond. All obligations of Tenant shall be prorated to the effective cancellation date and paid by Tenant within thirty (30) days of Landlord's billing. Other than the obligations stated above, Landlord shall release Tenant from any future liability after the effective cancellation date, except for Tenant obligations as expressed in Section 43 Hazardous Substance of this lease.

**SECTION 14. COMMON AREAS**

Common areas means all areas and facilities in the Shopping Center provided and so designated by Landlord and made available by Landlord for the common use and benefit of tenants of the Shopping Center and their customers, employees and invitees and substantially as set forth on Exhibit "A". Common areas shall include (to the extent the same are constructed), but not be limited to, the parking areas, sidewalks, landscaped areas, corridors, stairways, boundary walls and fences, incinerators, truckways, service roads, and service areas not reserved for the exclusive use of Tenant or other tenants. Landlord agrees that the areas cross-hatched on Exhibit "C" are no-build areas and Landlord shall not make any changes thereto without the prior written

11

consent of Tenant.   Notwithstanding the foregoing, Landlord shall not make any changes to the no-build areas of the common areas except minor changes that do not visibly or materially adversely impact Tenant or Tenant's parking.

## SECTION 15. OPERATION OF COMMON AREAS

Landlord shall, throughout the term hereof, operate and maintain the common areas including the parking areas for the use and benefit of the tenants of the Shopping Center and their customers and invitees.   Landlord shall at all times have exclusive control of the common areas and may at any time and from time to time: (i) promulgate, modify and amend reasonable rules and regulations for the use of the common areas, which rules and regulations shall be effective upon the Tenant upon delivery of a copy thereof to the Tenant; (ii) temporarily close any part of the common areas, including but not limited to closing the streets, sidewalks, road or other facilities to the extent necessary to prevent a dedication thereof or the accrual of rights of any person or of the public therein; (iii) exclude and restrain anyone from the use or occupancy of the common areas or any part thereof except bona fide customers and suppliers of the tenants of the Shopping Center who use said areas in accordance with the rules and regulations established by Landlord; and (iv) engage others to operate and maintain all or any part of the common areas, on such terms and conditions as Landlord shall, in its sole judgment, deem reasonable and proper.

## SECTION 16. COMMON AREA MAINTENANCE, TENANT'S SHARE

(a) Tenant shall  pay to Landlord (as billed by Landlord) as additional rental, its prorata share of the "maintenance cost" for the operation and maintenance of the common areas.

(b) The Maintenance Costs for the common areas shall be computed on an accrual basis, under generally accepted accounting principles, and shall include all costs of operating, maintaining and repairing the common areas,

12

including by way of example but not limitation: (i) cost of labor (including workmen's compensation insurance, employee benefits and payroll taxes); (ii) materials, and supplies used or consumed in the maintenance or operation of the common area; (iii) the cost of operating and repairing of the lighting; (iv) cleaning, painting, removing of rubbish or debris, snow and ice, private security services, and inspecting the common areas; (v) the cost of repairing paving, curbs, walkways, markings, directional or other signs; landscaping, and drainage and lighting facilities; (vi) rental paid for maintenance of machinery and equipment; (vii) cost of insurance for public liability and property insurance for property in the common areas which are not part of the building; and (viii) a reasonable allowance to Landlord for Landlord's supervision, which allowance shall not in an accounting year exceed five percent (5%) of the total of all Maintenance Costs for such accounting year, exclusive of any insurance expense. Maintenance Costs shall not include replacement costs, depreciation or any costs properly chargeable to a capital account under generally accepted accounting principles.

(c) Landlord shall maintain accurate and detailed records of all Maintenance Costs for the common areas in accordance with generally accepted accounting principles. Tenant's proportionate share of the Maintenance Costs of the common areas shall be a fraction, the numerator of which shall be the floor area of the premises and the denominator of which shall be the gross leasable area (in square feet) of all leasable space in the Shopping Center.

(d) Tenant's proportionate share of all Maintenance Costs shall be computed by Landlord within ninety (90) days after the end of each accounting year (which Landlord may change from time to time). At this time Landlord shall furnish to Tenant a statement showing in reasonable detail the actual Maintenance Costs incurred during such accounting year and Tenant's proportionate share thereof (prorated for

any partial Lease year, with appropriate adjustments to reflect any change in the floor area of the premises or the gross leasable area of a building occurring during such accounting year). Tenant shall pay its prorata share of said cost within thirty (30) days of receipt of Landlord's billing.

**SECTION 17. EMINENT DOMAIN**

(a) In the event the entire premises or any part thereof shall be taken or condemned either permanently or temporarily for any public or quasi-public use or purpose by any competent authority in appropriation proceedings or by any right of eminent domain, the entire compensation or award therefore, including reversion and fee but excluding leasehold relocation value, expenses and the unamortized value of Tenant's leasehold improvements and personal property, shall belong to the Landlord and Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to such portion award.

(b) In the event that only a portion of the demised premises, not exceeding twenty percent (20%) of same, shall be so taken or condemned, and the portion of the demised premises not taken can be repaired within ninety (90) days from the date of which possession is taken for the public use so as to be commercially fit for the operation of Tenant's business, the Landlord at its own expense shall so repair the portion of the demised premises not taken and there shall be an equitable abatement of rent for the remainder of the term and/or extended terms. If the portion of the demised premises not taken cannot be (with Landlord using its best efforts and due diligence) repaired within one hundred twenty (120) days from the date of which possession is taken so as to be commercially fit for the operation of Tenant's business, then this Lease shall terminate and become null and void from the time possession of the portion taken is required for public use, and from that date on the parties hereto shall be released from all

14

further obligations hereunder except as herein stated. **No** other taking, appropriation or condemnation shall cause **this** **Lease** to be terminated. Any such appropriation **or** condemnation proceedings shall not operate as or be **deemed** an eviction of Tenant or a breach of Landlord's covenant **of** quiet enjoyment.

(c) In the event that any portion greater than **twenty** percent (20%) of the demised premises (or 25% of the parking spaces in common areas) shall at any time be taken by public or quasi-public use or condemned under eminent domain, **then** at the option of the Landlord or Tenant upon the giving **of** thirty (30) days written notice (after such taking **or** condemnation), this Lease shall terminate and expire as **of** the date of such taking and any prepaid rental shall **be** prorated as of the effective date of such termination.

## SECTION 18.  TENANT'S TAXES

Tenant further covenants and agrees to pay **promptly** when due all taxes assessed against Tenant's **fixtures**, furnishings, equipment and stock-in trade placed in or **on** the demised premises during the term of this Lease.

## SECTION 19.  RISK OF GOODS

All personal property, goods, machinery, **and** merchandise in said demised premises shall be at Tenant's risk if damaged by water, fire, explosion, wind or accident of any kind, and Landlord shall have no responsibility therefor or liability for any of the foregoing and Tenant hereby releases Landlord from such liability.

## SECTION 20.  USE AND OCCUPANCY

The demised premises during the term of this **Lease** shall be occupied for the operating and conducting **therein** of a retail furniture store. So long as not conflicting with previously granted exclusives elsewhere in the **center**, the demised premises may also be used for appurtenant **uses**, and for no other purpose whatsoever without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Tenant shall at all times conduct

15

its operations on the demised premises in a lawful manner and shall, at Tenant's expense, comply with all laws, rules, orders, ordinances, directions, regulations, and requirements of all governmental authorities, now in force or which may hereafter be in force, which shall impose any duty upon Landlord or Tenant with respect to the business of Tenant and Tenant's use of the demised premises. Tenant shall comply with all requirements of the Americans with Disabilities Act, and shall be solely responsible for all interior alterations within the demised premises in connection therewith. Tenant covenants and agrees that the demised premises shall not be abandoned or during the first five (5) years of the term be left vacant. Tenant further covenants and agrees that during the first five (5) years of the term hereof, the demised premises shall be continuously used and operated, occupied and open for business for the use permitted herein during Tenant's regular business hours.

## SECTION 21. NUISANCES

Tenant shall not perform any acts or carry on any practice which may injure the demised premises or be a nuisance or menace to other tenants in the Shopping Center.

## SECTION 22. WASTE AND REFUSE REMOVAL

Tenant covenants that it will use, maintain and occupy said demised premises in a careful, safe, lawful and proper manner and will not commit waste therein. Landlord or its agent shall have access at all reasonable times to the demised premises for purposes of inspecting and examining the condition and maintenance of the demised premises. Tenant agrees to remove all refuse from the demised premises in a timely, clean and sanitary manner. Tenant shall provide a refuse collection container at the rear of the demised premises to accommodate Tenant's refuse and Tenant shall routinely clean up around trash containers. Tenant shall contract with a licensed/insured refuse collection contractor to timely remove refuse therefrom.

16

## SECTION 23. FIRE AND CASUALTY

(a) Landlord shall at all times during the term of this Lease carry fire, casualty, and extended coverage insurance on the full replacement cost of the common areas and all buildings, including the structural components (foundations, floors, walls, windows, structural supports, roof, HVAC, electrical systems, and plumbing) thereof. Landlord shall maintain insurance on improvements installed by or for the benefit of Tenant's use of the premises.

(b) If the demised premises shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the term hereof, Landlord shall repair and restore the same to a good tenantable condition with reasonable dispatch. During such period of repair, the rent herein provided for in this Lease shall abate (i) entirely in case 50% or more of the demised premises are untenantable; and (ii) proportionately if only a portion of the demised premises is untenantable and Tenant is able to economically conduct its business from the undamaged portion of the demised premises. The abatement shall be based upon a fraction, the numerator of which shall be the square footage of the damaged and unusable area of the demised premises and the denominator shall be the total square footage of the demised premises. Said abatement shall cease at such time as the demised premises shall be restored to a tenantable condition.

(c) In the event the demised premises, because of such damage or destruction, are not repaired and restored to a tenantable condition with reasonable dispatch within one hundred fifty (150) days from the date of such damage or destruction, Tenant or Landlord may, at their option, terminate this Lease within sixty (60) days following such one hundred fifty (150) day period but prior to the repair and restoration of same by giving prior written notice to the other party and thereupon Landlord and Tenant shall be



17

released from all future liability and obligations under this Lease.

(d) If one-third (1/3) or more of the ground floor area of the demised premises are damaged or destroyed during the last two (2) years of the original or any extended term of this Lease, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other within sixty (60) days following such damage or destruction, unless Tenant shall, within thirty (30) days following receipt of any such notice from Landlord, elects to extend the term of this Lease for an additional period of five (5) years from the date such damage or destruction is repaired and restored in which event  Landlord shall repair and restore the demised premises with reasonable dispatch thereafter.  Such election to extend shall be by exercising a remaining renewal option (if not exercised) or if no renewal options remain, at terms to be negotiated between Landlord and Tenant.

(e) If Landlord is required or elects to repair and restore the demised premises as herein provided, Tenant shall repair or replace its stock in trade, trade fixtures, furniture, furnishings and equipment and other improvements including floor coverings, and if Tenant has closed, Tenant shall promptly reopen for business.

### SECTION 24.  LANDLORD REPAIRS

(a) Landlord shall keep in good order, condition, and repair the following: (i) structural portions of the demised premises; (ii) downspouts; (iii) gutters; (iv) the roof of the Building of which the demised premises forms a part; and (vi) the plumbing and sewage system serving the demised premises but located outside of the demised premises, except (as to all items) for damage caused by any negligent act or omission of Tenant or its customers, employees, agents, invitees, licensees or contractors, which shall be repaired or replaced as necessary, at the sole cost and expense of Tenant. "Structural portions" shall mean  the following: (i)



18

foundations; (ii) exterior walls except for interior faces; (iii) concrete slabs; (iv) the beams and columns bearing the main load of the roof.

(b) Notwithstanding the provisions of Paragraph (a) above, Landlord shall have a share in the financial responsibility for repair and/or replacement of the heating, ventilating and air-conditioning equipment in the demised premises, as specified under Section 25 (a) below.

## SECTION 25. TENANT'S REPAIRS

(a) Except as otherwise provided in this Lease, Tenant shall keep and maintain, at Tenant's expense, all and every other part of the demised premises in good order, condition and repair, including, by way of example but not limitation: (i) all leasehold improvements; (ii) all heating, ventilating, and air conditioning, subject to (b) below; (iii) interior plumbing and sewage facilities; (iv) all interior lighting and exterior security lighting on Tenant's building; (v) electric signs; (vi) all interior walls; (vii) floor coverings; (viii) ceilings; (ix) appliances and equipment; (x) all doors, exterior entrances, windows and window moldings; (xi) plate glass; (xii) signs and showcases surrounding and within the demised premises; (xiii) the store front and exterior alterations done by Tenant; and (xiv) sprinkler systems including supervisory alarm service in accordance with current local and state fire protection standards.    In the event local or state codes do not require alarm systems, Tenant shall provide alarm service on all sprinkler systems to detect water flow and tampering with exterior and interior main control valves of the sprinkler system servicing Tenant's premises.

(b) Notwithstanding anyother language in this Lease to the contrary, Tenant shall be responsible for all repairs and/or replacements of the HVAC equipment except as a result of fire or other catastrophe which would be covered by property insurance.    Tenant shall pay $1,000.00 per incident/unit in Years two (2) through five (5); $1,200.00

per incident/unit in Years six (6) through ten (10); $1,440.00 per incident/unit in the first renewal term; and $1,728.00 per incident/unit in the second renewal term. Any cost/incident/unit exceeding these amounts above shall be split 50/50 between Tenant and Landlord during the initial term; split 75% by Tenant and 25% by Landlord in the option periods. Landlord's monetary responsibility may not be billed to Landlord (except during and for the first full lease year), but rather Tenant may deduct Landlords share from any percentage rental owed Landlord (in the same year or subsequent years cumulatively), as stated under Section 6 (d) of this Lease. During the first full lease year, Landlord shall warrant and take full responsibility for any and all needed repairs and/or replacements at Landlord's sole cost, and Tenant shall have no responsibility for such costs.

(c) If Landlord deems any repair which Tenant is required to make hereunder to be necessary, Landlord shall by notice advice Tenant of same. If Tenant refuses or neglects to make such repair and to complete the same with reasonable dispatch, Landlord may make such repair and Tenant shall, on demand, immediately pay to Landlord the cost of said repair, together with interest at ten percent (10%) per annum.

(d) Provided Landlord timely performs its obligation to repair and maintain the roof in accordance with Section 24 hereof, neither Tenant nor any of its contractors are permitted to perform alterations of any kind to the roof of the building. In the case of necessary alterations, only an authorized contractor approved by Carlisle-Syntec Systems may be used.

(e) Tenant shall pay promptly when due the entire cost of work in the demised premises undertaken by Tenant so that the demised premises and the Shopping Center shall at all times be free of liens for labor and materials arising from such work; to procure all necessary permits before

20

undertaking such work; to do all of such work in a good and workmanlike manner, employing materials of good quality; to perform such work only with contractors previously reasonably approved of in writing by Landlord.

## SECTION 26. COVENANT OF TITLE AND PEACEFUL POSSESSION

Subject to the provisions of Paragraph 12 hereof, Landlord shall, on or before the date on which Tenant is permitted to install its merchandise and fixtures in the demised premises, have good and marketable title to the demised premises in fee simple and the right to make this Lease for the term aforesaid. At such time, Landlord shall put Tenant into complete and exclusive possession of the demised premises, and if Tenant shall pay the rental and perform all the covenants and provisions of this Lease to be performed by the Tenant, Tenant shall, during the term hereby demised, freely, peaceably, and quietly enjoy and occupy the full possession of the demised premises and the common facilities of the Shopping Center, subject, however, to the terms and conditions of this Lease.

## SECTION 27. TENANT'S INSURANCE; INDEMNITY

(a) Casualty Insurance: Tenant shall carry such insurance against loss of its property in, on or about the demised premises by fire and such other risks as are covered by all risk and extended coverage property insurance or other hazards as Tenant deems necessary. Landlord shall not be liable for any damage to Tenant's property in, on or about the demised premises caused by fire or other insurable hazards regardless of the nature or cause of such fire or other casualty, and regardless of whether any negligence of Landlord or Landlord's employees or agents contributed thereto. Tenant expressly releases Landlord of and from all liability for any such damage. Tenant agrees that its insurance policy or policies shall include a waiver of subrogation recognizing this release from liability.

(b) Public Liability Insurance: Tenant agrees to procure and maintain during the demised term a policy or



21

policies of liability insurance, written by a responsible insurance company or companies (which may be written to include the demised premises in conjunction with other premises owned or operated by Tenant) insuring Tenant against any and all losses, claims, demands or actions for injury to or death of any one or more persons and for damage to property in any one occurrence in the demised premises to the limit of not less than $1,000,000.00 and $2,000,000.00 general aggregate policy limit arising from Tenant's conduct and operation of its business in the demised premises, $500,000.00 limit for fire and legal liability, and $1,000,000.00 limit for products and/or completed operations. Tenant shall furnish to Landlord certificates evidencing the continuous existence of such insurance coverage, which must also name Landlord as an additional insured. All insurance companies must be licensed to do business in the state where the premises are located. Certificates of insurance will be provided at the time this Lease is executed and twenty (20) days prior to expiration of the policy, or as soon as possible thereafter. Certificates of insurance are to specify notification to Landlord of cancellation or termination of policy not less than ten (10) days prior to cancellation or termination.

(c) Miscellaneous Insurance: Tenant agrees to provide and keep in force at all times worker's compensation insurance complying with the law of the state in which the premises are located. Tenant agrees to defend, indemnify and hold harmless Landlord from all actions or claims of Tenant's employees or employee's family members. Tenant agrees to provide a certificate as evidence of proof of worker's compensation coverage.

With respect to any alterations or improvements by Tenant, Tenant shall maintain contingent liability and builder's risk coverage naming Landlord as an additional named insured. If Tenant hires contractors to do any improvements on the premises, each contractor must provide

proof of worker's compensation coverage on its employees and agents to Landlord upon request therefor.

(d) Indemnity: Tenant shall indemnify Landlord, Landlord's agents, employees, officers or directors, against all damages, claims and liabilities arising from any alleged products liability (from products sold by Tenant) or from any accident or injury whatsoever caused to any person, firm or corporation during the demised term in the demised premises (described in Exhibit "A"), unless such claim arises from a breach or default in the performance by Landlord of any covenant or agreement on its part to be performed under this Lease or the negligence of Landlord. The indemnification herein provided shall include all costs, counsel fees, expenses and liabilities incurred in connection with any such claim or any action or proceeding brought thereon.

(e) Indemnity: Landlord shall indemnify Tenant, Tenant's agents, employees, officers or directors, against all damages, claims and liabilities arising from any alleged products liability or from any accident or injury whatsoever caused to any person, firm or corporation during the demised term in the demised premises and the Building and Common Areas, unless such claim arises from a breach or default in the performance by Tenant of any covenant or agreement on its part to be performed under this Lease or the negligence of Tenant. The indemnification herein provided shall include all costs, counsel fees, expenses and liabilities incurred in connection with any such claim or any action or proceeding brought thereon.

## SECTION 28. REAL ESTATE TAXES

Tenant shall pay Tenant's Proportionate Share (as hereinafter defined) of any real estate taxes imposed upon the Shopping Center for each lease year included within the period commencing with the Commencement Date and ending with the expiration of the term of this Lease. For each lease year, "Tenant's Proportionate Share" of the real estate taxes upon the Shopping Center (including the Common Areas)

23

attributable to buildings in the process of construction, a fair and reasonable adjustment shall be made to carry out the intent of this section.

Upon request, Landlord shall submit to Tenant true copies of the real estate tax bill for each tax year or portion of a tax year included within the term of this Lease and shall bill Tenant for the amount to be paid by Tenant hereunder. Said bill shall be accompanied by a computation of the amount payable by Tenant and such amount shall be paid by Tenant within thirty (30) days after receipt of said bill.

Should the State of Maryland or any political subdivision thereof or any governmental authority having jurisdiction thereof, impose a tax and/or assessment (other than an income or franchise tax) upon or against the rentals payable hereunder, in lieu of or in addition to assessments levied or assessed against the demised premises, or Shopping Center, then such tax and/or assessment shall be deemed to constitute a tax on real estate for the purpose of this section.

## SECTION 29. TENANT'S INSURANCE CONTRIBUTION

Tenant shall pay as additional rent, Tenant's Proportionate Share (as defined in Section 28 above) of the premiums for the insurance maintained by Landlord on all buildings and improvements, as well as liability insurance, for the Shopping Center, including the common areas, for each lease year during the term of this Lease. The premiums for the first and last lease years shall be prorated. Tenant shall pay Tenant's Proportionate Share of such premiums annually upon demand for such payment by Landlord, together with a copy of Landlord's insurance invoice. Tenant's Proportionate Share thereof shall be paid by Tenant within thirty (30) days after Landlord's demand therefor. The parties agree in return for the premiums paid for liability insurance the intent is for such insurance to



25

provide defense cost and make all payments for bodily injury or property damage as if Tenant was the first named insured.

## SECTION 30. FIXTURES

Provided that Tenant shall repair any damage caused by removal of its property and provided that the Tenant is not in default under this Lease, Tenant shall have the right to remove from the demised premises all of its signs, shelving, electrical, and other fixtures and equipment, window reflectors and backgrounds and any and all other trade fixtures which it has installed in and upon the demised premises.

## SECTION 31. SURRENDER

The Tenant covenants and agrees to deliver up and surrender to the Landlord the physical possession of the demised premises upon the expiration of this Lease or its termination as herein provided in as good condition and repair as the same shall be at the commencement of the original term, loss by fire or other casualty and/or ordinary wear and tear excepted, and to deliver all of the keys to Landlord or Landlord's agents.

## SECTION 32. HOLDING OVER

There shall be no privilege of renewal hereunder (except as specifically set forth in this Lease) and any holding over after the expiration by the Tenant shall be from day to day on the same terms and conditions (with the exception of rental which shall be prorated on a daily basis at twice the daily rental rate of the most recent expired term)  and no acceptance of rent by or act or statement whatsoever on the part of the Landlord or his duly authorized agent in the absence of a written contract signed by Landlord shall be construed as an extension of the term or as a consent for any further occupancy.

## SECTION 33. NOTICE

Whenever under this Lease provisions are made for notice of any kind to Landlord, it shall be deemed sufficient notice and sufficient service thereof if such

notice to Landlord is in writing, addressed to Landlord at c/o I. Neuman & Sons, Inc., 122 East 42nd Street, Suite 3009, New York, New York 10017, or at such address as Landlord may notify Tenant in writing, and deposited in the United States mailed by registered or certified mail, return receipt requested, with postage prepaid or Federal Express, Express Mail or such other expedited mail service as normally results in overnight delivery. Notice to Tenant shall be sent in like manner to the demised premises with a copy of same sent in like manner to Vice President, Real Estate, 1800 Moler Road, Columbus, Ohio 43207. All notices may be effective upon receipt or refusal of receipt. Either party may change the place for service of notice by notice to the other party.

## SECTION 34.  DEFAULT

If any sale of Tenant's interest in the premises created by this Agreement shall be under execution or similar legal process, or if Tenant shall be adjudicated a bankrupt or insolvent, and such adjudication is not vacated within thirty (30) days, or if a receiver or trustee shall be appointed for its business or property, and such appointment shall not be vacated within thirty (30) days, or if a corporate reorganization of the Tenant or an arrangement with its creditors shall be approved by a court under the Federal Bankruptcy Act, or if Tenant shall make an assignment for the benefit of creditors, or if in any other manner Tenant's interest under this Agreement shall pass to another by operation of law, then in any of said events, Tenant shall be deemed to have breached a material covenant of this lease and Landlord may, at its option, re-enter the premises and declare this lease and the tenancy hereby created terminated, but notwithstanding such termination Tenant shall remain liable for all rent or damage which may be due at the time of such termination and, further shall be liable for the liquidated damages set forth in the above.

27

Tenant covenants and agrees that it will perform all agreements herein expressed on its part to be performed, and that it will promptly upon receipt of written notice specifying action desired by Landlord in connection with any such covenant commence to comply with such notice; and further, that if Tenant shall not commence and proceed diligently to comply with such notice to the satisfaction of Landlord within twenty (20) days after delivery thereof, then Landlord may, at its option enter upon the premises and do the things specified in said notice, and Landlord shall have no liability to Tenant for any loss or damage resulting in any way from such action by Landlord, and Tenant agrees to pay promptly upon demand any expense incurred by Landlord in taking such action.

(A)  If Tenant:  (i) shall fail to pay minimum rental, or any item of additional rent or other sums due hereunder within ten (10) days after the written notice that the same has not been paid when due; or (ii) shall violate any other obligation, covenant or provision within fifteen (15) days after notice from Landlord (or such longer time as may reasonably be necessary if performance or compliance cannot be completed within the fifteen (15) day period, provided Tenant commences to cure the default within the fifteen (15) day period and thereafter diligently prosecutes same to completion), then Tenant shall be in default hereunder. Upon any such event of default, Landlord may, at its option, re-enter the premises and declare this lease and the tenancy hereby created terminated; and Landlord shall be entitled to all the provisions of applicable law respecting summary ejectment and the recovery of lands and tenements held over by Tenant.

Except as otherwise provided in Paragraph (d) of this Section 13, notwithstanding any termination of this lease or any termination of possession under this lease, tenant shall remain liable for performance and payment of all of the obligations and payments required under this lease as though

28

no such termination or removal had taken place and Landlord does not waive his rights or release tenant by reason of such action.

(B) Tenant further agrees that in any proceeding based upon Tenant's default in performing any covenant and whether or not Landlord shall re-enter the leased premises and terminate this lease pursuant to this lease, Tenant shall remain liable for any rent or damages which may be due or sustained prior thereto together with all reasonable costs, professional fees and expenses incurred by Landlord in such proceedings against Tenant or in leasing the premises to another tenant, and Tenant shall further be liable for a sum of money as liquidated damages and not as penalty, to be calculated in the following manner: Tenant shall pay an amount of money equal to the total rent which but for such termination would have become payable during the unexpired portion, of the term remaining at the time of such termination, less the amount of rent, if any, which Landlord may receive during such period from others to whom the premises may be rented on such terms and conditions and at such rentals as Landlord, in its sole discretion, shall deem proper.   Landlord shall first be reimbursed for all costs and expenses (including legal fees and court disbursements) incurred in receiving possession of the leased premises together with the cost and expense of repairs, alterations and changes incurred in the rerental of the premises.   Such liquidated damages shall be payable in monthly installments, in advance, on the first day of each calendar month following such termination, and continuing until the date originally fixed herein for the expiration of the then current term of this lease and any suit or action brought to collect the amount of any deficiency for any month shall not in any manner prejudice the right of Landlord to collect any deficiency for any subsequent month by a similar proceeding. Within one month after the date originally fixed herein, for the expiration of the then current term of this lease,

29

Landlord shall give a written statement to Tenant showing all sums received by Landlord by way of liquidated damages and all sums received from other to whom the premises may have been rented. In the event Tenant has paid a greater sum of money than is due, as determined by terms of this Paragraph B then and in such event, Landlord will promptly refund to Tenant any such excess.

Notwithstanding any other remedies reserved to the Landlord herein, in the event of any default by Tenant of any of the terms and conditions of this lease, or the covenants herein contained, or should the leased premises be deserted or during the first five (5) years of the lease term be vacated, Landlord shall have the right to re-enter the same and remove all persons and property therefrom as the agent of Tenant, either by force or otherwise, and Landlord shall exercise reasonable efforts to, rerent the leased premises as the agent of Tenant and receive the rent therefor, and to apply the same to the reimbursement of the Landlord for the costs and expenses thereof (including attorney's fees, brokerage commissions, costs incurred to prepare the space for a follow-on tenant and all other costs and expenses reasonably incurred by Landlord in conjunction with reletting the Leased Premises) and then to the payment of rent and other sums due under this lease. The Tenant shall, however, continue to be liable for any deficiency. Landlord may, at its option, reenter the premises by force or otherwise and declare this lease and the tenancy hereby created to be terminated and Landlord shall be entitled to all the provisions of the laws of the State wherein the leased premises are located and respecting summary ejectment in recovery of lands and tenements wrongfully held over by Tenant.

Notwithstanding any thing to contrary herein contained, Landlord shall make reasonable efforts to relet the Demised Premises following a Tenant default resulting in a termination of this lease or Tenant's possession of the

Demised Premises.  No mention in this lease of any specific right or remedy shall preclude Landlord from exercising any other right of from having any other remedy or from maintaining any action to which it may otherwise be entitled either at law or in equity; and the failure of Landlord to insist in any one or more instances upon a strict performance of a covenant of this Agreement or to exercise any option or right herein contained shall not be construed as a waiver or relinquishment for the future of such covenant, right, or option, but the same shall remain in full force and effect unless the contrary is expressed in writing by Landlord.  Landlord and Tenant agree that in any trial or similar proceeding under this lease each shall (and hereby does) waive any right to trial by a jury as may be provided for by applicable law.

## SECTION 35.  WAIVER OF SUBROGATION

Landlord and Tenant, and all parties claiming under each of them, mutually release and discharge each other from all claims and liabilities arising from or caused by any casualty or hazard covered or required hereunder to be covered in whole or in part by insurance coverage required to be maintained by the terms of this Lease on the demised premises or in connection with the Shopping Center or activities conducted with the demised premises, and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof.  All policies of insurance required to be maintained by the parties hereunder shall contain waiver of subrogation provisions so long as the same are available.

## SECTION 36.  LIABILITY OF LANDLORD; EXCULPATION

If Landlord shall default in the performance of any of the covenants, terms or provisions of this Lease and fails to cure such default within twenty (20) days after written notice thereof from Tenant (unless Landlord is diligently pursuing to cure same which reasonably requires more than twenty (20) days to so cure) then Tenant shall have the

31

right but not the obligation to perform or cause to be performed such obligations on behalf and at the expense of Landlord.    In such event, Tenant's cost and expenses incurred with respect thereto (including interest at the highest rate allowed by law, not to exceed fifteen percent (15%) per annum, from the date due until paid) shall, upon demand, be paid for by Landlord.    If not paid by Landlord within thirty (30) days thereafter, Tenant may deduct or offset any such costs and expenses from the Fixed Minimum Rent or Additional Rent, and/or in addition thereof, Tenant may rely on its remedies at law.    Landlord agrees that in the event of an emergency, Landlord's time to cure after written notice shall be reduced from said twenty (20) days to a reasonable time to so cure after written notice so to avoid personal injury and/or property damage.

### SECTION 37. RIGHTS CUMULATIVE

Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other of such rights, remedies and benefits or of any other rights, remedies and benefits allowed by law.

### SECTION 38. MITIGATION OF DAMAGES

Notwithstanding any of the terms and provisions herein contained to the contrary, Landlord and Tenant shall each have the duty and obligation to mitigate, in every reasonable manner, any and all damages that may or shall be caused or suffered by virtue of defaults under or violation of any of the terms and provisions of this Lease agreement committed by the other.

### SECTION 39. SIGNS

Landlord shall permit Tenant to use its standard individual letters on the front of the premises as well as to use  the second spot (previously used by Children's Palace) on the sign panel on the existing street pylon as



32

shown on Exhibit "D" attached and incorporated hereto, subject to governing county and municipal codes.

## SECTION 40. ENTIRE AGREEMENT

This Lease shall constitute the entire agreement of the parties hereto; all prior agreements between the parties, whether written or oral, are merged herein and shall be of no force and effect. This Lease cannot be changed, modified, or discharged orally but only by an agreement in writing signed by the party against whom enforcement of the change, modification or discharge is sought.

## SECTION 41. LANDLORD'S LIEN - DELETED

## SECTION 42. BINDING UPON SUCCESSORS

The covenants, conditions, and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefit of their respective heirs, representatives, successor and assigns.

## SECTION 43. HAZARDOUS SUBSTANCES

Landlord represents to Tenant that it has no knowledge of the presence of any hazardous substances in the demised premises and that it has no knowledge of any failure of the demised premises or the Shopping Center to comply with applicable local, state and federal environmental laws, regulations and ordinances. Landlord shall indemnify and hold Tenant harmless from any and all liabilities, penalties, demands, actions, costs and expenses (including, without limitation, reasonable attorney fees), remediation and response costs incurred or suffered by Tenant directly or indirectly arising due to the presence of any hazardous substance or toxic material on the demised premises or Shopping Center and not caused by Tenant.

During the term of this Lease, Tenant shall not suffer, allow, permit or cause the generation, accumulation, storage, possession, release or threat of release of any hazardous substance or toxic material, as those terms are used in the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and any



regulations promulgated thereunder, or any other present or future federal, state or local laws, ordinances, rules, and regulations.   Tenant shall indemnify and hold Landlord harmless from any and all liabilities, penalties, demands, actions, costs and expenses (including without limitation reasonable attorney fees), remediation and response costs incurred or suffered by Landlord directly or indirectly arising due to the breach of Tenant's obligations set forth in this Section.   Such indemnification shall survive expiration or earlier termination of this Lease.   At the expiration or sooner termination hereof, Tenant shall return the demised premises to Landlord in substantially the same condition as existed on the date of commencement hereof free of any hazardous substances in, on or from the demised premises.

## SECTION 44. TRANSFER OF INTEREST

If Landlord should sell or otherwise transfer its interest in the demised premises, upon an undertaking by the purchaser or transferee to be responsible for all the covenants and undertakings of Landlord, Tenant agrees that Landlord shall thereafter have no liability to Tenant under this Lease or any modifications or amendments thereof, or extensions thereof, except for such liabilities which might have accrued prior to the date of such sale or transfer of its interest by Landlord.

## SECTION 45. ACCESS TO PREMISES

Landlord and its representatives shall have free access to the demised premises at all reasonable times for the purpose of:   (i) examining the same or to make any alterations or repairs to the demised premises that Landlord may deem necessary for its safety or preservation; (ii) exhibiting the demised premises for sale or mortgage financing; (iii) in the event store is closed, Landlord shall have a key to show same; (iv) during the last three (3) months of the term of this Lease, for the purpose of exhibiting the demised premises and putting up the usual



34

notice "to rent" which notice shall not be removed, obliterated or hidden by Tenant, provided, however, that any such action by Landlord shall cause as little inconvenience as reasonably practicable and such action shall not be deemed an eviction or disturbance of Tenant nor shall Tenant be allowed any abatement of rent, or damages for an injury or inconvenience occasioned thereby.

**SECTION 46. HEADINGS**

The headings are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope or intent of this Lease.

**SECTION 47. NON-WAIVER**

No payment by Tenant or receipt by Landlord or its agents of a lesser amount than the rent in this Lease stipulated shall be deemed to be other than on account of the stipulated rent nor shall an endorsement or statement on any check or any letter accompanying any check or payment of rent be deemed an accord and satisfaction and Landlord or its agents may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

**SECTION 48. SHORT FORM LEASE**

This Lease shall not be recorded, but a short form lease, which describes the property herein demised, gives the term of this Lease and refers to this Lease, shall be executed by the parties hereto, upon demand of either party and such short form lease may be recorded by Landlord or Tenant at any time either deems it appropriate to do so. The cost and recording of such short form lease shall belong to the requesting party.

**SECTION 49. BROKERAGE**

Landlord and Tenant represent to each other that no broker was used in generating this Lease other than Steve Gerdon of First Washington Management, Inc., whose commission shall be paid solely by Landlord.



35

## SECTION 50. ACCEPTANCE OF PREMISES

Tenant accepts the premises in an "As Is" condition with the exception of the HVAC and structural integrity of the premises which Landlord represents is in good condition and the roof of the premises which Landlord represents is leak-free and subject to Landlord's obligations as set forth in Section 24 hereof.

Landlord shall permit Tenant, at Tenant's sole expense to remodel the premises including but not limited to possible structural changes to the storefront, storage and dock areas.

A set of plans illustrating Tenant's Work shall be preapproved by Landlord and attached as an Exhibit "B" to this Lease. Furthermore, Landlord shall remove and/or trim the trees along roadside so as to maximize the visibility to the premises.

## SECTION 51. EXCLUSIVITY

Landlord shall not lease to another retail furniture store within the shopping center, subject to existing leases prior to the execution of this Lease. Landlord represents to Tenant that no previously granted exclusive elsewhere in the center prohibits Landlord from leasing to Tenant for Tenant's intended use.

## SECTION 52. PERSONAL LIABILITY

Landlord agrees that there shall be no personal liability of any officers or directors of Tenant. Tenant agrees that there shall be no personal liability of any officers or directors of Landlord.

36

IN WITNESS WHEREOF, the parties hereto have executed this Lease the day and year first above written.

Signed and Acknowledged
in the presence of:

LANDLORD:
DECAR REALTY

BY: _____
     Herbert Neuman, Partner

TENANT:
SCHOTTENSTEIN STORES
CORPORATION D/B/A VALUE CITY
FURNITURE

BY: X _____
     Jay Schottenstein

ITS: Chairman _____

37

**STATE OF** *New York* :
 :                     **SS.**
**COUNTY OF** *New York* :

    The foregoing instrument was acknowledged before me this *21st* day of *DECEMBER* , 1993, by Herbert Neuman, Partner of Decar Realty, for and on behalf of said company.



MARION LEVENBERG
Notary Public, State of New York
No. 41-4842868
Qualified in Queens County
Commission Expires Jan. 31, 199_4_

                                   Notary Public

**STATE OF OHIO** :
 :                     **SS.**
**COUNTY OF FRANKLIN** :

    The foregoing instrument was acknowledged before me this *2nd* day of *December,* 1993, by Jay Schottenstein, Chairman of Schottenstein Stores Corporation, a Delaware Corporation, for and on behalf of said corporation.

                                   Notary Public

BARBARA PUGH
Notary Public, State of Ohio
My Commission Expires June 1, 1997

EXHIBIT 'A'



EXHIBIT 'C'



No Build' Areas

EXHIBIT 'D'

**Children's Palace**

VCF #74
NEW CARROLLTON, MD

## THIRD LEASE EXTENSION AND MODIFICATION AGREEMENT

This Third Lease Extension and Modification Agreement ("Agreement") is executed as of October 1, 2013 (the "Effective Date") by and between DECAR REALTY LLC, a New York limited liability company ("**Landlord**") and AMERICAN SIGNATURE, INC., an Ohio corporation ("**Tenant**").

### Background

On or about December 28, 1993, Decar Realty, as landlord, and Schottenstein Stores Corporation, as tenant, entered into a certain Lease Agreement for approximately 37,250 square feet of the premises located at 8301 Annapolis Road, New Carrollton, Maryland 20784, as more fully described in Section 1 of that Lease Agreement.

That Lease Agreement was subsequently modified, amended, extended and assigned by the following agreements:

1. Assignment and Assumption of Lease dated July 31, 2003 between Schottenstein Stores Corporation and American Signature, Inc.
2. Lease Modification Agreement dated October 15, 2008.
3. Lease Extension and Modification Agreement dated November 20, 2008.
4. Lease Extension and Modification Agreement dated November 17, 2010.

The Lease Agreement, as so modified, amended, extended and assigned, is referred to herein as the "**Lease**."

All right, title and interest of Decar Realty, as landlord under the Lease, was subsequently conveyed and assigned to Landlord, and Landlord is now the "Landlord" under the Lease.

All right, title and interest of Schottenstein Stores Corporation, as the tenant under the Lease, was subsequently assigned to and assumed by Tenant, and Tenant is now the "Tenant" under the Lease.

Landlord and Tenant desire to ratify and confirm the existence and terms of the Lease and to modify, amend and extend the Lease as set forth herein.

### Agreement

NOW, THEREFORE, in consideration of the foregoing background, which is incorporated herein, the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1. All capitalized terms used herein, which are not specifically defined herein, shall have the meaning ascribed to those terms in the Lease.

ASI #30351VCF #74, New Carrollton, MD                    1

2.     Landlord and Tenant hereby ratify and confirm that the Lease is in full force and effect.  Landlord represents and warrants to Tenant, and its successors and assigns, that Landlord now holds all right, title and interest of the Landlord under the Lease, and Tenant represents and warrants to Landlord, and its successors and assigns, that Tenant now holds all right, title and interest of the Tenant under the Lease.

3.     The Lease is hereby modified, amended and extended in the following respects:

(a)     Section 4. Renewal Options.

(1)     Tenant hereby exercises Option 3 previously granted in the Lease Extension and Modification Agreement dated November 20, 2008.  Landlord and Tenant hereby ratify and confirm the following terms with respect to Option 3:

The term of Option 3 is April 20, 2014 through April 19, 2019.

The demised premises consist of 37,250 square feet.

Rent, to be paid on a monthly basis and in accordance with the terms of the Lease, will be the amount of Five and 50/100  dollars per square foot ($5.50/s.f.) of the demised premises adjusted by the CPI factor as measured from May, 2009 through May, 2014 (collectively, the "Option 3 Rent").

Given that the CPI for May, 2014 will not be published until after the Option 3 period begins, Landlord and Tenant agree that Tenant will pay rent at the rate of Five and 50/100  dollars per square ($5.50/s.f.) until such time as the CPI for May, 2014 is published and Option 3 Rent can be determined, after which Tenant will make a rent adjustment retroactive to April 20, 2014.

(2)     Provided Tenant is not then in default under this Lease beyond any applicable cure period, Landlord hereby grants to Tenant two (2) additional five (5) year options, as follows:

(i) Option 4. The first five year option, to be known as Option 4, is for the term April 20, 2019 through April 19, 2024, and Rent, to be paid in accordance with the terms of the Lease, will be in the amount of the Option 3 Rent increased by the amount equivalent to fifty cents ($0.50) per square foot for the demised premises (collectively, the "Option 4 Rent").  Tenant shall provide written notice of its intent to exercise Option 4 on or before October 31, 2018.

(ii) Option 5. The second five year option, to be known as Option 5, is for the term April 20, 2024 through April 19, 2029, and Rent, to be paid in accordance with the terms of the Lease, will be in the amount of the Option 3 Rent adjusted by the CPI factor measured from July, 2013 through July, 2023.  Tenant shall provide written notice of its intent to exercise Option 5 on or before October 31, 2023.

(3)    For purposes of this Agreement and the Lease, the acronym "CPI" shall mean the consumer price index as published by the United States Department of Labor, Bureau of Labor Statistics, Urban Wage Earners and Clerical Workers database (year 1996=100) for the Washington-Baltimore area.  In the event that the CPI ceases to be published, Landlord and Tenant shall mutually select another comparable index to use in place thereof.

By way of example, to calculate the CPI factor as measured from May, 2009 through May 2013:

May, 2009 CPI = 138.510

May, 2013 CPI = 152.309

The change from May, 2013 as compared to May, 2009 equals (152.309-138.510) divided by 138.510, or an increase of 9.96 percent.  If applied to Option 3 Rent, then $5.50/s.f. adjusted by the CPI factor of 9.96 percent equals $6.05/s.f.

(b)    <u>Section 6. Percentage Rent</u>. For each of Option 3, Option 4 and Option 5, Tenant shall pay to Landlord as additional rent, a percentage rental of two and one half percent of "gross receipts" which exceed the natural breakpoint.  For purposes of clarity, the natural breakpoint is the annual rent divided by the number zero point zero two five (0.025).

(c)    <u>Section 33. Notice</u>.   The second sentence is hereby deleted in its entirety and replaced with the following:

Notice to Tenant shall be sent in like manner to Tenant at:

American Signature, Inc.
4300 East Fifth Avenue
Columbus, Ohio 43219
Attn: EVP and CEO

with a copy to:

American Signature, Inc.
4300 East Fifth Avenue
Columbus, Ohio 43219
ASI-Legal Department.

(d)    <u>Section 53. Tenant's Termination Right</u>. As of the Effective Date, Paragraph five (5) of the Lease Extension and Modification Agreement dated November 20, 2008, is hereby deleted in its entirety, and new Section 53, Tenant's Termination Right, is hereby added to the Lease as follows:

ASI #30351VCF #74, New Carrollton, MD                3

Section 53. Tenant's Termination Right. Notwithstanding any other provision of this Lease, if Tenant's gross sales at the premises for its most recent fiscal year shall be less than Seven Million Dollars ($7,000,000.00), then Tenant shall have the right during the term of Option 3 only, at Tenant's sole election, to terminate the Lease at the end of the then current Lease year (beginning with the first Lease year for Option 3 ending on April 19, 2015 and continuing through the end of the fifth Lease year of Option 3 ending on April 19, 2019) by providing written notice to Landlord not later than October 31 of the applicable Lease year. All other monetary obligations of Tenant under the Lease shall be prorated to the effective termination date.

4. This Agreement shall be considered a part of the Lease for all purposes. In the event of any inconsistency between the provisions of the Lease and the provisions of this Agreement, the provisions of this Agreement shall control.

5. Except as set forth herein, all terms and conditions of the Lease shall be unmodified and shall remain in full force and effect.

6. This Agreement may be executed and delivered in multiple counterparts each of which when taken together shall constitute a binding agreement. This Agreement may be executed and delivered by electronic copy or via facsimile, and such electronic copy or facsimile signatures and delivery shall be valid and binding the same as if original documents were delivered. Each party executing and delivering electronic or facsimile copies agrees to thereafter promptly deliver originals to the other party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date set forth above.

[The remainder of this page is intentionally blank.]

**LANDLORD:**

DECAR REALTY LLC
a New York limited liability company


By: _____
      Marv Newman
Its:    Member


**TENANT:**

AMERICAN SIGNATURE, INC.
an Ohio corporation

By: _____
      Edward L. Cornell
Its:    Executive VP & CFO

ASI #30351VCF #74, New Carrollton, MD                    5

STATE OF VERMONT          )
COUNTY OF WINDHAM         ) ss:

The foregoing instrument was acknowledged before me this **16** day of October, 2013, by Marv Newman, a Member of DECAR REALTY LLC, a New York limited liability company, on behalf of the company.

_____
Notary Public

STATE OF OHIO             )
COUNTY OF FRANKLIN        ) ss:

The foregoing instrument was acknowledged before me this **21st** day of October, 2013, by Edward L. Cornell, the Executive VP & CFO of American Signature, Inc., an Ohio corporation, on behalf of the corporation.

_____
Notary Public

Karen A. Graham
Notary Public, State of Ohio
My Commission Expires 10-08-2017

ASI #30351VCF #74, New Carrollton, MD                    6