# EXHIBIT B

# LEASE AGREEMENT

## by and between

### Decar Realty, LLC
### (Landlord)

### and

### Forman Mills, Inc
### (Tenant)

**8401 Annapolis Road**
**New Carrollton, MD 20784**

036932.00001/11930241v.4

1

## DATA SHEET

This Data Sheet is included for the convenience of the parties to the Lease.  Any conflict between the terms of this Data Sheet and the Lease shall be controlled by the Lease.

**1.**   Leased Premises:

    (A)   Name of Shopping Center:  Plaza 30

    (B)   Location of Shopping Center:  8301 Annapolis Road, New Carrollton, MD 20784

    (C)   Street Address of Premises:  8401 Annapolis Road

**2.**   Tenant's Floor Area:  Approximately 77,000 square feet, subject to adjustment as of and during the Primary Lease Term if Tenant elects the first Gross Floor Area Option to operate in 46,897 square feet.

**3.**   Landlord's Floor Area:  Approximately 175,285 square feet.

**4.**   Tenant's Proportionate Share:  .4393 (44%%), subject to decrease during the Primary Lease Term if Tenant elects the first Gross Floor Area Option to operate in 46,897 square feet.

**5.**   Lease Dates:

    (A)   Date Lease Executed by Both Parties:  September ___, 2009

    (B)   Date of Tender:  Lease Execution Date

    (C)   Rent Commencement Date:  30 days after store opens for business

**6.**   Initial Lease Term (1.1E):

    (A)   Rent Commencement Date: 30 days after store opens for business

    (B)   Expiring February 28th, 2011

**7.**   Primary Lease Term: (1.1F)

    (A)   Five (5) Years commencing March 1 2011

    (B)   Expiring February 28th, 2016

**8.**   Rental Rate:

    (A)   Initial Term:  The fixed Minimum Monthly Rent for the Initial Term shall be $18,281.25 (Eighteen thousand two hundred eighty one and 25/100 Dollars) or $219,375 (Two Hundred Nineteen Thousand Three Hundred Seventy Five Dollars) on an annual basis.

1

036932.00001/11930241v.4

(B)     Primary Lease Term:  Sixty (60) Days prior to the end of the Initial Lease Term, Tenant shall give notice to Landlord in writing of its intent to exercise one of two options (the "Gross Floor Area Options"):

     a.     Lease 46,897 sf at a fixed monthly rent of $19,051.91 (Nineteen Thousand Fifty-One and 91/100 Dollars) (46,897 sf x $4.875 per foot) or $228,622.92 (Two Hundred Twenty-Eight Thousand Six Hundred Twenty-Two and 92/100 Dollars) on an annual basis.  Any expense on balance of the space ends,(including Tenant's Proportionate Share and utilities) and the Landlord, at its sole cost and expense, takes full responsibility to divide store, including but not limited to redesigning entrance/exits, separate metered utilities, fire rated demising walls, required HVAC split, plumbing, bathrooms, offices, sprinkler systems, dock doors, and other mechanical systems, which division shall be substantially as shown on Schedule "H" attached hereto and made a part hereof.  Exhibit H does not reflect matters such as the location of Tenant's new bathrooms or offices (which shall be substantially similar in terms of size and utility of use as previously available to Tenant), nor the timing and schedule of such work, nor the specifications, therefor, all of which shall be subject to Tenant's reasonable prior consent.  The adjustment to rental and Tenant's Proportionate Share shall occur effective as of the commencement of the Primary Term, irrespective of the completion date of such improvements to separate the space.

     b.     Continue to operate in the demised premises (77,000 sf) at a fixed monthly rent of $31,281.25 (Thirty One Thousand Two Hundred Eighty One and 25/100 Dollars) per month (77,000 sf x 4.875 per foot) or $375,375 (Three Hundred Seventy Five Thousand Three Hundred Seventy Five Dollars) on an annual basis.

9.     Percentage Rent:  After Initial Term, Three per cent of Gross Sales (3%) over a Nine Million Dollars ($9,000,000) (the "Breakpoint") breakpoint of annual Gross Sale.  The Breakpoint shall increase to $9,900,000) for the first renewal term and $10,890,000 for the second renewal term.

10.     Additional Charges to Tenant:

(A)     CAM, Taxes, and Insurance:  Tenant shall pay its proportional share, capped at $2.50 per square foot per annum based on 45,000 square feet during the Initial Lease Term, subject to the exclusions and limitations set forth in the Lease.

(B)     During the Initial Lease Term, in addition to the amount set forth in 9(A) above, Tenant will contribute $3000 per month towards these expenses for use of the Additional Space which is approximately 32,000 square feet (77,000 less 45,000).

     After Initial Term Tenant shall pay Tenant's Proportionate Share of real estate taxes, CAM, and Insurance, subject to the exclusions and limitations set forth in the Lease.

2

036932.00001/11930241v.4

## GENERAL INFORMATION

**1.**   Store Telephone Number:

**2.**   Names and Addresses:

   (A)   Address for Notices and Billing:

   Forman Mills, Inc.
   1070 Thomas Busch Memorial Highway
   Pennsauken, NJ 08110
   Phone: 856.486.1447
   Fax: 856.254-1051
   Cell:
   Email:pvillari@formanmills.com

   (B)   Tenant (or if Tenant a corporation/partnership, Tenant's principal officer or partner):

   Rick Forman
   Store Phone:
   Work Email Address: rforman@formanmills.com

   (C)   Store Manager or Other Contact:

   (D)   Person to Call in Emergency: Phil Villari

   Cell: 856-340-1216
   Email: pvillari@formanmills.com

   (E)   Registered Agent (if Tenant a corporation or limited partnership):

   Name:

3

036932.00001/11930241v.4

## TABLE OF CONTENTS

ARTICLE I      DEFINITIONS AND ATTACHMENTS .................................................. 1
    Section 1.1      Certain Defined Terms ................................................................... 1
    Section 1.2      Additional Defined Terms .............................................................. 3
    Section 1.3      Attachments ................................................................................... 4

ARTICLE II     PREMISES ............................................................................................. 4
    Section 2.1      Demise ........................................................................................... 4
    Section 2.2      Landlord's Work ............................................................................ 5
    Section 2.3      Tenant's Acceptance of Premises .................................................. 5

ARTICLE III    TERM ..................................................................................................... 5
    Section 3.1      Term ............................................................................................... 5
    Section 3.2      Option to Renew ............................................................................ 6
    Section 3.3      Holding Over ................................................................................. 6

ARTICLE IV     USE ........................................................................................................ 7
    Section 4.1      Prompt Occupancy and Use .......................................................... 7
    Section 4.2      Storage and Office Areas ............................................................... 7
    Section 4.3      Tenant's Trade Name ..................................................................... 7
    Section 4.4      Store Hours .................................................................................... 7
    Section 4.5      Exclusivity ..................................................................................... 7
    Section 4.6      Lease Restrictions ......................................................................... 8

ARTICLE V      RENTAL ................................................................................................ 9
    Section 5.1      Rentals Payable ............................................................................. 9
    Section 5.2      Annual Base Rental ....................................................................... 9
    Section 5.3      Annual Base Rental Escalation ..................................................... 9
    Section 5.4      CPI Increase .................................................................................. 10
    Section 5.5      Annual Percentage Rental ............................................................. 10
    Section 5.6      "Gross Sales" Defined .................................................................. 10
    Section 5.7      Statements of Gross Sales; Audit Right ........................................ 11
    Section 5.8      Tenant's Records ........................................................................... 11
    Section 5.9      Payment of Rental ......................................................................... 11
    Section 5.10     Advance Rental ............................................................................. 12
    Section 5.11     Security Deposit ............................................................................ 12

ARTICLE VI     TAXES ................................................................................................... 12
    Section 6.1      Tenant to Pay Proportionate Share of Taxes ................................ 12
    Section 6.2      Payment of Tenant's Proportionate Share of Taxes ..................... 12
    Section 6.3      "Tax Year" Defined ....................................................................... 13
    Section 6.4      Taxes on Personal Property ........................................................... 14
    Section 6.5      Sales, Use or Other Taxes ............................................................. 14

ARTICLE VII    IMPROVEMENTS .................................................................................. 14
    Section 7.1      Tenant's Improvements ................................................................. 14

036932.00001/11930241v.4

| | | |
|---|---|---|
| Section 7.2 | Effect of Opening for Business | 15 |
| Section 7.3 | Mechanic's Liens | 15 |
| Section 7.4 | Leasehold Improvements and Tenant's Trade Fixtures | 15 |
| | | |
| ARTICLE VIII | OPERATIONS | 16 |
| Section 8.1 | Operations by Tenant | 16 |
| Section 8.2 | Signs and Advertising | 17 |
| Section 8.3 | Painting and Displays by Tenant | 17 |
| Section 8.4 | Trash Removal | 17 |
| | | |
| ARTICLE IX | REPAIRS AND ALTERATIONS | 17 |
| Section 9.1 | Repairs To Be Made By Landlord | 17 |
| Section 9.2 | Repairs To be Made By Tenant | 18 |
| Section 9.3 | Damage to Premises | 19 |
| Section 9.4 | Alterations by Tenant | 19 |
| Section 9.5 | Changes and Additions to Center | 19 |
| Section 9.6 | Roof and Walls | 20 |
| | | |
| ARTICLE X | COMMON AREAS; LANDLORD'S OPERATING COSTS | 20 |
| Section 10.1 | Use of Common Areas | 20 |
| Section 10.2 | Management and Operation of Common Areas | 20 |
| Section 10.3 | Employee Parking Areas | 20 |
| Section 10.4 | Tenant to Share Certain Expenses | 20 |
| Section 10.5 | "Landlord's Operating Costs" Defined | 21 |
| Section 10.6 | Operating Area Costs Cap | 23 |
| Section 10.7 | Audit Rights | 23 |
| | | |
| ARTICLE XI | UTILITIES | 23 |
| Section 11.1 | Utilities | 23 |
| | | |
| ARTICLE XII | INDEMNITY AND INSURANCE | 24 |
| Section 12.1 | Indemnity by Tenant | 24 |
| Section 12.2 | Landlord Not Responsible for Acts of Others | 24 |
| Section 12.3 | Insurance Rating | 24 |
| Section 12.4 | Liability Insurance | 24 |
| Section 12.5 | Insurance for Personal Property and Glass | 25 |
| Section 12.6 | Requirements of Insurance Coverage | 25 |
| Section 12.7 | Waiver of Subrogation | 25 |
| Section 12.8 | Security | 26 |
| Section 12.9 | Tenant's Contractor's Insurance | 26 |
| Section 12.10 | Landlord's Insurance | 26 |
| Section 12.11 | Indemnification of Landlord | 27 |
| | | |
| ARTICLE XIII | DAMAGE AND DESTRUCTION | 27 |
| Section 13.1 | Landlord's Obligation to Repair and Reconstruct | 27 |
| Section 13.2 | Landlord's Option to Terminate Lease | 27 |
| Section 13.3 | Demolition of Landlord's Buildings | 28 |

036932.00001/11930241v.4

| | | |
|---|---|---|
| Section 13.4 | Insurance Proceeds | 28 |
| ARTICLE XIV | CONDEMNATION | 28 |
| Section 14.1 | Effect of Taking | 28 |
| Section 14.2 | Condemnation Awards | 29 |
| ARTICLE XV | ASSIGNMENTS AND SUBLETTING | 29 |
| Section 15.1 | Landlord's Consent Required | 29 |
| Section 15.2 | Intentionally Omitted | 30 |
| Section 15.3 | Acceptance of Rent from Transferee | 30 |
| Section 15.4 | Assignment or Subletting to Affiliates | 30 |
| ARTICLE XVI | DEFAULT | 30 |
| Section 16.1 | "Event of Default" Defined | 30 |
| Section 16.2 | Remedies | 31 |
| Section 16.3 | Assignment in Bankruptcy | 32 |
| Section 16.4 | Rights Upon Possession | 33 |
| Section 16.5 | No Waiver | 33 |
| Section 16.6 | Right of Landlord to Cure Tenant's Default | 33 |
| ARTICLE XVII | SUBORDINATION AND ATTORNMENT | 33 |
| Section 17.1 | Peaceful and Quiet Use and Possession | 33 |
| Section 17.2 | Subordination | 34 |
| Section 17.3 | Attornment | 34 |
| Section 17.4 | Subordination, Non-Disturbance and Attornment Agreement | 34 |
| Section 17.5 | Waiver of Landlord's Lien | 34 |
| ARTICLE XVIII | ADVERTISING & PROMOTION | 35 |
| ARTICLE XIX | NOTICES | 35 |
| ARTICLE XX | MISCELLANEOUS | 35 |
| Section 20.1 | Retail Restriction Limit | 35 |
| Section 20.2 | Estoppel Certificate | 36 |
| Section 20.3 | Inspections and Access by Landlord | 36 |
| Section 20.4 | Remedies Cumulative | 36 |
| Section 20.5 | Successors and Assigns | 36 |
| Section 20.6 | Compliance with Laws and Regulations | 36 |
| Section 20.7 | Captions and Headings | 37 |
| Section 20.8 | Joint and Several Liability | 37 |
| Section 20.9 | Brokers | 37 |
| Section 20.10 | No Joint Venture | 37 |
| Section 20.11 | No Option | 38 |
| Section 20.12 | No Modification | 38 |
| Section 20.13 | Severability | 38 |
| Section 20.14 | Corporate Tenants | 38 |
| Section 20.15 | Applicable Law | 38 |

036932.00001/11930241v.4

Section 20.16    Performance of Landlord's Obligations by Mortgagee .......................... 38
Section 20.17    Waiver of Jury Trial ...................................................................... 39
Section 20.18    Limitation on Right of Recovery Against Landlord ........................... 39
Section 20.19    Rules and Regulations ..................................................................... 39
Section 20.20    Landlord's Approval ....................................................................... 39

ARTICLE XXI     TENANT'S COVENANTS REGARDING HAZARDOUS MATERIALS 39
Section 21.1     Definition ...................................................................................... 39
Section 21.2     General Prohibition ......................................................................... 40
Section 21.3     Notice ........................................................................................... 40
Section 21.4     Survival ......................................................................................... 41

7

## ADDITIONAL SCHEDULES

Schedule "A"                Legal Description of Shopping Center Area

Schedule "A-1"              Drawing of Shopping Center Area including Landlord's Buildings and Tenant's

Schedule "B"                Landlord's Building Standard Work

Schedule "C"                Tenant's Work

Schedule "D"                Form of Estoppel Certificate

Schedule "E"                Rent Schedule

Schedule "F"                Sign Criteria

Schedule "G"                ~~Guarantee~~ *List of other Tenant Restrictions*

Schedule "H"                Division of Floor between 77,000 square feet and 46,897 square feet

Schedule "I"                List of Existing Leases and Use Clauses

8

036932.00001/11930241v.4

## DEED OF LEASE

THIS DEED OF LEASE (this "Lease") is made as of the ___ day of September, 2009 , by and between Decar Realty, LLC, a Maryland Limited Liability Company (the "Landlord") and Forman Mills, Inc, a Pennsylvania Corporation.

## W I T N E S S E T H:

THAT FOR AND IN CONSIDERATION of the mutual covenants and agreements herein contained, the parties hereto do hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ATTACHMENTS

Section 1.1   Certain Defined Terms.

As used herein, the term:

A. "Shopping Center" means the Shopping Center Area and the Landlord's Buildings on the parcel of land more particularly described in Schedule "A" and known as Plaza 30.

B. "Shopping Center Area" means that certain parcel of land owned or controlled by Landlord situate in the Prince George's County, State of Maryland, more particularly described in Schedule "A", and, upon the opening for business with the public of any expansion of the Shopping Center on any property adjacent to the Shopping Center Area, subject to the compliance with the other terms of this Lease, the term "Shopping Center Area" shall include the property used for such expansion.

C. "Landlord's Buildings" means the structures constructed or to be constructed by Landlord (or a tenant of Landlord's in the Shopping Center) in the location shown on Schedule "A-1", as the same may be altered, reduced, expanded or replaced from time to time.

D. "Premises" means Tenant's portion of Landlord's Buildings shown on Schedule "A-1" identified as 8401 Annapolis Road, consisting of 77,000 square feet of Tenant's Floor Area.

E. "Initial Lease Term" means the period from the Rent Commencement Date until February 28th, 2011.

F. "Primary Lease Term" means the Five (5) Years commencing March 1, 2011 and Expiring February 28th, 2016.

G. "Permitted Use" means the operation of a Retail Store for the sale of men's, women's and children's apparel, Footwear and home products (the "Core Business") and General Merchandise and accessories related thereto, and any

other lawful use provided, however, that Tenant may not use the Premises for any other lawful use which is a "Prohibited Use" or a "Future Exclusive Use". Prohibited Use means a Laundromat, overnight kennel or sale of pornographic articles. "Future Exclusive Use" means any exclusive use, other than the Core Business or sale of General Merchandise and accessories, granted by Landlord pursuant to leases with other tenants in the Shopping Center, provided (i) Landlord shall notify Tenant within ten (10) business days after the execution of a Lease containing Future Exclusive Use, and (ii) Tenant shall not then be engaged in a use within the Premises that would violate such Future Exclusive Use, and (iii) Tenant may, notwithstanding the foregoing, sell merchandise that would otherwise be a Future Exclusive Use, provided the amount of floor area for the same within the Premises does not exceed 1,000 square feet in the aggregate.

H.      "Advance Rental" means the sum of one month's rent, $18,281 to be deposited with Landlord simultaneously with execution of lease, in cash or by certified funds.

I.      "Tenant Trade Name" means Forman Mills, which name Tenant represents it is entitled to use pursuant to all applicable laws or such other name that a majority of stores in the State of Maryland are operating under and from time to time. See Section 4.3.

J.      "Store Hours" means N/A. See Section 4.4.

K.      "Retail Radius Restriction" means N/A. See Section 20.1.

L.      "Landlord's Floor Area" shall be the total floor area of the Landlord's Buildings: 175,285 square feet.

M.      "Tenant's Floor Area" shall be that portion of Landlord's Floor Area constituting the Premises and shall, for all purposes of this Lease, be conclusively deemed to be 77,000 square feet during the Initial Lease Term and either 77,000 square feet or 46,897 square feet during the Primary Lease Term and subsequent Renewal Options subject to the Leasable Area Option exercised 60 days prior to expiration of the Initial Lease Term.

N.      "Common Areas" means those areas and facilities which may be furnished by Landlord in or near the Shopping Center for the non-exclusive general common use of tenants of the Shopping Center, their officers, agents, employees and customers, including (without limitation) all parking areas, access roads, employee parking areas, truckways, driveways, loading docks and areas, delivery passages, package pick-up stations, sidewalks, malls, courts, ramps, landscaped and planted areas, retaining walls, stairways, bus stops, first aid stations, sewage treatment facilities, if any, lighting facilities, comfort stations or rest rooms, and other similar areas, facilities or improvements.

O.      "Default Rate" means an annual rate of interest equal to the lesser of (i) the maximum rate of interest for which Tenant may lawfully contract in the State of

2

Maryland, or (ii) Twelve Percent (12%).

P. "Security Deposit" means the sum of $N/A.  See Section 5.11.

Q. "Tenant's Proportionate Share" means 44%, which shall reduce to 25.67% in the event that Tenant exercises its Gross Floor Area Option to reduce the Tenant's Floor Area to 45,000 square feet.

R. "Gross Floor Area Option": 60 days prior to the end of the Initial Lease Term Tenant shall exercise one of the following Gross Floor Area Options and notify Landlord in writing of their decision.  Subsequent to the exercise of the Gross Floor Area Option, "Tenant's Floor Area" shall refer to the floor are designated in the option chosen by Tenant as follows:

1. Lease 46,897 sf at a fixed monthly rent of $19,051.91 (Nineteen Thousand Fifty-One and 91/100 Dollars) (46,897 sf x $4.875 per foot) or $228,622.92 (Two Hundred Twenty-Eight Thousand Six Hundred Twenty-Two and 92/100 Dollars) on an annual basis.  Any expense on balance of the space ends,(including Tenant's Proportionate Share and utilities) and the Landlord, at its sole cost and expense, takes full responsibility to divide store, including but not limited to redesigning entrance/exits, separate metered utilities, fire rated demising walls, required HVAC split, plumbing, bathrooms, offices, sprinkler systems, dock doors, and other mechanical systems, which division shall be substantially as shown on Schedule "H" attached hereto and made a part hereof.  Exhibit H does not reflect matters such as the location of Tenant's new bathrooms or offices (which shall be substantially similar in terms of size and utility of use as previously available to Tenant), nor the timing and schedule of such work, nor the specifications, therefor, all of which shall be subject to Tenant's reasonable prior consent.  The adjustment to rental and Tenant's Proportionate Share shall occur effective as of the commencement of the Primary Term, irrespective of the completion date of such improvements to separate the space.

2. Continue to lease in the entire original Premises (77,000 sf) at a fixed monthly rent of $31,281.25 (Thirty One Thousand Two Hundred One and 25/100 Dollars) per month (77,000 sf x 4.875 per foot) or $375,375 (Three Hundred Seventy Five Thousand Three Hundred Seventy Five Dollars) on an annual basis.

Section 1.2    Additional Defined Terms.

The following additional terms are defined in the places in this Lease noted below:

Additional .......................................... 12
Advance Rental .................................... 15
Casualty ............................................. 31
Common .............................................. 7
Date ...................................................... 9
Default .................................................. 7
Event of Default ................................... 34
Gross ................................................ 7, 13

3

036932.00001/11930241v.4

| | | | |
|---|---|---|---|
| Gross Floor Area | 3 | Renewal | 10 |
| Hazardous Material | 43 | Rental | 12 |
| Initial | 6 | Retail | 6 |
| Landlord's | 6 | Security | 7 |
| Landlord's Buildings | 6 | Shopping | v |
| Landlord's Operating Costs | 25 | Shopping Center Area | v |
| Lease Commencement Date | 1 | Store | 6 |
| Mortgage | 37 | Tax | 17 |
| Mortgagee | 38 | Tenant | 6 |
| Permitted | 6 | Tenant's | 7 |
| Premises | 6 | Tenant's Floor Area | 7 |
| Premises | 1 | Tenant's | 6 |
| Primary | 6 | Termination | 9 |

Section 1.3   Attachments.

The following documents are attached hereto, and such documents, as well as all drawings and documents prepared pursuant thereto, shall be deemed to be a part hereof:

| | |
|---|---|
| Schedule "A" | Legal Description of Shopping Center Area |
| Schedule "A-1" | Drawing of Shopping Center Area including Landlord's Buildings and Tenant's |
| Schedule "B" | Landlord's Building Standard Work |
| Schedule "C" | Tenant's Work |
| Schedule "D" | Form of Estoppel Certificate |
| Schedule "E" | [Intentionally Deleted] |
| Schedule "F" | Sign Criteria |
| Schedule "G" | Lease Restrictions |
| Schedule "H" | Division of Floor between 77,000 square feet and 46,897 square feet |
| Schedule "I" | List of Existing Leases and Use Clauses |

## ARTICLE II
## PREMISES

Section 2.1   Demise.

For and in consideration of the Rental reserved and the mutual covenants contained in this Lease, Landlord hereby leases and demises unto Tenant, and Tenant hereby leases and

4

036932.00001/11930241v.4

accepts from Landlord, the Premises set forth in Clause D of Section 1.1 hereof for the Lease Term and upon the terms and conditions set forth in this Lease.

Section 2.2    Landlord's Work.

A.    Landlord shall deliver possession of the Premises to Tenant as a demised 77,000 square foot lit sales, stock room and exterior area in its "as-is" condition as of the Date of Tender, and Tenant accepts the Premises in AS-IS condition existing as of the date of this Lease and without any improvements or other work therein by Landlord. Landlord represents that on the Tender Date, the plumbing, mechanical, electrical HVAC and sprinkler system shall be in good working order and the Premises will be in broom clean condition. Notwithstanding the foregoing, Landlord shall provide, at its sole expense, energy efficient lighting fixtures and bulbs within the Premises pursuant to specifications reasonably approved by Tenant, and shall complete the work on or before November 1, 2009. Such lighting work shall be timely completed such that, subject only to completion by Tenant of the Tenant's Work Tenant will be able to obtain the issuance of a certificate of occupancy for and will be able to operate in the ordinary course of business within the Premises. Stock room lights and outdoor lights shall convey in as-is condition as of the date of tender.

Section 2.3    Tenant's Acceptance of Premises.

Notwithstanding anything to the contrary contained herein, but subject to Section 2.2A, Tenant shall be deemed to have accepted the Premises as existing as of the date of the execution of this lease.

**ARTICLE III**
**TERM**

Section 3.1    Term.

Possession of the Premises shall be delivered to Tenant upon lease execution (the "Date of Tender"). The Initial Lease Term commences on the Rent Commencement Date and expires on February 28th, 2011. The Primary Lease Term consists of the five (5) years commencing March 1 2011 and expiring February 28th, 2016 (the "Termination Date").

Section 3.1.1    Gross Floor Area Option:

Sixty (60) Days prior to the end of the Initial Lease Term, Tenant shall give notice to Landlord in writing of its intent to exercise one of two options:

1.    Lease 46,897 sf at a fixed monthly rent of $19,051.91 (Nineteen Thousand Fifty-One and 91/100 Dollars) (46,897 sf x $4.875 per foot) or $228,622.92 (Two Hundred Twenty-Eight Thousand Six Hundred Twenty-Two and 92/100 Dollars) on an annual basis. Any expense on balance of the space ends,(including Tenant's Proportionate Share and utilities) and the Landlord, at its sole cost and expense, takes full

5

036932.00001/11930241v.4

responsibility to divide store, including but not limited to redesigning entrance/exits, separate metered utilities, fire rated demising walls, required HVAC split, plumbing, bathrooms, offices, sprinkler systems, dock doors, and other mechanical systems, which division shall be substantially as shown on Schedule "H" attached hereto and made a part hereof. Exhibit H does not reflect matters such as the location of Tenant's new bathrooms or offices (which shall be substantially similar in terms of size and utility of use as previously available to Tenant), nor the timing and schedule of such work, nor the specifications, therefor, all of which shall be subject to Tenant's reasonable prior consent. The adjustment to rental and Tenant's Proportionate Share shall occur effective as of the commencement of the Primary Term, irrespective of the completion date of such improvements to separate the space.

B.      Continue to Lease in the entire original Premises (77,000 sf) at a fixed monthly rent of $31,281.25 (Thirty One Thousand Two Hundred One and 25/100 Dollars) per month (77,000 sf x 4.875 per foot) or $375,375 (Three Hundred Seventy Five Thousand Three Hundred Seventy Five Dollars) on an annual basis.

Section 3.2     Option to Renew.

Tenant shall have Two (2) separate Five (5) year Options to Renew (The "Renewal Options") under all of the same terms and conditions as set forth in this Lease, except for the rental rate. The rental rate for the First Renewal Option shall be 110% of the rent in the Primary Lease Term. The rental Rate for the Second Renewal Option shall be 110% of the rental rate during the First Renewal Option. The Renewal Options must be exercised in writing between Eighteen (18) months and Six (6) months prior to the expiration of the applicable Lease Term.

Section 3.3     Holding Over.

This Lease shall terminate on the Termination Date or at the end of any extension or renewal thereof, without the necessity of any notice from either Landlord or Tenant to terminate the same, and Tenant hereby waives notice to vacate or quit the Premises; provided, however, that in the event that Tenant shall holdover after expiration of the Lease Term, then at any time prior to the acceptance, Landlord, at its election or option, may re-enter and take possession of the Premises forthwith, by any legal action or process in force in the jurisdiction in which the Shopping Center is located. Tenant hereby agrees that if it fails to surrender the Premises at the end of the Lease Term, or any renewal thereof, Tenant will be liable to Landlord for the actual direct out-of-pocket damages which Landlord shall suffer by reason thereof (such damages shall explicitly not include rents that would have been obtained through a subsequent lease), and Tenant will indemnify Landlord against all claims and demands made by any succeeding tenants against Landlord, founded upon delay by Landlord in delivering possession of the Premises to such succeeding tenant.

If Tenant shall be in possession of the Premises after the Termination Date, in the absence of any written agreement extending the Lease Term hereof, the tenancy under this Lease shall become one from month-to-month, terminable by either party on thirty (30) days' prior

6

written notice, at a monthly rental equal to 110% of the monthly installment of Annual Base Rental payable during the last month of the Lease Term. Tenant shall also pay all other charges payable under the terms of this Lease, prorated for each month during which Tenant remains in possession. Such month-to-month tenancy shall also be subject to all other conditions, provisions and obligations of this Lease.

# ARTICLE IV
## USE

Section 4.1   Prompt Occupancy and Use.

Tenant shall lease the Premises upon commencement of the Initial Lease Term for the Permitted Use and for no other purpose whatsoever. Tenant shall not be obligated to continuously conduct its business in the Premises, provided, however, should the Premises not be open for business for 120 consecutive days, subject to any Excused Periods, Landlord shall have the right to terminate this Lease at any time thereafter upon ninety days' notice to Tenant, unless, if prior to Landlord's exercise of its recapture rights hereunder, Tenant resumes operations, or notifies Landlord after the recapture option is exercised that Tenant intends to reopen within ninety days thereafter and does so. Upon such termination, neither party shall have any further rights, obligations or liabilities hereunder from and after the date of such termination. An Excused Period shall mean any period (a) during which the Premises are being altered, remodeled or renovated, (b) after damage or destruction by fire or other casualty or a condemnation, prior to full repair or restoration (or return of possession to Tenant) of the Premises, or (c) during which the Premises are closed for the taking of inventory, provided such period does not exceed a reasonable period of time.

Section 4.2   Storage and Office Areas.

Intentionally Omitted.

Section 4.3   Tenant's Trade Name.

Unless otherwise approved by Landlord, Tenant shall conduct business in the Premises only in Tenant's Trade Name.

Section 4.4   Store Hours.

[INTENTIONALLY OMITTED]

Section 4.5   Exclusivity.

A.   Landlord grants to Tenant for the entire term of this Lease, including any renewal terms, the exclusive right to operate its Core Business within the Shopping Center and, except for (i) the Premises, (ii) any existing leases currently in place, which leases and use clauses are attached hereto as Schedule 1 or (iii) any lease which is for less than 6,000 square feet, Landlord shall not lease, sell or permit or consent to any sublease or assignment where any space in the Shopping Center is to be used, in whole or in part, for the Core Business.

7

B.    If any of the restrictions or prohibitions set forth in this Section 4.5 shall be violated and such violation is the result of Landlord's having failed to restrict or to prohibit the other tenant(s) or occupants within the Shopping Center from using their premises in violation of any of the provisions of this Section 4.5 (an "intentional or willful violation"), Tenant shall be entitled any of the following non-exclusive remedies: (i) to terminate this Lease upon ninety (90) days notice to Landlord, (ii) to pay fifty percent (50%) of Base Rent ("Alternate Rent") until the violation ceases to exist, regardless of any change in ownership or control of the premises in question, (iii) to seek injunctive relief to enjoin or restrain such violation, and (iv) to seek all other remedies available to it, at law and in equity, because of such violation.

C.    If the restrictions or prohibitions set forth in this Section 4.5 shall be violated and such violation is not an "intentional or willful violation", Tenant shall give Landlord notice of the violation, and Landlord shall have a period of ninety (90) days (or such longer period of time as shall be reasonably necessary) within which to use its best efforts to enjoin the violation and diligently to take such other steps as may be necessary or desirable to cause the cessation of the violation, including any and all necessary legal proceedings, including to seek injunctive relief to enjoin or restrain such violation. If Landlord fails to proceed as provided herein, Tenant may deem said failure to be an intentional or willful violation. If Landlord proceeds in good faith as provided herein, but fails to enjoin the violation prior to the expiration of ninety (90) days after notice thereof from Tenant, from and after the expiration of such ninety (90) day period and continuing until the cessation of the violation, Tenant shall be obligated to pay only Alternative Rent in lieu of all Base Rent and additional rent.

D.    If Landlord has not proceeded as provided above, Tenant shall have the right to proceed in Landlord's name to attempt to cause the cessation of the violation, in which event Landlord shall fully cooperate with Tenant, including executing documents confirming Tenant's said right. If Tenant is able to cause the cessation of the violation, Landlord shall reimburse Tenant its reasonable attorneys' fees incurred after the date Tenant assumes Landlord's right to proceed. In the event of a judicial determination that Landlord failed to restrict or prohibit other tenant(s) from using their premises subject to the provisions of this Section it shall be deemed to be an intentional or willful violation.

The provisions of this Section shall be deemed to be covenants running with the land comprising the Shopping Center and any land owned by Landlord or any affiliate of Landlord adjacent to the Shopping Center. For purposes of this provision, an affiliate shall include any principle of Landlord that is also a principle of an another entity controlling or owning an equity interest in land adjacent to the Shopping Center

Section 4.6    Lease Restrictions.

See Schedule "G": Lease Restrictions.

8

036932.00001/11930241v.4

## ARTICLE V
## RENTAL

Section 5.1   Rentals Payable.

Tenant covenants and agrees commencing on the Rent Commencement Date to pay to Landlord as rental ("Rental") for the Premises, the following:

A.   the Annual Base Rental; plus

B.   all additional sums, charges or amounts of whatever nature to be paid by Tenant to Landlord in accordance with the provisions of this Lease, whether or not such sums, charges or amounts are referred to as additional rental (collectively referred to as "Additional Rental");

Section 5.2   Annual Base Rental.

Tenant covenants and agrees to pay to Landlord as Base rental ("Rental") for the Premises, the following:

The fixed Minimum Monthly Rent for the Initial Term shall be $18,281.25 (Eighteen thousand two hundred eighty one and 25/100 Dollars) or $219,375 (Two Hundred Nineteen Thousand Three Hundred Seventy Five Dollars) on an annual basis.

The fixed Minimum Monthly Rent for the Primary Lease Term: As specified in the Gross Floor Area Option, the Monthly Rent for the Primary Term shall be either:

A.   46,897 sf option: A fixed monthly rent of $18,281.00 (Eighteen Thousand Two Hundred Eighty One Dollars) (45,000 sf x $4.875 per foot) or $219,375 (Two Hundred Nineteen Thousand Three Hundred Seventy Five Dollars) on an annual basis.

OR

B.   77,000 sf option:  A fixed monthly rent of $31,281 (Thirty One Thousand Two Hundred Eighty-One Dollars) per month (77,000 sf x 4.875 per foot) or $375,375 (Three Hundred Seventy Five Thousand Three Hundred Seventy Five Dollars) on an annual basis.

Annual Base Rental shall be payable without prior demand, deduction, offset or counterclaim, except as otherwise provided herein in equal monthly installments in advance on the first day of each full calendar month during the Term, the first such payment to include also any prorated Annual Base Rental for the period from Rental Commencement Date to the first day of the next succeeding calendar month.

Section 5.3   Annual Base Rental Escalation.

[INTENTIONALLY OMITTED]

9

Section 5.4   CPI Increase.

[INTENTIONALLY OMITTED]

Section 5.5   Annual Percentage Rental.

In the Primary Lease Term and all subsequent Renewal Options, Tenant shall pay as Additional Rent Three per cent of Gross Sales (3%) over a Nine Million ($9,000,000) Breakpoint in annual Gross Sales. The Breakpoint shall increase to Nine Million Nine Hundred Thousand Dollars ($9,900,000) for the first renewal term and Ten Million Eight Hundred Ninety Thousand Dollars ($10,890,000) for the second renewal term.

Section 5.6   "Gross Sales" Defined.

As used in this Lease, the term "Gross Sales" means the gross amount received by Tenant (including amounts received from any licensee or concessionaire of Tenant) from all sales, both for cash and on credit, made or rendered in, upon or from the Premises (and in cases of sales on credit, whether or not payment be actually made therefor); provided, however, that Gross Sales shall not include: (i) amounts received with respect to any sale to the extent of the net amount of any refund made or credit or discount allowed upon any such sale, where the merchandise sold, or some part thereof, is returned to and accepted by Tenant; (ii) exchanges or transfers of merchandise between other stores of Tenant, or any of its affiliates, where such exchanges or transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale that would otherwise be made from the Premises; (iii) returns to suppliers or manufacturers; (iv) the amount of any city, county, state or federal sales, use, gross receipts, luxury or excise tax on such sales which is both added to the selling price (or absorbed therein) and paid to the taxing authorities by Tenant; (v) any penalty charged by Tenant for a returned check; (vi) reimbursement of amounts for postage, express or delivery services, including United Parcel Service, incurred in delivering merchandise to customers, provided that such charges are at all times properly segregated from amounts includable in Gross Sales and so identified on Tenant's records; (vii) any sale at a discount to a bona fide employee of Tenant or, any of its affiliates, or of a licensee or concessionaire of Tenant; (viii) allowances, discounts or credits extended to customers and/or third parties to settle and/or avoid disputes; (ix) receipts from vending machines or pay telephones; (x) sums and credits received in settlement of claims for loss or damage to merchandise, including but not limited to insurance recoveries; (xi) charges for repairs, gift wrapping and similar minor auxiliary services not usually or customarily considered as merchandise or the rendition of services for profits; (xii) bulk sales and merchandise returned or sold to shippers, jobbers, wholesalers or manufacturers; (xiii) promotional offerings and charitable donations; (xiv) bad debts including, without limitation, unpaid balances on credit sales and uncollected checks; (xv) any charges added by Tenant to its regular cash price as a finance charge for sales on credit, provided that such charge is at all times properly segregated from amounts includable in Gross Sales and so identified on Tenant's records; provided that each transaction involving the extension of credit shall be treated as a sale to the extent of each such installment and credit payment when received by Tenant; (xvi) any charges paid to the issuer or processor of credit cards; (xvii) any sale of fixtures or equipment not in the regular course of Tenant's business or after use thereof; (xviii) gift certificates, promotional discounts or like vouchers, until such time

10

036932.00001/11930241v.4

as they have been converted into a sale by redemption; and (xix) catalog orders, telephone orders and/or computer, internet or other electronic orders of merchandise which are placed from the Premises but which are filled from an outside distribution center.

Section 5.7   Statements of Gross Sales; Audit Right.

Tenant shall provide Landlord with a statement of Gross Sales certified by Tenant's Chief Financial Officer within 60 days of the end of each calendar year during the Primary Term. Landlord shall have the right, at Landlord's sole cost and expense, within thirty (30) days from the date Landlord received Tenant's statement of Gross Sales to employ an independent certified public account to examine Tenant's books and records, as may be necessary to certify the amount of Tenant's Gross Sales for such calendar year. Such audit shall take place during normal business hours at the location where Tenant keeps its business records on ten (10) days prior written notice to Tenant. Once completed, Tenant shall provide Landlord with a copy of the audit report. If such audit shall disclose that Tenant's statement of Gross Sales, in the opinion of such independent certified public accountant were understated by more than five percent (5%), Landlord shall be entitled to collect, as additional rent, Percentage Rent on such additional Gross Sales, unless within thirty (30) days of receipt of such audit report, Tenant disagrees with such audit in which event Tenant shall have the right by written notice to Landlord to have an additional independent audit performed by a certified public accountant of its choosing. If Tenant's auditor and Landlord's auditor cannot agree on the amount of the Gross Sales, either party shall have the right to submit the determination to a third auditor acceptable to both Landlord and Tenant whose determination shall be binding on the parties. Each party shall pay for its own auditor and shall equally divide the cost of the third party auditor.

Section 5.8   Tenant's Records.

[INTENTIONALLY OMITTED]

Section 5.9   Payment of Rental.

Tenant shall pay all Rental when due and payable, without any counterclaim, setoff, deduction or prior demand therefor whatsoever, except as otherwise set forth herein. If Tenant shall fail to pay any Rental within ten (10) days after notice that the same is due, Tenant shall be obligated to pay a late payment charge equal to Two Percent (2%) of the Monthly Base Rental Rate for the month in question. In addition, any Rental which is not paid within thirty (30) days after the same is due shall bear interest at the Default Rate from the first day due until paid. Any additional Rental which shall become due shall be payable, unless otherwise provided herein, shall be due the later of the next installment of Annual Base Rental or thirty (30) days thereafter. Rental and statements required of Tenant shall be paid and delivered to Landlord at the address of Landlord as set forth in the "Notices" section of this Lease between the hours of 9:00 a.m. and 5:00 p.m. Monday through Friday or at such other place as Landlord may, from time to time, designate in a notice to Tenant. Any payment by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord shall be treated as a payment on account. The acceptance by Landlord of a check for a lesser amount with an endorsement of statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full shall be given no effect, and Landlord may accept such check without prejudice to any other

11

rights or remedies which Landlord may have against Tenant.

Section 5.10   Advance Rental.

Landlord acknowledges receipt from Tenant of an amount equal to the Advance Rental, the same to be held as security for the performance by Tenant of all obligations imposed under this Lease which Tenant is required to perform prior to the Rent Commencement Date. If Tenant shall fail to perform such obligations, Landlord shall be entitled to apply the Advance Rental, pro tanto, against any damages which it may sustain by reason of Tenant's failure to perform such obligations, but such application shall not preclude Landlord from recovering greater damages if the same can be established. Otherwise, if Tenant shall faithfully perform all such obligations, then the Advance Rental shall be applied, pro tanto, by Landlord against the Rental first becoming due hereunder.

No right or remedy available to Landlord as provided in this Section 5.10 shall preclude or extinguish any other right or remedy to which Landlord may be entitled.

Advance Rental shall be the amount of $18,281

Section 5.11   Security Deposit.

[INTENTIONALLY OMITTED]

## ARTICLE VI
## TAXES

Section 6.1   Tenant to Pay Proportionate Share of Taxes.

Tenant shall pay in each Tax Year during the Lease Term, as Additional Rental, a proportionate share of all real estate taxes, and valorem taxes and assessments on general receipts, or any other tax payable with respect to or allocable to the Shopping Center Area, including all land, Landlord's Buildings and all other buildings and improvements situated thereon, together with the reasonable cost (including reasonable fees of attorneys, consultants and appraisers) of any negotiation, contest or appeal pursued by Landlord in an effort to reduce any such tax, assessment or charge, but shall not include income, franchise, capital stock, estate or inheritance taxes, or taxes based on the receipt of rent, including gross receipt taxes and interest and penalties (not attributed to Tenant's late payments), (unless in lieu of, in addition to or as a substitute for real estate taxes by whatever name the tax may be designated), excise, profits, estates, inheritance, succession, gift or transfer tax, all the foregoing being collectively referred to herein as "Taxes." Tenant's proportionate share of Taxes for any Tax Year shall be computed by multiplying the amount of such Taxes by a fraction, the numerator of which is Tenant's Floor Area and the denominator of which is the Landlord's Floor Area. For the Tax Year in which the Lease Term commences or terminates, Tenant's liability for its proportionate share of any Taxes for such year shall be subject to a pro rata adjustment based upon the number of days of such Tax Year falling within the Lease Term.

Section 6.2   Payment of Tenant's Proportionate Share of Taxes.

12

036932.00001/11930241v.4

Tenant's proportionate share of Taxes shall be paid by Tenant in equal monthly installments in such amounts as are estimated and billed for each Tax Year by Landlord during the Lease Term, each such installment being due on the first day of each calendar month. Promptly after Landlord's receipt of tax bills for each Tax Year, Landlord will notify Tenant of the amount of Taxes for the Tax Year in question and the amount of Tenant's proportionate share thereof. Any overpayment or deficiency in Tenant's payment of its proportionate share of Taxes for each Tax Year shall be adjusted between Landlord and Tenant, and Landlord and Tenant hereby agree that Tenant shall pay Landlord or Landlord shall credit to Tenant's account (or, if such adjustment is at the end of the Lease Term, pay Tenant), as the case may be, within thirty (30) days of the aforesaid notification to Tenant, such amount necessary to effect such adjustment. Tenant's obligation for additional rent hereunder and Landlord's obligation, if any, to refund any overpayment of Tenant's proportionate share of Tax shall survive the termination or earlier expiration of this Lease. Tenant shall not be responsible for any interest or late charges imposed on Landlord for failure to pay the Taxes when due.

Section 6.2.1  Refund of Taxes. If Landlord shall receive a refund of Taxes with respect to all or part of a Lease Year for which Tenant has paid Tenant's proportionate share of Taxes, Tenant shall be credited with its proportionate share thereof after deducting all reasonable expenses incurred by Landlord in obtaining such refund (including reasonable attorneys' fees and expenses). Landlord shall promptly deliver to Tenant copies of all notices of proposed increases in assessment or proposed revaluation of any property that is included in the calculation of Taxes, in sufficient time to permit Tenant to contest such proposed increases or revaluation. If Landlord shall fail or refuse, on request of Tenant, to take any necessary steps to contest the validity or amount of the assessed valuation or Taxes for any real estate fiscal tax year, Tenant may undertake, by appropriate proceedings in the name of Landlord or Tenant, or both, to contest same at Tenant's sole cost and expense. Within a reasonable time after demand therefor, Landlord shall execute and deliver to Tenant any documents and other information in Landlord's possession required to enable Tenant to prosecute any such proceeding. If Landlord elects to commence such contest, Landlord shall promptly notify Tenant. If either Landlord or Tenant shall obtain a remission or refund of all or any part of the Taxes for any real estate fiscal tax year, the reasonable costs and expenses in connection therewith (including reasonable attorneys' fees) shall be deducted from the proceeds and promptly paid to the party who made such expenditures. Tenant's proportionate share of the net remission or refund shall be paid to Tenant promptly after receipt by Landlord or any person on behalf of Landlord, such proportionate share to be based on Tenant's Proportionate Share for the real estate fiscal tax year or years with respect to which such remission or refund has been received. If a prospective reduction in said assessed valuation, without a remission or refund, is obtained, the reasonable costs and expenses in connection therewith (including reasonable attorneys' fees) shall be added to the Taxes payable for the year in which such reduction is effected. If such reduction is obtained by Tenant, then Tenant's reasonable costs and expenses (including reasonable attorneys' fees) shall be paid to Tenant by Landlord promptly on demand. The provisions of this Section shall survive the termination or expiration of the Lease Term.

Section 6.3   "Tax Year" Defined.

The term "Tax Year" means each twelve (12) month period (deemed, for the purpose of this Section, to have 365 days) established as the real estate tax year by the taxing authorities

13

having lawful jurisdiction over the Shopping Center Area.

Section 6.4    Taxes on Personal Property.

In addition to Tenant's Proportionate Share of Taxes, Tenant shall be solely responsible for and pay within the time provided by law all taxes imposed on its inventory, furniture, trade fixtures, apparatus, leasehold improvements (installed by or on behalf of Tenant), equipment and any other of Tenant's personal or other property. At the request by Landlord, Tenant shall furnish Landlord with satisfactory evidence of these payments.

Section 6.5    Sales, Use or Other Taxes.

If during the Lease Term, any governmental authority having jurisdiction levies, assesses or imposes any tax on Landlord, the Premises, the Shopping Center Area, including all land, Landlord's Buildings and all other buildings and improvements situated thereon or the rents payable hereunder, in the nature of a sales tax, or a tax on rent, but shall not include any (a) income taxes (including corporate franchise or unincorporated business taxes); (b) estate or inheritance taxes; or (c) Taxes, Tenant shall pay the same to Landlord as Additional Rental at the time of, and together with, the first payment of Annual Base Rental due following receipt by Tenant of written notice of the amount of such tax. If any such tax is levied, assessed or imposed and the amount of the tax required to be paid by Tenant is not ascertainable because the tax relates to more than the Premises or the rents payable hereunder, then Tenant shall pay such share of the total taxes that Landlord shall reasonably estimate.

## ARTICLE VII
## IMPROVEMENTS

Section 7.1    Tenant's Improvements.

Tenant agrees, at its sole cost and expense, to complete the interior and exterior of the Premises necessary to prepare the Premises for the Permitted Use in accordance with Schedule "C" attached hereto and in accordance with approved plans and specifications, using new and quality materials and equipment by licensed contractors. Plans and specifications for all improvements, including the type of materials to be used by Tenant in the Premises, must be set forth in detail and submitted to Landlord for approval promptly upon execution of this Lease, which approval shall not be unreasonably withheld, conditioned or delayed. In the event that working plans are not available at the Lease Execution, preliminary plans and specifications and concept design shall be attached to the Lease, subject to conversion to full plans, for review and approval, which approval shall not be unreasonably withheld, conditioned or delayed. Landlord's approval of Tenant's plans shall constitute approval of Tenant's design concept only and approval of Tenant's plans shall in no event be deemed a representation or warranty by Landlord as to whether Tenant's plans comply with any and all legal requirements applicable to Tenant's plans and the work to be performed by Tenant. Tenant shall obtain all permits, certificates and other governmental approvals from all governmental entities having jurisdiction thereover which are necessary for the prosecution and completion of Tenant's work. Any improvements or modifications which Tenant wishes to make to the Premises in addition to Tenant's work shall be deemed to be alterations and shall be subject to the provisions of Section

14

036932.00001/11930241v.4

9.4 of this Lease. Tenant agrees to commence remodeling of the Premises promptly upon approval by Landlord of such plans and specifications. All such Tenant work must be completed prior to the Rent Commencement Date.

### Section 7.1.1   Signage.

Tenant shall install a sign on store façade at the sole and exclusive cost of the Tenant, depicted on Exhibit F attached hereto. Tenant shall have the right to anchor position signage, at Tenant's sole cost and expense, on all Shopping Center entry pylon signs as depicted on Exhibit F. In addition, if Landlord constructs or makes available to any other tenant or tenants of the Shopping Center any other signage located in the Common Areas, then such signage shall also include Tenant's identification, as an anchor position thereon. Any additional signage to be approved by the Landlord, such approval which shall not be unreasonably withheld, conditioned, or delayed. In the event Tenant exercises the 46,897 gross floor area option at the end of the Initial Lease Term, Tenant's Pylon Signs shall be adjusted in proportion to this change and Tenant shall be responsible for the cost of the replacement sign. In addition to the foregoing, Tenant shall have the right, at Tenant's sole cost and expense, to erect additional signs (including an additional pylon sign) provided Tenant obtains all necessary governmental approvals for such additional signs.

### Section 7.2   Effect of Opening for Business.

By opening for business, Tenant shall be deemed to have: (a) accepted the Premises, (b) acknowledged that the same are in the condition called for hereunder, and (c) agreed that the obligations of Landlord with respect to delivery of the Premises imposed hereunder have been fully performed.

### Section 7.3   Mechanic's Liens.

No work performed by Tenant pursuant to this Lease, shall be deemed to be for the use and benefit of Landlord so that no mechanic's or other lien shall be allowed against the estate of Landlord by reason of any consent given by Landlord to Tenant to improve the Premises. Tenant shall pay promptly all persons furnishing labor or materials with respect to any work performed by Tenant or its contractor on or about the Premises. In the event any mechanic's or other lien shall at any time be filed against the Premises by reason of work, labor, services or materials performed or furnished, or alleged to have been performed or furnished, to Tenant or to anyone holding the Premises through or under Tenant, Tenant shall within twenty (20) days written notice from Landlord cause the same to be discharged of record or bonded to the satisfaction of Landlord. If Tenant shall fail to cause such lien forthwith to be so discharged or bonded after being notified of the filing thereof, then, in addition to any other right or remedy of Landlord, Landlord may bond or discharge the same by paying the amount claimed to be due, and the amount so paid by Landlord including reasonable attorney's fees incurred by Landlord either defending against such lien or in procuring the discharge of such lien, together with interest thereon at the Default Rate, shall be due and payable by Tenant to Landlord as Additional Rental.

### Section 7.4   Leasehold Improvements and Tenant's Trade Fixtures.

15

036932.00001/11930241v.4



All leasehold improvements (as distinguished from trade fixtures and apparatus) installed in the Premises at any time, whether by or on behalf of Tenant or by or on behalf of Landlord, shall not be removed from the Premise at any time, unless such removal is consented to in advance, in writing, by Landlord; and at the expiration of this Lease (either on the Lease Termination Date or upon such earlier termination as provided in this Lease), all such leasehold improvements shall be deemed to be part of the Premises, shall not be removed by Tenant when it vacates the Premises, and title thereto shall vest solely in Landlord without payment of any nature to Tenant.

# ARTICLE VIII
## OPERATIONS

Section 8.1   Operations by Tenant.

In regard to the use and occupancy of the Premises, Tenant will at its expense: (a) keep the inside and outside of all glass in the doors and windows of the Premises clean; (b) keep all exterior store surfaces of the Premises clean; (c) replace promptly any cracked or broken glass of the Premises with glass of like grade and quality; (d) maintain the Premises in a clean, orderly, pet-odor free, and sanitary condition and reasonably free of insects, rodents, vermin and other pests; (e) keep all mechanical apparatus reasonably free of vibration and noise which may be transmitted beyond the Premises; (f) comply with all laws, ordinances, rules and regulations of governmental authorities and all recommendations of Landlord's fire insurance rating organization now or hereafter in effect; (g) light the show windows of the Premises and exterior signs to the extent required by Landlord; (h) comply with and observe all reasonable rules and regulations established by Landlord from time to time which apply generally to all tenants in the Shopping Center Area, provided they do not increase the financial burdens of Tenant or unreasonably restrict Tenant's rights under this Lease; and are not inconsistent with the terms of this Lease; and (i) maintain at all times a cleaning contract ensuring that the Premises is cleaned after closing every day the Tenant is open for business. Tenant shall be permitted at no additional rental charge to Tenant, to display and sell merchandise on the sidewalk directly in front of the Premises.

In regard to the use and occupancy of the Premises and the Common Areas, Tenant will not: (a) place or maintain any merchandise, trash or other articles in any vestibule or entry of the Premises, thereto or elsewhere on the exterior of the Premises, except in connection with any sidewalk sale; nor obstruct any Common Area; (b) use or permit the use of any objectionable advertising medium such as, without limitation, loudspeakers, phonographs, public address systems, sound amplifiers, or the reception of radio or television broadcasts within the Shopping Center which is in any manner audible or visible outside of the Premises; (c) permit undue accumulations of or burn garbage, trash, rubbish or other refuse within or without the Premises; (d) cause or permit noxious odors to emanate from the Premises; (e) solicit business in any Common Area; (f) distribute handbills or other advertising matter to, or upon any automobiles parked in any Common Area; (g) permit the parking of vehicles so as to interfere with the use of any Common Area; (h) receive or ship articles of any kind outside the designated loading areas for the Premises; (i) use the sidewalk or any other Common Area adjacent to the Premises for the sale or display of any merchandise or for any other business, occupation or undertaking; (j) conduct or permit to be conducted any auction, fire, going out of business, bankruptcy, or other

16

036932.00001/11930241v.4

similar sale in or connected with the Premises (but this provision shall not restrict the absolute freedom of Tenant in determining its own selling prices, nor shall it preclude the conduct of periodic seasonal, promotional or clearance sales); (k) use or permit the use of any portion of the Premises for any unlawful purpose (l) place a load upon any floor which exceeds the floor load for which the floor was designed to carry.

Section 8.2    Signs and Advertising.

Other than the signs depicted on Exhibit "H", and on a temporary basis, a "Grand Opening", "Now Hiring" and similar signs, flags, streamers and banners, Tenant will not place or suffer to be placed or maintained on the exterior of the Premises, or any part of the interior visible from the exterior thereof, any sign, advertising matter or any other thing of any kind, and will not place or maintain any decoration, letter or advertising matter on the glass of any window or door of the Premises without first obtaining Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant will, at its sole cost and expense, maintain such sign, decoration, lettering, advertising matter or other thing as may be permitted hereunder in good condition and repair at all times. Under no circumstances shall Tenant be permitted to place hand-lettered advertising on the interior or exterior of the Premises or any glass of any window or door of the Premises. Landlord shall, at all times, after three (3) days to Tenant therefor, have the right to remove any sign, advertisement or notice, which is not placed and maintained in accordance with this Section 8.2. Tenant shall be liable for any and all reasonable expenses incurred by Landlord in connection with such removal. Notwithstanding the foregoing, Tenant shall be responsible to repair any holes in the fascia drivet made in connection with erecting its signs.

Section 8.3    Painting and Displays by Tenant.

Except as otherwise provided herein, Tenant will not paint or decorate any part of the exterior of the Premises, without first obtaining Landlord's prior written approval. Notwithstanding the foregoing, Tenant shall be permitted to paint the exterior of the Premises in such colors which are consistent with Tenant's branded colors. Tenant will install and maintain at all times, subject to the other provisions of this Section, displays of merchandise in the show windows (if any) of the Premises. All articles, and the arrangement, style, color and general appearance thereof, in the interior of the Premises including, without limitation, window displays, advertising matter, signs, merchandise and store fixtures, shall be in keeping with the character and standards of the improvements within the Shopping Center, Landlord, at Tenant's sole cost and expense, reserves the right to require Tenant to correct any non-conformity.

Section 8.4    Trash Removal.

Tenant shall be responsible for its own trash removal.

## ARTICLE IX
## REPAIRS AND ALTERATIONS

Section 9.1    Repairs To Be Made By Landlord.

Landlord shall, at its expense, make all repairs which it deems necessary (except those

17



necessitated by the acts or omissions of Tenant or Tenant's agents) to the structure of Landlord's Buildings (including the foundations), the roof, and the exterior (except doors, windows and store front) of the Premises, and for the first one (1) year of the term, the heating, ventilation and air conditioning ("HVAC") system servicing the Premises and shall keep same in compliance with all applicable laws. Landlord shall be responsible only for structural, foundation, HVAC (for the first year of the term) and roof repairs. To the extent that Tenant becomes aware of a maintenance item that is Landlord's responsibility, Tenant shall promptly notify Landlord of any condition respecting such areas that may need repair. Except as otherwise provided herein, Landlord shall have no duty to Tenant to make any improvements to the Premises. Landlord shall not be liable for any damage caused to the property of Tenant, its agents, employees, sublessees, contractors or invitees, due to the improper construction or repair of the Premises or the Landlord's Building or any part or appurtenances or arising from the leaking of gas, water, sewer or steam pipes, or from electricity, or from any other cause whatsoever unless caused by intentional or gross negligence of the landlord or its agents or employees. Tenant agrees to report promptly in writing to Landlord any defective condition in or about the Premises or the Landlord's Building which becomes known to Tenant. If Landlord shall fail to make any necessary repairs or replacements required herein within twenty (20) days after notice from Tenant (except no such notice shall be required in the event of an emergency), unless such repairs or replacements cannot reasonably be completed within such twenty (20) day period and Landlord shall have commenced such work and is diligently proceeding to complete the same, Tenant shall have the right to perform such work upon ten days' notice to Landlord and offset the reasonable cost of such work against the next monthly installments of Rent due hereunder. In the event of an emergency, Tenant may perform such work upon immediately, without notice (provided Tenant shall give telephonic notice to Landlord, if reasonable under the circumstances), and offset the reasonable cost as set forth above.

Section 9.2    <u>Repairs To be Made By Tenant</u>.

All repairs to the Premises or any installations, equipment or facilities therein, other than those repairs required to be made by Landlord pursuant to Section 9.1 or Section 13.1, shall be made by Tenant at its expense. In connection therewith, Landlord shall assign to Tenant, at no cost to Tenant, any warranties or maintenance agreements in connection with the HVAC system. Without limiting the generality of the foregoing, Tenant will keep the interior of the Premises, together with all electrical, plumbing, , and other mechanical installations therein, in good order and repair and will make all replacements from time to time required thereto at its expense; and will surrender the Premises at the expiration of the Lease Term or at such other time as it may vacate the Premises in as good condition as when received, excepting depreciation caused by ordinary wear and tear, damage by Casualty, unavoidable accident or Act of God. Tenant will not overload the electrical wiring serving the Premises or within the Premises, and will install at its expense, subject to the provisions of Section 9.4, any additional electrical wiring which may be required in connection with Tenant's apparatus. Tenant shall make all repairs to the Premises necessitated by any act or omission of Tenant or its agents, employees, or invitees. All maintenance and repair work by Tenant shall be performed: (i) by licensed contractors approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed, (ii) in accordance with all applicable laws and regulations, and (iii) otherwise in accordance with the provisions of this Lease.

18

Section 9.3    Damage to Premises.

Tenant will repair promptly at its expense any damage to the Premises, and, upon demand, shall reimburse Landlord as Additional Rental for the cost of the repair of any damage to the exterior loading docks servicing the Premises and the walls adjacent thereto, caused by or arising from the installation or removal of property in or from the Premises. (unless caused by Landlord, its agents, employees or contractors). If Tenant shall fail to commence such repairs within five (5) days after notice to do so from Landlord, Landlord may make or cause the same to be made and Tenant agrees to pay to Landlord promptly upon Landlord's demand, as Additional Rental, the cost thereof with interest thereon at the Default Rate until paid. This Section shall be construed as an additional remedy granted to Landlord and not in limitation of any other rights or remedies which Landlord has or may have in said circumstances.

Section 9.4    Alterations by Tenant.

Except as otherwise provided in this Lease Tenant will not make or permit any alterations, renovations, improvements or other installations in, on or to the Premises or any part thereof (including, without limitation, any alterations of the store front or signs, structural alterations, or any cutting or drilling into any part of the Premises or any securing of any fixture, apparatus, or equipment of any kind to any part of the Premises), except for interior alterations which cost at least $100,000 unless and until Tenant shall have obtained Landlord's approval thereof, which approval shall not be unreasonably withheld, conditioned or delayed. If such approval is granted, Tenant shall cause the work to be performed, at its expense, promptly, efficiently, competently and in a good and workmanlike manner by duly qualified or licensed persons or entities, using first grade materials, without interference with or disruption to the operations of tenants of the Shopping Center. All such work shall comply with all applicable governmental codes, rules, regulations and ordinances. Landlord's consent to any alteration shall not be deemed to be a representation by Landlord that the alteration complies with applicable law (including, without limitation, the Americans With Disabilities Act), and Tenant shall remain solely responsible for such compliance. Tenants shall remove any partitions or improvements upon their departure from the Premises.

Section 9.5    Changes and Additions to Center.

Landlord reserves the right at any time and from time to time, at landlord's sole cost and expense, (a) to make or permit changes or revisions in its plan for the Shopping Center or the Shopping Center Area including additions to, subtractions from, rearrangements of, alterations of, modifications of or supplements to the building areas, walkways, parking areas, driveways or other Common Areas, (b) to construct other buildings or improvements in the Shopping Center Area and to make alterations thereof or additions thereto, and (c) to make or permit changes or revisions in the Shopping Center or the Shopping Center Area, including additions thereto, and to convey portions of the Shopping Center Area to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof. Notwithstanding anything else set forth in this Lease, Landlord's rights in this section 9.5 shall apply only to those changes that do not impact the parking, visibility, or access to or of the Premises or any of the Tenant's signage.

19

Section 9.6    Roof and Walls.

Landlord shall have the right to use all or any part of the roof of the Premises for maintenance, repairs, or replacements of any kind deemed necessary by Landlord, provided that access to the Premises shall not be denied; and to install, maintain, use, repair and replace within the Premises pipes, ducts, conduits, wires and all other mechanical equipment serving other parts of the Shopping Center Area, the same to be in locations within the Premises as will not unreasonably deny Tenant's use thereof. Tenant agrees upon prior written request, to give Landlord access to the Premises for the purposes of this Section 9.6.

# ARTICLE X
# COMMON AREAS; LANDLORD'S OPERATING COSTS

Section 10.1    Use of Common Areas.

Landlord grants to Tenant and its agents, employees and customers a non-exclusive license to use the Common Areas in common with others during the Lease Term, subject to the exclusive control and management thereof at all times by Landlord and subject, further, to the rights of Landlord set forth in Sections 9.5 and 10.2.

Section 10.2    Management and Operation of Common Areas.

Landlord will operate and maintain or will cause to be operated and maintained the Common Areas in a manner deemed by Landlord to be reasonable and appropriate and in the best interests of the Shopping Center, consistent with other similarly situated shopping centers in the same geographic areas. Landlord will have the right (i) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas; (ii) to enter into, modify and terminate easement and other agreements pertaining to the use and maintenance of the parking areas and other Common Areas, provided, however, all such closures shall be limited in scope and duration to minimize interference with Tenant's business operations in the Premises. (iii) to close temporarily any or all portions of the Common Areas; (iv) to discourage non-customer parking; and (v) to do and perform such other acts in and to said areas and improvements as, in the exercise of good business judgment, Landlord shall determine to be advisable.

Section 10.3    Employee Parking Areas.

[INTENTIONALLY DELETED]

Section 10.4    Tenant to Share Certain Expenses.

A.    During the Initial Lease Term, Tenant will pay Landlord, as Additional Rental, a proportionate share of Landlord's Operating Costs which shall be computed by multiplying Landlord's Operating Costs for the Lease Year in question by a fraction, the numerator of which is 45,000 and the denominator of which is Landlord's Floor Area. Such expenses shall not exceed $2.50 per foot per annum during the Initial Lease Term, based upon 45,000 square feet. Tenant will also pay $3000 per month towards Landlord's Operating Costs for the use of the Additional Space of approximately 32,000 square feet (77,000 less 45,000).

20

B.  During the Primary Lease Term and all subsequent Renewal Option(s) Term, Tenant will pay Landlord, as Additional Rental, a proportionate share of Landlord's Operating Costs which shall be computed by multiplying Landlord's Operating Costs for the Lease Year in question by a fraction, the numerator of which is Tenant's Floor Area and the denominator of which is Landlord's Floor Area.

Such proportionate share shall be paid by Tenant in monthly installments in such amounts as are reasonably estimated and billed by Landlord at the beginning of each twelve (12) month period commencing and ending on dates designated by Landlord, each installment being due on the first day of each calendar month. Promptly after the end of each such twelve (12) month period, but in no event later than ninety (90) days following the end of each twelve (12) month period Landlord shall deliver to Tenant a statement of Landlord's Operating Costs for such twelve (12) month period and the monthly installments paid or payable shall be adjusted between Landlord and Tenant, and each party hereby agrees that Tenant shall pay Landlord or Landlord shall credit Tenant's account (or, if such adjustment is at the end of the Lease Term, pay Tenant), within thirty (30) days of receipt of such statement, the amount of any excess or deficiency in Tenant's proportionate share of Landlord's Operating Costs paid by Tenant to Landlord during such twelve (12) month period. In the event that Landlord fails to bill Tenant for a period in excess of twelve (12) months, Landlord shall have permanently waived any right to bill Tenant for such expenses.

Section 10.5  "Landlord's Operating Costs" Defined.

The term "Landlord's Operating Costs" shall mean all costs and expenses incurred by Landlord in operating and maintaining the Landlord's Buildings and the Common Areas pursuant to Sections 9.1 and 10.2, including all costs and expenses of operating, maintaining, repairing, lighting, signing, cleaning, painting, striping, policing and security of the Common Areas or the Landlord's Buildings and any reasonable management fees related thereto. Without limiting the generality of the foregoing, Landlord's Operating Costs shall include, but not be limited to, the costs and expenses of the following, if the same are provided: police, alarms, security, and fire protection services; gardening and landscaping; public liability, property damage, sign, fire and extended coverage insurance; repairs; painting; striping; sweeping; lighting (including the cost of electricity and maintenance and replacement of fixtures and bulbs); regulating traffic; refuse removal; ice and snow removal from the Common Areas; equipment and supplies used for the maintenance of the Common Areas or the Landlord's Buildings; repair of paving, curbs and walkways; utility and drainage fees; water charges for hydrants and sprinklers (if any); reasonable management fees; and personnel for the operation and maintenance of the Common Areas (including employment taxes and workmen's compensation insurance for such personnel). Landlord's Operating Costs shall not include Taxes, which shall be payable in accordance with Article 6. The following items shall be excluded from Common Area Costs

(a)  The cost of any special service rendered to a tenant of the Shopping Center which is not rendered generally to all other tenants;

(b)  Costs of initial improvements to, or initial alterations of, space leased or to be leased to any tenant of the Shopping Center for the sole benefit of such tenant.

21

(c)     Costs and expenses incurred in connection with leasing space in the Shopping Center, such as leasing commissions, tenant allowances, space planner fees, advertising and promotional expenses, legal fees for the preparation of leases, and rent payable with respect to any leasing office;

(d)     Costs incurred due to the violation by Landlord or any tenant of the terms and conditions of any lease pertaining to the Shopping Center or of any valid, applicable building code, regulation or law, or incurred due to the Shopping Center being in violation of any such code, regulation or law, provided, however, Landlord may including in Operating Costs the normal cost of compliance with applicable law;

(e)     Costs of correcting defects in the construction of the Shopping Center (including latent defects in the Shopping Center) or in the Shopping Center equipment, except that for the purposes of this subparagraph, conditions resulting from ordinary wear and tear and not occasioned by construction defects shall not be deemed defects;

(f)     Costs of performing any clean-up of Hazardous Materials (as hereinafter defined) to the Shopping Center;

(g)     Principal or interest payments on loans secured by mortgages on the Shopping Center, and any rental under any ground or underlying lease or leases of the Shopping Center;

(h)     Interest or penalties for late payments by Landlord;

(i)     Rentals and other related expenses, if any, incurred in leasing air conditioning systems, elevators or other equipment which in accordance with generally accepted accounting principles would be capitalized, except for equipment which is used in providing janitorial services and which is not affixed to the Shopping Center;

(j)     Depreciation or amortization of any improvements or equipment;

(k)     The cost of repairing or restoring any substantial portion of the Shopping Center damaged by fire or other casualty, except that the portion of such costs not actually covered by insurance as a result of commercially reasonable deductibles not to exceed $5,000.00, shall be included in Common Area Costs;

(l)     The cost of repairs, alterations or replacements required as a result of the exercise of any right of eminent domain;

(m)     Salaries and benefits of executive officers of Landlord;

(n)     All items and services for which Tenant reimburses Landlord pursuant to other provisions of this Lease, or for which Tenant pays third persons directly;

(o)     Costs incurred in advertising and promotional activities for the Building;

(p)     Management fees or administration fees in excess of five percent (5%) of

22

036932.00001/11930241v.4

Operating Costs;

      (q)     Dues paid to associations representing landlords;

      (r)     Any costs for services rendered by any person or entity related to or affiliated with Landlord which is in excess of commercially reasonable rates for such services;

      (s)     Any costs or expenses legally required to be incurred by Landlord to bring the common areas of the Shopping Center into compliance with applicable law, including the Americans With Disabilities Act of 1990 as regulated as of the date of execution of this Lease (repairs of existing Common Areas which are otherwise in compliance shall not be excluded);

      (t)     Any additions or modifications to Common Areas in connection with any expansion of the Shopping Center; and

      (u)     Any replacements or capital improvements to the pylon signs and the repaving of drives and parking areas.

Section 10.6   Operating Area Costs Cap.

Notwithstanding the foregoing, for purposes of calculating Tenant's Proportionate Share of "Controllable" Operating Area Costs for any given calendar year, on a rentable square foot basis, the yearly percentage increase in Controllable Operating Costs on a rentable square foot basis, shall not exceed the greater of five percent (5%) or the corresponding increase in the Consumer Price Index for the Washington, D.C. area on a cumulative, compounded basis. "Controllable" Operating Costs shall mean all Operating Costs except those costs related to insurance, utilities (including utilities repairs), security, parking lot sealing and repaving and snow removal.

Section 10.7   Audit Rights.

Within one (1) year after the date of receipt by Tenant of any statement or bill related to CAM Costs, Tenant may inspect, copy and audit Landlord's books and records during Landlord's business hours upon 10 days' prior written notice delivered to Landlord. If an audit reveals an overcharge by Landlord of five percent (5%) or more in Tenant's pro rata share of CAM Costs or other additional charges required to be paid by Tenant under this Lease, Landlord shall pay the cost of the audit. Landlord shall immediately reimburse Tenant the amount of such overcharge, if any. If Landlord fails to do so for any reason within twenty (20) days after written demand from Tenant, then Tenant shall have the right to offset such amounts against subsequent installments of Rent and Additional Charges until paid in full.

## ARTICLE XI
## UTILITIES

Section 11.1   Utilities.

Tenant shall pay directly to the supplier all charges for water, gas, electricity, sewer, telephone and other utilities used upon the Premises commencing with the Date of Tender.

23

036932.00001/119302411v.4



Expenses for the installation and maintenance of utility meters shall be borne by Tenant, and if Landlord pays any such expenses, Tenant shall reimburse Landlord therefor promptly on demand.   Landlord represents that the utilities in the Premises are separately metered, except for the parking lot lights, the cost of which are part of the Tenant's electric meter.  Accordingly, Landlord agrees to reimburse Tenant for such lighting (the "Parking Lot Lighting Cost"), Landlord shall cause its consultant to establish the amount of the Parking Lot Lighting Cost, which determination shall be subject to the reasonable approval of Tenant.  The amount of such Parking Lot Lighting Cost shall be added to Operating Costs.  Landlord shall not be liable for any failure to furnish or any interruption of utility services.

## ARTICLE XII
## INDEMNITY AND INSURANCE

Section 12.1    Indemnity by Tenant.

Tenant shall indemnify, hold harmless and defend Landlord from and against any and all claims, actions, damages, liability and expense, including, but not limited to, attorney's and other professional fees, arising from any act, omission, or negligence of Tenant or its officers, contractors, licensees, agents, employees, guests, invitees, or visitors in or about the Shopping Center, the Common Areas and the Premises or arising (i) from any breach or default under this Lease by Tenant, or (ii) from, or relating to, the enforcement by Landlord of the provisions of this Lease as against Tenant, or arising from any accident, injury, or damage, howsoever and by whomsoever caused, to any person or property, occurring in the Premises, or (iii) from Tenant's or its employees, agents, licensees, customers, contractors or invitees use and occupancy of the Premises, the Common Areas or the Shopping Center.

Section 12.2    Landlord Not Responsible for Acts of Others.

Landlord shall not be responsible or liable to Tenant, or to those claiming by, through or under Tenant, for any loss or damage which may be occasioned by or through the acts or omissions of persons occupying space adjoining the Premises or any part of the Premises adjacent to or connecting with the Premises or any other part of the Shopping Center, or otherwise, or for any loss or damage resulting to Tenant, or those claiming by, through or under Tenant, or its or their property, from the breaking, bursting, stoppage or leaking of electrical cable and wires, and water, gas, sewer or steam pipes.

Section 12.3    Insurance Rating.

Tenant shall not conduct or permit any activity, or place any equipment or material, in or about the Premises or the Shopping Center which will increase the rate of fire or other insurance on the Shopping Center or insurance benefiting any other tenant of the Shopping Center; and if any increase in the rate of insurance is stated by any insurance company or by the applicable insurance rating bureau to be due to any activity, equipment or material of Tenant in or about the Premises, or the Shopping Center, Landlord shall notify Tenant thereof, and if Tenant fails to promptly remedy the conduct or activity, Tenant shall pay such increase to Landlord upon demand.

Section 12.4    Liability Insurance.

24

036932.00001/119302411v.4

Tenant shall, at its sole cost and expense, procure and maintain throughout the Term a commercial general liability policy insuring against claims, demands or actions for bodily injury, death, personal injury, and loss or damage to property arising out of or in connection with: (i) the Premises; (ii) the condition of the Premises; (iii) Tenant's operations in, maintenance and use of the Premises and the Shopping Center, and (iv) Tenant's liability assumed under this Lease. Such insurance shall have such combined single limit as reasonably required by Landlord from time to time, but in no event less than Two Million Dollars ($2,000,000.00) per occurrence, on an occurrence basis, and shall be primary over any insurance carried by Landlord. Such liability insurance shall be primary over any insurance carried by Landlord and shall name Landlord as an Additional Insured. Endorsements shall be obtained for cross-liability and contractual liability and shall include an aggregate per location endorsement. Prior to opening for business, Tenant shall provide Landlord with a Certificate of Insurance evidencing its compliance with the aforesaid provisions, as well as evidence of application for a current Certificate of Occupancy.

Section 12.5   Insurance for Personal Property and Glass.

Tenant shall, at its sole cost and expense, procure and maintain throughout the Lease Term a property insurance policy (written on special form, formerly known as an "All Risk" basis) insuring all of Tenant's personal property, including but not limited to equipment, furniture, fixtures, furnishings and leasehold improvements which are the responsibility of Tenant, for not less than the full replacement cost of said property. All proceeds of such insurance shall be used to repair or replace Tenant's property. In addition, Tenant shall, at its sole cost and expense, procure and maintain business interruption insurance in an amount not less than the Annual Base Rental due hereunder for the first Lease Year.

Tenant also shall, at its sole cost and expense, procure and maintain throughout the Lease Term glass insurance on all plate and other glass, insuring against all risks, in amounts satisfactory to Landlord, covering the full cost of replacing or restoring all of the plate and other glass in, at or about the Premises.

Section 12.6   Requirements of Insurance Coverage.

All such insurance required to be carried by Tenant herein shall be with an insurance company licensed to do business in the State of Maryland  and rated not lower than A-XII in the A.M. Best Rating Guide. Such insurance (i) shall contain an endorsement that such policy shall remain in full force and effect notwithstanding that the insured has released its right of action against any party before the occurrence of a loss; (ii) shall name Landlord and, at Landlord's request, any Mortgagee or ground lessor, as additional insured parties; and (iii) shall provide that the policy shall not be cancelled, failed to be renewed or materially amended without at least thirty (30) days' prior written notice to Landlord and, at Landlord's request, any Mortgagee and management agent. On or before the Commencement Date and, thereafter, not less than thirty (30) days before the expiration date of the insurance policy, an insurance certificate together with evidence satisfactory to Landlord of the payment of all premiums for such policy, shall be delivered to Landlord and, at Landlord's request, to any Mortgagee.

Section 12.7   Waiver of Subrogation.

25

Each party hereby releases the other party hereto from liability for any loss or damage to any building, structure or tangible personal property, or any resulting loss of income, or losses under worker's compensation laws and benefits, notwithstanding that such loss, damage or liability may arise out of the negligent or intentionally tortious act or omission of the other party or its agents, if such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Lease. Each party hereto shall have a waiver of subrogation clause (providing that such waiver of right of recovery against the other party shall not impair the effectiveness of such policy or the insured's ability to recover thereunder) included in its said policies.

### Section 12.8    Security.

In the event that Landlord engages the services of a professional security system for the Shopping Center, it is understood that such engagement shall in no way increase Landlord's liability for occurrences and/or consequences which such a system is designed to detect or avert and that Tenant shall look solely to its insurer as set out above for claims for damages or injury to any person or property.

### Section 12.9    Tenant's Contractor's Insurance.

Tenant shall require any contractor of Tenant performing work of a significant (permit-requiring) nature on the Premises to carry and maintain, at no expense to Landlord:

A.    Commercial Comprehensive General Liability Insurance, including independent contractor's liability coverage, contractual liability coverage, products and completed operations coverage, and an ISO Broad Form property damage endorsement and contractor's protective liability coverage, to afford protection, with limits for each occurrence, of not less than Two Million and No/100 Dollars ($2,000,000) with respect to bodily injury or death and One Million and No/100 Dollars ($1,000,000) with respect to property damage or equivalent terms, conditions and limits under a commercial liability form policy. In addition to the above tenant shall carry a $3,000,000.00 umbrella liability policy.

B.    comprehensive automobile liability insurance for owned, non owned, and hired vehicles with limits for each occurrence of not less than One Million and No/100 Dollars ($1,000,000) with respect to bodily injury or death and One Million Dollars ($1,000,000) with respect to property damage; and

C.    worker's compensation or employer's liability insurance in form and amounts required by law and satisfactory to Landlord.

### Section 12.10    Landlord's Insurance.

Landlord shall maintain in full force and effect (i) Special Form (formerly known as "All Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Shopping Center, including the insurable improvements in the Common Area, and (ii) liability insurance with respect to the common areas of the Shopping Center in form and in amounts which a similarly situated landlord would reasonably carry from

26

036932.00001/11930241v.4



time to time in the Prince George's County, Maryland, but in no event less than $3,000,000.00 per occurrence. Tenant shall be named as an additional insured on the liability policy. In no event shall the deductible for any insurance carried by Landlord under this Section 12.10 exceed five thousand dollars ($5,000) without Tenant's prior written consent.

Section 12.11  Indemnification of Landlord.

Landlord shall indemnify, hold harmless and defend Tenant from and against any and all claims, actions, damages, liability and expense, including, but not limited to, attorney's and other professional fees, arising from any act, omission, or negligence of Landlord or its officers, contractors, licensees, agents, employees, guests, invitees, or visitors in or about the Shopping Center, the Common Areas and the Premises or arising (i) from any breach or default under this Lease by Landlord, or (ii) or arising from any accident, injury, or damage, howsoever and by whomsoever caused, to any person or property, occurring in the Premises, or (iii) from Landlord's or its employees, agents, licensees, customers, contractors or invitees use and occupancy of the Premises, the Common Areas or the Shopping Center.

## ARTICLE XIII
## DAMAGE AND DESTRUCTION

Section 13.1   Landlord's Obligation to Repair and Reconstruct.

If the Premises shall be damaged by fire, the elements, accident or other casualty (any of such causes being referred to herein as a "Casualty"), but the Premises shall not be thereby rendered wholly or partially untenable, Landlord shall promptly cause such damage to be repaired and there shall be no abatement of Rental. If, as the result of Casualty, the Premises shall be rendered wholly or partially untenable, then, subject to the provisions of Section 13.2, Landlord shall cause such damage to be repaired and, provided such damage is not caused by the negligence of Tenant, its agents, concessionaires, officers, employees, contractors, licensees or invitees, all Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be abated proportionately as to the portion of the Premises rendered untenable during the period of such untenantability. In the event Landlord fails to complete such repairs within Six (6)months following the date of the Casualty, Tenant shall have the right to terminate this Lease, and any further obligations of Tenant hereunder, by written notice to Landlord. All such repairs shall be made at the expense of Landlord. Landlord shall not be liable for interruption to Tenant's business or for damage to or replacement or repair of Tenant's personal property (including, without limitation, inventory, trade fixtures, floor coverings, furniture and other property removable by Tenant under the provisions of this Lease) or to any leasehold improvements installed in the Premises, all of which damage, replacement or repair shall be undertaken and completed by Tenant promptly.

Section 13.2   Landlord's Option to Terminate Lease.

If the Premises are (a) rendered wholly untenable, in Landlord's reasonable estimate, or (b) damaged as a result of any cause which is not covered by Landlord's insurance or (c) damaged or destroyed in whole or in part during the last  one  ( 1 ) years of the Lease Term, or if Landlord's Buildings are damaged to the extent of fifty percent (50%) or more of Landlord's

27

036932.00001/11930241v.4



Floor Area, then, within 60 days of the event of casualty, Tenant must either exercise their Renewal Option according to the terms of the Lease if any such options remain, or notify Landlord of their intention to vacate at the end of the Lease Term. If Tenant chooses not to exercise their option to renew, Landlord, at its sole option, shall have the right to terminate this Lease by giving to Tenant notice of such election within ninety (90) days after the occurrence of such event. If such notice is given, the tenancy hereunder and the rights and obligations of the parties shall cease as of the date specified in such notice, which date shall not be later than ninety (90) days after the occurrence of such event and Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be adjusted as of the date of such termination.

Section 13.3   Demolition of Landlord's Buildings.

If Landlord's Buildings shall be so substantially damaged that it is reasonably necessary, in Landlord's judgment, to demolish such Buildings for the purpose of reconstruction, Landlord may demolish the same, in which event the Rental shall be abated to the same extent as if the Premises were rendered untenable by a Casualty.

Section 13.4   Insurance Proceeds.

If Landlord does not elect to terminate this Lease pursuant to Section 13.2, Landlord shall, subject to the prior rights of any Mortgagee, disburse and apply any insurance proceeds received by Landlord to the restoration and rebuilding of Landlord's Buildings in accordance with Section 13.1 hereof. All insurance proceeds payable with respect to the Premises shall belong to and shall be payable to Landlord.

## ARTICLE XIV
## CONDEMNATION

Section 14.1   Effect of Taking.

If the whole or any part of the Premises shall be taken under the power of eminent domain, this Lease shall terminate as to the part so taken on the date Tenant is required to yield possession thereof to the condemning authority. All Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be adjusted to such date. If said taking renders the remainder of the Premises unsuitable for the Permitted Use, either party may terminate this Lease as of the date when Tenant is required to yield possession by giving notice to that effect within thirty (30) days after such date. If twenty percent (20%) or more of Landlord's Floor Area in the Shopping Center Area is taken as aforesaid, or if parking spaces in the Shopping Center are so taken thereby substantially reducing the number of parking spaces in the Shopping Center Area, and Landlord does not deem it reasonably feasible to replace such parking spaces with other parking spaces on the portion of the Shopping Center Area not taken, then Landlord or Tenant may elect to terminate this Lease as of the date on which possession thereof is required to be yielded to the condemning authority, by giving notice of such election within ninety (90) days after such date. If any notice of termination is given pursuant to this Section, this Lease and the rights and obligations of the parties hereunder shall cease as of the date specified in such notice, which date shall not be later

28

036932.00001/11930241v.4



than ninety (90) days after the date of such notice and Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be adjusted as of the date of such termination.

Section 14.2   Condemnation Awards.

All compensation awarded for any taking of the Premises or the Shopping Center Area or any interest in either shall belong to and be the property of Landlord, Tenant hereby assigning to Landlord all rights with respect thereto; provided, however, nothing contained herein shall prevent Tenant from applying for reimbursement from the condemning authority (if permitted by law) for moving expenses, Tenant improvements, or the expense of removal of Tenant's trade fixtures, or loss of Tenant's business good will, but if and only if such action shall not reduce the amount of the award or other compensation otherwise recoverable from the condemning authority by Landlord or the owner of the fee simple estate in the Shopping Center Area.  In no event shall Tenant be entitled to any award for the unexpired portion of the Lease Term.

## ARTICLE XV
## ASSIGNMENTS AND SUBLETTING

Section 15.1   Landlord's Consent Required.

Tenant will not assign this Lease, in whole or in part, nor sublet all or any part of the Premises, nor license concessions or lease departments therein, nor pledge or secure by mortgage or other instruments this Lease, without first obtaining the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  This prohibition includes, without limitation, (i) any subletting or assignment which would otherwise occur by operation of law, merger, consolidation, reorganization, transfer or other change of Tenant's corporate or proprietary structure; (ii) an assignment or subletting to or by a receiver or trustee in any Federal or state bankruptcy, insolvency, or other proceedings; (iii) the sale, assignment or transfer of all or substantially all of the assets of Tenant, with or without specific assignment of Lease; or (iv) if Tenant is a corporation or partnership, the change in control in such corporation or partnership. For the purposes of this Section 15.1, a change in control of a partnership or corporation shall be deemed to be the transfer of twenty percent (20%) or more of the interests in such partnership or of the shares of such corporation as those interests or shares are owned on the date of this Lease. A change in the ownership of or power to control a majority of the outstanding capital stock of Tenant occurring by bequest or inheritance shall not be deemed an assignment of this Lease requiring Landlord's consent.  Consent by Landlord to any assignment or subletting shall not constitute a waiver of the requirement for such consent to any subsequent assignment or subletting.  No assignment or subletting hereunder whether or not consented to by Landlord, shall relieve the original Tenant from its liabilities or obligations under this Lease.  Even if Landlord accepts or collects rent from any such assignee, transferee, subtenant or occupant, Tenant will not be released from any provision of this Lease.  Tenant shall pay to Landlord, as Additional Rental, Landlord's reasonable out-of-pocket costs in connection with such assignment or subletting consented to by Landlord and any and all additional costs and expenses incurred hereunder, in an amount not to exceed $1500.00.  If Tenant shall sell a majority of its stores in the Maryland market, such sale shall not constitute an assignment of this Lease.  Furthermore, Tenant may sublet a portion of the Premises and may grant licenses and concessions without

29



Landlord's consent; provided, however, (i) the Sublease Premises shall not be subdivided into more than three (3) separate and distinct sublease premises, and the total subletting shall not exceed 10,000 square feet, and (ii) any demising plan to subdivide the Sublease Premises shall be subject to Sublandlord's consent, such consent not to be unreasonably withheld, conditioned or delayed.

Section 15.2   Intentionally Omitted.

Section 15.3   Acceptance of Rent from Transferee.

The acceptance by Landlord of the payment of Rental following any assignment or other transfer prohibited by this Article shall not be deemed to be a consent by Landlord to any such assignment or other transfer nor shall the same be deemed to be a waiver of any right or remedy of Landlord hereunder.

Section 15.4   Assignment or Subletting to Affiliates. Notwithstanding anything in Subsection 22.1(a) to the contrary, Tenant may, without the consent or approval of Landlord, sublet the all or any part of the Demised Premises or assign its interest under this Lease to an Affiliate, subject to the terms and conditions of this Lease. An Affiliate shall mean an affiliate of, or a person affiliated with, a specified person, including the specified person's immediate family (spouse, children, parents, brothers and sisters) and a person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the person specified. If the specified person is a partnership or limited liability entity, then the term "affiliate" shall include the managing members of the partnership or the limited liability entity and their immediate families. In the event of a partial sublet, Tenant shall be obligated to restore the Demised Premises to the condition existing prior to such partial sublet, unless Landlord shall otherwise agree in writing.

## ARTICLE XVI
## DEFAULT

Section 16.1   "Event of Default" Defined.

Any one or more of the following events shall constitute an "Event of Default":

A.   The failure of Tenant to pay any Rental or other sums of money within seven (7) days after written notice that said sum is due hereunder.

B.   Default by Tenant in the performance or observance of any covenant or agreement of this Lease (other than a default involving the payment of money), which default is not cured within thirty (30) days after the giving of written notice as defined in Article XIX NOTICES hereof by Landlord, unless such default is of such nature that it cannot be cured within such thirty (30) day period, in which case no Event of Default shall occur so long as Tenant shall commence the curing of the default within such thirty (30) day period and shall thereafter diligently prosecute the curing of same, such thirty (30) day period shall be extended for the period necessary to cure such noncompliance.

30

036932.00001/11930241v.4



C.      The vacating or abandonment of the Premises by Tenant at any time during the Lease Term of this Lease.

D.      [INTENTIONALLY OMITTED]

E.      The sale of Tenant's interest in the Premises under attachment, execution or similar legal process; or if Tenant is adjudicated as bankrupt or insolvent under any state bankruptcy or insolvency law and such adjudication or order is not vacated within thirty (30) days.

F.      The commencement of a case under any chapter of the federal Bankruptcy Code by or against Tenant or any guarantor of Tenant's obligations hereunder, or the filing of a voluntary or involuntary petition proposing liquidation or reorganization of Tenant or any guarantor; or an arrangement by Tenant or any guarantor with its creditors, unless the petition is filed or case commenced by a party other than Tenant or any such guarantor and is withdrawn or dismissed within thirty (30) days after the date of its filing.

G.      The admission in writing by Tenant or any guarantor of Tenant's obligations hereunder of its inability to pay its debts when due.

H.      The appointment of a receiver or trustee for the business or property of Tenant or any guarantor of Tenant's obligations hereunder of an assignment for the benefit of its creditors, or if in any other manner Tenant's interest in this Lease shall pass to another by operation of law.

I.      The making by Tenant or any guarantor of Tenant's obligations hereunder of an assignment for the benefit of its creditors, or if in any other manner Tenant's interest in this Lease shall pass to another by operation of law.

J.      The occurrence of any other event described as constituting an "Event of Default" elsewhere in this Lease.

Section 16.2    Remedies.

Upon the occurrence of an Event of Default, Landlord, at its option, without notice to Tenant in any instance (except where expressly provided for below) may in addition to all other rights and remedies provided in this Lease, at law or in equity, do any one or more of the following:

A.      Upon ten (10) days notice to Tenant, terminate this Lease and Tenant's right of possession of the Premises, and recover all damages to which Landlord is entitled under law, specifically including but without limitation, all of Landlord's expenses of reletting (including, without limitation, rental concessions to new tenants, repairs, Alterations, legal fees and brokerage commissions). If Landlord elects to terminate this Lease, every obligation of the parties shall cease as of the date of such termination, except that Tenant shall remain liable for payment of Rental and performance of all other terms and conditions of this Lease to the date

31

036932.00001/11930241v.4

of termination.

B.    Upon ten (10) days notice to terminate Tenant's right of possession of the Premises without terminating this Lease, in which event Landlord shall use commercially reasonable efforts to mitigate its damages by reletting the Premises, or any part thereof, for the account of Tenant, for such rent and term and upon such other conditions as are reasonably acceptable to Landlord. For purposes of such reletting, Landlord is authorized to reasonably redecorate, repair, alter and improve the Premises to the extent necessary in Landlord's reasonable discretion. Until Landlord relets the Premises, Tenant shall remain obligated to pay Rental to Landlord as provided in this Lease. If and when the Premises are relet and if a sufficient sum is not realized from such reletting after payment of all Landlord's expenses of reletting (including, without limitation, reasonable rental concessions to new tenants, repairs, alterations, reasonable legal fees and brokerage commissions) to satisfy the payment of Rental due under this Lease for any month, Tenant shall pay Landlord any such deficiency upon demand. Tenant agrees that Landlord may file suit to recover any sums due Landlord under this Section from time to time and that such suit or recovery of any amount due Landlord shall not be any defense to any subsequent action brought for any amount not previously reduced to judgment in favor of Landlord.

C.    Re-enter and repossess the Premises and remove all persons and effects therefrom, by summary proceeding, ejectment or other legal action or by using such force as may be necessary. Landlord shall have no liability by reason of any such re-entry, repossession or removal.

D.    Recover from Tenant, to the extent permitted under the laws of the State of Maryland, the value and/or cost of all concessions to Tenant under this Lease.

Section 16.3    Assignment in Bankruptcy.

In the event of an assignment by operation of law under the Federal Bankruptcy Code, or any state bankruptcy or insolvency law and Landlord elects not to terminate this Lease under Section 16.2, the assignee shall provide Landlord with adequate assurance of future performance of all of the terms, conditions and covenants of the Lease, which shall include, but which shall not be limited to, assumption of all the terms, covenants and conditions of the Lease by the assignee and the making by the assignee of the following express covenants to Landlord:

A.    That assignee has sufficient capital to pay the Rental and other charges due under the Lease for the entire Lease Term; and

B.    [INTENTIONALLY OMITTED]

C.    That assumption of the Lease by the assignee will not cause Landlord to be in violation or breach of any provision in any other lease, financing agreement or operating agreement relating to the Shopping Center; and

D.    That such assignment and assumption by the assignee will not substantially

32

036932.00001/11930241v.4



disrupt or impair any existing tenant mix in the Shopping Center.

Section 16.4   <u>Rights Upon Possession</u>.

If Landlord takes possession pursuant to this Article, with or without terminating this Lease, Landlord may, at its option, enter into the Premises, remove Tenant's alterations, signs, personal property, equipment and other evidences of tenancy, and store them at Tenant's risk and expense or dispose of them as Landlord may see fit, and take and hold possession of the Premises; provided, however, that if Landlord elects to take possession only without terminating this Lease, such entry and possession shall not terminate this Lease or release Tenant or any guarantor, in whole or in part, from the obligation to pay the Rental reserved hereunder for the full Term or from any other obligation under this Lease or any guaranty thereof.

Section 16.5   <u>No Waiver</u>.

If Landlord shall institute proceedings against Tenant and a compromise or settlement thereof shall be made, the same shall not constitute a waiver of any other covenant, condition or agreement herein contained, nor of any of Landlord's rights hereunder.  No waiver by Landlord of any breach shall operate as a waiver of such covenant, condition or agreement, or of any subsequent breach thereof.  No payment of Rental by Tenant or acceptance of Rental by Landlord shall operate as a waiver of any breach or default by Tenant under this Lease.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly installment of Rental herein stipulated shall be deemed to be other than a payment on account of the earliest unpaid Rental, nor shall any endorsement or statement on any check or communication accompanying a check for the payment of Rental be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rental or to pursue any other remedy provided in this Lease.  No re-entry by Landlord, and no acceptance by Landlord of keys from Tenant, shall be considered an acceptance of a surrender of the Lease.

Section 16.6   <u>Right of Landlord to Cure Tenant's Default</u>.

If an Event of Default shall occur, then Landlord may (but shall not be obligated to) make such payment or do such act to cure the Event of Default, and charge the amount of the expense thereof, together with interest thereon at the Default Rate, to Tenant.  Such payment shall be due and payable upon demand; however, the making of such payment or the taking of such action by Landlord shall not be deemed to cure the Event of Default or to stop Landlord from the pursuit of any remedy to which Landlord would otherwise be entitled.  Any such payment made by Landlord on Tenant's behalf shall bear interest until paid at the Default Rate.

**ARTICLE XVII**
**<u>SUBORDINATION AND ATTORNMENT</u>**

Section 17.1   <u>Peaceful and Quiet Use and Possession</u>.

Provided Tenant is not in default of this Lease beyond any applicable grace of notice period, Tenant shall have peaceful and quiet use and possession of the Premises without hindrance on the part of Landlord, and Landlord shall warrant and defend Tenant in such

33

peaceful and quiet use and possession against the claims of all persons claiming by, through, or under Landlord.

Section 17.2   <u>Subordination</u>.

Subject to the provisions of Section 17.4 below, Tenant's rights under this Lease are and shall remain subject and subordinate to the operation and effect of:

A.   any lease of land only or of land and buildings in a sale-leaseback transaction involving the Premises, or

B.   any mortgage, deed of trust or other security instrument constituting a mortgage lien upon the Premises,

whether the same shall be in existence at the date hereof or created hereafter, any such lease, mortgage, deed of trust or other security instrument being referred to herein as a "Mortgage" and the party or parties having the benefit of the same, whether as lessor, mortgagee, trustee, beneficiary or noteholder, being referred to herein as a "Mortgagee." Tenant's acknowledgment and agreement of subordination provided for in this Section is self-operative and no further instrument of subordination shall be required; however, Tenant shall execute such further assurances thereof as may be requested from time to time by Landlord or a Mortgagee.

Section 17.3   <u>Attornment</u>.

If any person shall succeed to all or part of Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease, or otherwise, and if so requested or required by such successor in interest, Tenant shall attorn to such successor in interest and shall execute such agreement in confirmation of such attornment as such successor in interest shall reasonably request.

Section 17.4   <u>Subordination, Non-Disturbance and Attornment Agreement</u>.

As a condition to Tenant subordinating its lease to Mortgagee, Landlord shall obtain a non-disturbance agreement for the benefit of Tenant from the Landlord's current or future Mortgagee, in the form reasonably acceptable to Tenant, which form shall provide that Tenant's rights, options and privileges under this Lease shall be protected and not impaired or disturbed by any enforcement action brought by Mortgagee under its loan or other security instrument.

Section 17.5   <u>Waiver of Landlord's Lien</u>.

Upon request from Tenant's lender, Landlord shall subordinate Landlord's rights to distrain upon or secure a lien against Tenant's personal property in or upon the Premises by a written agreement acceptable to Landlord in form and substance. However, if Landlord does so subordinate its rights to Tenant's lender, Landlord shall not be required (among other things) to permit the Premises to be used for storage on behalf of such lender of Tenant or to give notice of defaults to such lender. Furthermore, such lender shall be required to restore any damage caused to the premises by removal of any collateral therefrom.

34

036932.00001/11930241v.4



## ARTICLE XVIII
## ADVERTISING & PROMOTION

[Intentionally Omitted]

## ARTICLE XIX
## NOTICES

Any notice, request, demand, approval or consent given or required to be given under this Lease shall be in writing and shall be either (i) mailed by United States certified or registered mail postage prepaid and return receipt requested, (ii) hand-delivered, or (iii) sent by Federal Express or similar overnight delivery service, addressed as follows:

If to Landlord:

Decar Realty, LLC
122 East 42nd Street Suite 3009
New York, NY 10168

If to Tenant:

Forman Mills Corporate Office
1070 Thomas Busch Memorial Highway
Pennsauken, NJ 08110
Attention: President

with a copy to:

Joseph S. Finkelstein
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103

The date of service of such notice shall be (i) in the case of certified mail, return receipt requested, on the date such notice is received, as evidenced by the return receipt, (ii) in the case of hand-delivery, the date the notice is received as evidenced by the messenger's receipt, or (iii) in the case of Federal Express or similar service, on the first day after such notice is so sent that is not a Saturday, Sunday or legal holiday in the State of Maryland.

Either party may, at any time, change its Notice Address for the above purposes by sending a notice to the other party stating the change and setting forth the new address.

## ARTICLE XX
## MISCELLANEOUS

Section 20.1   Retail Restriction Limit.

35

036932.00001/11930241v.4



[INTENTIONALLY OMITTED]

Section 20.2   Estoppel Certificate.

At any time and from time to time, within ten (10) days after Landlord shall request the same, Tenant will execute, acknowledge and deliver to Landlord and to such Mortgagee or other party as may be designated by Landlord, a certificate in the form attached hereto as Schedule "D" with respect to the matters required by such party and such other matters relating to this Lease or the status of performance of obligations of the parties hereunder as may be reasonably requested by Landlord. 40.3 Landlord shall, without charge, at any time and from time to time, within twenty (20) days after request by Tenant, certify by a written instrument in a form reasonably requested by Tenant's lender or prospective purchaser or assignee, duly executed, acknowledged and delivered, to any person, firm, or corporation specified by Tenant the information set forth therein.

Section 20.3   Inspections and Access by Landlord.

Tenant will permit Landlord, its agents, employees and contractors to enter all parts of the Premises during Tenant's upon reasonable advance notice and during business hours to inspect the same and to enforce or carry out any provision of this Lease, including, without limitation, any access necessary for the making of any repairs which are Landlord's obligation hereunder; provided, however, that, in an emergency situation, such access shall be at any time upon Landlord's oral request.

Section 20.4   Remedies Cumulative.

No reference to any specific right or remedy shall preclude Landlord from exercising any other right or from having any other remedy or from maintaining any action to which it may otherwise be entitled at law or in equity. No failure by Landlord to insist upon the strict performance of any agreement, term, covenant or condition hereof, or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent during the continuance of any such breach, shall constitute a waiver of any such breach, agreement, term, covenant or condition. No waiver by Landlord of any breach by Tenant under this Lease or of any breach by any other tenant under any other lease of any portion of the Shopping Center shall affect or alter this Lease in any way whatsoever.

Section 20.5   Successors and Assigns.

This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord, its successors and assigns, and shall be binding upon Tenant, its successors and assigns and shall inure to the benefit of Tenant and only such assigns of Tenant to whom the assignment of this Lease by Tenant has been consented to by Landlord. Upon any sale or other transfer by Landlord of its interest in the Premises and the buyer's written assumption of Landlord's obligations hereunder, including without limitation, the obligation to repay Tenant's security deposit, Landlord shall be relieved of any obligations under this Lease occurring thereafter.

Section 20.6   Compliance with Laws and Regulations.

36

036932.00001/11930241v.4



Tenant, at its sole cost and expense, shall comply with and shall cause the Premises to comply with (a) all federal, state, county, municipal, and other governmental statutes, laws, rules, orders, regulations and ordinances ("Legal Requirements") affecting the Premises or any part thereof, or the use thereof, whether or not any such statutes, laws, rules, orders, regulations or ordinances which may be hereafter enacted involve a change of policy on the part of the governmental body enacting the same, and (b) all rules, orders and regulations of the National Board of Fire Underwriters or Landlord's fire insurance rating organization or other bodies exercising similar functions in connection with the prevention of fire or the correction of hazardous conditions which apply to the Premises. Any costs and responsibilities for structural matters relating to this Section 20.6 shall be born by the Landlord. If such Legal Requirements mandate structural changes to the Premises, the cost shall be amortized over a ten year period and one-half of such annual amortization amount shall be paid annually by Tenant (in 12 equal monthly installments) to Landlord as reimbursement to Landlord for such cost. Landlord represents and warrants that, as of the date possession of the Premises is delivered to Tenant, that the Premises comply with all statutes, laws, rules, orders, regulations and ordinances referenced in the preceding sentence. Landlord shall, at its sole cost and expense, promptly comply with all Legal Requirements, foreseen as well as unforeseen, ordinary as well as extraordinary, which relate to or pertain to the Premises or the Common Areas, except resulting from Tenant's specific manner of use or occupancy of the Premises, and whether or not said Legal Requirements (i) involve any change in governmental policy, (ii) are now in force or are hereafter passed, enacted or directed, or (iii) require extraordinary repairs, alterations, equipment or additions or any work (or changes to such work or any other requirements incidental thereto)

Section 20.7    Captions and Headings.

The Article and Section captions and headings are for convenience of reference only and in no way shall be used to construe or modify the provisions set forth in this Lease.

Section 20.8    Joint and Several Liability.

If two or more individuals, corporations, partnerships or other business associations (or any combination of two or more thereof) shall sign this Lease as Tenant, the liability of each such individual, corporation, partnership or other business association to pay rent and perform all other obligations hereunder shall be deemed to be joint and several, and all notices, payments and agreements given or made by, with or to any one of such individuals, corporations, partnerships or other business associations shall be deemed to have been given or made by, with or to all of them. In like manner, if Tenant shall be a partnership or other business association, the members of which are, by virtue of statute or federal law, subject to personal liability, the liability of each such member shall be joint and several.

Section 20.9    Brokers.

Landlord and Tenant acknowledge the only Broker involved in this transaction as Papadopolous Realty, such party to be compensated in a private arrangement with the Landlord, such costs incurring to the landlord as specified by their private agreement.

Section 20.10  No Joint Venture.

37

Any intention to create a joint venture or partnership relation between the parties hereto is hereby expressly disclaimed.

Section 20.11  No Option.

The submission of this Lease for examination does not constitute a reservation of or option for the Premises, and this Lease shall become effective only upon execution and delivery thereof by both parties.

Section 20.12  No Modification.

This writing is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms thereof, all negotiations, considerations and representations between the parties having been incorporated herein.  No course of dealings between the parties or their officers, employees, agents or affiliates shall be relevant or admissible to supplement, explain or vary any of the terms of this Lease.  This Lease can be modified only by a writing signed by the party against whom the modification is sought to be enforced.

Section 20.13  Severability.

If any term or provision, or any portion thereof, of this lease, or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances, other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

Section 20.14  Corporate Tenants.

In the event Tenant is a corporation, the persons executing this Lease on behalf of Tenant hereby covenant and warrant that:  Tenant is a duly constituted corporation qualified to do business in the State of Maryland; all Tenant's franchise and corporate taxes have been paid to date; all future forms, reports, fees and other documents necessary for Tenant to comply with applicable laws will be filed by Tenant when due; and such persons are duly authorized by the Board of Directors of such corporation to execute and deliver this Lease on behalf of the corporation.

Section 20.15  Applicable Law.

This Lease and the rights and obligations of the parties hereunder shall be construed in accordance with the laws of the State of Maryland (but not including the choice of law rules thereof).

Section 20.16  Performance of Landlord's Obligations by Mortgagee.

Tenant shall accept performance of any of Landlord's obligations hereunder by any Mortgagee, provided such Mortgagee elects to assume Landlord's obligations hereunder.  This Section shall not be construed to mean that Mortgagee is required to assume Landlord's

38

036932.00001/11930241v.4



obligations.

Section 20.17  Waiver of Jury Trial.

Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding at law or in equity in any court of competent jurisdiction.

Section 20.18  Limitation on Right of Recovery Against Landlord.

Tenant acknowledges and agrees that the liability of Landlord under this Lease shall be limited to its interest in the Shopping Center Area and any judgments rendered against Landlord shall be satisfied solely out of the proceeds of sale of its interest in the Shopping Center Area. No personal judgment shall lie against Landlord upon extinguishment of its rights in the Shopping Center Area and any judgment so rendered shall not give rise to any right of execution or levy against Landlord's assets. The provisions hereof shall inure to Landlord's successors and assigns including any Mortgagee. The foregoing provisions are not intended to relieve Landlord from the performance of any of Landlord's obligations under this Lease, but only to limit the personal liability of Landlord in case of recovery of a judgment against Landlord' not shall the foregoing be deemed to limit Tenant's rights to obtain injunctive relief or specific performance or to avail itself of any other right or remedy which may be awarded Tenant by law or under this Lease.

Tenant agrees to comply with the reasonable rules and regulations as may be promulgated from time to time by Landlord for the operation and maintenance of the Shopping Center.

Section 20.19  Rules and Regulations.

Tenant agrees to comply with the reasonable rules and regulations as may be promulgated from time to time by Landlord for the operation and maintenance of the Shopping Center, provided they do not increase the financial burdens of Tenant or unreasonably restrict Tenant's rights under this Lease and are not inconsistent with the terms of this Lease. In case of any conflict or inconsistency between the provisions of this Lease and any Rules and Regulations, the provisions of this Lease shall control

Section 20.20  Landlord's Approval.

Notwithstanding anything to the contrary contained herein, Landlord agrees that whenever Landlord's approval is required under the terms of this Agreement, such approval shall not be unreasonably withheld, conditioned or delayed.

## ARTICLE XXI
## TENANT'S COVENANTS REGARDING HAZARDOUS MATERIALS

Section 21.1  Definition.

As used in this Lease, the term "Hazardous Material" means any flammable items, explosives, radioactive materials, hazardous or toxic substances, material or waste or related

036932.00001/1193024 1v.4



materials, including any substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "infectious wastes," "hazardous materials" or "toxic substances" now or subsequently regulated under any federal, state or local laws, regulations or ordinances including, without limitation, oil, petroleum-based products, paints, solvents, lead, cyanide, DDT, printing inks, acids, pesticides, ammonia compounds and other chemical products, asbestos, PCBs and similar compounds, and including any different products and materials which are subsequently found to have adverse effects on the environment or the health and safety of persons.

Section 21.2   General Prohibition.

Tenant shall not cause or permit any Hazardous Material to be generated, produced, brought upon, used, stored, treated, discharged, released, spilled or disposed of on, in, under or about the Premises, the Common Areas or the Shopping Center by Tenant or its agents, affiliates, sublessees or assignees other than cleaning fluids and items which are sold to the public. Landlord hereby represents and warrants that, as of the date possession of the Premises is delivered to Tenant, that the Premises shall be free from any Hazardous Material, and that Landlord shall not cause or permit, nor allow any other tenant or person to cause or permit, any Hazardous Material to be released, spilled, brought into or otherwise released into the Premises. Tenant shall not be responsible for any Hazardous Materials in the Shopping Center which existed prior to the Tender Date or was caused by Landlord, its agents, contractors or employees, or a third party not connected with Tenant. Each Tenant and Landlord agree that it shall indemnify, defend and hold harmless the other from and against any and all actions (including, without limitation, remedial or enforcement actions of any kind, administrative or judicial proceedings, and orders or judgments arising out of or resulting therefrom), costs, claims, damages (including, without limitation, punitive damages), expenses (including, without limitation, attorneys', consultants' and experts' fees, court costs and amounts paid in settlement of any claims or actions), fines, forfeitures or other civil, administrative or criminal penalties, injunctive or other relief (whether or not based upon personal or bodily injury, property damage, or contamination of, or adverse effects upon, the environment, water tables or natural resources), liabilities or losses arising from a breach of Tenant's or Landlord's obligations (as applicable) (and each of their respective agents, affiliates, sublessees or assignees) as provided in the first two sentences of this Section 21.1.

Section 21.3   Notice.

In the event that Hazardous Materials (not existing as of the date possession of the Premises is delivered to Tenant) are discovered upon, in, or under the Premises, the Common Areas or the Shopping Center, and the governmental agency or entity having jurisdiction over the Premises, the Common Areas or the Shopping Center requires the removal of such Hazardous Materials, Tenant shall be responsible for removing those Hazardous Materials arising out of or related to the use or occupancy of the Premises by Tenant or its agents, affiliates, sublessees or assignees but not those of its predecessors. Notwithstanding the foregoing, Tenant shall not take any remedial action in or about the Premises, the Common Areas or the Shopping Center without first notifying Landlord of Tenant's intention to do so and affording Landlord the opportunity to protect Landlord's interest with respect thereto. Tenant immediately shall notify Landlord and Landlord shall immediately notify Tenant in writing of:

40

036932.00001/119302411v.4



(i) any spill, release, discharge or disposal of any Hazardous Material in, on or under the Premises, the Common Areas, the Shopping Center or any portion thereof, (ii) any enforcement, cleanup, removal or other governmental or regulatory action instituted, contemplated, or threatened (if Tenant has notice thereof) pursuant to any Hazardous Materials Laws; (iii) any claim made or threatened by any person against Tenant, the Premises, the Common Areas or the Shopping Center relating to damage, contribution, cost recovery, compensation, loss or injury resulting from or claimed to result from any Hazardous Materials; and (iv) any reports made to any governmental agency or entity arising out of or in connection with any Hazardous Materials in, on, under or about or removed from the Premises, the Common Areas or the Shopping Center, including any complaints, notices, warnings, reports or asserted violations in connection therewith.  Tenant also shall supply to Landlord as promptly as possible, and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings or asserted violations relating in any way to the Premises, the Common Areas, the Shopping Center or Tenant's use or occupancy thereof.  Likewise, Landlord shall immediately notify Tenant of any discovery, spill, release, discharge or disposal of Hazardous Material in or near the Premises or any Common Area or other space in the Shopping Center.

Section 21.4    Survival.

The respective rights and obligations of Landlord and Tenant under this Article 21 shall survive the expiration or earlier termination of this Lease.

IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby have executed this Lease under their respective hands and seals as of the day and year first above written.

WITNESS

LANDLORD:

Decar Realty, LLC

By:

Its:

Date: 9/7/09

WITNESS

TENANT:

Forman Mills, Inc

By:

Its:

Date:

41

036932.00001/11930241v.4

42

036932.00001/11930241v.4

## Schedule "A"

## LEGAL DESCRIPTION OF SHOPPING CENTER AREA

036932.00001/11930241v.4

202 8875027   P.03

p.4

## 4254   903

That pursuant to said Resolution and authority set forth above, the said dissolved Corporation and Irving Neuman, Herbert Neuman, Philip Zinman and Julius A. Zinman do hereby grant, convey and assign to Decar Realty, a Partnership existing under the laws of the State of New York, its successors and assigns, in fee simple all the parcel of ground, situate, lying and being in the Twentieth Election District of Prince Georges County, State of Maryland, and described as follows, that is to say:

✳    Being the residue of the land of Maxbee Investments, Inc. as described in a conveyance recorded among the Land Records of Prince Georges County, Maryland (20th Election District) in Liber 2439 at Folio 114, and also the residue of the land of Maxbee Investments, Inc. as described in Parcel No. 1 of a conveyance recorded among the aforesaid Land Records in Liber 2434 at Folio 117, said lands being all of Parcels 4, 5, 6, and 7 as shown on a plat of Subdivision entitled "Parcels 1 thru 7, Carrollan" and recorded among the aforesaid Land Records in Plat Book WWW 40 at Plat 26, the said parcels 4, 5, 6 and 7 being more particularly described as follows.

PARCEL 4

Being all of Parcel 4 as shown on a Plat of Subdivision entitled "Parcels 1 thru 7, Carrollan" and recorded among the Land Records of Prince Georges County, Maryland (20th Election District) in Plat Book WWW 40 at Plat 26, said Parcel 4 being also part of the land described in a conveyance to Maxbee Investments, Inc., recorded among the aforesaid Land Records in Liber 2439 at Folio 114, and being more particularly described as follows:

Beginning for the same at an iron pipe on the Easterly right-of-way line of 85th Avenue (60 feet wide), said iron pipe being the most Northerly corner of Parcel 4, Carrollan, and running thence with the outlines of said Parcel 4, S 04 deg. 29 min. 44 sec. E, 65.00 feet to an iron pipe, thence with the division line between Parcels 4 and 3, Carrollan, S 62 deg. 24 min. 43 sec. W, 7.36 feet to an iron pipe, thence with the said Easterly right-of-way line of 85th Avenue, 69.34 feet along the arc of a curve to the left, having a radius of 343.92 feet and a long chord bearing and distance of N 01 deg. 11 min. 13 sec. E, 68.33 feet to the point of beginning;

- 2 -

*[handwritten margin notes:]* The legal description (EXHIBIT A-1 to the Lease between Decar Realty LLC and NWL of New CARROLLTON JR and EXHIBIT A to the Landlord's Agreement (EXHIBIT E TO THE LEASE) starts at the ✳ and includes parcels 4, 5, 6 and 7 on pages 2, 3, 4 and 5 ending at the ✳✳ on pages

4254   904

Containing 14,21 acres.

PARCEL 5

Being all of Parcel 5 as shown on a Plat of Subdivision entitled "Parcels 1 thru 7, Carrollan" and recorded among the Land Records of Prince Georges County, Maryland (20th Election District) in Plat Book WWW 40 at Plat 26, said Parcel 5 being also part of the land described in a conveyance to Maxbee Investments, Inc., recorded among the aforesaid Land Records in Liber 2439 at Folio 114, and being more particularly described as follows:

Beginning for the same at an iron pipe on the Easterly right-of-way line of 85th Avenue (60 feet wide) said iron pipe being the most southerly corner of Parcel 5, Carrollan, and running thence with the said Easterly right-of-way line of 85th Avenue, 282.78 feet along the arc of a curve to the left, having a radius of 365.49 feet and a long chord bearing and distance of N 26 deg. 39 min. 37 sec. W, 275.78 feet to an iron pipe at a point of reverse curvature, thence 50.71 feet along the arc of a curve to the right, having a radius of 68.90 feet and a long chord bearing and distance of N 27 deg. 05 min. 37 sec. W, 49.50 feet to an iron pipe, thence with the outline of Parcel 5, N 84 deg. 36 min. 16 sec. E, 123.09 feet to an iron pipe, thence S 04 deg. 29 min. 44 sec. E, 303.03 feet to the point of beginning;

Containing 13,747 square feet.

PARCEL 6

Being all of Parcel 6 as shown on a Plat of Subdivision entitled "Parcels 1 thru 7, Carrollan" and recorded among the Land Records of Prince Georges County, Maryland (20th Election District) in Plat Book WWW 40 at Plat 26, said Parcel 6 being also part of the land described in a conveyance to Maxbee Investments, Inc., recorded among the aforesaid Land Records in Liber 2439 at Folio 114, and also the residue of the land described in Parcel No. 1 of a conveyance to the said Maxbee Investments, Inc., recorded among the aforesaid Land Records in Liber 2434 at Folio 117, and being more particularly described as follows:

Beginning for the same at an iron pipe on the Westerly right-of-way line of 85th Avenue (60 feet wide), said iron pipe being on the division line between Parcels 6 and 2, Carrollan, and running thence with the outline of said Parcel 6, S 62 deg. 24 min. 43 sec. W, 71.30 feet to an iron pipe, thence S 85 deg. 00 min. 59 sec. W, 594.59 feet to an iron pipe, thence

- 3 -

NOV 19 2003 5:39AM    HP LASERJET 3200                                        P.6

## 4254   905

S 54 deg. 56 min. 20 sec. W, 144.53 feet to an
iron pipe, thence N 35 deg. 11 min. 10 sec. W,
353.91 feet to an iron pipe, thence N 54 deg.
21 min. 50 sec. W, 173.00 feet to an iron pipe,
thence N 35 deg. 11 min. 10 sec. W, 112.30 feet
to an iron pipe, thence with the Southwesterly
right-of-way line of Defense Highway, N 54 deg.
21 min. 11 sec. E, 882.33 feet to an iron pipe,
thence continuing with the outlines of Parcel 6,
S 28 deg. 04 min. 17 sec. E, 135.00 feet to an
iron pipe, thence N 54 deg. 21 min. 11 sec. E,
150.13 feet to an iron pipe, thence with the
Westerly right-of-way line of 85th Avenue, S 05
deg. 33 min. 44 sec. E, 115.96 feet to an iron
pipe at a point of curvature, thence 96.19 feet
along the arc of a curve to the left, having a
radius of 125.90 feet and a long chord bearing
and distance of S 27 deg. 06 min. 37 sec. E,
93.90 feet to an iron pipe at a point of reverse
curvature, thence 236.36 feet along the arc of
a curve to the right, having a radius of 305.49
feet and a long chord bearing and distance of
S 26 deg. 39 min. 37 sec. E, 230.50 feet to an
iron pipe at a point of tangency, thence S 04
deg. 29 min. 44 sec. E, 190.28 feet to an iron
pipe at a point of curvature, thence 100.10 feet
along the arc of a curve to the right, having a
radius of 283.52 feet and a long chord bearing
and distance of S 05 deg. 37 min. 08 sec. W,
99.58 feet to the point of beginning;

Containing 546,426 square feet.

PARCEL 7

Being all of Parcel 7 as shown on a Plat
of Subdivision entitled "Parcels 1 thru 7,
Carrollan" and recorded among the Land Records
of Prince Georges County, Maryland (20th Elec-
tion District) in Plat Book WWW 40 at Plat 26
said Parcel 7 being also part of the land de-
scribed in a conveyance to Hughes Investments,
Inc., recorded among the aforesaid Land Records
in Liber 2439 at Folio 114, and being more par-
ticularly described as follows:

Beginning for the same at an iron pipe on
the Easterly right-of-way line of 85th Avenue
(60 feet wide) said iron pipe being the most
Southerly corner of Parcel 7, Carrollan, and
running thence with the said Easterly right-of-
way line of 85th Avenue, 95.16 feet along the
arc of a curve to the left, having a radius of
195.71 feet and a long chord bearing and distance
of N 31 deg. 45 min. 02 sec. W, 94.83 feet to an
iron pipe, thence with the Southeasterly right-
of-way line of Defense Highway, N 54 deg. 21 min.
11 sec. E, 30.66 feet to an iron pipe, thence
with the outline of Parcel 7, S 05 deg. 29 min.
44 sec. E, 105.67 feet to the point of beginning;

- 4 -

4254   905

Containing 1,040 square feet.

Together with and in addition thereto the bed of 85th Avenue as it runs its course Northerly from the South 67 deg. 24 min. 43 sec. W, 71.30 foot line of the hereinabove described property to Defense Highway; and together with and in addition thereto the portion of the bed of Defense Highway which was included in the description in the Deed from Joseph E. Rash and Norman M. Kransdorf, Trustees to Carrollan Shopping Center, Inc. and recorded among the Land Records of Prince Georges County, Maryland; subject, however, to the rights of the public to the use of said 85th Avenue and Defense Highway as shown by Owner's Dedication as set forth on said Plat of Carrollan.

Being Also the same tract of land which was conveyed by Carrollan Shopping Center, Inc., as Grantor unto Decar Realty Corp. by Deed dated February 23, 1966, and recorded among the Land Records of Prince Georges County, Maryland, in Liber 3286, Folio 513.

TOGETHER with all the rights, alleys, ways, waters, privileges, appurtenances, and advantages to the same belonging or in anywise appertaining.

And, together with any and all buildings, structures, and improvements now or at any time hereafter erected, constructed, or situated upon said parcels of land or any part thereof, together with any and all fixtures, plants, apparatus, appliances, machinery, equipment, furnishings and personal property of every kind and description now or hereafter affixed, attached, or annexed to any such buildings, structures, or improvements, together with any and all renewals and replacements of, additions to, and substitutions for any such buildings, structures, improvements, or any of the above referred to properties; ✳✳

And to have and to hold the said buildings, structures, and improvements, unto and to the use of the said Decar Realty, its successors and assigns, in fee simple, forever.

IN WITNESS WHEREOF, the said Decar Realty Corp. has caused this Deed to be executed by its President hereunto duly

- 5 -

202 8875027   P.03

p.4

## 4254   900

That pursuant to said Resolution and authority set forth above, the said dissolved Corporation and Irving Neuman, Herbert Neuman, Philip Zinman and Julius A. Zinman do hereby grant, convey and assign to Decar Realty, a Partnership existing under the laws of the State of New York, its successors and assigns, in fee simple all the parcel of ground, situate, lying and being in the Twentieth Election District of Prince Georges County, State of Maryland, and described as follows, that is to say:

Being the residue of the land of Maxbee Investments, Inc. as described in a conveyance recorded among the Land Records of Prince Georges County, Maryland (20th Election District) in Liber 2439 at Folio 114, and also the residue of the land of Maxbee Investments, Inc. as described in Parcel No. 1 of a conveyance recorded among the aforesaid Land Records in Liber 2434 at Folio 117, said lands being all of Parcels 4, 5, 6, and 7 as shown on a plat of Subdivision entitled "Parcels 1 thru 7, Carrollan" and recorded among the aforesaid Land Records in Plat Book WWW 40 at Plat 26, the said Parcels 4, 5, 6 and 7 being more particularly described as follows.

PARCEL 4

Being all of Parcel 4 as shown on a Plat of Subdivision entitled "Parcels 1 thru 7, Carrollan" and recorded among the Land Records of Prince Georges County, Maryland (20th Election District) in Plat Book WWW 40 at Plat 26, said Parcel 4 being also part of the land described in a conveyance to Maxbee Investments, Inc., recorded among the aforesaid Land Records in Liber 2439 at Folio 114, and being more particularly described as follows:

Beginning for the same at an iron pipe on the Easterly right-of-way line of 85th Avenue (60 feet wide), said iron pipe being the most Northerly corner of Parcel 4, Carrollan, and running thence with the outlines of said Parcel 4, S 04 deg. 29 min. 44 sec. E, 65.00 feet to an iron pipe, thence with the division line between Parcels 4 and 3, Carrollan, S 62 deg. 24 min. 43 sec. W, 7.36 feet to an iron pipe, thence with the said Easterly right-of-way line of 85th Avenue, 69.34 feet along the arc of a curve to the left, having a radius of 343.32 feet and a long chord bearing and distance of N 01 deg. 12 min. 13 sec. E, 68.23 feet to the point of beginning.

- 2 -

The legal description (EXHIBIT A-1 to the Lease between Decar Realty LLC and NWL of New CARROLLTON, dc and EXHIBIT A to the Landlord's Agreement (EXHIBIT E TO THE LEASE) starts at the ✳ and includes parcels 4, 5, 6 and 7 on pages 2, 3, 4 and 5 ending at the ✳✳ on page 5

4254   904

Containing ~~text~~ acres.

PARCEL 5

Being all of Parcel 5 as shown on a Plat of Subdivision entitled "Parcels 1 thru 7, Carrollan" and recorded among the Land Records of Prince Georges County, Maryland (20th Election District) in Plat Book WWW 40 at Plat 26, said Parcel 5 being also part of the land described in a conveyance to Maxbee Investments, Inc., recorded among the aforesaid Land Records in Liber 2439 at Folio 114, and being more particularly described as follows:

Beginning for the same at an iron pipe on the Easterly right-of-way line of 85th Avenue (60 feet wide) said iron pipe being the most southerly corner of Parcel 5, Carrollan, and running thence with the said Easterly right-of-way line of 85th Avenue, 382.78 feet along the arc of a curve to the left, having a radius of 365.49 feet and a long chord bearing and distance of N 26 deg. 39 min. 37 sec. W, 275.78 feet to an iron pipe at a point of reverse curvature, thence 50.71 feet along the arc of a curve to the right, having a radius of 66.90 feet and a long chord bearing and distance of N 27 deg. 06 min. 37 sec. W, 49.50 feet to an iron pipe, thence with the outline of Parcel 5, N 84 deg. 36 min. 16 sec. E, 123.09 feet to an iron pipe, thence S 04 deg. 29 min. 44 sec. E, 303.03 feet to the point of beginning;

Containing 13,747 square feet.

PARCEL 6

Being all of Parcel 6 as shown on a Plat of Subdivision entitled "Parcels 1 thru 7, Carrollan" and recorded among the Land Records of Prince Georges County, Maryland (20th Election District) in Plat Book WWW 40 at Plat 26, said Parcel 6 being also part of the land described in a conveyance to Maxbee Investments, Inc., recorded among the aforesaid Land Records in Liber 2439 at Folio 114, and also the residue of the land described in Parcel No. 1 of a conveyance to the said Maxbee Investments, Inc., recorded among the aforesaid Land Records in Liber 2434 at Folio 117, and being more particularly described as follows:

Beginning for the same at an iron pipe on the Westerly right-of-way line of 85th Avenue (60 feet wide), said iron pipe being on the division line between Parcels 6 and 2, Carrollan, and running thence with the outline of said Parcel 6, S 62 deg. 24 min. 43 sec. W, 71.30 feet to an iron pipe, thence S 85 deg. 00 min. 59 sec. W, 594.59 feet to an iron pipe, thence

- 3 -



## 4254   905

S 54 deg. 56 min. 20 sec. W, 144.55 feet to an iron pipe, thence N 35 deg. 11 min. 10 sec. W, 355.91 feet to an iron pipe, thence N 54 deg. 21 min. 50 sec. E, 173.00 feet to an iron pipe, thence N 35 deg. 11 min. 10 sec. W, 112.30 feet to an iron pipe, thence with the Southwesterly right-of-way line of Defense Highway, N 54 deg. 21 min. 11 sec. E, 882.33 feet to an iron pipe, thence continuing with the outlines of Parcel 6, S 28 deg. 04 min. 17 sec. E, 135.00 feet to an iron pipe, thence N 54 deg. 21 min. 11 sec. E, 150.13 feet to an iron pipe, thence with the Westerly right-of-way line of 85th Avenue, S 05 deg. 23 min. 44 sec. E, 115.96 feet to an iron pipe at a point of curvature, thence 96.19 feet along the arc of a curve to the left, having a radius of 126.90 feet and a long chord bearing and distance of S 27 deg. 06 min. 37 sec. E, 93.90 feet to an iron pipe at a point of reverse curvature, thence 236.34 feet along the arc of a curve to the right, having a radius of 305.49 feet and a long chord bearing and distance of S 26 deg. 39 min. 37 sec. E, 230.50 feet to an iron pipe at a point of tangency, thence S 04 deg. 39 min. 44 sec. E, 190.36 feet to an iron pipe at a point of curvature, thence 100.10 feet along the arc of a curve to the right, having a radius of 283.52 feet and a long chord bearing and distance of S 05 deg. 37 min. 08 sec. W, 99.58 feet to the point of beginning;

Containing 546,426 square feet.

PARCEL 7

Being all of Parcel 7 as shown on a Plat of Subdivision entitled "Parcels 1 thru 7, Carrollan" and recorded among the Land Records of Prince Georges County, Maryland (20th Election District) in Plat Book WWW 40 at Plat 26 said Parcel 7 being also part of the land described in a conveyance to Hughes Investments, Inc., recorded among the aforesaid Land Records in Liber 2439 at Folio 114, and being more particularly described as follows:

Beginning for the same at an iron pipe on the Easterly right-of-way line of 85th Avenue (60 feet wide) said iron pipe being the most Southerly corner of Parcel 7, Carrollan, and running thence with the said Easterly right-of-way line of 85th Avenue, 95.16 feet along the arc of a curve to the left, having a radius of 195.71 feet and a long chord bearing and distance of N 21 deg. 43 min. 02 sec. W, 94.33 feet to an iron pipe, thence with the Southeasterly right-of-way line of Defense Highway, N 54 deg. 11 min. 11 sec. E, 30.66 feet to an iron pipe, thence with the outline of Parcel 7, S 05 deg. 23 min. 44 sec. E, 105.87 feet to the point of beginning;

- 4 -

4254   905

Containing 1,040 square feet.

Together with and in addition thereto the bed of 85th Avenue as it runs its course Northerly from the South 63 deg. 24 min. 43 sec. W, 71.30 foot line of the hereinabove described property to Defense Highway; and together with and in addition thereto the portion of the bed of Defense Highway which was included in the description in the Deed from Joseph E. Rash and Norman M. Kransdorf, Trustees to Carrollan Shopping Center, Inc. and recorded among the Land Records of Prince Georges County, Maryland; subject, however, to the rights of the public to the use of said 85th Avenue and Defense Highway as shown by Owner's Dedication as set forth on said Plat of Carrollan.

Being Also the same tract of land which was conveyed by Carrollan Shopping Center, Inc., as Grantor unto Decar Realty Corp. by Deed dated February 23, 1966, and recorded among the Land Records of Prince Georges County, Maryland, in Liber 3295, Folio 513.

TOGETHER with all the rights, alleys, ways, waters, privileges, appurtenances, and advantages to the same belonging or in anywise appertaining.

And, together with any and all buildings, structures, and improvements now or at any time hereafter erected, constructed, or situated upon said parcels of land or any part thereof, together with any and all fixtures, plants, apparatus, appliances, machinery, equipment, furnishings and personal property of every kind and description now or hereafter affixed, attached, or annexed to any such buildings, structures, or improvements, together with any and all renewals and replacements of, additions to, and substitutions for any such buildings, structures, improvements, or any of the above referred to properties; ＊＊

And to have and to hold the said buildings, structures, and improvements, unto and to the use of the said Decar Realty, its successors and assigns, in fee simple, forever.

IN WITNESS WHEREOF, the said Decar Realty Corp. has caused this Deed to be executed by its President hereunto duly

- 5 -

## Schedule "A 1"

## DRAWING OF SHOPPING CENTER AREA INCLUDING LANDLORD'S BUILDINGS AND TENANT'S PREMISES

036932.00001/11930241v.4



## Schedule "B"

## LANDLORD'S BUILDING STANDARD WORK

## [intentionally omitted]

Schedule B-1

036932.00001/11930241v.4

## Schedule "C"

## TENANT'S WORK

1.    All work performed at the Premises must conform to all relevant building codes and be performed by appropriate licensed contractors. Tenant must secure Landlord's written approval of the Tenant's general contractor and subcontractors, such approval not to be unreasonably withheld, conditioned or delayed.

2.    Tenant shall secure a building permit, occupancy permit, and all other permits or licenses necessary for the commencement and completion of Tenant's Work and provide copies to Landlord.

3.    Prior to construction, Tenant shall provide to Landlord: a) Evidence of approval of Tenant's working drawings by the appropriate governmental authorities, b) evidence of contractor's insurance, c) copies of the Tenant's building permit.

4.    Tenant shall present all plans to Landlord for review and approval prior to construction, such approval not to be unreasonably withheld, conditioned or delayed.

5.    Tenant shall use only commercial quality building materials, fixtures, and equipment. All equipment must conform to safety and quality standards applicable to the use of such equipment in commercial settings.

6.    During construction upon prior notice to Tenant, Tenant shall schedule with Landlord an inspection of the Premises by Landlord to verify compliance with Tenant's Drawings and the requirements set forth in the lease.

7.    Upon completion of Tenant's work, Tenant shall request Landlord or Landlord's representative to conduct a final inspection of the Premises and compile a "punch list" to enumerate any areas of construction not in accordance with Tenant's drawings or Landlord's standards of quality. Tenant must address and remedy this punch list within thirty (30) days following its opening for business.

Schedule B-1

036932.00001/11930241v.4



## Schedule "D"

## TENANT ESTOPPEL CERTIFICATE

Tenant: _____ (the "Tenant")

Landlord: DECAR REALTY, LLC (the "Landlord")

Leased Premises: _____ (the "Premises") in the shopping center having an address of _____ (the "Property)

Lease Commencement Date: _____ the ("Lease Commencement Date")

The undersigned certifies to Landlord and to _____ and to _____. (together with its successors and assigns, "Lender") as follows with respect to the Lease (as defined below):

1. Tenant is the tenant of the Premises containing approximately _____ square feet of space in the Property pursuant to that certain

_____

_____

_____ (as amended, the "Lease") and Tenant has not transferred or assigned the Lease or sublet the Premises demised thereby, except as set forth below.

2. Attached hereto as Exhibit A is a true, correct and complete copy of the Lease. The Lease is in full force and effect, and the Lease has not been amended or modified (except as set forth in paragraph 1 above) and represents the entire agreement between Landlord and Tenant with respect to the Premises and the Property.

3. To the best of Tenant's knowledge, neither party to the Lease is in any way in default thereunder and no conditions exist which, with the giving of notice or passage of time would constitute a default under the Lease.

4. Tenant posted a Security Deposit in the amount of $_____ with the Landlord, which amount has not been applied to any default by the Tenant.

5. The rent for said Premises has been paid through and including _____, 20___. Tenant has not and agrees not to pay any rent more than one month in advance.

6. Tenant is currently obligated to pay rent in monthly installments of $_____ per month, comprised of the following amounts:

    (a)   Monthly Base Rental (excluding CAM):         $_____

    (b)   Monthly CAM escrow for operating expenses:    $_____

Schedule D-1

036932.00001/11930241v.4

7. The term of the Lease commenced on the Lease Commencement Date identified above and the term of the Lease expires on: _____. Tenant has _____ (__) renewal option(s) to extend the term of the Lease for _____ (__) years each.

8. Tenant does not have (i) a right to expand its Premises, (ii) a right of first offer to lease any additional portion of the Property, (iii) a right of first refusal to lease any additional portion of the Property, (iv) a right to purchase all or part of the Property or (v) a right to terminate the Lease prior to its stated expiration other than as specifically set forth in the Lease with respect to casualty and condemnation.

9. Tenant, as of this date, has no charge, lien, credit or claim of offset under the Lease or otherwise, against rents or other charges due or to become due thereunder or any abatement of rentals and no free rent periods or rental concessions or allowances have been granted to Tenant which have not been satisfied.

10. Tenant has accepted and is currently in possession of the Premises.

11. All tenant inducements and contributions due from Landlord to Tenant under the Lease have been received and all improvements to the Premises leased by Tenant thereof have been completed by Landlord in accordance with the provisions of the Lease and accepted by Tenant, other than the following items:_____.

12. No actions, whether voluntary or otherwise, are pending against Tenant under the bankruptcy or insolvency laws of the United States or any state thereof.

13. Tenant has received no written notice of any violation of any environmental law.

This Certificate is given to Contract Purchaser with the understanding that it and the Lender, and their respective successors and assigns, will rely hereon in connection with the conveyance to Contract Purchaser of the Property of which the Premises form a part.

14. Tenant agrees that upon notification by Lender in writing that rental payments are to be made to Lender because of a default under the loan made by Lender to Contract Purchaser, Tenant will cease making rental payments to Contract Purchaser, or its successors and assigns, and will begin making such rental payments directly to Lender.

15. If Lender or its designee succeeds to landlord's interest in the Property or if a sale by power of sale or foreclosure occurs, Tenant shall attorn to Lender, its designee or a purchaser at such sale as its landlord, and the Lease shall continue in full force and effect as a direct lease between Lender (or such designee or purchaser) and Tenant upon all of the terms, covenants and conditions set forth in the Lease; provided, however, that Lender (or such designee or purchaser) shall not be (i) liable for any accrued obligation of landlord, or for any act or omission of landlord, whether prior to or after such foreclosure or sale, unless such obligation is that of a continuing nature (ii) required to make any repairs to the Property or the Premises required as a result of fire or other casualty or by reason of condemnation unless Lender (or such designee or purchaser) shall be obligated under the Lease to make such repairs and shall have received sufficient casualty insurance proceeds or condemnation awards to finance the completion of such

Schedule D-2

036932.00001/11930241v.4



repairs, (iii) required to make any capital improvements to the Property or the Premises which landlord may have agreed to make, but had not completed, or to perform or provide any services not related to possession or quiet enjoyment of the Leased Premises, (iv) subject to any offsets or counterclaims which shall have accrued to Tenant against landlord prior to the date upon which Lender shall become the owner of the Property, (v) bound by any rent which Tenant may have paid for more than the current month to any prior landlord, or (vi) liable for the return of any security deposit posted by Tenant unless actually received by Lender (or such designee or purchaser) and required to be returned pursuant to the terms of the Lease.

16. Tenant will not seek to terminate the Lease or seek or assert any set-off or counterclaim against the rent or additional rent by reason of any act or omission of landlord, until Tenant shall have given written notice of such act or omission to Lender at the following address (or such other address as Lender may designate by written notice to Tenant from time to time) and a reasonable time after actual receipt by Lender of such notice of default shall have passed without the curing of such default by landlord or Lender:

17. Tenant agrees that the Lease shall not hereafter be modified or amended without the prior written consent of Lender and that Lender will not be bound by any modification of the Lease including, without limitation, any reduction in rent or term, unless Lender has consented thereto.

18. Tenant agrees that the Lease and all of the terms, covenants and provisions thereof (including, without limitation, all terms, covenants and provisions with respect to the disposition of any casualty insurance proceeds or condemnation awards) and all rights, remedies and options of Tenant thereunder are and shall at all times continue to be subject and subordinate in all respects to the deed of trust securing Lender's loan to Contract Purchaser, and to the lien thereof and all terms, covenants and conditions set forth in such deed of trust, including, without limitation, all renewals, increases, modifications, spreaders, consolidations, replacements and extensions thereof and to all sums secured thereby with the same force and effect as if such deed of trust had been executed, delivered and recorded prior to the execution and delivery of the Lease.

19. Tenant acknowledges that the person executing this estoppel certificate on behalf of Tenant has knowledge of the matters stated herein and has the authority to execute this estoppel certificate on behalf of Tenant.

IN WITNESS WHEREOF, the undersigned has caused this Certificate to be executed this _____ day of _____, 20___.

---

**(Name of Tenant)**

By: _____

Name: _____

Title: _____

Schedule D-3

036932.00001/11930241v.4

## Schedule "E"

## RENT SCHEDULE

## [INTENTIONALLY OMITTED]

Schedule E-1

036932.00001/11930241v.4

## Schedule "F"

## SIGN CRITERIA AND DEPICTION OF AVAILABLE SIGNAGE

Schedule E-1

F  *Two*

## SCHEDULE "B"
## SIGN SPECIFICATIONS
### Plaza 30 Shopping Center
### 8301 Annapolis Rd.
### New Carrollton Md. 20784

One line of neon channel letters centered on raceway:

| | | |
|---|---|---|
| Back and returns | - | .040 alum. Painted duranodic bronze 313-E or color used by Stone Sign Co. on adjacent sign |
| Face | - | 1/8" plexiglass, color your choice |
| Trim | - | your choice |
| Neon | - | your chouce |
| Raceway | - | 8" x 8" painted beige |
| Letter Style | - | Helvetica/logo style—or your logo |
| Maximum Height | - | 24" |
| Transformers | - | 30ma |
| Maximum Length | - | 75% of the storefront width |

*OR (1) EXIST Box Sign*
*(2) Forum mills standard Sign*



**Value City Furniture — National Wholesale Inc.**

| | | | | |
|---|---|---|---|---|
| AFRICAN FOOD | ATLANTIC SEAFOOD | BLOCKBUSTER | CARROLLTON CLEANERS | CHESAPEAKE SEAFOOD |
| IHEAKANWA | HAIR ACADEMY | SALON MATRIX | NEW CARRLT. LIQUOR | PAPA JOHN'S |
| 7-ELEVEN | SIMPLY FASHIONS | STAR BEAUTY SUPPLY | SUBWAY | |

PHOTO RENDERING — NTS

**Jack Stone Sign Co.**

| LIGHTING | QTY. | SIZES | VOLTS |
|---|---|---|---|
| LAMPS | | | |
| BALLAST | | | |
| DAYLIGHT | | | |
| COOL LIGHT | | | |

## Schedule "G"

## LEASE RESTRICTIONS

036932.00001/11930241v.4



_medical CTR_

## RIDER # 1

NOTE – This Rider is attached to and made a part of the Lease between Decar Realty, LLC (Landlord) and Medical Support Services, Inc. (Tenant) for the premises at 6317 Annapolis Road, New Carrollton, Maryland 20784. In the event of any conflict with the terms of the Lease, the terms of the Rider shall take precedence.

A.    CERTIFICATE OF OCCUPANCY:  Tenant shall obtain a Certificate of Occupancy to allow Tenant to conduct business as soon as possible.

B.    POSSESSION:  Tenant shall have free access immediately upon execution of this Lease to install flooring, for storage, and to install equipment and furnishings. If possession is delayed beyond March 30, 2008, Tenant may terminate this lease at anytime with no penalty.  The "Commencement Date" for the Lease term shall be the date Tenant obtains a Certificate of Occupancy.

C.    BUILD-OUT:  Tenant may build-out the premises as described in Rider #2 attached hereto, and such work shall be initiated after the Certificate of Occupancy is obtained.  Landlord warrants that the HVAC system is new and all current structural, roofing, plumbing, mechanical, electrical, HVAC, fixtures, and other exterior and interior items are in proper working order, and no problems exist with exterior windows.

D.    RENTAL ABATEMENT:  Tenant shall have no liability for base rent and additional rent for the first three (3) months following the Commencement Date.

E.    OPTION:  Tenant shall have the option to renew the Lease for three (3) additional terms of five (5) years each upon the same terms and conditions contained herein, except starting rent for third option period shall be fair market rent which Landlord shall identify at least 180 days in advance, or starting rent shall be the then current rent. The option periods are exercisable by Tenant informing Landlord at least ninety (90) days prior to the expiration of the then current term.

F.    EXPANSION OPTION:  Tenant shall have the first right of refusal on any immediately adjacent floor area which may become available during the Lease term, at agreed upon rental rate and subject to the same terms and conditions of Tenant's existing Lease. Tenant shall have ten (10) days after Landlord notification to exercise the option.

G.    EXCLUSIVE USE:  Landlord shall not permit the leasing of any space whose business is in conflict with the Tenant's intended use of the premises, including multidiscipline medical health care (including sick or accident injury patients) including, but not limited to, examinations, diagnostics (including X-rays and EMG's), rehabilitation, support care, chiropractic services, physical therapy, neurology, orthopedics, medical billing, and general office use.

H.    ASSIGNMENT/SUBLET:  With no cost at Tenant's option, Tenant may assign the space with no further obligation with Landlord's consent which will be timely and will not be unreasonably withheld; or Tenant may freely sublet the space or any portion thereof and be responsible for any rental shortage or benefit from any overage. The Assignee or Lessee shall be free to operate any business not in direct conflict with any other then current business in the Shopping Center, and shall not be any of the prohibited businesses identified in Exhibit A attached hereto, without express approval of Landlord. Prior to any sublet, Tenant shall inform Landlord of the sublet tenant's business, and Landlord shall have seven (7) days to verify said sublet tenant will not be conducting any business which is in violation

SUBWAY

Use of Premises        SECTION 20. The Leased Premises shall be used by Tenant solely for the purpose of conducting therein the business of a Subway Restaurant for on and off premises consumption. Tenant shall not use the Leased Premises for any other purpose without the written consent of the Landlord.

agents procuring this Lease and shall pay said agents a commission in accordance with a separate agreement.

Exclusive        SECTION 59. Landlord shall not lease space in the shopping center to any other take out, sandwich shop that provides a similar variety of sandwiches as Tenant.

IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement under their respective seals as of the day and year first above written.

WITNESS OR ATTEST:        LANDLORD:
                          DECAR REALTY, LLC


                          By: _____
                              Marvin Neuman, Member


WITNESS:                  TENANT:
                          SUBWAY REAL ESTATE CORP.

_____      By: _____ 4-8-02
                 (SEAL)       Theodore M. Parent
                          Its: __Vice President__

OCT 09 2003 3:37AM    HP LASERJET 3200                                    p.8

_VALUE CITY_

## SECTION 20. USE AND OCCUPANCY

The demised premises during the term of this Lease shall be occupied for the operating and conducting therein of a retail furniture store. So long as not conflicting with previously granted exclusives elsewhere in the center,

15

## SECTION 51. EXCLUSIVITY

Landlord shall not lease to another retail furniture store within the shopping center, subject to existing leases prior to the execution of this Lease. Landlord represents to Tenant that no previously granted exclusive elsewhere in the center prohibits Landlord from leasing to Tenant for Tenant's intended use.



## PAPA JOHNS PIZZA

6.   __Use of the Leased Premises__.

    6.1   The Premises may be used by Tenant for the operation of a carry-out and/or delivery pizza restaurant. Landlord agrees that after the date of entry into this lease it will not enter into any lease for space in the Building (or any additional buildings hereafter constructed on the land on which the Building is located) to any person or entity that would permit the occupant of such space to operate (i) a restaurant that sells pizza, whether on a dine-in, carry-out or delivery basis, or (ii) any adult bookstore, adult theater or adult video store, or (iii) any topless or strip bar, and that it will not allow any person or entity currently leasing space in the Leased Premises to operate any such business.



*Advance Auto*

...ply for all permits, licenses, authorizations and other governmental ..."Permits") required for the Work. Landlord shall cooperate with Tenant in ...e Permits.

...t shall pay before delinquency all costs for the Work which could result in any lien encumbrance being placed on Landlord's interest in the Leased Premises or any part thereof, shall keep the title to the Leased Premises and every part thereof free and clear of any lien or encumbrance in respect to the Work, and shall indemnify and hold harmless Landlord against any claim, loss, cost, demand and legal or other expense, whether in respect of any lien or otherwise, arising out of the supply of materials, services or labor for the Work. Any such lien shall be handled in accordance with Section 27 herein.

4)    USE.

a)    Tenant may use the Leased Premises for the display, storage and sale of automotive parts, accessories, supplies and/or maintenance items or for any and all other lawful uses. Notwithstanding the foregoing, Tenant shall in no event use the Leased Premises and Landlord shall in no event use any portion of the Shopping Center for any of the following (collectively, the "Prohibited Uses"):

i)      trailer court, junk yard, waste material collection facility, or auction house;

ii)     establishments providing adult-type entertainment or displays of a variety involving or depicting nudity or lewd acts;

iii)    a massage parlor;

iv)    a funeral home;

v)     a facility for the sale of paraphernalia for use with illicit drugs;

vi)    a facility for the sale or display of pornographic (as determined by community standards for the area in which the Leased Premises is located) material;

vii)   overnight parking of campers, mobile homes, boats or tractor trailers, except for such trailers as are a part of the business operations of Tenant or other Shopping Center tenants;

viii)  any exploration, drilling or similar operation of any kind;

ix)    dance hall, bar, off-track betting business, billiard or pool hall, bingo or similar games of chance, game arcade, bowling alley, theater, skating rink, nightclub or flea market;

3

*Advance Auto*

any use which involves the raising, breeding or keeping of any animals or ~~ltry~~;

xi)   any dangerous or unsafe uses;

xii)   any industrial uses, including, without limitation, any manufacturing, smelting, rendering, brewing, refining, chemical manufacturing or processing, or other manufacturing uses;

xiii)   any mining or mineral exploration or development except by non-surface means;

xiv)   drug or alcohol rehabilitation or treatment center;

xv)   abortion clinic;

xvi)   any place of religious worship such as a church, temple, synagogue, *mosque, or the like;*

xvii)   laundromat;

xviii)   training or educational facility.  As used herein, "training or educational facility" includes, but is not limited to, a beauty school, barber college, reading room, place of instruction, or any other operation catering primarily to students or trainees rather than to customers; provided, however, the foregoing shall not apply to the existing beauty school doing business within the Shopping Center as of the Commencement Date for so long as such beauty school continues to operate as a beauty school; or

xix)   any use for which a tenant (an "Existing Tenant") has been granted an exclusive use as of the Commencement Date pursuant to any existing lease already in place within the Shopping Center as of the Commencement Date (the "Existing Lease(s)"), which Existing Exclusive Uses and Existing Leases are more fully described in the attached Exhibit "J", (the "Existing Exclusive Uses") as long as the Existing Tenant continues to operate its premises for the purpose of the Existing Exclusive Use applicable to such Existing Tenant.

b)   Tenant may operate its business at the Leased Premises under any name of its choosing or permitted by law and may set its hours and days of operation, if any, in its sole discretion. Notwithstanding anything contained herein to the contrary, (i) nothing in this Lease shall constitute an agreement of Tenant (express or implied), directly or indirectly, to open or operate a business in the Leased Premises, the rentals received hereunder constituting the entire consideration for Landlord's entering into this Lease, and (ii) Tenant may, at any time during the "Term" (as hereinafter defined), without

4



## Schedule "H"

Schedule F-1

036932.00001/11930241v.4





